HAND-DELIVERED 1-27-15

To:     Governing Board President Tracy N. Livingston
        Governing Board Secretary Johanna Haver
        Governing Board Member Doyle Burke
        Governing Board Member Alfredo Gutierrez
        Governing Board Member John B. Heep
        Governing Board Member Jean McGrath
        Governing Board Member Dana F. Saar

Maricopa County Community College District (MCCCD)
2411 W. 14th Street
Tempe, Arizona  85281-6941

From:   CLEOPATRIA MARTINEZ, PhD
        7030 NORTH 21ST STREET
        PHOENIX, ARIZONA  85020

Re:  Notice of Claim/Appeal of Grievances

Dear Board Members:

The following is my Notice of Claim against MCCCD and/or appeal of grievances to the Governing Board.

## OVERVIEW

Since the Fall of 2009 and Spring of 2010, the MCCCD administration has engaged in an intense campaign of harassment, intimidation, and retaliation against me culminating in my unprecedented suspension for 15 months without pay and benefits.  The goal of the MCCCD campaign, however, was not to suspend me but to terminate my employment after nearly 30 years of faithful and excellent service as a mathematics professor first at Scottsdale Community College and then at Phoenix College.   Why MCCCD sought my termination remains as mysterious to me today as it was five years ago.  Perhaps it occurred because of my longstanding and continuous involvement in Hispanic issues at MCCCD.

When I was informed by the Chancellor that he intended to recommend to the Governing Board that I be terminated, I appealed pursuant to RFP 3.15.3 (effective July 1, 2012).  As more fully detailed below, my appeal was heard by a three member Termination Hearing Committee which recommended that I not be discharged.  Rather than to continue with the termination process at this point, the Chancellor then decided to suspend me for 15 months without any pay and benefits for essentially the same reasons that had been rejected by the Termination Hearing Committee. In awarding me unemployment benefits, the Arizona Department of Economic Security (DES) Administrative Law Judge who heard my appeal for unemployment benefits said that a suspension for 15 months without pay and benefits is tantamount to a discharge because of its unreasonable length and terms.  More details about the DES proceeding are presented later.

The reason why the Chancellor decided to "suspend" me is obvious.  By renaming my termination a "suspension" the Chancellor has effectively denied me the right to meet in either executive session or at a public meeting with the Governing Board afforded by Residential Faculty Policies (RFP 3.13.9 Faculty Member Dismissal). I would have selected a public meeting with the Board.

RFP 3.13.9 reads as follows:
*The Governing Board will meet with the faculty member and/or his/her representative and a representative of the administration to hear arguments regarding the Chancellor's and the Hearing Committee's recommendation regarding*

*dismissal. This meeting will be in executive session unless the faculty member chooses to have this meeting in public. The parties shall have no less than one-half hour to present their respective cases. The length of the meeting shall not exceed one hour.*

I have tried to keep the Governing Board apprised of my situation by various methods, including filing two grievances—one in 2010 and the other in 2014. However, as far as I know, the Governing Board has never formally or informally considered either of them. This means that the Governing Board itself is in violation of its own Policy since RFP 6, Conflict Resolution, requires that issues of this nature go before the Governing Board unless the matter is resolved beforehand.

The use of the Conflict Resolution process was the only method readily available to me and affordable after spending thousands of dollars on an attorney in representing me on various matters. These included representing me during the termination hearing process and to appeal the Chancellor's decision to suspend me for 15 months without any pay and benefits rather than to discharge me outright as he originally sought to do. As discussed above, by suspending me for 15 months, the Chancellor constructively discharged me (i.e., a suspension of unreasonable length) without giving me the opportunity to meet with you to defend myself in Executive Session or a Public Board Meeting as required by RFP 3.13.9.

Since April 15, 2014, I have not been paid nor have I received any benefits whatsoever from MCCCD. Before my suspension, my annual gross pay and benefits approximated $130,000.00. Replacement health insurance alone costs me over $700 dollars monthly which I pay from my rapidly diminishing savings which also funds my other living expenses.

I remain hopeful that the Governing Board will still consider my 2014 grievance regarding my "suspension" even belatedly so.

