UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Cleopatria Martinez, | ) | |
| | ) | |
| Plaintiff, | ) | CV-15-1759-PHX-NVW |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 15, 2016 |
| Maricopa County Community | ) | 1:37 p.m. |
| College District, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
|_____| ) | |


BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

RULE 16 SCHEDULING CONFERENCE


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          <u>A P P E A R A N C E S</u>

2      For the Plaintiff:

3                  Schleier Law Offices
                   By: TOD F. SCHLEIER, ESQ.
4                  3101 North Central Avenue, Suite 1090
                   Phoenix, AZ  85012
5
                   Law Offices of Kevin Koelbel
6                  By: KEVIN KOELBEL, ESQ.
                   7303 West Boston Street
7                  Chandler, AZ  85226

8      For the Defendants:

9                  Fisher & Phillips
                   By: PAVNEET SINGH UPPAL, ESQ.
10                 201 East Washington Street, Suite 1450
                   Phoenix, AZ  85004
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  This is civil case 2015-1759, Cleopatria

2  Martinez versus Maricopa County Community College District,

3  et al.  This is the time set for a scheduling conference.

4  Counsel, please announce for the record.

5          MR. SCHLEIER:  Good afternoon, Your Honor.  Tod

6  Schleier and Kevin Koelbel for the plaintiff.

7          MR. UPPAL:  Your Honor, good afternoon.  Pavneet Singh

8  Uppal of Fisher & Phillips on behalf of MCCD.

9          THE COURT:  All right.  Good afternoon, counsel.

10          Mr. Uppal, I haven't seen you in a long time.

11          MR. UPPAL:  Yes, Your Honor.

12          THE COURT:  I assume you're still making trouble,

13  right?

14          MR. UPPAL:  Not too much, Your Honor.

15          THE COURT:  But that's what Mr. Schleier does.  I

16  would expect no less from you.  So it's good to see you.

17          All right.  The initial disclosures have been done,

18  and no one contemplates any amended pleadings or additional

19  parties, correct?

20          MR. SCHLEIER:  That's correct, Your Honor.

21          MR. UPPAL:  Yes, Your Honor.

22          THE COURT:  So I'll just set February 12 as the

23  deadline for any motions to amend pleadings.  And as you know,

24  under Rule 15, if circumstances justify, you can always file a

25  motion.  But you'll have to meet the increasing burdens showing

1      that it was timely and not prejudicial in an unfair way.

2              Mr. Schleier, are there any state law claims?

3              MR. SCHLEIER:  No, Your Honor.  Just the federal 1983

4      claims.

5              THE COURT:  I'm just not familiar with the community

6      college district employment system.  Do they have any state

7      tenure rights or discipline rights that would give rise to any

8      judicial review?

9              MR. SCHLEIER:  The plaintiff was a tenure -- or was

10     and is a tenured mathematics professor and has been, I believe,

11     since 1985.

12             THE COURT:  So there's no challenge that under state

13     law, this action would have been within the authority -- is

14     it the chancellor who does this?

15             MR. SCHLEIER:  That's correct.

16             THE COURT:  All right.  All right.  Let's talk -- I

17     see the plaintiff has submitted -- you've submitted your

18     written discovery requests.  And I assume all of those

19     documents will be exchanged very quickly.  Let's talk about

20     what other discovery is contemplated.  So Mr. Schleier.

21             MR. SCHLEIER:  Yes.  We expect of course that the

22     parties will be deposed.  We anticipate that certain members

23     within the mathematics department will also be deposed

24     concerning the reinstitution of the directive that was issued

25     in 2010.  And we have, I believe, two experts who previously

1    testified at the hearing.  And subpoenas have been issued to

2    them for their files.  And I anticipate they'll be --

3              THE COURT:  Let me go back to that prior litigation.

4    How would that prior litigation bear on this case?

5              MR. SCHLEIER:  Well, I wouldn't use the word the

6    litigation.  There was a Hearing Committee --

7              THE COURT:  Oh, I thought there was --

8              MR. SCHLEIER:  No.  I don't believe the prior

9    litigation has anything to do with this.  And ultimately at the

10   appropriate time we'll file appropriate motions on that.

11             THE COURT:  Well, the Hearing Committee issued written

12   conclusions, correct?

13             MR. SCHLEIER:  Findings of fact and conclusions of

14   law.

15             THE COURT:  Was there any other record made of their

16   proceedings?

17             MR. SCHLEIER:  Other than that and the trans -- the

18   underlying transcript.

19             THE COURT:  That's what I'm asking.  Was there a

20   transcript?

21             MR. SCHLEIER:  Yes.  There's about 300 pages.

22             THE COURT:  So the entire record of what was before

23   the Committee would be available, correct?

24             MR. SCHLEIER:  It is.

25             THE COURT:  Now, let's -- let me explore in more

1    detail the depositions you have in mind.  Obviously -- Who

2    would you want to depose from the defendant?

3         MR. SCHLEIER:  I need to go back to my complaint, Your

4    Honor, but certainly the --

5         THE COURT:  And the reason I'm asking these questions,

6    I want to have a sense of -- that we have an appropriate

7    magnitude of discovery and from that judge how much time it

8    should fairly take.

