Pavneet Singh Uppal, SBN 016805
Shayna H. Balch, SBN 024852
FISHER & PHILLIPS LLP
3200 N. Central Ave., Suite 805
Phoenix, Arizona 85012-2425
Telephone: (602) 281-3400
Fax: (602) 281-3401
puppal@fisherphillips.com
sbalch@fisherphillips.com
Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Cleopatria Martinez,<br><br>Plaintiff,<br><br>v.<br><br>Maricopa County Community College District; et al.,<br><br>Defendants. | No. CV 15-01759-NVW<br><br>**DEFENDANTS' MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>[FED. R. CIV. P. 56]<br><br>(Oral Argument Requested) |

///
///
///
///
///
///
///
///
///

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Plaintiff is a Residential Faculty Member employed as a math instructor by MCCCD at Phoenix College.  In 2010 Defendants learned that Plaintiff was exposing MCCCD to a substantial risk of copyright infringement. In response to this threat, MCCCD imposed copy restrictions on Plaintiff in order to safeguard against potential copyright infringement claims. Unhappy with these restrictions, Plaintiff refused to comply and made repeated attempts to bypass the restrictions.  Most notably, in the fall of 2012, Plaintiff made copies of course materials at an off-campus store and sold them directly to students.  After being notified of Plaintiff's behavior by one of her students, MCCCD concluded that Plaintiff's actions violated MCCCD's cash handling policies set forth in MCCCD's Residential Faculty Policy Manual ("RFP Manual").

Specifically, the cash handling policy prohibits unauthorized faculty members from receiving compensation for the sale of instructional materials to students.  Accordingly, MCCCD instructed Plaintiff in writing to immediately issue refunds to the students to whom she had sold her instructional materials. Despite repeated reminders by MCCCD administration, Plaintiff obstinately refused to issue the refunds.  As a result, disciplinary proceedings were commenced against Plaintiff.  After a full day evidentiary hearing at which Plaintiff was represented by counsel, the Hearing Committee concluded that Plaintiff had engaged in "willful insubordination" and "willfully and intentionally failed to follow instructions that were communicated" to her by the President of Phoenix College. These findings were reduced to writing in the Hearing Committee's binding Findings of Fact and Conclusions of Law.

Although MCCCD had sought to terminate the Plaintiff for her acts of willful insubordination, the Hearing Committee declined to recommend termination in light of Plaintiff's nearly 30 years of service at MCCCD.  The Hearing Committee did, however, inform MCCCD Chancellor Glasper that an unpaid suspension was appropriate and necessary to address Plaintiff's misconduct. After conferring with the Hearing Committee regarding an approved disciplinary response, Chancellor Glasper suspended Plaintiff for 14 months without pay.  At the time of Plaintiff's suspension, Plaintiff still had not issued the ordered refunds.

FPDOCS 32672253.1

Following the completion of her suspension, Plaintiff returned to work at Phoenix College in the fall of 2015. It is important to note that to this day, roughly four-and-one-half years later, Plaintiff has remained insubordinate and refused to issue refunds to the affected students.

In the current action, Plaintiff argues that her 14-month-suspension violated her due process rights to liberty and property. In fact, Plaintiff received all the process which she was due including full notice and an opportunity to be heard, multiple meetings with MCCCD administration regarding the charges against her, and a full day evidentiary hearing. In addition, Plaintiff submitted at least five letters to the Governing Board seeking reversal of her suspension and even personally appeared to argue her case before the Governing Board on two occasions. Simply put, Plaintiff's claims that she was somehow denied due process are without merit and must be dismissed.

## II.     FACTUAL BACKGROUND

Plaintiff began working at Phoenix College in 1995 as a math instructor. [DSOF ¶5]. In early 2010, Phoenix College (one of ten community colleges within MCCCD) discovered that Plaintiff had exposed MCCCD to a substantial risk of liability for copyright infringement. [DSOF ¶6]. Instead of requiring her math students to purchase copyrighted textbooks, Plaintiff prepared her own course materials which she distributed to her students free of charge. [DSOF ¶7]. Plaintiff called these course materials her "Lecture Notes." [DSOF ¶7-9]. In preparing these course materials, Plaintiff *directly* copied math problems from copyright protected textbooks and inserted them into her course materials. She did so without providing attribution to the textbook publishers and/or authors. [DSOF ¶8-9].[1]

Once MCCCD discovered Plaintiff's conduct, administration officials *repeatedly* explained their copyright concerns to Plaintiff. [DSOF ¶10]. Unfortunately, despite repeated counseling attempts by MCCCD administration, Plaintiff continued to ignore federal copyright laws. [DSOF ¶10]. As a result of Plaintiff's continuing misconduct and the unacceptable legal risk that her actions presented, MCCCD imposed restrictions on Plaintiff's photocopying privileges. [DSOF ¶11].

