# EXHIBIT 2, PART 2

# TO

# PLAINTIFF'S STATEMENT OF FACTS

# IN SUPPORT OF

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT



**MARICOPA COMMUNITY COLLEGES**

# Residential Faculty Policies

## 2013 - 2014

### (Effective September 1, 2013)

Published by the Maricopa County
Community College District,
Human Resources Division

The Maricopa County Community College District does not discriminate on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status, or genetic information in employment or in the application, admissions, participation, access and treatment of persons in instructional programs and activities.



EXHIBIT 2
WIT: R. Gillespie
DATE: 11-22-16
Angela F. Miller, RPR, CR

MCCCD/Martinez 00248

**TABLE OF CONTENTS**

**1. POLICY STATEMENT AND DEFINITIONS**...................................................................1
   1.1. Policy Statement ................................................................................................1
   1.2. Definitions .........................................................................................................1

**2. RIGHTS OF RESIDENTIAL FACULTY**.......................................................................6
   2.1. Information.........................................................................................................6
   2.2. Time for Meetings .............................................................................................6
   2.3. Use of College Facilities ...................................................................................6
   2.4. Use of District Equipment..................................................................................6
   2.5. Office Space......................................................................................................6
   2.6. Mail ..................................................................................................................6
   2.7. Participation in Educational Policy Making ........................................................6
   2.8. Board Meetings.................................................................................................7
   2.9. Personnel Policy Revision and Interpretation....................................................7
   2.10. Budget Formulation Participation ....................................................................8
   2.11. Recruitment and Selection of Faculty/Faculty Screening of Administrative Personnel..........8
   2.12. Faculty Load Reassignments........................................................................10
   2.13. Dues For Faculty Association ........................................................................11

**3. RIGHTS OF MEMBERS** ........................................................................................12
   3.1. Instructional Rights/Academic Freedom ........................................................12
   3.2. Intellectual Property Rights .............................................................................12
   3.3. Personal Rights ..............................................................................................13
   3.4. Visitation of Faculty Members.........................................................................13
   3.5. Faculty Evaluation Plan (FEP) for Instructional Improvement .........................13
   3.5. (New) Probationary Faculty Peer Assistance and Review (Goes into effect July 1, 2014, for probationary
       faculty. Supersedes the current 3.5. and 3.6.) .........................................16
   3.6. Probationary Faculty Evaluation .....................................................................19
   3.7. Experimental Program Personnel ...................................................................20
   3.8. Legal Rights ...................................................................................................20
   3.9. Personnel Files ...............................................................................................21
   3.10. Probationary Faculty—Nonrenewal ..............................................................21
   3.11. Suspension of a Faculty Member..................................................................22
   3.12. Administrative Leaves of Absence .................................................................23
   3.13. Faculty Member Dismissal—Probationary and Appointive ............................23
   3.14. Membership in and Representation by Professional Organizations..................25
   3.15. Faculty Transfer/Reassignment Policy ..........................................................25
   3.16. Reduction in Force ........................................................................................27

**4. COMPENSATION AND HIRING PRACTICES** ..........................................................34
   4.1. Salary Schedule..............................................................................................34
   4.2. Salary Placement............................................................................................34
   4.3. Credit for Prior Experience .............................................................................34
   4.4. Salary Placement Review Board......................................................................36
   4.5. Horizontal Movement on the Salary Schedule .................................................36
   4.6. Vertical Movement on the Salary Schedule .....................................................37
   4.7. Restrictions and Exceptions to Advancement..................................................38
   4.8. Other Paid Duties and Benefits.......................................................................38
   4.9. Employment for Less Than Contract Year........................................................38
   4.10. Employment for Less Than One Hundred Percent (100%) Time......................38
   4.11. Faculty Professional Growth Activities ...........................................................38
   4.12. One-Year-Only (OYO) and One-Semester-Only (OSO) Faculty ....................38

MCCCD/Martinez 00249

**5. EMPLOYMENT CONDITIONS** .................................................................... **40**
  5.1. Calendar ................................................................................................40
  5.2. Residential Faculty Positions.................................................................41
  5.3. Faculty Member Load .............................................................................41
  5.4. Accountability/Professional Responsibilities ........................................43
  5.5. Assignments Beyond the Regular Contract ..........................................44
  5.6. Substitution ...........................................................................................44
  5.7. Hiring Practices—Employment Requirements.......................................44
  5.8. Part-Time Residential Faculty Members................................................44
  5.9. Sabbatical Leaves .................................................................................45
  5.10. Professional Unpaid Leaves .................................................................45

**6. CONFLICT RESOLUTION** ...................................................................... **46**
  6.1. Grievance Procedure..............................................................................46
  6.2. Resolution of Controversy .....................................................................49
  6.3. Informal Resolution and Mediation .......................................................51
  6.4. Administrative Evaluation ......................................................................53
  6.5. Conflict Between Student and Faculty Member .....................................54
  6.6. Internal Investigations...........................................................................55

**7. EFFECT OF POLICY** ............................................................................... **57**
  7.1. Separability ...........................................................................................57
  7.2. Statement of Good Faith ........................................................................57
  7.3. Compliance Between Individual Contract and Policy .............................57
  7.4. Renewal and Process for Successor Agreement ...................................57
  7.5. Sharing of Financial Data ......................................................................57
  7.6. Interest-Based Negotiation Timeline and Process.................................57
  7.7. Date of Implementation for Policy Change(s) ........................................58
  7.8. Attestation Page.....................................................................................59

**APPENDIX A - FACULTY PROFESSIONAL GROWTH POLICIES** ................ **60**
  A.1. INTRODUCTION .....................................................................................60
  A.2. PROFESSIONAL GROWTH ADVANCEMENT—GENERAL INFORMATION ....60
  A.3. POLICY FOR HORIZONTAL ADVANCEMENT ON THE SALARY SCHEDULE ....61
  A.4. SABBATICAL LEAVES............................................................................62
  A.5. PROFESSIONAL UNPAID LEAVES..........................................................66
  A.6. PROFESSIONAL GROWTH PROJECTS ...................................................68
  A.7. PROFESSIONAL GROWTH TRAVEL AND EXPENSES .............................69
  A.8. DENIAL OF PROFESSIONAL GROWTH ...................................................69
  A.9. BUDGET .................................................................................................69
  A.10. CLERICAL SUPPORT .............................................................................69

**APPENDIX B - BENEFITS** .......................................................................... **70**
  B.1. TRAVEL EXPENSES................................................................................70
  B.2. EMPLOYEE BENEFIT PROGRAM ............................................................70
  B.3. DISTRICT-WIDE EMPLOYEE BENEFITS ADVISORY COUNCIL.................70
  B.4. REIMBURSEMENT FOR UNUSED SICK LEAVE:  RETIREMENT OR DEATH IN SERVICE ....71
  B.5. LEAVES OF ABSENCE ...........................................................................71
  B.6. INSURANCE COVERAGE DURING A DISABILITY ....................................74
  B.7. CHANGES TO APPENDIX B.....................................................................74

MCCCD/Martinez 00250

**APPENDIX C - EXTRA PAY FOR EXTRA DUTY** ............................................................................ **75**
  C.1. INTRODUCTION............................................................................................................75
  C.2. AUTHORITY TO ESTABLISH RATES OF PAY AND PAYMENT ........................................75
  C.3. INSTRUCTIONAL FACULTY ASSIGNMENTS BEYOND THE REGULAR BASE CONTRACT............75
  C.4. SERVICE FACULTY ASSIGNMENTS BEYOND THE REGULAR BASE CONTRACT (INCLUSIVE OF SUMMER) 76
  C.5. PAY FOR COMMUNITY SERVICE ACTIVITIES (NONCREDIT)............................................76
  C.6. FACULTY SERVING AS ACADEMIC ADVISORS .............................................................76
  C.7. FACULTY PAY FOR EDUCATIONAL DEVELOPMENT AND/OR PROFESSIONAL GROWTH PROJECTS (NO
     STUDENT CONTACT) ....................................................................................................76
  C.8. HONORARIUM PAYMENTS ..........................................................................................77
  C.9. CO-OP/INTERNSHIP (HEALTH OCCUPATIONAL, CLINICAL AND PRACTICUM NOT INCLUDED IN THIS
     SECTION) ....................................................................................................................77
  C.10. FORUM SERIES ........................................................................................................77
  C.11. SUBSTITUTE PAY .....................................................................................................77
  C.12. PAY FOR SUPERVISION OF THE EVENING PROGRAM ................................................77
  C.13. PAY FOR SUPERVISION OF DUAL ENROLLMENT ......................................................77
  C.14. PAY FOR EVALUATION OF ADJUNCT FACULTY ..........................................................78
  C.15. PAY FOR EVALUATION OF DUAL ENROLLMENT INSTRUCTORS ..................................78
  C.16. OTHER INSTRUCTIONAL ACTIVITIES .........................................................................78
  C.17. ATHLETIC STIPENDS .................................................................................................79
  C.18. ATHLETIC DIRECTOR PAY AND REASSIGNED TIME ....................................................79
  C.19. OCCUPATIONAL PROGRAM DIRECTORS ....................................................................80
  C.20.  CHANGES TO APPENDIX C ......................................................................................80

**APPENDIX D - DEPARTMENT/DIVISION CHAIRS AND OCCUPATIONAL PROGRAM DIRECTORS.......81**
  D.1.  DEPARTMENT/DIVISION CHAIRS...............................................................................81
  D.2.  OCCUPATIONAL PROGRAM DIRECTOR......................................................................82

**APPENDIX E - RESIDENTIAL FACULTY SALARY SCHEDULE** ................................................. **1**

**APPENDIX F - COMMON POLICIES** ................................................................................... **1**

**APPENDIX G - PROCESS FOR RECOMMENDATIONS REGARDING COMPENSATION ITEMS** ................. **2**
  G.1.  Introduction.............................................................................................................2
  G.2.  Determining Factors .................................................................................................2
  G.3.  Recommendation Procedures....................................................................................2

**APPENDIX H - PROFESSIONAL CODE OF ETHICS** ............................................................. **3**

MCCCD/Martinez 00251

# 1. POLICY STATEMENT AND DEFINITIONS

## 1.1. Policy Statement

### 1.1.1.

The Chancellor of the Maricopa County Community College District (MCCCD) hereby retains and reserves, without limitation, all powers, rights, authority, duties, and responsibilities conferred upon the position or vested in the position, by the laws and constitutions of the State of Arizona and the United States, and all rights and powers, to manage the MCCCD and direct the Faculty (including assignment) of the MCCCD except as otherwise provided in this policy.

### 1.1.2.

The Chancellor shall have the right to establish such standards of professional conduct and rules and regulations that are not in conflict with this policy.

### 1.1.3.

It is recognized by the Faculty and Administration that it is desirable, in order to establish the terms and conditions governing employment, for representatives to meet and confer, in good faith, about policies affecting responsibilities and benefits pertaining to Residential Faculty employment.

### 1.1.4.

For this reason, this policy statement is adopted by the Governing Board of MCCCD and the Faculty Association, which is the nonexclusive representative of the MCCCD Residential Faculty. It is understood that this policy manual is applicable to Residential Faculty who are not members of the Faculty Association.

### 1.1.5.

The Governing Board and its designees shall not discriminate against Faculty because of their membership and/or participation in the Faculty Association or any other recognized organization.

## 1.2. Definitions

### Accountability/Professional Responsibilities

As the central mission of the MCCCD is teaching and learning, it is inherent in the professionalism of Faculty that additional hours, outside of teaching, are necessary for the enrichment of the colleges, District, and external communities. Professional responsibilities include, but are not limited to, academic support hours with students and active participation in Department/Division, College, and/or District activities.

### Calendar Days

Unless otherwise stated, the term "day(s)" in this manual means calendar day(s).

### College Plan

The *College Plan* is a document developed by the college Residential Faculty and approved by the College President that describes, but is not limited to, the selection, evaluation, duties, and responsibilities of the Department/Division Chair, and the duties and responsibilities of the Occupational Program Director. (See Appendix D). Colleges with both divisions and departments will also describe the allocation of reassigned time and Chair pay.

MCCCD/Martinez 00252

**College Staffing Advisory Committee**

The College Staffing Advisory Committee consists of the appropriate instructional administrator and at least four (4) Faculty appointed by the Faculty Senate President. The instructional administrator will be a nonvoting member of this committee.

The College Staffing Advisory Committee will consult with Department/Division Chairs and other appropriate personnel in order to make recommendations on the staffing of Faculty positions. The committee's recommendations will be delivered to the College President.

**Common Policies Committee**

The Common Policies Committee is a Governing Board-approved District committee consisting of the official representative of each employee group.

**Day Program**

The Day Program shall apply to the 195 consecutive days between mid-August and mid-May, of which 170 shall be days of accountability and shall be Monday through Friday starting at 6:00 a.m. and ending at 3:55 p.m., except for a section(s) of a course(s) starting prior to 3:55 p.m., or for section(s) of a course(s) that are part of an established day curriculum and must be offered after 3:55 p.m.

**Department/Division Chair**

A Department/Division Chair is a Faculty member as defined in the *Residential Faculty Policies* with certain administrative functions as assigned by appropriate college personnel. (See Appendix D.)

**District Faculty Association President**

The District Faculty Association President is the elected representative of Residential Faculty throughout the MCCCD.

**Educational Institutions**

For the purposes of implementing this policy, the terms "college," "community college center," or any other term indicating an institution as an educational institution, will be regarded as being identical in meaning. Unless otherwise specified herein, the provisions of this policy will be applied fully at all such institutions within the MCCCD, except as indicated in Section 5.2.

**Evening Program**

The Evening Program shall apply to the 195 consecutive days between mid-August and mid-May, of which 170 shall be days of accountability and shall encompass programs taught and/or supervised beyond those hours defined by the Day Program set forth in Section 1.2.

**Faculty Governance**

Faculty governance is a process determined by the Residential Faculty. It is understood that the Residential Faculty have primary responsibility for such fundamental areas as curriculum, subject matter and methods of instruction, research, Faculty status, and those aspects of student life which relate to the educational process.

If a college chooses not to participate in a governance system, the College President may make necessary committee appointments to carry out the educational objectives of the College and District. Should this occur, the College President will be cognizant of the governance standards at other colleges.

MCCCD/Martinez 00253

## Faculty Professional Growth Appeals Committee

The Faculty Professional Growth Appeals Committee shall be the FPG Policy Review Committee. Decisions will require a 2/3 majority vote.

## Faculty Professional Growth Committee

The Faculty Professional Growth Committee is a Governing Board approved District committee consisting of the Executive Vice Chancellor and Provost, a Vice President of Academic Affairs or designee and two (2) Faculty representatives from each college. The Faculty representatives will be appointed by the Faculty Senate Presidents from each college. The District Faculty Association President, or designee, will serve ex officio and be a nonvoting member.

## Faculty Senate Presidents

The Faculty Senate Presidents are elected representatives of the Residential Faculty of each college.

## Grievance

A grievance is an alleged misapplication, misinterpretation, or violation of a specific provision(s) of these policies that adversely affects the grievant (*i.e.*, an individual or a group of individuals that makes the claim). An interested party is a grievant or any person who might be required to take action, or against whom action might be taken, in order to resolve the claim.

The outcomes of the following items are not grievable:

- Faculty Member Dismissal—Section 3.13.

- Retrenchment—Section 3.16.

- Increment/Salary Withholding—Section 4.6.2.

- Faculty Professional Growth—Appendix A.

## Instructional Councils

Instructional Councils are discipline/service area Faculty committees formed to improve communications and coordination among and between Faculty working in common instructional/service areas. Membership in the Instructional Councils will be appointed by the Department/Division Chair at each college with the consent of the majority of the Residential Faculty in the appropriate discipline. The appointee will be qualified in the appropriate discipline. The Department/Division Chairs will report the appointments to their college's Faculty Senate President. Policies governing Instructional Councils are found in the current "Instructional Council Guidelines." Issues involving Instructional Councils are subject to Resolution of Controversy. (See Section 6.2.)

## Interest-Based Negotiation (IBN)

A process of negotiation focused on working together collaboratively to find solutions to issues. IBN is characterized by identifying issues to work, detailing the history and interests surrounding the issues, brainstorming options that address the issues, evaluating options based on agreed-upon criteria, and reaching consensus on a preferred option based on interests.

**Meet and Confer Team**

The meet and confer team includes an equal number of representatives from the Faculty and the Administration.  The team is co-chaired by a faculty member and an administrator.  The team is charged with using interest-based negotiation in the Meet and Confer Process.

**Meet and Confer Process**

The Meet and Confer Process is a process of deliberation between the Governing Board and Faculty Association, including Residential Faculty who are not members of the Faculty Association, for the purpose of articulating agreement regarding change with respect to responsibilities, wages, governance, benefits, and all other terms and conditions of Residential Faculty employment.  The process is detailed in Section 7.4.

**Occupational Program Director**

Faculty members who serve in the capacity of Occupational Program Director shall, while exercising the responsibilities of that position, have responsibilities which may include any or all of the following:  responsibility for occupational program including organization, administration, periodic review, continuing development, and general quality/effectiveness.  The primary focus of this position rests with the specific program management rather than issues of general institutional management.

**Residential/Adjunct Faculty Ratio**

The residential/adjunct ratio is defined as follows:

$$\text{residential/adjunct ratio} = \frac{\text{residential load hours}}{\text{total load hours}} : \frac{\text{adjunct load hours}}{\text{total load hours}}$$

**where total load hours is the sum of residential and adjunct instructional load hours for the Fall and Spring semesters for the prior academic year (excluding Rio Salado).  For this computation, residential overload hours and OYO/OSO instructional load hours are counted as residential load hours.**

**Residential Faculty**

Residential Faculty are Faculty members who hold probationary or appointive status. (Herein referred to as "Faculty members" or "Faculty.")

<u>Appointive Status.</u>

Appointive status is attained by a Faculty member at the beginning of his/her sixth consecutive year calculated from the start date of the first contract. (Hereinafter called "Appointive members.")

<u>Probationary Status.</u>

Probationary status is assigned to all Faculty members who have not attained appointive status.  (Hereinafter called "Probationary members.")

In order to earn credit toward appointive status, a Probationary member must meet the following three conditions:

1.  Be evaluated each calendar/academic year according to the procedures in **Section 3.6.**

MCCCD/Martinez 00255

2. Not accumulate unpaid absences in excess of 20% of his/her accountability days per semester.

3. Meet all conditions established in **Section 3.6.2. or 3.10.2.2.**

If these aforementioned conditions are not met, the probationary period may be extended an additional semester for each deficient semester.

### Residential Faculty Policy Review Process

The Residential Faculty Policy Review Process exists for the purpose of interpretation and recommendation for change in the *Residential Faculty Policies.* (See Section 2.1.)

### Resolution of Controversy

Resolution of Controversy is a method used to resolve matters as referenced in Section 6.2. that are not specifically addressed by the *Residential Faculty Policies.*

### Seniority

Seniority shall be based on continuing Residential employment, and shall date from the time of first paid service as a Residential Faculty member. When seniority status must be determined for two or more Faculty who have the same date of first paid service as a Residential Faculty member, seniority will be determined by the earliest date of appointment by the Governing Board.

### Teaching/Service Minor

To teach in a second field, Faculty members must meet the Maricopa Community Colleges' Faculty hiring qualifications for that specific academic or occupational teaching field.

MCCCD/Martinez 00256

## 2. RIGHTS OF RESIDENTIAL FACULTY

### 2.1. Information

Upon written request, the Governing Board, through the office of the appropriate Vice Chancellor, agrees to provide to the elected representatives of the Faculty information that is relevant for the Meet and Confer process (see Appendix G) and/or the implementation of the *Residential Faculty Policies*. It is understood that the Board will make a good-faith effort to honor Faculty requests for information.

### 2.2. Time for Meetings

Faculty can participate during hours of accountability (if it does not interfere with scheduled assignments) in meetings and grievance proceedings. Such meetings must normally not conflict with the scheduled assignment of those Faculty involved.

### 2.3. Use of College Facilities

The Faculty shall have the right of access to college buildings for the purpose of Faculty business, providing there is no interference with the regular academic program. The usual facility reservation procedure will be followed.

### 2.4. Use of District Equipment

The Faculty shall have the right, for the purpose of member representation, to use District equipment at reasonable times at the assigned location, including word processors, computers, duplicating and media equipment, and other apparatus and material, provided such equipment is not otherwise in use. The Board will make supplies available at its cost for such purposes.

### 2.5. Office Space

#### 2.5.1.

Office space will be provided for the Faculty at the colleges.

#### 2.5.2.

The District Faculty Association President will be provided with office space either at the District Support Services Center or at a college mutually agreed upon by both parties.

### 2.6. Mail

#### 2.6.1.

Faculty shall have use of intra-college and intra-District mail facilities, including electronic mail, within current guidelines and policies.

#### 2.6.2.

In order to encourage communication, auditoria and bulletin boards shall be made available for Faculty news and activities.

### 2.7. Participation in Educational Policy Making

#### 2.7.1.

Effective means of two-way communication between individual Faculty members and the administration shall exist for the promotion of professional practices.

MCCCD/Martinez 00257

**2.7.2.**

Policy and administrative regulations affecting the Faculty shall be discussed, before implementation, with the Faculty at the appropriate level.

**2.7.3.**

Policy recommending committees that plan, propose, or recommend any action that will influence decisions regarding the educational program of the District shall be a part of the administrative structure at each college and a part of the District administrative structure.   Such policy recommending committees shall include representatives of the Faculty.

## 2.8. Board Meetings

**2.8.1.**

The District Faculty Association President shall be accorded sufficient time at all regular Governing Board meetings to present Faculty views.

**2.8.2.**

The Faculty and the District Faculty Association President shall be furnished notice of all regular and special meetings of the Governing Board, stating date, time, and location.   In addition, agendas, minutes, budgetary information, and study materials will be furnished to the District Faculty Association President at the same time and in the same form as those furnished the Board.

## 2.9. Personnel Policy Revision and Interpretation

**2.9.1.**

Contested interpretation of existing policy (excluding alleged grievances against violations of this policy) shall be forwarded in writing by the District Faculty Association President to the Vice Chancellor of Human Resources, or designee, as well as any other applicable Vice Chancellor involved.

**2.9.2.**

The Vice Chancellor of Human Resources, or designee, shall consult with the District Faculty Association President at least once every semester to discuss contested interpretations (if any) of existing policy.   Other Vice Chancellors shall also be notified as appropriate. The parties shall agree on one of the following:

**2.9.2.1.**

The item is not of the utmost urgency and shall be deferred to be handled during the next Meet and Confer process.

**2.9.2.2.**

The parties reach an agreement on interpretation, reduce the agreement to writing for signature by both parties, and forward the written agreement to the Chancellor with the recommendation that it be placed on the next Board agenda for consideration.

MCCCD/Martinez 00258

**2.9.2.3.**

If the item is of utmost urgency and agreement cannot be reached, both parties will submit, within fourteen (14) days of initial consultations, their position statements to the Chancellor.  The Chancellor will review the positions of the parties and prepare a recommendation for the Governing Board.  In addition to the Chancellor's statement, position statements from the parties will also be submitted to the Governing Board for their consideration and action.

## 2.10. Budget Formulation Participation

**2.10.1.**

The District Faculty Association and the Faculty shall receive reasonable notice of District budget-formulation meetings.  Representatives of the District Faculty Association will participate in the District budget development process through their membership in the Chancellor's Financial Advisory Council (FAC). Preliminary college budgets will be developed with the participation of the respective Faculty Senate Presidents or designees prior to their college's budget submission to FAC. The Faculty Senate President or designee may submit to the College President recommendations on budget appropriations for programs and priorities before the college budget is finalized. Any subsequent changes will be brought to the attention of the Faculty Senate Presidents before submission to FAC.

**2.10.2.**

The District Faculty Association President and the Faculty Senate Presidents shall have access, through their Faculty representatives on FAC, to all budget development materials made available to FAC members.  The District Faculty Association President shall be provided, upon request, supporting materials related directly to issues brought before FAC, if such materials presently exist.

## 2.11. Recruitment and Selection of Faculty/Faculty Screening of Administrative Personnel

**2.11.1.**

The District Faculty Association President shall receive printed or electronic notice of Faculty and Management/Administrative/Technological (MAT) personnel posted vacancies.  Faculty shall be advised, via electronic mail, of all Faculty transfer opportunities.

**2.11.2.**

At the direction of appropriate college personnel and with the concurrence and assistance of the Director of Employment and Employee Relations, individual colleges will establish screening/selection processes to fill Faculty vacancies. Their processes will include the active participation of the appropriate members of the Faculty and/or other appropriate directors of employment.  College screening/selection committees will forward a written, unranked list of at least two (2), preferably three (3) to five (5), candidates to the College President for his/her consideration. At the written request of the College President, the college screening committee will forward a written, ranked list. (In the event the screening/selection committee finds there are not at least two [2] qualified candidates to forward to the College President, the committee may ask the College President to consider reopening or extending the search process.)

MCCCD/Martinez 00259

##### 2.11.2.1.

Faculty who chair screening committees will undergo training offered through the District Division of Human Resources prior to commencing a screening process. Training updates will be provided by the District Division of Human Resources as needed.

#### 2.11.3.

Faculty participation on screening committees shall be utilized in the screening of new college and District administrative personnel.

##### 2.11.3.1.

The College Senate Faculty President will recommend Faculty to serve on screening committees for college administrative personnel.

##### 2.11.3.2.

The District Faculty Executive Council will recommend Faculty to serve on screening committees for District administrative personnel.

#### 2.11.4.

All new Faculty must meet MCCCD minimum requirements and any additional standards as recommended by the relevant Instructional Council, approved by the Governing Board, and on file with the District Division of Human Resources.

#### 2.11.5.  MAT Member Reassigned to Faculty

##### 2.11.5.1.

A MAT member who has not previously held appointive status and is being reassigned to Faculty must be certified in the discipline to which he/she is reassigned, must meet hiring requirements that are currently in effect, and must serve the full probationary period. If the person began his/her employment as a Faculty member prior to reassignment as a MAT member, he/she would meet the current hiring requirements if the reassignment to Faculty is in the same Faculty position that the MAT member previously held. The MAT member shall interview with the Department/Division Chair in the discipline. The Chair will forward a recommendation to the Vice President of Academic Affairs. The reassignment must be approved by the College President, who will consult with the appropriate Vice President and Department/Division Chair, and the Faculty Senate President. The Department/Division Chair will informally consult members of that Department/Division.

##### 2.11.5.2.

Such MAT member shall be given credit toward the probationary period for any prior years with the District as a Faculty member.

MCCCD/Martinez 00260

## 2.12. Faculty Load Reassignments

### 2.12.1.

Each fiscal year Faculty members shall be granted annual load hour reassignments to prepare for and participate in college and district educational policy making (per Section 2.7.) and other activities beneficial to achieving the district's vision, mission, and values.

Representative activities include:

- board meeting attendance (per Section 2.8.);
- budget formulation (per Section 2.10.);
- recruitment and selection committees (per Section 2.11.);
- providing a supportive network for new and existing Faculty that promotes greater Faculty satisfaction and retention;
- providing an additional channel of communication among Faculty and between Faculty and the Governing Board, the Chancellor and the Chancellor's Executive Council;
- identifying interests and concerns of the Faculty that may otherwise go unrecognized, providing recommendations or strategies to address these interests or concerns, and participating in the meet and confer process and other processes as needed; and
- collaborating with other employee groups, and other MCCCD groups and committees, to develop a climate that allows all students, Faculty, and employees to succeed.

These load hours will not be used for political activities. Load hours will be granted as follows:

| District Governance: | Per Year |
|---|---|
| Faculty Association President | 30 hours |
| Faculty Association President-Elect | 15 hours |

College Governance:

Senate President

| Number of RFP Faculty at College | Per Year |
|---|---|
| 0-199 Faculty | 12 hours |
| 200-249 Faculty | 15 hours |
| 250 or more Faculty | 18 hours |

MCCCD/Martinez 00261

**2.12.2.**

The Faculty Professional Growth Committee shall consist of two (2) Subcommittees. Each subcommittee Chair shall be selected by the Faculty Association Council of Presidents from among the members of the Faculty Professional Growth Committee. Each Chair shall receive 3.0 load hours per year. At the end of each Academic year, each Chair will issue a written report outlining accomplishments, problems, and recommendations to the FPG Policy Review Committee and the Executive Vice Chancellor and Provost.

Each of the Faculty Professional Growth Committee college representatives shall be awarded reassigned time according to the following scale:

| Number of RFP Faculty at College | Per Year |
|---|---|
| 20-125 | 3.0 hours |
| 126-199 | 4.5 hours |
| 200-270 | 6.0 hours |
| Over 270 | 9.0 hours |

**2.12.3.**

Additional load reassignment may be granted by the Vice Chancellor of Human Resources to Faculty and the Faculty Association upon payment of all replacement costs to be computed in accordance with the provisions of Section C.3.3.

**2.13. Dues For Faculty Association**

Faculty who elect to join the Faculty Association can have their membership dues deducted from their salaries on a regular basis provided that they sign an authorization form to that effect.

MCCCD/Martinez 00262

## 3. RIGHTS OF MEMBERS

### 3.1. Instructional Rights/Academic Freedom

Faculty are entitled to instructional freedom in discussing their subject with students, and they should exercise their best effort to ensure topics are relevant to their subject. Faculty will determine curriculum and relevant subject matter for courses, recommend the appropriate pedagogy, textbooks, and other materials relevant to teaching their subject.

