# EXHIBIT 3

## TO

## PLAINTIFF'S STATEMENT OF FACTS

## IN SUPPORT OF

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Cleopatria Martinez,                    )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )     NO. CV 15-01759 NVW
                                        )
Maricopa County Community               )
College District, a political           )
subdivision of the State, and           )
Rufus Glasper and Debra                 )
Glasper, husband and wife,              )
                                        )
                    Defendants.         )
_____ )



RULE 30(B)(6) DEPOSITION OF JUDY CASTELLANOS


Phoenix, Arizona
December 15, 2016
10:23 a.m.




*Miller Certified Reporting, LLC*
*Post Office Box 513*
*Litchfield Park, Arizona 85340*
*(P)623-975-7472  (F)623-975-7462*
*www.MillerCertifiedReporting.com*



Nicole Tatlow, RPR
Certified Reporter  (AZ 50671)

1                        I N D E X

2

3     WITNESS                                    PAGE

4     JUDY CASTELLANOS

5            EXAMINATION BY MR. ROBAINA              5

6            EXAMINATION BY MS. BALCH               80

7         FURTHER EXAMINATION BY MR. ROBAINA        84

8

9

10                        *   *   *

11

12                     E X H I B I T S

13

14     NO.        DESCRIPTION                    PAGE

15     No. 1      Letters dated August 9, 2013      10

16     No. 2      Residential Faculty Policies 2012-2013   12

17     No. 3      Residential Faculty Policies 2013-2014   13

18     No. 4      Hearing Committee Findings of Fact,       20
                  Conclusions of Law, and Recommendation
19
       No. 5      Administrative Regulation: Fiscal         25
20                Management, Section 1

21     No. 6      Letters dated February 10, 2014;          26
                  Hearing Committee Findings of Fact,
22                Conclusions of Law, and Recommendation

23     No. 7      List of Faculty Suspended; Copies of      52
                  Suspensions
24
       No. 8      List of Faculty Suspended                 53
25

                 Miller Certified Reporting, LLC

1    No. 9      Suspension Documents for Jason ████████    60

2    No. 10     Suspension Documents for Walter ████████   61

3    No. 11     Suspension Information for Harry ██████    62

4    No. 12     Suspension Documents for Scott ██████     63

5    No. 13     Suspension Documents for David ██████     63

6    No. 14     E-mails dated August 11, 12, and 13,      64
                2014
7
     No. 15     E-mail dated August 13, 2014             65
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              RULE 30(B)(6) DEPOSITION OF JUDY CASTELLANOS, a

2    witness herein, was taken upon oral examination by the

3    parties through their respective attorneys before

4    NICOLE TATLOW, RPR, a Certified Reporter in and for the

5    County of Maricopa, State of Arizona, taken on December 15,

6    2016, commencing at 10:23 a.m., at the law offices of

7    ROBAINA & KRESIN, P.L.L.C., 5343 North 16th Street, Suite

8    200, Phoenix, Arizona.

9

10   COUNSEL APPEARING:

11           ROBAINA & KRESIN, P.L.L.C.
             BY:  Mr. Edmundo P. Robaina, Esq.
12           5343 North 16th Street, Suite 200
             Phoenix, Arizona  85016
13           epr@robainalaw.com
             Attorneys for Plaintiff
14
             FISHER & PHILLIPS, L.L.P.
15           BY:  Ms. Shayna H. Balch, Esq.
             201 East Washington Street, Suite 1450
16           Phoenix, AZ  85004
             sbalch@laborlawyers.com
17           Attorneys for Defendants

18   ALSO PRESENT:

19        Dr. Cleopatria Martinez, Plaintiff

20

21

22

23

24

25

```
 1   BY MR. ROBAINA:
 2        Q.    And then if you look at 20- -- or I'm sorry --
 3   3.15 in Exhibit 3, which is the 2013-2014, I think you'll
 4   see that it's not the same.
 5        A.    Mm-hm.
 6        Q.    Correct?
 7        A.    That's correct.
 8        Q.    All right.  So would you agree with me, then,
 9   that it's the 2012-2013 policies that apply to the intent to
10   dismiss?
11        A.    Yes.
12        Q.    And you're familiar with these 20- -- with these
13   Residential Faculty Policies, correct?
14        A.    Yes.
15        Q.    All right.  If you take a look at page 19 of
16   Exhibit 2, do you see 3.11.2?
17        A.    Mm-hm.
18        Q.    And it says that, "No faculty member shall be
19   disciplined, reprimanded, suspended, or reduced in
20   assignment or compensation without just cause," correct?
21        A.    What section are you reading?
22        Q.    I'm in Exhibit 2 at Section 3.11.2.
23        A.    Mm-hm.
24        Q.    Are you familiar with that section?
25        A.    Yes.
```

Miller Certified Reporting, LLC

```
1        A.    Each section of the Residential Faculty Manual
2   defines what an employee is entitled to.  So to say broad,
3   each section clearly defines what the employee is entitled
4   to.
5        Q.    Okay.  So let's go to, in 2012-2013, Residential
6   Faculty Policies, which are Exhibit 2, page 21, which is
7   "Faculty Member Dismissal."  Do you see that?
8        A.    Mm-hm.
9        Q.    All right.  Are you familiar with these policies?
10       A.    Yes.
11       Q.    And an employee has -- that's -- where there's a
12  notice of intent to dismiss, under your Residential Faculty
13  Policies, or MCCD's -- MCCCD's Residential Faculty Policies,
14  the employee has a right to a hearing, correct?
15       A.    Yes.
16       Q.    And the hearing committee hears evidence,
17  correct?
18       A.    That's correct.
19       Q.    And --
20             MS. BALCH:  And, Counsel, this is all in relation
21  to 3.15, right?
22             MR. ROBAINA:  Correct.
23             MS. BALCH:  I just didn't hear the policy number.
24  BY MR. ROBAINA:
25       Q.    And the committee makes findings of facts and
```

Miller Certified Reporting, LLC

1   conclusions of law that are binding with respect to those --

2   the issues that it discusses, correct?

