# EXHIBIT 6

# TO

# PLAINTIFF'S STATEMENT OF FACTS

# IN SUPPORT OF

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1

MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

Maricopa County Community College )
District                          )
                                  )
        v.                        )
                                  )
Dr. Cleopatria Martinez,          )
                                  )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Tempe, Arizona
November 18, 2013
9:32 a.m.

*Miller Certified Reporting, LLC*
*Post Office Box 513*
*Litchfield Park, Arizona 85340*
*(P) 623-975-7472  (F) 623-975-7462*

(COPY)

Angela Furniss Miller, RPR
Certified Reporter  (AZ 50127)

1                HEARING, PUBLIC SESSION, BEFORE THE

2     ADMINISTRATIVE HEARING COMMITTEE OF THE MARICOPA COUNTY

3     COMMUNITY COLLEGE DISTRICT, in the matter of Cleopatria

4     Martinez, held at 9:32 a.m. on November 18, 2013, at the

5     Maricopa County Community College, 2411 West 14th

6     Street, Tempe, Arizona, in the presence of:

7                Dr. Keith J. Crudup, Chairperson

8                Dr. Nora A. Reyes

9                Dr. Carlos F. Caire

10

11     FOR THE DISTRICT:

12                Mr. Pavneet Singh Uppal, Esq.
                 Ms. Shayna Blach, Esq.
13                FISHER & PHILLIPS, LLP
                 201 East Washington Street, Suite 1450
14                Phoenix, Arizona  85004

15     FOR THE APPELLANT:

16                Mr. Steven Montoya, Esq.
                 MONTOYA, JIMENEZ & PASTOR, P.A.
17                3200 North Central Avenue, Suite 2550
                 Phoenix, Arizona  85012

18

19     ADVISOR TO THE COMMITTEE:

20                Mr. Ernest Calderon, Esq.
                 Mr. Taylor R. Bell, Esq.
21                RIDENOUR, HIENTON & LEWIS, PLLC
                 201 North Central Avenue, Suite 3300
                 Phoenix, Arizona  85004

22

23                (Note:  There are various members of the public

24     present throughout the proceedings.)

25

<u>I N D E X</u>

<u>WITNESS</u>                                                    <u>PAGE</u>

   Sean Garrison

      Direct Examination by Mr. Uppal..............26

      Cross-Examination by Mr. Montoya............83

      Redirect Examination by Mr. Uppal..........111


   Cassandra Kakar

      Direct Examination by Ms. Blach............117

      Cross-Examination by Mr. Montoya...........143

      Redirect Examination by Ms. Blach..........157


   Anna Solley

      Direct Examination by Mr. Uppal............158

      Cross-Examination by Mr. Montoya...........163


   Cleopatria Martinez

      Direct Examination by Mr. Montoya..........172

      Cross-Examination by Mr. Uppal.............227

      Further Cross-Examination by Ms. Blach......267

      Redirect Examination by Mr. Montoya........271

1                                  I N D E X

2

3     WITNESS                                              PAGE

4         Fredric D. Bellamy

5              Direct Examination by Mr. Montoya...........272

6              Cross-Examination by Mr. Uppal..............293

7              Redirect Examination by Mr. Montoya........310

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

CHAIRPERSON CRUDUP:  I convene the Administration Hearing regarding the Statement of Charges brought by the Maricopa County Community College District, which for the purposes of this hearing we will call Phoenix College against Cleopatria Martinez.

We have a court reporter present and a record will be made of this hearing.

Welcome, everyone.  We are the Hearing Committee.  I wanted to read the MCCCD charges against Dr. Cleopatria Martinez.  My name is Dr. Keith Crudup, this is Dr. Nora Reyes, and this is Dr. Carlos Caire.

Would counsel and the parties please introduce themselves starting with Phoenix College and then Dr. Martinez.

MR. UPPAL:  Good morning.  Mr. Chairman and Members of the Committee, my name is Pavneet Uppal; with me is my colleague Shayna Balch, we're from the law firm of Fisher & Phillips, and we represent the District in today's hearing.  I also want to introduce my client, President Anna Solley.  She is here with us.  She is the District representative and President of Phoenix College.

And thank you for your time and look forward to

1    this hearing.