## Termination Hearing Committee Nixed My Termination

The Termination Hearing Committee recommended that I not be terminated. Pursuant to RFP 3.13.7 the Termination Hearing Committee could only recommend one of two choices: 1) recommend termination and 2) not recommend termination. As related above, the Termination Hearing Committee recommended that I not be terminated.

Since before classes started in spring of 2010, I have been continuously accused of violating copyright laws and MCCCD Policy. At no time was I given the opportunity to defend myself against these ludicrous accusations until my termination hearing in February 2014. The Termination Hearing Committee concluded that MCCCD had failed to establish that I had violated any copyright law or MCCCD policy or that I violated MCCCD Cash Handling Policy. The committee recommended that I not be terminated. So for nearly five years I have suffered abuse based on allegations that MCCCD could not prove.

In April 2010 the PC President told me I could print nothing for my classes without the permission of my department chair. In December 2010 the PC President gave me a directive which eliminated all my academic freedom because it required that I not use any of my own creativity in teaching. To my knowledge, no other professor at PC has ever been treated so cavalierly. Indeed, to my knowledge, no professor in the history of the District has been treated so brusquely.

In August 2013 the Phoenix College President told me I was to be terminated due to alleged copyright violations, a cash-handling violation, and insubordination. I appealed. The Termination Hearing Committee found that MCCCD had not carried its burden of proof and recommended that I not be terminated. While the Chancellor did not "terminate" me, he suspended me from March 2014 until August 2015 without pay or benefits, the length and severity of which is unprecedented at the District.

## DES Administrative Law Judge Not Fooled

I applied for unemployment benefits on May 1, 2014. On appeal of the initial denial of benefits, the DES Administrative Law Judge (ALJ) reversed the denial and found in my favor. He affirmed all the findings of my termination committee except that of insubordination. He pointed out that I could not have been insubordinate for the reasons MCCCD asserted if I hadn't violated either copyright law or the cash handling policy. He dismissed MCCCD's contention at the DES Hearing that I had not been terminated but suspended. The ALJ stated, "*If the suspension is for an unreasonable period of time…the suspension terminates the employer-employee relationship and the worker is discharged on the date the worker was suspended and for the reason the worker was suspended.*" Furthermore, he held that "*a suspension of 16 or more of the employer's workdays is a suspension for an unreasonable period of time.*" See attached copy of ALJ Decision.

**Annotated Time Line by Semester**

**Fall 2009**

Throughout the semester the Phoenix College administration began what became five years of harassment including false and intimidating accusations and severe violations of my academic freedom.

For example, I was accused of keeping 3 computers in my office. Actually IT had not gotten around to removing 2 of those computers which they eventually did. I was accused of having LimeWire on my computer. I told the PC administration I did not know what LimeWire was, and I certainly did not install it on my computer. I was told supervision of my FWS (federal work/study student workers) was unsuitable because they sometimes worked while I was in class. However, this was the practice of all other employees with their FWS. I was accused of giving my password to my FWS. I assured the PC administration only I knew my password. But the PC administration insisted I change it, so I did. The administration lied by saying that I requested a set-aside for Hispanic students from the Federal Title V Grant PC had received. The truth is I requested that PC consider the needs of Hispanic students since Title V money goes only to Hispanic Serving Institutions. I know set-asides are illegal. I was accused of placing sensitive papers in my office trash receptacle. I told the PC administration I did not know they were in my trash and had no knowledge of how they got there.

As a result of these false accusations, the PC administration took disciplinary action: I was no longer allowed to have student workers, I could not serve on committees, etc., and President Solley notified me I could be terminated.

**Spring 2010**

During the previous semester, for teaching "College Algebra & Trigonometry" I used both the assigned textbook and my lecture notes which included problems directly from the assigned textbook. All faculty use problems from the assigned textbook as this falls squarely within the scope of the fair use doctrine of copyright law. In Spring 2010 I taught a similar course (Trigonometry) using the assigned textbook and some of the lecture notes I had used during Fall 2010. My lecture notes are my lesson plans.