9         MR. SCHLEIER:  Well, certainly the chancellor.  It is

10   conceivable that a member or two of the Committee who made

11   their findings might be deposed, and I underscore might.

12   President Solley who originally issued the directive may be

13   deposed.

14        THE COURT:  Which directive?

15        MR. SCHLEIER:  The directive back in 2010 dealing with

16   the copying and what Professor Martinez could and could not do

17   as far as copying, use of materials.

18        THE COURT:  Is there any dispute about what that

19   directive was?

20        MR. SCHLEIER:  No, no.

21        THE COURT:  I'm not trying to quarrel with you.  I'm

22   just trying to understand why do you need to depose anybody

23   about that if there's no dispute about what the directive was?

24        MR. SCHLEIER:  Well, there may not be, but it's now in

25   force and effect at this time.  And we would probably want to

1    find the factual basis upon which that directive was issued.

2    In other words, with whom did she consult, et cetera?  And we

3    may find that out from the expert when we get his file.

4            THE COURT:  That sounds like information that would be

5    very efficiently obtained through interrogatories.  You might

6    still want to follow up, but if it's just finding out basics,

7    there's much cheaper ways to do it than depositions.  I'm just

8    thinking off the top of my head.  So who else?

9            MR. SCHLEIER:  I am looking for -- Could I consult

10   with --

11           THE COURT:  Certainly.

12           MR. SCHLEIER:  We'll want to depose the interim

13   president who reissued the directive in August, 2015.

14           THE COURT:  That was after these events?

15           MR. SCHLEIER:  Yes, after the suspension and once

16   Professor Martinez began the fall semester last year.

17           THE COURT:  What would you be looking to obtain from

18   the --

19           MR. SCHLEIER:  Just the reasons at this point, after

20   the Hearing Committee had determined that the district had not

21   satisfied its burden of proof of violation of copyright laws,

22   why, again, was this directive then issued, issues like that.

23           THE COURT:  Well, again, just reading the case report,

24   it appears that Ms. Martinez was given an express directive,

25   and then she continued to by doing offsite copying, doing

1    exactly what she had been told explicitly not to do.  I'm

2    wondering how it would matter whether, in terms of ultimate

3    metaphysical truth, whether it was a copyright violation or not

4    if in fact she had been told explicitly not to do it because

5    the district had advice of counsel that it was a serious risk.

6           How would it matter what the truth is?  Not truth.  I

7    don't mean truth.  I mean the ultimate legal correctness of the

8    fear of copyright violation.  If she had been -- Seems like

9    there's no issue of fairness or warning.  She got all that.

10   And she continued to do it.

11          So I'm just -- I'm very cautious about what I read in

12   these reports.  I don't assume anything to be true.  But I'm

13   just trying to think through what, you know, what's appropriate

14   discovery.

15          MR. SCHLEIER:  I mean, to summarize, I think from the

16   plaintiff, there may be six, possibly eight depositions.  I

17   think certainly I would anticipate we would not exceed the ten

18   deposition limit.  That's my thought.

19          THE COURT:  As you know, under the rules, I am charged

20   with managing discovery to keep it proportionate to the

21   dispute.  And so there's no right to ten depositions.  I just,

22   by having this discussion, I just want to flesh out what's

23   appropriate.  And so -- all right -- eight to ten, but it's --

24   What I'm hearing is that's not really focused yet.  Those are

25   just some initial thoughts.

1          So, Mr. Uppal, what do you have in mind for discovery,

2    appropriate discovery?

3          MR. UPPAL:  Your Honor, I think I know where you're

4    going with this, and of course Mr. Schleier and Mr. Koelbel and

5    I are all aware that the scope of discovery has to be

6    proportionate to the dispute.  But this is my second time at

7    the rodeo with Professor Martinez.  The prior litigation is not

8    really only the committee hearing but her prior suit in 2011.

9          And I remember being in front of Judge Campbell in the

10   prior suit which he dismissed with prejudice, and I find myself

11   repeating the same thing; that in terms of proportionality,

12   from my perspective as MCCD's counsel, the dispute is not just

13   the employment issue that's before you right now.  The dispute

14   is that this individual has, according to our outside copyright

15   expert, engaged in copyright violations.  And she is under

16   restrictions currently that she is chafing under that she wants

17   lifted.

18         We have no trust in her that she will in fact comply

19   with the copyright rules as they exist, as they apply to all

20   entities, and we have been advised by our counsel -- the

21   privilege on this is waived in terms of advice of counsel, the

22   copyright counsel -- that the things that she is doing could

23   expose, or has done in the past, could expose the district to

24   monetary liability for copyright infringement that far exceeds

25   anything in the employment realm.

1          So that's my perspective, that what's at issue here is

2     not just the employment issue, but we cannot tolerate, unless

3     she wins in court and is reduced to a judgment, a situation

4     that would allow her to return to continue doing the things

5     that she was doing before, putting the district at risk for a

6     copyright infringement judgment against it.

7          THE COURT:  Well, I thought from the case management

8     report, this was just a money damage case for the past

9     suspension.  Is there more to it than that?