---

[1] The fact that Plaintiff engaged in this behavior is not in dispute. Plaintiff testified under oath that problems from the copyright protected materials were inserted into her course materials. [DSOF ¶9]. Plaintiff's sole excuse for engaging in this behavior is that she "didn't know" that her conduct violated federal copyright laws and/or that she didn't see anything wrong with what she was doing. [DSOF ¶9].

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

1   MCCCD was hopeful that the suspension of Plaintiff's copy privileges would serve to illustrate the
2   seriousness of this matter to Plaintiff, but instead of complying with the newly imposed copy
3   restrictions, Plaintiff continued to disregard copyright laws and actually circumvented the copy
4   restrictions that were put in place. [DSOF ¶12].

5   MCCCD then sought a legal opinion from an outside copyright expert, attorney Sean
6   Garrison. Mr. Garrison, who specializes in copyright law, advised MCCCD that "significant portions
7   of [Plaintiff's] Course Materials have been copied from other [copyrighted] sources." [DSOF ¶13].
8   He further advised MCCCD to cease further distribution or use of Plaintiff's course materials because
9   they presented a "significant risk of [copyright] infringement." [DSOF ¶13]. Mr. Garrison also
10  estimated that MCCCD's potential exposure to damages for Plaintiff's copyright infringement could
11  be as high as $150,000 *per violation*. [DSOF ¶13]. Mr. Garrison further opined that because Plaintiff
12  copied problems from at least three textbooks, MCCCD could face damages of $450,000 plus
13  attorneys' fees and costs. [DSOF ¶13]. In reliance upon Mr. Garrison's recommendations, Phoenix
14  College President Anna Solley issued a directive on December 9, 2010 that imposed further
15  restrictions on Plaintiff's copying privileges. [DSOF ¶14]. Specifically, the December 9, 2010
16  Directive prohibited Plaintiff from utilizing any course materials of her own creation. [DSOF ¶14].
17  Instead, Plaintiff was required to only use course materials that are "approved by the math department"
18  or that are "available in the bookstore for sale to students and that are authored by persons other than
19  [Plaintiff]." [DSOF ¶14]. The Directive further required Plaintiff to submit her photocopy requests
20  to the Math Department Chair for his approval. [DSOF ¶14].

21  Despite MCCCD's frequent discussions with Plaintiff regarding the importance of complying
22  with copyright laws and the imposition of the December 9, 2010 Directive, Plaintiff continually and
23  repeatedly attempted to evade the Directive. [DSOF ¶15]. In August of 2012, Plaintiff violated the
24  December 9, 2010 Directive by having her materials photocopied off campus at a local Staples store.
25  [DSOF ¶15]. Specifically, Plaintiff informed her students that they were not required to purchase a
26  course textbook and that she would provide them with course materials in lieu of a textbook. [DSOF
27  ¶15]. Plaintiff then made copies of her course materials at an off-campus Staples store and required
28  students to purchase them from her for $11. [DSOF ¶15]. MCCCD administration concluded that

Plaintiff's actions violated MCCCD's cash handling policies which prohibit unauthorized faculty members from receiving compensation from the sale of instructional materials.[2] [DSOF ¶15].

On or around October 18, 2012, after it was established that Plaintiff had sold the materials directly to students, Plaintiff was instructed to immediately issue refunds to her students by personal check. [DSOF ¶17]. Several months later on or around January 9, 2013, MCCCD Vice President of Academic Affairs Cassandra Kakar learned that students had not yet received refunds from Plaintiff. [DSOF ¶17]. As a result, Dr. Kakar instructed Plaintiff to provide copies of the front and back of all cashed refund checks by January 18, 2013. [DSOF ¶17]. However, Plaintiff insubordinately failed to provide the requested canceled checks. [DSOF ¶17].

On March 20, 2013, Plaintiff was notified that a Pre-Disciplinary Conference had been scheduled regarding her conduct. [DSOF ¶18]. On or around April 3, 2013, Plaintiff met with MCCCD administration to participate in a Pre-Disciplinary Conference with President Solley and Vice President Kakar. [DSOF ¶19]. Judy Castellanos and Sheri Klein from the MCCCD District Office HR Solutions Center were also present. [DSOF ¶19]. During the meeting, Plaintiff was informed of the charges against her and given an opportunity to respond. [DSOF ¶19].

Subsequent to the April 3, 2013 meeting, President Solley and Vice President Kakar sought to terminate Plaintiff's employment due to her unacceptable misconduct and Plaintiff was provided with an August 9, 2013 Statement of Charges regarding her proposed dismissal. [DSOF ¶20]. Plaintiff met with Vice Chancellor of Human Resources Jim Bowers and received a Statement of Charges regarding her proposed dismissal of employment (which included a charge of insubordination for failing to follow the December 9, 2010 Directive from President Anna Solley). [DSOF ¶20]. Upon receipt of the Statement of Charges regarding her proposed dismissal, Plaintiff requested an evidentiary hearing, which MCCCD granted. [DSOF ¶21].