Faculty shall maintain the right and responsibility to determine grades and other evaluations of student performance.

Outside of class, when Faculty express themselves as citizens or as public employees, they shall be free from institutional censorship or discipline. When acting as citizens, Faculty will exercise their best efforts to indicate that they are not speaking for the institution and to conduct themselves as scholars and representatives of higher education. When acting as public employees, Faculty will be allowed to speak freely on all matters of institutional governance, as is necessary to support a robust system of shared governance.

Faculty are entitled to freedom in research and in the publication of the results consistent with the provisions of Section 3.2. Intellectual Property Rights.

### 3.2. Intellectual Property Rights

MCCCD recognizes the academic exception of the Works Made for Hire Doctrine for Faculty whose work, disseminated in print or electronically, is created independently at the Faculty member's own initiative with the ordinary use of resources such as a library, office space and equipment, and computer and network facilities.

#### 3.2.1.

A Faculty-developed work, disseminated in print or electronically, that has been *commissioned or sponsored* by MCCCD requires a signed written contract prior to the development of the work. MCCCD *commissioned* or *sponsored* works are defined as works with specified outcomes, that include the provision of compensation such as additional financial payment or release time for the Faculty developing the work and may include the use of substantial MCCCD resources.

##### 3.2.1.1.

The contract for *commissioned or sponsored works* will include the following provisions:

###### 3.2.1.1.1.

MCCCD can perform, communicate, or otherwise enjoy full use of commissioned or sponsored work for internal instructional, educational and administrative purposes without payment of royalty, license fee or similar considerations.

###### 3.2.1.1.2.

The Faculty member who has developed the commissioned or sponsored work must obtain prior written approval from MCCCD for the use, sale, or licensing of it.

MCCCD/Martinez 00263

**3.2.2.**

Other provisions may be negotiated by the Faculty member and MCCCD and added to the contract. These may include the ability to edit and control the presentation of the work, the ability to change and update materials over time, the ability to create derivative or related works, and the sharing of costs and revenues associated with the commercialization of such work.

**3.2.3.**

A Faculty member shall not, in connection with any class, suggest or require that a student purchase instructional materials which the Faculty member has produced, or from the purchase of which the Faculty member or the Faculty member's designee is entitled to royalty or similar consideration, unless the materials have been:

**3.2.3.1.**

produced by a "recognized, independent publisher," defined as a commercial entity in the business of publishing books, periodicals, and similar instructional materials, and which performs editorial, printing, distribution, marketing, and other functions typically associated with commercial publishing at the publisher's expense; and

**3.2.3.2.**

previously approved for students' purchase by the Vice President of Academic Affairs at the college where the Faculty member teaches the class.

**3.2.4.**

A Faculty member shall not have any financial interest in or receive compensation from the sale of any unpublished instructional materials required or suggested for a class that the Faculty member teaches.

**3.3. Personal Rights**

The Governing Board recognizes that the personal life of a Faculty member is not an appropriate concern of the MCCCD, provided it does not affect the Faculty member's effectiveness in fulfilling professional obligation(s).

**3.4. Visitation of Faculty Members**

Brief class visits by administrative and/or staff personnel may be conducted without notice to the Faculty member in situations that need immediate attention for the normal operation of the College, for example, the safety and welfare of the Faculty and/or students. These visits will not be used for the purpose of the Faculty member evaluation.

**3.5. Faculty Evaluation Plan (FEP) for Instructional Improvement**

Inasmuch as the Faculty is committed to quality teaching and instruction and is contracted to provide professional services to students, colleagues, and the MCCCD, the Faculty do hereby agree to adhere to, support, and implement the following self-evaluation policies and procedures.

**3.5.1.** The objectives of the evaluation program are as follows:

MCCCD/Martinez 00264

#### 3.5.1.1.

To improve teaching performance.

#### 3.5.1.2.

To advise the Faculty members regularly and specifically of their strengths and weaknesses, progress, and overall status.

### 3.5.2. Time Frame

#### 3.5.2.1.

Although the FEP can begin at any time, the appropriate college Vice President, through the appropriate Department/Division Chair, will be responsible for notifying a Faculty member early in the fall semester of the evaluation year. The FEP must be completed and submitted to the college Vice President by June 30th of the evaluation year.

#### 3.5.2.2.

Faculty must complete or review and update a plan every year while in "probationary" status and every third year (or more often if the Faculty member desires) when in appointive status.

#### 3.5.2.3.

Each College Senate will appoint a "Resource Person" who is familiar with the FEP to help facilitate the process. The Faculty/Staff Development Specialist is a suggested candidate for this position.

### 3.5.3. Areas for Evaluation

To complete an FEP, each Faculty member must engage in a self-examination of the three Required Areas and at least two of the Elective Areas. Examples of the following areas can be found in the Faculty Evaluation Plan guidelines.

#### 3.5.3.1. Required Areas

**3.5.3.1.1.** Teaching, Learning, and/or Service

**3.5.3.1.2.** Course Assessment and/or Program Development/Revision

**3.5.3.1.3.** Governance and/or Committee Participation at the College and/or District levels

#### 3.5.3.2. Elective Areas

**3.5.3.2.1.** Professional Development

**3.5.3.2.2.** Acquisition of New Skills

**3.5.3.2.3.** Enhancement of Diversity

**3.5.3.2.4.** College Level Assessment of Learning Outcomes

**3.5.3.2.5.** Service to the Community

MCCCD/Martinez 00265

### 3.5.3.3. Related Areas

In addition to an assessment of these "Three Required Areas and Two Elective Areas," other "Related Areas" may also be selected by the Faculty member to review, in order to bring into better focus their full professional involvement at the college or within the MCCCD. See the FEP guidelines for examples.

### 3.5.4. Participants

The team will consist of:

### 3.5.4.1.

The Faculty member to be assessed will be the director of, and active participant in, the designing and implementation of his/her FEP plan. He/She will carry the major responsibility for gathering the information about and completing the plan to the best of the person's ability.

### 3.5.4.2.

A FEP committee member (to be chosen by the Faculty member) may be outside the Faculty member's discipline, department, or college.

### 3.5.4.3.

A third person will be chosen from the following: Another professional colleague, Department/Division Chair, college Vice President, Faculty/staff development specialist, and advisory committee member or alumnus.

### 3.5.4.4.

Students (or other services area recipients) will always provide input regarding teaching or service area performance via a customizable questionnaire or other appropriate measurement instrument. See FEP guidelines for details.

### 3.5.5. Verification of Compliance

At the conclusion of the process, the individual team members will review the documents submitted by the Faculty member to indicate his/her performance and goals in the areas outlined in the FEP and discuss them with the Faculty member. An "FEP Summary Endorsement Sheet" will be signed by the individual team members and also by the Department/Division Chair and appropriate Vice President, or Vice President's designee, to verify the work and indicate compliance with the process. A copy of the FEP Summary Endorsement Sheet will be filed with the appropriate Vice President, or Vice President's designee.

### 3.5.6.

The FEP guidelines may be modified by a majority of votes cast by the Faculty, providing any modifications do not violate the policies and procedures outlined in Section 3.5.

MCCCD/Martinez 00266

**3.5. (New) Probationary Faculty Peer Assistance and Review** (Goes into effect July 1, 2014, for probationary faculty. Supersedes the current 3.5. and 3.6.)

Faculty are committed to quality teaching and to providing professional service to students, colleagues, and the District. Faculty agree to adhere to, support, and implement the following probationary faculty evaluation policies and procedures.

### 3.5.1. Purpose

Probationary Faculty document their instructional expertise, service to college and community, and professional development through the Individual Development Plan (IDP). The rigorous IDP process is intended to provide significant professional growth and development for the probationary Faculty member in an environment of support and encouragement from Faculty Developers, Department/Division Chairs, Faculty Mentors, Instructional Administrators, and others. Probationary Faculty submit an IDP report annually for a period of five (5) years.

### 3.5.2. Areas for Evaluation

The IDP includes the following areas for evaluation: instruction; service to department/division, college, and district; and professional development. Evidence for each annual IDP report shall only include activities from the one-year period of the report.

#### 3.5.2.1. Instruction

To document instructional excellence, probationary faculty submit the following required elements:

**3.5.2.1.1.** Instructional evaluation from VPAA or designee
**3.5.2.1.2.** Instructional evaluation from Department/Division Chair
**3.5.2.1.3.** Instructional observation and feedback from peer(s)
**3.5.2.1.4.** Instructional evaluation from students
**3.5.2.1.5.** Narrative demonstrating a personal reflection on teaching effectiveness in light of the instructional evaluations

Probationary faculty not engaged in instructional activities will submit comparable documents to those listed above with the focus being on the observation/evaluation of the probationary faculty member's primary work activity.

#### 3.5.2.2. Service to Department/Division, College, and District

To document service to department/division, college, and district, probationary faculty submit evidence of the following, as applicable:

**3.5.2.2.1.** Listing of committee/task force membership and description of contributions.
**3.5.2.2.2.** Description of participation in special projects/initiatives such as special events or curriculum development/revision.
**3.5.2.2.3.** Description of community service activities such as working with local business and industry, recruitment, service learning, outreach events, advisory board participation, outreach to K-12 partners, outreach to university partners, and volunteer activities.

MCCCD/Martinez 00267

### 3.5.2.3. Professional Development

To document professional development, probationary Faculty submit evidence of the following, as applicable:

**3.5.2.3.1.** College-level courses completed
**3.5.2.3.2.** Workshops and conferences attended
**3.5.2.3.3.** Books or articles published
**3.5.2.3.4.** Presentations given

## 3.5.3. Peer Assistance and Review (PAR) Team Participants

The PAR Team meets regularly to discuss the probationary Faculty member's progress in developing the IDP.

### 3.5.3.1. PAR Team for Year 1

**3.5.3.1.1.** The probationary Faculty member.
**3.5.3.1.2.** Two trained, appointive Faculty peers chosen by the probationary Faculty member. Peers will be selected with the assistance of the Faculty Developer in consultation with the appropriate Vice President or designee. Peers may be selected from outside the faculty member's discipline, department, or college.
**3.5.3.1.3.** The College's Faculty Developer.

### 3.5.3.2. PAR Team for Years 2 – 5

**3.5.3.2.1.** The probationary Faculty member.
**3.5.3.2.2.** A trained, appointive Faculty peer chosen by the probationary Faculty member. Peer may be selected from outside the faculty member's discipline, department, or college.
**3.5.3.2.3.** A trained, professional colleague, Department/Division Chair, or instructional administrator selected by consensus of the Senate President and appropriate Vice President

## 3.5.4. Peer Assistance and Review Committee (PARC)

The PARC consists of the appropriate instructional administrator and at least four (4) trained, appointive Faculty appointed by the Faculty Senate President in collaboration with the appropriate college Vice President.  The Peer Assistance Review Committee will evaluate all probationary Faculty Individual Development Plan (IDP) reports and make recommendations to the College President related to the renewal of the probationary appointment, and when appropriate, the granting of appointive status.  For each probationary Faculty member, the PARC will offer one of the following recommendations by consensus:
- recommend renewal
- recommend renewal with concerns
- do not recommend renewal

Upon review of the fifth IDP report of a probationary Faculty member, the PARC will recommend by consensus one of the following:
- recommend for appointive status
- recommend for nonrenewal

MCCCD/Martinez 00268

### 3.5.5. Timeline

#### 3.5.5.1 Year 1

The focus of the first year is for the Probationary Faculty to be actively involved in the new faculty experience at the college.

| | |
|---|---|
| August: | Probationary Faculty participate in New Faculty Experience. PAR Teams identified. |
| September – November: | Instructional observations and follow-up meetings. IDP plan created in consultation with PAR.  PAR team meeting(s). Faculty Developer keeps appropriate VP informed of progress. |
| January – March: | Initial draft of IDP submitted to PAR team no later than the end of the week of accountability. Instructional observations and follow-up meetings. PAR team meeting. Final draft of IDP submitted to the PAR team by the Monday after Spring Break. |
| April: | PARC evaluates all IDPs submitted by probationary Faculty. Recommendation submitted to College President and probationary Faculty informed by April 15. |
| May: | College President announces renewal or intent to non-renew decision by May 1. |

#### 3.5.5.2 Years 2 – 3

| | |
|---|---|
| September – November: | Instructional observations and follow-up meetings. IDP plan created in consultation with PAR.  PAR team meeting(s). Faculty Developer keeps appropriate VP informed of progress. |
| January – March: | Initial draft of IDP submitted to PAR team no later than the end of the week of accountability. Instructional observations and follow-up meetings. PAR team meeting(s). Final draft of IDP submitted to the PAR team by the Monday after Spring Break. |
| April: | PARC evaluates all IDPs submitted by probationary Faculty. Recommendation submitted to College President and probationary Faculty informed by April 15. |
| May: | College President announces renewal or intent to non-renew decision by May 1. |

#### 3.5.5.3 Year 4

| | |
|---|---|
| September – November: | Instructional observations and follow-up meetings. IDP plan created in consultation with PAR.  PAR team meeting(s). Faculty Developer keeps appropriate VP informed of progress. |
| January – March: | Initial draft of IDP submitted to PAR team no later than the end of the week of accountability. Instructional observations and follow-up meetings. PAR team meeting(s). Final draft of IDP submitted to the PAR team by the Monday after Spring Break. |
| April: | PARC evaluates all IDPs submitted by probationary Faculty. Recommendation submitted to College President and probationary Faculty informed by April 15. |
| May: | College President announces renewal or intent to non-renew decision by May 1.  The College President also announces intent to recommend or not recommend for appointive status. Probationary Faculty not recommended for appointive status will end their employment as Residential Faculty at the end of year five (5). |

MCCCD/Martinez 00269

**3.5.5.4 Year 5**

| | |
|---|---|
| September – November: | Instructional observations and follow-up meetings. IDP plan created in consultation with PAR. PAR team meeting(s). Faculty developer keeps appropriate VP informed of progress. |
| January – March: | Initial draft of IDP submitted to PAR team no later than the end of the week of accountability. Instructional observations and follow-up meetings. PAR team meeting(s). Final draft of IDP submitted to the PAR team by the Monday after Spring Break. |
| April: | PARC evaluates all IDPs submitted by probationary Faculty. Recommendation submitted to College President and probationary Faculty informed by April 15. |
| May: | College President forwards recommendation for appointive status to the Governing Board no later than May 1. Probationary Faculty that did not receive an appointive status recommendation at the end of year four (4) will end their employment at the end of year five (5). |

## 3.5.6. Rebuttal of PARC Recommendation of Nonrenewal

Probationary Faculty who receive a recommendation of nonrenewal from the PARC may send the College President a written rebuttal to the recommendation. Such rebuttal must be received within five (5) business days of the notification of the recommendation.

## 3.6.    Probationary Faculty Evaluation

In addition to the Faculty Evaluation Plan and student evaluations, the appropriate Vice President, or Vice President's designee, in conjunction with the Department/Division Chair, will meet with the first year probationary Faculty during each semester of the first year and anytime during the academic year for the second through fifth years of employment in order to discuss the Faculty member's progress in the areas of committee/department/division/college/District assignments, Faculty development, and adherence to the college processes and procedures. The probationary Faculty member will receive a jointly written follow up report from the Vice President, or Vice President's designee, and Chair within eight weeks of the meeting or, if the meeting occurs within eight weeks of the end of a semester, no later than the end of that semester that summarizes the findings of the meeting. The report will indicate strengths, accomplishments, and areas of needed improvement, if any.

## 3.6.1.

Evaluations of teaching effectiveness conducted by the Vice President or Vice President's designee and Department/Division Chair or designee, (who shall be, in the case for Occupational Programs, the Occupational Program Director) for the probationary period will be mandatory. Class evaluations shall be conducted in each semester during the first two probationary years and in each year during the third through fifth probationary years. The Vice President or Vice President's designee and Department/Division Chair or designee (who shall be, in the case for Occupational Programs, the Occupational Program Director) may at any time, with 24 hours advance notice, visit a class for evaluation of teaching and learning. The number of evaluation visits shall not exceed four (4) per semester. By October 1st of the fourth and fifth academic years, the Probationary member should be advised in writing, by the Department/Division Chair or appropriate Vice President, of any deficiencies which may, if uncorrected, result in non-renewal of contract, and the Probationary Faculty member shall have the remainder of the academic year to address said deficiencies.

MCCCD/Martinez 00270

### 3.6.2.

Fifth-year Probationary members will be notified in writing of any deficiencies arising after October 1st. The probationary period may be extended one additional semester for the affected Probationary member per Section 1.2. Failure of the Probationary member to correct said deficiencies in the additional semester will result in their non-renewal at the end of that semester.

## 3.7. Experimental Program Personnel

Members involved in experimental programs retain full rights under the *Residential Faculty Policies.*

## 3.8. Legal Rights

Nothing in this policy shall be construed to deny or diminish any individual rights that a member has under the law.

### 3.8.1. Indemnification

#### 3.8.1.1.

MCCCD, to the extent legally permissible, indemnifies and defends its employees against liability for acts or omissions arising out of and in the course of their employment for MCCCD or performing duties related to the conduct of MCCCD business. The General Counsel is authorized to represent MCCCD and/or the employee and direct the defense of any claim, action, suit or proceeding on behalf of MCCCD and the employee for which MCCCD is indemnifying the employee pursuant to this policy. MCCCD retains the right to direct, settle, compromise, appeal, and otherwise defend any such claim, action, suit or proceeding, including representation and the use of counsel as MCCCD deems desirable. In any such event, the employee is expected to cooperate fully.

#### 3.8.1.2.

Employees are not represented by counsel employed or retained by MCCCD in grievance procedures, internal discrimination matters, employment dismissal, or other similar proceedings, as these are internal processes which seek to inform MCCCD, its administrators, and Governing Board members regarding the appropriateness of specific conflicts.

#### 3.8.1.3.

MCCCD does not provide representation or indemnify employees with regard to criminal offenses, licensure, certification, or similar professional administrative or disciplinary actions, parking or moving vehicle violations, or fees, fines or penalties associated with such violations. MCCCD does not provide representation or indemnification for acts involving intentional misconduct, willful or knowing violation of the law, and transactions from which the individual derives an improper personal benefit. Each employee is expected to comply with federal and state laws, and local ordinances.

MCCCD/Martinez 00271

### 3.9. Personnel Files

The MCCCD shall maintain the official personnel files, which shall contain all materials relevant to the member's employment and shall be the sole repository of such materials with the exception of a college file. Only those materials permitted by law will be included in the official file. Each file will have attached a record for notation of names, dates, and purposes of persons reviewing the files. Only authorized personnel will be permitted to view employee files. A member shall have the right to:

**3.9.1.**

Review the contents of his/her file(s) upon request, except letters of recommendation and College/University placement files which, when submitted, request confidentiality.

**3.9.2.**

Receive a copy of any documents contained therein, except as noted in Section 3.9.1.

**3.9.3.**

Be notified, in writing, when material (other than of a routine office nature) is being added to the file(s).

**3.9.4.**

Request the inclusion of relevant documents to be added to the file(s). (Determination of relevancy is the responsibility of the Director of Employment and Employee Relations.)

**3.9.5.**

Request the removal of all inappropriate and/or obsolete documents from the files. (Determination will be made by the Director of Employment and Employee Relations.)

**3.9.6.**

File a written response to be included whenever negative or derogatory information is placed in the file(s).

### 3.10. Probationary Faculty—Nonrenewal

**3.10.1.**

While Faculty are originally employed with the intention that they are continuing employees, the Chancellor (upon the advice of a College President) may recommend to the Governing Board that a Probationary member's contract not be renewed. The Chancellor or designee will deliver the notice of intent to recommend nonrenewal by delivering it personally to the Faculty member or by sending it by U.S. registered or certified mail directed to the member at his/her place of residence as recorded in the MCCCD records.

**3.10.2.**

The Chancellor's notice of intent to recommend non-renewal must be delivered in accordance with the following dates:

MCCCD/Martinez 00272

#### 3.10.2.1.

Not later than March 1st for all members in Probationary status. By October 1st of the fourth and fifth academic years, the Probationary Faculty member should be advised in writing, by the Department/Division Chair or appropriate Vice President, or Vice President's designee of any deficiencies which may, if uncorrected, result in non-renewal of contract, and the Probationary member shall have the remainder of the academic year to address said deficiencies.

#### 3.10.2.2.

Fifth-year Probationary members will be notified in writing of any deficiencies arising after October 1st. The probationary period may be extended one additional semester for the affected Probationary member per Section 1.2. Failure of the Probationary member to correct said deficiencies in the additional semester will result in their non-renewal at the end of that semester.

### 3.10.3.

Within fourteen (14) days of the receipt of the Chancellor's note of intent to recommend nonrenewal, the member shall, upon request to the Chancellor, be orally advised of the reasons that contributed to the decision to recommend nonrenewal of employment. Such advisement shall be given by the appropriate College President within fourteen (14) days of receipt of the Faculty member's written request.

### 3.10.4.

Within fourteen (14) days of the College President's advisement of the reasons for nonrenewal, the Chancellor shall honor the Faculty member's written request to the Chancellor to confirm, in writing, the reasons given in advisement of nonrenewal. Such written confirmation shall be delivered to the member's place of residence via certified mail, registered mail, or personal service within fourteen (14) days of the Chancellor's receipt of the request.

### 3.10.5.

The process referenced here above shall be completed prior to any nonrenewal recommendation to the Governing Board, for action prior to April 30th.

## 3.11. Suspension of a Faculty Member

### 3.11.1.

Upon a written statement of charges formulated by the Chancellor, charging a Faculty member of the MCCCD, the Chancellor, or his/her designee, may immediately suspend the Faculty member and give notice of suspension. At the option of the Faculty member, the MCCCD Faculty Association President will be notified of this action.

### 3.11.2.

The notice of suspension shall be in writing and be served upon the Faculty member, personally or by U.S. (registered or certified) mail, addressed to the Faculty member at his/her place of residence as recorded in the MCCCD records.

MCCCD/Martinez 00273

**3.11.3.**

Any Faculty member who has been suspended pursuant to this Section will normally be paid his/her regular salary during the period of suspension. A suspension without pay will occur only upon advice of General Counsel. If payment is to be withheld, the Vice Chancellor of Human Resources will first consult with and advise the member and, at the option of the Faculty member, the Faculty Association President regarding the rationale for that action.

## 3.12. Administrative Leaves of Absence

### 3.12.1. Criminal Complaint

**3.12.1.1.**

If a Faculty member is charged by criminal complaint, information, or indictment with any criminal offense, which would be cause for dismissal, the Chancellor or designee may immediately place the member on compulsory leave of absence for a period of time extending for not more than ten (10) days after the date of entry of judgment in the proceedings.

**3.12.1.2.**

Pay during this period will be based on the same consideration as in Section 3.13.3.

### 3.12.2. Complaints—Other Than Criminal

**3.12.2.1.**

The Vice Chancellor of Human Resources may, if it is appropriate, place a Faculty member on paid administrative leave of absence. At the option of the Faculty member, the MCCCD Faculty Association President will be advised.

**3.12.2.2.**

Pay during this period will be based on the same consideration as in **Section 3.11.3.**

## 3.13. Faculty Member Dismissal—Probationary and Appointive

A Faculty member who is recommended, by the College President, through the Chancellor, to the Governing Board, for dismissal shall have access to the following due-process procedures.

**3.13.1.**

A written statement of charges, formulated by the College President, shall be forwarded to the Vice Chancellor of Human Resources. After review of the charges, the Vice Chancellor, in consultation with the MCCCD Legal Office, may recommend, to the Chancellor, that there exists prima facie cause for the dismissal of a Faculty member. The Chancellor shall inform the Governing Board in writing, with a copy of the recommendation being sent (U.S. certified or registered mail) to the Faculty member at his/her place of residence as recorded in the MCCCD records. The Vice Chancellor's recommendation will give notice to the Chancellor, Governing Board, and the Faculty member of the intention to formally recommend dismissal, which shall not be sooner than thirty (30) days from the date of the letter, nor later than the end of the current academic year.

MCCCD/Martinez 00274

**3.13.2.**

A written statement of charges shall be provided to the Chancellor, Governing Board, and the Faculty member as an attachment to the notification outlined in the preceding paragraph. The statement of charges shall state, if applicable, the statutes, policies, rules, or written objectives of the College that the Faculty member is alleged to have violated. The statement of charges shall be of such specificity that the Faculty member will be able to prepare a defense based on the statement.

**3.13.3.**

The Faculty member shall have the right to a hearing by filing a written request with the Vice-Chancellor within five (5) business days after being served with a notice of intent to dismiss. The filing of a timely request shall suspend the dismissal procedure, pending the completion of the hearing.

**3.13.4.**

Upon request, a Hearing Committee shall be constituted within five (5) business days and shall be composed of three (3) Faculty members: one (1) appointed by the Chancellor, one (1) selected by the President of the Faculty Association, and one (1) selected by the member. All three (3) shall be Appointive Faculty. The committee member selected by the Chancellor and the President of the Faculty Association will be from colleges other than the college where the Faculty member recommended for dismissal is assigned. The committee shall be considered constituted when the hearing committee and the Faculty member have been informed by the Faculty Association President of the committee's formation.

**3.13.5.**

The Hearing Committee shall select a Chair. Unless the parties stipulate to extend the time beyond that which is set forth below, the Chair shall conduct a meeting with the attorney representing the MCCCD and the Faculty member and/or his/her attorney/representative no later than twenty (20) business days after the formation of the committee for the purpose of exchanging exhibits, witness lists, and summaries of witness testimony. The Chair may choose to deny admission of an exhibit(s) or witness testimony for failure to comply with this Section.

**3.13.6.**

Unless the parties otherwise agree, the Hearing Committee shall conduct the hearing no later than ten (10) business days after the exchange of information detailed in **Section 3.13.5.** Prior to the hearing, the Faculty member must declare, in writing, whether he/she wishes the hearing to be public or in executive session. The member may attend the hearing; present any testimony, evidence, or statements, oral or written, in his/her behalf; and be represented by legal counsel or other representative. It is expressly understood the act of testifying will not be subject to reprisal by the MCCCD.

MCCCD/Martinez 00275

**3.13.7.**

Within five (5) business days after completion of the hearing, the Hearing Committee shall provide the Chancellor, and the Faculty member with a summary of the evidence that was presented during the hearing.  In addition, the Hearing Committee shall render binding written findings of fact and conclusions of law and forward these along with its recommendation regarding dismissal to the Chancellor.  The above deadline may be extended up to fifteen (15) business days after completion of the hearing, if the Hearing Committee requests briefs and/or recommended findings of fact and conclusions of law from the parties.

**3.13.8.**

After receiving the Hearing Committee's summary of evidence, findings of fact, conclusions of law, and final recommendation in regard to dismissal, the Chancellor, may meet with the Hearing Committee to clarify any questions he/she may have. The Chancellor shall have ten (10) business days in which to review the recommendation regarding dismissal.  The Chancellor may adopt the Hearing Committee's recommendation regarding dismissal or make his/her own recommendation and forward the recommendation along with the summary of the evidence, a copy of the findings of fact, conclusions of law, and final recommendations of the Hearing Committee to the Governing Board.

**3.13.9.**

The Governing Board will meet with the Faculty member and/or his/her representative and a representative of the administration to hear arguments regarding the Chancellor's and the Hearing Committee's recommendation regarding dismissal.  This meeting will be an executive session unless the Faculty member chooses to have this meeting in public.  The parties shall have no less than one-half hour to present their respective cases. The length of the meeting shall not exceed one (1) hour.

**3.13.10.**

The Governing Board, at a public meeting, shall render a final decision for retention or dismissal of the Faculty member.  A copy of the final decision shall be sent (U.S. certified or registered mail) to the Faculty member at his/her place of residence as recorded in MCCCD records.  It is expressly understood that the Governing Board decision does not diminish the Faculty member's right to seek other legal remedies under local, state and federal law.

## 3.14.  Membership in and Representation by Professional Organizations

Faculty members will have complete freedom in selecting the professional organizations they may join, or refrain from joining.

## 3.15.  Faculty Transfer/Reassignment Policy

**3.15.1.**

Since the employment notification from the Maricopa County Community College MCCCD states that a Faculty member is employed by the MCCCD, a Faculty member may request a transfer or be transferred from a discipline or service department at one college to a similar discipline or service department, if qualified in that discipline or service department, at another college.

MCCCD/Martinez 00276

**3.15.2.**

In the case of an employee-requested transfer, the following steps will be observed.

### 3.15.2.1. Basic to Transfer Determination

#### 3.15.2.1.1.

The preference of the Faculty member for a particular college;

#### 3.15.2.1.2.

Protecting the employment of Appointive Faculty members in the event of overstaffing in the present assignment;

#### 3.15.2.1.3.

Meeting the staffing needs educationally and/or numerically of another college/facility; and/or

#### 3.15.2.1.4.

Improving working relationships.

### 3.15.2.2. Requisites for Transfer

#### 3.15.2.2.1.

All parties concerned will provide input into the transfer decision including, but not limited to, the following: College Presidents, Vice Presidents, Department/Division Chairs of the appropriate colleges, in addition to the Faculty member requesting transfer.

#### 3.15.2.2.2.

The determination of transfer will be based upon, but not limited to, the following considerations:  (a) willingness of transferee; (b) reciprocal need for transfer; (c) academic qualifications of transferee;      (d) compatibility      within      receiving Department/Division structure; and (e) mutual Presidential agreement.