3       A.    That's correct.

4       Q.    And then it makes a recommendation, right?   To

5   the Chancellor?

6       A.    Yes.

7       Q.    And the Chancellor can accept the recommendations

8   or can make his own recommendations and forward those to the

9   Governing Board, correct?   That's under 3.15.8 [sic].

10          MS. BALCH:   Objection.   Misstates.

11          THE WITNESS:   Can you further explain what you

12   mean by that?

13   BY MR. ROBAINA:

14       Q.    Under 3.15.8 [sic], "The Chancellor may adopt the

15   hearing committee's recommendation regarding dismissal or

16   make his or her own recommendation and forward the

17   recommendation along with the summary of the evidence, a

18   copy of the findings of facts, conclusions of law, and final

19   recommendations of the hearing committee to the Governing

20   Board," correct?

21       A.    And that's regarding the dismissal.

22       Q.    Correct.

23       A.    Yes.

24       Q.    Yes?   All right.

25          Just going back to Section 3.11.2 for a moment.

1      A.     What I'm stating is that in this particular

2  section, we would work with our legal to get the

3  interpretation on that.

4      Q.     Have you ever asked your legal -- well, I can't

5  ask you what your legal has told you.

6             Have you ever had cause to determine what that

7  section -- how that section applies to employees who are

8  being disciplined, reprimanded, suspended, or reduced in

9  assignment or compensation?

10            MS. BALCH:  I'm going to object to that.  I think

11 it's getting too close to attorney-client privilege.

12 BY MR. ROBAINA:

13     Q.     Yeah, I'm not asking you what your legal counsel

14 has asked you.

15            MR. ROBAINA:  Can you repeat the question,

16 please?

17            (Requested portion of record read.)

18            THE WITNESS:  We work with our legal department

19 on this.

20 BY MR. ROBAINA:

21     Q.     Let me show you what I'd like to have marked as

22 Exhibit 4.

23            (Exhibit No. 4 marked.)

24 BY MR. ROBAINA:

25     Q.     Have you seen this document before?

Miller Certified Reporting, LLC

21

```
 1        A.    Yes.
 2        Q.    Would you take a look at the -- page 7 of
 3   Exhibit 4?
 4              Do you see in Paragraph 64 where it says that,
 5   "It is inconclusive as to whether Dr. Martinez intentionally
 6   or inadvertently violated federal copyright law"?  Do you
 7   see that?
 8        A.    Yes.
 9        Q.    The next one, 65, says, "It is inconclusive as to
10   whether or not Dr. Martinez violated the cash-handling
11   policies of MCCCD."  Do you see that?
12        A.    Yes.
13        Q.    And do you see No. 66, where it says,
14   "Dr. Martinez willfully and intentionally failed to follow
15   the instructions that were communicated to her when she
16   failed to issue refunds to the students as directed by
17   President Solley"?  See that?
18        A.    Yes.
19        Q.    Those conclusions were binding on the District
20   with respect to the issues that were discussed in those
21   conclusions, correct?
22              MS. BALCH:  Objection.  Form.  Foundation.
23              THE WITNESS:  Can you repeat the question again?
24              MR. ROBAINA:  Can you read it back, please?
25              (Requested portion of record read.)
```

Miller Certified Reporting, LLC

```
 1              THE WITNESS:  Can you repeat it one more time,
 2    slowly, please?
 3              (Requested portion of record read.)
 4              THE WITNESS:  So this is a two-question.  So they
 5    were binding, but what issues were discussed?  In regards to
 6    what?
 7    BY MR. ROBAINA:
 8         Q.   I guess if you like, you can review the findings
 9    of facts and conclusions of law before you answer the
10    question.  My question is simply that under their policies,
11    these conclusions are binding on the District with respect
12    to the issues that are discussed in those conclusions,
13    right?
14         A.   They're binding, but the Chancellor could make a
15    decision based on his recommendation on what policy we
16    talked before.
17         Q.   I'm not understanding your answer.
18         A.   The committee's information is binding.
19         Q.   On who?
20         A.   On -- who do you mean?
21         Q.   Who are they binding on?
22         A.   They're binding on the dismissal, termination,
23    that was discussed here.
24         Q.   And you're saying that the Chancellor can do
25    what?
```

1    read the whole thing, but I'll point you to the section that

2    I --

3         A.    Okay.

4         Q.    Are you familiar with these policies?

5         A.    I -- I have seen them, but I do not work with

6    them on a daily basis.

7         Q.    Okay.  What policies do you work with on a daily

8    basis?  Do you work with any particular policies on a daily

9    basis?

10        A.    The staff policy manual, which is for classified,

11   and the residential.

12        Q.    Okay.  Let me show you what I'd like to have

13   marked as Exhibit 6.

14             (Exhibit No. 6 marked.)

15   BY MR. ROBAINA:

16        Q.    Have you seen this document before?

17        A.    Yes.

18        Q.    Did you help prepare that document?

19        A.    Yes.

20        Q.    All right.  Do you see the statement of charges,

21   which is on the second page of Exhibit 6?

22        A.    Yes.

23        Q.    And did you help prepare that document?

24        A.    Yes.

25        Q.    Did Ms. Martinez receive any review of the

27

1    suspension that she received -- well, let me just ask it

2    this way.  Scratch that.

3                Was Ms. Martinez entitled to appeal her

4    suspension?

5         A.    For suspensions, under the RFP, employees are not

6    granted an appeal.  They're given the notice, and then

7    they're -- they have an opportunity to visit with the Vice

8    Chancellor, and then a copy is provided to the Faculty

9    Senate.

10        Q.    What is the purpose of visiting with the Vice

11   Chancellor?

12        A.    To let them know that they're going to be

13   receiving this, and if they want to address whatever they

14   need to, they can, but that's it.  They don't get anything

15   else.

16        Q.    The Vice Chancellor cannot change the discipline,

17   right?  The Vice Chancellor cannot change the suspension to

18   something less, right?