2            MR. MONTOYA:  Good morning.  My name is Steven

3    Montoya.  I'm a lawyer here in Phoenix.  This is my

4    client, Dr. Cleopatria Martinez.  She's a professor of

5    mathematics at Phoenix College, who's worked for the

6    District for 28 years.

7            CHAIRPERSON CRUDUP:  Thank you.

8            MR. MONTOYA:  You're welcome.

9            CHAIRPERSON CRUDUP:  Are there any witnesses

10   present in the hearing room -- other than -- no other

11   witnesses?

12           We will ask witnesses who have not testified to

13   remain outside the hearing room.  Once -- once the

14   witness has testified, they may remain if we have room.

15   I don't think we have much room.  Naturally, Dr. Anna

16   Solley and Dr. Cleopatria Martinez who will be witnesses

17   are allowed to remain in the room as they are the client

18   representatives or the client herself.

19           The Hearing Committee has reviewed all the

20   exhibits, briefs, et cetera.  We ask the parties to

21   cover the major points of the case.  Since the rules of

22   evidence do not apply in administrative hearings, the

23   Hearing Committee is admitting all that has been

24   submitted into evidence to become part of the record.

25           We will now begin the case.  The Hearing

1     Committee will allow each side ten minutes each for an

2     opening statement beginning with Phoenix College and

3     then Dr. Martinez.

4           MR. UPPAL:  All right.  Members of the

5     Committee, good morning.  I want to proceed with my

6     opening statement and take you through the charges and a

7     brief summary of the evidence that you will be hearing

8     today.  This will also show, I believe, conclusively by

9     the time that you listen to all the evidence -- and

10    thank you for reviewing the materials that we have

11    submitted -- that the recommendation and the request to

12    terminate Dr. Martinez's employment should be

13    recommended by this Committee to the full Board.

14           As you hear the evidence today, I ask you to

15    keep a couple of things in mind as we launch into my

16    summary as well as the main presentation, and it's the

17    following:  This is not a court of law.  So, the

18    technical rules as you -- as Mr. Crudup -- Dr. Crudup

19    just mentioned, the rules of evidence such as --

20    generally, the rules of evidence do not apply.

21    Similarly, the sorts of things that you hear in the

22    court of law or sorts of things that you might here in a

23    TV drama such as something must be proven beyond a

24    reasonable doubt or by preponderance of the evidence,

25    those standards likewise do not apply.

1       So, what I'm going to ask this Committee is as

2   you evaluate the evidence, as you evaluate the

3   credibility of the witnesses which you will need to do,

4   as you review the documents, apply the standards of

5   common sense; because at the end of the day, this

6   Committee is not caring out the ultimate decision,

7   that's up to the Board.  This Committee is charged with

8   making a recommendation to the Board.

9       And I believe that if you apply a standard of

10  common sense, you will see that there is a mountain of

11  evidence in support of the charges, the charges as we

12  will go through basically boil down to three points,

13  which is:  One, that Dr. Martinez has violated both the

14  law and the District's rules with respect to

15  misappropriating, misusing, and plain stealing

16  copyrighted materials, that's really what we're talking

17  about.

18      Copyright involves ownership.  And here we have

19  a situation where Dr. Martinez, unfortunately,

20  misappropriated and used on her own, materials from

21  three copyrighted textbooks.  Here they are.  They look

22  like textbooks, they smell like textbooks, they feel

23  like textbooks, and when you open to the second page,

24  there is a copyright notice.  There is no doubt about

25  this issue.

1          Likewise, after you hear the evidence, I submit

2     to you that there will really be no reasonable basis to

3     dispute -- and, indeed, Dr. Martinez has never disputed

4     -- that she copied material without permission, without

5     attribution, and in violation of the copyright holder's

6     rights, and inserted them into her own materials which

7     she distributed to her class.  And it doesn't matter

8     what her reasons were behind that.  The fact is that

9     that act constitutes a violation of copyright and it

10    exposes the District to hundreds of thousands, perhaps

11    even a million dollars in damages.

12         And you will hear expert testimony on this

13    issue.

14         The second major point is that Dr. Martinez

15    then after the District took actions to address her

16    violation of copyright, it was forced to take actions

17    including imposing restrictions upon her copying

18    privileges.  Basically, an instructor normally if they

19    adhere to the rules has a right to submit requests for

20    copying to Phoenix Colleges online copy center.  Because

21    of these repeated violations, that privilege -- and it

22    is a privilege -- was restricted with respect to Dr.