In January 2010 I was accused of violating copyright laws and policies during the Fall 2009 and Spring 2010. I later deduced that the accusation came from my inclusion of problems from the textbook in my lecture notes. I asked what I could do to remedy the perceived problem and the administration sternly accused me of trying to circumvent the copyright issue. **Nevertheless, by April 2010, I had replaced all math problems in my lecture notes which I had borrowed from the textbook with math problems that I had made up. In other words, by this date the risk about which the District was complaining had been completely eliminated because the alleged offending math problems had been deleted. Moreover, the Termination Hearing Committee found that I had not used any of these lecture notes since the spring of 2010 when Phoenix College first raised its concerns. See Finding #24 and related findings in the Termination Hearing Committee's Finding of Fact, Conclusions of Law, and Recommendation.**

In May 2010, I filed an internal grievance alleging Mr. Sueyoshi, chair of the math department, violated my academic freedom. (Exhibit ?) Also, Mr. Sueyoshi failed to respond to the grievance within the RFP established timeline. President Solley imposed the restriction that Mr. Sueyoshi would monitor my copy requests. I did not grieve President Solley's restriction. However, both the Vice Chancellor for Human Resources and the Chancellor responded to my grievance as though I had grieved President Solley's restriction. Mr. Sueyoshi denied copy requests and his reasons were untruthful, irrational, inconsistent, and not based on copyright law thus violating my academic freedom. It was Mr. Sueyoshi's punitive restrictions which were the subject of my grievance. Per the RFP 6 grievance process, I requested an audience with the Governing Board to defend myself. The Governing Board has never responded as required by RFP 6.1.2.5. I was told by a Board Member that the Board was never advised of my request.

**Fall 2010**

Not only was I prohibited by the Phoenix College administration from using any of my lecture notes for any purpose, but I also was banned from using in class any outline or lesson plan I prepared. I was forced to teach from memory—without the use of any notes to guide my lectures. This was a severe infringement of my academic freedom and made teaching very difficult since I had to teach each class without the use of lesson plans to guide the lecture.

For teaching Arithmetic during Spring 2010, I used my own department-approved instructional materials instead of a published textbook. In Fall 2010, I planned to again use the same instructional materials. Several weeks into the semester the PC administration prohibited me from using these instructional materials even though I had gone through the approval process and the department had sanctioned the use of the materials. In December 2010, President Solley gave me a directive which prohibited me from using anything

I wrote. This was interpreted to mean I could not even copy the product of my lectures for students, I could not produce a single math problem for a test or for use during a lecture, I was not allowed to use a list of math formulas I selected, I could not use a "+" sign in front of the infinity symbol to symbolize positive infinity, etc. My academic freedom was trampled upon and my students were not allowed the benefits of my extensive training and experience in mathematics.

I was not allowed even to provide disabled students or students who were absent from class copies of the contemporaneous notes I routinely make during class documenting the topics covered during the class. The reason given was that I authored these notes, and the PC President's directive did not allow me to author anything I use.  Additionally, the administration refused to make copies of a test because I had added two adjectives for clarification to the author's directions of one of the questions, and the Math Dept. Chair said, "You cannot 'author' your own directions to test questions."  I had to remove the two adjectives for the administration to approve copies for my students.

**Spring 2011**

For my Math 120 (Algebra) class, I used my colleague's (Tim Bryan's) department-approved instructional materials. With permission from Tim Bryan, I changed his use of Roman numerals for chapter numbers to Arabic numbers and I separated chapters with a quote from motivational people like Mahatma Gandhi, Martin Luther King, Associate Supreme Court Justice Sonia Sotomayor, etc. The PC administration scolded me and denied these additional changes.

**Fall 2011& Spring 2012**

In September 2011, in response to my request to discuss dissolution of  PC President Solley's restricting directive of December 2010, President Solley presented an "Agreement" which stipulated that I had violated copyright, I was insubordinate, and that I was evasive. Additionally, it stated that I agreed to waive for all time my rights and protections regarding copyright afforded to faculty members at MCCCD, that I would not sue, grieve, or otherwise act to invalidate the agreement, finally that I waived all personal claims and causes of action of any kind in connection with the agreement or the facts alleged in complaints I had filed. I chose not to sign the Agreement.