10          MR. SCHLEIER:  Well, only to the extent that the

11    ultimate finding by the Hearing Committee, whether that will be

12    entitled to collateral estoppel effect.  The Committee did

13    determine that the district did not satisfy or meet its burden

14    of proof of copyright violations after hearing both experts in

15    that case.

16          MR. UPPAL:  But that was --

17          THE COURT:  How would that be collateral estoppel?

18    That's just a committee within the district.  That's not

19    anywhere close to normal notions of collateral estoppel, which

20    happen to be from a court adjudication, and sometimes it can

21    arise from an administrative adjudication where there's

22    sufficient legal basis to give that decision some degree of

23    finality, although that's an exception, not the rule.  This is

24    just a committee in the district.

25          MR. SCHLEIER:  Yes.  But at least based upon some of

1   the legal research that I have done, both parties were given

2   the opportunity to cross-examine.  They were represented by

3   counsel.  There was no appeal of this that was possible.  And I

4   believe under at least some Ninth Circuit law that I have read,

5   that can be given collateral estoppel effect.

6           MR. UPPAL:  Your Honor, if I may speak to that?

7           THE COURT:  You may.

8           MR. UPPAL:  There is a collateral estoppel issue, just

9   not the one that my opposing counsel is outlining.

10          The Hearing Committee is not collateral estoppel at

11  all -- of course we'll brief all this -- because the

12  standard -- the burden of proof is flipped on that.  There is a

13  collateral estoppel issue in that the issue of Ms. Martinez's

14  copyright infringement were front and center in her prior

15  federal court case.  It was fully briefed.

16          THE COURT:  I thought -- I'm sorry.  I didn't go back

17  and reread your complaint, but I read the case report.  And I

18  did not understand that from the case report.  I thought the

19  case -- The case report refers to prior litigation.  But I

20  didn't have any understanding that it had to do with these

21  copyright issues.  Tell me what it did.

22          MR. UPPAL:  There was a prior case that was filed by

23  Ms. Martinez in which she also alleged due process claims as

24  well as discrimination claims.  And one of the defenses that

25  was front and center presented by myself, because I was the

1   defense counsel, MCCD explained to the Court in her prior

2   federal litigation that the disciplinary measures that had been

3   imposed were as a direct result of her copyright infringement.

4   And an expert report was submitted and exchanged as a part of

5   that prior litigation.  When I say litigation, I'm not talking

6   about the hearing.  I'm talking about a federal court case.

7           THE COURT:  That was Judge Bolton?

8           MR. UPPAL:  I thought it was Judge Campbell, but I may

9   be mistaken.

10          MR. SCHLEIER:  It was Judge Campbell, I believe.

11          THE COURT:  All right.

12          MR. UPPAL:  So, Your Honor, the end result of that is

13  after that issue being raised and focused and presented to the

14  Court and an expert report being exchanged where the plaintiff

15  did not submit a counter-report, she dismissed her case with

16  prejudice.  Since that issue was raised before Judge Campbell

17  not as a collateral issue, as the core defense, the collateral

18  estoppel is she can't raise it again.  She can't contest it, at

19  least in my view.

20          And as I think Your Honor is seeing now, this is going

21  to be a somewhat more complicated case than just appears on the

22  face of the pleadings.

23          THE COURT:  So she dismissed it with prejudice?

24          MR. UPPAL:  Yes, Your Honor.

25          So at some point -- we're not deep enough into this --

1  we will be, I anticipate, presenting a motion to the Court that

2  with respect to the issue of actions that she may have engaged

3  in with respect to copyright infringement, no matter what the

4  Hearing Committee found, because that Committee has a different

5  standard of proof, the fact that this was a core defense in the

6  first litigation and she dismissed it without prejudice, she

7  can't now contest it again before you.

8        Also, Your Honor's absolutely right.  Irrespective of

9  collateral estoppel, we don't actually have to prove copyright

10 infringement in fact.  What's at stake is the motivation.  And

11 we have advice of counsel, again, on a defense that we've put

12 forward and waived the privilege on where the attorney has

13 advised the district that what she has done in the past poses

14 copyright infringement claims and subjects the district to very

15 substantial potential liability.

16       That's the whole ball of wax essentially.  That's why

17 she has been subjected in large parts to the disciplinary

18 measures that she is chafing under and contesting in this

19 lawsuit.

20       THE COURT:  You know, I also want to -- I don't think

21 it's raised, but it says that she was requiring students to buy

22 materials from her.  And, boy, I'm not familiar with that.  Is

23 that an issue at all or --

24       MR. UPPAL:  Your Honor, it is an issue in that there

25 is a rule at MCCD, a published policy that says that

UNITED STATES DISTRICT COURT

1    instructors cannot, without prior written approval, sell

2    materials to their students.  And the reason -- rationale for

3    the rule is essentially that students may feel compelled to buy

4    a particular instructor's textbook from which they are, you

5    know, getting monetary remuneration, and that's just not

6    permitted without written approval.