---

[2] Specifically, MCCCD's policies prohibit instructors from having "any financial interest in or receiv[ing] compensation from the sale of any unpublished instructional materials required or suggested for a class that the instructor teaches." [DSOF ¶16]. This prohibition makes perfect sense when one considers the position of authority that faculty members hold over their students. Students may feel compelled to purchase materials which are required, recommended, or offered by their instructors. Similarly, students may feel that their grades could be affected if they decline to purchase materials from a faculty member. [DSOF ¶16]

5

Plaintiff received her full day evidentiary hearing on November 18, 2013. [DSOF ¶ 22]. During the hearing Plaintiff was represented by experienced employment counsel, Stephen Montoya, and was able to call witnesses, cross examine MCCCD's witnesses, enter evidence, and offer expert testimony. [DSOF ¶22-23]. Following the hearing, the Hearing Committee issued binding Findings of Fact and Conclusions of Law. [DSOF ¶24]. The Hearing Committee found that Plaintiff engaged in "willful insubordination" and that she "willfully and intentionally failed to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley." [DSOF ¶24]. Upon receipt of the Hearing Committee's findings, Chancellor Glasper met with the Hearing Committee to inquire about the basis of their conclusions. [DSOF ¶25]. The Hearing Committee members explained to Chancellor Glasper that because Plaintiff had been with the District for nearly 30 years, they were reluctant to recommend her permanent separation from employment, but believed a disciplinary action such as an unpaid suspension was appropriate. [DSOF ¶25].

In light of the Hearing Committee's recommendations, Chancellor Glasper prepared a revised February 10, 2014 Statement of Charges proposing that Plaintiff be suspended from employment for 14 months. [DSOF ¶26]. Chancellor Glasper notified Plaintiff, though her counsel, that he had decided to suspend Plaintiff. [DSOF ¶26]. Chancellor Glasper also offered Plaintiff the opportunity to schedule a meeting with the Vice Chancellor of Human Resources to discuss the rationale for the decision. [DSOF ¶26]. Plaintiff accepted the invitation and MCCCD scheduled a meeting between Plaintiff and the Vice Chancellor Bowers.[3] [DSOF ¶26].

---

[3] Plaintiff incorrectly alleged in her Amended Complaint that she was denied due process because her Statement of Charges was "backdated to February 10, 2014" and because she was "never given the opportunity to respond to the Statement of Charges in writing before she was suspended." Doc. 14., ¶¶ 17, 42. The Statement of Charges was originally dated February 10, 2014, with an effective suspension date of March 1, 2014. [DSOF ¶27]. MCCCD originally scheduled a meeting between Plaintiff and Vice Chancellor of Human Resources Bowers to discuss the Statement of Charges on February 25, 2014 – four days before the effective date of the suspension. [DSOF ¶27]. The day before the meeting was scheduled to take place, Plaintiff unilaterally canceled the meeting citing a "sudden medical issue." [DSOF ¶27]. She informed MCCCD that the earliest she could meet consistent with her attorney's schedule was Friday, March 7, 2014. [DSOF ¶27]. MCCCD accommodated Plaintiff's request to move her meeting to March 7, 2014, and postponed Plaintiff's suspension by one month to ensure that she received a meeting with the Vice Chancellor prior to the suspension taking effect. [DSOF ¶27]. Plaintiff was issued a an Update to Notice of Suspension Without Pay dated April 14, 2014 which stated that her revised dates of suspension were April 15,

Plaintiff met with Vice Chancellor Bowers on March 7, 2014 to discuss the Statement of Charges and her suspension. DSOF ¶28]. During the meeting, Plaintiff was represented by experienced employment counsel, was provided with a copy of the Statement of Charges, and was afforded an opportunity to respond and voice her concerns. [DSOF ¶28]. It is important to note that this second Statement of Charges and meeting with the Vice Chancellor took place *after Plaintiff had a full day evidentiary hearing on the same issues just months before*. Moreover, just days after her meeting with Vice Chancellor Bowers, on March 12, 2014, Plaintiff submitted a nine page legal brief though her attorney which set forth her objections to the suspension and argued that "a fourteen-month suspension is the economic equivalent of a dismissal." [DSOF ¶28]. The legal brief contained more than 30 pages of exhibits – including the Hearing Committee's Findings of Fact and Conclusions of Law - and was sent to MCCCD's Vice Chancellor of Human Resources and all members of the Governing Board [DSOF ¶28].

Shortly thereafter, and in anticipation of the Governing Board's March 25, 2014 regularly scheduled board meeting, Plaintiff submitted a one-and-one-half page letter to the Governing Board objecting to her suspension and asking "the board to intervene in [her] case to rescind the Chancellor's suspension." [DSOF ¶ 29]. Plaintiff and her counsel each separately spoke before the Governing Board in open session. [DSOF ¶29] While addressing the Governing Board, Plaintiff and her counsel each advanced the argument that her suspension was improper and that "the chancellor's fourteen month suspension of [Plaintiff] is the functional equivalent of termination from the district." [DSOF ¶29].