#### 3.15.2.2.3.

Members will follow procedures as outlined by the District Division of Human Resources.

### 3.15.2.3.

The parties recognize that there are occasions necessitating the reassignment of Faculty when the steps outlined in the voluntary transfer policy are not appropriate or do not meet the needs of the situation.

#### 3.15.2.3.1.

In such instances, decisions to reassign Faculty will be authorized by the College President(s) who are involved, with the concurrence of the Vice Chancellor of Human Resources, or designee.  The Faculty member(s) will be advised as far in advance as possible of any decision to implement an involuntary transfer.

MCCCD/Martinez 00277

#### 3.15.2.3.2.

Affected Faculty members shall have the right to appeal (in writing) such reassignment. Such appeal must be delivered to the Vice Chancellor of Human Resources, or designee, within fifteen (15) days of the original notice of reassignment. The Vice Chancellor of Human Resources, or designee, will review the circumstances of the reassignment, determine whether to sustain the appeal or not, and notify the Faculty member and provide a decision in writing within thirty (30) days of receipt of the appeal. The Faculty member will have the right to appeal the decision of the Vice Chancellor of Human Resources, or designee, to the Chancellor for a final decision. Such appeal must be delivered to the Chancellor within fifteen (15) days of written notification of the Vice Chancellor's decision. The Chancellor will advise the affected Faculty member, the affected College President(s) and the Governing Board of his/her decision regarding the transfer appeal within thirty (30) days of the receipt of the appeal. In the event the reassignment location has not been finalized, an update will be provided in writing every thirty (30) days.

### 3.16. Reduction in Force

#### 3.16.1. Retraining

In order to avoid or defer a reduction in force, a President or Provost may request that funds be expended to provide training to Faculty employed in a service or program the President or Provost would otherwise recommend be reduced or discontinued. Any determination that funds be expended pursuant to this paragraph is wholly within the discretion of the President or Provost and is contingent upon the availability of such funds. The President or Provost may appoint an advisory committee to assist him/her in the above.

#### 3.16.2. Grounds, Deadlines

##### 3.16.2.1.

Prior to October 1st, a President or Provost shall notify the Chancellor of any determination that a particular kind of service or program should be reduced or discontinued for the succeeding academic year. Before notifying the Chancellor, the President or Provost shall consider program enrollment, effect on budget, impact on workforce, and any other factor the President or Provost deems material to a determination that a particular kind of service or program should be reduced or discontinued.

##### 3.16.2.2.

Prior to submitting a recommendation to the Governing Board, the Chancellor shall pursue alternative means for reallocation of resources in order to avoid a reduction in force. Such alternatives shall include, but are not limited to, solicitation of voluntary resignations, requests for transfer, multiple-college assignments or transfers that could include day and evening assignments, teaching a reduced load for reduced pay, and implementation of an early retirement program for Appointive members.

MCCCD/Martinez 00278

#### 3.16.2.3.

Following recommendation by the Chancellor, the Governing Board may, upon a determination that a particular kind of service or program is to be reduced or discontinued, and that it is therefore necessary to decrease that number of Faculty, terminate the employment of Faculty by means of a reduction in force. Completion of the reduction in force shall effect the termination of employment of Faculty necessary to reduce or discontinue the service or program as ordered by the Governing Board.

#### 3.16.2.4.

Prior to February 1st, the Vice Chancellor of Human Resources shall cause to be delivered written notice to all Faculty in the MCCCD in every discipline subject to the reduction in force that such action may be recommended to the Governing Board.

### 3.16.3. Definitions

#### 3.16.3.1. One-Semester-Only

Temporary employment pursuant to a one-semester contract, with no continuous employment rights.

#### 3.16.3.2. One-Year-Only

Temporary employment pursuant to a one-year contract, with no continuous employment rights.

#### 3.16.3.3. Probationary

An employment status of a Faculty member who has not attained appointive status.

#### 3.16.3.4. Appointive

An employment status of a Faculty member attained at the beginning of his/her sixth consecutive year calculated from the date of the first contract.

#### 3.16.3.5. Seniority

For purposes of this policy, seniority means the length of service teaching in a full-time Faculty position in the MCCCD, measured from the first day of paid service in a probationary Faculty assignment. In a reduction in force, a Faculty member with more seniority shall be favored for retention in a position over a Faculty member with less seniority.

### 3.16.4. Priorities

#### 3.16.4.1.

A reduction in force shall be accomplished in accordance with the following procedures:

#### 3.16.4.2. Step I

##### 3.16.4.2.1.

Faculty employed in the MCCCD among the following categories in those disciplines subject to the reduction in force shall not be rehired, in the following order of priority.

MCCCD/Martinez 00279

#### 3.16.4.2.1.1.

Adjunct

#### 3.16.4.2.1.2.

One-semester-only

#### 3.16.4.2.1.3.

One-year-only

### 3.16.4.2.2.

If the reduction in force may be completed by not rehiring fewer than all eligible Faculty within a category, the selection of any individual who shall not be rehired is wholly within the discretion of the Vice Chancellor of Human Resources, or designee. If, following exhaustion of the process prescribed in Step I, the reduction in force has not been completed, the process prescribed in Step II shall be followed.

## 3.16.4.3. Step II

Employment shall be terminated among all Probationary Faculty members in the MCCCD in those disciplines subject to the reduction in force on the basis of seniority as defined in Section 3.16.3.5. If, following exhaustion of the process prescribed herein, there are two or more individuals holding the same seniority status and the number of individuals exceeds the number of Faculty whose employment must be terminated in order to complete the reduction in force, the selection of any Faculty whose employment shall be terminated shall be by an equitable selection process such as a lottery. The Vice Chancellor of Human Resources or designee shall employ best efforts to offer alternative employment within the MCCCD to each Probationary Faculty whose employment is terminated pursuant to this process. If, following exhaustion of the process prescribed in Step II, the reduction in force has not been completed, the process prescribed in Step III shall be followed.

## 3.16.4.4. Step III

Employment shall be terminated among all Appointive Faculty members in the MCCCD in those disciplines subject to the reduction in force, on the basis of the following criteria in the following order of priority:

### 3.16.4.4.1. Seniority, as that term is defined in **Section 3.16.3.5.**

### 3.16.4.4.2. Continuity

#### 3.16.4.4.2.1.

The criterion of continuity shall be considered only if there are two (2) or more individuals holding the same status and the number of individuals exceeds the number of Faculty whose employment must be terminated in order to complete the reduction in force.

MCCCD/Martinez 00280

**3.16.4.4.2.2.**

For purposes of this policy, continuity means a total number of points associated with a Faculty member as calculated on the basis of the following factors:

**3.16.4.4.2.2.1.**

One (1) point for each semester during which the Faculty has taught on a full-time basis in the MCCCD in a discipline subject to the reduction in force;

**3.16.4.4.2.2.2.**

Ten (10) points if the Faculty, during the semester immediately preceding the calculation of points, taught in the MCCCD at least one (1) class in a discipline subject to the reduction in force. If the Faculty did not teach in such a discipline during the immediately preceding semester, the point total of this factor shall equal ten (10) minus the number of intervening semesters since the most recent semester during which the Faculty taught in the MCCCD at least one (1) class in a discipline subject to the reduction in force. In no event shall the total points for this factor equal less than zero.

**3.16.4.4.2.2.3.**

Three (3) points if the Faculty has earned thirty (30) or more upper division or graduate semester hours, or the equivalent thereof, in a discipline that is subject to the reduction in force.

**3.16.4.4.2.3.**

In a reduction in force, a Faculty member associated with a greater number of points in a calculation of continuity shall be favored for retention in a position for which the Faculty is certified over a Faculty member with a lesser number of points.

**3.16.4.4.3.** Horizontal placement on salary schedule

**3.16.4.4.3.1.**

The criterion of horizontal placement on salary schedule shall be considered only if there are two (2) or more individuals holding both the same seniority status and the same continuity status and the number of such individuals exceeds the number of Faculty whose employment must be terminated in order to complete the reduction in force.

MCCCD/Martinez 00281

#### 3.16.4.4.3.2.

In a reduction in force, a Faculty member shall be favored for retention in direct relation to where the Faculty's salary is situated on the salary schedule effective during the academic year in which the reduction in force is to be completed. A Faculty member whose salary is situated further to the right on the salary schedule shall be favored for retention in a position for which the Faculty is certified.

#### 3.16.4.4.3.3.

If, following exhaustion of the process prescribed herein, there are two (2) or more individuals situated in the same column of the salary schedule effective during the academic year in which the reduction in force is to be completed and the number of such individuals exceeds the number of Faculty whose employment must be terminated in order to complete the reduction in force, the selection of any Faculty whose employment is to be terminated shall be by an equitable selection process such as a lottery.

#### 3.16.4.4.3.4.

The Vice Chancellor of Human Resources or designee shall employ best efforts to offer alternative employment within the MCCCD to each Appointive Faculty member whose employment is terminated pursuant to this process.

### 3.16.5. Reinstatement.

A Probationary or Appointive Faculty whose employment has been terminated pursuant to a reduction in force shall have the option of reinstatement for two (2) years and shall be reinstated in inverse order of reduction in force, provided the Faculty is qualified to perform the assignment for which he/she is being recalled and is recommended for reinstatement by the Chancellor. In the event that two (2) or more Faculty equally qualified have the same termination date, the first member to be recalled shall be the one who has the greatest seniority.

### 3.16.6. Notice and Hearing

#### 3.16.6.1.

Prior to March 1st, a notice shall be delivered to any Probationary or Appointive Faculty whose employment will be recommended for termination pursuant to a reduction in force. The notice shall be in writing and delivery is effective upon deposit in U.S. mail sent via certified delivery to the Faculty's place of residence as recorded in the Employee Records and Information Center or upon delivery personally to the Faculty. The contents of the notice shall include:

##### 3.16.6.1.1.

The effective date of termination;

MCCCD/Martinez 00282

**3.16.6.1.2.**

The basis, procedures, and criteria used in the reduction in force;

**3.16.6.1.3.**

A summary of procedures under which the Faculty may appeal the decision to recommend termination of employment; and

**3.16.6.1.4.**

A description of the reinstatement rights of the Faculty.

**3.16.6.2.**

A Probationary or Appointive Faculty whose employment is recommended for termination pursuant to a reduction in force may appeal the recommendation to the Governing Board. Such appeal shall be made by delivery of a written notice of appeal to the office of the Governing Board no later than fourteen (14) calendar days following receipt of the notice of recommendation for termination. The notice of appeal shall include a complete statement of the grounds upon which the proposed reduction in force is alleged to have been administered improperly.

**3.16.6.3.**

A hearing on the Faculty's appeal shall take place within twenty (20) calendar days following receipt of the notice of appeal. The hearing shall be conducted by a hearing officer selected by the Vice Chancellor of Human Resources, or designee. If the parties are unable to stipulate on the Hearing Officer, each party shall nominate a qualified candidate to serve as a Hearing Officer (previous experience as a hearing officer in resolving employment disputes at one or more educational institutions). The choice of the Hearing Officer shall be made pursuant to an equitable selection such as a coin flip.

**3.16.6.4.**

The Faculty and the MCCCD each shall, no fewer than seven (7) calendar days prior to the hearing, file with the hearing officer a written statement. The Faculty's statement shall specify the Faculty's name, position, and duties; a comprehensive summary of all pertinent facts that are the basis of the appeal; and a list of witnesses the Faculty will present at the hearing. The MCCCD's statement shall include a comprehensive summary of all pertinent facts upon which the MCCCD relied as justification for the reduction in force and a list of witnesses the MCCCD will present at the hearing.

MCCCD/Martinez 00283

**3.16.6.5.**

The hearing shall be conducted in an informal manner without reliance on formal rules of evidence or procedure. An audio tape record of the hearing shall be made and copy made available for either party on request. The Hearing Officer shall consider all evidence that is reliable and probative and shall exclude evidence that is unduly repetitious. Each party may call witnesses for testimony, and have the right to cross-examine witnesses. The Faculty shall have the burden of proving, by clear and convincing evidence, that the proposed reduction in force was administered improperly.

**3.16.6.6.**

The Hearing Officer shall, within twenty (20) calendar days following the conclusion of the hearing, issue a report containing a recommendation to the Governing Board on the disposition of the Faculty's appeal. The report shall include a summary of facts relied upon by the Hearing Officer, a determination of the issues, and conclusions regarding the appeal.

**3.16.6.7.**

The Governing Board may adopt, modify, or reject the decision of the Hearing Officer. The decision of the Governing Board shall include facts relied upon for the decision, a determination of the issues, and conclusions regarding the appeal. Action taken by the Governing Board regarding the Faculty's appeal is not subject to any further appeal within the MCCCD.

**3.16.7.**

The process referenced here above if requested by a Probationary or Appointive Faculty shall be completed prior to any action by the Governing Board upon any recommendation that employment of the Faculty be terminated due to a reduction in force. This Board action must be completed prior to June 30th.

MCCCD/Martinez 00284

# 4. COMPENSATION AND HIRING PRACTICES

## 4.1. Salary Schedule

For the fiscal year **2013-2014**, the salary schedule will be adjusted upward 2 and one-half percent (2.5%) effective July 1, **2013**.

## 4.2. Salary Placement

Placement of Faculty on the salary schedule will be determined in accordance with Section 4.3.

### 4.2.1.

All Faculty must meet the Maricopa Community Colleges' Faculty hiring qualifications.

### 4.2.2.

MCCCD, whether for purposes of initial employment or for vertical or horizontal advancement on the salary schedule, recognizes only those academic credits and/or degrees earned at accredited institutions eligible for inclusion in the Education Directory, Colleges and Universities, U.S. Department of Education. Accrediting references will be kept current and on file in Employee Services.

## 4.3. Credit for Prior Experience

### 4.3.1.

On the schedule for academic placement, a Master's degree with 24 upper division and/or graduate semester hours in the teaching field, or a Master's in the teaching field is required for Step 1. Additional hiring qualifications that have been recommended by Instructional Councils will be used to place the individual at Step 1.

### 4.3.2.

On the schedule for occupational placement, the minimum requirement for placement on Step 1 is a Bachelor's degree plus three (3) years of occupational experience in the field to be taught, or an Associate's degree or 64 credits plus five (5) years occupational experience in the field to be taught, or five (5) years occupational experience in the field to be taught or a Master's degree with 24 upper division credits and/or graduate credits in the field to be taught. Those individuals who use solely the five (5) years occupational experience as a minimum requirement for placement will be placed horizontally at Step 1 and will receive no additional horizontal movement on the salary schedule.

### 4.3.3.

For placement, credit will be given at the rate of one (1) step on the salary scale for each year of full time teaching experience and/or occupational experience up to five (5) years. Credit for full time teaching and/or occupational experience beyond five (5) years will be given at the rate of one (1) step for each two (2) years of experience. Any fractional parts will not be counted.

MCCCD/Martinez 00285

**4.3.3.1.**

An accumulation of adjunct teaching experience will be counted; thirty (30) credit hours equals one year.  An accumulation of two thousand (2000) hours of documented employment, full or part time, equals one (1) year of occupational experience.  Credit will be given at the rate of one (1) step on the salary scale for each year of teaching and/or occupational experience up to five (5) years.  Credit for teaching experience and/or occupational experience beyond five (5) years will be given at the rate of one (1) step for each two (2) years of experience. It is the responsibility of the Candidate/employee to provide verification to the District Division of Human Resources.

**4.3.3.2.**

In the job posting, if the position requires additional academic experience and/or additional work experience, credit will be given at the rate of one (1) step on the salary scale for each year of full time teaching and/or work experience up to five (5) years.  Credit for full time teaching and/or full time work experience beyond five (5) years will be given at the rate of one (1) step for each two (2) years of experience.

**4.3.3.3.**

If the job posting requires a dual discipline, one discipline will be used to place the individual at minimum salary; the other discipline will be used for additional horizontal and vertical salary placement.

**4.3.3.4**

The maximum credit allowable for prior experience, may not exceed a total of nine steps beyond Step 1 on the salary schedule.

**4.3.3.5.**

K-12 teaching experience will follow Section 4.3.3.

**4.3.3.6.**

The highest horizontal academic initial placement is the doctorate level.

**4.3.3.7.**

The changes in this provision become effective for any new Faculty member with a starting date on or after July 1, 2007.

MCCCD/Martinez 00286

**4.3.4.**

The Vice Chancellor of Human Resources, or designee, in consultation with the Executive Vice Chancellor and Provost, may grant additional steps (not to exceed Step 10). Consideration for extra steps will be given in those cases where the applicant(s) selected by the College President is (are) unwilling to accept the position strictly on the basis of the salary that was offered when computed in accordance with the preceding paragraph. When consideration is given for the granting of additional steps, the Executive Vice Chancellor and Provost, or designee, shall convene an ad hoc committee consisting of the following persons or their designees: MCCCD Faculty Association President, Faculty President at the affected college, and the College President at the affected college. The Executive Vice Chancellor and Provost will chair the committee and will be entitled to a vote. Additional steps will be granted only if there is unanimity among the committee members.

## 4.4. Salary Placement Review Board

**4.4.1.**

A Faculty member may within the first twelve (12) months of employment as a Faculty member, appeal his/her vertical and/or horizontal placement to the Faculty Association President. If the Faculty member's appeal occurs within the first twelve (12) months of his/her employment, the Faculty Association President will convene a review committee to review his/her initial salary placement as prescribed by the District Division of Human Resources Guidelines. The review committee will consist of four (4) members from the Faculty with the Faculty Association President, or designee, serving as chair. The Chair will appoint two (2) members: one (1) member will be appointed from the Faculty Professional Growth Committee and one (1) member from the appropriate Instructional Council. The fourth member will be the respective Faculty Senate President or designee.

**4.4.2.**

The purpose of the committee will be to (1) review the case with the concerned Faculty member; (2) meet with the Vice Chancellor of Human Resources, or designee, to discuss the case; and (3) make written recommendations to the said Vice Chancellor, or designee. The Vice Chancellor, or designee, upon receiving the written recommendation, will communicate, in writing, his/her decision within fifteen (15) business days.

## 4.5. Horizontal Movement on the Salary Schedule

**4.5.1.**

All Faculty members move horizontally on the salary schedule for each credit hour beyond the minimum entering requirement up to a maximum of eighty-five (85) semester hours unless the member has earned a doctoral degree.

**4.5.2.**

To receive credit, a nondegreed member must (a) file a course of study leading to an Associate's degree, or (b) file a listing of technical and general education courses accepted by the Department/Division Chair, Vice President of Academic Affairs, the College President, and the Faculty Professional Growth Committee.

MCCCD/Martinez 00287

**4.5.3.**

If the administration requires additional study by the nondegreed Faculty member, the salary will be adjusted accordingly.

**4.5.4.**

Faculty members will be granted additional increments to their base salary for acceptable credit, including the doctoral degree, as indicated on the salary schedule.  (See Appendix E.)

## 4.6. Vertical Movement on the Salary Schedule

**4.6.1.**

Subject to annual recommendation by the Chancellor and approval by the Governing Board, the Faculty may be authorized for advancement vertically through the steps of the salary schedule at the rate of one (1) step per year of service.

**4.6.2.**

**Increment and/or Salary Increase Withholding for Individual Faculty Members.**  Upon recommendation of the College President, the Chancellor may withhold the recommendation for vertical advancement or salary increases for any of the following reasons:

**4.6.2.1.**

Lack of teaching effectiveness.

**4.6.2.2.**

Giving insufficient time and effort to duties assigned or failure to perform a reasonable amount of extracurricular activities.

**4.6.2.3.**

Lack of adherence to the adopted policies of the MCCCD.  Notification must be made prior to April 15th.

**4.6.3.**

Any individual Faculty member denied an increment or salary increase may appeal no later than April 20th to the Vice Chancellor of Human Resources, or designee.  Within fifteen (15) days of such appeal, the Executive Vice Chancellor and Provost shall convene a review committee.  The committee will be composed of the Executive Vice Chancellor and Provost, the President of the College, and two (2) members from the Faculty appointed by the Faculty Senate President.  The Faculty member may be present at the hearing, along with a representative of his/her choice.  If a College does not have a Faculty Senate President, the College President will convene the Faculty to elect the Faculty representatives.  The committee will review the evidence and forward a recommendation to the Chancellor.  The Chancellor will review the evidence, consider the advice of the committee, and render a final decision no later than May 15th.

MCCCD/Martinez 00288

**4.7. Restrictions and Exceptions to Advancement**

**4.7.1.**

In order for a Faculty member to be advanced one (1) vertical step on the salary schedule, that Faculty member shall have worked at least one (1) full semester as a Residential Faculty member.  If the member worked less than one (1) full semester as a Residential Faculty member, he/she will remain on the same step of the schedule for the following year.

**4.7.2.**

Twenty-four (24) credit hours of approved study are required to progress to Step 14.

**4.7.3.**

The maximum vertical progression for nondegreed Faculty members is Step 9, unless a prescribed plan of educational/professional development is completed and approved by the Vice Chancellor of Human Resources, or designee, Executive Vice Chancellor and Provost, and the Faculty Professional Growth Committee.

**4.8. Other Paid Duties and Benefits**

All other paid duties, rates of pay, as well as other benefits, for Faculty shall be in the Appendices (A, B, C, D, E) of this *Residential Faculty Policies* manual.

**4.9. Employment for Less Than Contract Year**

For Faculty members working less than the regular contract year, pay shall be prorated on the basis of the number of days actually worked.

**4.10. Employment for Less Than One Hundred Percent (100%) Time**

For Faculty members working less than a full contract load, pay shall be prorated on the basis of a percentage of load actually worked.

**4.11. Faculty Professional Growth Activities**

Faculty Professional Growth activities are administered in compliance with Appendix A.

**4.12. One-Year-Only (OYO) and One-Semester-Only (OSO) Faculty**

**4.12.1. Hiring Practices for OYO/OSO Faculty**

OYO/OSO faculty may be hired only to address one of the following situations:

**4.12.1.1.**

To backfill a residential faculty line when the incumbent is reassigned to a non-faculty position or is on sabbatical or leave.

**4.12.1.2.**

To launch a new program at a college when no residential faculty exist at the college that are qualified in the program area.  The program may be staffed by OYO/OSO faculty up to a maximum of six semesters while it is determined if the program is viable.

MCCCD/Martinez 00289

**4.12.1.3.**

To backfill a residential faculty line vacated due to a retirement or separation when there is insufficient time between the vacating of the line and the first day of the semester in which the new hire will need to begin teaching.

**4.12.1.4.**

To backfill a residential faculty line when a search process for a residential faculty new hire has failed (*i.e.*, no preferred candidates offered the job accepted the position).

**4.12.1.5.**

To provide time for the college to enter the appropriate faculty hiring cycle.

**4.12.1.6.**

Exceptions may be made only with the authorization of the Vice Chancellor of Human Resources or designee.

**4.12.2. OYO/OSO Faculty Later Hired as Residential Faculty**

OYO/OSO experience will count towards salary placement for Residential Faculty but will not count towards the probationary period, sabbatical eligibility, and seniority.

MCCCD/Martinez 00290

# 5. EMPLOYMENT CONDITIONS

## 5.1. Calendar

### 5.1.1. Contract Year

#### 5.1.1.1.

The academic year for Faculty shall consist of 195 consecutive days between mid-August and mid-May, of which 170 shall be days of accountability. The contract year commences on July 1st and continues through June 30th.

#### 5.1.1.2.

Exceptions to the above may be made, by mutual agreement between the Faculty member and the College President, so long as the Faculty member work load is equivalent to that required in other sections of this policy manual. Such exceptions must also be approved by the Vice Chancellor of Human Resources, or designee.

#### 5.1.1.3.

Mutually agreeable prorated Faculty contracts of a duration greater than 195 days may be approved by the College President after consultation with the Department/Division Chair of the involved discipline/service area. The maximum length of a prorated extended contract is ten (10) weeks. To ensure consistency and equity in the proration of extended contracts, the provisions of C.3.4. and C.4.2. shall apply. Instructional faculty are to meet thirty (30) hours of professional responsibilities per week and service faculty are to meet thirty-five (35) hours of professional responsibilities per week during prorated extended contract periods. The College President may prohibit a Faculty member on an extended contract from accepting additional MCCCD contracts during the extended contract period.

### 5.1.2. Paid Holidays and Recesses.

The following holidays shall be contract days on which no work will be required, but regular pay will continue: Independence Day, Labor Day, Veterans Day, Thanksgiving Break, Winter Break, Martin Luther King Day, Presidents Day, Spring Break (five [5] days), and Memorial Day.

#### 5.1.2.1.

The foregoing will be paid days only if they fall within any Faculty member's contractual period.

#### 5.1.2.2.

If the Department/Division Chair of the affected discipline/service area and the College President determine that Faculty members should work identified paid holidays and/or breaks, then compensatory hour(s)/day(s) equal to the time worked shall be granted.

### 5.1.3. In-service and orientation days

The regular contract year shall include a minimum of one (1) day each semester that will be used by the individual Faculty member in preparation for the opening of each semester.

MCCCD/Martinez 00291

### 5.2. Residential Faculty Positions

#### 5.2.1.

Residential Faculty authorized positions at any college are based on total instructional load for the most recently completed Fall and Spring semesters in the same academic year.   Load is converted to full-time teacher equivalents (FTTE) by dividing total instructional load by 30.

#### 5.2.2.

At the individual colleges (except Rio Salado), a minimum of 60% of the total instructional load shall be taught by Residential Faculty.  The residential/adjunct ratio (as defined in 1.2.) for the individual colleges (except Rio Salado) will be calculated each Fall semester.  During the eight to ten (8 – 10) year implementation phase commencing in Fall 2013, colleges shall increase the number of filled residential faculty lines every year until the percentage of instructional load taught by residential faculty reaches and is maintained at 60% or higher.   Implementation plan guiding principles identified by the meet and confer team will govern the implementation phase.

#### 5.2.3.

As a part of its normal deliberations, the College Staffing Advisory Committee will seek to allocate faculty lines with an appropriate balance between departments/divisions to ensure that 60% of the total instructional load at each college is taught by Residential faculty.

### 5.3. Faculty Member Load

#### 5.3.1.

A full-time load for an Instructional Faculty member will be thirty (30) instructional load hours per fiscal year. Satisfying residential faculty minimum instructional load requirements takes priority over instructional load assigned to adjunct faculty, given comparable qualifications.  Instructional load will normally be split between two (2) consecutive semesters. Exceptions to this norm will be permitted by mutual agreement between the Faculty member and the appropriate Vice President. Lecture hours are to be on a one-to-one basis. Laboratory hours are to be counted as 0.7 of a lecture hour. Laboratory hours are those clock hours that exceed the credit hours for a particular course. P.E. activity classes will be given 0.75 instructional load for each instructional period.

MCCCD/Martinez 00292

**5.3.1.1.** <u>Faculty Load for Large Classes</u>

| **Types** | **Students** | **Load** |
|---|---|---|
| Regular Lecture Classes | Up to 59 | Regular Load |
| | 60-89 | 1.5 x Regular Load |
| | 90 & Over | 2 x Regular Load |
| Math | Up to 52 | Regular Load |
| | 53-75 | 1.5 x Regular Load |
| | 76 & Over | 2 x Regular Load |
| English Composition | Up to 44 | Regular Load |
| | 45-59 | 1.5 x Regular Load |
| | 60 & Over | 2 x Regular Load |

**5.3.1.2.**

Regular lecture classes that involve separate class sections of different duration shall be calculated on a FTSE-generation basis. For example, if the class is a 15-week, 3-credit class that also contains students registered for 10 weeks/2 credits, the 2-credit students shall count as 0.67 student each. A 5-week/1-credit student shall count as 0.33 student. (This provision does not apply to non-lecture-type classes nor to classes in which concurrent sections are offered for the entire semester or where class size is not above the Regular Load.)

**5.3.1.3.** <u>Field-Trip Courses</u>

**5.3.1.3.1.** <u>During Faculty member dates of accountability</u>.

Load—0.2 load hours* for each day of field trip conducted during a paid school holiday or employee paid vacation period. Pay will be at the rate as set forth in Section C.3.3. Overload Rate.

\* Maximum of 1.0 load for any field trip.

**5.3.1.3.2.** <u>Outside Faculty member dates of accountability</u>.

Load—1.0 load for the first five (5) days and 0.17 load per day of field trip in excess of five (5) days.

**5.3.2.**

When a Faculty member agrees to an overload, his/her compensation will be based on load hours in excess of fifteen (15.0) per semester or thirty (30.0) per academic year.

**5.3.3.**

If the total teaching load for a Faculty member is below thirty (30.0) load hours for the academic year, his/her contract amount will be adjusted to reflect this deficiency.

MCCCD/Martinez 00293

**5.3.4.**

Experimental loading may be utilized in occupational programs, interdisciplinary programs, or other specialized programs, if approved by the Executive Vice Chancellor and Provost in consultation with the Vice Chancellor of Human Resources, or designee.

## 5.4. Accountability/Professional Responsibilities

**5.4.1.**

Instructional Residential Faculty members are required to meet the thirty (30) hours of professional responsibilities per week.

- to meet all classes as scheduled;
- to hold a minimum of five (5) scheduled academic support hours reflective of the Faculty member's teaching schedule, and to post the time and location of scheduled support hours so that they are publicly accessible to students;
- to participate in department, division, college, and/or District activities as defined in Section 1.2. and other assignments made pursuant to 5.4.7.; and
- Instructional Faculty reassigned to perform work other than teaching classes shall be accountable for two (2) hours per week for each load hour of reassigned time.