19        A.    Let me read that section.

20        Q.    We're talking about 3.11.3, correct, in

21   Exhibit 2?  I'm sorry.  Exhibit 3?

22        A.    Exhibit 3, yes.

23        Q.    Yeah.  Exhibit 3.

24        A.    Section 3.11.1 says, "Upon a written statement of

25   charges formulated by the Chancellor charging a faculty

1          A.     That's correct.

2          Q.     Okay.  The Vice Chancellor can't change the

3   suspension, correct?

4               MS. BALCH:  Objection.  Form.

5   BY MR. ROBAINA:

6          Q.     Under this policy?

7          A.     This section clearly states that the meeting is

8   to advise a member of the action, meaning what they're --

9          Q.     So the Vice Chancellor can't change that

10  suspension, correct?

11              MS. BALCH:  Objection.  Form.

12  BY MR. ROBAINA:

13         Q.     Under this policy?

14              MR. ROBAINA:  She's here for -- she's a 30(b)(6).

15  BY MR. ROBAINA:

16         Q.     Go ahead and answer that.

17         A.     This section clearly states that the Vice

18  Chancellor of Human Resources will consult and advise the

19  member at the option of the faculty member and the faculty

20  association regarding the rationale for the action.

21         Q.     I know what the section says.  My question is:

22  Do you have any knowledge as to whether or not the Vice

23  Chancellor of Human Resources can change the decision to

24  suspend the faculty member -- a faculty member without pay

25  under this policy?

1        A.     That meeting is strictly to advise the employee,

2   who would be the residential faculty member, of what is

3   happening.

4        Q.     So the answer's no?

5        A.     Correct.

6        Q.     So in this case, Ms. Martinez first went to a

7   hearing on the proposed dismissal, correct?

8        A.     Yes.

9        Q.     And there were findings of facts and conclusions

10  of law with regard to the allegations in the notice of

11  intent to dismiss, right?

12       A.     Correct.

13       Q.     And the Chancellor, subsequent to the findings of

14  facts and conclusions of law, reviewed the findings and

15  facts and conclusions of law, correct?

16       A.     Correct.

17              MS. BALCH:   Objection.   Form.

18  BY MR. ROBAINA:

19       Q.     And met with the committee, correct?

20       A.     I was not there.

21       Q.     You were not there.   Okay.   You know that the

22  Chancellor, though, ultimately suspended Dr. Martinez for 14

23  months, correct?   Or he notified her of his intent to

24  suspend her for 14 months, correct?   Which is in Exhibit 6?

25       A.     Mm-hm.

1          A.     According to the conclusions, she did not.

2          Q.     Okay.  1.12.2 and 1.12.3 are not anywhere in the

3    statement of charges for the notice of termination -- I'm

4    sorry -- notice of intent to dismiss, are they?

5          A.     It's just background information that we just put

6    there.

7          Q.     My question to you is:  Are those sections cited

8    in the notice of intent to dismiss and the statement of

9    charges attached to the notice of intent to dismiss?

10         A.     No.

11         Q.     Take a look at Exhibit 5.  And if you would look

12   at I-39, these are the cash-handling policies that

13   Dr. Martinez was alleged to have violated in the statement

14   of charges attached to the intent to dismiss that is

15   Exhibit 1, correct?  Yes?

16         A.     Yes.  It's in -- stated in the statement of

17   charges.

18         Q.     All right.  Those are different from, if you

19   would look at I-22 in Exhibit 5, 1.12.2 and 1.12.3, correct?

20         A.     They're -- what was your question?

21                MR. ROBAINA:  Can you read it back?

22                (Requested portion of record read.)

23                THE WITNESS:  Yes.

24   BY MR. ROBAINA:

25         Q.     Did someone tell you to cite 1.12.2 and 1.12.3?

1    the 2013-2014?

2         A.    I would have to pull it.

3         Q.    All right.

4         A.    Because every section -- every year, Maricopa

5    changes policies, so --

6         Q.    All right.  So you don't --

7         A.    And the numbering can change.

8         Q.    Okay.  And then -- let's go ahead and mark this

9    one as Exhibit 11.

10               (Exhibit No. 11 marked.)

11   BY MR. ROBAINA:

12        Q.    And that's -- those are the documents you were

13   able to find for Harry ████; is that correct?

14        A.    Yes.

15        Q.    Do you know -- it doesn't say on there, I don't

16   believe, what policy he was suspended under, does it?

17        A.    No.

18        Q.    Are you going to be able to look for and find

19   anything else on Mr. ████?

20        A.    Let me tell you, we spent so many hours that at

21   this point, this situation -- this action happened in 2008,

22   so it would take us -- I don't know if I'll be able to find

23   anything, to be honest.  I would have to spend hours and

24   hours trying to find it, if there's anything.

25        Q.    Okay.  So as of right now, you don't know what

Miller Certified Reporting, LLC

1   policy or what the issue was with Mr. ██████, correct?

2       A.   No.

3       Q.   All right.  Let's have this one marked as 12.

4          (Exhibit No. 12 marked.)

5  BY MR. ROBAINA:

6       Q.   All right.  And this is the information that you

7  found with regard to Scott ██████, correct?

8       A.   Yes.

9       Q.   This was a suspension for three days, correct?

10      A.   It says, "Employee to be suspended for three

11  six-hour days," suspension without pay.

12      Q.   And this is on -- this is a 2016 suspension,

13  correct?

14      A.   Correct.

15         (Exhibit No. 13 marked.)

16  BY MR. ROBAINA:

17      Q.   Do you recognize that document?

18      A.   Yes.

19      Q.   All right.  And is this the information that you

20  found on David ██████?

21      A.   That is correct.

22      Q.   And this says that he was suspended from 12/1 to

23  1/4 based on a settlement agreement.  Do you see that?