23    Martinez.  In order to address her copyright violations,

24    restrictions had to be imposed upon her right to submit

25    materials to the copy center.

1        In essence, the District imposed a series of

2   restrictions after she violated copyright, after they

3   tried to explain it to her, after they tried to counsel

4   her, after she still continued to violate the copyright

5   rules, the District imposed a requirement that, in

6   essence, her materials that she wanted to use during her

7   classes had to be pre-reviewed, not for purposes of

8   interfering with her academic freedom, but simply and

9   plainly and only, for looking at the fact as to whether

10  those materials, whether or not they contained

11  copyrighted materials that are being used without

12  permission.

13       We had to do this.  There was no other

14  alternative in light of the liability situation that Dr.

15  Martinez had created.  Dr. Martinez repeatedly violated

16  those copyright restrictions -- excuse me, copying

17  restrictions.

18       Instead of submitting her materials for

19  pre-review, instead of using approved textbooks, instead

20  of having her Department Chairman review the materials

21  to make sure there was no copyright infringement, she

22  repeatedly tried to circumvent these restrictions by

23  directly printing things to the Department printer; by

24  going outside to Staples and making copies on her own,

25  all so she could avoid the review procedures that were

1    put in place to prevent the liability that she had

2    exposed the District to for copyright infringement.

3         Second major issue is as a result of her

4    copyright violations and her attempts to circumvent the

5    restrictions that were imposed upon her, her pattern of

6    conduct culminated in a situation where instead of

7    having students buy textbooks instead of having students

8    -- instead of submitting materials for pre-review for

9    the District to make sure that they didn't contain

10   copyright infringement; her behavior culminated in a

11   situation where she took materials that she wanted to

12   use in class and as the evidence will show and went to

13   Staples and made copies.  This too was an act of

14   circumvention.  She then took those materials that she

15   had copied at Staples and distributed them to her class

16   and asked her class to pay for those materials.

17        Now, I want to be very clear here.  We're not

18   claiming that she turned a profit on this; but, that's

19   not the issue.  This was, again, another act of

20   circumvention, another act to avoid the restrictions

21   that had been put in place, and in doing so she violated

22   the District cash-handling rules, which was the ultimate

23   straw that broke the camel's back.

24        You are all familiar with the cash-handling

25   rule.  It is a rule that states that unless you have

1     prior permission, you cannot sell anything to your

2     students; you cannot sell Tupperware, you can't sell

3     lottery tickets, you can't sell a novel, and you can't

4     sell course materials.  And it doesn't matter whether or

5     not your intent is to try to turn a profit, because the

6     reason for the rule is different.  The reason for the

7     rule -- I'm sure it will make common sense to you, but

8     it will also be explained through testimony, the reason

9     for the rule is that an instructor is in a position of

10    power and authority over his or her students.  So,

11    imagine a situation where you're an instructor and you

12    say, you require, you recommend, or any way imply to

13    your students that they are required or needs to in some

14    way buy materials from you and pay for them.

15          What is a student going to think?

16          I think most of you have been instructors at

17    one time or another or you might already be.  You know

18    what the student is going to think, you're in a position

19    of authority over them.  The student is going to think

20    that they have to buy these materials because if they

21    don't buy the materials they may suffer some kind of

22    detriment with respect to their grades or recommendation

23    or whatever authority the instructor holds, and they

24    will conclude that they must buy the materials.

25          CHAIRPERSON CRUDUP:  About two more minutes.

```
1            MR. UPPAL:  Thank you.
2            That is the reason why the cash-handling rule
3       is in place, it's to prevent an abuse of power.
4            So, when -- what happened here is that a
5       student came to the District and said that he had bought
6       -- or, she had bought these materials from Dr. Martinez,
7       but Dr. Martinez would not give her a receipt.  Well,
8       why?  Because common sense would tell you why.  She
9       would not give a receipt because she already knew she
10      was violating the rules.
11           So, when this was discovered, the District took
12      action to enforce this rule, and the action it took was
13      first meet with Dr. Martinez and try to counsel her as
14      it had done previously with the copyright issues.  Dr.
15      Martinez literally walked out of that meeting.  She
16      would not listen to that counseling.  Then she was
17      instructed to contact the students with respect to whom
18      she violated the cash handing rules; she did not do so.
19      So, then she was told by Dr. Solley and by Dr. Kakar
20      that she needed to issue refunds.  She still did not
21      issue refunds.  The District checked on whether or not
22      she was complying with the directive to issue refunds
23      for the materials she had sold in violation of the
24      cash-handling rule.  She did not do so.
25           In fact, a spot check of the students who were
```