For all my courses, I taught using a textbook but was not allowed to use any lecture notes to guide my lectures. The harassment continued with petty, mean-spirited accusations from the administration. For instance, the administration did not allow me to make copies of a test of math formulas represented with the variable "u" until I changed the variable to the letter "x". Additionally, a final exam was held up because I had prepared a graph using the MCCCD software on my computer which produced a graph which was mathematically identical to the graph in the textbook except that the background color was different. The administration required that the graphs be absolutely identical. No other faculty member has been subjected to this unrealistic and bizarre standard. As a result I was forced to show the textbook's graph (which was identical to mine except that the textbook had a black grid and the District's software produced a blue grid) on the overhead projector.

**Fall 2012**

In August I told my class I would be using my colleague's approved instructional material as their textbook. The PC administration said that if the students wanted a copy of this material, they would have to make the copies and pay for it themselves.  The students asked me to make the copies, and they would reimburse me the cost of copying. I made the copies at Staples and the students reimbursed me. The PC administration ordered me to give the students the money they had reimbursed me. I responded that I would then want the copied materials returned to me. The PC administration said I was to assume the cost of copying myself. I did not return the money to the students because I felt it was an unreasonable request since it was beyond the scope of my responsibilities, it was not among my job duties, and the administration had originally stated that the students were to pay for their own copies.

**Spring 2013**

In late spring 2013, I received a call from Sherrie Klein at District HR to schedule a meeting with me.  She was reluctant to give me any information but after a series of inquiries, she informed me the meeting was to "provide you with information that benefits faculty." Not understanding the stated purpose of the meeting, I asked who would be in attendance at that meeting. Again, only after I made numerous inquiries, did she divulge that there would be four high-ranking administrators and myself at this meeting. I asked if I could bring a representative. She said I could.

It soon became evident that the purpose of the meeting had been mischaracterized.  It was in fact a disciplinary meeting. They accused me of continuing to violate copyright laws, of violating the cash-handling policy, and of insubordination. Although on short notice, I

was glad to finally be afforded the opportunity to defend myself against the administration's perplexing, disturbing, and oftentimes inconsistent allegations. We did not finish the meeting, so it would be continued.

A few weeks later I received notice that the meeting would reconvene during final exam week. My representative asked that we meet after finals because she was unwilling to miss classes during this very important week. I was told we could not meet after finals because it was beyond our contract time. I assured the administration that both my representative and I were willing to come in outside of our contract time. I was told to get someone else if my representative couldn't come. I reiterated that no faculty would be willing to be absent from final exams. I was told to attend this meeting or be considered insubordinate.

I met at the District with the Phoenix College President, Vice President, and two administrators from Human Resources. When I repeatedly asked for documentation of alleged continued violation of copyright laws and policies, the President refused to show me a single page of evidence of alleged continued copyright violations. She insisted I had them among the emails I had received from 2009 to the present, but I explained I did not know to which of the thousands of emails I had received she was referring. I asked for these documents in order to determine the factual basis of the accusations made against me, so I could respond precisely. For nearly three years, I had been asking for evidence supporting these allegations so I could cogently respond to them. I had not been given the opportunity in the past and it was again denied to me at this meeting. The President ended the meeting abruptly and told me I would be terminated on the first day of Fall 2013.

**Fall 2013**

In August 2013, I received a letter of termination of employment and was given administrative leave with pay until my termination. I appealed in accordance with the Residential Faculty Policies (RFP). A three-member committee of faculty heard the evidence at a Termination Hearing. In December they submitted their recommendation not to terminate my employment because Maricopa County Community College District (MCCCD) had failed to show that 1) there had been a copyright violation and that 2) there had been a violation of the cash-handling policy. The Faculty Termination Committee did find that I had not done what the administration had ordered me to do—i.e., return money to students who had reimbursed me for making instructional copies for them. I never disputed the facts about cash handling other than to assert that my actions were not insubordinate. My lawyer submitted correspondence to the Governing Board requesting a hearing on the suspension alleging it was tantamount to termination. The Governing Board did not respond.

**Spring 2014**

In a meeting on March 6, 2014, the acting Vice Chancellor for Human Resources told me the Chancellor was not terminating me but had suspended me without pay, without medical insurance, completely severed my association with MCCCD as of March 1, 2014, until August 2015 (i.e., for more than a year) due to insubordination. I was not allowed to have any hearing or to provide a defense. In April 2014, the Chancellor revised the suspension without pay date to be effective April 15, 2014 until August 2015.