7              A, she violated the rule, but, B, she was instructed

8    to issue refunds to everyone whom she sold those materials to,

9    and years later she still hasn't done it.  And as a result the

10   Hearing Committee that attorney Schleier keeps referring to

11   found that she had in fact committed willful insubordination.

12             THE COURT:  So, Mr. Schleier, what -- I don't have the

13   Committee's report, but what was their basis, stated basis for

14   exonerating Ms. Martinez?  That the district hadn't proven a

15   case of --

16             MR. SCHLEIER:  Had not met its burden of proof nor

17   that she had violated the rules dealing with cash handling.

18   And I believe there were two additional findings.  And, yes,

19   they did find that she was insubordinate by ignoring a

20   directive concerning the reimbursement of students for copying

21   charges.

22             I think it was $11 --

23             THE COURT:  What was the finding with respect to

24   copyright violation?  What did they find?

25             MR. SCHLEIER:  That the district had not satisfied its

1    burden of proof concerning copyright violations.

2            THE COURT:  Proof of what?  Proof of what?

3            MR. SCHLEIER:  That in fact that she did, and it did

4    not --

5            THE COURT:  That it was a copyright violation?

6            MR. SCHLEIER:  That they did not meet their burden of

7    proof that she had violated the copyright laws or Fair Use

8    Doctrine.

9            THE COURT:  So it's grounded in an ultimate judgment

10   about copyright law?

11           MR. SCHLEIER:  Yes, it was, after hearing the two

12   experts.

13           THE COURT:  And that was their reason for exonerating

14   her?

15           MR. SCHLEIER:  That was the reason why they made their

16   determination she should not be terminated, which was

17   Chancellor Glasper's recommendation.

18           THE COURT:  Was there -- Again, I'm talking about the

19   Committee's stated findings and recommendations.  Was there any

20   other basis for exonerating her other than their conclusion

21   that this was not a copyright violation?

22           MR. SCHLEIER:  Nor did she violate cash handling

23   regulations of the district.

24           THE COURT:  What was the issue there?  I thought this

25   was allegedly inappropriately requiring students to buy

| | |
|---|---|
| 1 | materials from her.  That doesn't sound like cash handling to |
| 2 | me. |
| 3 | MR. SCHLEIER:  No.  It was basically reimbursing her |
| 4 | for copying charges for lecture notes that she had distributed. |
| 5 | That's what it was.  We're not -- |
| 6 | THE COURT:  The students were required to reimburse |
| 7 | her -- |
| 8 | MR. SCHLEIER:  For copying charges. |
| 9 | THE COURT:  Well, I guess that will depend on what |
| 10 | that regulation, how it reads, and I don't have that. |
| 11 | MR. SCHLEIER:  And -- |
| 12 | THE COURT:  Go ahead. |
| 13 | MR. SCHLEIER:  We're focusing so much on this |
| 14 | copyright issue, but the true thrust of what we're arguing is |
| 15 | denial of due process here when Professor Martinez was |
| 16 | suspended for 15 months, which basically, at least in my 40 |
| 17 | years of practicing, that's virtually unheard of.  And under |
| 18 | Ninth Circuit law it's basically the same thing as a |
| 19 | termination. |
| 20 | THE COURT:  But I'm understanding the issue to be a |
| 21 | process issue, a procedure issue. |
| 22 | MR. SCHLEIER:  That's correct. |
| 23 | THE COURT:  And what was the fatal defect in the |
| 24 | procedure that was followed? |
| 25 | MR. SCHLEIER:  That the Committee basically did not |

1    recommend termination, that Committee findings should have been

2    given to the Governing Board for final review.  Chancellor

3    Glasper decided he was not going to do that, and he then

4    decided to suspend -- He issued new charges, which were

5    basically almost identical to the old charges that were heard

6    by the Hearing Committee.  And then he basically suspended her

7    for 15 months.  And she did not get a pre- or a post-suspension

8    hearing, which the Ninth Circuit has said is required.

9              THE COURT:  I'm sorry.  I didn't -- It was a new

10   charge as opposed to going forward on the original charge?

11             MR. SCHLEIER:  After the Hearing Committee in

12   February, I believe it was, of 2014, Chancellor Glasper issued

13   new charges, which were basically identical --

14             THE COURT:  Were the old charges terminated?

15             MR. SCHLEIER:  Well, the Hearing Committee heard them

16   and made a decision on those old charges.  And basically the

17   recommendation of Chancellor Glasper was termination, and the

18   Committee said no.

19             THE COURT:  I know.  But that recommendation of the

20   Committee, that's not the end of the procedure, is it?

21             MR. SCHLEIER:  Well, Chancellor Glasper was supposed

22   to give that -- the findings of fact and conclusions of law to

23   the Governing Board for ultimate review.  He did not --

24             THE COURT:  That's the Board, the District Board?

25             MR. SCHLEIER:  The District Board, yes.  And

1   ultimately decided to suspend her for 15 months.

2           THE COURT:  I'm trying to get clear was there two

3   separate sets of charges one after another, or was there one

4   set of charges that continued through process?