Following the March 25, 2014 Governing Board meeting, Plaintiff submitted at least three additional letters to the Governing Board outlining her objections to her suspension and her contention that a 14-month-suspension was tantamount to a termination of employment. [DSOF ¶¶30-33]. Plaintiff also appeared before the Governing Board a second time on October 28, 2014 and argued against her suspension. [DSOF ¶34]. But if that were not enough, Plaintiff also had two other individuals separately appear before the Governing Board on her behalf and object to her suspension.

---

2014 to May 15, 2015. [DSOF ¶27]. Plaintiff accepted this invitation and met with Vice Chancellor Bowers on March 7, 2014. [DSOF ¶27].

[DSOF ¶34]. In the fall of 2015, following the completion of her 14-month-suspension from MCCCD, Plaintiff returned to work at Phoenix College. [DSOF ¶35].

## II.   LEGAL ARGUMENT

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). To defeat Defendants' motion, Plaintiff "may not rest upon the mere allegations or denials of her pleading, but … must set forth specific facts showing that there is a genuine issue for trial." *Id.* Defendants' motion must be granted if the evidence presented by Plaintiff "is merely colorable or is not significantly probative." *Id.* at 249 (internal citations omitted). Here, Plaintiff has asserted five causes of action against Defendants alleging: (1) 42 U.S.C. § 1983 – Liberty interest against Glasper, (2) 42 U.S.C. § 1983 – Property interest against Glasper, (3) 42 U.S.C. § 1983 – Liberty interest against MCCCD, (4) 42 U.S.C. § 1983 – Property interest against MCCCD, and (5) Declaratory relief against MCCCD. For the reasons set forth below, each of these causes of action fail.

### A.   Plaintiff Was Afforded Complete Due Process and Her § 1983 Claims Must Be Dismissed.

To state an actionable due process claim an employee must demonstrate that she was deprived of either a liberty or property interest. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999). It is the plaintiff who bears the burden of proving that her public employer failed to provide due process protections. *Collyer v. Darling*, 98 F.3d 211, 223 (6th Cir. 1996). In the present case, Plaintiff has alleged that her procedural due process rights were impaired when she was suspended for fourteen months without pay. Plaintiff contends that a 14-month-suspension is tantamount to a termination of employment and that she was therefore entitled to the same protections afforded to MCCCD Residential Faculty who are permanently separated from employment. Plaintiff's argument fails for multiple reasons. As an initial matter, Plaintiff had no applicable liberty interest entitling her to due process. Plaintiff appears to allege liberty interests in future employment with MCCCD and in her reputation within the community. However, based on the undisputed facts in this case, and as discussed in further detail below, neither of these liberty interests are at issue. Additionally, Plaintiff's

8

FPDOCS 32672253.1

argument that she was not afforded procedural due process before being deprived of her property interest in her employment (via a 14 month suspension) is similarly defective. Plaintiff was suspended, not terminated, and she received all of the process she was due under MCCCD's RFP Manual. Moreover, even assuming, *arguendo,* that Plaintiff's 14-month-suspension was tantamount to a termination, she received more than sufficient notice and a meaningful opportunity to be heard as required by due process.

### 1. Plaintiff Has No Liberty Interests Entitling Her to Due Process Protections.

Under due process analysis, a liberty interest "encompasses an individual's freedom to work and earn a living." *Bollow v. Fed. Reserve Bank of San Francisco*, 650 F.2d 1093, 1100 (9th Cir.1981), cert. denied, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982). Here, Plaintiff claims that she has actionable liberty interests in future employment with MCCCD and her reputation in the community entitling her to due process. However, as set forth below, Plaintiff's claims are without merit.

### a) Plaintiff Does Not Have a Liberty Interest In Future Employment With MCCCD.

Due process protects a "generalized . . . right to choose one's field of private employment." *Conn v. Gabbert*, 526 U.S. 286, 292 (1999) (citing cases involving "a complete prohibition of the right to engage in a calling"). Due process does *not* protect the right of employment with a *specific employer*. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707 (1972) (due process was not implicated because the State had not barred the employee "from all other public employment in state universities."); *see, also, Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 896 (1961) (an employment decision to bar a cook from working at a specific military base did not violate the employee's due process right because the plaintiff "remained free to obtain employment. . . with any other employer."); *also Llamas v. Butte Comm. Coll. Dist.*, 238 F.3d 1123 (9th Cir. 2001) ("We have consistently held that people do not have liberty interests in a specific employer. For example, a federal employee 'does not possess a liberty interest in her civil service career.'") (citing *Clemente v. United States*, 766 F.2d 1358, 1365 (9th. Cir. 1985)).