The Department/Division Chair and the Faculty member, in consultation with the appropriate administrator, will determine assignments with the final approval of the College President. Faculty members will be permitted to teach hours in the evening/weekend program to make their load.

All Faculty shall meet their hours of accountability/professional responsibilities within the parameters of the day program as defined in Section 1.2. unless initially hired under different circumstances or amended by mutual consent.

**5.4.2**

Hours of accountability for Service Faculty who teach classes will be reduced at the rate of two hours and twenty minutes for each load hour. To meet the thirty-five (35) hours per week of accountability/professional responsibilities, service Faculty members are required to meet scheduled Department/Division assignments and other College/MCCCD-related activities as defined in Section 1.2.

**5.4.3.**

Within the hours of accountability/professional responsibilities, all Faculty members are required to maintain equity of assignments and to participate in nonteaching assignments.

**5.4.4.**

All administratively approved reassigned time will be processed through and with the approval of the College President. Such reassigned time shall be part of the hours of accountability/professional responsibilities. Other paid activities beyond the base contract will not be considered part of the hours of accountability/professional responsibilities.

MCCCD/Martinez 00294

**5.4.5.**

The College President, or designee, shall develop a list of approved extracurricular assignments, with the advice and recommendation of the Faculty Senate President. Faculty assignments shall be determined by the College President after consultation with the Faculty Senate President.

**5.4.6.**

The Faculty assumes reasonable responsibility for MCCCD/College facilities and equipment under its supervision and control.

**5.4.7.**

Nonteaching professional responsibilities may be assigned by the Chancellor or designee. Notification of such assignment will be through the Office of the College President. Such activities include participation in Faculty curricular and educational development meeting(s), in-service training program(s), ceremonial exercises such as commencement, academic advisement, and such other activities as may reasonably be required for the full and proper discharge of the Faculty member's responsibilities.

## 5.5. Assignments Beyond the Regular Contract

(See Appendix C.)

## 5.6. Substitution

Qualified substitutes may be employed when deemed necessary by the College President or designee. Qualified Residential Faculty members may be employed as substitutes. (See Substitute Pay Schedule—Appendix C.)

## 5.7. Hiring Practices—Employment Requirements

Prior to assuming their duties, all Faculty members will file a loyalty oath as required by the Arizona Revised Statutes.

## 5.8. Part-Time Residential Faculty Members

**5.8.1.**

In determining pay for part-time Faculty members, with no additional assigned responsibilities, eighteen (18.0) semester load hours will be used in determining prorated salary.

**5.8.2.**

For an Appointive member carrying less than a full load and prorated accountability, fifteen (15.0) semester load will be used in determining prorated salary and sick leave.

**5.8.3.**

Faculty members who work at least fifty percent (50%), but less than seventy-five percent (75%) of a full-time load will receive fifty percent (50%) of Flexible Benefit credits that they would receive if they were full time. Faculty members who work at seventy-five percent (75%) or more of a full-time load shall be treated as full-time Faculty for benefit purposes.

MCCCD/Martinez 00295

**5.8.4.**

An Appointive member serving in a part-time capacity will receive full benefits provided that the part-time status occurs as a result of illness, disability, and/or administrative approval.

## 5.9. Sabbatical Leaves

Sabbatical leaves may be granted to qualified members of the Faculty. The administration and conditions of sabbatical leave shall be governed by the policy as stated in Appendix A.

## 5.10. Professional Unpaid Leaves

Professional unpaid leaves are those leaves that are recommended by the Faculty Professional Growth Committee, approved by the Chancellor or designee, and relate to the Faculty member's assigned duties. Therefore, the Faculty member is entitled to continuing service credit (advancement on salary schedule and continuous credit for sabbatical leave). The administration and conditions of professional unpaid leave shall be governed by the policy as stated in Appendix A.

MCCCD/Martinez 00296

## 6.    CONFLICT RESOLUTION

### 6.1. Grievance Procedure

A grievance is an alleged misapplication, misinterpretation, or violation of a specific provision(s) of the *Residential Faculty Policies* that adversely affects the grievant.  Matters not specifically covered by the *RFP* should be addressed through Resolution of Controversy.

#### 6.1.1.

A grievant may choose one of two processes:

##### 6.1.1.1.

Informal level.  Within twenty-five (25) business days of the occurrence of the act or omission giving rise to the grievance or within twenty-five (25) business days of the date when the grievant should reasonably have known of the act or omission, the grievant shall present the grievance orally to his/her immediate supervisor, citing the specific section of the *RFP* which has allegedly been misapplied, misinterpreted, or violated.  The purpose of bringing the matter to the attention of the immediate supervisor is to resolve the matter at the lowest level, or

##### 6.1.1.2

The mediation process, as defined in **Section 6.3.**, may be initiated if all parties agree and follow steps outlined in **Section 6.3.**

### 6.1.2.  Formal Level

#### 6.1.2.1.  Level 1—Appropriate Vice President.

If the grievant is not satisfied with the disposition of the alleged grievance at the informal level, the grievant may file the original grievance, in writing, within seven (7) business days with the Vice President who is the immediate supervisor of the person to whom the grievance was taken at the informal level.  If the grievant elects not to file the original grievance in writing within seven (7) business days, the grievance will be considered terminated. If no decision is rendered within five (5) business days after the informal meeting, the grievance is automatically forwarded to the next level. (If the grievant's immediate supervisor at the informal level reports directly to the College President, this step in the grievance process can be omitted.) Within ten (10) business days after receipt of the written grievance, the appropriate Vice President and the grievant will meet in an attempt to resolve the grievance.

MCCCD/Martinez 00297

**6.1.2.2. Level 2—College President.**

If the grievant is not satisfied with the disposition of the grievance at Level 1, the grievant may, within fifteen (15) business days of the meeting with the appropriate Vice President, forward the written grievance and the response received at Level 1 to the College President. If the grievant elects not to forward the grievance in writing within fifteen (15) business days of the meeting with the Vice President, the grievance will be considered terminated.  If no decision is rendered within ten (10) business days of the meeting with the Vice President, the grievance will be automatically forwarded to the next level. Within five (5) business days, the College President, or designee, will arrange a meeting at a mutually agreeable time and place, such meeting to occur within five (5) business days after the grievant is notified.  The College President will issue a written response to the grievant and to the Faculty Senate President within five (5) business days after the meeting.

**6.1.2.3. Level 3—Vice Chancellor.**

If the grievant is not satisfied with the disposition of the grievance at Level 2, grievant may, within fifteen (15) business days of the meeting with the appropriate College President, forward the written grievance and the response received at Level 2 to the Vice Chancellor of Human Resources. If the grievant elects not to forward the grievance in writing within fifteen (15) business days of the meeting with the College President, the grievance will be considered terminated. If no decision is rendered within ten (10) business days of the meeting with the College President, the grievance will be automatically forwarded to the next level.  Within five (5) business days, the Vice Chancellor of Human Resources, or designee, will arrange a meeting at a mutually agreeable time and place, such meeting to occur within five (5) business days after the grievant has been notified.   The Vice Chancellor of Human Resources, or designee, will issue a written response to the grievant and to the Faculty Senate President within five (5) business days after the meeting.

**6.1.2.4. Level 4—Chancellor.**

If the grievant is not satisfied with the disposition of the grievance at Level 3, the grievant may, within five (5) business days after receipt of the written decision, forward the written grievance and response to the Chancellor.  The Chancellor or designee, will render a written decision within fifteen (15) business days after receipt of the written grievance.

**6.1.2.5. Level 5—Governing Board.**

If the grievant is not satisfied with the Chancellor's decision at Level 4, the grievant may, within five (5) business days, request that the grievance be reviewed by the Governing Board.  The Governing Board may, at its option within thirty (30) days after receipt of the written grievance, review the evidence and issue a written decision which shall be final.  Should no written decision be rendered within thirty (30) days, the decision at Level 4 is final.

MCCCD/Martinez 00298

### 6.1.3. Miscellaneous

#### 6.1.3.1. Written Decisions.

Decisions rendered at Level 1 that are unsatisfactory to the aggrieved person and all decisions rendered at Levels 2, 3, 4, and 5 of the grievance procedure shall be in writing, setting forth the decision and the reasons therefore, and shall be transmitted promptly to all parties in interest.

#### 6.1.3.2. Separate Grievance File.

All documents, communications, and records dealing with the processing of a grievance shall be filed in a separate grievance file and shall not be kept in the personnel file of any participant. A member shall have access to all documents pertaining to his/her grievance and may acquire copies of same.

#### 6.1.3.3. Meetings and Hearings.

All meetings and hearings under this procedure shall be conducted in private and shall include only such parties in interest and their designated or selected representatives.

#### 6.1.3.4.

If the aggrieved party is the Faculty Association, the grievance will be initiated at the appropriate level, but in no case lower than Level 2.

#### 6.1.3.5.

Every effort shall be made to resolve year-end grievances prior to the end of the academic year.

#### 6.1.3.6.

The aggrieved may not present any issues at Level 2, 3, 4, or 5 not presented at Level 1.

#### 6.1.3.7.

Time limits provided in this grievance procedure may be extended by mutual agreement, in writing, between the aggrieved and the administration.

#### 6.1.3.8.

The term "business day" is any day on which the District Support Services Center offices are open for business.

#### 6.1.3.9.

The grievance procedures established here may not be the sole and exclusive remedy available to a grievant for resolving disputes arising under this document. It is understood that the subject matter forming the basis of the grievance may also be instituted in an administrative action before a governmental board or agency. The provisions of **Section 3.9.** still apply.

MCCCD/Martinez 00299

## 6.2. Resolution of Controversy

Complainants seeking remedy for issues arising outside this policy manual (interpretation, application, or violation of Board policies that have a direct impact on the terms and conditions of Faculty employment, or decisions of unfair or inequitable treatment in such areas as Instructional Councils) can be appealed for resolution by the following procedures:

### 6.2.1.

A complainant may choose one of two processes:

#### 6.2.1.1.

Informal level.  Within forty-five (45) business days of the occurrence of the act or omission giving rise to the Resolution of Controversy or within forty-five (45) business days of the date when the complainant should reasonably have known of the act or omission, the complainant shall present the Resolution of Controversy orally to his/her immediate supervisor.  The purpose of bringing the matter to the attention of the immediate supervisor is to resolve the matter at the lowest level.

#### 6.2.1.2.

The mediation process, as defined in **Section 6.3.**, may be initiated if all parties agree and follow steps outlined in **Section 6.3.**

### 6.2.2.  Formal Level

#### 6.2.2.1.  Level 1—Appropriate Vice President.

If the complainant is not satisfied with the disposition of the Resolution of Controversy at the informal level or if no decision has been rendered within five (5) business days after the informal meeting, the complainant may file the original Resolution of Controversy, in writing, within seven (7) business days with the Vice President who is the immediate supervisor of the person to whom the Resolution of Controversy was taken at the informal level.  (If the complainant's immediate supervisor at the informal level reports directly to the College President, this step in the Resolution of Controversy process can be omitted.) Within ten (10) business days after receipt of the written Resolution of Controversy, the appropriate Vice President and the complainant will meet in an attempt to resolve the Resolution of Controversy.

MCCCD/Martinez 00300

### 6.2.2.2. Level 2—College President.

If the complainant is not satisfied with the disposition of the Resolution of Controversy at Level 1, or if no written decision has been rendered within ten (10) business days, the complainant may, within fifteen (15) business days of the meeting with the appropriate Vice President, forward the written Resolution of Controversy and the response received at Level 1 to the College President. Within five (5) business days, the College President, or designee, will arrange a meeting at a mutually agreeable time and place, such meeting to occur within five (5) business days after the complainant is notified. The College President will issue a written response to the complainant and to the Faculty Senate President within five (5) business days after the meeting.

### 6.2.2.3. Level 3—Vice Chancellor.

If the complainant is not satisfied with the disposition of the Resolution of Controversy at Level 2, or if no written decision has been rendered within ten (10) business days, the complainant may, within fifteen (15) business days of the meeting with the appropriate College President, forward the written Resolution of Controversy and the response received at Level 2 to the Vice Chancellor of Human Resources. Within five (5) business days, the Vice Chancellor of Human Resources, or designee, will arrange a meeting at a mutually agreeable time and place, such meeting to occur within five (5) business days after the complainant has been notified. The Vice Chancellor of Human Resources, or designee, will issue a written response to the complainant and to the Faculty Senate President within five (5) business days after the meeting.

### 6.2.2.4. Level 4—Chancellor.

If the complainant is not satisfied with the disposition of the Resolution of Controversy at Level 3, the complainant may, within five (5) business days after receipt of the written decision, forward the written Resolution of Controversy and response to the Chancellor. The Chancellor or designee, will render a written decision within fifteen (15) business days after receipt of the written Resolution of Controversy.

### 6.2.2.5. Level 5—Governing Board.

If the complainant is not satisfied with the Chancellor's decision at Level 4, the complainant may, within five (5) business days, request that the resolution of controversy be reviewed by the Governing Board. The Governing Board may, at its option within thirty (30) days after receipt of the written Resolution of Controversy, review the evidence and issue a written decision which shall be final. Should no written decision be rendered within thirty (30) days, the decision at Level 4 is final.

### 6.2.3.

College-level appeal will involve the Faculty Senate President and shall start at the level next higher than the person involved in the decision in question.

MCCCD/Martinez 00301

**6.2.4.**

If the decision under appeal was made at the highest College level, the process will move to the District level.

**6.2.5.**

District-level appeal will involve the District Faculty Association President and Council of Presidents.

## 6.3.    Informal Resolution and Mediation

**6.3.1.**

All Faculty shall be accorded treatment by their supervisors in a manner befitting the professionalism of all parties.  In the interest of collegial relations, an issue may be resolved either through informal resolution or, thereafter, mediation before entering into the formal level of the grievance process as set forth in Section 6.1.2. or the escalated procedures set forth in Section 6.2.

To initiate this process, a party must contact the Faculty Senate President, the Department/Division Chair, or the appropriate Vice President.

### 6.3.1.1.  Informal Resolution Process

Informal resolution shall consist of an arranged meeting with all relevant individuals, *i.e.*: the parties involved, the appropriate Department/Division Chair, the appropriate Vice Presidents(s), and the Faculty Senate President or his/her designee.

### 6.3.1.2.  Mediation Process

If all parties agree to mediate, the Faculty Senate President or other college senate officer will request that the Office of the Vice Chancellor of Human Resources contact the mediation service.  The Mediator (trained, certified, and neutral) will mediate, conciliate, and coordinate communication among disputing parties.

#### 6.3.1.2.1.

The Mediator shall coordinate meetings and/or the exchange of correspondence between the disputing parties.  The Mediator shall establish the time, date, and place of each meeting, giving at least 48 hours notice.  If all parties agree, mediation can occur with less than 48 hours notice.

#### 6.3.1.2.2.

The Mediator shall forward copies of the complaint and the mediation guidelines to the disputing parties.  All mediation meetings shall be closed and confidential.

#### 6.3.1.2.3.

If the matter is resolved through mediation, the Mediator shall prepare an Agreement within five (5) business days of the completion of the mediation stating:

**6.3.1.2.3.1.**

The names of the parties;

**6.3.1.2.3.2.**

that the mediation was successful;

**6.3.1.2.3.3.**

the terms of the resolution.

Each party shall sign and date the Agreement at which time the mediation process ends.

**6.3.1.2.4.**

The Notice of Resolution, which will include the names of the parties involved, that the mediation was successful and the date of resolution, will be sent to the parties involved, the Faculty Senate President, the appropriate Vice President(s), and the College President.

**6.3.1.2.5.**

Information received by the mediator during the mediation process will be confidential. Personal notes and minutes created or received during the mediation will be destroyed by the Mediator. The Mediator will not testify or provide statements about cases in which he or she were involved to grievance or any other committees or hearing boards.

**6.3.1.2.6.**

The Mediator may terminate mediation after meeting with each party at least once if it is apparent that the matter cannot be mediated.

**6.3.1.2.7.**

If the matter is grievable or subject to the Resolution of Controversy process, a party has an additional fifteen (15) business days from the termination of mediation to proceed with the formal level of the grievance process addressed in Section 6.1.2. In accordance with the terms thereof, or in the matter of a Resolution of Controversy, to the next applicable level of appeal as set forth in Section 6.2.

MCCCD/Martinez 00303

**6.3.1.2.8.**

The mediation process shall conclude within forty-five (45) calendar days following the assignment of a mediator to the dispute.  If no final resolution has been reached within that time, the mediation process shall cease; however, the mediator shall continue the mediation process for no more than fifteen (15) additional calendar days if the mediator and all parties to the mediation expressly acknowledge that the mediation process has been constructive and that the mediator and all parties believe that continuing the process will lead to a successful resolution of the dispute.

**6.3.2.**

No Faculty member shall be disciplined, reprimanded, suspended, or reduced in assignment or compensation without just cause.

**6.3.3.**

When any Faculty member is required by the College President to appear before the Chancellor, Governing Board, or any committee thereof, concerning any matters that could adversely affect employment, he/she shall be entitled to select a representative and/or to have legal counsel present to advise and/or represent him/her during such meetings or interviews.

**6.4.   Administrative Evaluation**

**6.4.1.**

The purpose of this process is to evaluate the validity of a complaint against a Faculty member and, at the option of the College President or designee, to provide guidance as to appropriate action. This process should not be used to evaluate student claims of discrimination or student complaints involving an academic process.

**6.4.2.**

The College President, or designee, in response to a written, signed complaint from a student, Faculty member, administrator, or staff, may initiate an administrative evaluation after advising the Faculty member within fifteen (15) accountability days of receipt of the complaint; and, at the option of the Faculty member, will advise the Faculty Senate President.

**6.4.3.**

The evaluation team for an administrative evaluation shall consist of the appropriate Vice President, a Faculty member chosen by the evaluee, and a Faculty member appointed by the College President, who may ask that this Faculty member be appointed by the Faculty Senate President. In no instance shall the Department/Division Chair of the evaluee or the Faculty Senate President serve on the evaluation team. The evaluee must secure the Faculty member and communicate acceptance to the College President or designee within seven (7) calendar days of notification of the Administrative Evaluation; otherwise, the Faculty Senate President will appoint a Faculty member within seven (7) calendar days after the failure occurs.

MCCCD/Martinez 00304

**6.4.4.**

Prior to the evaluation, the College President, in consultation with the evaluation team, will determine the nature and scope of the evaluation. The scope may be expanded to include recommendation for action to the College President. The evaluation process is confidential. Only the results of the evaluation will be discussed with the evaluee, the evaluation team, and, at the option of the evaluee, the Faculty Senate President. A report that explains the evaluation results will be generated within forty (40) accountability days from the receipt of the signed complaint and placed in the evaluee's official personnel file **(see also RFP 3.9.4. & 3.9.6.).** The College President and the evaluee will receive a copy of this evaluation.  By mutual agreement between the College President or designee, evaluation team and evaluee, the deadline may be extended.

**6.4.5.**

The College President will have fourteen (14) calendar days from receipt of the report to take any action deemed necessary based on the results of the evaluation.

## 6.5. Conflict Between Student and Faculty Member

When there is a complaint by a student against a Faculty member, the proper District or College authority will work in confidence with the parties to resolve the conflict.  A Faculty member will not be required to respond to any complaint that is not in writing over complainant's signature or to complaints that do not have specific documentation of incidents, *i.e.*, dates, times, etc.  This complaint must be made available to the Faculty member involved.

**6.5.1.**

A student who feels that he/she has been treated unfairly or unjustly by a Faculty member (full-time or part-time) with regard to an academic process such as grading, testing, or assignments, shall discuss the issue first with the Faculty member involved.  This conference shall be requested by the student within fifteen (15) business days from the time the student knew or reasonably should have known about the unfair or unjust treatment. This instructional grievance process shall not be utilized in a case in which a student feels he/she has experienced discrimination. If the student feels that he/she has experienced discrimination on the basis of race, color, religion, national origin, gender, age, disability, veteran status, or sexual orientation, the student shall refer to the Discrimination Complaint Procedures for Students as administered by the Vice President for Student Affairs.

**6.5.2.**

If, within ten (10) business days of the request for the conference with the Faculty member, the problem is not resolved or the Faculty member has been unable to meet with the student, the student may continue the process by filing a written complaint with the Department/Division Chair and appropriate administrative office at the College.  This written complaint must be filed within ten (10) business days following the previous deadline.  The written complaint will be given to the Faculty member five (5) days before any official meetings are convened.

MCCCD/Martinez 00305

**6.5.3.**

Upon receipt of a written complaint, the Department/Division Chair or appropriate college administrative officer will work with the parties in an attempt to resolve the conflict.  The Faculty member may ask that the Faculty Senate President be in attendance.   Every attempt will be made to maintain confidentiality during this process.

**6.5.4.**

A Faculty member will not be required to respond to a complaint that is not in writing and that, when appropriate, did not have the specific documentation including dates, times, materials, etc.  The written complaint will be made available to the Faculty member.

**6.5.5.**

If the complaint is not resolved at this level within ten (10) business days, the student should forward, to the Vice President of Academic Affairs or appropriate College administrative office, a copy of the original written complaint with an explanation regarding action taken at each prior level.  The Vice President of Academic Affairs or appropriate College administrative officer will meet with the student, Faculty member, the Department/Division Chair, and the Faculty Senate President (the latter upon request of the Faculty member), and attempt to resolve the issues.  This level will be the final step in any complaint process regarding grades.

**6.5.6.**

If the complaint, other than those concerning grades, is not resolved by the Vice President of Academic Affairs or the appropriate College administrative officer, it may be forwarded in writing by the student to the College President for final resolution. The College President, or designee, will expedite a timely examination of the issues and will issue a final written determination in the complaint process.

**6.6.    Internal Investigations**

**6.6.1.**

Internal investigations will be conducted only by agents granted investigative authority pursuant to MCCCD policies and procedures, or by an administratively authorized assignment or contract.

To the extent allowed by law, a Faculty member against whom a complaint is filed will be provided with:

**6.6.1.1.**

a written copy of the complaint, if and when MCCCD procedure requires, or if a preliminary review or investigation indicates that a response from the accused Faculty member must be requested to complete the investigation and/or to comply with MCCCD policies and procedures.

**6.6.1.2.**

a written copy of the investigator's final determination or recommendations at the conclusion of the investigation.

MCCCD/Martinez 00306

**6.6.2.**

A Faculty member may submit a written response to the allegations at any time during the investigation, as well as a written rebuttal after the investigator's final determination or recommendations have been issued. The complaint and all written statements, responses, and rebuttals will be appended to the investigator's official final determination or recommendations.

**6.6.3.**

A Faculty member who is required to appear or respond to a matter related to an internal investigation has a right to representation and counsel as stipulated in **Sections 6.3.2. and 6.3.3.** In no case shall a Faculty member be required to appear or respond prior to receiving a written copy of the complaint.

**6.6.4.**

Retaliation or retribution by a Faculty member against any person who files a complaint may result in disciplinary action up to and including termination. Similarly, if the investigator determines that the complaint is materially false and that it was made in bad faith, the complaining party may be subject to disciplinary action up to and including termination or expulsion.

MCCCD/Martinez 00307

# 7. EFFECT OF POLICY

## 7.1. Separability

In the event that any provision of this policy is contrary to any Residential Faculty Policies adopted by the District prior to the effective date of this policy acceptance, the provisions of this policy shall apply. In the event that any provisions of these policies shall be declared invalid by any court of competent jurisdiction, such decisions shall not invalidate the entire policy, it being the express intention of the parties that all other provisions not declared invalid shall remain in full force and effect.

## 7.2. Statement of Good Faith

Both parties agree that, during the course of developing this policy, each party had the opportunity to identify issues, state interests, and evaluation options. The parties further agree that all obligations and benefits herein are the result of voluntary agreement. This document contains the full and complete agreement reached on issues considered. No amendment or supplement to this policy shall be deemed effective unless agreed upon according to the provisions of Section 2.9., reduced to writing, ratified by the Residential Faculty, and approved by the Governing Board.

## 7.3. Compliance Between Individual Contract and Policy

Any individual contract between the Board and an individual Faculty member (except in the case of certain specially funded positions) shall be subject to and consistent with the terms and conditions of this policy.

## 7.4. Renewal and Process for Successor Agreement

This agreement shall remain in full force and effect until July 1, 2014, and thereafter from year to year unless either party gives written notice of an intention to reopen negotiations no later than September 1.

## 7.5. Sharing of Financial Data

By September 15, using the process described in Appendix G, the Vice Chancellor of Business Services will provide the Faculty Association with the District Financial Plan and other financial information necessary for effective discussions and negotiation.

## 7.6. Interest-Based Negotiation Timeline and Process

### 7.6.1. Issues Identification and Prioritization

The members of the Meet and Confer Team will identify proposed negotiation issues in writing at the first formal meeting of the year that shall occur no later than September 15. During the second meeting of the year, the Meet and Confer Team will identify by consensus the initial set of issues to negotiate.  Issues may include but are not limited to compensation, benefits, and working conditions.

### 7.6.2. Meeting Schedule

The Meet and Confer Team will meet a minimum of twice a month from September to the following April except in December and January when the team will meet once. Meetings will be three hours in duration. This schedule may be modified upon mutual consent of the team members.

MCCCD/Martinez 00308

### 7.6.3. Ground Rules

During the first formal meet and confer meeting of the negotiation year, the Meet and Confer Team will reach consensus on ground rules that will govern the negotiation process.

### 7.6.4. Agreements

The Meet and Confer Team will reach agreements by consensus through use of the interest-based negotiation process. Agreements shall be reduced to writing and affirmed by members of the Meet and Confer Team for inclusion in the Residential Faculty Policies.

### 7.6.5. Presentation to the Board

The faculty and administrative co-chairs of the Meet and Confer team shall be permitted to regularly and jointly update the Governing Board on progress related to the resolution of issues. Updates may be provided in-person at a Governing Board meeting or via an alternate communication method as agreed upon by the Meet and Confer Team.

### 7.6.6. Board Decision

On or before April 15, the Meet and Confer Team will submit a written report to the Board summarizing all agreements reached, issues resulting in impasse, and issues being rolled forward to the next negotiation year.

#### 7.6.6.1.

The Board will consider the recommendations of the Meet and Confer Team and may accept, reject, or modify the proposed solutions consistent with its authority.

#### 7.6.6.2.

Final action by the Board and ratification by the Residential Faculty shall constitute the agreement for a budget year and shall be contained in the Residential Faculty Policies.

### 7.7. Date of Implementation for Policy Change(s)

Any change in policy from the prior year will become effective July 1 (unless otherwise indicated in this policy manual), and shall continue in effect or terminate, as provided in Section 7.4.

MCCCD/Martinez 00309

## 7.8. Attestation Page

This agreement shall become effective upon ratification by the parties except as specifically provided otherwise in this agreement.  This agreement, which will become effective on July 1, 2013, shall constitute the full and complete commitment between both parties.

Doyle Burke
President
MCCCD Governing Board

Patricia Finkenstadt
President
MCCCD Faculty Association

Irene Kovala
Co-Chair (Administration)
Meet and Confer Team

Frank Wilson
Co-Chair (Faculty)
Meet and Confer Team

Linda Lujan
Administration Member
Meet and Confer Team

Pat Lokey
Faculty Member
Meet and Confer Team

James Bowers
Administration Member
Meet and Confer Team

Keith Heffner
Faculty Member
Meet and Confer Team

Daniel Corr
Administration Member
Meet and Confer Team

Jim Simpson
Faculty Member
Meet and Confer Team

Rufus Glasper
Chancellor
MCCCD

MCCCD/Martinez 00310

## APPENDIX A - FACULTY PROFESSIONAL GROWTH POLICIES

## A.1. INTRODUCTION

### A.1.1.

MCCCD recognizes the value of professional growth as it pertains to the continued development of teaching and learning. Faculty may choose to advance on the salary schedule or receive reimbursement for various types of activities directly related to professional development. FPG has developed a set of policies and procedures that relate to advancement and reimbursement. All requests for salary advancement and/or reimbursement must adhere to the policies and procedures.

### A.1.2.

The policy is essentially a method of recognizing the efforts of Faculty as they engage in professional activities related to their service to the District. The policy does not allow for compensation be provided for activities considered to be a part of a Faculty member's professional obligation.

### A.1.3.

Because of the great variety of activities that are recognized and the even greater range of individual requests, it may be necessary to apply interpretive judgment to determine whether the request adheres to the policy. Part of the responsibility of the FPG Committee is to make such determinations.

### A.1.4.

These guidelines will be prepared and reviewed annually by the FPG Committee and the Policy Review Committee. The guidelines will be approved annually by the Faculty Executive Council. Faculty should familiarize themselves with the guidelines prior to the submission of requests.

## A.2. PROFESSIONAL GROWTH ADVANCEMENT—GENERAL INFORMATION

### A.2.1.

For a Faculty member to be credited with horizontal increments, transcripts, grade slips, official notices showing satisfactory completion for academic coursework, and proof of attendance or other types of verification required for non-academic advancement activities must be on file with the District Division of Human Resources by September 15th of the contract year.