24      A.   Yes.

25      Q.   Do you know anything more about why he was



**MARICOPA COMMUNITY COLLEGES®** | **Rufus Glasper**
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

February 10, 2014

Dr. Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ 85020

Re: Notice of Suspension without Pay

Dear Dr. Martinez:

Based upon the attached written statement of charges, I have decided to suspend your employment under my sole authority as Chancellor pursuant to section 3.11 of the Residential Faculty Policies. The purpose of this letter to notify you that your suspension from your position as Mathematics faculty at Phoenix College will begin on March 1, 2014 and end on May 15, 2015. Your teaching responsibilities and pay will resume Fall semester, 2015 unless you choose to retire (see below).

Having sought the advice of the General Counsel as required by section 3.11.3 of the RFP, I am satisfied that your procedural rights concerning the grounds for suspension have been met. The basis for this action is the unanimous finding of an independent hearing committee that you willfully violated the district policies set forth in the statement of charges and that I have the authority to suspend your employment without pay.

Also under the terms of subsection 3.11.3, the interim Vice Chancellor for Human Resources will offer to consult with you (and the Faculty Association President, if you choose) concerning the rationale for this decision. If you accept his invitation, he will deliver this notice and attachment after the meeting. If you decline your opportunity to consult with him, he will have the decision delivered to you in accordance with the policy.

You may voluntarily retire from your position in lieu of this suspension without pay. If you elect to do so, you will remain on paid administrative leave and be paid through May 9, 2014.

Sincerely,

Rufus Glasper, Ph.D., CPA
Chancellor

Lee Combs
General Legal Counsel

cc: Dr. Anna Solley
    Mr. Jim Bowers

Ten colleges and two skill centers dedicated to student success.

Chandler-Gilbert | Estrella Mountain | GateWay | Glendale | Mesa | Paradise Valley | Phoenix
Rio Salado | Scottsdale | South Mountain | Maricopa Skill Center | SouthWest Skill Center

Exhibit No. 6
Name Castellanos
Date 12-15-16
Nicole Tatlow, Reporter



**MARICOPA COMMUNITY COLLEGES®** | **Rufus Glasper**
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

February 10, 2014

Dr. Cleopatria Martinez
7030 N. 21ˢᵗ Street
Phoenix, AZ 85020

Re: Statement of Charges

Based upon the findings of the hearing committee which are attached to this statement, and the record of their proceedings, I have determined as follows:

In teaching your Phoenix College mathematics students, you did not use a textbook. Instead, you prepared your own course materials you called your "lecture notes," copied them on Phoenix College equipment and at College expense, and distributed them to your students without charge. In preparing your notes, you copied problems from copyright protected textbooks and inserted them into your lecture notes without attribution to, or permission of, the copyright holders.

In early 2010, Phoenix College discovered that you may have exposed MCCCD to liability for copyright infringement, notified you of the concerns, and provided training and legal counsel. To protect the College from the risk of liability, in April 2010 President Solley restricted your copying privileges, allowing only those copy projects approved by your department chair. You attempted to bypass these restrictions. The chair filed a complaint that was referred to an administrative evaluation team for investigation. The team, including your own appointee, unanimously concluded that your lecture notes violated copyright and that you had failed to follow President Solley's direction.

President Solley considered this history, and on December 10, 2010 imposed a stricter restriction in accordance with the RFP. She directed you to use only course materials approved by the department, that were available in the bookstore for sale to the students, and that were authored by persons other than yourself. She also required that you provide proper attribution of authorship of the materials by others and show evidence that you had purchased the materials or otherwise received permission to use them from the author. She restricted your authority to copy to materials approved by your department chair after two days' notice and written proof that you had permission of the author to copy the materials.

In concluding her directive, Dr. Solley stated, "This direction is intended to communicate job duties to you within the meaning of Governing Board employment standard A4.3. In accordance with that section of the All Employment Policy Manual, willful and intentional violation of these instructions will be considered grounds for disciplinary action, up to and including dismissal."

Despite MCCCD's frequent discussions with you regarding the importance of complying with copyright laws and the December 9, 2010 directive, you continued to attempt to ignore the directive. At the beginning of the Fall 2012 Semester, you informed your students that they were not required to purchase a course textbook and that you would provide them with your own course materials in lieu of a textbook. In violation of President Solley's December, 2010 directive, you made copies at a local Staples store of course materials that had not been approved by your department chair, and distributed them to your students for $11 per copy, payable directly to you. This distribution violated Dr. Solley's directive.

Page 2

You decided unilaterally that no district policy required you to comply with the job duties communicated to you in writing by Dr. Solley, so you violated them. However, her directive was issued under section 3.7.4 of the RFP. This section authorizes a president to take "any appropriate action" after receiving the results of the administrative review. In considering the appropriate action, Dr. Solley relied on the advice of expert counsel to assess the risk of liability represented by your behavior, on your documented history of evasion of her prior efforts to protect MCCCD, and the unanimous report of the administrative evaluation team. You did not file a timely appeal or grievance seeking review of this directive.

An additional concern arose after a student brought the copying to PC's attention, complaining that you did not provide receipts for the material charges. MCCCD Administrative Regulation 1.12. states as follows:

"1.12.2 Authorization

Prior to participating in the sale of products or services, Revenue and Expenditure categories must be included in a program's budget, and approved by the Governing Board during the annual budget adoption process, or as legally changed during a fiscal year.

1.12.3 Fees

Fees exchanged for products or services produced through an educational, training, or service activity shall be pre-approved by the Governing Board."

Phoenix College determined that your course materials charge was not included in the adopted budget or pre-approved by the Governing Board. Dr. Solley therefore issued a corrective action that directed you to issue refunds to the students for the unauthorized charge. You refused, and offered no explanation or justification of your decision to the hearing committee. The hearing committee found your failure to comply with the corrective action was in violation of Administrative Regulation 6.7.1 and Administrative Regulation 6.7.3.