1    owed this commission --

2              CHAIRPERSON CRUDUP:  Time.

3         MR. UPPAL:  If I could wrap up in 15 seconds.

4              CHAIRPERSON CRUDUP:  Okay.

5         MR. UPPAL:  -- discovered that she had not

6    issued the refunds.  So, finally, she was instructed she

7    had to produce cancelled checks and she still has not

8    done so.

9              That's why we're here, it is a pattern of

10   conduct that creates liability and is plainly

11   unacceptable.  Thank you.

12             CHAIRPERSON CRUDUP:  Thank you.

13        MR. MONTOYA:  How much time do I have?

14             CHAIRPERSON CRUDUP:  Ten minutes.

15        MR. MONTOYA:  Ten minutes.  I'll try to keep it

16   in mind.

17             The evidence is going to be clear that what my

18   friend Mr. Uppal has told you this morning is nonsense.

19   There is no copyright violation; that is ridiculous.

20   There's something called the Fair Use Doctrine.

21   Scholars since I was in college have been making copies

22   of other people's publications for class work pursuant

23   to the copyright statute without violating any law.

24             Most recently I submitted an opinion,

25   coincidentally decided on Friday of last week, in the

1   case of <u>Authors Guild versus Google</u>.  I challenge you, I

2   beg you to get on Google Book, and to plug in the book

3   that's on your desk.  You can read 90 percent of it on

4   Google Book for nothing and a federal court ruled that

5   that didn't violate the author's or the publisher's

6   copyright.

7        We have an expert who's been litigating

8   copyright cases for 25 years in the Valley.  His name is

9   Fred Bellamy.  He's reviewed all these materials and he

10  thinks that the District's allegation that Cleopatria

11  Martinez has violated the copyright law is preposterous.

12  In his words, trumped up.  She didn't violate the

13  copyright laws; that is ridiculous.

14       Read the case, get on Google Book and look for

15  yourself.  Looking at Google Book -- that makes what

16  Ms. -- Professor Martinez did infinitesimally small.

17  She didn't violate the copyright law; that is

18  ridiculous.

19       In reference to the copyright materials.

20  Everyone knows, you heard of the saying, even a dog

21  knows the difference between getting tripped on and

22  kicked.  Anyone knows the difference between selling --

23  hey, I'll sell -- I'm Starbucks, I'll sell you this cup

24  of coffee; and getting reimbursed for something:  Hey,

25  I'm going to Starbucks, you want me to pick something

1   up, you can pay me when we get back?  That's not selling

2   anything.

3        We'll read the District rules regarding selling

4   or money handling in the course of the hearing and they

5   don't even apply to the situation.

6        The materials that she actually copied, the

7   District was willing to copy them only one-by-one, like

8   one segment of the material per segment.  She offered

9   her students:  Hey, if you want to borrow mine and go

10  copy it yourself, go ahead.  You can.  If you want me to

11  copy them all at Staples, we can do that too.  She was

12  reimbursed.  Not only was she not selling something, she

13  was getting reimbursed for something and she lost money

14  on it.

15       One thing that is completely absent from the

16  Administration's case is any look at this scholar in her

17  totality.  And you're scholars, and I urge you to do

18  that, that is your obligation to do.

19       This woman worked her way based on scholarships

20  through undergraduate and through graduate school.  She

21  ultimately was awarded a Ph.D. through the University of

22  Colorado all on scholarships based upon her merit.  Her

23  mother had a third-grade education.  She grew up in the

24  projects on welfare.  She has been an educator for the

25  college -- community college district for 28 years.  No

1    student has complained about her saying that she is a

2    horrible teacher.  She loves teaching.