**Summer/Fall 2014**

May 1, 2014, I applied for unemployment benefits. The Department of Economic Security (DES) Unemployment Insurance Administration determined I was disqualified because the MCCCD administration had given the following reasons:

*"Voluntarily Left Employment, A.R.S. 23-775.1, Leaving in Anticipation of Discharge, A.A.C. R6-3-50135.C (You left your job because you believed you were to be discharged. You did not determine prior to quitting whether your employer was actually going to discharge you. You voluntarily left work without good cause in connection with your employment."*

Furthermore, the PC administration said I was suspended for gross insubordination. (See Decision of Appeal Tribunal). On appeal, the Appeal Tribunal found in my favor. The DES Administrative Law Judge wrote:

1) I "was discharged from employment but not for willful or negligent misconduct,"

2) I "was placed on suspension for insubordination arising out of a dispute over copyright and cash handling issues. The employer's internal investigation and fact-finding did not find sufficient evidence to discharge the claimant.... Because the employer did not find a violation of the cash-handling policies, the order/instruction to return the money to the students was not reasonable. **The claimant was not insubordinate for refusing ....The claimant did not sell the documents or otherwise make a profit.**" (See Decision of Appeal Tribunal). [emphasis added]

3) My suspension was "for an unreasonable period of time." Therefore, "the suspension terminates the employer-employee relationship and the worker is discharged on the date the worker was suspended and for the reason the worker was suspended." (See Decision of Appeal Tribunal).

## Claims

My specific claims for relief are as follows.

MCCCD has violated my employment contract as spelled out in the RFP, other policies, rules, regulations, and practice. As detailed above, the MCCCD followed the terms of the contract only when it benefited itself while holding me to strict compliance. I was neither timely apprised of the information against me nor was I ever given the opportunity to rebut the accusations for over three years until the Termination Hearing Committee convened to hear my appeal in the fall semester of 2010.

I have submitted two grievances which were never processed to the Governing Board as required by the RFP. The more recent grievance was filed on August 14, 2014.

The District deliberately failed to process to conclusion the termination process and in so doing I was denied my contractual right to appear before the Board to defend myself against these absurd accusations in executive session or in a public meeting. Worse still, the District without any legal basis switched horses in mid-stream by converting the termination process into a summary suspension process leading to an exceedingly long "suspension" from which there was no appeal to the Board.

With respect to the 2014 suspension without pay, it was implemented **before** I was notified that I was suspended. The RFP calls for notification before an adverse employment action is taken. There are no guidelines or process outlined for the Chancellor to follow in determining what employee actions should result in suspension and the length of such suspensions nor is there a guide for determining when the employee should be suspended with or without pay.

There are other claims for relief I am investigating among which are: retaliation under Title VII, defamation, intentional infliction of emotional distress. As evidence supporting these claims becomes available I will amend this Notice of Claim/appeal of grievances.

## Damages and Settlement

At this point I estimate my yearly gross income and monetized benefits to approximate $130,000.00 or $10,800 per month. Additionally, there are other perks which I lost. These perks include approximately $8,000 in travel funds for faculty for two years, $20,000 lost opportunities to receive grants for projects both in the two summers and the two calendar years, $4,000 in lost tuition covered for faculty and family for two years, legal fees and costs at this point are in the neighborhood of $60,000.00. Assuming I serve the 15 months suspension, my damages amount to $254,500.00. Furthermore, I had to activate my social security benefits before they reached their maximum resulting in a loss of income. I have been subjected to intentional infliction of emotional distress since fall semester of 2009.

At this point I am willing to settle all my claims against the District for the monetary damages spelled out above. Additionally, I require that I be given a letter of apology from the District which will be posted where HR postings are normally made within the District and that it be emailed to every student, faculty, and employee of the District and that my employment records and any other records containing information about the matters dealt with herein be sanitized. Please note that the amount of back pay depends on when I am reinstated.

Sincerely,

*Cleopatria Martinez*

Cleopatria Martinez, PhD

Attachment: Decision of Appeal Tribunal (i.e., Decision of the Administrative Law Judge (ALJ)