5           MR. UPPAL:  If I might attempt, Your Honor?

6           THE COURT:  You may.

7           MR. UPPAL:  So initially the set of charges were

8   seeking the professor's termination.  The Hearing Committee

9   came back with a recommendation against termination.  The

10  chancellor has the option to adopt that recommendation or

11  substitute his own.

12          What the chancellor did was upon receiving the Hearing

13  Committee's recommendation against termination, he accepted

14  that and instead recommended her suspension.

15          On that, contrary to Mr. Schleier's characterization,

16  there was a pre-termination hearing with the vice chancellor of

17  human resources.  And in fact the professor and her attorney,

18  her previous attorney, Stephen Montoya, presented her full case

19  to the entire Governing Board contesting the suspension.

20          So what this case is really about is the plaintiff's

21  attempt to elevate form over substance.  They got all the

22  process that was due, both pre-suspension and post-suspension.

23  Their argument really boils down to a suspension for 14 months

24  is the same thing as a termination, so the entire hearing

25  process, including the Hearing Committee, should have been

1    reconstituted now to consider the suspension.

2          A, the internal due process rules don't require that,

3    and, two, Supreme Court precedent doesn't require that.

4          Due process in this, both procedural and substantive,

5    is informal.  Supreme Court has repeatedly said that.

6          And she got a hearing on the suspension with the vice

7    chancellor, and she got to plead her entire case before the

8    Governing Board.  And her attorney Stephen Montoya, as opposing

9    counsel well knows, sent all the charges, all the

10   recommendations, and everything to the Governing Board.  She

11   just couldn't win her case before the Governing Board.  That's

12   her main complaint.

13         THE COURT:  Well, no one ever accuses Mr. Montoya of

14   being less than diligent.

15         So, Mr. Schleier, I'm asking a question, not making an

16   assertion.  But it seems like if the chancellor had taken the

17   original recommendation, say, I think otherwise, and I'm going

18   to terminate her, it doesn't seem like there would be any due

19   process violation there.  She got her process, got a

20   recommendation one way.  The decision maker went the other way.

21         They could have done that, couldn't they?

22         In terms of federal due process --

23         MR. SCHLEIER:  It would have had to have gone to the

24   Governing Board.  That would have been the last step in the

25   process.

1          THE COURT:  Is that right, Mr. Uppal?

2          MR. UPPAL:  If the -- Yes.  If the chancellor had

3    taken the position that termination, permanent separation, was

4    in fact what was called for, then he would have presented

5    that -- his own recommendation of termination as well as the

6    Hearing Committee's conclusions and findings of fact to the

7    Governing Board.  But what I'm saying to Your Honor is that

8    happened anyway.

9          THE COURT:  Well, what are -- what's the criteria for

10   what matters have to be approved by the Board and what matters

11   can be determined with finality by the chancellor?  And I

12   would -- I think I'm hearing you say that termination requires

13   Board approval.  Does everything require Board approval?

14         MR. UPPAL:  No.  No.  A suspension does not require

15   the approval of the Board, but in this case the suspension was

16   approved by the Board.

17         THE COURT:  All right.

18         MR. UPPAL:  Because this exact argument that they're

19   making here Mr. Montoya made in open session to the Governing

20   Board saying, hey, this 14-month suspension is the same as a

21   termination, you can't do this, or she's not -- you know, the

22   circumstances don't warrant it.  The Governing Board just

23   didn't buy the argument.

24         THE COURT:  All right.  I'm having this extended

25   discussion because I'm trying to get a handle on what's

1    appropriate discovery.

2            Frankly, this looks like a case that could be reduced

3    to a stipulated statement of facts.  It doesn't seem like

4    there's any dispute about what actually happened.  Have you all

5    thought about that?

6            MR. SCHLEIER:  We have not discussed that.

7            THE COURT:  Let me throw it out.  You can take eight

8    depositions or you can sit down across the table and talk and

9    find out what's really in dispute.  And it would seem,

10   Mr. Uppal, you can -- you've already given them all the

11   records, correct, or you're going to?

12           MR. UPPAL:  Yes, Your Honor.

13           THE COURT:  Okay.  So most of this is going to be

14   readily ascertainable from the record.  I'm just suggesting to

15   you I'm not going to set any limits right now.  I'm not

16   disposed to it.  But I'm suggesting to you that you all come at

17   it that way because it looks like most of the dispute here is

18   going to be legal points, not about what happened.

19           So, anyway, I was asking you, Mr. Uppal, what's your

20   view on discovery?

21           MR. UPPAL:  Your Honor, I will not be taking nearly as

22   many depositions or I should say will not be initiating nearly

23   as many depositions as plaintiff's counsel, but I have before

24   me their initial disclosure that lists 43 witnesses and 5,600

25   documents.  This is not a criticism.  It's initial disclosure.