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

FPDOCS 32672253.1

Here, as in the cases cited above, Plaintiff was not barred from "all other public employment" in community colleges, or even the educational field. Nor was Plaintiff permanently barred from employment with MCCCD. To the contrary, Plaintiff's restriction was limited to a 14-month-suspension from MCCCD based on her "admission of willful insubordination" after she "willfully and intentionally failed to follow instructions that were communicated to her" by Phoenix College President Anna Solley. [DSOF ¶24]. Given that Plaintiff was free to work in her chosen occupation during her suspension - and even retuned to employment with MCCCD in the fall of 2015 - she was not barred from her right to pursue her chosen field of employment.

    **b) Plaintiff's Alleged Liberty Interest in Her Reputation Was Not Infringed Because The Charges Against Her Did Not Implicate Honesty or Morality.**

Plaintiff's Amended Complaint further alleges that Defendants' conduct infringed on her liberty interest in her reputation in the community. Doc. 14, ¶95, 103-04. However, it is well-established that in the employment context, a liberty interest based on reputation is only implicated if the charge impairs a reputation for honesty or morality. *Bollow,* 650 F.2d 1093. "[W]hen the government dismisses an individual for reasons that might seriously damage his standing in the community, he is entitled to notice and a hearing to clear his name." *Id.* at 1100. "To implicate constitutional liberty interests, however, the reasons for dismissal must be sufficiently serious to 'stigmatize' or otherwise burden the individual so that he is not able to take advantage of other employment opportunities." *Id.* at 1101. Moreover, to infringe upon a constitutionally protected liberty interest, the charges must be published. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

Here, Plaintiff has alleged that the "fact of the suspension interfered with [her] ability to perform in her profession" and that Defendants "damaged her reputation in her professional community." But a suspension or termination, alone, does not affect a liberty interest. "Charges that carry the stigma of moral turpitude" such as dishonesty or immorality "may implicate a liberty interest, but charges of incompetence or inability to get along with others do not." *Wheaton v. Webb-Petett*, 931 F.2d 613, 617. Here, Plaintiff was suspended because she "willfully and intentionally failed to

follow instructions that were communicated to her" by Phoenix College President Anna Solley. [DSOF ¶24]. An allegation of willful insubordination does not implicate honesty or morality. Rather, insubordination is a form of failure to perform job duties which is insufficient to give rise to a protectable liberty interest.

          **c)**      **Even Assuming *Arguendo* That Plaintiff Had An Actionable Liberty Interest, She Was Not Entitled to A Due Process Hearing Because The Accuracy of the Charge of Insubordination Was Not Contested.**

The type of due process afforded to plaintiffs alleging liberty interest deprivations differs from the more traditional property interest deprivation analysis. In cases such as the present one where a stigmatization liberty interest is advanced, the procedural due process afforded to the aggrieved individual is notice and "an opportunity to refute the charge." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707 (1972). "The purpose of such notice and hearing is to provide the person an opportunity to clear his name." *Id.* at 573, n. 12, 92 S.Ct., at 2707. Here, the accuracy of the insubordination allegation which led to Plaintiff's 14-month-suspension is not in dispute, so Plaintiff was not entitled to a name clearing hearing.

As set forth above, following MCCCD's recommendation that Plaintiff be dismissed from employment, she received the benefit of a full day evidentiary hearing where she was represented by counsel. [DSOF ¶22-23]. At issue in the hearing was Plaintiff's alleged insubordination for refusing to issue refunds in violation of an express directive from Phoenix College President Solley - the very same charge that Plaintiff's suspension was based on. [DSOF ¶18-24]. During the evidentiary hearing, Plaintiff testified under oath that despite numerous reminders from college administration, she never complied with President Solley's directive, could provide no excuse or justification for her misconduct, conceded that her noncompliance was a "mistake," and acknowledged that she should have complied. [DSOF ¶24]. At the conclusion of the administrative dismissal hearing, the Hearing Committee issued its Binding Findings of Fact and Conclusions of Law in which the Hearing Committee found that Plaintiff had made "an admission of willful insubordination" by testifying that she had "made a mistake" in "willfully and intentionally fail[ing] to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley."

11

[DSOF ¶24]. However, the Hearing Committee recommended against permanent separation from employment due to Plaintiff's 30 year employment history with MCCCD. [DSOF ¶25]. Instead, the Hearing Committee advised Chancellor Glasper that an unpaid suspension was more appropriate. [DSOF ¶25]. In compliance with the MCCCD's RFP Manual, Chancellor Glasper accepted the binding Findings of Fact and Conclusions of Law, issued a new Statement of Charges for willful insubordination, and imposed an unpaid disciplinary suspension of 14 months. [DSOF ¶26]. Because the factual accuracy of the Statement of Charges surrounding Plaintiff's insubordination is not contested, Plaintiff was not entitled to a "name clearing" hearing. *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) ("if the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation."); *Jones v. Los Angeles Cmty. Coll. Dist.*, 702 F.2d 203 (9th Cir. 1983) (noting that due process protections only apply when, among other requirements, the accuracy of the charge is contested).