### A.2.2.

No request for academic credit will be approved for any activity accomplished earlier than two (2) years prior to the submission of the request. Course work completed prior to the Faculty member's hire is deemed to be a condition of their employment that is used in determining their initial placement on the salary schedule, and therefore is not eligible for advancement under Professional Growth. Inclusion of coursework for horizontal placement may be appealed under Section 4.4. Salary Placement Review Board.

MCCCD/Martinez 00311

**A.2.3.**

Some activities require prior approval from the Faculty Professional Growth Committee.

**A.2.4.**

The Faculty Professional Growth Committee will at all times attempt to make determinations in an open and unbiased manner that is free from conflict of interest. Accordingly, Department/Division Chairs who are members of the Faculty Professional Growth Committee will abstain from decisions that affect the professional growth applications of Faculty members in their respective departments/divisions; likewise, Faculty members who are on the Professional Growth Committee will abstain from decisions that affect the professional growth applications of their respective Department/Division Chairs.   Other potential conflicts of interest will be treated in a similar manner.

## A.3. POLICY FOR HORIZONTAL ADVANCEMENT ON THE SALARY SCHEDULE

### A.3.1. Approval of Individual College Courses

#### A.3.1.1. Graduate Courses Within Subject Field Policy

Graduate-level courses for which credit is granted, and not previously taken within the subject field, are almost always approved.

#### A.3.1.2. Undergraduate Courses Within Subject Field

Undergraduate courses within subject field will be acceptable if approved.

#### A.3.1.3. Graduate Courses Not Within Subject Field

Graduate courses not within the subject field are acceptable if the course has a direct application to the professional responsibility of the Faculty member. Courses required for the correction of Maricopa Community Colleges' Faculty hiring qualifications deficiencies will not be accepted for advancement on the salary schedule, *e.g.,* "The Community College" course.

#### A.3.1.4. Undergraduate Courses Not Within Subject Field

Undergraduate courses not within the subject field may be acceptable if approved.

### A.3.2. Approval of College Courses While Pursuing a Degree

#### A.3.2.1. Graduate Degree

Not all graduate degrees advance the cause of the professional competency of the member.  Specific justification must be supplied to prove that the completion of the degree will produce specific benefit and credit to the field of responsibility. Exceptions will be made for degrees leading to a probable future assignment.

#### A.3.2.2. Undergraduate Degree

Faculty members who are pursuing the Associate or Bachelor's degree must file a "Program of Study" as outlined by the degree-granting institution, and obtain approval from the appropriate Vice President.

MCCCD/Martinez 00312

### A.3.3. Approval of Nonacademic Activity

The maximum nonacademic activity credit allowed to advance on the salary schedule will be limited to fifty-seven (57) credit hours of the total eighty-five (85) hours possible. A clear and complete description of the nonacademic activity must be submitted with the request for credit approval. The Faculty Professional Growth Committee may request documentation and/or verification of the activity.

#### A.3.3.1. Travel

One (1) credit will be granted for each consecutive ten (10) days of travel. The maximum credit allowable in the area is twelve (12) credit hours.

#### A.3.3.2. Work Experience

The work experience must be directly related to the Faculty member's field of responsibility, and one (1) credit will be granted for each thirty-five (35) clock hours of work experience.

#### A.3.3.3. Clinics, Conferences, Workshops and Seminars

One (1) credit hour will be granted for each eighteen (18) hours in clinics, conferences, workshops, or seminars.

#### A.3.3.4. Other Professional Activity

One (1) credit will be granted for each thirty-five (35) clock hours of service performed. The activity must be in addition to the professional responsibilities of the Faculty member, and these activities must occur outside the regular hours of accountability.

## A.4. SABBATICAL LEAVES

### A.4.1. Purpose of Leave

Sabbatical leaves are granted to qualified Faculty members for intellectual stimulation normally to be attained by study, research, travel, suitable work experience, or other creative activity. The purpose of the sabbatical leave is to upgrade the educational program of the college by improving Faculty competency.

### A.4.2. Administration of Sabbatical Leave Policy

The Faculty Professional Growth Committee shall administer the sabbatical leave policy. The duties of the Sabbatical Leave Subcommittee shall be to prepare application forms; to screen application forms; to make recommendations for sabbatical leaves to the Faculty Professional Growth Committee. The Subcommittee shall consist of the Faculty Professional Growth Committee Chair, one (1) Faculty representative from each of the colleges, and two (2) Vice Presidents of Academic Affairs, or designees.

### A.4.3. Application and Recommendation Procedures

#### A.4.3.1.

The Office of the Vice Chancellor of Human Resources shall publish, by May 1st, an informational listing of persons eligible for sabbatical leave for the following year.

MCCCD/Martinez 00313

### A.4.3.2.

Applications must be submitted to the appropriate Vice President of Academic Affairs for forwarding to the Sabbatical Leave Subcommittee no later than October 1st. If October 1 falls on a weekend, the due date is the Friday prior to October 1st. The Subcommittee may request additional written or oral explanations of proposals.

### A.4.3.3.

The Subcommittee shall submit its recommendations to the Faculty Professional Growth Committee. The Faculty Professional Growth Committee shall present its list of recommendations to the Executive Vice Chancellor and Provost prior to December 30th. The District Faculty Association President will receive a copy of this list.

### A.4.3.4.

Sabbatical leave recommendations shall be presented to the Governing Board prior to January 30th. If the Chancellor changes the recommendation of the Faculty Professional Growth Committee, the committee will be advised prior to presentation to the Governing Board. Both the Chancellor's recommendations and the Faculty Professional Growth Committee's recommendations will be presented.

### A.4.3.5.

Applicants will be notified by the Executive Vice Chancellor and Provost following Governing Board action. The District Faculty Association President will also be notified should there be deviations from the list prepared by the Faculty Professional Growth Committee.

### A.4.3.6.

Recommendations made in the Spring are for the Fall semester of that calendar year and the Spring semester and Summer of the next calendar year.

## A.4.4. Criteria for Sabbatical Selection

Criteria for sabbatical selection will include, but will not be limited to, the following: (The order of listing does not indicate a priority.)

**A.4.4.1.** Service to the District.

**A.4.4.2.** Completion of advanced degrees.

**A.4.4.3.** Completing resident requirement for an advanced degree.

**A.4.4.4.** Research and publication.

**A.4.4.5.** Curriculum and materials development.

**A.4.4.6.** Planned and approved travel related to the subject field.

**A.4.4.7.** Practical training of job experience in a subject-related field.

**A.4.4.8.** Updating of knowledge in subject field.

## A.4.5. Conflicts

If two (2) sabbaticals of comparable merit are received, the Faculty member applying for his/her first sabbatical will be given preference.

MCCCD/Martinez 00314

### A.4.6. Compensation and Financial Arrangements

#### A.4.6.1.

A Faculty member on sabbatical leave will receive full pay for one-half (1/2) of the contract year and three-fourths (3/4) pay for the second one-half (1/2) of the contract year. A "short-term" sabbatical (defined as ten [10] weeks in length and taken outside of the contract assignment) may be granted. Pay for short-term sabbaticals will be ten (10) load hours at the overload rate.

#### A.4.6.2.

If the sabbatical activity includes remuneration from other than the MCCCD, the sabbatical proposal must clearly state all financial arrangements. The Faculty Professional Growth Committee may recommend (a) a sabbatical with regular pay;   (b) an adjustment in sabbatical leave salary; (c) a leave without pay; or (d) denial of the proposal.

#### A.4.6.3.

Faculty members on sabbatical leave will be paid at the same interval as other employees unless some other arrangement is made that is mutually satisfactory to the recipient and the administration. All other Faculty benefits shall accrue.

#### A.4.6.4.

The Faculty member's status shall not change while on leave, and the time spent on sabbatical leave will not interrupt progress on the salary schedule. The Faculty member receiving the sabbatical will return to the position that he/she left unless, by written mutual agreement, other arrangements were made prior to the sabbatical having been granted.

#### A.4.6.5.

A Faculty member on sabbatical will retain his/her status as a member of the Arizona State Retirement System according to the regulation of that system.

### A.4.7. Policy

#### A.4.7.1.

Faculty members shall be eligible for consideration for sabbatical leave after serving twelve (12) consecutive semesters as Residential Faculty members in the MCCCD. The twelve (12) consecutive semesters will not be considered as having been "broken" if the Faculty member accepts a "temporary assignment" in another policy group for a period of not more than two (2) years.

#### A.4.7.2.

A Faculty member is eligible for an additional sabbatical leave after completing twelve (12) consecutive semesters following the prior sabbatical.

#### A.4.7.3.

Every eligible Faculty member following specified Faculty Professional Growth procedures shall be given equal consideration in granting sabbatical leaves except as outlined in Section A.4.5.

MCCCD/Martinez 00315

**A.4.7.4.**

The Sabbatical Leave Subcommittee recommends the Residential Faculty of each College to be granted sabbatical leave based upon criteria in Section A.4.4 and available funding for sabbatical leaves.

**A.4.7.5.**

Members on sabbatical leave may not receive any remuneration from MCCCD other than registration fees, conference fees, or reimbursement for travel funds directly related to and necessary for their sabbatical.   Faculty requesting professional growth funds as part of their sabbatical must include these items as part of their sabbatical proposal.  Faculty members on sabbatical are eligible for, but not guaranteed, registration, conference, and travel funds.   Approval of a sabbatical proposal does not guarantee funding of professional growth funds.

**A.4.7.6.**

Members on sabbatical leave may not participate in voluntary services to the District or to College/District Faculty Governance unless permission is granted by the Faculty Professional Growth Committee and the Executive Vice Chancellor and Provost.

**A.4.7.7.**

A short-term sabbatical may be granted only if the goal cannot be accomplished during either a Fall or a Spring semester.  A short-term sabbatical may not be taken in conjunction with a regular semester sabbatical.

**A.4.7.8.**

Any change in the sabbatical proposal must be formally approved by the Governing Board upon the recommendation of the Faculty Professional Growth Committee and the Chancellor or his/her designee.

**A.4.7.9.**

Faculty members unable to complete their sabbatical programs because of an emergency, accident, or illness shall be allowed to modify the programs and shall continue to receive contract benefits, provided they have furnished satisfactory notification and evidence to the Faculty Professional Growth Committee and the Executive Vice Chancellor of Human Resources, or designee, and the District Faculty Association President will also be notified. Contract benefits will be governed by the benefit and disability provisions of the *RFP.*

**A.4.7.10.**

In case of alleged failure to follow the sabbatical proposal, the Chancellor will appoint a fact-finding committee to study the case.  The committee will include the College President, the Faculty Senate President, and the Chair of the Faculty Professional Growth Committee.    The committee will provide, without recommendation, its findings to the Chancellor, who will determine appropriate action.   If a College does not have a Faculty Senate President, the College President will convene the Faculty to elect the Faculty representative.

MCCCD/Martinez 00316

### A.4.8. Performance Reports

To ensure that the members on sabbatical have begun their leaves according to plan, each shall submit a statement indicating this to the Executive Vice Chancellor and Provost, the College President, and the Faculty Professional Growth Committee no later than thirty (30) days after the beginning of each semester and summer.  Sabbatical salaries will be suspended if this requirement is not fulfilled.

### A.4.9. Return from Sabbatical

#### A.4.9.1.

Each Faculty member returning from leave shall file, within sixty (60) days, a written report with the Faculty Professional Growth Committee, the Executive Vice Chancellor and Provost, and the College President. An official transcript will serve in lieu of a written report for full-time study programs.

#### A.4.9.2.

The recipient will be required to sign a promissory note for the sabbatical salary, which shall be forgiven at the rate of one (1) semester for each two (2) semesters of contract fulfilled.  A short-term sabbatical will be considered a one (1) semester sabbatical for this obligation.  If the recipient is unable to fulfill the term of the promissory note due to death or disability, the note shall be void.

### A.4.10. Publication During Sabbatical

#### A.4.10.1.

When a Faculty member satisfies all of the conditions of his/her sabbatical agreement and, apart from the agreement, produces copyrightable material during the term of the sabbatical, he/she shall maintain sole ownership of the material.

#### A.4.10.2.

When a Faculty member produces copyrightable or patentable material as a condition of his/her sabbatical, the copyright or patent remains with the Faculty member, but the District retains the unlimited right for students and staff to use the material without payment of royalties.  This right will apply to any subsequent revisions of the material.

## A.5. PROFESSIONAL UNPAID LEAVES

### A.5.1. Purpose of Leave

Professional Unpaid Leaves not to exceed two (2) consecutive semesters may be granted to Appointive members of the Faculty for intellectual stimulation normally to be attained by study, research, travel, suitable work experience, or other creative activity.  The purpose of the Professional Unpaid Leave is to upgrade the educational program of the College by improving Faculty competency.

### A.5.2. Administration of Professional Unpaid Leave Policy

The Faculty Professional Growth Committee shall administer the Professional Unpaid Leave Policy.

MCCCD/Martinez 00317

### A.5.3. Application Procedures

#### A.5.3.1.

Applications for Professional Unpaid Leaves must be submitted to the appropriate Vice President for forwarding to the Faculty Professional Growth Committee no later than February 15th and shall include:

**A.5.3.1.1.** A statement of objectives of the proposed leave.

**A.5.3.1.2.** A statement relating the proposed leave to assigned duties.

**A.5.3.1.3.** A letter from the Department/Division Chair.

**A.5.3.1.4.** A letter from the College President or designee.

**A.5.3.1.5.** (If work related) a letter stating duties and responsibilities.

#### A.5.3.2.

The Faculty Professional Growth Committee may request additional written or oral explanations of proposals.

### A.5.4. Recommendation Procedures

#### A.5.4.1.

The Faculty Professional Growth Committee shall present its list of recommendations to the Chancellor and the Executive Vice Chancellor and Provost before April 1st.  The District Faculty Association President will also receive a copy of this list.

#### A.5.4.2.

The Chancellor and the Executive Vice Chancellor and Provost shall present recommendations of the Faculty Professional Growth Committee, along with their own recommendations, to the Governing Board by May 1st.

#### A.5.4.3.

Applicants will be notified by the Executive Vice Chancellor and Provost following Governing Board action.  The District Faculty Association President will also be notified.

### A.5.5. Criteria for Professional Unpaid Leave

Criteria for Professional Unpaid Leave selection will include, but will not be limited to, the following:  (The order of listing does not indicate a priority.)

**A.5.5.1.** Service to the District.

**A.5.5.2.** Completion of advanced degrees.

**A.5.5.3.** Completing resident requirement for an advanced degree.

**A.5.5.4.** Research and publication.

**A.5.5.5.** Curriculum and materials development.

**A.5.5.6.** Planned and approved travel related to the subject field.

**A.5.5.7.** Practical training or job experience in a subject-related field.

**A.5.5.8.** Updating of knowledge in subject field.

MCCCD/Martinez 00318

### A.5.6. Policy

#### A.5.6.1.

Any change in a Professional Unpaid Leave Proposal must be formally approved by the Governing Board or its delegate.

#### A.5.6.2.

In the case of an alleged failure to follow the Professional Unpaid Leave Proposal, the Chancellor may appoint a fact-finding committee to study the case. The committee will include the College President, the Faculty Senate President, and the Chair of the Faculty Professional Growth Committee. The committee will submit a finding of fact to the Chancellor, who will determine an appropriate action. If the College does not have a Faculty Senate President, the College President will convene the Faculty to elect the Faculty representative.

### A.5.7. Performance Reports

#### A.5.7.1.

To ensure that the Faculty members on Professional Unpaid Leave have begun their leaves according to plan, each shall submit a statement indicating this to the Executive Vice Chancellor and Provost, and the Faculty Professional Growth Committee no later than thirty (30) days after the beginning of each semester.

#### A.5.7.2.

Within sixty (60) days after returning, a final report stating benefits and professional growth acquired shall be sent to the Faculty Professional Growth Committee, the Executive Vice Chancellor and Provost,, and the College President.

#### A.5.7.3.

Failure to meet requirements as stated in Sections A.5.6.1, A.5.7.1, and A.5.7.2 shall cause the Professional Unpaid Leave to revert to the classification of Personal Unpaid Leave.

#### A.5.7.4.

A Faculty member unable to complete his/her Professional Unpaid Leave Program because of accident or illness, shall be allowed to modify the program and shall continue to receive contract benefits, provided he/she has furnished satisfactory notification and evidence of the situation to the Faculty Professional Growth Committee. The Faculty member's contract benefits will be governed by the benefit and disability provisions of the *Residential Faculty Policies*.

## A.6. PROFESSIONAL GROWTH PROJECTS

Faculty members are eligible to apply for professional growth funds to:

### A.6.1.

Participate in conferences, workshops or professional meetings that will increase knowledge, skills, or attitudes enhancing one's role at the college and/or in Faculty development.

MCCCD/Martinez 00319

### A.6.2.

Develop projects or programs for one or more Faculty members to improve knowledge, skills, or attitudes in a particular area.

## A.7. PROFESSIONAL GROWTH TRAVEL AND EXPENSES

The Chancellor, with Governing Board approval, will allocate to the Faculty Professional Growth Committee a sum for travel and expenses to attend professional activities. The expenditures of such funds shall be administered by the College Travel Committee in compliance with Faculty Professional Growth policies.

## A.8. DENIAL OF PROFESSIONAL GROWTH

Denial of sabbatical leave, professional unpaid leave, or professional growth travel by the Faculty Professional Growth Committee is not grievable under the *Residential Faculty Policies* as outlined in Section 6.1. Members shall have the right to appeal decisions of the Faculty Professional Growth Committee on aforementioned activities to the Faculty Professional Growth Appeals Committee.

## A.9.    BUDGET

|  | 2013-2014 |
|---|---|
| Travel | $ 507,479 |
| Projects | 507,479 |
| Sabbaticals | 1,522,439 |

### A.9.1.

Monies allocated for the fiscal year will be fungible among all the Professional Growth accounts. The Faculty Professional Growth Committee will make a recommendation to transfer funds to the Executive Vice Chancellor and Provost, who will approve the transfer.

### A.9.2.

Unused Professional Growth monies may be carried forward to the next fiscal year.

### A.9.3.

Annual changes to Appendix A should be proposed after the implementation of the process described in Appendix G.

## A.10.   CLERICAL SUPPORT

Clerical support will be provided for the Faculty Professional Growth Committee through the Office of the Executive Vice Chancellor and Provost. The Executive Vice Chancellor and Provost will be expected to provide no less than a full time, regular, twelve (12) month clerical position to support the Faculty Professional Growth Committee. Efforts will be made with regard to space requirements for the committee, its files, and other materials/equipment.

MCCCD/Martinez 00320

## APPENDIX B - BENEFITS

### B.1. TRAVEL EXPENSES

A Faculty member traveling on prior-approved college business shall be reimbursed for expenses, as stated in current travel procedures.

### B.2. EMPLOYEE BENEFIT PROGRAM

#### B.2.1. Benefit Credits

##### B.2.1.1.

The District will contribute benefit credits toward the employee's Flexible Benefits Program Flex credits will be allocated to both the "core" and "buy up" PPO options. The level of flex credits will be based upon the tier of medical coverage elected or the waiving of medical coverage.

| Medical coverage | Benefits |
|---|---|
| Waiver | 2,000 |
| Employee only | 7,284 |
| Employee and child/children | 12,750 |
| Employee and spouse | 14,796 |
| Employee and Domestic Partner | 14,796 |
| Employee and family | 17,997 |

##### B.2.1.2.

The Flexible Benefits coverage provided by the District for Faculty members in the course of their employment will also be provided in the same manner for those Faculty members while on sabbatical or other paid leaves of absences.

#### B.2.2. Insurance

##### B.2.2.1. Hospitalization/Major Medical

The Faculty member may purchase hospitalization/major medical insurance according to the Flexible Benefits Program.

##### B.2.2.2. Income Disability Coverage

According to the core program of the Flexible Benefits Program, the District will provide the member with long-term disability insurance equal to 66-2/3% of the Faculty member's base contract salary. The waiting period shall be ninety (90) calendar days or exhaustion of all sick leave, whichever comes last.

##### B.2.2.3. Term Life Insurance

According to the core program of the Flexible Benefits Program, the District will provide basic life insurance coverage of twenty thousand dollars ($20,000). The Faculty member may purchase additional life insurance according to the Flexible Benefits Program.

### B.3. DISTRICT-WIDE EMPLOYEE BENEFITS ADVISORY COUNCIL

The District Faculty Association will have two (2) representatives on the District-wide Employee Benefits Advisory Council.

MCCCD/Martinez 00321

## B.4. REIMBURSEMENT FOR UNUSED SICK LEAVE: RETIREMENT OR DEATH IN SERVICE

### B.4.1.

A Faculty member who has a minimum of ten (10) years of satisfactory service (without a break in service) at the time of death or retirement from the District shall have his/her final preretirement contract amount adjusted to reflect payment, on a proportional basis, for unused accumulated sick leave allowance. This transaction will eliminate the balance of his/her accumulated sick leave.

### B.4.2.

The amount of the contract adjustment shall be computed as follows: The daily salary rate of the last current contract of the deceased/retiree will be multiplied by twenty-five percent (25%), this product not to exceed forty dollars ($40) per day. This product will then be multiplied by the number of unused sick days to determine the death/retirement benefit.

| Years of Service at Death or Retirement | Maximum Number of Unused Accumulated Sick Days Allowed |
|---|---|
| Fifteen (15) or more | Two hundred (200) |
| Ten (10) to fifteen (15) | One hundred fifty (150) |

### B.4.3.

For the purpose of implementing this section, and for payment of unused sick leave, retirement shall apply to those Appointive members who are accepted into the Arizona State Retirement System. This option may not be exercised more than once in this District.

## B.5. LEAVES OF ABSENCE

For all leave calculations, a day shall consist of 6 hours for instructional faculty and 7 hours for service faculty.

### B.5.1. Sick Leave

#### B.5.1.1.

Faculty members on a nine (9) month contract are granted ten (10) days of sick leave per year. Other Faculty are allowed days proportionate to the number of months of annual employment. Faculty employed less than full time are allowed sick leave days prorated in the same manner as their salaries. These days are accumulated indefinitely. Such sick leave shall be credited to said Faculty members as earned. Each Faculty member shall be given an accounting of sick leave upon written request to the District Division of Human Resources.

### B.5.1.2. Bereavement Leave and Catastrophic Illness/Imminent Death Leave

#### B.5.1.2.1.

Bereavement Leave (not chargeable to any other kind of leave), may be used up to but not in excess of five (5) business days due to the death of an employee's spouse/partner, father, mother, grandfather, grandmother, child, foster child, brother, sister, grandchild, stepchild, stepfather, stepmother, or spouse's/partner's father, mother, grandfather, grandmother, or in-laws in any one incident. (Bereavement is a paid leave.)

MCCCD/Martinez 00322

**B.5.1.2.2.**

Catastrophic Illness/Imminent Death Leave may be used up to but not in excess of five (5) business days, due to the Catastrophic Illness/Imminent Death of an employee's spouse/partner or family member of the employee or employee's spouse/partner, to include the following: father, mother, stepfather, stepmother, grandfather, grandmother, child, stepchild, foster child, brother, sister, grandchild, or in-laws in any one incident. Catastrophic Illness is defined as a sudden illness/injury that is seriously incapacitating such as those that have the potential for permanent disability or extensive hospitalization/confinement or death and requires immediate action. (Catastrophic Illness/Imminent Death is a paid leave separate from any other leave.)

**B.5.1.2.3.**

The appropriate College President/Vice Chancellor may, when circumstances warrant, grant Bereavement or Catastrophic Illness/Imminent Death Leave to any employee based upon the Catastrophic Illness/Imminent Death or death of a person other than those listed.

**B.5.1.2.4.**

In addition, travel time outside the state, not to exceed five (5) business days for Catastrophic Illness/Imminent Death and not to exceed five (5) business days for Bereavement in any one incident, may be charged against accrued sick leave.

**B.5.1.3.**

All provisions of sick leave apply when a member is prevented by illness from starting to work at the beginning of the contract year. However, should a Faculty member fail to appear at the beginning of the contract year for any reason other than illness, leave and salary for that contract year will be reduced proportionately by the time elapsed prior to assumption of duties.

**B.5.1.4.**

The Vice Chancellor of Human Resources, or designee, may, at the request of the College President or appropriate District official, require satisfactory evidence to substantiate illness absences, and may under certain conditions require that the Faculty member, at District expense, be examined by appropriate health professionals (including but not limited to physicians, psychologists, psychiatrists) selected by the District. The Faculty Association President will be informed of the District's intention to require such examinations.

MCCCD/Martinez 00323

**B.5.2. Personal Time**

**B.5.2.1.**

Personal leave, not to exceed four (4) days per calendar year (24 hours for teaching Faculty, 28 hours for service Faculty) (non cumulative), is available. Faculty employed less than full time are allowed personal leave days prorated in the same manner as their salaries. Faculty on prorated extended contracts are allowed personal leave days prorated in the same manner as their salaries. Personal time does not need to be approved. As much advance notice as possible should be given for scheduling purposes. Personal time is not to be used to routinely come in late or leave early from work. Personal leave will be charged to the employee's sick leave.

**B.5.2.2.**

A Faculty member may be granted leave to participate in a professional or civic duty without loss of salary if prior written approval is granted by appropriate College President/Vice Chancellor. If a Faculty member receives compensation for a professional or civic activity, such compensation shall be deposited with the College Fiscal Officer or appropriate District official.

**B.5.3. Family and Medical Leave**

Family and Medical Leave will be provided to regular full-time and regular part-time eligible employees not to exceed twelve (12) weeks within a twelve (12)-month period for adoption or childbirth, to care for an ill child, parent, or spouse/partner, or for the employee's own illness. The leave may be a paid or unpaid leave based upon the employee's accrued time available. Accumulation of accrued time will continue while the employee remains in a paid status. Accumulation of accrued leave will cease when the employee goes into an unpaid status but previously earned benefits will be held for the employee. The District will continue to pay the flexible benefits for the insurance coverage selected by the employee during the Family and Medical Leave.

For the duration of Family and Medical Leave, employees will not seek, nor be employed in outside employment during their hours of accountability. The Vice Chancellor of Human Resources, or designee, may grant exceptions for extenuating circumstances for individuals adversely affected by these provisions.

**B.5.4. Medical Leave of Absence**

Should an employee request more time after exhaustion of the Family and Medical Leave, an employee may request a medical leave of absence for personal health reasons, (up to nine (9) months with up to ten (10) years of service, and up to fifteen (15) months with ten (10) or more years of service). A physician's statement, acceptable to the appropriate Human Resources staff or designee, must be received. Accumulation of accrued time will continue while the employee remains in a paid status. Accumulation of accrued time will cease when the employee goes into an unpaid status, but previously accrued benefits will be held for the employee. An employee who is granted a leave under this section will return to the position that he/she left. Failure to return from a Medical Leave of Absence will result in automatic termination.

For the duration of Medical Leave, employees will not seek, nor be employed in outside employment during their hours of accountability. The Vice Chancellor of Human Resources, or designee, may grant exceptions for extenuating circumstances for individuals adversely affected by these provisions.

MCCCD/Martinez 00324

### B.5.5. Leave of Absence for Personal Reasons

Should an employee not be eligible for a Family and Medical Leave, a Personal Leave of Absence for personal reasons may be requested in up to one semester increments and must be approved by the appropriate supervisor, College President/Vice Chancellor with concurrence of the Vice Chancellor of Human Resources, or designee. Accumulation of accrued time will continue while the employee remains in a paid status. Accumulation of accrued time will cease when the employee goes into an unpaid status but previously accrued benefits will be held for the employee. An employee who is granted an approved leave under this section will return to the position which he/she left. Failure to return from an approved personal leave will result in automatic termination.

If known in advance, an employee may request a Personal Leave of Absence longer than one semester with approval from the supervisor, College President/Vice Chancellor with concurrence from the Vice Chancellor of Human Resources, or designee. A Personal Leave will have a cap of two semesters. With approval from the supervisor, College President/Vice Chancellor, the Vice Chancellor of Human Resources, or designee, may grant exceptions for extenuating circumstances.

### B.5.6. Medical Leave (Job-Related Disability)

Any Faculty member requiring a medical leave due to a job-related disability may return, within two (2) years, to the same or a similar position upon evidence that the member can perform in a satisfactory manner. This evidence will be the result of an examination by a doctor employed by the Governing Board.

## B.6. INSURANCE COVERAGE DURING A DISABILITY

### B.6.1. Insurance Coverage During a Medical Leave of Absence

The District will continue to pay the flexible benefits for the insurance coverage selected by the employee based upon the following schedule:

| Years of Service | Premium Payment |
|---|---|
| zero (0) to five (5) | six (6) months* |
| over five (5) | twelve (12) months* |
| over ten (10) | eighteen (18) months* |
| | *includes FMLA |

### B.6.2. Insurance Coverage During a Leave of Absence for Personal Reasons

The District will continue to pay the flexible benefits for the insurance coverage for the first twenty-four (24) weeks in a 12-month period. After twenty-four (24) weeks, the employee may continue to pay for the insurance coverage selected during the approved leave of absence.

## B.7. CHANGES TO APPENDIX B

Annual changes to Appendix B should be proposed after the implementation of the process described in Appendix G.

MCCCD/Martinez 00325

**APPENDIX C - EXTRA PAY FOR EXTRA DUTY**

## C.1.   INTRODUCTION

**C.1.1.**  Effective July 1, 2013, the dollar amounts included in the following sections of this appendix shall be increased by at least the same percentage as the salary schedule and be rounded off to the nearest fifty cents ($0.50). The sections that are covered by this automatic increase and rounding are Sections C.3.3., C.4.1., C.4.2., C.5., C.6., C.7., C.9., C.11., C.14., C.15., C.16., C.17., and C.18. The dollar amounts in Sections C.4.1., C.4.2., and D.1.6. will be increased by at least the same percentage as reflected in the increase in the salary schedule or in Section C.3.3., whichever is higher.