Therefore, for purposes of RFP Section 3.13, this letter will serve as a statement of charges that you are in violation of Administrative Regulation 6.7.1 and Administrative Regulation 6.7.3. In accordance with these regulations, disciplinary action up to and including termination is warranted. I accept the hearing committee's recommendation that you should not be dismissed from employment. However, I believe suspension without pay for a substantial time is the appropriate sanction.

Sincerely,

Rufus Glasper, Ph.D. CPA
Chancellor

BEFORE THE GOVERNING BOARD OF THE
MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

| | |
|---|---|
| MARICOPA COUNTY COMMUNITY<br>COLLEGE DISTRICT,<br><br>v.<br><br>DR. CLEOPATRIA MARTINEZ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | HEARING COMMITTEE<br><br>FINDINGS OF FACT, CONCLUSIONS<br>OF LAW, AND RECOMMENDATION |

Pursuant to the October 16, 2013 Scheduling Order, having reviewed all of the parties' pleadings and exhibits and conducting a hearing on November 18, 2013, the Hearing Committee (by majority vote) hereby submits the following Findings of Fact, Conclusions of Law and Recommendation.

## FINDINGS OF FACT

1.  After having taught mathematics full-time for ten years at Denver Community College, Dr. Cleopatria Martinez moved to Arizona and started teaching mathematics full-time at Scottsdale Community College on January 1, 1985.

2.  Dr. Martinez voluntarily transferred to Phoenix College ("PC") in 1995 and has been teaching mathematics there full-time ever since.

3.  Dr. Martinez elected to voluntarily transfer to PC because there were very few minority students attending Scottsdale Community College, and she wanted to use her bilingual education skills in the mathematics classroom to better educate the large number of minority students attending PC.

4.  Dr. Martinez was elected by her colleagues to serve as the Chairperson of the Mathematics Department of PC from 2002 to 2005.

5.  In early 2010, PC discovered that Dr. Cleopatria Martinez may have exposed MCCCD to potential liability for copyright infringement.

6.  Dr. Martinez testified that, during her twenty-eight years of teaching mathematics in the MCCCD system, she and her colleagues in the Mathematics Departments of both Scottsdale Community College and PC routinely borrowed mathematics problems from other mathematicians to use in their student handouts for educational purposes on a not for profit basis.

7.  Dr. Martinez testified, without rebuttal, that this borrowing of mathematics problems is a longstanding, widespread custom throughout the District and academia at large.

8.  Instead of requiring her mathematics students to purchase textbooks, Dr. Martinez prepared her own course materials which she called her "Lecture Notes" and distributed them to

her students.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 77:17-78:15, 106:16-108:16, 121:25-140:13, 132:16-137:25).

9.     Dr. Martinez read the Copyright Act of 1976 and believed that it authorized her to use small portions of other scholars' work under the "Fair Use" doctrine because she was using it only for classroom teaching purposes on a not for profit basis and her use of the material did not undermine the potential market for the other scholar's work.

10.     For the "Fair Use" doctrine of the Copyright Act, the "use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107.

11.     Dr. Martinez copied problems from copyright protected textbooks and inserted them into her course materials.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 106:16-108:16).

12.     Dr. Martinez, in her Basic Arithmetic (MAT082) course, copied problems directly from a copyrighted textbook entitled "Basic Mathematics" and inserted them into her "MAT 082 Basic Arithmetic Spring 2010" course materials which she distributed to students.  MCCCD Exhibit List # 20 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

13.     Dr. Martinez also copied problems directly from the Sullivan & Sullivan "Precalculus" textbook and inserted them into her "MAT182 Trigonometry Spring 2010" course materials.  MCCCD Exhibit List # 22 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

14.     Dr. Martinez did not require her students to purchase textbooks in her Spring MAT082 Course.  MCCCD Exhibit List # 18 (email from Dr. Martinez stating "I indicated in my syllabus that, instead of a published textbook, I was using lecture notes in my MAT082 class.")

15.     Dr. Martinez did not require her students to purchase textbooks in her Spring MAT182 Course.  See Dr. Martinez's hearing testimony (conceding that students were not required to purchase a textbook in her Spring 2010 MAT182 course).

16.     On or around January 12, 2010, MCCCD's Vice President of Academic Services, Ronnie Elliot, sent Dr. Martinez an email notifying her that there were alleged copyright related problems with the materials she had printed for the Fall 2009 and Spring 2010 semesters.  MCCCD Exhibit List # 23 (January 12, 2010 email).  The materials in question were packets of course materials for Dr. Martinez's MAT182 and MAT187 courses and contained mathematics problems and graphs that were taken from copyrighted textbooks.  MCCCD Exhibit List # 11 (Ronnie Elliot Declaration, ¶¶8-9); MCCCD Exhibit List # 16 (MAT182 course packet); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memorandum).

17.     Dr. Martinez used three of the four packets of "lecture notes" in the Spring of 2010 in two pre-calculus classes.  See District Exhibit 6, parts 1-3.

405881                                                          -2-

18.   The MCCCD administration, following Vice President Elliot's email, repeatedly explained its copyright concerns to Dr. Martinez and asked Dr. Martinez to remove any copyright protected mathematics problems from her materials.  See Kakar Hearing Testimony.

19.   On January 26, 2010, Vice President Elliot sent Dr. Martinez an email outlining MCCCD's concerns regarding Dr. Martinez's potential copyright infringement.   MCCCD Exhibit List # 24 (January 26, 2010 email).

20.   On January 28, 2010, MCCCD in-house-counsel Margaret McConnell discussed copyright compliance with Dr. Martinez telephonically.  MCCCD Exhibit List # 25 (January 28, 2010 email).

21.   Dr. Martinez did not benefit from the multiple MCCCD copyright information sessions noted above.

22.   PC's own expert witness, Sean Garrison, testified that under the "Fair Use" doctrine, someone could lawfully copy from a copyrighted textbook without either using or purchasing the textbook.

23.   On February 5, 2010, Vice President of Academic Affairs Casandra Kakar, Interim Vice President of Administrative Services Paul DeRose, and Dr. Martinez met to discuss Dr. Martinez's alleged misuse of copyrighted materials.  MCCCD Exhibit List # 26 (February 12, 2010 email).