3            Actually, you know this, she's been with the

4    District for 28 years.  She's 65 years old.  She could

5    retire.  Collect a full pension, get another job, and

6    collect on that, too.  The reason why she hasn't done

7    that is because she loves to teach.  It would have been

8    a lot easier for her to say: Hey, listen, if you're

9    going to humiliate me this way, if you're going to beat

10   up on me this way, I'm just going to retire.  I'm going

11   to bow out.  The reason why she didn't do that is

12   because it's wrong to bow out in the face of unjustified

13   charges and it's wrong to leave your job when you love

14   your job and you deserve your job and you haven't done

15   anything wrong.

16           The last thing that I'd like to say within my

17   ten minutes is, you know, God, termination?  Even --

18   even if the District is right, does this warrant

19   termination for a scholar who's worked for the District

20   for 28 years?

21           Absolutely not.  The punishment, the sanction

22   is not to measure it with the alleged underlying

23   misconduct even if you believe the underlying

24   misconduct.  And a principle of justice which should

25   adhere in this proceeding is proportionality.

1           The District's, the Administration's proposed

2       sanction overreaches in its allegations, overreaches in

3       its misinterpretation of the applicable rules and

4       overreaches in its sanction, all the while ignoring the

5       totality of this scholar's -- of this community college

6       professor's lifetime accomplishments in 28 years serving

7       this District.  Thank you.

8           CHAIRPERSON CRUDUP:  Thank you.  Mr. Uppal, you

9       can call your first witness.

10          MR. UPPAL:  Excellent.  We're going to call our

11      expert, Sean Garrison.  Where would the Committee like

12      him to sit?  At the end of the table?

13          (Whereupon the witness enters the hearing

14      room.)

15

16          MR. UPPAL:  Mr. Lopez was out in the hall and

17      indicated he wanted to sit in as a member of the public.

18      If we can accommodate him, Mr. Chair?

19          MR. MONTOYA:  He is not one of our witness.

20          MR. UPPAL:  He is not our witness.

21          MR. MONTOYA:  But we believe he has a right to

22      be here as a member of the public and a member of the

23      District community.

24          MR. UPPAL:  We're fine with that.

25          THE WITNESS:  Where am I going?

```
 1              MS. BLACH:  Finished with the witness.
 2              MR. UPPAL:  I'd like to call my next witness.
 3              MR. MONTOYA:  Five minutes left of their whole
 4    case?  That is our view.
 5              MR. UPPAL:  I'd like to call my witness now.
 6    I'd like to call President Anna Solley.
 7
 8                   ANNA SOLLEY,
 9        called as a witness herein, having been first duly
10            sworn, was examined and testified as follows:
11
12                   DIRECT EXAMINATION
13
14    BY MR. UPPAL:
15        Q.   Good afternoon, Dr. Solley.  Could you please
16    tell the Committee what position you hold with MCCCD?
17        A.   Yes.  I'm President of Phoenix College.
18        Q.   And if there is a problem or a headache or an
19    insubordinate employee who doesn't follow the law,
20    doesn't follow directives, whose desk does it ultimately
21    land on at Phoenix College?
22        A.   It is my responsibility.  I serve as the CEO of
23    the college and I'm responsible for all the operations
24    of the institution.  So, any issue that affects an
25    employee, that affects a student, that affects budget,
```

1    any challenges that we face are ultimately my

2    responsibility.

3         Q.   So, there's this phrase, and tell me if it's

4    accurate, does the buck stop with you?

5         A.   Absolutely.

6         Q.   And if there's a headache, it's your headache?

7         A.   Absolutely.

8         Q.   So, in your own words, Dr. Solley, would you

9    please tell the Committee, face them and tell them why

10   you are recommending Dr. Cleopatria Martinez for

11   termination?

12        A.   Committee Members, I am recommending that Dr.

13   Martinez be terminated for several reasons.  One

14   certainly deals with the infringement of copyright and

15   fair use violations; in addition to that, repeated

16   attempts to not follow the Governing Board policies and

17   procedures; in addition to that, repeated attempts not

18   to follow my directives, my directions; and not just my

19   directions, but the directions and advice of our staff

20   and our faculty and her Chair; and then, of course,

21   another issue has to do with the most recent situation

22   in regards to violation of the Cash-Handling Policy.

23             And then also because we are very concerned

24   about potential liability, this morning's expert

25   witness, Sean Garrison, talked in detail about some of

1    the potential threats, not only to our college but he

2    gave examples of previous situations where there had

3    been losses and we're very concerned about that because

4    we do have limited resources.  We're good stewards of

5    the public resources and we want to ensure that those

6    resources are deployed for the right purpose, to promote

7    and support student's success, to promote and support

8    teaching and learning, and not to put us in the

9    defensive posture of defending a very expensive

10   lawsuits.