1    I realize some of these are going to go by the wayside.  But

2    having been through this drill previously and knowing how

3    strong the feelings are on both sides, I did talk with my

4    colleague, Mr. Schleier, known him for many years, get along

5    with him really well, and because of what's at stake, from my

6    standpoint, as I previously explained, I would ask Your Honor

7    to approve something close to the one-year discovery cutoff

8    that we have requested, because I understand your point that

9    there are -- that the legal issues may predominate or the

10   factual issues.  But I've been down this road with this

11   plaintiff before, and I see what's coming in terms of

12   experts --

13           THE COURT:  What's coming?

14           MR. UPPAL:  Your Honor, I think every single point on

15   this case, if it tracks the previous case, which I think will

16   be in fact what happens, is going to be disputed.  I think that

17   the legal issues will be informed by the facts.  And I do see

18   the other side taking the amount of depositions that they have

19   outlined.

20           THE COURT:  All right.  Now, with respect to experts,

21   you want to put on a copyright case?  Is that what you want the

22   experts for?

23           MR. SCHLEIER:  It may be possible, yes.  And that's

24   why they have been identified and we put in the expert

25   disclosure deadlines.

1          THE COURT:  Is there any other expert testimony

2    contemplated?

3          MR. SCHLEIER:  I don't believe so.  I don't believe we

4    need an economic expert because the damages on the suspension

5    are basically liquidated.

6          THE COURT:  I would think so.

7          MR. SCHLEIER:  Yeah.  It's 15 months approximately.

8          THE COURT:  Well, let me throw this out.  Just reading

9    this report and now having a better understanding, I want to

10   raise the question of whether there's any room here for

11   testimony about copyright law, first of all.  It's a point of

12   law.  For better or worse, you're charged with what I think.

13   We don't bring in expert witnesses to tell us what the law is.

14          And, secondly, perhaps more importantly, it's not at

15   all clear to me that it matters what the answer is to the

16   copyright issue.  And if the advice of counsel is that there's

17   a serious risk here and the district had a policy and a clear

18   directive, it doesn't seem to me to matter whether -- how one

19   would resolve the question of copyright law.

20          So if that's the case, it would seem that a lot of

21   expense could be avoided.  It wouldn't seem to make sense to

22   spend all the time to work up experts and take their

23   depositions if in the end it doesn't matter which expert it is,

24   as I said, right, in terms of ultimate metaphysical truth.

25          So that's looking like one area that merits close

1   scrutiny as to whether it's worth the substantial expense that

2   would be involved.

3           MR. UPPAL:  Your Honor, I completely agree with that.

4   I just want to explain why I'm going to have an expert.  If

5   this case survives summary judgment, if, I want the jury to

6   understand why these disciplinary measures, which in a vacuum

7   may seem harsh or the plaintiff will argue were unjustified or

8   shouldn't continue -- they filed a dec action after all -- were

9   not harsh, were entirely appropriate, and need to continue.

10          And the only way I can really do that is by presenting

11  the testimony regarding the advice of counsel that we received

12  as to which we've alleged an affirmative defense and waived the

13  privilege.  That's -- That's why I'm presenting it.  I agree

14  that at the end of the day, whether in point of fact she has

15  committed copyright infringement is not the issue.

16          THE COURT:  Well, all right.  I think I'm not going to

17  right at this time limit you on this.  I urge you to sit down

18  and see if you can focus your real areas of dispute, you know,

19  right now.  I'm skeptical that it would ever be submitted to

20  the jury.  You may get an instruction from me.  But on the

21  other hand I can understand why both sides don't want to be --

22  find themselves in a situation where they might need that

23  testimony if they don't have it.

24          And I guess if, Mr. Uppal, if what you're saying is

25  you wanted to present this to show that there was a reasonable

1    good faith basis for the opinion of caution that came from your

2    counsel, perhaps.  And I'm not prejudging this, but I tell you

3    having a trial on that would look like a big distraction to the

4    jury from what really matters.  This is our first discussion,

5    so nobody has to get worried about anything I'm saying.  But

6    it's looking like that would be something that would have to

7    be looked at closely, whether that would be a basic Rule 403

8    issue, whether its probative value justifies -- whether it has

9    any -- much or any probative value at all.

10             I suppose if we're going to have a trial that's going

11   to leave it to the jury, I can see why both of you would want

12   to have somebody lined up.

13             I'm just preliminarily skeptical that the trial would

14   ever get to that, but -- All right.

15             Now, the time -- So you want nine months for fact

16   discovery.  And I agree if you're going to have expert

17   testimony, that's not going to be really dependent on

18   discovery.  You can have your experts get going.

19             So, Mr. Uppal, you were saying you think you need that

20   much time?

21             MR. UPPAL:  Yes, Your Honor.  I mean, again, I do know

22   some of them are going to go by the wayside, but I'm already

23   dealing with 43 identified witnesses and 5,600 document

24   disclosure.  That's only going to grow.  And I would submit to

25   you that given what's at stake, nine months of fact discovery

1    is appropriate.

2         THE COURT:  Mr. Schleier, if you're listing 43

3    witnesses, one way to speed this up and economize it is for me

4    to require you to give the bare bones of what they're going to

5    testify.  And it seems highly likely that many of them are not

6    going to have evidence that's either significant or disputed.

7         So that's the way for the other side to make a

8    judgment of how many of them they might need to depose.  And I

9    often will require this, especially if you're offering

10   witnesses that may well be background or cumulative witnesses.