### 2. Plaintiff's Allegation That Her Property Right to Continued Employment Was Infringed When She Was Suspended for 14 Months Fails as a Matter of Law.

Plaintiff contends that she "had property interests in her contracts and as a tenured professor" she was denied that property interest without procedural due process. Doc. 14. Specifically, Plaintiff alleges that her "suspension without pay for fourteen and a half months amounts to a property deprivation sufficient to implicate procedural due process protections" and that her suspension was the functional equivalent of a termination. Doc. 14, ¶ 49.[4] As such, Plaintiff appears to contend that

---

[4] To the extent that Plaintiff's Amended Complaint can be read as alleging that she was somehow denied due process with respect to her August 9, 2013 Statement of Charges, her claim fails as a matter of law. Plaintiff received full written notice of the charges against her on March 20, 2013, 2013. [DSOF ¶18]. Subsequently, Plaintiff had pre-termination meetings with MCCCD administration as well as a full day evidentiary hearing before a hearing committee comprised of her peers. [DSOF ¶18-23]. Prior to the hearing, Plaintiff submitted full briefing through experienced employment counsel. [DSOF ¶22-23]. At the hearing, Plaintiff was similarly represented by counsel who offered witnesses, cross-examined the District's witnesses, submitted exhibits, and called an expert witness in her defense. [DSOF ¶23]. At the conclusion of the hearing, the Hearing Committee rendered its Findings of Fact and Conclusions of Law in which it found Plaintiff to have engaged in "willful insubordination" when she "willfully and intentionally failed to follow instructions that were

12

she was entitled to the same type of procedural protections as faculty who are permanently separated from employment. Amended Complaint, ¶¶49-50.  Specifically, Plaintiff contends that her February 20, 2014 Statement of Charges deprived her of: (1) "the opportunity to respond to the Statement of Charges in writing before she was suspended"; and (2) "failed to allow [her] any opportunity to present evidence refuting the new Statement of Charges before a neutral finder-of-fact." Doc. 14. These claims fail because Plaintiff was suspended, not terminated, and she received all the procedures she was entitled to.  Moreover, even assuming, *arguendo,* that her suspension was tantamount to a termination, she received all the due process to which she was entitled.

### i. Plaintiff Was Suspended, Not Terminated, And Received All The Procedures She Was Due.

Plaintiff incorrectly argues that her 14-month-suspension from MCCCD was the functional equivalent of a termination.  A "termination" is a permanent separation from employment. Indeed, even Black's Law Dictionary defines "termination" as "[t]the act of ending something" and "termination of employment" as "[t]he complete severance of an employer-employee relationship." BLACK'S LAW DICTIONARY (8th ed. 2004).  Here, Plaintiff's suspension was for a finite duration, it was always contemplated that she would return to work after serving the suspension, and Plaintiff did, in fact, return to work at MCCCD in the fall of 2015.  [DSOF ¶35].  Accordingly, even though Plaintiff objects to the length of her suspension (which was necessitated by her egregious misconduct) it was qualitatively different from a termination.

Notwithstanding Plaintiff's arguments to the contrary, her suspension was properly processed as a suspension and she received appropriate due process protections.  Pursuant to MCCCD's RFP Manual, Residential Faulty Members who are suspended are entitled to the receipt of a written statement of charges formulated by the MCCCD Chancellor. RFP § 3.11.1. "If payment is to be withheld [from a suspended faculty member], the Vice Chancellor of Human Resources will first

---

communicated to her when she failed to issue refunds to students as directed by President Solley." [DSOF ¶24].   Despite the foregoing findings, the Hearing Committee recommended against the sanction of termination. [DSOF ¶24].  Simply put, Plaintiff received complete due process protections with respect to her August 9, 2013 Statement of Charges regarding her proposed termination of employment.

consult with and advise the member, and at the option of the Faculty member, the Faculty Association President regarding the rationale for that action." [DSOF ¶_]. Here, there is no dispute that these procedures were followed. On February 10, 2014, MCCCD General Counsel Lee Combs notified Plaintiff though her counsel that MCCCD Chancellor Glasper had "decided to accept the recommendation of the hearing committee" against termination, but "decided that suspension is appropriate based on the committee's finding of a willful policy violation." [DSOF ¶26]. Because the suspension was without pay, General Counsel Combs further informed Plaintiff that she had "an opportunity under the procedure to meet with Vice Chancellor of Human Resources Bowers to discuss the rationale for this decision before it [was] delivered." [DSOF ¶26]. Plaintiff accepted this invitation and met with Vice Chancellor Bowers on March 7, 2014. [DSOF 26-28]. Accordingly, Plaintiff received all the procedures she was entitled to under the portion of MCCCD's RFP Manual pertaining to suspensions.