**C.1.2.**  Full-time Faculty are to be given first consideration when extra pay for extra duty assignments are staffed.

## C.2.   AUTHORITY TO ESTABLISH RATES OF PAY AND PAYMENT

Authority shall be delegated to the Vice Chancellor of Human Resources from the Governing Board to establish rates of pay and to authorize such payments that may not be specifically covered by this policy. Such action shall be reported to the Governing Board in an informational manner; and, where possible, a uniform rate shall be included in the policy the year following its establishment through this provision.

## C.3.   INSTRUCTIONAL FACULTY ASSIGNMENTS BEYOND THE REGULAR BASE CONTRACT

### C.3.1.  Overload Assignments During the Contract Year

During the contract year, Faculty may not exceed seven-and-one-half (7.5) overload hours (teaching) per semester in addition to their regular base contract. College presidents or designee(s) may approve additional paid nonteaching hours under unusual circumstances not to exceed twenty-five (25.0) load hours per semester for the total workload (teaching and non-teaching). Additions to the faculty contract for duties for teaching and non-teaching special services contract assignments are included in this limit and are considered to be above the regular base contract of fifteen (15.0) load hours per semester. Faculty members who are assigned additional overload hours will need to comply with reporting requirements. For Department/Division Chairs, overload assignments beyond the regular base contract are subject to the provisions of Appendix D, Section D.1.3.

It is the intent of this policy to assure maximum instructional capabilities and to assist Faculty in their professional endeavors; therefore, load limitations listed above shall include any combination of teaching assignments, Service Faculty assignments, and/or community service (noncredit) assignments.

### C.3.2.  Teaching Assignments Beyond Days of Accountability

A teaching load (following completion of 195 days of accountability in a contract year) shall consist of not more than fifteen (15.0) load hours, of which not more than nine (9.0) load hours may be concurrent.

### C.3.3.  Overload Rate

Effective July 1, 2013, Faculty members shall be paid at the rate of eight hundred fifty-four dollars ($854) per load hour.

MCCCD/Martinez 00326

**C.3.4.  Prorated Extended Contract Rate**

The weekly pay rate for additional weeks beyond the 195-day (39-week) academic year specified in 5.1.1.1. shall be equal to the Faculty member's base salary (as specified by the salary schedule in Appendix E) divided by 39 weeks.

**C.4.  SERVICE FACULTY ASSIGNMENTS BEYOND THE REGULAR BASE CONTRACT (INCLUSIVE OF SUMMER)**

**C.4.1.**  During their contract assignment, service Faculty who perform identical or similar duties (other than academic advising) on a scheduled basis, in addition to their regular assignment, shall be paid at the rate of forty-seven dollars ($47.00) per clock hour for such work.  Holidays that fall on the Faculty member's regularly scheduled day will be paid.   Service faculty may not exceed twelve (12) additional clock hours per week in assignments the same as or similar to his/her regular duties. College presidents or designee(s) may approve additional clock hours under unusual circumstances not to exceed fifteen (15) clock hours per week. For service faculty who have instructional load hours, 5.4.2. shall apply.

**C.4.2.**  For work performed outside of the base contract (before or after the contract year of 195 days of accountability), service Faculty (not on prorated extended contracts) will be paid at forty-seven dollars ($47.00) per clock hour effective July 1, 2013, for performing such duties that are identical or similar to those that they perform during their regular contract assignments. Faculty on prorated extended contracts will be paid as specified in C.3.4.

**C.5.  PAY FOR COMMUNITY SERVICE ACTIVITIES (NONCREDIT)**

A Faculty member (not on a prorated extended contract) who works in the community services (noncredit) program beyond his/her base contract (including time periods which may be before or after the required 195 days of accountability) shall be paid at the rate of twenty-seven dollars and fifty cents ($27.50) per clock hour effective July 1, 2013.   Faculty members on prorated extended contracts will be paid as specified in C.3.4.

**C.6.  FACULTY SERVING AS ACADEMIC ADVISORS**

Faculty (not on prorated extended contracts) who serve, in addition to their regular base contracts, as advisors (including time periods which may be before or after the required 195 days of accountability) shall be paid at the rate of twenty-nine dollars ($29.00) per clock hour effective July 1, 2013. Faculty members on prorated extended contracts will be paid as specified in C.3.4.

**C.7.  FACULTY PAY FOR EDUCATIONAL DEVELOPMENT AND/OR PROFESSIONAL GROWTH PROJECTS (NO STUDENT CONTACT)**

**C.7.1.**  Faculty (not on prorated extended contracts) employed to complete professional growth projects or to participate in educational development projects (no student involvement) in addition to their base contracts (including time periods that may be before or after the required 195 days of accountability) shall be paid at the rate of twenty-seven dollars ($27.00) per clock hour effective July 1, 2013.  Such work is not to be included in the weekly limitation (see Section C.3. of Appendix C) and shall be submitted on a Request for Personnel Services and paid on a time ticket or through an extended contract.  All such work shall be completed in addition to the required hours of accountability. Faculty members on prorated extended contracts will be paid as specified in C.3.4.

MCCCD/Martinez 00327

**C.7.2.** Faculty who produce materials while performing such nonteaching activities as described above shall retain the right to the copyrights or patents for such materials. However, the District will retain the unlimited right for students and staff to use the materials without payment of royalties. This right will apply to any subsequent revisions of the materials.

## C.8. HONORARIUM PAYMENTS

Payment of an honorarium to Faculty members may be allowed under the following conditions:

**C.8.1.**

A guest appearance for a scheduled event.

**C.8.2.**

Shall be approved in advance through the College President.

**C.8.3.**

Shall not exceed one hundred dollars ($100) per appearance, which shall be interpreted to mean per date of appearance.

**C.8.4.** Honorarium payments exceeding one hundred dollars ($100) may be approved by the College President or designee for workshops and other appearances that exceed the normal time frame for a typical guest appearance.

## C.9. CO-OP/INTERNSHIP (HEALTH OCCUPATIONAL, CLINICAL AND PRACTICUM NOT INCLUDED IN THIS SECTION)

For 2013-2014, the rate of pay will be two hundred fifty-seven dollars and fifty cents ($257.50) per student.

## C.10. FORUM SERIES

Faculty may deliver no more than four (4) presentations per year at five hundred dollars ($500) per presentation.

## C.11. SUBSTITUTE PAY

Faculty who serve as substitutes (in addition to their regular hours of accountability) in the instructional program (including the evening program) will be paid at the rate of nineteen dollars ($19.00) per each twenty-five (25) minutes or major portion thereof effective July 1, 2013.

## C.12. PAY FOR SUPERVISION OF THE EVENING PROGRAM

Compensation will be at the rate of two-tenths (0.2) load hour per section, with concurrent sections calculated as a single section, not to exceed thirty (30) sections per semester. Compensation for Service Faculty will be based on the number of Service Faculty contract hours at the rate of (0.2) load hour per contract hour, not to exceed thirty (30) hours per semester per supervisor. Duties include, but are not limited to, scheduling of classes, recruitment, selection and evaluation of Adjunct Faculty, resolution of problems, and supervision of staff.

## C.13. PAY FOR SUPERVISION OF DUAL ENROLLMENT

Compensation will be at the rate of 0.3% of the schedule base salary for each Dual Enrollment Instructor teaching the supervised discipline.

MCCCD/Martinez 00328

**C.14.   PAY FOR EVALUATION OF ADJUNCT FACULTY**

In the absence of an evening supervisor, when a Faculty member evaluates an Adjunct Faculty member serving in the evening program, he/she shall be paid at the rate of nineteen dollars ($19.00) per each twenty-five (25) minutes or major portion thereof for the evaluation visit effective July 1, 2013.

**C.15.   PAY FOR EVALUATION OF DUAL ENROLLMENT INSTRUCTORS**

A Faculty member assigned to evaluate a Dual Enrollment Instructor will be paid one hundred thirteen dollars ($113) per evaluation.

**C.16.   OTHER INSTRUCTIONAL ACTIVITIES**

Academic Year 2013-2014

| Activity | Pay | Additional Contract Weeks |
|---|---|---|
| Band, Director | 2,935.50 | 2 weeks @ $ 699.00 for each 30 hour week (With appropriate college approval may be released for three semester hours per academic year rather than receiving the stipend.) |
| Assistant(s) | 2,363.50 | 1 week @ $ 699.00 for each 40 hour week |
| Choir, Director(s) | 2,363.50 | (With appropriate college approval may be released for three semester hours per academic year rather than receiving the stipend.) |
| Speech Activities, Director(s) | 2,935.50 | |
| Assistant(s) | 2,363.50 | |
| Theatre, Director(s) | 2,540.00 | per major production, not to exceed four (4) per academic year |
| Musical Theatre Director | 2,540.00 | per major production, not to exceed four (4) per academic year |
| Opera, Director(s) | 2,540.00 | per major production, not to exceed four (4) per academic year |
| Student Government Advisor(s) | 2,363.50 | |
| Intramural Director(s) | 2,363.50 | |
| Dance Concert Director | 2,540.00 | per major production, not to exceed four (4) per academic year |

MCCCD/Martinez 00329

**C.17.  ATHLETIC STIPENDS**

Faculty serving as athletic coaches, directors, and trainers will receive stipends and reassigned time according to the following schedule:

| | Stipend | Reassigned Time |
|---|---|---|
| Assistant Athletic Director | $ 2,232.50 | |
| Archery | 5,038.00 | 1.5 load hours |
| Head Baseball & Softball Coach | 6,827.50 | 3.0 load hours |
| Assistant Baseball & Softball | 4,243.50 | |
| Head Basketball | 6,658.50 | 3.0 load hours |
| Assistant Basketball | 4,026.00 | 1.5 load hours |
| Cross Country | 4,243.50 | 1.5 load hours |
| Head Football Coach | 8,232.00 | 4.5 load hours |
| Assistant Football | 5,038.00 | 1.5 load hours |
| Golf | 4,640.00 | 1.5 load hours |
| Head Soccer | 5,821.00 | 3.0 load hours |
| Assistant Soccer | 3,630.50 | 1.5 load hours |
| Tennis | 4,640.00 | 1.5 load hours |
| Head Track Coach | 5,821.00 | 3.0 load hours |
| Assistant Track | 3,630.50 | 1.5 load hours |
| Head Volleyball | 5,645.50 | 3.0 load hours |
| Assistant Volleyball | 3,237.00 | 1.5 load hours |
| Head Wrestling | 6,658.50 | 3.0 load hours |
| Assistant Wrestling | 4,138.00 | 1.5 load hours |
| Trainer—Football | 2,101.50 | |
| Trainer—Basketball/Wrestling | 1,881.00 | |
| Trainer—Baseball/Track/Other | 1,184.00 | |
| Trainer—Women Volleyball/Cross Country | 1,184.00 | |
| Trainer—Women Basketball | 1,184.00 | |
| Trainer—Women Softball/Track and Field | 1,184.00 | |

**C.18.  ATHLETIC DIRECTOR PAY AND REASSIGNED TIME**

**C.18.1.  Pay per Sport**

| Sports | |
|---|---|
| Football | $1,621.50 |
| Basketball | 1,621.50 |
| Soccer | 1,132.50 |
| Track | 1,132.50 |
| Baseball/Softball | 1,132.50 |
| Volleyball | 1,132.50 |
| Cross Country | 650.00 |
| Archery | 650.00 |
| Wrestling | 650.00 |
| Tennis | 650.00 |
| Golf | 650.00 |

**C.18.2.  Reassigned Time**

**C.18.2.1.** Twelve (12) hours per year for eight (8) sports

**C.18.2.2.** Fifteen (15) hours per year for nine (9) sports

MCCCD/Martinez 00330

### C.18.3.  Summer Pay

#### C.18.3.1.

Two (2) weeks prior to fall term (30 hours @ $27. 50 per hour) pays $825 per week.

#### C.18.3.2.

Two (2) weeks following spring term (30 hours @ $27. 50 per hour) pays $825 per week.

#### C.18.3.3.

Additional weeks (30 hours @ $27. 50 per hour) may be approved by the College President but are not guaranteed.

## C.19.  OCCUPATIONAL PROGRAM DIRECTORS

Appropriate remuneration for members serving as Occupational Program Directors for active programs will be determined as provided in Section D.2.

## C.20.  CHANGES TO APPENDIX C

Annual changes to Appendix C should be proposed after the implementation of the process described in Appendix G.

MCCCD/Martinez 00331

**APPENDIX D - DEPARTMENT/DIVISION CHAIRS AND OCCUPATIONAL PROGRAM DIRECTORS**

**D.1. DEPARTMENT/DIVISION CHAIRS**

### D.1.1. Selection

Department/Division Chairs shall be selected from the membership of the Department/Division, as prescribed by the *College Plan*. The *College Plan* should describe the duties and responsibilities of the Chair inclusive of those duties outlined in Section D.2.3.

### D.1.2. Duties

Department/Division Chairs are Residential Faculty, as defined by the *RFP*, who are accountable for the supervision or management of a Department/Division within the college including all duties and responsibilities articulated in the *College Plan*.

### D.1.3. Remuneration

Pay is determined at the rate of eleven percent (11%) of the schedule base salary, plus:

- one percent (1%) of the schedule base salary for each Faculty member of the Department/Division

- one-half percent (1/2%) of the schedule base salary for each Adjunct Faculty member teaching within the Department/Division

- one-half percent (1/2%) of the schedule base salary for each full-time staff member or equivalent supervised by the Chair.

Pay for part-time staff who are supervised and evaluated by the Department/Division Chair shall be prorated (*e.g.*, two half-time staff members equal one full-time staff member). Pay will not be granted for supervising Federal Work Study employees.

Pay for Occupational Program Directors who supervise and evaluate Residential and/or Adjunct Faculty shall be assigned as provided in Section D.2.3, rather than to the Department/Division Chair.

### D.1.4. Overload Teaching

Department/Division Chairs will not teach on an overload basis during the day program. Exceptions, based on exigency, can be individually authorized by the appropriate Vice President.

### D.1.5. Administrative Reassigned Time, Clerical Support, and Summer Extended Contract Hours

#### D.1.5.1.

Administrative load reduction, clerical support, and summer extended contract hours will be determined by the number of FTTE in each Department/Division, adjusted as of the forty-fifth (45th) day of the current fall semester. The number of FTTE in the Department/Division will be determined by dividing the total teaching load in the Department/Division by fifteen (15) and rounding up to the nearest whole number.

MCCCD/Martinez 00332

**D.1.5.2.**

Division/Department reassigned time, clerical support, and extended contract hours:

| Day FTTE for fall semester | Reassigned per Year | Clerical Support to Department/Division | | Summer Extended Hrs. |
|---|---|---|---|---|
| 4-8 | 6.0 | ¼-½ | 12 mos | 24 |
| 9-16 | 9.0 | ½ | 12 mos | 33 |
| 17-26 | 12.0 | 1.0 | 12 mos | 42 |
| 27-34 | 15.0 | 1-1½ | 12 mos | 51 |
| 35-Above | 18.0 | 2.0 | 12 mos | 60 |

**D.1.5.3.**

The figures listed above may be supplemented by the College President. Modifications of secretarial help may be made by the College administration in consultation with the Department/Division involved.

### D.1.6. Summer Extended Contract Hours—Rates of Pay

Extended summer contract hours, authorized by the appropriate Vice President, will be paid at the rate of forty- seven dollars ($47.00) per clock hour. (In most cases there will be a requirement that the Department/Division Chair be at the college just prior to the beginning of the fall semester.)

### D.1.7. Department/Division Chair Evaluation

Each Department/Division Chair shall be evaluated in the spring of each year in a manner prescribed by the appropriate Vice President. The evaluation shall include a review of the current year as well as planning parameters for the following year. Additionally, each Department/Division Chair shall be evaluated annually by the Faculty members in the Department/Division in a manner to be specified in the *College Plan*.

### D.1.8. Colleges With Both Divisions and Departments

Colleges with both divisions and departments will develop a *College Plan* for reassigned time and Chair pay. The *College Plan* will include the selection process along with the roles and duties of Department/Division Chairs. The parameters for these plans shall be in general conformity to those outlined in Section D.1. The Vice Chancellor of Human Resources, or designee, will review the plan for internal consistency.

## D.2. OCCUPATIONAL PROGRAM DIRECTOR

**D.2.1.**

Those Faculty members who are responsible for coordinating approved occupational programs may receive remuneration or reassigned time as determined by the College President.

**D.2.2.**

If reassigned time is taken, the Faculty member will not teach on an overload basis during the day program without approval by the appropriate Vice President.

MCCCD/Martinez 00333

### D.2.3. Residential Faculty and Adjunct Faculty Management Remuneration

Occupational Program Directors who supervise and evaluate Faculty shall be compensated at the rate of one percent (1%) of the schedule base for each Residential Faculty member teaching within the program.  Occupational Program Directors who supervise and evaluate Adjunct Faculty shall be compensated at the rate of one half percent (1/2%) of the schedule base for each Adjunct Faculty member teaching within the program.  Only the Occupational Program Director or the Department/Division Chair actually responsible for supervising and evaluating Faculty and/or Adjunct Faculty shall be compensated for those duties, not both.

In situations where Faculty and staff are not supervised by a Department/Division Chair and are supervised by the Occupational Program Director, the Occupational Program Director is accountable for the supervision or management of an academic program within the college including all duties and responsibilities articulated in the *College Plan*. In no case should both a Chair and an Occupational Program Director perform these duties simultaneously and only one of either the Chair or the Occupational Program Director shall receive remuneration for these duties.

### D.2.4.

A Faculty member may not receive pay and/or reassigned time as both a Department/Division Chair and an Occupational Program Director.

### D.2.5. Occupational Program Director Evaluation

Each Occupational Program Director shall be evaluated in the spring of each year in a manner prescribed by the appropriate Vice President.  The evaluation shall include a review of the current year as well as the planning parameters for the following year.

MCCCD/Martinez 00334

## APPENDIX E - RESIDENTIAL FACULTY SALARY SCHEDULE

**Maricopa Community College District**
**Residential Faculty Salary Schedule**
**2013 – 2014**
**Effective 7/1/2013**

**Base Salary**
**Credit Hour 0.33%       $145.24**
**Vertical Increment 7%    $3081**

| Step | IP | IP+12 | IP+20 | IP+24 | IP+36 | IP+40 | IP+48 | IP+60 | IP+75 | IP+85 | Ph.D. |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1 | $44,012 | $45,755 | $46,917 | $47,498 | $49,241 | $49,822 | $50,984 | $52,726 | $54,905 | $56,357 | $57,084 |
| 2 | $47,093 | $48,836 | $49,998 | $50,579 | $52,322 | $52,903 | $54,065 | $55,807 | $57,986 | $59,438 | $60,165 |
| 3 | $50,174 | $51,917 | $53,079 | $53,660 | $55,403 | $55,984 | $57,146 | $58,888 | $61,067 | $62,519 | $63,246 |
| 4 | $53,255 | $54,998 | $56,160 | $56,741 | $58,484 | $59,065 | $60,227 | $61,969 | $64,148 | $65,600 | $66,327 |
| 5 | $56,336 | $58,079 | $59,241 | $59,822 | $61,565 | $62,146 | $63,308 | $65,050 | $67,229 | $68,681 | $69,408 |
| 6 | $59,417 | $61,160 | $62,322 | $62,903 | $64,646 | $65,227 | $66,389 | $68,131 | $70,310 | $71,762 | $72,489 |
| 7 | $62,498 | $64,241 | $65,403 | $65,984 | $67,727 | $68,308 | $69,470 | $71,212 | $73,391 | $74,843 | $75,570 |
| 8 | $65,579 | $67,322 | $68,484 | $69,065 | $70,808 | $71,389 | $72,551 | $74,293 | $76,472 | $77,924 | $78,651 |
| 9 | $68,660 | $70,403 | $71,565 | $72,146 | $73,889 | $74,470 | $75,632 | $77,374 | $79,553 | $81,005 | $81,732 |
| 10 | $71,741 | $73,484 | $74,646 | $75,227 | $76,970 | $77,551 | $78,713 | $80,455 | $82,634 | $84,086 | $84,813 |
| 11 | $74,822 | $76,565 | $77,727 | $78,308 | $80,051 | $80,632 | $81,794 | $83,536 | $85,715 | $87,167 | $87,894 |
| 12 | $77,903 | $79,646 | $80,808 | $81,389 | $83,132 | $83,713 | $84,875 | $86,617 | $88,796 | $90,248 | $90,975 |
| 13 | $80,984 | $82,727 | $83,889 | $84,470 | $86,213 | $86,794 | $87,956 | $89,698 | $91,877 | $93,329 | $94,056 |
| 14 | | | | $87,551 | $89,294 | $89,875 | $91,037 | $92,779 | $94,958 | $96,410 | $97,137 |

Initial Placement (IP) indicates initial placement on the salary schedule
for any Faculty member with an associates, bachelors, or masters degree.
**Wage & Salary for MCCCD**
Credit hours are paid for each hour earned.

MCCCD/Martinez 00335

**APPENDIX F - COMMON POLICIES**

Common policies adopted by the District Governing Board apply to all employees in the District. There is agreement that the following policies will be removed from the *Residential Faculty Policies* and become part of the Common Policies. Until such time as these policies are formally adopted by the District Governing Board, they shall remain in force as contained in the 1989-90 *Residential Faculty Policies*.

Additions, changes, or deletions to the Common Policies will be in accordance with the procedural operations of the Common Policies Committee.

> Employment Requirements
> Military Leave
> Jury Duty
> Voting in Public Elections
> Governing Board Rights
> Arizona State Retirement Program
> Social Security Program
> Hiring of Relatives
> Tax Sheltered Annuities
> Industrial Compensation
> Tuition Waivers
> Employee Policy Manual Distribution
> Early Retirement

MCCCD/Martinez 00336

**APPENDIX G - PROCESS FOR RECOMMENDATIONS REGARDING COMPENSATION ITEMS**

**G.1.    Introduction**

G.1.1.

Effective July 1, 2004, each year the starting point for potential salary changes will be stated by September 15th through the Vice Chancellor of Business Services. Specifically, based on financial forecasts and compliance with legal and policy requirements as depicted in the current Financial Plan, this will reflect a recommendation on a cost of living adjustment, step, professional growth per the formula and flex benefits as of this date, which may change as new information becomes available.

G.1.2.

After September 15th and prior to October 1st discussions on compensation items will be moved into the Meet and Confer process.  A recommendation from Meet and Confer is desired by February 28th; however, it is understood that recommendations are not binding on the District and the MCCCD Governing Board retains sole authority for budget adoption and salary setting.

**G.2.    Determining Factors**

Determining factors for a Meet and Confer recommendation may include:

G.2.1.

The cost of a cost-of-living increase reflective of an amount equal to the total increase in the Western Consumer Price Index as determined by the U.S. Department of Labor, Bureau of Labor Statistics for the preceding July 1st – June 30th fiscal year.

G.2.2

The cost of a step increase as stated in Section 4.6.

G.2.3.

The cost of professional growth for every new Faculty member in the amount of $1,250.

G.2.4.

Other expenditure needs that are considered to be priorities as a result of District-wide planning processes.

G.2.5.

All of these cost as compared to revenue availability and maintenance of financial stability requirements.

G.2.6.

Compliance with the Expenditure Limitation.

**G.3.    Recommendation Procedures**

This change affects any Faculty hourly wage or benefit including but not limited to: Benefit Credits (Appendix B, *RFP*) and Extra Pay for Extra Duty (Appendix C, *RFP*).

MCCCD/Martinez 00337

## APPENDIX H - PROFESSIONAL CODE OF ETHICS

Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end professors devote their energies to continuously developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry.

As teachers, professors encourage and protect the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to ensure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom.

As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates, even when it leads to findings, practices and conclusions that differ from their own. Professors acknowledge academic debt and strive to be objective in their professional judgment and supervision of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution and for maintaining the highest professional standards through a meaningful culture of peer review.

As members of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize respectfully and seek revision. Professors give priority to their paramount responsibilities within their institution when determining the amount and character of work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions.

As members of their community, professors maintain the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

MCCCD/Martinez 00338

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("MOU") is entered into this _10_ day of ___October___, 2013 by and among the Maricopa County Community Colleges District ("MCCCD") and the Faculty Association ("Faculty"), and hereafter referred to jointly as "the parties."

1.  The parties have entered into a successor Residential Faculty Policy Manual, ratified by the Faculty Association on August 16, 2013 and approved by the MCCCD Governing Board on September 24, 2013, a copy of which is attached hereto.

2.  The parties utilize the Meet and Confer process to articulate agreement regarding change with respect to responsibilities, wages, governance, benefits, and all other terms and conditions of Residential Faculty employment. Three items agreed to by the parties during the process leading to the successor agreement were inadvertently omitted from the final document.

3.  For the purposes of the interpretation of the Residential Faculty Policies effective October 1, 2013, the parties hereby agree that the following language shall be considered to be a part of the policies and the policies shall be considered amended to include the following language (added language is shown in italics).

### 1.2. Definitions

. . .

#### College Staffing Advisory Committee

The College Staffing Advisory Committee consists of the appropriate instructional administrator and at least four (4) Faculty appointed by the Faculty Senate President. The instructional administrator will be a nonvoting member of this committee.

The College Staffing Advisory Committee will consult with Department/Division Chairs and other appropriate personnel in order to make recommendations on the staffing of Faculty positions. The committee's recommendations will be delivered to the College President.

*Relevant data related to the college will be provided to the committee by the appropriate college personnel as requested by the College Staffing Advisory Committee. Relevant data includes, but is not limited to, the residential/adjunct ratio by discipline, the FTTE/FTSE ratio by discipline, FTSE by discipline, headcount by discipline, and the number of budgeted residential faculty lines at the college.*

#### Peer Assistance and Review Committee

*The Peer Assistance and Review Committee (PARC) consists of the appropriate instructional administrator and at least four (4) trained, appointive Faculty appointed by the Faculty Senate*

MCCCD/Martinez 00339

*President in collaboration with the appropriate college Vice President. The Peer Assistance and Review Committee (PARC) will evaluate all Probationary Faculty Individual Development Plan (IDP) reports and make recommendations to the College President related to the renewal of the probationary appointment, and when appropriate, the granting of appointive status.*

*Individual Development Plan (IDP)*

*The Individual Development Plan (IDP) is an annual professional growth process through which probationary Faculty document their instructional expertise, service to the department/division, college, and district, and professional development. The IDP report is evaluated by the Peer Assistance and Review Committee (PARC) and is the basis for recommendations related to probationary contract renewal and appointive status.*

4. <u>Term of Memorandum.</u> This MOU shall remain in full force and effect from the date below until June 30, 2014 or until modified or terminated by a written document signed by the parties, whichever occurs first. This MOU can only be extended past June 30, 2014 by written agreement signed by the parties

**Faculty Association**

_____          10/9/13
President                                Date

**Maricopa County Community Colleges District**

_____          10/9/13
Chancellor                               Date

MCCCD/Martinez 00340

 **MARICOPA COMMUNITY COLLEGES®** | Rufus Glasper
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

August 9, 2013

Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ  85020

Re:  Intent to dismiss you from your employment

Dear Dr. Martinez:

Dr. Anna Solley, President of Phoenix College (PC) has forwarded a statement of charges to James Bowers, Interim Vice Chancellor for Human Resources.  Mr. Bowers has reviewed the charges, in consultation with the MCCCD Legal Office, and recommended to me that there exists prima facie cause for your dismissal from your position as Mathematics Faculty at Phoenix College (see attached).  I concur with his recommendation.  The recommended effective date of your involuntary termination is September 24, 2013.

Maricopa County Community College District Administrative Regulation 6.7 states that violation of any of its Employment Standards "constitutes grounds for disciplinary action, up to and including termination of any Maricopa County Community College District (MCCCD) employee as outlined by the respective policy manuals".

Pursuant to Section 3.15.3 of the RFP Policy Manual, you may invoke your right to a hearing by filing a written request with Interim Vice Chancellor James Bowers within five (5) business days after being served with this notice of intent to dismiss you from your employment.

Sincerely,

*Rufus Glasper*

Rufus Glasper, Ph.D., CPA
Chancellor

Cc:    MCCCD Governing Board
       Dr. Anna Solley
       Mr. Jim Bowers

EXHIBIT 3
WIT: R.Glasper
DATE: 11-22-16
Angela F. Miller, RPR, CR

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert  I  Estrella Mountain  I  GateWay  I  Glendale  I  Mesa  I  Paradise Valley  I  Phoenix
Rio Salado  I  Scottsdale  I  South Mountain  I  Maricopa Skill Center  I  SouthWest Skill Center



**MARICOPA COMMUNITY COLLEGES®** | Vice Chancellor
Human Resources

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8103 • F 480.731.8120 • www.maricopa.edu.

August 9, 2013

Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ  85020

**RE:  Employment Status**

Dear Dr. Martinez:

You are being placed on paid administrative leave from August 12 through September 24, 2013, pending the approval of your termination. During administrative leave, you will remain an employee of Maricopa County Community College District (MCCCD) and must continue to observe all policies regarding employee conduct.