24.   Dr. Martinez has not used any of the four sets of "lecture notes" since the Spring of 2010 when PC first raised its concerns regarding the notes.

25.   On April 15, 2010, PC Librarian Ann Roselle conducted a personalized one-on-one copyright training session with Dr. Martinez.  MCCCD Exhibit List # 28 (Copyright PowerPoint Presentation).  See also, Kakar Hearing Testimony.

26.   When Dr. Martinez met with the librarian, the librarian told Dr. Martinez that Dr. Martinez knew as much about copyright law as she did.  See Martinez Hearing Testimony.

27.   Following the revocation of Dr. Martinez's copying privileges, Dr. Martinez was required to submit her copy requests to Mathematics Department Chairperson Mr. Sueyoshi so that Mr. Sueyoshi could review her materials for possible copyright violations prior to copying and distribution to students.  MCCCD Exhibit List # 8 (April 2, 2010 Directive).

28.   Dr. Martinez sought and obtained a form of written permission from the publisher of the textbook, Sullivan & Sullivan's "Precalculus," to copy materials from their book after PC accused her of violating copyright law.

29.   On or around April 19, 2010, Dr. Martinez attempted to bypass the copying restrictions by having an adjunct mathematics Professor, Johnny Santellan, make 24 sets of copies of her "Lecture Notes" for distribution to her mathematics students without obtaining prior approval from the Mathematics Department Chairperson.  MCCCD Exhibit List # 12 (Sueyoshi Depo., ¶9); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 223:11-224:21).

30.    Because Dr. Martinez did not feel she was able to obtain reliable guidance regarding copyright compliance from the District, she sought advice from a private intellectual property attorney regarding the issue, Mr. Frederick Bellamy.

31.    Mr. Bellamy reviewed the first two sets of Dr. Martinez's "lecture notes" and concluded that they did not violate copyright law because they fell under the "Fair Use" doctrine.

32.    Mr. Bellamy based his conclusion that Dr. Martinez did not violate copyright law on the opinion that the portion of material that Dr. Martinez copied from the Sullivan & Sullivan Precalculus textbook was very small, that she used the copied materials exclusively for educational purposes without any profit motive, that the content of the copied material consisted of mathematics problems that are arguably not subject to copyright in the first place, and that the small portion of the textbook that are arguably not subject to copyright is not adversely impact the potential market for the textbook.

33.    At the hearing, another lawyer presiding in the area of intellectual property law, Sean Garrison, testified on behalf of PC. In contrast to Mr. Bellamy, Mr. Garrison testified at the hearing that the first three sets of Dr. Martinez's lecture notes violated copyright law.

34.    In contrast to his testimony at the hearing of November 18, 2013, in his written report Mr. Garrison concluded only that the first three sets of Dr. Martinez's lecture notes subjected the District "to a serious risk of a copyright infringement claim." See District Exhibit 6, p. 0002.

35.    MCCCD invited Dr. Martinez to a copyright workshop that was held on March 1, 2010 at PC. Dr. Martinez chose not to attend the workshop. MCCCD Exhibit List # 10 (Solley Decl., ¶11).

36.    PC President Anna Solley, on December 9, 2010, concluded that Dr. Martinez's alleged misconduct posed an unacceptable legal risk of a copyright infringement claim and imposed restrictions on Dr. Martinez's photocopying privileges. MCCCD Exhibit List # 10 (Solley Decl., ¶12).

37.    MCCCD sought a legal opinion from an outside copyright expert, attorney Sean Garrison. MCCCD Exhibit List # 10 (Solley Decl., ¶ 14); MCCCD Exhibit List # 7 (Sean Garrison October 22, 2010 Memo).

38.    According to Mr. Garrison, the third set of "lecture notes" appeared to have 13 mathematics problems copied from two other mathematics textbooks.

39.    Mr. Garrison testified that he was certain that Dr. Martinez has committed copyright infringement. See, Garrison Hearing Testimony. In reaching this conclusion, Mr. Garrison reviewed thousands of pages of material including nearly 300 pages of Dr. Martinez's lecture notes and three separate copyrighted mathematics textbooks. MCCCD Exhibit List # 6 (Sean Garrison April 19, 2013 Report), see also Garrison Hearing Testimony.

40.    In reliance upon Mr. Garrison's recommendations, PC President Anna Solley issued a December 9, 2010 directive that imposed further restrictions on Dr. Martinez's copying

-4-

privileges.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 10 (Solley Decl., ¶15).

41.   The December 9, 2010 Directive prohibited Dr. Martinez from utilizing any course materials of her own creation.  MCCCD Exhibit List # 9 (December 9, 2010 Directive). Instead, Dr. Martinez was required to only use course materials that are "approved by the mathematics department" or that are "available in the bookstore for sale to students and that are authored by persons other than [Dr. Martinez]."  MCCCD Exhibit List # 9 (December 9, 2010 Directive).

42.   The December 9, 2010 Directive further required Dr. Martinez to submit her photocopy requests to the Mathematics Department Chair for his approval.  MCCCD Exhibit List # 9 (December 9, 2010 Directive).

43.   Despite MCCCD's frequent discussions with Dr. Martinez regarding the importance of complying with copyright laws and the December 9, 2010 Directive, Dr. Martinez continued to attempt to ignore the directive.  See Kakar Hearing Testimony.

44.   At the beginning of the Fall 2012 semester (on or about August 21-23, 2012), Dr. Martinez informed her students that they were not required to purchase a course textbook and that she would provide them with her own course materials in lieu of a textbook.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

45.   In fall of 2012, Dr. Martinez sought to have her lecture notes photocopied off campus at a nearby Staples store.  This practice is inconsistent with the December 9, 2010 Directive.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

46.   Dr. Martinez did not submit her Fall 2012 materials to Mathematics Department Chairperson Mr. Sueyoshi for approval.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

47.   Dr. Martinez made copies of her course materials at an off-campus Staples store and distributed them to students for $11 per copy.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

48.   The $11 course material fee was paid directly to Dr. Martinez by students. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

49.   PC accused Dr. Martinez of violating the District's "cash handling" rules by distributing these course materials to her students if the students reimbursed her for her out-of-pocket copying costs.