11        Q.   So, if a lawsuit had resulted as a result of

12   Dr. Martinez's copyright violations or her attempts to

13   evade the limitations that were placed on her, as a

14   result of those copyright violations all that money and

15   all those damages that Mr. Garrison testified about,

16   where would that money come from?  Who would pay the

17   attorney's fees?  Who would pay the damages?

18        A.   Those funds would come from my college.  And we

19   are experiencing some budget challenges, not just my

20   college but in the system.  We have lost some

21   considerable funding from the State, and as a result of

22   that, that would mean that rather than hiring faculty

23   and staff or providing support for very specific

24   programs that would support student success, we would

25   have to use those resources in turn to defend our

1    colleagues against these lawsuits.

2         Q.   So, instead of spending the money for students,

3    you have to spend it fighting a lawsuit?

4         A.   That is correct.

5         Q.   And what about with respect to the complaints

6    that you've received from students that they couldn't

7    even get receipts from Dr. Martinez after she sold them

8    packets of materials, how does that impact your request

9    for termination?

10        A.   That is an indication of willful and

11   intentional behavior on behalf of Dr. Martinez, because

12   it demonstrates that she is not willing to follow

13   directives, she was not willing to follow instructions.

14   And we have been working with Dr. Martinez for the last

15   four years.  We've met with her, we've counselled her,

16   we've advised her.

17             And, again, the latest indication is that she's

18   not going to change her behavior and she's going to put

19   us in a very precarious situation and it's really

20   beginning to affect students.  And if anybody knows

21   anything about me, I stand for -- I'm a person of

22   integrity; I stand for excellence.  I want our students

23   to have the best because they deserve the best.

24             CHAIRPERSON CRUDUP:  Okay.  One last question.

25             MR. UPPAL:  Okay.  If the Committee would

1     indulge me, I would like one final question.

2          MR. MONTOYA:  What about my turn?

3          MR. UPPAL:  I said one final question, Mr.

4     Montoya.

5          CHAIRPERSON CRUDUP:  One question.

6     Q.   BY MR. UPPAL:  Do you have any final comment

7     that you would like to make to the Committee with

8     respect to your level of trust in Ms. Martinez [sic] and

9     what you would like the Committee to do or not do?

10         MR. MONTOYA:  Object to him asking an

11    open-ended question when his time is already expired.

12    And he's been repeatedly warned by the Committee that

13    you are going to hold him to his time so that he would

14    expend it wisely.

15         MR. UPPAL:  Mr. Chairperson, how many minutes

16    has Mr. Montoya used making speeches and objections,

17    these same objections over and over and over.  That time

18    should come back to me.

19         MR. MONTOYA:  If he wouldn't completely --

20         CHAIRPERSON CRUDUP:  Just one minute.

21         MR. MONTOYA:  -- do the same thing over and

22    over --

23         MR. UPPAL:  One question.  One minute.

24         MR. MONTOYA:  -- I wouldn't have to do that.

25         CHAIRPERSON CRUDUP:  You may proceed.

1       Q.   BY MR. UPPAL:   So the question was, which the

2   Committee Chairperson has just allowed you to answer is:

3   Could you please tell the Committee in your own words

4   what level of trust you have in Dr. Martinez to follow

5   the law, follow the directives, follow orders that you

6   have received [sic], and what you would like -- or what

7   your request is of the Committee in this matter?

8       A.   I do not trust that Dr. Martinez would comply

9   with our directive; I do not trust that she will follow

10  the law; I do not trust she will abide by Governing

11  Board policies and procedures.   I respectfully request

12  that the Committee recommend to our Chancellor -- or,

13  the Governing Board, excuse me, termination as per my

14  request, my recommendation.

15          CHAIRPERSON CRUDUP:   Okay.   Thank you.

16

17                       CROSS-EXAMINATION

18

19  BY MR. MONTOYA:

20      Q.   You believe that Professor Martinez violated

21  copyright law, right?

22      A.   Yes.

23      Q.   But that's not your independent conclusion, is

24  it?  Because you're not a copyright law expert, right?

25      A.   It is not my independent conclusion but we did