11        MR. SCHLEIER:  I understand that, Your Honor, but it's

12   my practice in an initial disclosure statement to disclose

13   everything and be overinclusive rather than paying the penalty

14   later on of not identifying a witness.

15        THE COURT:  That's fine.  But I guess what I want to

16   direct is that you all communicate.  And right now I'm not

17   going to make a directive.  I'm going to rely on counsel's

18   ability to be practical to let Mr. Uppal know what those

19   witnesses are about, what they're going to say.  And it may be

20   undisputed matters.  It may be cumulative.  I just want an

21   efficient, economic way for everybody to move the case along.

22        So I'm going to direct you to do that but not put it

23   in an order.  I'm sure you all know how to do that.

24        So November -- So, Mr. Uppal, what I'm hearing you say

25   is there's a history of bad blood here without pointing fingers

1   at any one side or the other.

2            MR. UPPAL:  I think that's fair, Your Honor.

3            THE COURT:  Well, Mr. Schleier, you want -- you think

4   this is an appropriate schedule too?  I mean --

5            MR. SCHLEIER:  Candidly, when I sent the initial draft

6   to Mr. Uppal, the deadlines were shorter.  He asked for

7   somewhat longer deadlines, and as a matter of professional

8   courtesy and based upon working with him for a long period of

9   time, I extended them.

10           THE COURT:  I often see that in the schedules that are

11  proposed, and that's why I'm having this discussion.

12           What I worry about is if we have too much time, things

13  stop and start, and counsel burn up more money refamiliarizing

14  themselves with the case.  On the other hand, I know there's

15  other things to do.  But if you're going to do depositions, it

16  really makes sense to do them close, if not back to back on

17  simple ones.

18           Mr. Schleier, you're going to be driving the

19  depositions.  Mr. Uppal doesn't have much to depose.

20           MR. SCHLEIER:  Right.

21           THE COURT:  So then it's just a matter of scheduling.

22  I take it all these people are going to be people from the

23  district?

24           MR. SCHLEIER:  I would anticipate, Your Honor, yes.

25           THE COURT:  So Mr. Uppal has good control over their

UNITED STATES DISTRICT COURT

1    availability.

2              MR. UPPAL:  With the exception of I think there are

3    people that are retired.  At least two of the people that he's

4    mentioned have retired, including one that I definitely think

5    he's going to depose, which is President Solley.

6              MR. SCHLEIER:  That's right.

7              MR. UPPAL:  And I believe Ms. Kakar, who is listed, is

8    also retired.  But I do not anticipate big problems.

9              THE COURT:  All right.  There's a lot to be said

10   having discovery before you get deep into the summer because

11   it's so hard to schedule stuff in the summer anyway.  Could we

12   get this done by the end of June; everybody enjoy their

13   vacations afterwards?

14             Mr. Uppal, I'm not twisting your arm.  I'm thinking

15   economy for both clients, and if after you dialog you have

16   legitimate disagreements with the other side about whether

17   certain depositions are even necessary, you can bring that

18   dispute to me, and I'll --

19             MR. SCHLEIER:  Your Honor, could I offer a compromise?

20             THE COURT:  Yes.

21             MR. SCHLEIER:  I had originally suggested August 26th

22   in my initial proposal, and that would basically almost split

23   the baby between the end of June and when we have November 4th

24   or so.

25             THE COURT:  I'm not trying to beat up on you.  I just

1      want to hear why that wouldn't be enough.

2                MR. UPPAL:  August 26th, Your Honor?

3                THE COURT:  Uh-hmm.

4                MR. UPPAL:  Your Honor, I didn't move it out but two

5      months, so Mr. Schleier's correct he proposed August 26th.  I

6      asked for a couple months, not like another half a year or

7      anything, and he agreed.

8                THE COURT:  But I guess the real issue, as I said,

9      Mr. Schleier is going to be driving the discovery.

10               MR. UPPAL:  Yes.

11               THE COURT:  So you're going to be in a position to be

12     initiating the process and the timeliness, and for the most

13     part defendant will be producing these witnesses.  So --

14               MR. UPPAL:  Fair enough, Your Honor.  And that will

15     drive back -- that will necessarily have to drive back the

16     expert disclosures as well.  But so be it in terms of August

17     26th if that's acceptable to the Court.

18               THE COURT:  I don't want to put anybody in an unfair

19     spot.  I'm just trying to think through.  Another goal is to

20     have our motions for summary judgment briefed before the end of

21     the year.

22               MR. SCHLEIER:  The total briefing process or just

23     filed, Your Honor?  I'm sorry?

24               THE COURT:  Just filed.

25               MR. SCHLEIER:  I'm sorry?

1          THE COURT:  Well, actually I know I'd have to think it

2     through.  If we have close of discovery at the end of August,

3     we should be able to have the motions for summary judgment

4     fully briefed before the holiday period in December.  And

5     nothing happens in the second half of December anyway.

6          MR. SCHLEIER:  Or the first half.

7          THE COURT:  And I don't schedule anything for anybody

8     in the second half of December.