                ii.        **Assuming, *Arguendo,* That Plaintiff's Suspension Was Tantamount to A Termination, Plaintiff Still Received All of the Process Which She Was Due.**

In apparent recognition of the fact that MCCCD followed proper procedures governing a suspension, Plaintiff argues that her 14-month-suspension was the functional equivalent of a termination and, therefore, she was entitled to the more robust procedural requirements for dismissals under MCCCD's RFP Manual. But even if the Court were inclined to accept Plaintiff's argument, her alleged procedural due process claim fails because Plaintiff actually received all of the due process that would have applied to a terminated employee.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, (1950)). The Supreme Court has further described "'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Id.* (emphasis in original). "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected

FPDOCS 32672253.1

property interest in his employment." *Id.* "Due process is flexible ... and calls for such procedural protections as the particular situation demands." *Peacock v. Board of Regents of Univs. and State Coll. of Arizona*, 597 F.2d 163 (9th Cir. 1979) (citing *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Plaintiff was provided with these protections.

### (1) **Plaintiff Received Pre-Disciplinary Notice Of The Insubordination Charge On March 20, 2013.**

Before any person can be deprived of a property interest, they must first be notified in order to ensure that his/her later hearing is meaningful. *See Loudermill*, 470 U.S. at 542. Although Plaintiff now contends that she was denied pre-disciplinary notice of the charges against her, MCCCD satisfied this requirement long ago when it provided Plaintiff with her March 20, 2013 Notice of Pre-Disciplinary Conference. [DSOF ¶18]. The Notice included the allegations against her and specifically asserted that Plaintiff had committed insubordination when she failed to issue reimbursement checks to students after being directed to do so by MCCCD. This is the very same allegation that a hearing committee of Plaintiff's peers found her guilty of and which later formed the basis for her 14-month-suspension. The Notice further informed Plaintiff that a Pre-Disciplinary Conference had been scheduled for April 3, 2013, and that the highest ranking individuals at Phoenix College, President Anna Solley and Vice President of Academic Affairs Casandra Kakar, would serve as Hearing Officers. [DSOF ¶18]. As stated in the Notice, the purpose of the meeting was to "ensure that the decision to be made concerning the complaints against you ... is based on complete and accurate information, to inform you of the charges against you and the evidence in support of those charges, and provide you with an opportunity to respond." [DSOF ¶18]. Simply put, as of March 20, 2013, MCCCD had satisfied its obligation to put Plaintiff on notice of the charges against her.

### (2) **Plaintiff Received Due Process Hearings and Numerous Meaningful Opportunities to Be Heard.**

A plaintiff with a property interest in employment is further entitled to receive a due process hearing consisting of a meaningful opportunity to be heard. Here, Plaintiff contends that she was denied her meaningful opportunity to be heard because MCCCD purportedly did not "allow [her] any

15

opportunity to present evidence refuting the new Statement of Charges before a neutral finder-of-fact." Doc. 14. Given that Plaintiff received a full day evidentiary hearing and a meeting with the Vice Chancellor of Human Resources prior to suspension, it is unclear why Plaintiff believes that she was short-changed. What is clear is Plaintiff is attempting to elevate form over substance. It is well-established that *"*[d]ue process is flexible … and calls for such procedural protections as the particular situation demands." *Peacock,* 597 F.2d at 165. The key aspect of due process is whether the aggrieved employee has received a hearing in which he/she has received a meaningful opportunity to be heard. The "hearing" afforded in due process procedure does not require the elaborate trappings or formalities of judicial hearings. *See Loudermill*, 470 U.S. at 545. "The formality and procedural requisites for the hearing can vary, depending upon the interests involved and the nature of the subsequent proceedings." *Boodie v. Connecticut*, 410 U.S. 371, 378 (1971). Here, even though Plaintiff was only suspended, she effectively received all of the due process protections applicable to a termination, and she certainly received a hearing and meaningful opportunity to be heard.

Indeed, as set forth in section II (Factual Background), Plaintiff received multiple opportunities to be heard with respect to her discipline for her undisputed willful insubordination. [DSOF ¶18-36]. These opportunities to be heard included multiple meetings with key decision-makers within MCCCD administration and a full day long evidentiary hearing before a committee of her peers. [DSOF ¶18-36]. In addition, Plaintiff's attorney submitted a nine page legal brief to the MCCCD Governing Board outlining her arguments that "a fourteen-month suspension is the economic equivalent of a dismissal." [DSOF ¶28]. Plaintiff also submitted at least four letters to the Governing Board asserting the same argument. [DSOF ¶30-33]. Plaintiff and her counsel each separately appeared before the Governing Board in open session and argued that her suspension was improper and "the functional equivalent of a termination from the district." [DSOF ¶29]. And if that were not enough, Plaintiff also had two other individuals separately appear on her behalf before the Governing Board to advocate for the reversal of her suspension. [DSOF ¶29]. Simply put, in light of the multiple opportunities that Plaintiff was provided to be heard and to argue against suspension, Plaintiff is now foreclosed from arguing that her procedural due process rights were somehow denied.