For the duration of paid administrative leave, you should not report to work nor do you need to make contact with your supervisor. Upon approval of your termination by the Maricopa County Community Colleges Governing Board, you will be notified regarding the termination of your employment status with MCCCD.

Sincerely,

James Bowers, J.D.
Interim Vice Chancellor for Human Resources

cc:     Dr. Anna Solley
        Employee Personnel File

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert | Estrella Mountain | GateWay | Glendale | Mesa | Paradise Valley | Phoenix
Rio Salado | Scottsdale | South Mountain | Maricopa Skill Center | SouthWest Skill Center



**MARICOPA COMMUNITY COLLEGES** | Vice Chancellor
Human Resources

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8103 • F 480.731.8120 • www.maricopa.edu

August 9, 2013

Dear Dr. Glasper:

The following statement of charges against Dr. Cleopatria Martinez was forwarded to me by Dr. Anna Solley, President, Phoenix College. Pursuant to 3.15.1 of the Residential Faculty Policy (RFP), I have reviewed the charges, in consultation with the MCCCD Legal Office, and recommend to you that there exists prima facie cause for the dismissal of Dr. Cleopatria Martinez.

Sincerely,

James Bowers, J.D.
Interim Vice Chancellor for Human Resources

### Statement of Charges

- Violation of Administrative Regulation 6.7.1 - "Wilful and intentional violation of any state or federal law, applicable ordinance, MCCCD Governing Board policy, or MCCCD administrative regulation that affects the employee's ability to perform his or her job", specifically:

  - Violation of MCCCD's cash handling rules as covered by MCCCD Administrative Regulations 1, 17

- Violation of Residential Faculty Policy Manual 3.2.4 - "A Faculty member shall not have any financial interest in or receive compensation from the sale of any unpublished instructional materials required or suggested for a class that the Faculty member teaches."

- Violation of U.S. Copyright Law and fair use guidelines, and MCCCD Administrative Regulations 3.2.4 and 3.2.5 regarding copyright regulations:

  - 3.2.4 Employees are prohibited from copying materials not specifically allowed by the (1) copyright Law, (2) fair use guidelines, (3) Licenses or contractual agreements, or (4) other permission.

  - 3.2.5 The Governing Board disapproves of unauthorized duplication in any form. Employees who wilfully disregard this Board policy and/or the aforementioned copyright guidelines do so at their own risk and assume all liability for their actions.

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert | Estrella Mountain | GateWay | Glendale | Mesa | Paradise Valley | Phoenix
Rio Salado | Scottsdale | South Mountain | Maricopa Skill Center | SouthWest Skill Center

- Violation of Administrative Regulation 6.7.3 - "Willful and intentional failure to perform job
  duties that have first been communicated to an employee and are within the employee's
  scope of employment", specifically, repeated failure to follow instructions regarding
  printing/copying of unauthorized materials, failure to use only approved course materials,
  unauthorized copying and sale of course materials, failure to reimburse students for the
  materials you wrongfully charged them for, and failure to meet the deadline to provide
  copies of any reimbursement checks to students.

Brief Timeline:

- January 2010 - College Vice Presidents Ronnie Elliott, Paul DeRose and Cassandra
  Kakar, along with Maggie McConnell, Assistant General Counsel, reviewed the
  requirements of AR 3.2 with you at length.
- April 2, 2010 –Anna Solley, Phoenix College President, notified you that your copying
  privileges at the Phoenix College IKON Copy Center were suspended.
- Spring 2010 – An Administrative Evaluation was initiated based on Mr. Joe Sueyoshi's
  complaint.  By agreement, the Evaluation Team did not undertake its task until the fall
  semester.  The findings and recommendations were submitted to Dr. Solley on
  November 17, 2010.  The overall findings included:
  o Copyright and plagiarism:  Dr. Martinez was notified in writing and in meetings of
    MCCCD's and Phoenix College's concerns regarding her course materials
    violating copyright, fair use, and plagiarism laws.
  o Insubordination:  Dr. Martinez failed to follow Dr. Solley's and MCCCD's Legal
    Counsel's directives - specifically, she repeatedly requested copies, copied and
    printed unauthorized materials.
- December 9, 2010 – Dr. Solley administered an initial Corrective Action to you for
  insubordination and failure to follow instructions regarding printing or copying of
  unauthorized materials.
- August 21-23, 2012 - You told your MAT 091 and MAT 151 students not to buy the
  approved text that you listed on the syllabus.  Instead, you made copies of a colleague's
  materials and sold them to your students for $11 each.
- October 18, 2012 – A Second Corrective Action for insubordination and unauthorized
  copying and sale of course materials was administered to you by Dr. Solley.  Included in
  the corrective action was the following directive:  "Because you imposed charges on
  your students without authority to do so, you have the responsibility to reimburse the
  students from your own funds.  You are hereby directed to do so by personal check,
  beginning immediately and continuing until all students who paid you are reimbursed."
- January 11, 2013 – Upon discovering that the students who bought your unauthorized
  course materials had yet to be reimbursed, Cassandra Kakar directed you, via email, to
  provide her, by January 18, 2013, with front and back copies of all cashed personal
  reimbursement checks to your students.
- January 18, 2013 - You failed to provide Dr. Kakar with copies of any reimbursement
  checks and neglected to contact her regarding the money you still owe the students.
- February 21, 2013 – A student turned in the MAT091 materials which you left in room
  B210.  Timothy Bryan, Mathematics Faculty, has previously told you that you do not
  have permission to use his materials again.

A Professional Limited Liability Company



Taylor R. Bell
Robert R. Beltz
Michael W. Brewer
Tiffany F. Broberg
Robert E. Brown
Ernest Calderón
Jeannette B. Cross
Michael D. Curry
David G. Derickson
Robert J. Hackett
April M. Hamilton
James R. Hienton
Vishnu R. Jonnalagadda
John P. Kaites
Lawrence S. Koplow*
Meaghan K. Kramer

Tamalyn E. Lewis
Michael S. Love
Matthew H. Mason
Damien R. Meyer
Brian D. Myers
Kurt A. Peterson
Patricia A. Premeau
William G. Ridenour
Robert P. Rutila
David R. Smith*+
Jesse M. Squier*
Beth L. Tippett
Scott S. Wakefield
Blake E. Whiteman
Jerry D. Worsham II

Chase Tower  ■  201 North Central Avenue  ■  Suite 3300
Phoenix, Arizona 85004-1052  ■  (602) 254-9900  ■  fax (602) 254-8670

+Licensed in New York Only

*Of Counsel

VIA HAND DELIVERY

December 9, 2013

Our File No.: 25052-0002

Dr. Rufus Glasper
Chancellor, The Maricopa Community Colleges
2411 W. 14th Street
Tempe, AZ 85281

Re:   *Maricopa County Community College District v. Dr. Cleopatria Martinez*

Dear Dr. Glasper:

As legal counsel to the Hearing Committee, we write to provide the Governing Board and Chancellor of the Maricopa County Community College District the Hearing Committee's results and Recommendation in the Dr. Cleopatria Martinez personnel matter. Enclosed please find the Hearing Committee's Findings of Fact, Conclusions of Law, and Recommendation. The Hearing Committee has recommended that the Governing Board deny Phoenix College President Anna Solley's request to terminate Dr. Martinez from her MCCCD employment.

The Hearing Committee, after reviewing the record and conducting a hearing (and after careful deliberation) determined that Phoenix College did not carry its burden of proof relating to the issues of copyright violations and the cash handling policy violations. The Hearing Committee has found that there is evidence of Dr. Martinez' insubordination. However, the Hearing Committee does not believe termination of employment is appropriate.

We recommend that Chancellor Glasper place the Hearing Committee's Findings of Fact, Conclusions of Law and Recommendation, the entire record, exhibits and hearing transcript in a secure room for the Governing Board's and his review. We strongly recommend that the Governing Board make itself intimately familiar with all that the Hearing Committee considered in making its Recommendation.



LAWYERS ASSOCIATED WORLDWIDE
406846

Argentina, Australia, Austria, Belgium, Bolivia, Brazil, Bulgaria, Canada, Cayman Islands, Columbia, Cyprus, Denmark, England, Estonia, France, Germany, Greece, India, Ireland, Israel, Italy, Japan, Malaysia, Mauritius, Mexico, Netherlands, New Zealand, Peru, Portugal, Romania, Singapore, Spain, Sweden, Switzerland, Thailand, UAE, USA

MCCCD/Martinez 03843

December 9, 2013
Page 2

_____

In our opinion (as legal counsel to the Committee), the Hearing Committee determined that the District's failure to carry its burden of proving the alleged copyright policy and alleged cash handling policy violations overshadowed the findings of insubordination. Therefore, the Committee deemed that the punishment of termination was disproportionate to Dr. Martinez' misconduct. We stand ready to discuss the Hearing Committee's Findings, Conclusions & Recommendation with the MCCCD Governing Board if it so chooses.

Very truly yours,

Ernest Calderón

Enclosure:     Findings of Fact, Conclusions of Law and Recommendation
               Full Record
               Hearing Transcript
               All Exhibits

Cc:            Dr. Keith Krudup, Hearing Committee Chairman
               Dr. Nora Reyes, Hearing Committee Member
               Dr. Carlos Caire, Hearing Committee Member
               President Anna Solley, c/o Pavneet Uppal, Esq.
               Dr. Cleopatria Martinez, c/o Stephen Montoya, Esq.

MCCCD/Martinez 03844

A Professional Limited Liability Company



Taylor R. Bell
Robert R. Beltz
Michael W. Brewer
Tiffany F. Broberg
Robert E. Brown
Ernest Calderón
Jeannette R. Cross
Michael D. Curry
David G. Derickson
Robert J. Hackett
April M. Hamilton
James R. Hienton
Vishnu R. Jonnalagadda
John P. Kaites
Lawrence S. Kaplow*
Meaghan K. Kramer

*Of Counsel

Chase Tower    ▪    201 North Central Avenue    ▪    Suite 3300
Phoenix, Arizona 85004-1052    ▪    (602) 254-9900    ▪    fax (602) 254-8670

Tamalyn E. Lewis
Michael S. Love
Matthew H. Mason
Damien R. Meyer
Brian D. Myers
Kurt A. Peterson
Patricia A. Premeau
William G. Ridenour
Robert P. Ruffa
David R. Smith*+
Jesse M. Squier*
Beth L. Tippett
Scott S. Wakefield
Blake E. Whiteman
Jerry D. Worsham II

+Licensed in New York Only



EXHIBIT
WIT: R. Glasper
DATE: 11-22-16
Angela F. Miller, RPR, CR

**VIA HAND DELIVERY**

December 9, 2013

Our File No.: 25052-000

Dr. Rufus Glasper
Chancellor, The Maricopa Community Colleges
2411 W. 14th Street
Tempe, AZ 85281

    Re:    *Maricopa County Community College District v. Dr. Cleopatria Martinez*

Dear Dr. Glasper:

    As legal counsel to the Hearing Committee, we write to provide the Governing Board and Chancellor of the Maricopa County Community College District the Hearing Committee's results and Recommendation in the Dr. Cleopatria Martinez personnel matter. Enclosed please find the Hearing Committee's Findings of Fact, Conclusions of Law, and Recommendation. The Hearing Committee has recommended that the Governing Board deny Phoenix College President Anna Solley's request to terminate Dr. Martinez from her MCCCD employment.

    The Hearing Committee, after reviewing the record and conducting a hearing (and after careful deliberation) determined that Phoenix College did not carry its burden of proof relating to the issues of copyright violations and the cash handling policy violations. The Hearing Committee has found that there is evidence of Dr. Martinez' insubordination. However, the Hearing Committee does not believe termination of employment is appropriate.

    We recommend that Chancellor Glasper place the Hearing Committee's Findings of Fact, Conclusions of Law and Recommendation, the entire record, exhibits and hearing transcript in a secure room for the Governing Board's and his review. We strongly recommend that the Governing Board make itself intimately familiar with all that the Hearing Committee considered in making its Recommendation.



December 9, 2013
Page 2

_____

     In our opinion (as legal counsel to the Committee), the Hearing Committee determined that the District's failure to carry its burden of proving the alleged copyright policy and alleged cash handling policy violations overshadowed the findings of insubordination. Therefore, the Committee deemed that the punishment of termination was disproportionate to Dr. Martinez' misconduct. We stand ready to discuss the Hearing Committee's Findings, Conclusions & Recommendation with the MCCCD Governing Board if it so chooses.

Very truly yours,

Ernest Calderón

Enclosure:    Findings of Fact, Conclusions of Law and Recommendation
             Full Record
             Hearing Transcript
             All Exhibits

Cc:           Dr. Keith Krudup, Hearing Committee Chairman
             Dr. Nora Reyes, Hearing Committee Member
             Dr. Carlos Caire, Hearing Committee Member
             President Anna Solley, c/o Pavneet Uppal, Esq.
             Dr. Cleopatria Martinez, c/o Stephen Montoya, Esq.

*12 - 9 - 2013*

## BEFORE THE GOVERNING BOARD OF THE
## MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

| | | |
|---|---|---|
| MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT, | ) ) ) | HEARING COMMITTEE |
| v. | ) ) ) | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION |
| DR. CLEOPATRIA MARTINEZ | ) | |

Pursuant to the October 16, 2013 Scheduling Order, having reviewed all of the parties' pleadings and exhibits and conducting a hearing on November 18, 2013, the Hearing Committee (by majority vote) hereby submits the following Findings of Fact, Conclusions of Law and Recommendation.

### FINDINGS OF FACT

1. After having taught mathematics full-time for ten years at Denver Community College, Dr. Cleopatria Martinez moved to Arizona and started teaching mathematics full-time at Scottsdale Community College on January 1, 1985.

2. Dr. Martinez voluntarily transferred to Phoenix College ("PC") in 1995 and has been teaching mathematics there full-time ever since.

3. Dr. Martinez elected to voluntarily transfer to PC because there were very few minority students attending Scottsdale Community College, and she wanted to use her bilingual education skills in the mathematics classroom to better educate the large number of minority students attending PC.

4. Dr. Martinez was elected by her colleagues to serve as the Chairperson of the Mathematics Department of PC from 2002 to 2005.

5. In early 2010, PC discovered that Dr. Cleopatria Martinez may have exposed MCCCD to potential liability for copyright infringement.

6. Dr. Martinez testified that, during her twenty-eight years of teaching mathematics in the MCCCD system, she and her colleagues in the Mathematics Departments of both Scottsdale Community College and PC routinely borrowed mathematics problems from other mathematicians to use in their student handouts for educational purposes on a not for profit basis.

7. Dr. Martinez testified, without rebuttal, that this borrowing of mathematics problems is a longstanding, widespread custom throughout the District and academia at large.

8. Instead of requiring her mathematics students to purchase textbooks, Dr. Martinez prepared her own course materials which she called her "Lecture Notes" and distributed them to

-1-

EXHIBIT 5
WIT: K. Glasper
DATE: 11-22-16
Angela F. Miller, RPR, CR

her students.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 77:17-78:15, 106:16-108:16, 121:25-140:13, 132:16-137:25).

9.    Dr. Martinez read the Copyright Act of 1976 and believed that it authorized her to use small portions of other scholars' work under the "Fair Use" doctrine because she was using it only for classroom teaching purposes on a not for profit basis and her use of the material did not undermine the potential market for the other scholar's work.

10.    Per the "Fair Use" doctrine of the Copyright Act, the "use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107.

11.    Dr. Martinez copied problems from copyright protected textbooks and inserted them into her course materials.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 106:16-108:16).

12.    Dr. Martinez, in her Basic Arithmetic (MAT082) course, copied problems directly from a copyrighted textbook entitled "Basic Mathematics" and inserted them into her "MAT 082 Basic Arithmetic Spring 2010" course materials which she distributed to students.  MCCCD Exhibit List # 20 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

13.    Dr. Martinez also copied problems directly from the Sullivan & Sullivan "Precalculus" textbook and inserted them into her "MAT182 Trigonometry Spring 2010" course materials.  MCCCD Exhibit List # 22 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

14.    Dr. Martinez did not require her students to purchase textbooks in her Spring MAT082 Course.  MCCCD Exhibit List # 18 (email from Dr. Martinez stating "I indicated in my syllabus that, instead of a published textbook, I was using lecture notes in my MAT082 class.")

15.    Dr. Martinez did not require her students to purchase textbooks in her Spring MAT182 Course.  See Dr. Martinez's hearing testimony (conceding that students were not required to purchase a textbook in her Spring 2010 MAT182 course).

16.    On or around January 12, 2010, MCCCD's Vice President of Academic Services, Ronnie Elliot, sent Dr. Martinez an email notifying her that there were alleged copyright related problems with the materials she had printed for the Fall 2009 and Spring 2010 semesters.  MCCCD Exhibit List # 23 (January 12, 2010 email).  The materials in question were packets of course materials for Dr. Martinez's MAT182 and MAT187 courses and contained mathematics problems and graphs that were taken from copyrighted textbooks.  MCCCD Exhibit List # 11 (Ronnie Elliot Declaration, ¶¶8-9); MCCCD Exhibit List # 16 (MAT182 course packet); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memorandum).

17.    Dr. Martinez used three of the four packets of "lecture notes" in the Spring of 2010 in two pre-calculus classes.  See District Exhibit 6, parts 1-3.

18.     The MCCCD administration, following Vice President Elliot's email, repeatedly explained its copyright concerns to Dr. Martinez and asked Dr. Martinez to remove any copyright protected mathematics problems from her materials. See Kakar Hearing Testimony.

19.     On January 26, 2010, Vice President Elliot sent Dr. Martinez an email outlining MCCCD's concerns regarding Dr. Martinez's potential copyright infringement. MCCCD Exhibit List # 24 (January 26, 2010 email).

20.     On January 28, 2010, MCCCD in-house-counsel Margaret McConnell discussed copyright compliance with Dr. Martinez telephonically. MCCCD Exhibit List # 25 (January 28, 2010 email).

21.     Dr. Martinez did not benefit from the multiple MCCCD copyright information sessions noted above.

22.     PC's own expert witness, Sean Garrison, testified that under the "Fair Use" doctrine, someone could lawfully copy from a copyrighted textbook without either using or purchasing the textbook.

23.     On February 5, 2010, Vice President of Academic Affairs Casandra Kakar, Interim Vice President of Administrative Services Paul DeRose, and Dr. Martinez met to discuss Dr. Martinez's alleged misuse of copyrighted materials. MCCCD Exhibit List # 26 (February 12, 2010 email).

24.     Dr. Martinez has not used any of the four sets of "lecture notes" since the Spring of 2010 when PC first raised its concerns regarding the notes.

25.     On April 15, 2010, PC Librarian Ann Roselle conducted a personalized one-on-one copyright training session with Dr. Martinez. MCCCD Exhibit List # 28 (Copyright PowerPoint Presentation). See also, Kakar Hearing Testimony.

26.     When Dr. Martinez met with the librarian, the librarian told Dr. Martinez that Dr. Martinez knew as much about copyright law as she did. See Martinez Hearing Testimony.

27.     Following the revocation of Dr. Martinez's copying privileges, Dr. Martinez was required to submit her copy requests to Mathematics Department Chairperson Mr. Sueyoshi so that Mr. Sueyoshi could review her materials for possible copyright violations prior to copying and distribution to students. MCCCD Exhibit List # 8 (April 2, 2010 Directive).

28.     Dr. Martinez sought and obtained a form of written permission from the publisher of the textbook, Sullivan & Sullivan's "Precalculus," to copy materials from their book after PC accused her of violating copyright law.

29.     On or around April 19, 2010, Dr. Martinez attempted to bypass the copying restrictions by having an adjunct mathematics Professor, Johnny Santellan, make 24 sets of copies of her "Lecture Notes" for distribution to her mathematics students without obtaining prior approval from the Mathematics Department Chairperson. MCCCD Exhibit List # 12 (Sueyoshi Decl., ¶9); MCCCD Exhibit List # 4-5 (Martinez Depo, pp. 223:11-224:21).

30.   Because Dr. Martinez did not feel she was able to obtain reliable guidance regarding copyright compliance from the District; she sought advice from a private intellectual property attorney regarding the issue, Mr. Frederic Bellamy.

31.   Mr. Bellamy reviewed the first two sets of Dr. Martinez's "lecture notes" and concluded that they did not violate copyright law because they fell under the "Fair Use" doctrine.

32.   Mr. Bellamy based his conclusion that Dr. Martinez did not violate copyright law on the opinion that the portion of material that Dr. Martinez copied from the Sullivan & Sullivan Precalculus textbook was very small, that she used the copied materials exclusively for educational purposes without any profit motive, that the content of the copied material consisted of mathematics problems that are arguably not subject to copyright in the first place, and that the small portion of the textbook that Dr. Martinez copied did not adversely impact the potential market for the textbook.

33.   At the hearing, another lawyer practicing in the area of intellectual property law, Sean Garrison, testified on behalf of PC. In contrast to Mr. Bellamy, Mr. Garrison testified at the hearing that the first three sets of Dr. Martinez's lecture notes violated copyright law.

34.   In contrast to his testimony at the hearing of November 18, 2013, in his written report Mr. Garrison concluded only that the first three sets of Dr. Martinez's lecture notes subjected the District "to a serious risk of a copyright infringement claim." See District Exhibit 6, p. 0002.

35.   MCCCD invited Dr. Martinez to a copyright workshop that was held on March 1, 2010 at PC. Dr. Martinez chose not to attend the workshop. MCCCD Exhibit List # 10 (Solley Decl., ¶11).

36.   PC President Anna Solley, on December 9, 2010, concluded that Dr. Martinez's alleged misconduct posed an unacceptable legal risk of a copyright infringement claim and imposed restrictions on Dr. Martinez's photocopying privileges.  MCCCD Exhibit List # 10 (Solley Decl., ¶12).

37.   MCCCD sought a legal opinion from an outside copyright expert, attorney Sean Garrison.   MCCCD Exhibit List # 10 (Solley Decl., ¶ 14); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memo).

38.   According to Mr. Garrison, the third set of "lecture notes" appeared to have 13 mathematics problems copied from two other mathematics textbooks.

39.   Mr. Garrison testified that he was certain that Dr. Martinez has committed copyright infringement.  See Garrison Hearing Testimony.  In reaching this conclusion, Mr. Garrison reviewed thousands of pages of materials including nearly 300 pages of Dr. Martinez's lecture notes and three separate copyrighted mathematics textbooks.  MCCCD Exhibit List # 6 (Sean Garrison April 19, 2013 Report); see also Garrison Hearing Testimony.

40.   In reliance upon Mr. Garrison's recommendations, PC President Anna Solley issued a December 9, 2010 directive that imposed further restrictions on Dr. Martinez's copying

privileges. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 10 (Solley Decl., ¶15).

41.     The December 9, 2010 Directive prohibited Dr. Martinez from utilizing any course materials of her own creation. MCCCD Exhibit List # 9 (December 9, 2010 Directive). Instead, Dr. Martinez was required to only use course materials that are "approved by the mathematics department" or that are "available in the bookstore for sale to students and that are authored by persons other than [Dr. Martinez]." MCCCD Exhibit List # 9 (December 9, 2010 Directive).

42.     The December 9, 2010 Directive further required Dr. Martinez to submit her photocopy requests to the Mathematics Department Chair for his approval. MCCCD Exhibit List # 9 (December 9, 2010 Directive).

43.     Despite MCCCD's frequent discussions with Dr. Martinez regarding the importance of complying with copyright laws and the December 9, 2010 Directive, Dr. Martinez continued to attempt to ignore the directive. See Kakar Hearing Testimony.

44.     At the beginning of the Fall 2012 semester (on or about August 21-23, 2012), Dr. Martinez informed her students that they were not required to purchase a course textbook and that she would provide them with her own course materials in lieu of a textbook. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

45.     In fall of 2012, Dr. Martinez sought to have her lecture notes photocopied off campus at a nearby Staples store. This practice is inconsistent with the December 9, 2010 Directive. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

46.     Dr. Martinez did not submit her Fall 2012 materials to Mathematics Department Chairperson Mr. Sueyoshi for approval. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

47.     Dr. Martinez made copies of her course materials at an off-campus Staples store and distributed them to students for $11 per copy. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

48.     The $11 course material fee was paid directly to Dr. Martinez by students. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

49.     PC accused Dr. Martinez of violating the District's "cash handling" rules by distributing these course materials to her students if the students reimbursed her for her out-of-pocket copying costs.

50.     PC subsequently claimed that Dr. Martinez violated the District's "cash handling" policies by seeking reimbursement for the copies.

51.     MCCCD's policies prohibit instructors from having "any financial interest in or receiv[ing] compensation from the sale of any unpublished instructional materials required or

suggested for a class that the instructor teaches." MCCCD Exhibit List # 41 (Residential Faculty Policies, 3.2.4).).

52. Dr. Martinez failed to follow the protocol set forth in the December 9, 2010 Directive in copying her Fall 2012 course materials. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

53. Dr. Martinez distributed course materials directly to students in her Fall 2012 MAT151 class. MCCCD Exhibit List # 4-5 (Martinez Depo. pp. 232:19-233:21).

54. The MCCCD Administration learned of Dr. Martinez's unauthorized distribution of course materials to students after one of Dr. Martinez's MAT151 students complained to Mathematics Department Chairperson Mr. Sueyoshi. The student complained that Dr. Martinez refused to provide her with a receipt for the purchased course materials. See Kakar Hearing Testimony.

55. Upon learning that Dr. Martinez had distributed course materials to students allegedly in violation of MCCCD's cash handling policy, President Solley instructed Martinez to immediately issue refunds to her students via personal check. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

56. On or around October 18, 2013, President Solley and Dr. Kakar met with Dr. Martinez to explain the seriousness of Dr. Martinez's alleged cash handling violation. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony. In addition, President Solley and Dr. Kakar prepared a written counseling memo dated October 18 2010 for Dr. Martinez regarding her alleged violation of cash handling rules. Dr. Martinez was provided with a copy of the October 18, 2010 counseling notice and President Solley proceeded to explain to Dr. Martinez the seriousness of the alleged cash handling violations and the requirement that Dr. Martinez issue reimbursements to her students. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

57. Several months later, on or around January 9, 2013, Dr. Kakar learned that most (if not all) students had not yet received refunds from the Dr. Martinez. MCCCD Exhibit List # 39 (various emails regarding student refunds). As a result, Dr. Kakar instructed Dr. Martinez to provide copies of refund checks by January 18, 2013. MCCCD Exhibit List # 39 (various emails regarding student refunds).

58. Dr. Martinez failed to produce a single refund check by the January 18, 2013 deadline. MCCCD Exhibit List # 39 (various emails regarding student refunds).

59. Dr. Martinez did not think that she had violated any District rule in reference to the copies. Therefore, she declined to follow the December 9, 2010 order because she believed she was not required to do so under any District rule.

60. At the November 18, 2013 hearing, Dr. Martinez did not provide any explanation for her refusal to comply with the October 18, 2012 and January 9, 2013 directives to issue refunds to her students. See Martinez Hearing Testimony.

61.    At the hearing Dr. Martinez testified that she had made a "mistake" and, in retrospect, should have complied with President Solley's instructions.  See Martinez Hearing Testimony.

62.    On or around August 9, 2013, MCCCD Chancellor Rufus Glasper sent Dr. Martinez a letter informing her that MCCCD was proceeding with termination proceedings. Included with this letter was a statement of charges that summarized the particular violations Dr. Martinez had been charged with (hereinafter referred to as "Statement of Charges.") MCCCD Exhibit List # 1 (Statement of Charges).

## CONCLUSIONS

63.    PC failed to carry its burden of proof relating to violation of MCCCD's cash handling rules found in MCCCD Administrative Regulations 1.17, violation of Residential Policy Manual 3.2.4 (relating to financial interests in unpublished materials), violation of U.S. Copyright Law and fair use guidelines, and violation of MCCCD Administrative Regulations 3.2.4 and 3.2.5 related to copyright regulations.

64.    Notwithstanding their education, their experience, and their good faith, Mr. Bellamy and Mr. Garrison disagreed as to whether or not Dr. Martinez violated copyright law. Therefore, it is inconclusive as to whether Dr. Martinez intentionally and/or inadvertently violated federal copyright law.

65.    It is inconclusive as to whether or not Dr. Martinez violated the "cash handling" policies of MCCCD.

66.    Dr. Martinez willfully and intentionally failed to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley.

67.    Dr. Martinez conceded that she never complied with President Solley's clear directive to issue refunds to her students.  Although Dr. Martinez now regrets her decision not to comply with President Solley's directive, she has never claimed that she did not understand the instructions or that the instructions were beyond the scope of management's authority.  Viewed in light of these facts, Martinez's claim that she "made a mistake" is an admission of willful insubordination.

68.    By failing to comply with President Solley's directive to issue refunds to her students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.1 which prohibits the "[w]illful and intentional violation of any…MCCCD administrative regulation that affects the employee's ability to perform his or her job."

69.    By failing to comply with President Solley's directive to issue refunds to students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.3 which prohibits the "[w]illful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment."

///

## RECOMMENDATION

78.   We hereby recommend that the Governing Board deny President Solley's termination request and allow Dr. Martinez to continue her MCCCD employment.

79.   Per MCCCD Administrative Regulation 6.7 indicating that violation of any Employment Standards "constitutes grounds for disciplinary action, up to [emphasis added] and including termination," we hereby recommend that the Governing Board retain Dr. Martinez.