50.   PC subsequently claimed that Dr. Martinez violated the District's "cash handling" policies by seeking reimbursement for the copies.

51.   MCCCD's policies prohibit instructors from having "any financial interest in or receiv[ing] compensation from the sale of any unpublished instructional materials required or

408681                                                   -5-

suggested for a class that the instructor teaches." MCCCD Exhibit List # 41 (Residential Faculty Policies, 3.2.4).).

52.    Dr. Martinez failed to follow the protocol set forth in the December 9, 2010 Directive in copying her Fall 2012 course materials.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

53.    Dr. Martinez distributed course materials directly to students in her Fall 2012 MAT151 class.  MCCCD Exhibit List # 4-5 (Martinez Depo. pp. 232:19-233:21).

54.    The MCCCD Administration learned of Dr. Martinez's unauthorized distribution of course materials to students after one of Dr. Martinez's MAT151 students complained to Mathematics Department Chairperson Mr. Sueyoshi. The student complained that Dr. Martinez refused to provide her with a receipt for the purchased course materials.  See Kakar Hearing Testimony.

55.    Upon learning that Dr. Martinez had distributed course materials to students allegedly in violation of MCCCD's cash handling policy, President Solley instructed Martinez to immediately issue refunds to her students via personal check.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

56.    On or around October 18, 2012, President Solley and Dr. Kakar met with Dr. Martinez to explain the seriousness of Dr. Martinez's alleged cash handling violation. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.  In addition, President Solley and Dr. Kakar prepared a written counseling memo dated October 18 2010 for Dr. Martinez regarding her alleged violation of cash handling rules.  Dr. Martinez was provided with a copy of the October 18, 2010 counseling notice and President Solley proceeded to explain to Dr. Martinez the seriousness of the alleged cash handling violations and the requirement that Dr. Martinez issue reimbursements to her students.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

57.    Several months later, on or around January 9, 2013, Dr. Kakar learned that most (if not all) students had not yet received refunds from the Dr. Martinez.  MCCCD Exhibit List # 39 (various emails regarding student refunds).  As a result, Dr. Kakar instructed Dr. Martinez to provide copies of refund checks by January 18, 2013.  MCCCD Exhibit List # 39 (various emails regarding student refunds).

58.    Dr. Martinez failed to produce a single refund check by the January 18, 2013 deadline. MCCCD Exhibit List # 39 (various emails regarding student refunds).

59.    Dr. Martinez did not think that she had violated any District rule in reference to the copies.  Therefore, she declined to follow the December 9, 2010 order because she believed she was not required to do so under any District rule.

60.    At the November 18, 2013 hearing, Dr. Martinez did not provide any explanation for her refusal to comply with the October 18, 2012 and January 9, 2013 directives to issue refunds to her students.  See Martinez Hearing Testimony.

61. At the hearing Dr. Martinez testified that she had made a "mistake" and, in retrospect, should have complied with President Solley's instructions. See Martinez Hearing Testimony.

62. On or around August 9, 2013, MCCCD Chancellor Rufus Glasper sent Dr. Martinez a letter informing her that MCCCD was proceeding with termination proceedings. Included with this letter was a statement of charges that summarized the particular violations Dr. Martinez had been charged with (hereinafter referred to as "Statement of Charges.") MCCCD Exhibit List # 1 (Statement of Charges).

## CONCLUSIONS

63. PC failed to carry its burden of proof relating to violation of MCCCD's cash handling rules found in MCCCD Administrative Regulations 1.17, violation of Residential Policy Manual 3.2.4 (relating to financial interests in unpublished materials), violation of U.S. Copyright Law and fair use guidelines, and violation of MCCCD Administrative Regulations 3.2.4 and 3.2.5 related to copyright regulations.

64. Notwithstanding their education, their experience, and their good faith, Mr. Bellamy and Mr. Garrison disagreed as to whether or not Dr. Martinez violated copyright law. Therefore, it is inconclusive as to whether Dr. Martinez intentionally and/or inadvertently violated federal copyright law.

65. It is inconclusive as to whether or not Dr. Martinez violated the "cash handling" policies of MCCCD.

66. Dr. Martinez willfully and intentionally failed to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley.

67. Dr. Martinez conceded that she never complied with President Solley's clear directive to issue refunds to her students. Although Dr. Martinez now regrets her decision not to comply with President Solley's directive, she has never claimed that she did not understand the instructions or that the instructions were beyond the scope of management's authority. Viewed in light of these facts, Martinez's claim that she "made a mistake" is an admission of willful insubordination.

68. By failing to comply with President Solley's directive to issue refunds to her students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.1 which prohibits the "[w]illful and intentional violation of any...MCCCD administrative regulation that affects the employee's ability to perform his or her job."

69. By failing to comply with President Solley's directive to issue refunds to students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.3 which prohibits the "[w]illful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment."

///

406661                                    -7-

## RECOMMENDATION

70.    We hereby recommend that the Governing Board deny President Selley's termination request and allow Dr. Matthies to continue her MCCCD employment.

71.    Per MCCCD Administrative Regulation 6.7 indicating that violation of any Employment Standards "constitutes grounds for disciplinary action, up to [emphasis added] and including termination," we hereby recommend that the Governing Board retain Dr. Matthies.

It is ordered so, at Mesa, Arizona, this 9th day of December, 2013.