9          Indeed, when deadlines fall through there, I go

10    through, and I just extend them on my own, playing Santa Claus,

11    I guess.

12         Actually August 26th is a Friday.  All right.  Let's

13    set the close of fact discovery for August 26th, and then

14    expert disclosures -- Those experts can get going now.

15         MR. SCHLEIER:  Your Honor, in my original proposal, it

16    was May 20th.

17         THE COURT:  September, October, November -- May --

18    That should be plenty of time.  That's four months.  That's

19    plenty of time.

20         And, Mr. Uppal, you're going to know whether they are

21    going to be wanting to present an expert on the copyright

22    stuff.  So if it turns out they decide not to, you might decide

23    not to, or you might independently want to do it.  But you're

24    going to know before that date whether they're doing that or

25    not, so --

1        So let's set May -- Let's move it up a little bit,

2   just -- Let's set May the 6th for initial expert disclosures

3   for anybody that is intending to offer any experts other than

4   rebuttal to the other side.

5        Let's say June -- June the 3rd -- Well, June the 10th

6   is five weeks for any rebuttal -- initial rebuttal expert

7   disclosures and June 24 for any, I mean, any responding expert

8   disclosures, and June 24 for any purely rebuttal disclosures

9   for whichever party is propounding initial experts.  And then

10   we'll also set August 26th for the close of expert discovery.

11        And, Mr. Uppal, how many weeks do you need to do your

12   motion for summary judgment?  I know the other side is too,

13   but --

14        MR. UPPAL:  30 days after the close of discovery, Your

15   Honor.

16        THE COURT:  Well, how about September 23rd then?  Does

17   that work for both of you?

18        MR. SCHLEIER:  That was the date I originally

19   proposed, Your Honor.

20        THE COURT:  Okay.  All right.  We'll set September

21   23rd as the deadline for any dispositive motions.  Then we'll

22   brief them in due course, and it will be fully briefed before

23   the holiday period.

24        And then in the event there are no dispositive

25   motions, we'll set a date for submission of a proposed joint

1   final pretrial statement of September 16.

2           Now, I guess your proposal for the deadline for

3   good faith settlement discussions, May 27, that seems to be

4   plenty of time.  As I think you all know, I require the parties

5   and counsel to meet to discuss settlement.  You don't have to

6   settle a case.  You don't even have to make a settlement offer.

7   But you all have to be there and talk about it, and you have to

8   file a one-line report with me telling me that you did.

9           I like to -- You can satisfy my requirement tomorrow

10  if you want.  I set a deadline by which it -- I require that it

11  be done.  I want this to be at the point in time where the

12  parties have the important information but hopefully before the

13  lawyers have spent all the money.

14          And for you, Mr. Uppal, you need a human being with

15  settlement authority to be there.

16          MR. UPPAL:  Understood, Your Honor.

17          THE COURT:  Oh, I guess May 27th still looks fine.

18  Anybody have any different thoughts?

19          We'll set May 27 as the deadline for the good faith

20  settlement discussions.  If you want to have a settlement

21  conference with a magistrate judge, you both request it, I'll

22  order that.  Bear in mind it usually takes them six to eight

23  weeks to get things scheduled.  So if you want to do that, make

24  the request enough ahead of time that the magistrate judge can

25  get it on their calendar.

1          And, Nick, is there anything else on my list?

2          THE CLERK:  The pretrial order deadline, you said

3     September 16th, but I think you might have meant October.  You

4     said September 23rd for dispositive motions.

5          THE COURT:  What was my date for summary judgment

6     motions again?

7          THE CLERK:  September 23rd.

8          THE COURT:  Yes, indeed, it should be October.  We'll

9     set October 14 as the deadline for submission of a proposed

10    joint final pretrial statement.  But that date will drop out if

11    any dispositive motions are set.

12         All right.  Counsel, is there anything that either of

13    you would like to bring up that would assist us in processing

14    the case?

15         MR. SCHLEIER:  I don't think so, Your Honor.  Thank

16    you.

17         MR. UPPAL:  No.  Thank you for your time, Your Honor.

18         THE COURT:  Well, I encourage you to, as I said

19    before, think through how you can process -- Obviously the

20    plaintiffs have an interest.  They're usually working on a

21    contingent fee.  They have an interest in being economical,

22    thorough but economical, and the same incentive applies to the

23    defendant.  But it just seems to me like there are things here

24    that you can narrow and notwithstanding the pessimism you

25    express, Mr. Uppal.  So hope springs eternal in my heart.  All

1    right.  Very well then.  I'm going to take a brief recess to

2    retrieve my file for the next case.

3         (Proceedings recessed at 2:29 p.m.)

35

```
 1                    C E R T I F I C A T E

 2

 3          I, LINDA SCHROEDER, do hereby certify that I am duly

 4    appointed and qualified to act as Official Court Reporter for

 5    the United States District Court for the District of Arizona.

 6          I FURTHER CERTIFY that the foregoing pages constitute

 7    a full, true, and accurate transcript of all of that portion of

 8    the proceedings contained herein, had in the above-entitled

 9    cause on the date specified therein, and that said transcript

10    was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 25th day of July,

12    2016.

13

14

15                                        s/Linda Schroeder
                                   Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25
```