Finally, it should be noted that nowhere in Plaintiff's 117 paragraph Amended Complaint does she contend that her substantive due process rights were violated. The reason for this omission is obvious. Plaintiff has deliberately chosen to focus on alleged procedural deficiencies in MCCCD's disciplinary process to divert attention from her egregious misconduct. As discussed above, the MCCCD Hearing Committee found Plaintiff to have "willfully and intentionally failed to follow instructions that were communicated" to her by President Solley and concluded that Plaintiff had engaged in "willful insubordination" by violating a lawful directive to issue refunds to students. [DSOF ¶24]. During the hearing, Plaintiff offered no excuse or rationale for her insubordination. Instead she merely testified that she had made a "mistake." [DSOF ¶24]. Despite conceding her "mistake," Plaintiff has to this day refused to issue refunds to her students. [DSOF ¶17,36]. Under these circumstances, an utterly insubordinate and unprofessional employee is lucky to have escaped with only a 14-month-suspension. Indeed, Plaintiff does not even attempt to argue that the suspension was somehow disproportionate to her misconduct so as to constitute a violation of her substantive due process rights.

### B. Plaintiff's Request for Declaratory Relief is Not Actionable.

Plaintiff's request for declaratory relief relates to a personnel action that was put into place on December 9, 2010, in response to Plaintiff's practice of misusing copyright protected materials. [DSOF ¶12-14] Plaintiff's conduct in this regard subjected MCCCD to a substantial risk of liability. In addition, Plaintiff has remained insubordinate and has never issued refunds to students to whom she improperly sold her so-called course materials. [DSOF ¶36]

Although Plaintiff has requested the extraordinary remedy of declaratory relief, Plaintiff has not cited to a single authority or case in which declaratory relief has been awarded in circumstances even remotely similar to the present case. The reason for this omission is self-evident – there is no legal basis for declaratory relief in these circumstances. But even assuming, *arguendo,* that Plaintiff's request for declaratory relief has some basis in the federal Declaratory Judgment Act, Plaintiff must still identify an ongoing violation of statutory or constitutional provisions in order to state an actionable claim for relief. The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

17

legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court has held that "the phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genetech, Inc.* 549 U.S. 118, 127, 127 S.Ct. 764, 771 (2007).

Here, there simply is no case or controversy before the Court regarding the copy restrictions that MCCCD imposed on Plaintiff. The December 9, 2010 Directive is a routine personnel action which remains in place due to Plaintiff's continuing insubordination. [DSOF ¶__] Although Plaintiff may object to the continuing restrictions presented by the Directive, she has no claim under the Declaratory Judgment Act. As the Supreme Court held long ago, "The Due Process Clause of the Fourteenth Amendment is not a guarantee against [allegedly] incorrect or ill-advised personnel decisions." *Bishop,* 426 U.S. at 350, 96 S.Ct. at 2079. To hold otherwise "would enable every discharged employee to assert a constitutional claim merely by alleging that his former supervisor made a mistake." *Id.*

Moreover, even if the Court were inclined to find the existence of a case or controversy, the Court should not exercise its discretion in this case. The Supreme Court has emphasized that the Declaratory Judgment Act permits, but does not require, a federal court to issue a declaratory judgment. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137 (1995). Accordingly, "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* 515 U.S. at 287, 115 S.Ct. at 2143. Here, given Plaintiff's gross insubordination, the Court should not intrude into the realm of personnel decisions which should properly be reserved for the employer. Otherwise, the Declaratory Judgment Act will become a tool for plaintiffs' lawyers to challenge virtually any disciplinary action imposed by an employer.

### III. CONCLUSION

For the above and foregoing reasons, Defendants respectfully submit that the Plaintiff's Amended Complaint should be dismissed in its entirety and that summary judgment should be entered in favor of Defendants on all claims.

1  RESPECTFULLY SUBMITTED this 3rd day of March 2017.

2          FISHER & PHILLIPS LLP

3

4         By  s/ Shayna H. Balch
         Pavneet Singh Uppal
5           Shayna H. Balch
         3200 N. Central Avenue, Suite 805
6           Phoenix, Arizona 85012-2425
         Attorneys for Defendants
7

**FISHER & PHILLIPS LLP**
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

FPDOCS 32672253.1

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of March 2017 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

Edmundo P. Robaina
Thomas T. Griffin
Ashley A. Marton
ROBAINA & KRESIN PLLC
5343 North 16th Street, Suite 200
Phoenix, Arizona 85016
Attorneys for Plaintiff

  s/ Michelle Colwell

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2425
(602) 281-3400

FPDOCS 32672253.1