It is ordered so, at Mesa, Arizona, this 9th day of December, 2013.

_____
Dr. Keith Curley
Chairperson
On Behalf of the Hearing Committee,
Dr. Nina Bayes and Dr. Carlos Cairo

40581
-8-



**MARICOPA COMMUNITY COLLEGES**
**OFFICE OF THE CHANCELLOR**

## M E M O R A N D U M

**DATE:**     February 10, 2014

**TO:**       Dana Saar, President
             MCCCD Governing Board

**FROM:**     Rufus Glasper

**SUBJECT:**  **Recommendation to adopt hearing committee's recommendation**
             **regarding dismissal, Dr. Cleopatria Martinez**

On August 9, 2013, I notified Dr. Cleopatria Martinez, in writing that I intended to
recommend to the MCCCD Governing Board that she be dismissed from her position as
Mathematics Faculty at Phoenix College (copy attached). This recommendation was based on
a statement of charges against Dr. Martinez prepared by Dr. Anna Solley, President of
Phoenix College, and reviewed and forwarded to me by James N. Bowers, Interim Vice
Chancellor for Human Resources (copy attached).

Pursuant to Section 3.15.3 of the RFP Policy Manual, Dr. Martinez invoked her right to a
hearing on her dismissal. This hearing was held on November 18, 2013 pursuant to section
3.15.2 – 3.15.7 of the RFP Policy Manual.

I received the Hearing Committee's Summary of Evidence, Findings of Fact, Conclusions of
Law and Recommendation on December 9, 2013. I was unable to schedule a meeting with the
hearing committee because of the winter break, and the parties graciously extended the time
for my decision to permit me this opportunity. On January 23, 2014, pursuant to section
3.15.8 of the RFP Policy Manual, I met with the Hearing Committee to clarify questions I had
concerning their recommendations.

Now, as required by section 3.15.8 of the RFP Policy Manual, I am providing the Governing
Board with my recommendation regarding dismissal along with the Summary of the Evidence
and a copy of the Findings of Fact, Conclusions of Law and final recommendations of the
Hearing Committee.

EXHIBIT 6
WIT: R. Glasper
DATE: 11-22-16
Angela F. Miller, RPR, CR

Page 2

Based on all of the information referred to above and attached hereto, I accept the written recommendation of the committee that Dr. Martinez NOT be dismissed. After consulting with the committee I have determined that a lesser sanction authorized by the RFP and within my sole discretion as Chancellor is appropriate and warranted.

Attachments

cc:    MCCCD Governing Board Members
       Mr. Jim Bowers
       Dr. Anna Solley
       Mr. Pavneet Uppal
       Mr. Steve Montoya



**MARICOPA COMMUNITY COLLEGES®** | Rufus Glasper
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

February 10, 2014

Dr. Cleopatria Martinez
7030 N. 21ˢᵗ Street
Phoenix, AZ 85020

Re: Notice of Suspension without Pay

Dear Dr. Martinez:

Based upon the attached written statement of charges, I have decided to suspend your employment under my sole authority as Chancellor pursuant to section 3.11 of the Residential Faculty Policies. The purpose of this letter is to notify you that your suspension from your position as Mathematics faculty at Phoenix College will begin on March 1, 2014 and end on May 15, 2015. Your teaching responsibilities and pay will resume Fall semester, 2015 unless you choose to retire (see below).

Having sought the advice of the General Counsel as required by section 3.11.3 of the RFP, I am satisfied that your procedural rights concerning the grounds for suspension have been met. The basis for this action is the unanimous finding of an independent hearing committee that you willfully violated the district policies set forth in the statement of charges and that I have the authority to suspend your employment without pay.

Also under the terms of subsection 3.11.3, the interim Vice Chancellor for Human Resources will offer to consult with you (and the Faculty Association President, if you choose) concerning the rationale for this decision. If you accept his invitation, he will deliver this notice and attachment after the meeting. If you decline your opportunity to consult with him, he will have the decision delivered to you in accordance with the policy.

You may voluntarily retire from your position in lieu of this suspension without pay. If you elect to do so, you will remain on paid administrative leave and be paid through May 9, 2014.

Sincerely,

Rufus Glasper, Ph.D., CPA
Chancellor

Lee Combs
General Legal Counsel

cc: Dr. Anna Solley
Mr. Jim Bowers

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert I Estrella Mountain I GateWay I Glendale I Mesa I Paradise Valley I Phoenix
Rio Salado I Scottsdale I South Mountain I Maricopa Skill Center I SouthWest Skill Center



**MARICOPA COMMUNITY COLLEGES®** | Rufus Glasper
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

February 10, 2014

Dr. Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ 85020

Re: Statement of Charges

Based upon the findings of the hearing committee which are attached to this statement, and the record of their proceedings, I have determined as follows:

In teaching your Phoenix College mathematics students, you did not use a textbook. Instead, you prepared your own course materials you called your "lecture notes," copied them on Phoenix College equipment and at College expense, and distributed them to your students without charge. In preparing your notes, you copied problems from copyright protected textbooks and inserted them into your lecture notes without attribution to, or permission of, the copyright holders.

In early 2010, Phoenix College discovered that you may have exposed MCCCD to liability for copyright infringement, notified you of the concerns, and provided training and legal counsel. To protect the College from the risk of liability, in April 2010 President Solley restricted your copying privileges, allowing only those copy projects approved by your department chair. You attempted to bypass these restrictions. The chair filed a complaint that was referred to an administrative evaluation team for investigation. The team, including your own appointee, unanimously concluded that your lecture notes violated copyright and that you had failed to follow President Solley's direction.

President Solley considered this history, and on December 10, 2010 imposed a stricter restriction in accordance with the RFP. She directed you to use only course materials approved by the department, that were available in the bookstore for sale to the students, and that were authored by persons other than yourself. She also required that you provide proper attribution of authorship of the materials by others and show evidence that you had purchased the materials or otherwise received permission to use them from the author. She restricted your authority to copy to materials approved by your department chair after two days' notice and written proof that you had permission of the author to copy the materials.

In concluding her directive, Dr. Solley stated, "This direction is intended to communicate job duties to you within the meaning of Governing Board employment standard A4.3. In accordance with that section of the All Employment Policy Manual, willful and intentional violation of these instructions will be considered grounds for disciplinary action, up to and including dismissal."

Despite MCCCD's frequent discussions with you regarding the importance of complying with copyright laws and the December 9, 2010 directive, you continued to attempt to ignore the directive. At the beginning of the Fall 2012 Semester, you informed your students that they were not required to purchase a course textbook and that you would provide them with your own course materials in lieu of a textbook. In violation of President Solley's December, 2010 directive, you made copies at a local Staples store of course materials that had not been approved by your department chair, and distributed them to your students for $11 per copy, payable directly to you. This distribution violated Dr. Solley's directive.

*Ten colleges and two skill centers dedicated to student success.*

Page 2

You decided unilaterally that no district policy required you to comply with the job duties communicated to you in writing by Dr. Solley, so you violated them. However, her directive was issued under section 3.7.4 of the RFP. This section authorizes a president to take "any appropriate action" after receiving the results of the administrative review. In considering the appropriate action, Dr. Solley relied on the advice of expert counsel to assess the risk of liability represented by your behavior, on your documented history of evasion of her prior efforts to protect MCCCD, and the unanimous report of the administrative evaluation team. You did not file a timely appeal or grievance seeking review of this directive.

An additional concern arose after a student brought the copying to PC's attention, complaining that you did not provide receipts for the material charges. MCCCD Administrative Regulation 1.12. states as follows:

"1.12.2 Authorization

Prior to participating in the sale of products or services, Revenue and Expenditure categories must be included in a program's budget, and approved by the Governing Board during the annual budget adoption process, or as legally changed during a fiscal year.

1.12.3 Fees

Fees exchanged for products or services produced through an educational, training, or service activity shall be pre-approved by the Governing Board."

Phoenix College determined that your course materials charge was not included in the adopted budget or pre-approved by the Governing Board. Dr. Solley therefore issued a corrective action that directed you to issue refunds to the students for the unauthorized charge. You refused, and offered no explanation or justification of your decision to the hearing committee. You refused, and offered no explanation or justification of your decision to the hearing committee. The hearing committee found your failure to comply with the corrective action was in violation of Administrative Regulation 6.7.1 and Administrative Regulation 6.7.3.

Therefore, for purposes of RFP Section 3.13, this letter will serve as a statement of charges that you are in violation of Administrative Regulation 6.7.1 and Administrative Regulation 6.7.3. In accordance with these regulations, disciplinary action up to and including termination is warranted. I accept the hearing committee's recommendation that you should not be dismissed from employment. However, I believe suspension without pay for a substantial time is the appropriate sanction.

Sincerely,

Rufus Glasper, Ph.D. CPA
Chancellor

BEFORE THE GOVERNING BOARD OF THE
MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

| | |
|---|---|
| MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT, | ) ) ) HEARING COMMITTEE |
| v. | ) ) FINDINGS OF FACT, CONCLUSIONS |
| DR. CLEOPATRIA MARTINEZ | ) OF LAW, AND RECOMMENDATION ) |

Pursuant to the October 16, 2013 Scheduling Order, having reviewed all of the parties' pleadings and exhibits and conducting a hearing on November 18, 2013, the Hearing Committee (by majority vote) hereby submits the following Findings of Fact, Conclusions of Law and Recommendation.

## FINDINGS OF FACT

1.      After having taught mathematics full-time for ten years at Denver Community College, Dr. Cleopatria Martinez moved to Arizona and started teaching mathematics full-time at Scottsdale Community College on January 1, 1985.

2.      Dr. Martinez voluntarily transferred to Phoenix College ("PC") in 1995 and has been teaching mathematics there full-time ever since.

3.      Dr. Martinez elected to voluntarily transfer to PC because there were very few minority students attending Scottsdale Community College, and she wanted to use her bilingual education skills in the mathematics classroom to better educate the large number of minority students attending PC.

4.      Dr. Martinez was elected by her colleagues to serve as the Chairperson of the Mathematics Department of PC from 2002 to 2005.

5.      In early 2010, PC discovered that Dr. Cleopatria Martinez may have exposed MCCCD to potential liability for copyright infringement.

6.      Dr. Martinez testified that, during her twenty-eight years of teaching mathematics in the MCCCD system, she and her colleagues in the Mathematics Departments of both Scottsdale Community College and PC routinely borrowed mathematics problems from other mathematicians to use in their student handouts for educational purposes on a not for profit basis.

7.      Dr. Martinez testified, without rebuttal, that this borrowing of mathematics problems is a longstanding, widespread custom throughout the District and academia at large.

8.      Instead of requiring her mathematics students to purchase textbooks, Dr. Martinez prepared her own course materials which she called her "Lecture Notes" and distributed them to

her students.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 77:17-78:15, 106:16-108:16, 121:25-140:13, 132:16-137:25).

9.     Dr. Martinez read the Copyright Act of 1976 and believed that it authorized her to use small portions of other scholars' work under the "Fair Use" doctrine because she was using it only for classroom teaching purposes on a not for profit basis and her use of the material did not undermine the potential market for the other scholar's work.

10.     Per the "Fair Use" doctrine of the Copyright Act, the "use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.

11.     Dr. Martinez copied problems from copyright protected textbooks and inserted them into her course materials.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 106:16-108:16).

12.     Dr. Martinez, in her Basic Arithmetic (MAT082) course, copied problems directly from a copyrighted textbook entitled "Basic Mathematics" and inserted them into her "MAT 082 Basic Arithmetic Spring 2010" course materials which she distributed to students.  MCCCD Exhibit List # 20 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

13.     Dr. Martinez also copied problems directly from the Sullivan & Sullivan "Precalculus" textbook and inserted them into her "MAT182 Trigonometry Spring 2010" course materials.  MCCCD Exhibit List # 22 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

14.     Dr. Martinez did not require her students to purchase textbooks in her Spring MAT082 Course.  MCCCD Exhibit List # 18 (email from Dr. Martinez stating "I indicated in my syllabus that, instead of a published textbook, I was using lecture notes in my MAT082 class.")

15.     Dr. Martinez did not require her students to purchase textbooks in her Spring MAT182 Course.  *See* Dr. Martinez's hearing testimony (conceding that students were not required to purchase a textbook in her Spring 2010 MAT182 course).

16.     On or around January 12, 2010, MCCCD's Vice President of Academic Services, Ronnie Elliot, sent Dr. Martinez an email notifying her that there were alleged copyright related problems with the materials she had printed for the Fall 2009 and Spring 2010 semesters.  MCCCD Exhibit List # 23 (January 12, 2010 email).  The materials in question were packets of course materials for Dr. Martinez's MAT182 and MAT187 courses and contained mathematics problems and graphs that were taken from copyrighted textbooks.  MCCCD Exhibit List # 11 (Ronnie Elliot Declaration, ¶¶8-9); MCCCD Exhibit List # 16 (MAT182 course packet); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memorandum).

17.     Dr. Martinez used three of the four packets of "lecture notes" in the Spring of 2010 in two pre-calculus classes. See District Exhibit 6, parts 1-3.

18.    The MCCCD administration, following Vice President Elliot's email, repeatedly explained its copyright concerns to Dr. Martinez and asked Dr. Martinez to remove any copyright protected mathematics problems from her materials. See Kakar Hearing Testimony.

19.    On January 26, 2010, Vice President Elliot sent Dr. Martinez an email outlining MCCCD's concerns regarding Dr. Martinez's potential copyright infringement. MCCCD Exhibit List # 24 (January 26, 2010 email).

20.    On January 28, 2010, MCCCD in-house-counsel Margaret McConnell discussed copyright compliance with Dr. Martinez telephonically. MCCCD Exhibit List # 25 (January 28, 2010 email).

21.    Dr. Martinez did not benefit from the multiple MCCCD copyright information sessions noted above.

22.    PC's own expert witness, Sean Garrison, testified that under the "Fair Use" doctrine, someone could lawfully copy from a copyrighted textbook without either using or purchasing the textbook.

23.    On February 5, 2010, Vice President of Academic Affairs Casandra Kakar, Interim Vice President of Administrative Services Paul DeRose, and Dr. Martinez met to discuss Dr. Martinez's alleged misuse of copyrighted materials. MCCCD Exhibit List # 26 (February 12, 2010 email).

24.    Dr. Martinez has not used any of the four sets of "lecture notes" since the Spring of 2010 when PC first raised its concerns regarding the notes.

25.    On April 15, 2010, PC Librarian Ann Roselle conducted a personalized one-on-one copyright training session with Dr. Martinez. MCCCD Exhibit List # 28 (Copyright PowerPoint Presentation). See also, Kakar Hearing Testimony.

26.    When Dr. Martinez met with the librarian, the librarian told Dr. Martinez that Dr. Martinez knew as much about copyright law as she did. See Martinez Hearing Testimony.

27.    Following the revocation of Dr. Martinez's copying privileges, Dr. Martinez was required to submit her copy requests to Mathematics Department Chairperson Mr. Sueyoshi so that Mr. Sueyoshi could review her materials for possible copyright violations prior to copying and distribution to students. MCCCD Exhibit List # 8 (April 2, 2010 Directive).

28.    Dr. Martinez sought and obtained a form of written permission from the publisher of the textbook, Sullivan & Sullivan's "Precalculus," to copy materials from their book after PC accused her of violating copyright law.

29.    On or around April 19, 2010, Dr. Martinez attempted to bypass the copying restrictions by having an adjunct mathematics Professor, Johnny Santellan, make 24 sets of copies of her "Lecture Notes" for distribution to her mathematics students without obtaining prior approval from the Mathematics Department Chairperson. MCCCD Exhibit List # 12 (Sueyoshi Decl., ¶9); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 223:11-224:21).

30.    Because Dr. Martinez did not feel she was able to obtain reliable guidance regarding copyright compliance from the District, she sought advice from a private intellectual property attorney regarding the issue, Mr. Frederic Bellamy.

31.    Mr. Bellamy reviewed the first two sets of Dr. Martinez's "lecture notes" and concluded that they did not violate copyright law because they fell under the "Fair Use" doctrine.

32.    Mr. Bellamy based his conclusion that Dr. Martinez did not violate copyright law on the opinion that the portion of material that Dr. Martinez copied from the Sullivan & Sullivan Precalculus textbook was very small, that she used the copied materials exclusively for educational purposes without any profit motive, that the content of the copied material consisted of mathematics problems that are arguably not subject to copyright in the first place, and that the small portion of the textbook that Dr. Martinez copied did not adversely impact the potential market for the textbook.

33.    At the hearing, another lawyer practicing in the area of intellectual property law, Sean Garrison, testified on behalf of PC. In contrast to Mr. Bellamy, Mr. Garrison testified at the hearing that the first three sets of Dr. Martinez's lecture notes violated copyright law.

34.    In contrast to his testimony at the hearing of November 18, 2013, in his written report Mr. Garrison concluded only that the first three sets of Dr. Martinez's lecture notes subjected the District "to a serious risk of a copyright infringement claim." See District Exhibit 6, p. 0002.

35.    MCCCD invited Dr. Martinez to a copyright workshop that was held on March 1, 2010 at PC. Dr. Martinez chose not to attend the workshop. MCCCD Exhibit List # 10 (Solley Decl., ¶11).

36.    PC President Anna Solley, on December 9, 2010, concluded that Dr. Martinez's alleged misconduct posed an unacceptable legal risk of a copyright infringement claim and imposed restrictions on Dr. Martinez's photocopying privileges. MCCCD Exhibit List # 10 (Solley Decl., ¶12).

37.    MCCCD sought a legal opinion from an outside copyright expert, attorney Sean Garrison. MCCCD Exhibit List # 10 (Solley Decl., ¶ 14); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memo).

38.    According to Mr. Garrison, the third set of "lecture notes" appeared to have 13 mathematics problems copied from two other mathematics textbooks.

39.    Mr. Garrison testified that he was certain that Dr. Martinez has committed copyright infringement. See Garrison Hearing Testimony. In reaching this conclusion, Mr. Garrison reviewed thousands of pages of materials including nearly 300 pages of Dr. Martinez's lecture notes and three separate copyrighted mathematics textbooks. MCCCD Exhibit List # 6 (Sean Garrison April 19, 2013 Report); see also Garrison Hearing Testimony.

40.    In reliance upon Mr. Garrison's recommendations, PC President Anna Solley issued a December 9, 2010 directive that imposed further restrictions on Dr. Martinez's copying

privileges. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 10 (Solley Decl., ¶15).

41.     The December 9, 2010 Directive prohibited Dr. Martinez from utilizing any course materials of her own creation. MCCCD Exhibit List # 9 (December 9, 2010 Directive). Instead, Dr. Martinez was required to only use course materials that are "approved by the mathematics department" or that are "available in the bookstore for sale to students and that are authored by persons other than [Dr. Martinez]." MCCCD Exhibit List # 9 (December 9, 2010 Directive).

42.     The December 9, 2010 Directive further required Dr. Martinez to submit her photocopy requests to the Mathematics Department Chair for his approval. MCCCD Exhibit List # 9 (December 9, 2010 Directive).

43.     Despite MCCCD's frequent discussions with Dr. Martinez regarding the importance of complying with copyright laws and the December 9, 2010 Directive, Dr. Martinez continued to attempt to ignore the directive. See Kakar Hearing Testimony.

44.     At the beginning of the Fall 2012 semester (on or about August 21-23, 2012), Dr. Martinez informed her students that they were not required to purchase a course textbook and that she would provide them with her own course materials in lieu of a textbook. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21.

45.     In fall of 2012, Dr. Martinez sought to have her lecture notes photocopied off campus at a nearby Staples store. This practice is inconsistent with the December 9, 2010 Directive. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

46.     Dr. Martinez did not submit her Fall 2012 materials to Mathematics Department Chairperson Mr. Sueyoshi for approval. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

47.     Dr. Martinez made copies of her course materials at an off-campus Staples store and distributed them to students for $11 per copy. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

48.     The $11 course material fee was paid directly to Dr. Martinez by students. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

49.     PC accused Dr. Martinez of violating the District's "cash handling" rules by distributing these course materials to her students if the students reimbursed her for her out-of-pocket copying costs.

50.     PC subsequently claimed that Dr. Martinez violated the District's "cash handling" policies by seeking reimbursement for the copies.

51.     MCCCD's policies prohibit instructors from having "any financial interest in or receiv[ing] compensation from the sale of any unpublished instructional materials required or

suggested for a class that the instructor teaches." MCCCD Exhibit List # 41 (Residential Faculty Policies, 3.2.4.).).

52.   Dr. Martinez failed to follow the protocol set forth in the December 9, 2010 Directive in copying her Fall 2012 course materials.   MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

53.   Dr. Martinez distributed course materials directly to students in her Fall 2012 MAT151 class. MCCCD Exhibit List # 4-5 (Martinez Depo. pp. 232:19-233:21).

54.   The MCCCD Administration learned of Dr. Martinez's unauthorized distribution of course materials to students after one of Dr. Martinez's MAT151 students complained to Mathematics Department Chairperson Mr. Sueyoshi. The student complained that Dr. Martinez refused to provide her with a receipt for the purchased course materials.  See Kakar Hearing Testimony.

55.   Upon learning that Dr. Martinez had distributed course materials to students allegedly in violation of MCCCD's cash handling policy, President Solley instructed Martinez to immediately issue refunds to her students via personal check.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

56.   On or around October 18, 2012, President Solley and Dr. Kakar met with Dr. Martinez to explain the seriousness of Dr. Martinez's alleged cash handling violation. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.  In addition, President Solley and Dr. Kakar prepared a written counseling memo dated October 18 2010 for Dr. Martinez regarding her alleged violation of cash handling rules.  Dr. Martinez was provided with a copy of the October 18, 2010 counseling notice and President Solley proceeded to explain to Dr. Martinez the seriousness of the alleged cash handling violations and the requirement that Dr. Martinez issue reimbursements to her students.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

57.   Several months later, on or around January 9, 2013, Dr. Kakar learned that most (if not all) students had not yet received refunds from the Dr. Martinez.  MCCCD Exhibit List # 39 (various emails regarding student refunds).  As a result, Dr. Kakar instructed Dr. Martinez to provide copies of refund checks by January 18, 2013.  MCCCD Exhibit List # 39 (various emails regarding student refunds).

58.   Dr. Martinez failed to produce a single refund check by the January 18, 2013 deadline. MCCCD Exhibit List # 39 (various emails regarding student refunds).

59.   Dr. Martinez did not think that she had violated any District rule in reference to the copies.  Therefore, she declined to follow the December 9, 2010 order because she believed she was not required to do so under any District rule.

60.   At the November 18, 2013 hearing, Dr. Martinez did not provide any explanation for her refusal to comply with the October 18, 2012 and January 9, 2013 directives to issue refunds to her students. See Martinez Hearing Testimony.

61.   At the hearing Dr. Martinez testified that she had made a "mistake" and, in retrospect, should have complied with President Solley's instructions. See Martinez Hearing Testimony.

62.   On or around August 9, 2013, MCCCD Chancellor Rufus Glasper sent Dr. Martinez a letter informing her that MCCCD was proceeding with termination proceedings. Included with this letter was a statement of charges that summarized the particular violations Dr. Martinez had been charged with (hereinafter referred to as "Statement of Charges.") MCCCD Exhibit List # 1 (Statement of Charges).

## CONCLUSIONS

63.   PC failed to carry its burden of proof relating to violation of MCCCD's cash handling rules found in MCCCD Administrative Regulations 1.17, violation of Residential Policy Manual 3.2.4 (relating to financial interests in unpublished materials), violation of U.S. Copyright Law and fair use guidelines, and violation of MCCCD Administrative Regulations 3.2.4 and 3.2.5 related to copyright regulations.

64.   Notwithstanding their education, their experience, and their good faith, Mr. Bellamy and Mr. Garrison disagreed as to whether or not Dr. Martinez violated copyright law. Therefore, it is inconclusive as to whether Dr. Martinez intentionally and/or inadvertently violated federal copyright law.

65.   It is inconclusive as to whether or not Dr. Martinez violated the "cash handling" policies of MCCCD.

66.   Dr. Martinez willfully and intentionally failed to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley.

67.   Dr. Martinez conceded that she never complied with President Solley's clear directive to issue refunds to her students. Although Dr. Martinez now regrets her decision not to comply with President Solley's directive, she has never claimed that she did not understand the instructions or that the instructions were beyond the scope of management's authority. Viewed in light of these facts, Martinez's claim that she "made a mistake" is an admission of willful insubordination.

68.   By failing to comply with President Solley's directive to issue refunds to her students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.1 which prohibits the "[w]illful and intentional violation of any...MCCCD administrative regulation that affects the employee's ability to perform his or her job."

69.   By failing to comply with President Solley's directive to issue refunds to students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.3 which prohibits the "[w]illful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment."

///

406681                                    -7-

## RECOMMENDATION

70.    We hereby recommend that the Governing Board deny President Solley's termination request and allow Dr. Martinez to continue her MCCCD employment.

71.    Per MCCCD Administrative Regulation 6.7 indicating that violation of any Employment Standards "constitutes grounds for disciplinary action, *up to* [emphasis added] and including termination," we hereby recommend that the Governing Board retain Dr. Martinez.

It is ordered so, at Mesa, Arizona, this 9th day of December, 2013.

Dr. Keith Crudup
Chairperson
On Behalf of the Hearing Committee,
Dr. Nora Reyes and Dr. Carlos Caire.

406681

-8-

### 3.10.2.1.

Not later than March 1st for all members in Probationary status. By October 1st of the fourth and fifth academic years, the Probationary Faculty member should be advised in writing, by the Department/Division Chair or appropriate Vice President, or Vice President's designee of any deficiencies which may, if uncorrected, result in non-renewal of contract, and the Probationary member shall have the remainder of the academic year to address said deficiencies.

### 3.10.2.2.

Fifth-year Probationary members will be notified in writing of any deficiencies arising after October 1st. The probationary period may be extended one additional semester for the affected Probationary member per Section 1.2. Failure of the Probationary member to correct said deficiencies in the additional semester will result in their non-renewal at the end of that semester.

### 3.10.3.

Within fourteen (14) days of the receipt of the Chancellor's note of Intent to recommend nonrenewal, the member shall, upon request to the Chancellor, be orally advised of the reasons that contributed to the decision to recommend nonrenewal of employment. Such advisement shall be given by the appropriate College President within fourteen (14) days of receipt of the Faculty member's written request.

### 3.10.4.

Within fourteen (14) days of the College President's advisement of the reasons for nonrenewal, the Chancellor shall honor the Faculty member's written request to the Chancellor to confirm, in writing, the reasons given in advisement of nonrenewal. Such written confirmation shall be delivered to the member's place of residence via certified mail, registered mail, or personal service within fourteen (14) days of the Chancellor's receipt of the request.

### 3.10.5.

The process referenced here above shall be completed prior to any nonrenewal recommendation to the Governing Board, for action prior to April 30th.

## 3.11. Suspension of a Faculty Member

### 3.11.1.

Upon a written statement of charges formulated by the Chancellor, charging a Faculty member of the MCCCD, the Chancellor, or his/her designee, may immediately suspend the Faculty member and give notice of suspension. At the option of the Faculty member, the MCCCD Faculty Association President will be notified of this action.

### 3.11.2.

The notice of suspension shall be in writing and be served upon the Faculty member, personally or by U.S. (registered or certified) mail, addressed to the Faculty member at his/her place of residence as recorded in the MCCCD records.

**3.11.3.**

Any Faculty member who has been suspended pursuant to this Section will normally be paid his/her regular salary during the period of suspension. A suspension without pay will occur only upon advice of General Counsel. If payment is to be withheld, the Vice Chancellor of Human Resources will first consult with and advise the member and, at the option of the Faculty member, the Faculty Association President regarding the rationale for that action.

## 3.12. Administrative Leaves of Absence

### 3.12.1. Criminal Complaint

**3.12.1.1.**

If a Faculty member is charged by criminal complaint, information, or indictment with any criminal offense, which would be cause for dismissal, the Chancellor or designee may immediately place the member on compulsory leave of absence for a period of time extending for not more than ten (10) days after the date of entry of judgment in the proceedings.

**3.12.1.2.**

Pay during this period will be based on the same consideration as in Section 3.13.3.

### 3.12.2. Complaints—Other Than Criminal

**3.12.2.1.**

The Vice Chancellor of Human Resources may, if it is appropriate, place a Faculty member on paid administrative leave of absence. At the option of the Faculty member, the MCCCD Faculty Association President will be advised.

**3.12.2.2.**

Pay during this period will be based on the same consideration as in **Section 3.11.3.**

## 3.13. Faculty Member Dismissal—Probationary and Appointive

A Faculty member who is recommended, by the College President, through the Chancellor, to the Governing Board, for dismissal shall have access to the following due-process procedures.

### 3.13.1.

A written statement of charges, formulated by the College President, shall be forwarded to the Vice Chancellor of Human Resources. After review of the charges, the Vice Chancellor, in consultation with the MCCCD Legal Office, may recommend, to the Chancellor, that there exists prima facie cause for the dismissal of a Faculty member. The Chancellor shall inform the Governing Board in writing, with a copy of the recommendation being sent (U.S. certified or registered mail) to the Faculty member at his/her place of residence as recorded in the MCCCD records. The Vice Chancellor's recommendation will give notice to the Chancellor, Governing Board, and the Faculty member of the intention to formally recommend dismissal, which shall not be sooner than thirty (30) days from the date of the letter, nor later than the end of the current academic year.