Dr. Keith Cudnip
Chairperson
On Behalf of the Hearing Committee,
Dr. Nora Reyes and Dr. Carlos Caire

406681



# HUMAN RESOURCES

## PERSONNEL ACTION REQUEST

Record #

### EMPLOYEE INFORMATION

| Name | Scott | | SS# | | Date | 02/11/16 |
|---|---|---|---|---|---|---|

| Daytime Phone | | Message Phone | |
|---|---|---|---|

### TYPE OF ACTION REQUESTED (APPLIES TO ALL POLICY GROUPS UNLESS INDICATED)

- [ ] New Employment Regular hire
- [ ] Short Term Hire (OSO)
- [ ] Short Term Hire (OYO)
- [ ] Employee selected through Posting

- [ ] New Specially Funded Hire
- [ ] Athletic Specialist Hire
- [ ] Administrative (PS) Reassignment
- [ ] Voluntary
- [ ] Involuntary

- [ ] Administrative (FAC, MAT, M&O, SPF) reassignment
- [ ] Transfer
- [ ] Separation
- [ ] Supervisor Change: **X**

- [ ] SPF Renewals/Changes
- [ ] Temporary reassignment
- [ ] Return to to Reg. Assign
- [ ] **X** Other Suspension

Complete Department Table Change Form
www.maricopa.edu/hrweb/payroll/FormPage.html

### POSITION INFORMATION

| Position Title | | Posting # | |
|---|---|---|---|

| Grade | Calendar 9/12 Mo | 12 Month  10 Month  9.5 Month  9.0 Class  Other | Recommended Start Date |
|---|---|---|---|
| 700 | FTE: ☒ 1.00 ☐ .90 ☐ 0.80 ☐ 0.75 ☐ 0.50 ☐ 0.00 ☐ Oth | | End Date |

| College/Division | | | Supervisor Phone # |
|---|---|---|---|

| Department/Office | | Days | |
|---|---|---|---|
| Department ID | | Hours | |

### SPECIALLY FUNDED INFORMATION

| Funding Start Date | End Date | Grade | Step |
|---|---|---|---|
| Funding Source/Grant Name | | Salary | |

### SEPARATION INFORMATION

| Last Day Worked | Reason | | Separation Date |
|---|---|---|---|

### BUDGET INFORMATION

- [ ] New  [ ] Replacement  [ ] Reallocation  If replacement give name/reason

#### Budget Code(s)/Percentage (Include OGF Codes):

| Position charge to | | If Funding & FTE coming from different accounts, please identify: | | | |
|---|---|---|---|---|---|
| FRS # 1 | % | **FUNDING/FTE** | | | **DIFFERENTIAL/PAY PERIOD** |
| OGF # 1   110-100-111650-51111 | | FRS#1 OGF#2 | % | Earnings Code | Total hours |
| FRS # 2 | % | | | | |
| OGF # 2 | | FRS#2 OGF#2 | % | | |
| FRS # 3 | % | | | | |
| OGF # 3 | | POS #1 POS #2 | % | | |

### SIGNATURE/BUDGET APPROVAL

Supervisor/Committee Chair/Date

Dean/Date

College Budge Approval/Date

Budget Department/Date

College President/Authorized Designee/Date

Employee Services Representative/Date

Exhibit No. 12
Castellano
Date 2-15-16
Nicole Fallow, Reporter
MCCCD/Martinez 04901

# DISTRICT USE ONLY

| Name | Scott ▓ | | SS# ▓ | | | ▓pl ID ▓ | | |
|---|---|---|---|---|---|---|---|---|

| Action SUS | Reason DAC | Employee Class FCA | Beginning Date 03/16/16 | Ending Date 03/19/16 | Position ID ▓ | | Job Code ▓ |
|---|---|---|---|---|---|---|---|
| Grade 700 | Step 14 | Biweekly Rate $0 | | Assignment Amount | | Annual Rate | |

| Action REC | Reason REC | Employee Class FCA | Beginning Date 03/19/16 | Ending Date | Position ID ▓ | | Job Code ▓ |
|---|---|---|---|---|---|---|---|
| Grade 700 | Step 14 | Biweekly Rate ▓ | | Assignment Amount | | Annual Rate | |

| Action | Reason | Employee Class | Beginning Date | Ending Date | Position ID | | Job Code |
|---|---|---|---|---|---|---|---|
| Grade | Step | Biweekly Rate | | Assignment Amount | | Annual Rate | |

| Cal. ID | 9/12 mo | FTE | Prob. Period | | Sick Leave Payoff | Vacation Payoff? |
|---|---|---|---|---|---|---|

Sab-batical | Type | | Eligibility Date | Start

Faculty Provisional Status

ASRS: YES ☐  NO ☐

District/Agency Retirement Date:

Service Date | Protective Service Date | College

Board Date:

Sick Leave Payoff — Hours: Current, Prior, Total
Vacation Payoff? — Hours: Current, Prior, Total
Absence Reconciliation Complete
Date

Record # ⊖   Tax Multiplier

Comments:
Employee to be suspended for three 6-hour days without pay for disciplinary reasons to be served on 3/16, 3/17, and 3/18/16. Employee's return to work is 3/19/16. Please assure he receives holiday pay for 3/14 and 3/15. This suspension was requested by Chris Haines, Interim President Phoenix College, approved by Rufus Glasper and letter signed by Exec VC & Provost Maria Harper-Marinick on behalf of Chancellor Glasper. No benefits should be interrupted.

Employee is required to reimburse Phoenix College for $950 by 5/13/16.

Processed by | Date Processed
Sick Leave Current | Sick Leave Prior

Amount | Amount
Assign ID | Assign ID
Vacation Current | Vacation Prior
Amount | Amount
Assign ID | Assign ID
Tax Multiplier | Dated Processed

Adjustments

Termination Reason:

| HR Preparer | | Date |
|---|---|---|
| HR Approval | Sheri Klein  ЯК | Date 02/11/16 |

## INITIAL IN APPROPRIATE BOX

| Benefits | Budget SPF | Emp. Relations | Employment | Payroll | Personnel File | Wage/Salary |
|---|---|---|---|---|---|---|

Revised dk 7/18/00

Earnings Code

Total Hours

Position Charge to
FRS # 1                    %
OGF #1   110-100-111650-51111
FRS # 2                    %