# EXHIBIT 23

MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT


Maricopa County Community College  )
District                           )
                                   )
          v.                       )
                                   )
Dr. Cleopatria Martinez,           )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Tempe, Arizona
November 18, 2013
9:32 a.m.


*Miller Certified Reporting, LLC*
*Post Office Box 513*
*Litchfield Park, Arizona 85340*
*(P)623-975-7472 (F)623-975-7462*


(COPY)

Angela Furniss Miller, RPR
Certified Reporter  (AZ 50127)

MCCCD/Martinez 03451

1              HEARING, PUBLIC SESSION, BEFORE THE

2    ADMINISTRATIVE HEARING COMMITTEE OF THE MARICOPA COUNTY

3    COMMUNITY COLLEGE DISTRICT, in the matter of Cleopatria

4    Martinez, held at 9:32 a.m. on November 18, 2013, at the

5    Maricopa County Community College, 2411 West 14th

6    Street, Tempe, Arizona, in the presence of:

7              Dr. Keith J. Crudup, Chairperson

8              Dr. Nora A. Reyes

9              Dr. Carlos F. Caire

10

11   FOR THE DISTRICT:

12             Mr. Pavneet Singh Uppal, Esq.
             Ms. Shayna Blach, Esq.
13           FISHER & PHILLIPS, LLP
             201 East Washington Street, Suite 1450
14           Phoenix, Arizona  85004

15   FOR THE APPELLANT:

16             Mr. Steven Montoya, Esq.
             MONTOYA, JIMENEZ & PASTOR, P.A.
17           3200 North Central Avenue, Suite 2550
             Phoenix, Arizona  85012

18

19   ADVISOR TO THE COMMITTEE:

20             Mr. Ernest Calderon, Esq.
             Mr. Taylor R. Bell, Esq.
21           RIDENOUR, HIENTON & LEWIS, PLLC
             201 North Central Avenue, Suite 3300
22           Phoenix, Arizona  85004

23             (Note:  There are various members of the public

24   present throughout the proceedings.)

25

MCCCD/Martinez 03452

3

I N D E X

WITNESS                                                        PAGE

    Sean Garrison

        Direct Examination by Mr. Uppal..............26

        Cross-Examination by Mr. Montoya............83

        Redirect Examination by Mr. Uppal..........111


    Cassandra Kakar

        Direct Examination by Ms. Blach............117

        Cross-Examination by Mr. Montoya...........143

        Redirect Examination by Ms. Blach..........157


    Anna Solley

        Direct Examination by Mr. Uppal............158

        Cross-Examination by Mr. Montoya...........163


    Cleopatria Martinez

        Direct Examination by Mr. Montoya..........172

        Cross-Examination by Mr. Uppal.............227

        Further Cross-Examination by Ms. Blach......267

        Redirect Examination by Mr. Montoya........271

MCCCD/Martinez 03453

4

1                            I N D E X

2

3      WITNESS                                           PAGE

4          Fredric D. Bellamy

5              Direct Examination by Mr. Montoya...........272

6              Cross-Examination by Mr. Uppal.............293

7              Redirect Examination by Mr. Montoya........310

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MCCCD/Martinez 03454

5

1                            I N D E X

2

3            (NOTE:  Pursuant to order of the Committee,
    all exhibits marked for identification are received into
4   evidence; Page 13, Line 23.)
             (NOTE:  MCCCD Exhibits 44, 45, and 46 are not
5   attached and are retained by Mr. Calderon, Advisor to
    the Hearing Committee.)

6

7   EXHIBIT   DESCRIPTION

8   MCCCD

9      1      August 9, 2013 Letter, Intent to Dismiss

10     2      March 20, 2013 Notice of Pre-Disciplinary
              Conference
11
       3      October 18, 2012 Counseling Notice
12
       4      Dr. Cleopatria Martinez Deposition Transcript,
13            Vol. 1

14     5      Dr. Cleopatria Martinez Deposition Transcript,
              Vol. 2
15
       6      April 19, 2013 Sean Garrison Expert Report &
16            Exhibits

17     7      October 29, 2010 Sean Garrison Memo

18     8      April 2, 2010 Directive

19     9      December 9, 2010 Directive

20     10     Anna Solley Declaration

21     11     Ronnie Elliot Declaration

22     12     Joe Sueyoshi Declaration

23     13     James Sousa Declaration

24     14     Wilbert Nelson Declaration

25     15     Dr. Martinez's MAT 082 Lecture Notes

MCCCD/Martinez 03455

1                         I N D E X

2       EXHIBIT   DESCRIPTION

3       MCCCD

4         16      Dr. Martinez's MAT 182 Fall 2009 Lecture Notes

5         17      Dr. Martinez's MAT 182 Spring 2010 Lecture
                  Notes

6
          18      October 15, 2010 E-mail Correspondence
7
          19      Excerpts from Charles P. McKeauge Basic
8                 Mathematics Textbook

9         20      Excerpted Comparison Between Charles P.
                  McKeauge Basic Mathematics Textbook and Dr.
10                Martinez's MAT 082 Lecture Notes

11        21      Excerpts from Sullivan & Sullivan Precalculus
                  Textbook
12
          22      Excerpted Comparison between Sullivan &
13                Sullivan Precalculus Textbook and Dr.
                  Martinez's MAT 182 Lecture Notes
14
          23      January 12, 2010 E-mail to Dr. Martinez
15
          24      January 26, 2010 E-mail
16
          25      January 28, 2010 E-mail
17
          26      February 12, 2010 E-mail
18
          27      October 12, 2010 Letter from Dr. Solley to Dr.
19                Martinez Summarizing Chronology of Events

20        28      MCCCD Copyright PowerPoint Training
                  Presentation
21
          29      Dr. Martinez's Responses to MCCCD's Requests
22                for Production of Documents Regarding Receipts

23        30      May 31, 1995 Correspondence regarding Transfer
                  to Phoenix College
24
          31      Dr. Martinez's Employee Profile
25
          32      Arizona State Retirement Fact Sheet

MCCCD/Martinez 03456

I N D E X

EXHIBIT   DESCRIPTION

MCCCD

33        November 29, 2011 Letter to Dr. Martinez

34        September 17, 2012 E-mail correspondence
          between Dr. Martinez and Tim Bryan

35        November 28, 2012 E-mail to Dr. Martinez's
          Students Regarding Refunds

36        December11, 2012 Student Complaint

37        December 11, 2012 E-mail to Dr. Martinez
          Regarding Student Complaints

38        December 13, 2012 E-mail to Dr. Martinez

39        Various E-mails Regarding Student Refunds

40        E-mail Regarding Tim Bryan Materials

41        2012/2013 MCCCD Faculty Policy Manual

42        2011 MCCCD Blue Book

43        Printouts from ratemyprofessor.com

44        Precalculus: Concepts Through Functions,
          Instructor's Edition, by Sullivan & Sullivan

45        Basic Mathematics, by Charles McKeauge

46        Bound Tim Bryan Materials Sold to Students

EXHIBIT   DESCRIPTION

APPELLANT

1         3.4 Trigonometry Identities

2         18 Basic Graphs and Conics

3         Math 187 Fall 2010 Pre-Calculus (Algebra)
          Outline

4         Math 182 Spring 2010 Plane Trigonometry Outline

1                              I N D E X

2        EXHIBIT   DESCRIPTION

3        APPELLANT

4          5        MAT187 Test 1, 1.1-1.10

5          6        Domain and Range of Graphs

6          7        Homework for Transformations

7          8        Inverse Trigonometric Functions

8          9        Calculus I 20, Basic Integration Formulas

9         10        Tim Bryan's Intermediate Algebra Outline for
                    Syllabus Spring 2011

10        11        Chapter 2 Fractions Test for MAT 082

11
          12        Attached A Regarding Violations to Academic
12                  Freedom

13        13        February 7, 2011, Tom Adamson's E-mail
                    regarding Scholarships from Math Department
14
          14        August 21, 2011 E-mail from Dr. Martinez to Joe
15                  Sueyoshi regarding Request Copies of my Fall
                    2011 Schedule
16
          15        September 21, 2010 E-mail from Dr. Kakar to Dr.
17                  Martinez regarding Print Request

18        16        September 22, 2011 E-mail from Dr. Martinez to
                    Joe Sueyoshi Regarding Lecture Notes
19
          17        April 4, 2012 E-mail from Dr. Martinez to Dr.
20                  Kakar regarding Request for Permission to
                    Develop Materials
21
          18        December 16, 2010 Letter to Dr. Martinez from
22                  Mr. Bellamy

23        19        Professional Biography of Fredric Bellamy

24        20        Staples Receipt dated April 2, 2013

25        21        December 13, 2012 E-mail from Lee Combs to Dr.
                    Martinez Regarding $11 Refund

MCCCD/Martinez 03458

1                            I N D E X

2       EXHIBIT   DESCRIPTION

3       APPELLANT

4          22        August 23, 2010 E-mail from Estelle Simpson to
                     Dr. Martinez Regarding Substitution of my
5                    Problems

6          23        September 13, 2011 E-mail from Joe Sueyoshi to
                     Dr. Martinez Regarding Latest Copy Request
7
           24        September 16, 2011 E-mail from Dr. Kakar to Dr.
8                    Martinez regarding Latest Copy Request

9          25        April 8, 2010 E-mail from Lee Combs to Maggie
                     McConnell Regarding Conversation Today
10
           26        April 13, 2010 E-mail from Dr. Martinex to Dr.
11                   Solley Regarding Request for Meeting with Dr.
                     Solley
12
           27        September 22, 2011 E-mail from Dr. Kakar to Dr.
13                   Martinez Regarding Informal Grievance

14         28        February 7, 2011 E-mail from Dr. Kakar to Dr.
                     Martinez regarding Vocabulary Notes
15
           29        Summary of Trigonometry Identities
16
           30        Geometry Summary
17
           31        February 7, 2011 Permission to Use Handouts
18                   Signed by Elena Sung

19         32        April 15 10.3 Problems 1-8 and 19-27, odd

20         33        Description of Professor Martinez's Notes

21         34        September 1, 2011 E-mail from Dr. Martinez to
                     Amalia Valley Villegas Regarding Request Copies
22                   of My Fall 2011 Schedule

23         35        January 7, 2011 E-mail from Dr. Martinez to Dr.
                     Solley regarding Electronic Copy of Dec 9, 2010
24                   letter

25         36        January 11, 2011 E-mail from David Munoz to Dr.
                     Martinez Regarding Acknowledgment of Receipt

MCCCD/Martinez 03459

I N D E X

EXHIBIT   DESCRIPTION

APPELLANT

37      January 11, 2011 E-mail to Dr. Martinez
        Regarding Pay.Gov Payment Confirmation

38      January 11, 2011 E-mail from Melissa Sailors
        to Lee Combs Regarding Previous Request for
        Information Re: Cleopatria Martinez

39      January 15, 2011 E-mail from Dr. Solley to Dr.
        Martinez Regarding Electronic Copy of Dec 9,
        2010 Letter

40      January 18, 2011 E-mail from Dr. Solley to Dr.
        Martinez Regarding MAT 120 Outline for Spring
        2011

41      February 3, 2011 E-mail from Dr. Solley to Dr.
        Martinez Regarding December 9, 2010 Directive

42      February 8, 2011 E-mail from Dr. Solley to Dr.
        Martinez Regarding Copy Request:  MAT 120
        Homework Outline for Syllabus

43      February 14, 2011 E-mail from Dr. Solley to Dr.
        Martinez Regarding Tests for M120

44      February 17, 2011 E-mail from Dr. Solley to Dr.
        Martinez Regarding Meeting Request

45      February 18, 2011 E-mail from Dr. Martinez to
        Dr. Solley Regarding Meeting Request

46      February 17, 2011 E-mail from Dr. Solley to Dr.
        Martinez Regarding Meeting Request

47      January 27, 2011 E-mail from Dr. Martinez to
        Dr. Solley Regarding December 9, 2010 Directive

48      February 4, 2011 E-mail from Dr. Solley to Dr.
        Martinez Regarding Copy Request: MAT 120
        Homework Outline for Syllabus

49      April 4, 2011 E-mail from Joe Sueyoshi to Dr.
        Martinez Regarding Copy Calc Ch 3 Test

MCCCD/Martinez 03460

1                              I N D E X

2        EXHIBIT   DESCRIPTION

3        APPELLANT

4        50          April 4, 2011 E-mail from Joe Sueyoshi to Dr.
                     Martinez Regarding Copy Calc Ch 3 Test
5
         51          April 5, 2011 E-mail from Joe Sueyoshi to Dr.
6                    Martinez Regarding Copy Calc Ch 3 Test

7        52          April 7, 2011 E-mail from Dr. Martinez to Joe
                     Sueyoshi Regarding Copy Calc Ch 3 Test
8
         53          April 11, 2011 E-mail from Dr. Martinez to
9                    Wilbert Nelson Regarding Textbook Required?

10       54          September 20, 2011 E-mail from Dr. Martinez to
                     Karen Lee Regarding Request Permission to Copy
11                   My Lecture Notes

12       55          April 2, 2012 E-mail from Dr. Kakar to Dr.
                     Martinez Regarding Exam with Graph
13
         56          October 12, 2011 E-mail from Dr. Kakar to Dr.
14                   Martinez Regarding Copy Request:  Trig
                     Identities
15
         57          September 11, 2013 E-mail from Lee Combs to the
16                   Hearing Committee

17

18

19

20

21

22

23

24

25

MCCCD/Martinez 03461

P R O C E E D I N G S

CHAIRPERSON CRUDUP:  I convene the
Administration Hearing regarding the Statement of
Charges brought by the Maricopa County Community College
District, which for the purposes of this hearing we will
call Phoenix College against Cleopatria Martinez.

We have a court reporter present and a record
will be made of this hearing.

Welcome, everyone.  We are the Hearing
Committee.  I wanted to read the MCCCD charges against
Dr. Cleopatria Martinez.  My name is Dr. Keith Crudup,
this is Dr. Nora Reyes, and this is Dr. Carlos Caire.

Would counsel and the parties please introduce
themselves starting with Phoenix College and then Dr.
Martinez.

MR. UPPAL:  Good morning.  Mr. Chairman and
Members of the Committee, my name is Pavneet Uppal; with
me is my colleague Shayna Balch, we're from the law firm
of Fisher & Phillips, and we represent the District in
today's hearing.  I also want to introduce my client,
President Anna Solley.  She is here with us.  She is the
District representative and President of Phoenix
College.

And thank you for your time and look forward to

MCCCD/Martinez 03462

13

1    this hearing.

2              MR. MONTOYA:  Good morning.  My name is Steven

3    Montoya.  I'm a lawyer here in Phoenix.  This is my

4    client, Dr. Cleopatria Martinez.  She's a professor of

5    mathematics at Phoenix College, who's worked for the

6    District for 28 years.

7              CHAIRPERSON CRUDUP:  Thank you.

8              MR. MONTOYA:  You're welcome.

9              CHAIRPERSON CRUDUP:  Are there any witnesses

10   present in the hearing room -- other than -- no other

11   witnesses?

12             We will ask witnesses who have not testified to

13   remain outside the hearing room.  Once -- once the

14   witness has testified, they may remain if we have room.

15   I don't think we have much room.  Naturally, Dr. Anna

16   Solley and Dr. Cleopatria Martinez who will be witnesses

17   are allowed to remain in the room as they are the client

18   representatives or the client herself.

19             The Hearing Committee has reviewed all the

20   exhibits, briefs, et cetera.  We ask the parties to

21   cover the major points of the case.  Since the rules of

22   evidence do not apply in administrative hearings, the

23   Hearing Committee is admitting all that has been

24   submitted into evidence to become part of the record.

25             We will now begin the case.  The Hearing

MCCCD/Martinez 03463

1      Committee will allow each side ten minutes each for an

2      opening statement beginning with Phoenix College and

3      then Dr. Martinez.

4               MR. UPPAL:  All right.  Members of the

5      Committee, good morning.  I want to proceed with my

6      opening statement and take you through the charges and a

7      brief summary of the evidence that you will be hearing

8      today.  This will also show, I believe, conclusively by

9      the time that you listen to all the evidence -- and

10     thank you for reviewing the materials that we have

11     submitted -- that the recommendation and the request to

12     terminate Dr. Martinez's employment should be

13     recommended by this Committee to the full Board.

14               As you hear the evidence today, I ask you to

15     keep a couple of things in mind as we launch into my

16     summary as well as the main presentation, and it's the

17     following:  This is not a court of law.  So, the

18     technical rules as you -- as Mr. Crudup -- Dr. Crudup

19     just mentioned, the rules of evidence such as --

20     generally, the rules of evidence do not apply.

21     Similarly, the sorts of things that you hear in the

22     court of law or sorts of things that you might here in a

23     TV drama such as something must be proven beyond a

24     reasonable doubt or by preponderance of the evidence,

25     those standards likewise do not apply.

MCCCD/Martinez 03464

1    So, what I'm going to ask this Committee is as

2    you evaluate the evidence, as you evaluate the

3    credibility of the witnesses which you will need to do,

4    as you review the documents, apply the standards of

5    common sense; because at the end of the day, this

6    Committee is not caring out the ultimate decision,

7    that's up to the Board.  This Committee is charged with

8    making a recommendation to the Board.

9    And I believe that if you apply a standard of

10   common sense, you will see that there is a mountain of

11   evidence in support of the charges, the charges as we

12   will go through basically boil down to three points,

13   which is:  One, that Dr. Martinez has violated both the

14   law and the District's rules with respect to

15   misappropriating, misusing, and plain stealing

16   copyrighted materials, that's really what we're talking

17   about.

18   Copyright involves ownership.  And here we have

19   a situation where Dr. Martinez, unfortunately,

20   misappropriated and used on her own, materials from

21   three copyrighted textbooks.  Here they are.  They look

22   like textbooks, they smell like textbooks, they feel

23   like textbooks, and when you open to the second page,

24   there is a copyright notice.  There is no doubt about

25   this issue.

MCCCD/Martinez 03465

1          Likewise, after you hear the evidence, I submit

2     to you that there will really be no reasonable basis to

3     dispute -- and, indeed, Dr. Martinez has never disputed

4     -- that she copied material without permission, without

5     attribution, and in violation of the copyright holder's

6     rights, and inserted them into her own materials which

7     she distributed to her class.  And it doesn't matter

8     what her reasons were behind that.  The fact is that

9     that act constitutes a violation of copyright and it

10    exposes the District to hundreds of thousands, perhaps

11    even a million dollars in damages.

12          And you will hear expert testimony on this

13    issue.

14          The second major point is that Dr. Martinez

15    then after the District took actions to address her

16    violation of copyright, it was forced to take actions

17    including imposing restrictions upon her copying

18    privileges.  Basically, an instructor normally if they

19    adhere to the rules has a right to submit requests for

20    copying to Phoenix Colleges online copy center.  Because

21    of these repeated violations, that privilege -- and it

22    is a privilege -- was restricted with respect to Dr.

23    Martinez.  In order to address her copyright violations,

24    restrictions had to be imposed upon her right to submit

25    materials to the copy center.

Miller Certified Reporting, LLC

MCCCD/Martinez 03466

1          In essence, the District imposed a series of

2     restrictions after she violated copyright, after they

3     tried to explain it to her, after they tried to counsel

4     her, after she still continued to violate the copyright

5     rules, the District imposed a requirement that, in

6     essence, her materials that she wanted to use during her

7     classes had to be pre-reviewed, not for purposes of

8     interfering with her academic freedom, but simply and

9     plainly and only, for looking at the fact as to whether

10    those materials, whether or not they contained

11    copyrighted materials that are being used without

12    permission.

13         We had to do this.  There was no other

14    alternative in light of the liability situation that Dr.

15    Martinez had created.  Dr. Martinez repeatedly violated

16    those copyright restrictions -- excuse me, copying

17    restrictions.

18         Instead of submitting her materials for

19    pre-review, instead of using approved textbooks, instead

20    of having her Department Chairman review the materials

21    to make sure there was no copyright infringement, she

22    repeatedly tried to circumvent these restrictions by

23    directly printing things to the Department printer; by

24    going outside to Staples and making copies on her own,

25    all so she could avoid the review procedures that were

MCCCD/Martinez 03467

1    put in place to prevent the liability that she had

2    exposed the District to for copyright infringement.

3           Second major issue is as a result of her

4    copyright violations and her attempts to circumvent the

5    restrictions that were imposed upon her, her pattern of

6    conduct culminated in a situation where instead of

7    having students buy textbooks instead of having students

8    -- instead of submitting materials for pre-review for

9    the District to make sure that they didn't contain

10   copyright infringement; her behavior culminated in a

11   situation where she took materials that she wanted to

12   use in class and as the evidence will show and went to

13   Staples and made copies.  This too was an act of

14   circumvention.  She then took those materials that she

15   had copied at Staples and distributed them to her class

16   and asked her class to pay for those materials.

17          Now, I want to be very clear here.  We're not

18   claiming that she turned a profit on this; but, that's

19   not the issue.  This was, again, another act of

20   circumvention, another act to avoid the restrictions

21   that had been put in place, and in doing so she violated

22   the District cash-handling rules, which was the ultimate

23   straw that broke the camel's back.

24          You are all familiar with the cash-handling

25   rule.  It is a rule that states that unless you have

MCCCD/Martinez 03468

1    prior permission, you cannot sell anything to your

2    students; you cannot sell Tupperware, you can't sell

3    lottery tickets, you can't sell a novel, and you can't

4    sell course materials.  And it doesn't matter whether or

5    not your intent is to try to turn a profit, because the

6    reason for the rule is different.  The reason for the

7    rule -- I'm sure it will make common sense to you, but

8    it will also be explained through testimony, the reason

9    for the rule is that an instructor is in a position of

10   power and authority over his or her students.  So,

11   imagine a situation where you're an instructor and you

12   say, you require, you recommend, or any way imply to

13   your students that they are required or needs to in some

14   way buy materials from you and pay for them.

15           What is a student going to think?

16           I think most of you have been instructors at

17   one time or another or you might already be.  You know

18   what the student is going to think, you're in a position

19   of authority over them.  The student is going to think

20   that they have to buy these materials because if they

21   don't buy the materials they may suffer some kind of

22   detriment with respect to their grades or recommendation

23   or whatever authority the instructor holds, and they

24   will conclude that they must buy the materials.

25           CHAIRPERSON CRUDUP:  About two more minutes.

MCCCD/Martinez 03469

1          MR. UPPAL:  Thank you.

2          That is the reason why the cash-handling rule

3    is in place, it's to prevent an abuse of power.

4          So, when -- what happened here is that a

5    student came to the District and said that he had bought

6    -- or, she had bought these materials from Dr. Martinez,

7    but Dr. Martinez would not give her a receipt.  Well,

8    why?  Because common sense would tell you why.  She

9    would not give a receipt because she already knew she

10   was violating the rules.

11         So, when this was discovered, the District took

12   action to enforce this rule, and the action it took was

13   first meet with Dr. Martinez and try to counsel her as

14   it had done previously with the copyright issues.  Dr.

15   Martinez literally walked out of that meeting.  She

16   would not listen to that counseling.  Then she was

17   instructed to contact the students with respect to whom

18   she violated the cash handing rules; she did not do so.

19   So, then she was told by Dr. Solley and by Dr. Kakar

20   that she needed to issue refunds.  She still did not

21   issue refunds.  The District checked on whether or not

22   she was complying with the directive to issue refunds

23   for the materials she had sold in violation of the

24   cash-handling rule.  She did not do so.

25         In fact, a spot check of the students who were

MCCCD/Martinez 03470

1    owed this commission --

2              CHAIRPERSON CRUDUP:  Time.

3              MR. UPPAL:  If I could wrap up in 15 seconds.

4              CHAIRPERSON CRUDUP:  Okay.

5              MR. UPPAL:  -- discovered that she had not

6    issued the refunds.  So, finally, she was instructed she

7    had to produce cancelled checks and she still has not

8    done so.

9              That's why we're here, it is a pattern of

10   conduct that creates liability and is plainly

11   unacceptable.  Thank you.

12             CHAIRPERSON CRUDUP:  Thank you.

13             MR. MONTOYA:  How much time do I have?

14             CHAIRPERSON CRUDUP:  Ten minutes.

15             MR. MONTOYA:  Ten minutes.  I'll try to keep it

16   in mind.

17             The evidence is going to be clear that what my

18   friend Mr. Uppal has told you this morning is nonsense.

19   There is no copyright violation; that is ridiculous.

20   There's something called the Fair Use Doctrine.

21   Scholars since I was in college have been making copies

22   of other people's publications for class work pursuant

23   to the copyright statute without violating any law.

24             Most recently I submitted an opinion,

25   coincidentally decided on Friday of last week, in the

1    case of Authors Guild versus Google.   I challenge you, I

2    beg you to get on Google Book, and to plug in the book

3    that's on your desk.   You can read 90 percent of it on

4    Google Book for nothing and a federal court ruled that

5    that didn't violate the author's or the publisher's

6    copyright.

7              We have an expert who's been litigating

8    copyright cases for 25 years in the Valley.   His name is

9    Fred Bellamy.   He's reviewed all these materials and he

10   thinks that the District's allegation that Cleopatria

11   Martinez has violated the copyright law is preposterous.

12   In his words, trumped up.   She didn't violate the

13   copyright laws; that is ridiculous.

14             Read the case, get on Google Book and look for

15   yourself.   Looking at Google Book -- that makes what

16   Ms. -- Professor Martinez did infinitesimally small.

17   She didn't violate the copyright law; that is

18   ridiculous.

19             In reference to the copyright materials.

20   Everyone knows, you heard of the saying, even a dog

21   knows the difference between getting tripped on and

22   kicked.   Anyone knows the difference between selling --

23   hey, I'll sell -- I'm Starbucks, I'll sell you this cup

24   of coffee; and getting reimbursed for something:   Hey,

25   I'm going to Starbucks, you want me to pick something

MCCCD/Martinez 03472

1    up, you can pay me when we get back?  That's not selling

2    anything.

3         We'll read the District rules regarding selling

4    or money handling in the course of the hearing and they

5    don't even apply to the situation.

6         The materials that she actually copied, the

7    District was willing to copy them only one-by-one, like

8    one segment of the material per segment.  She offered

9    her students:  Hey, if you want to borrow mine and go

10   copy it yourself, go ahead.  You can.  If you want me to

11   copy them all at Staples, we can do that too.  She was

12   reimbursed.  Not only was she not selling something, she

13   was getting reimbursed for something and she lost money

14   on it.

15        One thing that is completely absent from the

16   Administration's case is any look at this scholar in her

17   totality.  And you're scholars, and I urge you to do

18   that, that is your obligation to do.

19        This woman worked her way based on scholarships

20   through undergraduate and through graduate school.  She

21   ultimately was awarded a Ph.D. through the University of

22   Colorado all on scholarships based upon her merit.  Her

23   mother had a third-grade education.  She grew up in the

24   projects on welfare.  She has been an educator for the

25   college -- community college district for 28 years.  No

MCCCD/Martinez 03473

```
 1    student has complained about her saying that she is a
 2    horrible teacher.  She loves teaching.
 3              Actually, you know this, she's been with the
 4    District for 28 years.  She's 65 years old.  She could
 5    retire.  Collect a full pension, get another job, and
 6    collect on that, too.  The reason why she hasn't done
 7    that is because she loves to teach.  It would have been
 8    a lot easier for her to say:  Hey, listen, if you're
 9    going to humiliate me this way, if you're going to beat
10    up on me this way, I'm just going to retire.  I'm going
11    to bow out.  The reason why she didn't do that is
12    because it's wrong to bow out in the face of unjustified
13    charges and it's wrong to leave your job when you love
14    your job and you deserve your job and you haven't done
15    anything wrong.
16              The last thing that I'd like to say within my
17    ten minutes is, you know, God, termination?  Even --
18    even if the District is right, does this warrant
19    termination for a scholar who's worked for the District
20    for 28 years?
21              Absolutely not.  The punishment, the sanction
22    is not to measure it with the alleged underlying
23    misconduct even if you believe the underlying
24    misconduct.  And a principle of justice which should
25    adhere in this proceeding is proportionality.
```

MCCCD/Martinez 03474

1          The District's, the Administration's proposed

2     sanction overreaches in its allegations, overreaches in

3     its misinterpretation of the applicable rules and

4     overreaches in its sanction, all the while ignoring the

5     totality of this scholar's -- of this community college

6     professor's lifetime accomplishments in 28 years serving

7     this District.  Thank you.

8          CHAIRPERSON CRUDUP:  Thank you.  Mr. Uppal, you

9     can call your first witness.

10          MR. UPPAL:  Excellent.  We're going to call our

11     expert, Sean Garrison.  Where would the Committee like

12     him to sit?  At the end of the table?

13          (Whereupon the witness enters the hearing

14     room.)

15

16          MR. UPPAL:  Mr. Lopez was out in the hall and

17     indicated he wanted to sit in as a member of the public.

18     If we can accommodate him, Mr. Chair?

19          MR. MONTOYA:  He is not one of our witness.

20          MR. UPPAL:  He is not our witness.

21          MR. MONTOYA:  But we believe he has a right to

22     be here as a member of the public and a member of the

23     District community.

24          MR. UPPAL:  We're fine with that.

25          THE WITNESS:  Where am I going?

MCCCD/Martinez 03475

1          MR. UPPAL:  You're going right there, Mr.

2     Garrison.

3          Dr. Martinez, I have a request of you.  You're

4     fine where you are, but there's a PowerPoint slide right

5     behind you so if you could not shift this way, that

6     would be much appreciated.

7          All right.  May we continue?

8          CHAIRPERSON CRUDUP:  Yes.

9          MR. UPPAL:  All right.  Sir, would you please

10     state your name?

11          THE WITNESS:  Sean Garrison.

12          MR. UPPAL:  And would you please --

13          THE COURT REPORTER:  Sorry.  I hate to

14     interrupt, but I need to swear in the witness, please.

15

16                    SEAN GARRISON,

17        called as a witness herein, having been first duly

18           sworn, was examined and testified as follows:

19

20                    DIRECT EXAMINATION

21

22     BY MR. UPPAL:

23        Q.  Mr. Garrison, could you please introduce

24     yourself to the Committee and tell the Committee who you

25     are.

MCCCD/Martinez 03476

1      A.   Yes.  As I said, my name is Sean Garrison.   I

2    am a partner at the law firm of Lewis, Roca &

3    Rothgerber.  I practice in the intellectual property and

4    technology practice group at Lewis, Roca & Rothgerber.

5    I've been practicing in that field for 21 years.

6    Exclusively in that field, working primarily with

7    copyrights and trademarks.

8      Q.   And how did you become involved in this matter?

9      A.   Initially, I received a call and it was either

10   from Maggie McConnell or Lee Combs in the Legal

11   Department indicating that they had an issue at Phoenix

12   College, a copyright issue for which they were looking

13   for an independent review of some materials.

14     Q.   And could you explain to the Committee why

15   you're qualified to have conducted that review?

16     A.   Well, again, so through -- at that time,

17   probably 18, 19 year's worth of experience practicing in

18   copyright law, advising clients in terms of

19   copyrightability of issues; how you protect your

20   copyright rights; how to analyze whether something is

21   copyrightable or not; how to seek protection; also

22   representing clients in the enforcement and defense of

23   copyright infringement claims.

24     Q.   Would it be fair to say that your Legal

25   practice is essentially devoted to advising clients and

MCCCD/Martinez 03477

1    litigating copyright issues?

2       A.   Copyright is a substantial part of my practice.

3    There's also trademarks and a little bit of patent

4    licensing and litigation, yes, in the area of

5    intellectual property.  That's all I do.

6       Q.   All right, sir.  And could you please explain

7    to the Committee in legal and in practical terms, what

8    is a copyright?  What's the purpose of a copyright?

9       A.   Okay.  Sure.  So, copyright protects works of

10    authorship, it is created by the U.S. Constitution,

11    Article 1, Section 8 in order to foster the creation in

12    the United States of the sciences and works of

13    authorship.

14       And what a copyright protects is an author's

15    creative and original expression in whatever they may be

16    writing or creating.  Copyright -- the purpose of the

17    copyright is then to give that author a limited time

18    period for exclusive control over the works that they

19    create; and that can be to commercialize those works,

20    with the idea being that it's better for the economy,

21    it's better for the society if we foster the development

22    of these -- of these kinds of works.

23       And in exchange for that -- in exchange for

24    author's sharing their works that they've created with

25    the public, they're going to get a limited period of

MCCCD/Martinez 03478

```
 1    exclusivity with respect to those works that they've
 2    created.
 3        Q.   So, in essence, does a copy- -- under the law,
 4    does a copyright holder own the right to financially
 5    exploit and benefit the work for which he or she owns
 6    the copyright?
 7        A.   Absolutely.
 8        Q.   That's -- that's really, basically, the
 9    underlying policy and the central rule of copyright law,
10    right?
11        A.   The policy is we want to foster these works,
12    right.  So, in order to do that and create that
13    incentive, we want to then give the copyright owners the
14    exclusive right to then commercialize and exploit those
15    works to benefit financially from those works in
16    exchange for sharing them with the public.
17        Q.   Is there a legal term that someone violates the
18    copyrights, someone who does not hold a copyright if he
19    or she exploits the copyright, or undermines the
20    copyright, or violates it in someway, what is that
21    called under the law?
22        A.   It's called "infringement."  And it doesn't --
23    in terms of exploitation, it doesn't require any sort of
24    financial aspect to it, but it's simply using the
25    copyrighted work without authorization.
```

1    Q.   I want to ask you a follow-up question on what

2    you just said.  So, are you saying that under the law

3    you can violate a copyright even if you do not

4    personally benefit from that?

5    A.   Oh, absolutely.

6    Q.   Can you give the Committee some common examples

7    of what constitutes copyright infringement?

8    A.   Copyright, what it protects is the right to

9    copy the work of authorship; the right to distribute it;

10   the right to publish it, for example; and it gives you

11   that exclusive right.  So, an infringement then would

12   be:  You are copying the work; you're distributing the

13   work; publishing it in some way without the copyright

14   owner's permission.

15   Q.   And can you give the Committee an example of

16   how a copyright could be infringed even though the

17   infringer herself does not financially benefit from the

18   situation?

19   A.   Sure.  So, you can imagine any number of

20   different scenarios.  So, think of perhaps a non-profit

21   entity that works with battered women, and as the

22   director of that non-profit entity, I come across a book

23   that I think will be particularly helpful for the women

24   that come into my shelter and I decide I get a copy of

25   that book, and I scan it or make copies of it and hand

1   it out to all the women that come into my shelter.   I

2   don't charge them for it, I give it away.   But,

3   nonetheless, I am infringing that copyright because I

4   don't have the right to do that.   I'm distributing that

5   work; I'm copying that work without permission of the

6   copyright owner.

7         Q.   So, irrespective of the financial motive, even

8   if you have a motive that's completely altruistic, or

9   charitable, or not for your own financial gain, if you

10  exploit a copyrighted work, that may constitute

11  infringement?

12        A.   Motive is entirely irrelevant to infringement.

13        Q.   So, following up the example you just gave of

14  the battered women's shelter.   If a college professor

15  infringes or violates a copyright by distributing

16  copyrighted materials by copying them and giving them to

17  her students, does the same rule apply that motive is

18  irrelevant?

19        A.   Oh, absolutely.   And the District itself has

20  been sued in that situation before.

21        Q.   I think that goes without saying, but could

22  you, since you're here and since this is a large part of

23  your practice, could you explain to the Committee, you

24  know, in the legal and practical terms why is it so

25  important for individuals and institutions such as MCCD

MCCCD/Martinez 03481

1    [sic] to comply with copyright law?

2        A.   Well, I think there's a number of different

3    reasons.  One from the standpoint just from an

4    educational institution of academic integrity that

5    itself would create works of authorship to respect the

6    rights of others, number one.  But, number two, just

7    from an infringement standpoint, the District and/or

8    college is going to be responsible for the acts of its

9    faculty, and if the faculty is out there infringing

10   someone else's copyright, that's going to lead to

11   potential claims for substantial damages.

12       So, a copyright owner that sues for

13   infringement is entitled to get any actual damages that

14   he or she may prove, which could be, for example, lost

15   profits.  You know, in the case of a textbook, I know

16   that that's what you're dealing with here, you know,

17   whatever profits they may have lost from the sale of the

18   textbook.  If -- they also have a choice to sue for

19   what's referred to as statutory damages, and that is a

20   notion in copyright law that says, you know, sometimes

21   it's very difficult, if not impossible, to really

22   pinpoint what your real damages are, but that doesn't

23   mean that there's no harm that's been caused by the

24   infringement.

25       And so what the statue then allows is for the

MCCCD/Martinez 03482

1    copyright owner to elect instead of taking actual

2    damages, statutory damages, and statutory damages can be

3    awarded based on each work that's infringed and then

4    there's a range, anywhere from $750 per work to $30,000

5    per work depending on the circumstances.  And in case of

6    willful and intentional infringement, the judge has

7    discretion to ratchet those damages up to $150,000 per

8    work.

9        Q.   So, that's not -- those statutory damages that

10   you were explaining to the Committee, those statutory

11   damages are available even if loss profits can't be

12   shown?

13       A.   Absolutely right.  In fact, that's -- that's

14   usually when a copyright owner will -- there's two

15   instances when a copyright owner will typically elect

16   statutory damages:  One is when they're not able to show

17   any actual monetary damages; two would be when perhaps

18   their monetary damages are minimal to some degree.

19   Maybe they can show some, but determining with certainty

20   is a little bit difficult, they can elect to go the

21   statutory damage's route.  And they can even go through

22   the case and get answers to both sides of the question,

23   right?

24           So, they can get a ruling that, okay, your

25   actual damages are $10,000, but we would award $25,000

1   or a hundred thousand dollars or whatever it might be in

2   statutory damages and the copyright owner can elect at

3   that point in time.

4        Q.   So, are these statutory damages which are not

5   dependent on profits, is this a way of the law sending a

6   message to potential copyright infringers?

7        A.   Well, certainly in part that is the case.

8   Because, especially, the discretion that the Courts are

9   given in awarding those damages, and then in issues

10  where there are intentional and willful infringement

11  found, being able to escalate those damages

12  specifically.

13       But, even more so than that it is to ensure

14  that the copyright owner is able to get some

15  compensation for the unauthorized use of their

16  copyrighted work even in instances where they really may

17  not be able to show true actual financial damages.

18       Q.   And how common is it for copyright holders to

19  bring a lawsuit if they feel that their works are being

20  violated or misused by persons who are acting in

21  violation of copyright law?

22       A.   Lawsuits get filed all the time.  I can tell

23  you that Pearson Education, the publisher of the

24  "Precalculus Concept Through Functions."

25       Q.   Are you pointing at this book?

1      A.   Yes, I am.

2      Q.   When you say "Pearson," are you talking about

3   the publisher of that book?

4      A.   That is the publisher and copyright owner of

5   that textbook.  Over the last ten years, Pearson has

6   been a party to over a hundred copyright cases.

7      Q.   Pearson publishes textbooks, right?

8      A.   Yes, they do.  Pearson owns more than 10,000

9   copyrights in the U.S. Copyright Office.  I can't tell

10   you exactly how many they have because when you search

11   the U.S. Copyright Office records, there is an upward

12   limit of 10,000 and all I can tell you is that they have

13   more than that.

14      Q.   So, if Pearson, the publisher of textbooks,

15   sues for copyright infringement, does this mean

16   educational institutions get sued for copyright

17   violations?

18      A.   Oh, absolutely.  As I mentioned before, the

19   District itself has been sued for copyright violations

20   in the past.

21      Q.   So, this issue of facing the lawsuit for the

22   District itself, when you said the District has been

23   sued, you're referring to MCCD, right?

24      A.   Yes, I am.

25      Q.   The District itself has been sued for copyright

MCCCD/Martinez 03485

1    violation?

2        A.    It had an issue at Mesa Community College about

3    10 or 11 years ago where a professor took an electronic

4    book, published it on her classroom Website for students

5    to access and use during the term, to download during

6    the term; did not have the authorization of the

7    copyright owner and the copyright owner sued.

8        Q.    So, this issue of facing a lawsuit, it's not

9    merely theoretical?

10       A.    Absolutely not.

11       Q.    It happened.

12             Okay.  So, in addition to damages that you were

13   explaining to the Committee, if you face a copyright

14   infringement lawsuit, are there also other issues of

15   liability such as attorney fees at issue?

16       A.    Yes.  First off, any intellectual property

17   lawsuit and copyright in particular are extraordinary

18   expensive cases to prosecute and defend.  The American

19   Intellectual Property Right Association publishes each

20   year a survey of economic costs of litigation in IP and

21   they break that out even geographically so we can figure

22   out, in the southwest, in Arizona, if a copyright

23   infringement case is filed, what's the mean cost of

24   defending the lawsuit.  So in lawsuits where the damages

25   are, you know, just a million dollars or less, the mean

MCCCD/Martinez 03486

1    cost just of defending is $344,000.  So just to defend

2    the lawsuit, regardless of whether it has merit or not,

3    is substantially expensive if you're sued.

4           On top of that, if you get to the end of the

5    lawsuit and you are found guilty essentially or liable

6    for copyright infringement, the judge then has

7    discretion to award attorney's fees to the copyright

8    owner.  So, you not only are paying your own costs to

9    defend the case you could get stuck paying the

10    plaintiff's fees as well.

11    Q.   So, you just said that the mean number for

12    defending a copyright infringement lawsuit is 344,000.

13    When you say the word "mean," does that mean half of the

14    lawsuits or substantial mean is the middle number?

15    A.   That's right.

16    Q.   Not an average?

17    A.   That's right.

18    Q.   Many of the lawsuits would cost $344,000 to

19    defend?

20    A.   Yes.

21    Q.   And if the defendant such as the District loses

22    the lawsuit, not only does it have to pay its loses, it

23    also has to pay the other side, the copyright holder,

24    for his attorney's fees?

25    A.   Likely.

MCCCD/Martinez 03487

1      Q.   Okay.  All right, sir.

2           Are you familiar with Dr. Cleopatria Martinez?

3      A.   Only by name.  I've never met Dr. Martinez.

4      Q.   And how did you come to -- how did you become

5      acquainted -- even though you've not met her, how did

6      you become to learn about Dr. Martinez?

7      A.   Again, as I mentioned, I was contacted by the

8      District legal office over an issue at Phoenix College.

9      I went out and met with Cassandra Kakar, Joe Sueyoshi,

10     and Maggie McConnell from the Legal Department at

11     Phoenix College and they explained to me this was in --

12     Q.   I don't mean to interrupt you.  Let's just

13     establish who they are.

14     A.   Sure.

15     Q.   One of the people you met with is Maggie

16     McConnell?

17     A.   Right.

18     Q.   And you understood her to be in-house counsel

19     for the District?

20     A.   Correct.

21     Q.   And during that same meeting, you met with a

22     Professor Sueyoshi?

23     A.   Yes.

24     Q.   And he's Chairman of the Math Department at

25     Phoenix College, right?

MCCCD/Martinez 03488

1      A.   That was my understanding.

2      Q.   And the third person you met with is Dr.

3  Cassandra Kakar?

4      A.   Yes.

5      Q.   And she was a representative of the District?

6      A.   Vice President of Academic Affairs, if I recall

7  her title correctly.

8      Q.   I'm sorry if I interrupted.  I wanted to make

9  sure the Committee understood who those people were.  I

10  believe you were telling the Committee what transpired

11  at the meeting.

12      A.   I went out and met with them, they explained to

13  me that there were some issues with course materials

14  that had been requested for copying at the college

15  copying center, and that there had been a grievance

16  filed by Dr. Martinez over, I guess, a suspension of her

17  copying privileges; that the issue that had arisen back

18  in the early part of 2010 over her course materials, and

19  concerns over whether or not those materials had been

20  copied without authorization from textbooks.

21           So, what the District was asking me to do was

22  take an independent review of four course packets, I'll

23  refer to them as, and make a determination of whether I

24  thought they had been created based on copying or

25  whether there was independent creation.

MCCCD/Martinez 03489

1          MR. UPPAL:  Okay.  I want to direct the

2     Committee's attention to Tab 9 of your binders in front

3     of you.

4          Q.   BY MR. UPPAL:  Mr. Garrison, I'm going to show

5     you --

6          A.   I think this is actually Tab 6.

7          Q.   I apologize.  I was looking at it upside down?

8          MR. MONTOYA:  Pavneet, could you tell me what

9     exhibit number that is because you've not given me a

10    tabbed version.

11         MS. BLACH:  That is the exhibit list.

12         MR. MONTOYA:  So, that is Exhibit 6?

13         MR. UPPAL:  Yes.  So, that would be the expert

14    report of Mr. Garrison.

15         MR. MONTOYA:  I understand.  Thank you.

16         Q.   BY MR. UPPAL:  Mr. Garrison, to expedite

17    everything, I will come around here.  I will tell you

18    that before you were admitted to the room that the

19    Committee counsel, Mr. Calderon, had informed the

20    parties that all the materials submitted by both sides

21    had essentially been placed in evidence.

22              So, what we have here is your expert report and

23    there are exhibits behind your expert report.  So, for

24    example, we have Exhibit 1 to your report.  That's Bates

25    labeled Garrison 0027.  That's your Bates label,

1    correct?

2         A.   Yes.

3         Q.   And a Bates label is a way that lawyers

4    intentionally keep track of documents?

5         A.   Correct.

6         Q.   So we have four exhibits to your report.  Are

7    these the lecture notes or course materials that you

8    were asked to review?

9         A.   Yes.  These were handed to me at the meeting I

10   had with Dr. Kakar and Mr. Sueyoshi and Maggie

11   McConnell.

12        Q.   What was your understanding as to who had

13   created these course materials or lecture notes?

14        A.   Dr. Martinez.

15        Q.   In some cases the lecture notes are quite

16   thick, they're not just a few pages, they're 50 or 60

17   pages?

18        A.   Correct.

19        Q.   Okay.  Tell the Committee again what were you

20   charged with analyzing with respect to the course

21   materials.

22        A.   So, the concern was whether or not the content

23   of these materials had been copied out of copyrighted

24   textbooks; and what the college was looking for -- the

25   District was looking for was kind of an independent

1    analysis.  They had already done internally some

2    analysis and had concerns and believed there had been

3    copying and they were asking, essentially, for an

4    independent review.

5        Q.    So, then, did you undertake an analysis in

6    which you compared Dr. Martinez's lecture notes that are

7    appended to your expert report against copyrighted

8    textbooks?

9        A.    We did.

10        Q.    And as you sit here today, what is your opinion

11    as to whether Dr. Martinez engaged in copyright

12    infringement with respect to the lecture notes that are

13    appended to your report?

14        A.    Three of the four, there's no doubt in my mind

15    there was copyright infringement, the verbatim of

16    copying out of textbooks that we were able to find, and

17    other evidence that during those time periods there was

18    no authorization in place from the copyright owner of

19    those textbooks to do that.

20            With respect to the fourth one, which is

21    Exhibit 4, and this is the Math 187 fall 2010

22    precalculus algebra outline, I could not determine any

23    specific evidence of copying, but there was an entry

24    that I found to be concerning and highly suggestive of

25    copying.

MCCCD/Martinez 03492

1      Q.   Well, let's leave the fourth one behind.  Let's

2      use the first three sets of lecture notes.

3            Just as an aside, you're a lawyer, I'm a

4      lawyer, Mr. Montoya is lawyer, and Mr. Calderon.   I

5      think the reasons -- one of reasons people hate lawyers

6      is we are always saying:  On the one hand or the other

7      hand.  You didn't say.

8            You said:  There is no doubt in your mind that

9      what Dr. Martinez did with the respect to the three

10     lecture notes is copyright infringement.  Do you have

11     that level of certainty?  There's no doubt in your mind?

12     A.   There's no doubt in my mind.

13     Q.   Let me turn then to the analysis that you

14     conducted.  So, first of all, we have these three books

15     in front of us.  Do you recognize these books?

16     A.   I recognize the top book and I recognize the

17     titles of the other two.

18     Q.   Okay.  And you basically were trying to compare

19     whether Dr. Martinez's lecture notes contained material

20     that was taken from these types of textbooks, right?

21     A.   Correct.

22     Q.   And I want to -- can't really see it here,

23     unfortunately, but these -- if the Committee looks at

24     the screen, on the left side there is a picture of the

25     cover of the textbook and on the right side there is a

MCCCD/Martinez 03493

1    page which I know that you cannot read from the vantage

2    point at which you are sitting, but the right side

3    essentially contains the copyright notice and

4    essentially -- Shayna, can you try and adjust that --

5    essentially you will see in your -- you're welcome to

6    look at the textbooks themselves -- this textbook, for

7    example -- well, Mr. Garrison, you're the expert here.

8    What does that "C" with the circle mean?

9        A.    That is the copyright notice.  So, it says

10   copyright 2007 Pearson Education, Inc.

11       Q.    Okay.  We'll go through these a little bit

12   quicker.  But, in fact, all of these contain copyright

13   notices, don't they?

14       A.    They do.

15       Q.    What's the purpose of the copyright notice?

16       A.    To do exactly what it sounds like, to give

17   notice to the public that the publisher or claimant in

18   the notice claims copyright of the work.

19       Q.    All right.  So, next I want to direct the

20   Committee's attention -- I know you're on Tab 6, and if

21   you will turn to approximately page 13 of Mr. Garrison's

22   report.  Starting on page 13, Mr. Garrison, and

23   continuing, you have a series of charts that are in your

24   report.  These are charts that you prepared, right?

25       A.    Yes.

MCCCD/Martinez 03494

1   Q. What are these charts designed to illustrate?

2 And if the Committee prefers, you can look on the screen

3 here.

4   A. What we did is for each of the four course

5 packets that we received, we created a chart where we

6 found either instances of District copying out of a

7 textbook or some discrepancy in the materials themselves

8 that would be suggestive of having been copied from

9 somewhere else, and we identified in the chart the

10 left-hand column, specifically the pages and item

11 numbers of the materials.

12   Q. What's the left-hand column titled?

13   A. "Course materials page/question number."

14   Q. Okay.  So that left-hand column, that is

15 reference to particular citations or particular pages of

16 Dr. Martinez's lecture notes where you contend that you

17 have found copying of copyrighted material?

18   A. I don't content it, it's there.

19   Q. Okay.  The second column that says,

20 "Discrepancy or text," what's the purpose of that

21 column?

22   A. So, that is an expositive description of

23 exactly what copying we found.

24   Q. And the third column that says, "Source

25 information," is that essentially --

1          A.    That's the -- that's the textbook and where it

2    came from.

3          Q.    Okay.  And, for example, you have -- you have

4    many of these charts in your expert report, but this

5    first chart for precalculus trigonometry, fall 2009,

6    this contains two-dozen instances, doesn't it, of

7    situations -- or, excuse me, examples where you

8    determined that Dr. Martinez's lecture notes had lifted

9    are verbatim copy material from copyrighted works?

10         A.    I believe for this one it was about two dozen.

11   I should say these are just examples, so this is not

12   necessarily an exhaustive list of all the copying that

13   there was.  But the point, given the time constraints

14   that we had on the work at the time, was to identify

15   whether or not there was copying and substantial

16   copying; and once we got to that point and were

17   satisfied that, yes, indeed there was, there was no

18   point in beating a dead horse.

19         Q.    Gotcha.  When you say there is no point in

20   beating the dead horse, do you mean really for your

21   purpose it wouldn't have served a purpose to try and

22   find every single instance of infringement?

23         A.    No.

24         Q.    This was more than enough for you to conclude

25   without a doubt she had engaged in copyright

MCCCD/Martinez 03496

1    infringement?

2        A.   You could go on forever with the number of

3    pages in that textbook; it just wouldn't have been

4    efficient.

5        MR. UPPAL:  I want the Committee to understand

6    that.  This is not an exhaustive list of every single

7    act of infringement that Dr. Martinez engaged in.  The

8    expert witness just said that he reached a point --

9        MR. MONTOYA:  I object.

10       MR. UPPAL:  -- where there was no point in

11   beating a dead horse.

12       MR. MONTOYA:  Excuse me.  I object to a speech

13   from counsel during examination.

14       Q.   BY MR. UPPAL:  All right.  So let's continue.

15   This is a continuation of --

16       CHAIRPERSON CRUDUP:  Continue.

17       Q.   BY MR. UPPAL:  -- of the same chart.  And

18   there's no way we can go through every single example

19   precalculus trigonometry but I want to go through a few

20   examples on your chart.

21       A.   Sure.

22       MR. UPPAL:  The Committee can look at the

23   screen or follow along with its binder.  Just one second

24   to catch up here.

25       Q.   BY MR. UPPAL:  All right.  So if we look at

MCCCD/Martinez 03497

1    this problem, for example, did you -- you will see that

2    there's essentially a triangle with a right angle in it.

3    Did you find this same problem in Dr. Martinez's lecture

4    notes and in a textbook?

5        A.   That's right.  So, we're talking about -- this

6    is actually from the third course packet, the basic

7    arithmetic, MAT 082, which on my report that starts on

8    page 17, and this particular one is, I believe, the

9    third -- third entry in that report.

10           Now, what we found here was exactly right:

11   Identical image, identical text used both in Dr.

12   Martinez's course packet and the textbook which was the

13   "Basic Mathematics" by McKeauge.  And I should say we

14   found this not by having the textbook itself in hand,

15   but we found this one through our own due diligence of

16   Google searching.  And this section of the McKeauge

17   textbook happened to be available on Google, and by

18   putting in the parameters here, we were able to locate

19   it and it was identical.

20       Q.   So, Mr. Garrison, I'm glad that you used that

21   example, because before you were admitted to this room,

22   during the opening statements, counsel for Dr. Martinez

23   made an argument that somehow these materials or

24   portions of these materials are available on Google or

25   Google Books, that what Dr. Martinez did couldn't

MCCCD/Martinez 03498

1   constitute copyright infringement.  Could you explain to

2   the Committee what the difference is?

3       A.   Well, certainly.  The fact that something is

4   available on Google or through a search engine has

5   absolutely nothing to do with whether or not it is

6   protectable as copyrighted material or copyrighted text.

7   That's one of the great myths or fallacies that if it's

8   available on the Internet, it's free for anybody to

9   copy; that's a hundred percent untrue.

10      Q.   So, this is also part of your report.  And on

11  the left-hand side of the page, this is a comparison

12  that you drew between -- or, is this a comparison

13  between a textbook -- excuse me.

14           This is a comparison -- an illustrative

15  comparison that I want you to explain to the Committee,

16  and essentially would you agree with me that it's

17  showing that on the right side are Dr. Martinez's

18  lecture notes and on the left side are the very same

19  examples of the sources of the copyrighted books from

20  which she took the example?

21      A.   This looks to be one example.  You can see No.

22  36 on the left side is identical to No. 27 on the right

23  side.

24      Q.   And let's just go through another couple of

25  examples.  What did you find with respect to problem No.

1       28 on this chart?

2           A.    With respect to No. 28, what we see is there

3       appears to be some minor word changes.  So, for example,

4       replacing the word "rent" with "house payment."

5           Q.    Does that take it out of the realm of

6       copyright?

7           A.    No, absolutely not.  In fact, many courts will

8       interpret that kind of minor word changing as evidence

9       of intentional infringement.

10          So, ultimately what we found here is the

11      problems and with some minor word changing were

12      virtually identical, 80 percent identical.

13          Q.    Okay.  And here's one involving where the

14      source copyrighted textbook, Sullivan had a pie chart

15      and the pie chart is missing from Dr. Martinez's lecture

16      notes, right?

17          A.    The pie chart is not included but the substance

18      from the pie chart is incorporated into the text.

19          Q.    So, basically everything but the pie chart was

20      copied from this textbook?

21          A.    Yes.

22          Q.    And there are various other examples which I

23      would encourage the Committee to look at.

24          Let's take a look at this one real briefly.

25      What's -- again, on the left-hand side you have Dr.

MCCCD/Martinez 03500

1    Martinez's -- excuse me.  You have the copyrighted book

2    with its example on the left-hand side and on the

3    right-hand side you have what Dr. Martinez incorporated

4    into her lecture notes.  Could you explain this to the

5    Committee?

6         A.   Well, they're identical.

7         Q.   You would agree that's identical as well?

8         A.   Correct.

9         Q.   Same thing with this example?  Basically

10   they're identical except for --

11             MR. MONTOYA:  Objection.

12        Q.   BY MR. UPPAL:  Would you agree with me that

13   this example is Dr. Martinez's lecture notes are

14   identical except for she didn't include the title

15   "Gallons Per Second"?

16             MR. MONTOYA:  Objection to counsel testifying

17   for the purported expert witness.

18        Q.   BY MR. UPPAL:  Okay.  You know, in light of the

19   objection, I'm going to withdraw the question so there

20   doesn't have to be a ruling on it.

21             Mr. Garrison, why don't you read what's on the

22   left-hand side of the screen that's taken from the

23   Sullivan & Sullivan textbook.

24             MR. MONTOYA:  Objection.  I think the witness

25   should testify to the Committee.  Reading stuff that

1    anyone can read, that you can read for yourself, that's

2    really not, in my opinion, what we're here for.  If he

3    could get to him testifying as to the content of his

4    opinions, fine.  But reciting stuff that he's reading on

5    the board, that's really not in my opinion what we're

6    here for and I also think it's a waste of our valuable

7    time.

8         MR. UPPAL:  Well, I'd like to respond to that.

9    If Dr. Martinez and her counsel want to stipulate that

10   the copyright infringement was repetitive and rampant,

11   we can move on.  But I think it's important for the

12   District -- for the Committee to understand how

13   blatantly and pervasively this individual took

14   copyrighted materials and incorporated them into her own

15   lecture notes.

16        MR. MONTOYA:  My response is I think he has the

17   right to prove his case, but reading stuff to you from

18   the board that you can read for yourself, in my opinion,

19   that is a waste of time and that's not what this

20   individual is here to testify about.

21        MR. UPPAL:  I submit to you that the time -- we

22   have a certain amount of allotted time and we should be

23   able to use it in the matter that we believe best

24   illustrates the misconduct that the -- that Dr. Martinez

25   engaged.

MCCCD/Martinez 03502

```
 1              MR. MONTOYA:  I think that's true.  If, in

 2      fact, the Committee affirms that we have a certain

 3      amount of allotted time.  If you want to limit time, I

 4      encourage him to waste all of his time with this kind of

 5      thing, but so far no one has told us what the time limit

 6      is, and consequently I object.

 7              (Whereupon a discussion was held off the

 8      record between advisory counsel and the Committee.)

 9

10              CHAIRPERSON CRUDUP:  Okay.  The hearing today

11      we want to try to stop by 5 o'clock, so we are -- we

12      read through this material, so you can read through what

13      you're doing now, but do not continue with this line,

14      just reading through material.

15              MR. UPPAL:  Okay.  Excellent.  And I just say

16      the reason I ask the witness to read it is in response

17      to any objections which are being interposed essentially

18      because the counsel does not want the Committee to see

19      here how blatantly this was done, but I'm going to move

20      on.

21          Q.   BY MR. UPPAL:  Mr. Garrison, would you read the

22      example from the copyrighted text on the left-hand side?

23          A.   Yes.  So out of the textbook, it is problem No.

24      5, and there is in bold "Gallons Per Second" of heading

25      and then the text of the word problem is:
```

MCCCD/Martinez 03503

1            "The flow of water from a water facet can fill

2            a 3-gallon container in 15 seconds.  Give the

3            ratio of gallons to second as a rate in

4            gallons per second."

5      Q.   And --

6      A.   If we move to No. 31 from the lecture notes,

7  the text of the word problem is identical.

8      Q.   So, I want to respect what the Committee just

9  illustrated, but we're going to just -- without you

10 reading them -- go through.  These are, again, examples

11 as I flip through the materials in your expert report,

12 there's just -- would you agree with me that there's

13 just example after example of verbatim copying by Dr.

14 Martinez from copyrighted textbook?

15     A.   There is repetitive verbatim copy.

16     Q.   And we have many examples of this.

17          MR. MONTOYA:  I think this witness already

18 testified -- I wrote it down -- that he could go on,

19 quote, unquote, "forever," unquote.  I really think

20 that -- and I ask the Committee, please tell us how much

21 time each side has, then I'll stop objecting and we can

22 move on.  Because if he wants to spend his time doing

23 this, that is his right.  But I don't want him to take

24 all of the time that he has, me be left with no time to

25 defend her career, she's the one who has something to

1    lose, and then 5 o'clock hits and we're done.

2        CHAIRPERSON CRUDUP:  I think this morning

3    for -- we're thinking the morning for his side and

4    afternoon session for your side.

5        MR. MONTOYA:  Thank you.  I understand.

6        MR. UPPAL:  So, I'm just going to draw the

7    Committee's attention to the numerous examples.  I will

8    continue.

9        Q.    BY MR. UPPAL:  Oh.  I do want to ask you one

10   thing, Mr. Garrison, before we move on.  In addition to

11   copying the word problems, there's examples in your

12   report where Dr. Martinez has, in fact, even copied the

13   graphs or illustrations, right?

14       A.    Yes.

15       Q.    This is one of those?

16       A.    It is.

17       Q.    And you did these charts for each of the three

18   textbooks from which you concluded there was copyright

19   infringement?

20       A.    We did the charts for the course packets.

21       Q.    For three -- okay.  Excellent.

22            And here you have before you an e-mail from Dr.

23   Solley which is also in the binder.  I want to draw your

24   attention to this portion of Dr. Martinez's e-mail to

25   Dr. Solley on October 15, 2010.  I'm going to read out

MCCCD/Martinez 03505

1        what Dr. Martinez wrote, but what I want you to tell the

2        Committee is what the significance of this is.

3                        So, Dr. Martinez wrote:  "I indicated in my

4                        syllabus instead of a published textbook, I was

5                        using lecture notes in my MAT 082 class.

6                        Because of this students were not required to

7                        buy the textbooks."

8                        What is the significance of any of that?

9            A.    This is a very key piece, because what this

10       demonstrates is that the lecture notes were serving as a

11       substitute for the textbook.

12           Q.    Why is that important?

13           A.    Because that is exactly why the publisher then

14       -- the -- they are losing their right to exploit their

15       copyrighted work, because of the substitution.   The

16       substitution of the work for the textbook also excludes

17       all of the course materials from being considered a fair

18       use.

19           Q.    We'll turn to that exclusion for fair use in a

20       second.   But I just want to quickly draw the Committee's

21       attention to ratings from her students to move on:

22                        "No book needed; didn't have to pay for the

23                        textbook; she just uses a set of lecture notes

24                        that she copied for us at Kinkos; she doesn't

25                        believe in textbooks so you print work off of

MCCCD/Martinez 03506

1          her Website."

2          All right.  So, Mr. Garrison all of this

3    copyright infringement -- all of these examples of

4    copyright infringement, they involve math, right?

5          A.   They do.

6          Q.   And we all heard sort of this, you know, saying

7    or statement that math is universal, right?

8          A.   Sure.

9          Q.   Okay.  Well, since we are just dealing with

10   math problems or math equations, please explain to the

11   Committee why what Dr. Martinez did is still copyright

12   infringement?

13         A.   So, really, if you want to look at the copying,

14   the instances of copying, there's three aspects to it:

15   We've talked about the word problems; we've talked about

16   the images that are copied; and then the third element

17   of the copying that we found were actual problem

18   equations.  So, you know, the example might be, you

19   know, something like 2X to the third power plus 42 times

20   8 equals what and you have to solve that equation.

21         Those essentially were the three elements for

22   the math textbook.  And why that is then copyrightable

23   and protectable is that it takes a lot of work and

24   creativity to come up with:  What examples am I going to

25   use; what problems do I want to utilize in order to

MCCCD/Martinez 03507

1    illustrate the underlying math principles that we're

2    talking about.  The underlying math principles aren't

3    copyrightable, that's not what's being protected, but

4    the decisions to use this particular set of example

5    equations or the language for this particular word

6    problem, that is what is indeed copyrightable and indeed

7    copyrighted by the textbook publishers.

8        Q.    So?

9        A.    So, yes, these would be examples of the sets of

10   equations that were copied from textbooks that I was

11   referring to.

12       Q.    And the sequence of presentation also has

13   copyright significance?

14       A.    The sequence of presentation, the compilation

15   of multiple equations into one set is protectable.

16       Q.    Okay.  How about now?

17             In addition, you gave an example with respect

18   to sequence of equations.  What about -- didn't the

19   materials that you reviewed, the lecture notes that you

20   reviewed, did a lot of them contain word math problems?

21       A.    They did.  And so, you know, again, with

22   respect to the word problems, there is creativity in

23   determining, you know:  What words do I want to use; how

24   do I want to put those words onto the page, to then

25   illustrate the underlying principle.  And the key for

MCCCD/Martinez 03508

1    copyrightability is it's only a minimal degree of

2    creativity that's required to have copyright protection.

3            So, this is not -- copyright is not reserved

4    for works of fiction and things that, you know, have no

5    bearing to facts or math principles, copyright extends

6    far beyond that.

7        Q.   How about charts or graphic illustration that

8    illustrate math concepts, are those copyright protected?

9        A.   Yes.

10       Q.   So, in essence -- well, let's just go through

11   it real quickly.  So, even though it's math equations,

12   can you explain to the Committee why there's no doubt in

13   your mind what Dr. Martinez did is copyright

14   infringement?

15       A.   Because there's repetitive, verbatim copying.

16       Q.   And the repetitive, verbatim copying is from

17   textbooks that have what?

18       A.   They are copyrighted.

19       Q.   They have a copyright notice, right?

20       A.   They do have a copyright notice.

21       Q.   And, sir, once -- before you -- before you

22   started giving your testimony, there was an argument

23   presented by Mr. Montoya who is counsel for his client,

24   Dr. Martinez, that what Dr. Martinez did constituted

25   fair use.  And so to speed things up, could you tell the

MCCCD/Martinez 03509

1    Committee, A, what is fair use, and why in your opinion

2    what Dr. Martinez did is not fair use?

3        A.   Sure.  Fair use, I mean, for starters it is

4    what it says, it's a fair use and not an unfair use.

5    And it is a statutory defense to a copyright

6    infringement claim that says:  Although you are

7    infringing, in a very limited set of circumstances we

8    may decide that -- or, the Court may decide that it's

9    okay, it's fair, and there are underlying principles.

10        And the two most under- -- I would say the two

11   most important underlying principles for the fair use

12   are:  Is what you're doing just copying to serve as a

13   substitute for the original work?  In other words, you

14   know, there's no transformation in the work from the

15   original to the new work.  And, second, what is the

16   market effect of this infringement?  Not just by the one

17   person doing it, but if this were adopted as a regular

18   practice across the market, what effect is that going to

19   have on the market for the copyrighted work?

20        Q.   So, as to that second factor, you mean the law

21   looks at not just what Dr. Martinez did but --

22        A.   If every professor at every college and

23   university did the same thing, what effect is that going

24   to have on the copyright owner's work.

25        Q.   Well, you have in the materials what Dr.

MCCCD/Martinez 03510

1      Martinez did, which is she didn't require them to buy

2      published textbooks?

3          A.   Right.

4          Q.   So what would be the effect if every professor

5      did what Dr. Martinez did which is create lecture notes

6      taken from copyrighted books?

7          A.   Then you would have substantially less -- if

8      not no -- sales of textbook.

9          Q.   Right.  Because --

10         A.   And they would lose money.

11         Q.   Because who would buy the textbook if they

12     didn't need to, right?

13         A.   And if they lost money, they wouldn't create

14     new textbooks.

15         Q.   So, as to the first factor as to whether the

16     infringer is essentially making a copy to substitute for

17     the original copyrighted work, what is your opinion as

18     to whether or not that's effectively what Dr. Martinez

19     did?

20         A.   There's no question, she said it.  She said it

21     in her e-mail; she said it in her deposition.  That's

22     what she was doing, that was her intent.

23         Q.   To make a substitute for the copyrighted book?

24         A.   So the students did not have to buy the

25     textbook.

MCCCD/Martinez 03511

```
 1        Q.   So, given that neither factor is present in
 2   this case, what's your -- is there really any question
 3   as to whether or not Dr. Martinez qualifies for the
 4   exception of fair use?
 5        A.   There's no fair use.
 6        Q.   There's no fair use here?
 7        A.   No.
 8             CHAIRPERSON CRUDUP:  Could I ask one question,
 9   please?  Can I?
10             MR. CALDERON:  Absolutely, Mr. Chair.
11             CHAIRPERSON CRUDUP:  What would have made Dr.
12   Martinez's use of copyrighted material in line of fair
13   use without infringing on copyrights restrictions?
14             THE WITNESS:  So, a number of things.  Number
15   one is and most importantly getting authorization from
16   the copyright owner to create these, that would be
17   number one.
18             Number two would be if what she was doing is
19   simply supplementing and using as illustration from the
20   textbooks that the students were required to buy and did
21   buy.  And so it wasn't using it as a substitute but
22   really as more of a supplement of the textbook.
23             Thirdly, with respect to the course materials
24   themselves -- this is kind of spelled out in her
25   communication that is she had with Pearson Education --
```

MCCCD/Martinez 03512

1    acknowledgment in terms of where the material was being

2    taken, because without that acknowledgment, without

3    saying this is being used from the Sullivan textbook or

4    the Tussy & Gustafson textbook or the McKeauge textbook,

5    the implication of those materials is it's the original

6    work of Dr. Martinez.  And given the copying, that

7    didn't occur.

8            CHAIRPERSON CRUDUP:   Okay.

9            MR. UPPAL:  Dr. Crudup, thank you for your

10   question.  And I welcome the Committee to ask any

11   questions of this expert witness that you might have.

12       Q.   BY MR. UPPAL:  When you said in response to Dr.

13   Crudup's question as to what would have made it fair

14   use, you said authorization from the copyright holder,

15   right?  Does that basically mean written permission from

16   the copyright holder?

17       A.   It would.  So -- in fact, that wouldn't be an

18   issue of fair use because then you have permission to do

19   what you do.

20       Q.   Right.  The copyright holder can always say to

21   someone:  Sure, you can copy my materials?

22       A.   Absolutely.

23       Q.   And the second one, the second point that you

24   said is the issue of whether what Dr. Martinez did

25   qualifies as a supplementation of the copyrighted

MCCCD/Martinez 03513

1    material or whether it's essentially a replacement,

2    right?

3         A.   Yes.

4         Q.   Under that circumstance, to fit under that

5    criteria, wouldn't you have to have the students buy the

6    textbook?

7         A.   Yes.

8         Q.   And she did the opposite, right?

9         A.   Yes.   That's the problem here.

10        Q.   And the third one, you said acknowledgment.

11   Does that basically mean something like an attribution

12   such as the author thanks such and such,

13   author/publisher for allowing her to use the following

14   materials that are taken from textbook so and so?

15        A.   There isn't necessarily -- necessarily any

16   specific wording that you have to use, but what you do

17   have to do is include copyright notices that may be

18   required by the owner, identify the fact that you are

19   copying from another copyrighted work and what that

20   might be.

21        Q.   Did she -- did Dr. Martinez do any of these

22   things that -- any of these three things that you've

23   just explained to the Committee what would have allowed

24   her to qualify under fair use?

25        A.   Not in any of the four course packets that I

MCCCD/Martinez 03514

1      reviewed.

2           Q.   But you did see Dr. Martinez obtained some

3      permissions, didn't you?  And I want to turn to those.

4                As I look for them, why don't you tell the

5      Committee whether you saw any permissions from any

6      publishers for the course materials that you had

7      explained constitute copyright infringement?

8           A.   I did not.

9           Q.   All right.  I want to draw your attention to

10     this letter which is in the binder before the Committee,

11     and it's one of the permissions that Dr. Martinez came

12     up with, and it's dated April 13, 2010, and the

13     highlighted portion says:

14               "This acknowledgment must be carried on the

15                copyright or acknowledgment page of your book,

16                or as a footnote on the page on which the

17                material appears."

18               And then gives the acknowledgment:  "Sullivan

19                'Precalculus Concepts Through Function, the

20                Right Triangle,' April copyright 2007,

21                reprinting by permission of Pearson Education."

22               And then the permission section says:  "To make

23                up to 35 copies of selected homework problems

24                from each section of Chapter 5, 6, and 7, pages

25                through 371 to 563; for Professor Martinez and

MCCCD/Martinez 03515

1    students in MAT 187, precalculus, beginning

2    fall 2010 at Phoenix College."

3         Well, here's a permission.  Why -- does this

4    change your opinion that Dr. Martinez engaged in

5    copyright infringement?

6         A.   No, because the three course packets on which

7    it's my opinion that there is copyright infringement are

8    not covered by this permission statement.  Number one,

9    it talks about the fall of 2010.  Two of the three were

10   from the fall of 2009 and spring of 2010, so it predates

11   this permission.  This would not -- this doesn't apply

12   retroactively.

13        Second, it's very specific to what course it's

14   talking about, it's MAT 187, precalculus.  So, it

15   wouldn't apply to the MAT 082 basic arithmetic example.

16        This is typical of what you would see in any

17   sort of permission statement and/or the legal term might

18   be license to copy and use a copyrighted work.  And what

19   a copyright owner is able to do is place very stringent

20   restrictions on what you are able to do, and so here you

21   see Pearson's saying you got to put this acknowledgment

22   in your book, you can only use problems from Chapters 5,

23   6, and 7.  So, that means if you're using problems from

24   Chapter 4 or Chapter 8, that's not covered.  You can

25   only make up to 35 copies.  So, the 36 copy would be an

MCCCD/Martinez 03516

1    infringement.

2         As soon as you step outside the bounds of the

3    authorized permission, you're infringing.

4         Q.   And read the last sentence of that permission

5    and tell me if that is complied with?

6         A.   "Permission is granted free of fee on the

7              understanding that the above textbook has been

8              adopted for the course and purchased by the

9              students."

10        And that, again, goes to the crux of the issue

11   from a textbook publisher.  Yes, we will allow this

12   under certain circumstances, but we need to know that

13   the students are buying the textbook.  You can't use

14   your materials as a substitute for our book.

15        CHAIRPERSON CRUDUP:  Excuse me.  As far as

16   requiring a syllabi professor that may say requires a

17   textbook.  In the case of Dr. Martinez, do you have any

18   syllabi as far as the exhibit saying this is the

19   required textbook?

20        THE WITNESS:  My recollection was that these

21   were not required textbooks in the semesters that we

22   were talking about.

23        CHAIRPERSON CRUDUP:  Okay.  Thank you.

24        THE WITNESS:  That was the information that I

25   was given.

MCCCD/Martinez 03517

1            CHAIRPERSON CRUDUP:  Another point -- sorry.

2     But, can we take like a five-minute short break?

3            MR. UPPAL:  Absolutely, Dr. Crudup.

4            CHAIRPERSON CRUDUP:  Thank you.  I need five to

5     10 minutes.

6            (Whereupon a recess is taken at 10:57 a.m.

7     until 11:03 a.m.)

8

9            CHAIRPERSON CRUDUP:  I'd like to say ideally

10    our lofty goal is to try to get all the arguments in by

11    5 o'clock today.  I do want to make sure both sides get

12    equal time.  Again, we're shooting for your side this

13    morning and your side in the afternoon.

14            MR. UPPAL:  Dr. Crudup, I agree.  The only

15    thing I would say is that we started a little bit late.

16    And the other thing I would say is my understanding of

17    equal time is usually that the cross-examination counts

18    toward their time.  So, that might take my case after

19    the lunch break, depending on the cross-examination

20    time.  Just in fairness.

21            MR. MONTOYA:  Can I just say one thing?

22            CHAIRPERSON CRUDUP:  Sure.

23            MR. MONTOYA:  I think the concept of equal time

24    is unfair in this case because it's my client's job, her

25    livelihood, her career on the line.  She should have

1    more time.  And moreover equal time.  Since they're

2    going first really allows them --

3              MR. UPPAL:  Steve, can we reserve that argument

4    until the Committee's advisor is back?

5              MR. MONTOYA:  Please don't interrupt me, that

6    is the Chair's job.

7              MR. UPPAL:  I just think the Committee's

8    counsel should be here.

9              MR. MONTOYA:  I would ask that you direct that

10   I not be interrupted other than by you or Members of the

11   Committee or counsel.

12             So, I think my -- allowing them to go first,

13   allows -- and saying that there's equal time, allows

14   them to actually control exactly how much time that I

15   have and I think that's unfair.  Thank you.

16             (Whereupon Mr. Calderon is present in the

17   hearing room.)

18

19             MR. UPPAL:  My intent was not to interrupt.  My

20   only thought was that the Committee might have wanted to

21   hear that argument and my response when counsel was

22   present.

23             CHAIRPERSON CRUDUP:  Thank you.  Noted.  I

24   guess we can reconvene.

25             MR. CALDERON:  I'm sorry.  I went to the soda

MCCCD/Martinez 03519

machine.

MR. UPPAL:  Mr. Chairperson, can I continue?

CHAIRPERSON CRUDUP:  Yes.

Q.   BY MR. UPPAL:  Mr. Garrison, we're talking about the permission.  First of all, did Dr. Martinez produce and have you ever seen a single permission for any of the three sets of summaries that you created in your expert report that show copyright infringement?

A.   No.

Q.   With respect to the permission she did produce, I just want to quickly take the Committee through it, they don't apply retroactively, right?

A.   Correct.

Q.   And they require an attribution or acknowledgment that the materials were taken from a copyrighted work, right?

A.   They do.

Q.   Did that attribution or acknowledgment appear in any of the materials or any of the course notes of Dr. Martinez that you reviewed?

A.   No.

Q.   And, finally, the permission requires that -- and is granted -- under the understanding that the copyrighted textbook be published -- excuse me, be purchased by the students; is that right?

MCCCD/Martinez 03520

1       A.    It is.

2       Q.    Was that requirement met?

3       A.    Not to my understanding.

4       Q.    You said not to your understanding.  But,

5   actually, didn't even review a e-mail by Dr. Martinez to

6   the contrary?  We can flip back to it.

7       A.    With respect to the MAT 082, she specifically

8   says that.

9       Q.    Because of this, the students were not required

10  to buy textbooks?

11      A.    She was using her lecture notes instead.

12      Q.    She was using reviews from students in other

13  courses essentially saying the same thing --

14      A.    Yes.

15      Q.    -- isn't there, that they don't have to buy

16  textbooks?

17      A.    Yes.

18      Q.    No book needed; didn't have to pay for a

19  textbook, these are all student comments.

20            All right.  And with respect to these three

21  issues of students not being required to buy the

22  textbook, that the permissions aren't retroactive, and

23  that they require attribution which Dr. Martinez did not

24  give, these three failures carry through with respect to

25  each of their permission that Dr. Martinez produced;

MCCCD/Martinez 03521

```
1        isn't it true?

2            A.   Yes.

3                MR. UPPAL:  So, we could go through all these

4        but the Committee has them before them, so taking my cue

5        from what the Chairperson said, I'm not going to make

6        this point over and over except that if there's any

7        doubt on the Committee's part, we can go through it.

8                But, yes, there are permissions, but they don't

9        apply to the materials that have been infringed; they're

10       not retroactive; there's no attribution; and students

11       aren't being required to buy the textbooks, that's the

12       problem with all of the permissions that Dr. Martinez

13       has produced.

14           Q.   BY MR. UPPAL:  And, in fact, Mr. Garrison, the

15       fact that Dr. Martinez knows how to go about getting

16       permissions from publishers, does that indicate anything

17       to you?

18           A.   Well, I think it does.  It would -- it would

19       certainly be used, or could be used, as evidence of

20       willfully trying to evade the restrictions and

21       intentionally infringing on the work.

22           Q.   Why does the fact that Dr. Martinez has

23       permissions just not for the works she infringed, why

24       does that show willful violation or willful

25       infringement?
```

MCCCD/Martinez 03522

1      A.   Couple of things.  Number one, you know how to

2    get it, so to then bury your head in the sand and not

3    get it is evidence of intentionally not doing so.

4          Second, when you look through the e-mail

5    correspondence from the fall of 2010, what you see is

6    Dr. Martinez continually going back to Pearson in

7    particular, and kind of changing the scenario, in my

8    view, what looks like to be an effort to get Pearson to

9    say something that, yes, it's okay to use the materials

10    that could then be used out of context.

11      Q.   All right.  And with respect to the volume of

12    material that Dr. Martinez took without permission from

13    copyrighted textbooks, does that have any significance

14    with respect to fair use or any other issue?

15      A.   Well, the -- the volume is certainly a factor.

16    What we saw in our analysis, in my opinion, is that

17    there was more than enough to establish that there was

18    infringement.  There is no -- some people believe that

19    there is this rule that if you only take up to a certain

20    percent, that's okay, and it's a fair use; but, that's

21    not the case at all.

22          Although the amount and substantiality is an

23    issue to be considered in the overall fair-use analysis,

24    you can then take a very small part of a copyrighted

25    work and it still would be a substantial piece of that

MCCCD/Martinez 03523

```
 1          work; and if you do that, that's going to be
 2          infringement, it's not going to qualify for a fair use.
 3          And if we're talking about in the context of a math
 4          textbook that is going to have numerous sections trying
 5          to teach numerous different mathematical principles, and
 6          you take whole sections of problems to demonstrate a
 7          particular mathematical principle, it doesn't make sense
 8          to try to do this mathematical equation in your head of,
 9          well, what percentage did it take?  That is a
10          substantial amount from the textbook as it relates to
11          that particular principle.
12               Q.    All right.  You've now covered the permissions
13          that Dr. Martinez did produce and why they don't apply
14          with respect to the material that they infringe.  With
15          respect to this textbook "Basic Mathematics," did Dr.
16          Martinez produce any permission at all?
17               A.    I did not see one.
18               Q.    With respect to this one, "Pre-Algebra"?
19               A.    I did not see one for that book either.
20               Q.    Did you have a chance to review a report that
21          Dr. Martinez produced from a lawyer named Fred Bellamy?
22               A.    I did.
23               Q.    And who is Mr. Bellamy?
24               A.    Mr. Bellamy is a lawyer at Steptoe & Johnson
25          here in Phoenix.
```

1    Q.    And you have nothing against Mr. Bellamy right?

2    A.    I do not.

3    Q.    And you read his report?

4    A.    Yes.

5    Q.    Okay.  And his -- again, to expedite matters,

6    Mr. Bellamy's report essentially states that in his

7    opinion Dr. Martinez did not engage in copyright

8    infringement.

9         MR. MONTOYA:  Objection.  I don't think that he

10   can testify to what a piece of evidence says that has to

11   be introduced into evidence first.  Mr. Uppal is not a

12   witness in this case.

13        MR. UPPAL:  I'll withdraw the question.

14        CHAIRPERSON CRUDUP:  Okay.

15   Q.    BY MR. UPPAL:  What is -- since you read it and

16   since you're an expert, what is the central position of

17   Mr. Bellamy's report?

18   A.    Mr. Bellamy argues that Dr. Martinez's course

19   packet or lecture notes -- we don't know exactly which

20   one because he doesn't say -- is fair use.

21   Q.    Okay.  And does Mr. Bellamy give any opinion

22   with respect to the three charts that you created as to

23   which you've testified Dr. Martinez engaged in copyright

24   infringement?

25   A.    I don't recall him addressing the charts at all

MCCCD/Martinez 03525

1    in his letter.

2        Q.   Can you tell from Mr. Bellamy's two-page letter

3    what he reviewed?

4        A.   Well, you can't because it says, number one,

5    that the materials you sent include your spring 2000

6    [sic] lecture notes for MAT 182 trigonometry, and the

7    problem we have for that is that two of the course

8    packets that I reviewed have at least a heading in those

9    materials for MAT 182 trigonometry.  So, we don't know

10   which of the two, for starters, that he may have been

11   looking at.

12           Then he also says, "as well as the pages from

13   the required textbook that contains similar math

14   problems," but we don't know what textbook that was,

15   what pages those were, and it's my understanding that

16   there wasn't a required textbook in the spring of 2010.

17       Q.   So, Mr. Bellamy when he says "required

18   textbook," what does -- what does that phrase illustrate

19   or point to?

20       A.   I'm not sure I understand your question.

21       Q.   What does "required textbook" mean?  Does it

22   mean that the textbook was required?

23       A.   It would suggest at least he was told that the

24   textbook was required for the class.

25       Q.   So, let's look at the factors that Mr. Bellamy

1    points to in his report.  He indicates that the lecture

2    notes do not appear to supplant the textbook but rather

3    to supplement it.  What -- what do you have to say to

4    the Committee about that issue?

5        A.   That flies in the face of all the evidence that

6    we have, that the purpose of the course materials were

7    to replace the textbook so that the students did not

8    have to buy it.

9        Q.   And, in fact, that's what some of the students

10   are saying in their reviews, right?

11       A.   Yes.

12       Q.   So is it your contention that this is a

13   factually incorrect statement?

14       A.   Based on the evidence that I've seen, yes.

15       Q.   And, once again, we don't know what Mr. Bellamy

16   looked at, we don't even know whether he looked at the

17   course materials that you reviewed, do we?

18       A.   We don't.

19            MR. MONTOYA:  It is 11:15.  He has taken all of

20   the time testifying for this witness.  I just ask that

21   the Committee hold -- not hold that against us, but hold

22   it against him because he has a lot of other stuff that

23   he's going to want to go through you with -- go through

24   with you, and he's taking all of the time and it should

25   only be his time, not -- not our time.

MCCCD/Martinez 03527

1          MR. UPPAL:  I'd like to address this.  And I

2     want to say that I've known Mr. Montoya for a very long

3     time and I really respect his capability and what he's

4     trying to do for his client, but this is now about the

5     tenth time he's raised this objection.  I think the

6     Committee has ruled on it.  But now that we're at the

7     tenth time that the same objection has been raised, I

8     think it's fair to say I need to point out that Mr.

9     Montoya and his client did not even show up on time.

10         MR. MONTOYA:  I think we did.  I think we were

11    here early.  In fact, I know we were and that can be

12    confirmed with the guard downstairs.

13         MR. UPPAL:  Then that's fine, I withdraw that

14    if that's the case.  We were here at 9 o'clock and maybe

15    perhaps Mr. Montoya didn't realize, and that's fine.

16         MR. MONTOYA:  We were preparing downstairs and

17    we came up.

18         MR. UPPAL:  We were ready to proceed at 9:00.

19    I think this issue has been ruled on.

20         MR. CALDERON:  For your information, Chairman,

21    the hearing was set for 9:30.

22         MR. UPPAL:  That's fine.  We were hear at 9:00,

23    but if it's 9:30, we were here too.  But I think Mr.

24    Montoya is actually cutting into my time by making the

25    same objection ten times after the Committee has ruled

1    on it.

2         MR. MONTOYA:  I don't think the Committee has

3    ruled on it.  And this was a specific request, that his

4    use of his time should be -- should cut into the rest of

5    his time, not into our time.  And that's -- that's a

6    request that I urge you -- that's very traditional in

7    these types of cases, that if someone uses up all their

8    time, that's their problem and not the other side's

9    problem.  That -- Court's routinely issue rulings in

10   that regard.  Of course, you don't have to, but I think

11   -- I think it's appropriate for me to ask you to.

12        CHAIRPERSON CRUDUP:  We're going to take that

13   into consideration.  There is a good chance we're going

14   to be beyond today the way things are going.

15        So, just a rough timeline.  From 9:30 to 9:50

16   we had intro and opening statements; from 9:50 to 11:15

17   we've had Phoenix College -- is that what this says? --

18   and then from 11:50 to 12:30 [sic] let's have lunch; and

19   from 12:20 to 11- -- to 1:20, Phoenix College witnesses;

20   and then and then 1- -- 1:20 to 4:20 Dr. Martinez's

21   witnesses; then from 4:20 to 5:00, closing statements.

22        MR. MONTOYA:  Yes.

23        CHAIRPERSON CRUDUP:  Let's shoot for that, but

24   there's a good chance we'll have to go to that.

25        MR. UPPAL:  I certainly agree and defer with

MCCCD/Martinez 03529

```
 1        all that, my only point would be as I made previously,
 2        Mr. Montoya's cross-examination has to count against his
 3        time.
 4               MR. MONTOYA:  I disagree with that.  Not, if
 5        he's taking -- not if he's -- not at the rate that he's
 6        going.  He has known from the very beginning that we
 7        only have a short period of time but, yet, he insists
 8        stubbornly to proceed the way that he's proceeding, and
 9        I respect him for that, but that's his choice and he
10        should bear the responsibility for it, not us.
11               DR. CAIRE:  May I ask a question?
12               CHAIRPERSON CRUDUP:  Yes.
13               DR. CAIRE:  If Mr. Martinez's questioning is
14        taken out of his time, how are we going to guarantee
15        that your questioning will be taken out of your time if
16        it's at the end of the hearing?
17               MR. UPPAL:  Well, both sides have to -- both
18        sides' cross-examination have to count against their
19        time allotment.  Mine will as well.
20               MR. CALDERON:  Mr. Chairman, I recommend that
21        cross-examination be taken out of the time allotment of
22        the person who has called the witness, unless it looks
23        like somebody is asking cross-examination in order to
24        delay, then -- then it should be reconsidered.  But
25        normally you present a witness; you ask your witness
```

MCCCD/Martinez 03530

```
 1      questions and expect the cross-examination; you get a

 2      rebut if you want.  That should come out of the time of

 3      the person that calls the witness, unless it looks like

 4      the person on cross is trying to string it out for no

 5      reason, then I would recommend the Hearing Committee

 6      tell them stop, we've heard enough.

 7              That's my recommendation, Mr. Chair.

 8              CHAIRPERSON CRUDUP:  Okay.  I agree.

 9      Q.   BY MR. UPPAL:  All right.  So continuing, sir,

10      with respect to Mr. Bellamy's two-page letter --

11      actually, let me move on.

12              Does it change your opinion in anyway that Dr.

13      Martinez engaged in verbatim and repetitive copyright

14      infringement?

15      A.   No.

16      Q.   Okay.  And does Mr. Bellamy's report address

17      your report in any manner?

18      A.   It does not.  And it appears to rely upon facts

19      that aren't supported by the evidence that I've seen.

20      Q.   And read the fourth item that Mr. Bellamy

21      states in his two-page letter -- well, actually, let me

22      read it and ask you for your reaction.

23              "There does not appear to be any adverse effect

24              on the potential market for the textbook based

25              on the lecture notes, as the students are
```

MCCCD/Martinez 03531

82

```
 1                required to purchase the textbook for the
 2                course."
 3                What's your reaction to that?
 4        A.    Well, exactly as I just said.  We talked about
 5   earlier one of the significant issues being the
 6   potential market.  And in this case he seems to be
 7   relying on the fact that the students are required to
 8   purchase the textbook for the course, and the evidence
 9   that I've seen is directly to the contrary.
10        Q.    Would you agree that Dr. Martinez's -- well,
11   you've already said it.  So, you would agree, right,
12   that it was a verbatim copyright infringement?
13        A.    In many cases.
14        Q.    Would you agree it was rampant?
15        A.    Correct.
16        Q.    How about pervasive?
17        A.    That's a fair characterization.
18                MR. UPPAL:  I pass the witness.
19                THE WITNESS:  Yes.
20                MR. MONTOYA:  May I proceed?
21                CHAIRPERSON CRUDUP:  Yes.
22
23
24
25
```

MCCCD/Martinez 03532

CROSS-EXAMINATION

BY MR. MONTOYA:

    Q.   You practice law privately?

    A.   I do.

    Q.   Intellectual property?

    A.   Correct.

    Q.   Do you litigate copyright cases?

    A.   I have, yes.

    Q.   You ever represented any publishers?

    A.   Any publishers, no.

    Q.   Would you like to?

    A.   I --

    Q.   It would be a good client, right?

    A.   Any potential client can be a good client.

    Q.   Wouldn't a large publisher be a good client,
Mr. Garrison?  That's true, isn't it?

    A.   Could be.

    Q.   Now, Mr. Garrison, you know this report of
yours, what's it dated?

    A.   Which report are you referring to?

    Q.   Your expert report that's right in front of you
beginning with page 1, Garrison page 1.  What's the date
of that, please?

        Do you mind if I come and show you?

MCCCD/Martinez 03533

84

```
 1            A.   This is Exhibit 6, April 19th, 2013?

 2                 MR. MONTOYA:  Can I move this so I don't trip

 3      over it?

 4                 MS. BLACH:  Yes.

 5            Q.   BY MR. MONTOYA:  Okay.  And I'm looking at the

 6      first page.  Did you prepare this in the context of a

 7      lawsuit?

 8            A.   Yes, I did.

 9            Q.   Okay.  And as an expert witness in a lawsuit,

10      you're hired to add -- to help the person who hired

11      you's case, aren't you?

12            A.   I'm hired as an expert witness to give you an

13      opinion on whatever is at issue in the case.

14            Q.   Have you ever heard of a client hiring an

15      expert who gives adverse opinions that is disclosed to

16      the Court?

17            A.   I've seen that happen all the time, yes.

18            Q.   Have you ever -- isn't it true that before a

19      client discloses an expert in federal court, the client

20      gets a preliminary opinion from the expert to see if it

21      helps the client's case?

22            A.   Not always the case, no.

23            Q.   How many cases have you tried in federal court,

24      sir?

25            A.   In federal court, to trial I would say probably
```

MCCCD/Martinez 03534

1      one or two.

2            Q.   How many years have you been practicing?

3            A.   Twenty-one.

4            Q.   Twenty-one years you've tried to two federal

5      cases?

6            A.   Yes.

7            Q.   Were they in copyright?  If you can --

8            A.   I do not remember.

9            Q.   -- remember.

10           You don't remember.

11           MR. UPPAL:  Could -- could you let the witness

12     answer the question, please?

13           MR. MONTOYA:  Chair, I don't want to get into

14     any arguments with opposing counsel.  Consequently, I'm

15     going to ask opposing counsel to direct his questions

16     not to me but to the Chair.

17           MR. UPPAL:  Objection.  In that case -- very

18     well.

19           Objection.  I request the Chair direct Mr.

20     Montoya to allow the witness to answer the question

21     before he moves onto the next question and not talk over

22     the witness.

23           MR. MONTOYA:  And I'll try to.  I'm trying to

24     go quickly.

25           Q.   BY MR. MONTOYA:  How many appeals have you

1       argued regarding the issue of copyright, sir?

2            A.   One.

3            Q.   Okay.  Have you ever been qualified as an

4       expert in federal court?

5            A.   I have not.

6            Q.   Now, tell -- tell the Members of the Committee

7       how much money you were paid to prepare this opinion of

8       yours.

9            A.   I'm paid $500 an hour.

10           Q.   Times how much?  You know, mathematics.  Right?

11           A.   I had not calculated how much time I spent on

12      it, but probably in the nature of -- neighborhood of

13      $10,000.

14           Q.   Okay.  And how much have you charged them to

15      prepare for this hearing?

16           A.   I haven't sent out a bill yet, but it's been

17      probably another 7 to 10 hours.

18           DR. REYES:  Mr. Chairman, may I ask a question,

19      please?

20           CHAIRPERSON CRUDUP:  Yes.

21           DR. REYES:  Would it be possible, rather than

22      to try to get a person's character and profession, if we

23      can focus on the packets we were presented.

24           MR. MONTOYA:  I will.

25           DR. REYES:  Because we can waste a lot of time.

         1              MR. MONTOYA:  I will, but let me respond to

         2       that.  The reason why I'm going into this is because

         3       this shows -- I do like Mr. Garrison, he's certainly a

         4       nice man; however, it's important for the Committee to

         5       know that expert witnesses -- lawyers know you can find

         6       an expert witness to say anything.  They are not

         7       objective; they are not neutral.  And one of the most

         8       important attributes of a witness is lack of bias and

         9       neutrality, and I am establishing that this witness is

        10       hardly neutral, he is a paid advocate who's already --

        11       who's an expert witness in a federal lawsuit on behalf

        12       of the District and it does go to his credibility.  He's

        13       not someone who just is giving you a scientific

        14       analysis.

        15              But I was able to be done with that part of it

        16       anyway.

        17              DR. REYES:  One more question.  Did you -- did

        18       you have any opposition to the facts that were shared by

        19       Mr. Garrison?

        20              MR. MONTOYA:  Oh, yeah.  I'm about to get to

        21       that.

        22              DR. REYES:  If you can please --

        23              MR. MONTOYA:  I will.

        24              DR. REYES:  -- stick with those points, that

        25       will be appreciated.

MCCCD/Martinez 03537

1          MR. MONTOYA:  I will.

2      Q.   BY MR. MONTOYA:  Do you have any math

3   background?

4      A.   Other than math classes that I took in college,

5   no.

6      Q.   Were you a math major?

7      A.   I was not.

8      Q.   What did you major in?

9      A.   I went in as a physics major and come out as a

10   comparative literature major.

11      Q.   Okay.  Did you understand the equations that

12   you were reviewing?

13      A.   I didn't feel that I had to -- had to

14   understand the equation to know whether or not --

15      Q.   Can you answer the question?

16      A.   -- there was copying.

17      Q.   Can you answer the question?

18      A.   I am.

19      Q.   Answer the question?

20      A.   I am.

21          THE COURT REPORTER:  I'm sorry.  I'm sorry.

22   Please, one at a time.

23          THE WITNESS:  If you would allow me to answer,

24   I'd be happy to do that.

25          MR. UPPAL:  Mr. Chairman?

1        Q.   BY MR. MONTOYA:  Did you understand the

2    equation, that's the question?

3            MR. UPPAL:  Mr. Chairman.

4            CHAIRPERSON CRUDUP:  Yes.

5            MR. UPPAL:  I object.  Once again Mr. Montoya

6    is not allowing the witness to answer the question when

7    he doesn't like the answer.  And so this -- this is just

8    fairness.  And the witness said it himself before I

9    objected, he wants to answer the question.

10           CHAIRPERSON CRUDUP:  Please allow the witness

11   to answer.

12           MR. MONTOYA:  He wasn't answering.

13           MR. UPPAL:  That's argumentative.

14           MR. MONTOYA:  Okay.  Well, let me ask the

15   question.  It's a super simple one grammatically.

16           MR. UPPAL:  No.  No, I object.  He had an

17   answer he wanted to give and he should be allowed to

18   give it before we move on to the next question.

19           CHAIRPERSON CRUDUP:  I'll allow the witness to

20   answer the question.

21           MR. MONTOYA:  Okay.  Okay.

22       Q.   BY MR. MONTOYA:  Go ahead and answer.

23       A.   I believe what I said was:  In order to

24   determine whether or not there was copying, I did not

25   have to understand the equation or not.

MCCCD/Martinez 03539

90

1      Q.   Okay.  I understand that.

2      A.   So, I didn't focus on that.

3      Q.   Okay.  Did you -- now, here's the question --

4   that I understand what you just said, you say you didn't

5   have to.

6           My question is:  Did you understand the

7   equations?

8      A.   I didn't focus on that one way or the other to

9   try and understand them or not.

10     Q.   Okay.  Do you believe that mathematical

11  formulas and equations can be copyrighted?

12     A.   The underlying principles?  I'm not quite sure

13  I understand your question.

14     Q.   Well, okay.  Do you understand that there are

15  mathematical formulas and mathematical calculations

16  applying those formulas?

17     A.   So, you're talking about something like "PI r2"

18  is the area of a circle, that kind of equation?

19     Q.   That's a formula.

20     A.   A formula is that what you're referring to?

21     Q.   And that formula can be represented numerically

22  and graphically using geometry, correct?

23     A.   No.

24     Q.   Okay.  Can that be copyrighted?

25     A.   The formula itself, no.

Miller Certified Reporting, LLC

MCCCD/Martinez 03540

1      Q.   Okay.  Now, can mathematical calculations be

2   copyrighted?

3      A.   Yes.

4      Q.   That's your view?

5      A.   Yes, if you --

6      Q.   Okay.  Are you aware that the Supreme Court of

7   the United States has ruled -- do you know what an

8   algorithm is?

9      A.   I do know what an algorithm is.

10      Q.   Tell the Committee what an algorithm is.

11      A.   An algorithm is a formula that is used by a

12   computer to carry out a particular function.

13      Q.   Only by a computer?

14      A.   Well, it doesn't have to be a computer.

15      Q.   Do mathematicians use mathematical algorithms?

16      A.   Yes, they do.

17      Q.   Okay.  Answer the Committee whether or not an

18   algorithm is subject to copyright?

19      A.   Subject to copyright?

20      Q.   Yes.  That's a simple question.

21      A.   As an algorithm expressing a particular

22   principle of math, I don't think it would be.

23      Q.   Okay.  Now, it's true that insubstantial

24   copying doesn't violate the copyright law, right?

25      A.   I don't think you can just say "insubstantial

MCCCD/Martinez 03541

1    copying."

2         Q.   Isn't substantiality an element of a copyright

3    claim?  The infringement has to be substantial; isn't

4    that true, yes or no?

5         A.   No, there has to be copying.

6         Q.   Okay.  But the copying has to be substantial,

7    right?

8         A.   No.  The copying -- there has to be copying.  I

9    think what you're referring to, sir, may be the concept

10   of substantial similarity.

11        Q.   Well, okay.  So, did you try to find out how

12   extensive the copying that you claimed Professor

13   Martinez was -- how extensive, was it?

14        A.   I think the charts that I prepared showed that

15   it was very extensive.

16        Q.   Okay.  Now, let's do a little bit of

17   arithmetic.  What percentage was copied and what

18   percentage was not?

19        A.   As I said in my direct testimony, you wouldn't

20   do that --

21        Q.   You don't know?

22        A.   -- calculation.

23        Q.   Do you know?

24             MR. UPPAL:  Objection.

25             MR. MONTOYA:  He answered the question.  He

```
 1     said he didn't know.

 2            MR. UPPAL:  When Mr. Montoya -- objection.

 3     When Mr. Montoya does not like the answer, he cuts off

 4     the witness, the witness has not completed his answer,

 5     and Mr. Montoya once again raised his voice, cut off,

 6     and tried to move ahead.  So, I want the witness to be

 7     able to answer.

 8            CHAIRPERSON CRUDUP:  Let the witness answer.

 9     Q.   BY MR. MONTOYA:  Do you know what --

10            MR. UPPAL:  Wait.

11            MR. MONTOYA:  Okay.  Go ahead.

12            MR. UPPAL:  Objection.

13     Q.   BY MR. MONTOYA:  Go ahead.  Answer away.

14     A.   What was the question?

15     Q.   The question was:  Do you know --

16            MR. UPPAL:  No.  I -- I -- objection.

17            MR. MONTOYA:  What the --

18            MR. UPPAL:  I'd like the exact question read

19     back.

20            MR. MONTOYA:  And that's the Chair's call, not

21     your call, Mr. Uppal.

22            MR. UPPAL:  I didn't say it was my call.  I

23     said I would like the question to be read back.

24            CHAIRPERSON CRUDUP:  Just rephrase the

25     question, please.
```

MCCCD/Martinez 03543

94

1     Q.   BY MR. MONTOYA:   Okay.   Do you know what

2    numerical percentage Professor Martinez copied from the

3    source works in any particular example?

4     A.   I -- no.   Other than the particular examples

5    were verbatim copying.

6     Q.   You --

7     MR. MONTOYA:   Okay.   And the reason why I

8    interrupt him, I would ask that the witness be directed

9    to answer my questions.   We are really pressed for time.

10    If you want to come in and be here all day, that would

11    be fine, but I really would like to move on.

12     MR. UPPAL:   Objection.   That's argumentative.

13    He's answering the questions, Mr. Montoya just doesn't

14    like the answers he's getting so he keeps cutting the

15    witness off.

16     CHAIRPERSON CRUDUP:   Please.

17     Q.   BY MR. MONTOYA:   Now, so you claim Professor

18    Martinez infringed the copyright laws or violated the

19    copyright laws?

20     A.   Yes.

21     Q.   Okay.   Tell the Committee -- this is really

22    important -- in your view, when was the last instance in

23    your opinion of infringement?   Chronologically in time

24    when was the last incident?

25     A.   I'm not -- well, I'm not sure I understand the

MCCCD/Martinez 03544

1      question.  Are you talking about of the four course

2      materials that I review?

3          Q.   Of everything you reviewed, whatever it was

4      that you reviewed, when -- tell the Committee when the

5      last infringement was in time chronologically.

6          A.   Well, of the four course packets that I

7      reviewed the last once came from the fall of 2010.

8          Q.   Okay.  So that was three years ago?

9          A.   Yes, it would be.

10         Q.   What's the statute of limitations on copyright

11     claims?

12         A.   Three years from the discovery of the

13     infringement.

14         Q.   Okay.  And you saw this correspondence

15     between -- do you know whether -- okay.  You claim that

16     -- a paid expert witness -- that Professor Martinez

17     violated the copyright laws.  Do you know whether the

18     publisher's lawyers, their teams of lawyers have claimed

19     that Professor Martinez has violated the copyright laws?

20         A.   No, I have no idea.

21         Q.   You said that fair use was a statutory defense;

22     is that true?

23         A.   Yes, it is.

24         Q.   It's also a common law defense, isn't it?

25         A.   Well, there is no more common law copyright.

MCCCD/Martinez 03545

1      That was abolished by the 1976 Copyright Act.

2          Q.   But, in fact, the statute incorporated the

3      common law, right?

4          A.   The statute codified certain elements from the

5      common law; but it's a statutory defense, there's no

6      more common law.

7          Q.   So, according to you there's no common law of

8      copyright.  What about copyright cases subsequent to the

9      passage of the Copyright Act, isn't that a common law of

10     copyright?

11         A.   I'm not sure I understand your question.

12         Q.   I withdraw the question.

13              Now -- now, you say that whether or not

14     something is on Google has nothing to do with copyright?

15         A.   I believe what I said is whether or not

16     something is available on the Internet, whether that's

17     through Google or anywhere else, does not mean that it

18     is not protected by copyright.

19         Q.   Have you ever been on Google Books?

20         A.   I'm not sure if I have.

21         Q.   Have you ever heard of an author named Toni

22     Morrison?

23         A.   Yes.

24         Q.   Were you a fan of hers?

25         A.   I wouldn't say a fan but I've heard of her.

MCCCD/Martinez 03546

1          Q.   Have you ever heard of her famous book,

2    "Beloved"?

3          A.   No.

4          Q.   Do you know whether or not you can read

5    90 percent of it on Google Books even though it's

6    copyrighted?

7              MR. UPPAL:  Objection.  Facts not in evidence.

8              MR. MONTOYA:  I'm asking him what he knows.

9              MR. UPPAL:  No, that --

10           THE WITNESS:  No, I don't know.

11           MR. UPPAL:  -- that presupposes something.

12           CHAIRPERSON CRUDUP:  Okay.  Go ahead and answer

13    it.

14          Q.   BY MR. MONTOYA:  Do you know whether or not you

15    can read 90 percent of Toni Morrison's famous book

16    "Beloved" on Google Books?

17          A.   I do not.

18          Q.   Have you ever heard of a -- you like legal

19    books?

20          A.   Not particularly.

21          Q.   Have you ever heard of a book called "Simple

22    Justice" by Richard Kluger?  It won the National Book

23    Award?

24          A.   No.

25          Q.   Do you know whether -- so, you wouldn't know

MCCCD/Martinez 03547

 1        whether you can read that book that's copyrighted in

 2        it's entirety on Google Books?

 3             A.   I do not.

 4             Q.   Now, what is your -- you went to Columbia Law

 5        School?

 6             A.   I did.

 7             Q.   That's a fine law school, isn't it?

 8             A.   I -- I liked it.  I had --

 9             Q.   It's in the Southern District of New York,

10        right?

11             A.   It is in the Southern District of New York.

12             Q.   In fact, a lot of intellectual property

13        litigation transpires in the Southern District of New

14        York in Downtown Manhattan, right?

15             A.   It does.

16             Q.   So, it's -- the Southern District of New York

17        is a hotspot for copyright litigation, isn't it?

18             A.   Between the Southern District of New York and

19        the Ninth Circuit, those probably are the two primary

20        venues.

21             Q.   Well, have you read the District Court's recent

22        opinion in Authors Guild versus Google?

23             A.   I'm aware of it; I've not read the opinion.

24             Q.   Are you aware that a federal judge ruled in

25        that case that Google Books --

MCCCD/Martinez 03548

1      MR. UPPAL:  Objection.

2      Q.   BY MR. MONTOYA:  -- didn't violate --

3      MR. UPPAL:  Objection.  Where is this in Mr.

4  Montoya's submissions?  I'd just like to be cited to the

5  exhibit.

6      MR. MONTOYA:  I'll tell you, it's in the

7  citation of supplemental authority that I filed with the

8  Committee's counsel, each Member of the Committee, and

9  opposing counsel on Friday.  That's exactly where it is.

10  Plus, it's also all over the Internet.  It's the biggest

11  news in the area of copyright for the past month.

12      MR. UPPAL:  I don't have it.  Is it an exhibit?

13  I mean, you can just point me to -- I've -- I got a

14  binder of your materials.

15      MR. MONTOYA:  What I'll do is I got a copy for

16  you.  Here's a copy for you.

17      MR. UPPAL:  But my question was --

18      MR. MONTOYA:  Don't ask me questions.

19      CHAIRPERSON CRUDUP:  He supplied it by e-mail

20  to us on Friday.

21      MR. UPPAL:  Where is the actual document?  Was

22  it -- is it in evidence?  I just -- it's a question at

23  point.  Is the -- is the --

24      MR. MONTOYA:  Can I answer?

25      MR. CALDERON:  I'll answer.  Mr. Chairman, I

MCCCD/Martinez 03549

1    understand everything that was submitted has been

2    admitted as evidence, the whole shebang.

3           MR. UPPAL:  So, Mr. Calderon, was the opinion

4    submitted by Mr. Montoya?

5           MR. CALDERON:  Everything up to this morning

6    when we started at 9:30 is in the record.

7           MR. UPPAL:  Very good.

8       Q.  BY MR. MONTOYA:  Okay.  Have you ever heard of

9    a Jurist named Denny Chin?

10       A.  I do not know Denny Chin.

11       Q.  Have you ever heard of the United States Court

12    of Appeals for the Second Circuit?

13       A.  Yes, I have.

14       Q.  Isn't that one of the most renowned circuit --

15    federal circuit courts in the United States?

16       A.  It's the Court of Appeals for the Southern

17    District of New York.

18       Q.  Is that a yes or a no?

19       A.  I don't know how you measure whether it's

20    renowned or not.

21       Q.  You think it's renowned, don't you?

22       A.  No, I wouldn't determine it to be renowned or

23    not.

24       Q.  Okay.  Are you aware that Denny Chin, even

25    though he was sitting as a District Court judge is in

MCCCD/Martinez 03550

1    fact really a judge on the Second Circuit Court of

2    Appeals?

3         A.   I am aware of that now that you mentioned it.

4         Q.   And are you aware that in Judge Chin's written

5    opinion of last Friday, he concluded that Google Books

6    did not violate the federal copyright laws because

7    Google Books copying of over 20 million books --

8              MR. UPPAL:   Objection.   Is this a question or a

9    speech?

10        Q.   BY MR. MONTOYA:   -- was fair use under the

11   copyright law?   Are you aware of that, question mark?

12             THE WITNESS:   May I respond?

13             CHAIRPERSON CRUDUP:   Yes.   Respond.

14             THE WITNESS:   I am aware that the opinion was

15   released on Friday.   As I mentioned, I have not read

16   that opinion.   I am aware that the opinion found that

17   the Google Books' indexing of the books was -- was

18   not -- was a fair use.

19             And the issues that I understand from the

20   summaries that I have read on that case were that there

21   were two principle differences in that case from what we

22   have here.   Number one being that Google's copying was

23   transformative in nature in that the purpose of what

24   Google was doing was to index and make numerous books

25   that are, for example, no longer in print available to

MCCCD/Martinez 03551

1    be found and located, number one; but, number two, that

2    these were not intended to be a substitute for obtaining

3    the books themselves.

4        Q.   BY MR. MONTOYA:  Okay.

5             DR. REYES:  Mr. Chairman, may I?

6             CHAIRPERSON CRUDUP:  Yes.

7             DR. REYES:  A question regarding -- we all

8    received the Google document and information --

9             MR. MONTOYA:  Yes.

10            DR. REYES:  -- and appreciate that.

11            My question is in regard to how it was

12   presented by Google.  I believe they have reference

13   information for where they took the -- the information,

14   what was being scanned.  There was all these citations.

15   So, if we could stick to that line of questioning with

16   regard to the fact of --

17            MR. MONTOYA:  Well -- well, we really can't

18   because you've not been on Google Books obviously --

19            DR. REYES:  Yes, I have.

20            MR. MONTOYA:  -- because it's not a question of

21   citation, Professor, it's a question of wholesale

22   complete copying.  This isn't a question of pulling out

23   a paragraph without citation, this -- they copied 90

24   percent of Toni Morrison's book, including the cover.

25            So, my basic point is --

1          MR. UPPAL:  Objection.  Objection.  So I just

2     want to say to the Committee that what Mr. Montoya just

3     said is argument.  He's not a witness.

4          MR. MONTOYA:  I answered a question.

5          MR. UPPAL:  He has no expertise in copyright

6     law.  He's not a copyright lawyer.  I would just say to

7     the Committee, he's saying a lot of things under the

8     guise of a question that's actually a speech.  For what

9     he says, there's no evidence.

10          MR. MONTOYA:  Well, my response would be, the

11     evidence is Judge Chin's 30-page written opinion that

12     speaks for itself.

13          And the evidence is also something that you can

14     take judicial notice of and that is Google Books.  I'm

15     telling you, they are replicating these books --

16          MR. UPPAL:  He's telling you -- objection.

17          MR. MONTOYA:  -- virtually in photo.

18          MR. UPPAL:  That's argument.  That's not a

19     fact.

20          MR. MONTOYA:  I'm answering a question --

21          MR. UPPAL:  He's telling you.

22          MR. MONTOYA:  -- that a Member of the

23     Committee --

24          MR. UPPAL:  He's telling you.  This is

25     argument.

MCCCD/Martinez 03553

```
 1            MR. MONTOYA:  I was trying to answer a
 2    question, Professor.
 3            DR. REYES:  Okay.  I'm just going back to what
 4    was stated.  And based on my own notes, I understood Mr.
 5    Garrison to say in response to a previous question what
 6    would have made Dr. Martinez's use of copyright material
 7    alined with fair use, and the response was getting
 8    authorization from copyright to -- well, in my -- in my
 9    words.
10            MR. MONTOYA:  I understand.  That's a good
11    point.  I want to go to --
12            DR. REYES:  -- as supplemental; not substitute
13    for textbook; and acknowledgment regarding the source as
14    to whether the material came.  That's what I'm trying to
15    get back to.
16            MR. MONTOYA:  And, thank you.  I want to get
17    back to that.
18            DR. REYES:  Okay.
19        Q.   BY MR. MONTOYA:  I'm going to show you
20    something on my little iPad that you guys can see, too.
21    It's what I've been talking about.  It's Toni Morrison's
22    book "Beloved" on Google Books.  Does this look like a
23    supplement or the actual book?
24        A.   It looks to be a scan of the book.
25        Q.   Yeah.  And it's your understanding that --
```

MCCCD/Martinez 03554

1    isn't it true that three private authors with

2    copyrighted books -- not out-of-print books, not books

3    whose copyright had expired -- sued Google for copyright

4    infringement in Authors Guild versus Google?

5        A.   I do not know how many there were.

6        Q.   You don't?

7        A.   I don't.

8        Q.   You don't know whether or not you agree with

9    Authors Guild versus Google or not because you haven't

10   read it, have you?

11       A.   I haven't read the opinion.  I did note on the

12   website there --

13       Q.   And --

14            CHAIRPERSON CRUDUP:  Five more minutes.

15            THE WITNESS:  Excuse me.  Next to the scan,

16   that there was -- that there was an icon and

17   availability there that said "buy the book."  That you

18   could click on it to buy it and either download it or

19   have it sent to you.

20       Q.   BY MR. MONTOYA:  Yeah.  And actually you can

21   buy -- you can buy the --

22            MR. UPPAL:  Objection.  It's not a question.

23            MR. MONTOYA:  Okay.

24            MR. UPPAL:  Here we go again.

25            MR. MONTOYA:  That was not responsive to my

MCCCD/Martinez 03555

1      question.

2              MR. UPPAL:   If Mr. Montoya is going to continue

3      this, I should get to cross-examine him.

4              CHAIRPERSON CRUDUP:   Move on.

5         Q.    BY MR. MONTOYA:   Under the Fair Use Doctrine

6      you don't need the copyright holder's permission, do

7      you?

8         A.    That's correct.

9         Q.    Under the Fair Use Doctrine, the mere fact that

10     you cite the source of what you copied, that's not a

11     defense, is it?

12        A.    That you -- no, it is not.

13        Q.    In fact, under the Fair Use Doctrine, you can

14     publish the book even if the copyright holder vehemently

15     objects, right?

16        A.    No.   I would disagree with that.

17        Q.    Okay.   Isn't it true that under the Fair Use

18     Doctrine, if -- even if the publisher objects, you still

19     get to publish it?

20        A.    The whole book?   No.

21        Q.    Well, no, you get to use the portion that you

22     published even without permission?

23        A.    If the entire analysis is gone through and a

24     Court determines in balancing the factors that that's a

25     fair use.

MCCCD/Martinez 03556

1    Q.    You're not saying --

2    A.    It's purely contextual.  There is no -- you're

3    asking for a principle of law that does not exist.

4    Q.    But you admit this, that under the Fair Use

5    Doctrine, you don't need the publisher's permission?

6    A.    That is correct.

7    Q.    And under the Fair Use Doctrine, you don't need

8    to attribute the underlying source, do you, under the

9    Fair Use Doctrine?

10    A.    Actually, if you look at the classroom

11    guidelines that are part of the legislative history that

12    is an issue.  That is the point.

13    Q.    I'm asking:  Do you know whether or not those

14    classroom guidelines were ever provided to Professor

15    Martinez?

16    A.    I don't.

17    Q.    Those classroom guidelines are not part of the

18    statute, are they?

19    A.    They are not part of the statute, they have

20    been adopted in case law.

21    Q.    But they haven't -- case law is conflicting in

22    this area, isn't it?

23    A.    I don't know what you mean by "conflicting."

24    Q.    Well, you -- okay.  I mean -- I mean what

25    "conflicting" would always mean as a part of speech.

MCCCD/Martinez 03557

1      You have differing opinions --

2                MR. UPPAL:  Objection.

3                MR. MONTOYA:   -- that contradict with each

4      other.

5                MR. UPPAL:  Another speech.  This is not a

6      question.

7                MR. MONTOYA:  He asked me.

8                MR. UPPAL:  But you didn't --

9                CHAIRPERSON CRUDUP:  Five more minutes.

10               THE WITNESS:  I don't know what issue is

11     conflicting.

12          Q.   BY MR. MONTOYA:  Now, do you think copyright is

13     a controversial area of law?

14          A.   In some cases it can be.

15          Q.   Okay.  Do you think that the nature of

16     copyright is evolving in light of the Internet?

17          A.   Certainly.

18          Q.   Fred Bellamy, do you know him?

19          A.   I know him, yes.

20          Q.   Do you know he -- he went to Harvard College,

21     are you aware of that?

22          A.   I am aware of that.

23          Q.   Are you aware that he went to Harvard Law

24     School?

25          A.   I believe that's right.

MCCCD/Martinez 03558

        Q.   Are you aware he was a partner at Brown & Bain

for many years?

            MR. UPPAL:  Objection.  Now --- you know, he's

having an objection for wasting time.  Mr. Bellamy --

            MR. MONTOYA:  He asked him about Fred Bellamy.

            MR. UPPAL:  No, he didn't.  Mr. Bellamy can

come here and testify about going to Harvard himself.

            MR. MONTOYA:  Can I respond before the

Committee rules?  Can I say something before you rule?

            Mr. Uppal asked:  Do you know who Fred Bellamy

is, he works at Steptoe & Johnson.  I'm just following

up on Fred Bellamy.

            MR. UPPAL:  We'll stipulate he went to Harvard.

        Q.   BY MR. MONTOYA:  Are you aware he was a partner

at Brown & Bain for many years?

        A.   That I don't remember.

        Q.   The date of your expert opinion is April 19,

2013, correct?

        A.   Correct.

        Q.   And can -- do you remember criticizing Mr.

Bellamy's opinion for not considering your expert

opinion?

        A.   I think what I was criticizing was the original

report that I had prepared in 2010.

        Q.   Who gave you the materials that you based your

```
 1          opinion on factually?  Who gave you the factual data

 2          that you based your opinion on?

 3              A.    In 2010?

 4              Q.    Whenever.

 5              A.    2013?  It came from, as I said, the meeting

 6          that I had with --

 7              Q.    It came from the District?

 8              A.    -- Cassandra Kakar and Joe Sueyoshi, yes.  It

 9          came from my own independent searching and evaluation

10          and --

11              Q.    Did you interview Professor Martinez?

12                    MR. UPPAL:  Objection.  Objection.  Once again

13          he's --

14                    MR. MONTOYA:  I only have two minutes.  I'm

15          trying to get my point across.

16                    MR. UPPAL:  Well, then, don't interrupt.

17                    THE WITNESS:  And --

18              Q.    BY MR. MONTOYA:  Did you interview Professor

19          Martinez?

20              A.    I did not.

21              Q.    So, you don't -- you don't know her factual

22          explanation for what she did, do you?

23              A.    Only from the e-mail correspondence and the

24          deposition testimony that I've read.

25              Q.    How do you know you've got all the e-mails from
```

MCCCD/Martinez 03560

1      Professor Martinez?  How do you know they were complete?

2          A.   I don't.

3               MR. MONTOYA:  No further questions.  Thank you.

4               Thank you, sir.

5               CHAIRPERSON CRUDUP:  Okay.  I guess lunch break

6      recess until what time?

7               THE WITNESS:  So, I'm done?  Do I understand

8      that?

9               MR. UPPAL:  Now, actually, may I make a request

10     of the Committee?  I'd like to limit my redirect to this

11     witness to five minutes.  So, if we could delay lunch by

12     five-minutes and then we could excuse this witness.

13               CHAIRPERSON CRUDUP:  Okay.  Proceed.

14

15                    REDIRECT EXAMINATION

16

17     BY MR. UPPAL:

18         Q.   Mr. Garrison, since Mr. Montoya has questioned

19     you about this opinion, read that last paragraph of page

20     20 out loud to the Committee and please tell the

21     Committee what that means.

22         A.   Are you -- the paragraph that starts

23     "similarly"?

24               MR. MONTOYA:  Objection.

25               MR. UPPAL:  Sure.

MCCCD/Martinez 03561

1          MR. MONTOYA:  Now, he's asking this witness to

2     read something to you --

3          MR. UPPAL:  It's two sentences.

4          MR. MONTOYA:  -- that's already in evidence.

5          MR. UPPAL:  It's two sentences.

6          MR. MONTOYA:  That is a waste of time.

7          MR. UPPAL:  It takes less than his objection.

8          CHAIRPERSON CRUDUP:  You can read.  Go ahead.

9          THE WITNESS:  Okay.  "Similarly Google Books is

10              also transformative in the sense that it has

11              transformed book text into data for purposes of

12              substantive research, including data mining and

13              text mining in new areas, thereby opening up

14              new fields of research.  Words in books are

15              being used in a way they have not been used

16              before.  Google Books has created something new

17              in the use of book text.  The frequency of

18              words and trends in their usage provides

19              substantive information."

20     Q.   BY MR. UPPAL:  Is there anything transformative

21     about what Dr. Martinez did with respect to the

22     materials that you told the Committee were copyright

23     infringement?

24     A.   No.  Her coursework were merely a substitute.

25          MR. MONTOYA:  Objection.  He's not a

MCCCD/Martinez 03562

1   mathematician.  He's not qualified to answer that.

2          MR. UPPAL:  That's not an objection.

3          MR. MONTOYA:  Goes to foundation.

4          MR. UPPAL:  I'm sorry.  I don't mean to chuckle

5   at that.

6     Q.   BY MR. UPPAL:  Would you tell the Committee

7   what "transformative" means in the realm of copyright

8   law?

9     A.   Sure.  In the realm of copyright law, what

10  "transformative" means is that you would take -- taken

11  an original work and repurposed it for something

12  different.  Not taken original work, summarized it, and

13  used it for the very same purpose.

14    Q.   So, what did Dr. Martinez do and how is it

15  different from the Google Books project?

16          MR. MONTOYA:  Objection.

17          THE WITNESS:  Dr. Martinez copied --

18          MR. MONTOYA:  He testified he doesn't know what

19  the Google Books project is about.  He's testified that

20  he's never even been on Google Book.

21          MR. UPPAL:  That's not an objection.  That's an

22  attempt by Mr. Montoya to keep the Committee from

23  understanding why this Google --

24          CHAIRPERSON CRUDUP:  Allow him to finish his

25  five minutes.

1              MR. UPPAL:  Thank you.

2              THE WITNESS:  The distinction is that what Dr.

3    Martinez did was to copy out of the textbooks, create

4    what is essentially a condensed version of the textbook,

5    of the -- of the principles that she was teaching, and

6    allowing the students to use that as a substitute for

7    the textbook itself.  Totally different from what the

8    Judge was describing there in Google Book.

9         Q.   BY MR. UPPAL:  So, in plain English, does

10   "transformative" mean transforming it into substantially

11   different?

12        A.   Yes.

13        Q.   And that is what Judge Chin from the section

14   just read held that Google Books does?

15        A.   Correct.

16        Q.   It takes a work that may be copyright but the

17   manner in which Google Books uses it, transforms it

18   isn't something else?

19        A.   Yes.

20        Q.   That's what makes it a fair use?

21        A.   Yes.

22        Q.   Is there anything with what Dr. Martinez did

23   with verbatim, rampant copying that is transformative?

24        A.   No.  Google Books was not simply republishing

25   books for anyone to get access to.

MCCCD/Martinez 03564

1     Q.    And in some cases, wasn't there even permission

2     that Google Books had?

3     A.    There may have been, I don't know.

4           MR. MONTOYA:   Objection.   Reading from the

5     opinion --

6           THE WITNESS:   With respect to the partner

7     program --

8           THE COURT REPORTER:   I'm sorry.   I'm sorry.

9     Please, one at a time.

10          MR. MONTOYA:   That was an objection, Chair.

11          DR. REYES:   I don't believe he answered.

12          MR. UPPAL:   I just want him to explain to the

13    Committee that some of what Google Books -- this opinion

14    is about, some of what Google Books, what this opinion

15    does, concerned copyrighted material that the Google

16    Books did not have permission for; but, in that case the

17    Judge said it's transformative, it's been transformed

18    into something different.   In respect to another

19    section, Google Books obtained permission.

20          MR. MONTOYA:   Now -- now, he's -- now the

21    hypocrisy of what he just did --

22          MR. UPPAL:   Well, I'm trying to ask the

23    witness.   He's cutting into my five minutes.   May I

24    continue, Mr. Chairperson?

25          CHAIRPERSON CRUDUP:   One more minute.

MCCCD/Martinez 03565

```
1              MR. UPPAL:  Okay.

2              THE WITNESS:  So, page 5 of the opinion is

3     referring to the partner program, where it specifically

4     says that works are displayed with permission of the

5     right's holders; it explains that partners provided

6     Google with a printed copy of their books for scanning

7     or a digital copy if one existed; partners then decided

8     how much of their books from a few sample pages to an

9     entire book would be browsable; and as of 2012, there

10    were approximately 2.5 million books with the consent of

11    some 45,000 right's holders as part of that program.

12             MR. UPPAL:  Thank you.

13             Thank you for indulging me with five minutes,

14    Mr. Chairperson and Committee Members.  I greatly

15    appreciate it.

16             CHAIRPERSON CRUDUP:  Recess until 12- -- 12:25

17    or so.

18             (Whereupon the noon recess was taken from 11:57

19    a.m. until 12:29 p.m.)

20             (Whereupon the witness enters the hearing

21    room.)

22

23             CHAIRPERSON CRUDUP:  You can call your next

24    witness.  I guess we're calling to order or reconvening.

25             MS. BLACH:  All right, we call our next
```

MCCCD/Martinez 03566

1      witness, Dr. Cassandra Kakar.

2

3                          CASSANDRA KAKAR,

4          called as a witness herein, having been first duly

5              sworn, was examined and testified as follows:

6

7                          DIRECT EXAMINATION

8

9      BY MS. BLACH:

10         Q.   Dr. Kakar, can you please let the Committee

11     know who you are and where you work.

12         A.   Yes.  I'm the Vice President of Academic

13     Affairs.  My name is Dr. Cassandra Kakar and I work at

14     Phoenix College.

15         Q.   How long have you worked for MCCCD?

16         A.   About 18 years.

17         Q.   Have you ever met Dr. Martinez before?

18         A.   Yes.

19         Q.   When did you meet Dr. Martinez?

20         A.   About nine, nine to ten years ago.  She was the

21     Department Chair and I just became the Interim Vice

22     President of Academic Affairs, so we worked together

23     then.

24         Q.   Did you have any interactions with her in 2010?

25         A.   Yes, I did.

MCCCD/Martinez 03567

118

1      Q.   What happened in 2010?

2      A.   There was a bit of a controversy in January

3 because my Vice President of Administrative Services had

4 notified me that there was some concern about copyright

5 violation from the copy center regarding some of the

6 materials Dr. Martinez wanted to have reproduced or

7 printed.

8      Q.   When were you first notified of these issues?

9      A.   Early in January, January 2010.  Ronnie --

10 Dr. -- Ms. Elliot let me know about them.  She wanted me

11 to kind of explore, find out what was going on, and so I

12 did do that, did a bit of an investigation.

13     Q.   And what was this investigation that you did?

14     A.   Well, I felt like I needed to get Mr. Sueyoshi,

15 the Department Chair, involved because there were large

16 -- there was significant-sized workbooks that were being

17 held up to be printed because they felt there was some

18 copyright.  So, I asked Joe if he would review the

19 materials and compare them to the textbooks we were

20 using and he did that for us.  There were 10 to 12 pages

21 for two of the textbooks, you could see very clearly it

22 was directly from the book.

23          So, I then reported it to Ms. Elliot and said

24 that this is what Mr. Sueyoshi had discovered, and that

25 Ronnie and I had pretty much concurred that we needed to

MCCCD/Martinez 03568

1      talk to Dr. Solley and let her know that we were -- we

2      had a lot of concern about this and we felt like we

3      needed to let District Legal know.  And Dr. Solley, once

4      we presented it to her, she agreed.  So we met with

5      Maggie McConnell from the District Office about this.

6          Q.   And what happened after you met with Maggie

7      McConnell from the District Office?

8          A.   Well, Maggie was very concerned as well.  We

9      were very concerned about the college as well as the

10     District and the liability that could possibly happen.

11     And so then Ronnie Elliot, basically she let Dr.

12     Martinez know that there was some concerns and that

13     she's not going to be able to have those copies made.

14         Q.   Dr. Kakar, I'd like to show you a document.

15     This is Exhibit 23 to the District's exhibits.  Do you

16     recognize this document?

17         A.   Yes, I do.

18         Q.   And what is that document?

19         A.   Looks like Dr. Martinez's writing to Ronnie

20     asking:  "Please remind me, what are the items I had

21              printed for fall that were suspect and the same

22              for spring," because there were some fall print

23     jobs and some springs.  And Ronnie responded to her

24     there was a mechanism in place to flag potential

25     copyright materials and it was brought to her attention

MCCCD/Martinez 03569

1   that some of the items printed were suspect and -- for

2   fall as well as spring.

3           So, Ronnie was asking Dr. Martinez, does she

4   have any documentation that -- from the publisher that

5   released her to use the materials in this way; and, if

6   so, she just wanted the documentation so she could

7   release her print job and then we could move on.  But if

8   she didn't have the approval, then we cannot print the

9   request at this time.

10      Q.   Dr. Kakar, the e-mail at the bottom that is

11   dated Jan 12th, 2010, it's from Ronnie Elliot to

12   Cleopatria Martinez --

13      A.   Mm-hm.

14      Q.   -- is that the initial notification to Dr.

15   Martinez that you mentioned earlier?

16      A.   Yes.  I mean, yes, this kind of got it started.

17      Q.   And can you please read for me the first

18   sentence of that e-mail.

19      A.   From Ronnie?

20      Q.   Yes.

21      A.   "As you may or may not know, we have mechanisms

22           in place to red flag potential copyright

23           issues."

24      Q.   Okay.  I'm going to show you another document.

25   It's been marked as Exhibit 24 to the Districts's

MCCCD/Martinez 03570

1    exhibits and this is another e-mail, and it is from

2    Ronnie Elliot, and it's dated January 26th, 2010, to

3    Cleopatria Martinez.  Do you recognize this document?

4         A.   Yes, I do.  Yes, and she lets Dr. Martinez know

5    that we did talk indeed to Margaret McConnell, our

6    District legal counsel, regarding copyright infringement

7    and fair use as defined in federal law.  We provided

8    Maggie with the copies of her request and a copy of the

9    textbooks and this morning received the finding based on

10   the federal copyright law, including limitations of fair

11   use.  So, now it is documented in this piece.

12        Q.   Dr. Kakar, do you know whether the District, in

13   addition to these two e-mails that I just showed you,

14   ever met with Dr. Martinez to explain their copyright

15   concerns to Dr. Martinez?

16        A.   Well, I know that there were a lot of e-mails

17   going back and forth and I believe that Dr. Martinez

18   actually spoke to Maggie McConnell on the phone and had

19   a phone conference with her as well.

20        Q.   Did you ever have any meetings with Dr.

21   Martinez about --

22        A.   Oh, I had multiple meetings with Dr. Martinez.

23   E-mails, face-to-face, phone conversations.  Extensive.

24   In fact, there's a document that's ten pages long of

25   communications and ways to reach out to Dr. Martinez.

MCCCD/Martinez 03571

1      Q.   I'm going to walk you through some of these

2    communications.  We went through the January 12th

3    e-mail; this is the January 26th e-mail that we just

4    discussed; the next exhibit is Exhibit 25, and this is

5    another e-mail.  It's dated January 28th, 2010, and this

6    is from Margaret McConnell to Cleopatria Martinez.  Do

7    you recognize this e-mail?

8      A.   Yes, I do remember this.

9      Q.   And what does that e-mail summarize?

10     A.   Basically that anything from copyrighted source

11   reproduced without written permission, there has to be

12   written permission for the copyright holder to say that

13   it's okay.  It's an error.  An individual that would be

14   printing without that is violating copyrights.

15     Q.   Dr. -- Dr. Kakar, did anything prompt that

16   e-mail?  Had Maggie McConnell met with Dr. Martinez

17   prior to sending this e-mail?

18     A.   Perhaps.  I recall a phone conversation, but

19   perhaps they did meet face-to-face.

20     Q.   Was she --

21     A.   And she said:  I explained to you today that I

22   represented District --

23     MR. MONTOYA:  I need to object as to this

24   witness testifying as to what she thinks transpired

25   between two individuals when she doesn't, in fact, know

MCCCD/Martinez 03572

1     based on her knowledge.  They didn't tell her it

2     happened, she didn't witness it happen.

3                  THE WITNESS:  No, I was copied -- sorry.

4                  MS. BLACH:  Let me respond to the objection to

5     the Hearing Committee.  Dr. Kakar is copied on this

6     e-mail, so she is testifying based on information that

7     she knows.

8                  MR. MONTOYA:  But she was asked whether or not

9     Professor Martinez actually met with Ms. McConnell and

10    that's what I was objecting to.

11                 MS. BLACH:  And that's actually addressed in

12    the first sentence of the e-mail.

13                 CHAIRPERSON CRUDUP:  Okay.  Continue.

14        Q.    BY MS. BLACH:  So, as I was asking you Dr.

15    Kakar, can you please read the first sentence of that

16    e-mail?

17        A.    "As we discussed today, it is inappropriate

18              to copy anything from copyrighted source and

19              reproduce it without written permission of the

20              copyright holder, it is more egregious if a

21              person reproduces it without providing notice

22              on the material about who owns the copyright."

23        Q.    So that's a third e-mail where Dr. Martinez was

24    instructed regarding copyright laws?

25        A.    Yes.

MCCCD/Martinez 03573

1      Q.   Let's walk through another one.  Here is

2   Exhibit 26 and this is an e-mail from Paul DeRose dated

3   Friday, February 12, 2010, to Cleopatria Martinez;

4   you're, of course, copied on this e-mail.  It appears to

5   be a summary of the meeting.  Can you please explain

6   what happened during that meeting for me?

7      A.   Yes.  It was a meeting with myself, Paul

8   DeRose, who is now the Interim Vice President of

9   Administrative Services, and our faculty Senate

10   President Denny Sheehan was with Dr. Martinez.  And we

11   basically discussed copyright laws, we went over the

12   copyright verbiage that is printed in the front of the

13   textbook that is being used in the math class.

14            And "in order to use material from the text,

15            prior approval must be obtained from the

16            publisher's Legal Department" -- we covered all

17            this with Dr. Martinez -- "and an approval from

18            the publisher rep is not acceptable.

19            Cleopatria was referred to the e-mail sent by

20            Maggie McConnell which describes the copyright

21            issue and contains a link to seek publisher's

22            approval.  Cleopatria said she understands the

23            copyright law and will not use material from

24            any textbook without prior approval from the

25            publisher's Legal office.  And if Cleopatria

Miller Certified Reporting, LLC

MCCCD/Martinez 03574

```
 1              decides to bind her notes or handouts,

 2              Cassandra" -- I -- "recommended they be

 3              distributed by the bookstore similar by the

 4              practice used by other faculty at her

 5              department and Phoenix College.  This will be a

 6              nominal fee to the students, and will also

 7              minimize cost to the Department's print budget.

 8              The posting of notes on Blackboard is also an

 9              option.

10              "In addition to our discussion, we would like

11              to encourage you" -- we are asking Dr. Martinez

12              --  "to attend an upcoming copyright workshop

13              that is being held at Phoenix College.  This

14              workshop is being held March 1st from 1:00 to

15              3:00 p.m."

16         Q.    As of February 12th, 2010, Dr. Martinez told

17    you that she understood copyright laws?

18         A.    Yes, she did.

19         Q.    Did it appear to you that she understood

20    copyright laws?

21         A.    She seemed sincere and she felt like she

22    understood more and knew more about copyright laws.

23         Q.    And this summary is based off of an in-person

24    meeting that you had with Dr. Martinez, with Paul

25    DeRose, and with Denny Sheehan?
```

MCCCD/Martinez 03575

1       A.   Yes.

2       Q.   How is Denny Sheehan invited to this meeting?

3       A.   Dr. Martinez invited him as a faculty Senate

4  President.

5       Q.   And, Dr. Kakar, I would like to bring your

6  attention to the last sentence of this e-mail.  Can you

7  read that allowed for me?

8       A.   "This workshop is scheduled for March 1st from

9            1:00 to 3:00 p.m."

10      Q.   Sorry.  The last --

11      A.   "In addition to our discussion, we would also

12           like to encourage you to attend an upcoming

13           copyright workshop being held March 1st from

14           1:00 to 3:00 p.m."

15      Q.   Dr. Kakar, do you know whether Dr. Martinez

16  attended that copyright workshop that she was invited

17  to?

18      A.   No, she did not attend.

19      Q.   Do you know whether the District took any steps

20  to hold a separate one-on-one training session for her

21  since she could not attend that meeting?

22      A.   Yes.  I arranged for her to meet with one of

23  our librarians that has expertise in copyright and also

24  attended the workshop and she went through the

25  PowerPoint with Dr. Martinez in a one-on-one

MCCCD/Martinez 03576

1    environment.

2        Q.   Let me introduce another exhibit.   This is

3    Exhibit 8.   This is a letter dated April 2nd, 2010.   Do

4    you recognize this document?

5        A.   Yes, I do.   This is a letter from Dr. Solley to

6    Dr. Martinez.

7        Q.   And, in essence, what is this notifying Dr.

8    Martinez of?

9        A.   Well, that basically, she's been using the

10   materials that she -- that are copyrighted -- or,

11   violate copyright, and that we're going to have to

12   suspend her copying privileges again, because Icon

13   Services are -- you know, it was pointed out that these

14   materials are being printed again.   So, Dr. Solley

15   basically felt like she needed to suspend her -- her

16   printing privileges.

17       Q.   And does this letter summarize any of the

18   copyright regulations?

19       A.   Yes.   It gives the detail 3.2 Copyright

20   Regulation from our Governing Board 1, 2, and 3, and the

21   back page has 4, 5, and 6.

22       Q.   And I'd like you to read the last two

23   paragraphs out loud.

24       A.   "You are finally admonished that any further

25            copyright/fair use violation would lead to

MCCCD/Martinez 03577

1           disciplinary action taken against you, up to

2           and including termination of your employment.

3           "I am willing to arrange for individual

4           training and consulting on copyright if you

5           feel it will be helpful.  But I will restore

6           your copying privileges only when I determine

7           that you not only understand your legal

8           obligations but also that you will strictly

9           adhere to them."

10      Q.   So, on April 2nd, 2010, Dr. Martinez was yet

11   again advised that her conduct violated copyright laws?

12      A.   Yes.

13      Q.   I'm now showing you an exhibit that's been

14   marked as Exhibit 25 to Dr. Martinez's exhibits.  And

15   this is an e-mail -- well, there's actually two e-mails.

16   The first e-mail is on the lower portion, on page 2 of

17   this.  It starts at the bottom of page 1, and it's from

18   Maggie McConnell -- Margaret McConnell to Cleopatria

19   Martinez, and then on top of that there's another e-mail

20   from Lee Combs to Cleopatria Martinez, and these are

21   both dated on April 8th, 2010.  Do you recognize these

22   e-mails?

23      A.   Yes, I do.

24      Q.   Can you please describe for me that first

25   e-mail from Maggie McConnell to Cleopatria Martinez?

MCCCD/Martinez 03578

1      A.   Yes.  It seems like Cleopatria -- or, Dr.

2   Martinez was asking Maggie McConnell to actually read

3   some of her class materials and she advised her to speak

4   to the librarian about the questions, you responded the

5   librarian had asked you to speak to me.  It was my

6   understanding you wanted advice concerning whether, in

7   your words, changing a number from a three to a five or

8   plus to a minus from someone's copyrighted math equation

9   presumably in a textbook would avoid a copyright

10  violation.

11          And Maggie says:  "I explained to you that the

12          numbers, sequences of numbers are definition of

13          'literally works' under federal copyright

14          guidelines.  While I noted that two plus two is

15          equal to four is not copyrightable, I advised

16          you that more complicated math equations are.

17          I stated that the only way for you to ensure

18          you do not violate copyright is to make up the

19          math questions completely on your own to

20          illustrate a math theory.  As I noted, that

21          would only be the safe approach.  And with your

22          advanced degree and your years of experience

23          that should not be difficult.

24          "You still indicated you wish for me to review

25          materials.  You also advise that you could not

MCCCD/Martinez 03579

1           attend the special presentation I and Hazel

2           Davis prepared on copyright law for Phoenix

3           College last month because of other

4           commitments.  However, as I reiterated, I'm not

5           going to be in a position to tell you whether

6           the changing of a number or two, or of a

7           mathematical sign, is enough.

8           "In fact, no Maricopa Community College

9           District is going to be in a position to tell

10          you that 'tweaking' is okay, particularly when

11          the owner of the original work isn't given

12          credit for the 'tweaked' work.  The verdict

13          under the law would almost certainly be that

14          'tweaking' would not solve the problem, and

15          that is the answer that you are going to get

16          from a wide range of folks."

17      Q.   Doctor, in the interest of time, I'm going to

18      go through some e-mails.  I want you the summarize them

19      rather than read them all into the record.

20      A.   All right.

21      Q.   I do want to respect the Committee's time.

22      A.   Okay.

23          MR. MONTOYA:  I object.  Now, this -- first

24      this witness is reading e-mails that are already into

25      evidence that you can read yourself.  Now she's

MCCCD/Martinez 03580

```
 1        purporting to summarize e-mails that are already in
 2        evidence that you can read for yourself.  That is
 3        improper and it's a super waste of time.
 4             MS. BLACH:  I would like to try to speed this
 5        up if possible with the Hearing Committee.  I would be
 6        happy -- if Mr. Calderon was willing to stipulate --
 7             MR. UPPAL:  Montoya.
 8             MR. MONTOYA:  I'm Montoya, he's Calderon.
 9             MS. BLACH:  I'm sorry.
10             MR. MONTOYA:  That's okay.
11             MS. BLACH:  I'm sorry.  If you're willing to
12        stipulate to the fact your client was repeatedly
13        notified of copyright violations on dozens of occasions
14        via e-mail, via letters, via in-person meeting, and
15        telephone, we can bypass this entire line of
16        questioning.
17             MR. MONTOYA:  We dispute that she violated
18        copyright; however, we do not dispute that these e-mails
19        were sent or that these e-mails were received, which is
20        very, very different.  And because we do not dispute
21        that they were sent or that they were received, we don't
22        need to go through this process.  And I think that we're
23        already behind time and I would hope that this witness
24        will testify to things that she has personal knowledge
25        of that is not already in these documents, but
```

MCCCD/Martinez 03581

1      summarizing -- you know, you wouldn't want me to

2      summarize documents in to evidence, you'd rather read

3      the documents yourself firsthand.

4           DR. REYES:  Mr. Chairman, may I suggest that if

5      we abide by the time that's written on the board, you

6      can proceed as you are if you so chose to use your time

7      that way, but that we adhere to the time on the board.

8      Would that be acceptable?

9           CHAIRPERSON CRUDUP:  That's right.

10          MR. MONTOYA:  I don't -- that would be fine

11     with me.  What I don't want is:  Oh, we're out of time

12     and how unfair.

13          DR. REYES:  That is why you can use your

14     judgment.

15          MS. BLACH:  Thank you.  I'll be happy to

16     proceed that way.

17     Q.   BY MS. BLACH:  So, these e-mails dated

18     April 8th, 2010, is that yet another notification to Dr.

19     Martinez --

20     A.   Yes.

21     Q.   -- of her copyright violations?

22     A.   Yes.  Lee made commentary after Maggie wrote

23     her summary.

24     Q.   Okay.  So that's two e-mails.

25          I would like to next introduce Exhibit 27.  And

1    earlier you described a document that you said was about

2    ten pages long.  Is this that document?

3        A.   Yes, this is the document that I was referring

4    to.

5        Q.   And does this document -- is this document a

6    chronology?

7        A.   Yes, it is.

8        Q.   And is this document a chronology of all of

9    the -- well, many of the repeated communications that

10   you had with Dr. Martinez about copyright issues?

11       A.   Yes.

12       Q.   And it's ten pages long, single spaced?

13       A.   Correct.

14       MR. MONTOYA:  When we refer to documents, I

15   would ask that the Chairman direct whoever is referring

16   to them to identify them chronologically so we can have

17   some type of idea of when this happened because I think

18   that's important in this case.

19       MS. BLACH:  All of these exhibits are, in fact,

20   dated and I actually have been going through them

21   chronologically.

22       MR. MONTOYA:  Well, I mean, I would ask that

23   you identify the date for the record and I would ask the

24   Chair to direct you to do so, please.

25       MS. BLACH:  I'm happy to do so.  This is an

MCCCD/Martinez 03583

1    October 12th, 2010, letter to Dr. Martinez detailing the

2    repeated communications to Dr. Martinez regarding her

3    copyright violations.

4         Q.   BY MS. BLACH:  In the interest of time, Dr.

5    Kakar, I'm trying to fly through a couple of exhibits

6    here.

7              The next exhibit that I'm introducing is

8    Exhibit No. 9.  This is the December 9th, 2010,

9    directive.  Do you recognize that document?

10        A.   Yes, I do.

11        Q.   And can you read for me just the first -- the

12   first sentence of that one, two, three, fourth

13   paragraph?

14        A.   "Pursuant to Section 3.7.4 of the RFP, I now

15             direct you to only use course materials

16             approved by the Department that are available

17             in the bookstore for sale to the students and

18             that are authorized by persons other than

19             yourself."

20        Q.   Do you know why this directive was put into

21   place?

22        A.   Because there were more and more attempts and

23   actual printing of materials that violated copyright

24   law.

25        Q.   And do you know whether Dr. Martinez abided by

1    this December 9, 2010, directive?

2        A.   She actually -- no, she didn't.  She continued

3    to try to use her own materials.

4        Q.   Can you give me any examples of how she tried

5    to evade this directive?

6        A.   Well, I know that sometimes -- one time she had

7    adjunct faculty members print materials for her; I know

8    she would print things from her computer directly to the

9    laser printer at the -- in the department, Math

10   Department; and I also know that she willfully went

11   around the processes we put in place and went to a

12   private entity, Staples, to have books created and bound

13   by materials the author had not approved be printed.

14       Q.   Are there any other examples detailed in the

15   October 12th, 2010, chronology that we discussed a few

16   minutes ago?

17       A.   I think there's more that comes later.  I mean,

18   I can -- if you want to go on to the next letter.

19       Q.   I was just asking --

20       A.   Yeah, October 12th.

21       Q.   I was just asking generally if you were aware

22   whether there were additional attempts to avoid the

23   directive that were sent forth in the October 12, 2010,

24   letter?

25       A.   Yeah.  I mean, at some point Dr. Solley asked

MCCCD/Martinez 03585

1    that Joe Sueyoshi approve all the print jobs of Dr.

2    Martinez just to make sure that copyright violations

3    were not occurring, and he saw numerous times that he

4    had to say that the materials could not be printed

5    because they had contained the same types of things that

6    were in the previous documents from way back when Ronnie

7    Elliot discovered it with Icon back in 2010.

8         MR. MONTOYA:  Excuse me.  I have one -- I

9    didn't mean to interrupt.  Were you done?

10        THE WITNESS:  Yes.  Thank you.

11        MR. MONTOYA:  My time for cross-examination

12   comes out of their time, and I just wanted to get the

13   Committee's guidance as to when that time begins before

14   it all runs out.  Like, 1:25 is right around the corner.

15        CHAIRPERSON CRUDUP:  Okay.  1:25 you can begin

16   your cross-examination.

17        MR. MONTOYA:  My -- my case begins at 1:25, not

18   my cross-examination of their case.  The Chair

19   previously ruled with the concurrence of the entire

20   Committee, that cross-examination time would come out of

21   the person who called the witness, unless the person

22   who's cross-examining, the examiner was wasting time.

23   So, my cross-examination, unless I'm misunderstanding

24   the Committee's ruling, would have to transpire before

25   1:25.  That's all I'm asking.

MCCCD/Martinez 03586

1          MR. CALDERON:  Mr. Chairman, may I ask a

2    question?  Counsel, how long do you have left of this

3    witness?

4          MS. BLACH:  I only have a few minutes, maybe

5    five minutes or so left of my direct, and my colleague

6    does have an additional witness that he intends to call

7    for a few minutes.

8          MR. CALDERON:  Does that help at all with the

9    timetables?

10         MR. MONTOYA:  Well, I -- I'm not going to have

11   nearly as much time as she's taken for this witness, but

12   I probably will need ten minutes.  So, that's going to

13   put us -- we're not going to make it, and that's the

14   only reason why I bring this up.  Because I don't want

15   to be penalized for it into my time.

16         MR. UPPAL:  I want to bring something up

17   myself.  Mr. Montoya, with his speeches and --

18         DR. CAIRE:  I'm sorry.

19         MR. UPPAL:  -- addressing the Committee, has

20   actually acted unfairly towards us.  I mean, this has

21   got to be his 24th issue and speech on this matter.  And

22   Mr. Calderon, I want to ask you, when we had a prior

23   telephone conference, didn't you state something along

24   the lines of there would be attempts to make it roughly

25   equal, but it was not down to the last minute?

MCCCD/Martinez 03587

1          MR. MONTOYA:  I object to Counsel being --

2          MR. UPPAL:  Could we get Mr. Calderon to

3    actually address that?

4          MR. MONTOYA:  First, I need to object for the

5    record and I did, so I'll shut up now.

6          MR. CALDERON:  Mr. Chairman, first of all, I'm

7    not going to be examined.  It's a good shot, but I'm not

8    going to be examined.  But I will say that my

9    understanding of talking to the Committee, the Committee

10   was going to do everything they could to make it as

11   equal as possible.  I did not promise precision.

12         MR. UPPAL:  So, my request would be if we could

13   get through this witness without Mr. Montoya raising

14   objection on the same issue again, because that's what's

15   unfair.

16         CHAIRPERSON CRUDUP:  Just continue, please.

17         MS. BLACH:  Thank you, sir.

18     Q.   BY MS. BLACH:  Let's see where I was now.

19   So -- so I can move onto the next line of questioning in

20   the interest of time, I just want to make sure I

21   understand your response correctly.  So, essentially,

22   you just testified that in addition to violating the

23   directive by submitting copy jobs to Joe Sueyoshi that

24   did not comply with the directive; Dr. Martinez also

25   attempted to avoid the directive by having an adjunct

1    faculty member make photocopies for her by printing

2    repeated documents directly to the Math Department's

3    laser printer; and also by evading the directive by

4    having materials copied at an offsite Staples store?

5         A.   That's correct.

6         Q.   And those are the ones that you're aware of?

7         A.   Yes.

8         Q.   Let's put the shift over to -- let's talk some

9    more about the copies that Dr. Martinez made at the

10   off-campus Staples store.  How were you notified about

11   those Staples -- how were you notified about those

12   photocopies?

13        A.   Students began to complain to the Department

14   Secretary and the Department Chair about not getting a

15   receipt.  They didn't get a receipt from Dr. Martinez

16   for the book that they purchased from her.

17        Q.   And is it -- was it improper for Dr. Martinez

18   to have sold these materials directly to her students?

19        A.   Yes.  It's improper on a number of levels.

20   First of all, the common sense, a faculty should never

21   sell anything to a student.  They're really in a

22   position where a student might feel obligated to

23   purchase something because they're the instructor that

24   is going to be grading them.  So, it's very

25   inappropriate in that level.  But also it violates the

MCCCD/Martinez 03589

1    cash-handling policies and procedures of the Maricopa

2    Community College District.

3         Q.   Was Dr. Martinez aware of the Cash-Handling

4    Policy?

5         A.   Yes.  She has signed off on the designations

6    that we all do at the beginning of the year.  She's very

7    aware of the policies.

8         Q.   After you were notified of the violation of the

9    Cash-Handling Policy, did you ever meet with Dr.

10   Martinez about her violation?

11        A.   Yes, we did.  Actually, Dr. Solley and I met

12   with her, I believe it was in October, and we actually

13   had a second Corrective Action, and it was a formal

14   meeting and a document was being read by Dr. Solley to

15   Dr. Martinez about this cash-handling incident, and Dr.

16   Martinez was very agitated, did not wish to stay,

17   challenged Dr. Solley.  And Dr. Solley was reading the

18   letter to her, she told Dr. Solley she didn't need to be

19   read to and she basically left with the document in hand

20   and left the -- left the office.

21        Q.   Did she leave the office before the meeting was

22   concluded?

23        A.   Yes, she did.

24        Q.   So, she essentially walked out of the meeting?

25        A.   Yes, she did.

MCCCD/Martinez 03590

1      Q.   During this meeting, was Dr. Martinez

2   instructed to issue refunds to the students that she

3   improperly charged?

4      A.   Yes.  We got to that, I think that was about

5   when she stopped the meeting and walked out.  It's

6   documented in that letter, though, that she is to refund

7   the students.

8      Q.   Do you know whether the District took any steps

9   to notify the students that Dr. Martinez would be

10   issuing refunds?

11      A.   She did not take the steps but we did.  We --

12   Joe Sueyoshi, the Department Chair, sent out an e-mail

13   blast to students that were involved in her class and

14   let them know Dr. Martinez would be refunding them and

15   they are to notify -- and be in touch with her so they

16   could get their money back.

17      Q.   Do you know whether the students ever received

18   those refunds they were supposed to receive?

19      A.   My understanding is one student got their money

20   returned, I believe that was Patty, but no other

21   students received a refund.

22      Q.   In fact, didn't you receive copies of e-mails

23   in which students complained about not receiving the

24   refunds?

25      A.   Yes, and I actually sat down with some

MCCCD/Martinez 03591

1      guidelines and asked Dr. Martinez to please send --
2      provide me with copies of checks, the front and back
3      copies, so I could make sure that the students would be
4      reimbursed.  And I believe I sent that message to her
5      January 8th of 2012, and gave her until the 18th, I
6      believe, to bring me the documentation; and I never
7      received anything from Dr. Martinez.
8          Q.    To date, has Dr. Martinez complied with your
9      instruction to provide you with copies of cancelled
10     checks for the student reimbursements?
11         A.    No.
12         Q.    Do you know if students are still actively
13     seeking refunds from Dr. Martinez?
14         A.    I think there's a few.  I know that the
15     cashiers have told me that students come to the
16     cashier's office because they got this e-mail blast and
17     they're wondering where their money is.
18         Q.    And did you report these issues with the
19     Cash-Handling Policy to anyone?
20         A.    Well, of course, Dr. Solley knew and District
21     legal was aware and the HR area.
22              MS. BLACH:  All right.  Pass the witness.
23              MR. MONTOYA:  Chairman, may I proceed?
24              CHAIRPERSON CRUDUP:  Yes.  You may proceed.
25              MR. MONTOYA:  Thank you.

MCCCD/Martinez 03592

<pre>
 1                        CROSS-EXAMINATION

 2

 3      BY MR. MONTOYA:

 4           Q.    Hello.   I'm Steve Montoya.

 5           A.    Hello.

 6           Q.    How are you?

 7           A.    Fine.   How are you?

 8           Q.    Have we met?

 9           A.    I don't think we have.

10           Q.    I don't think we have either.

11                 I have a few questions for you.   Do you have a

12      doctorate degree?

13           A.    Yes, I do.

14           Q.    In what?

15           A.    Education.

16           Q.    Ph.D. or Ed.D.?

17           A.    Ed.D.

18           Q.    When did you obtain it?

19           A.    About two years ago.

20           Q.    Are you an expert in copyright law?

21           A.    No, I'm not.

22           Q.    Do you purport to be -- is studying copyright

23      law your hobby?

24           A.    No.

25           Q.    You testified repeatedly, and correct me if I'm
</pre>

MCCCD/Martinez 03593

1       wrong, that in order to copy somebody else's work

2       without violating the copyright law, you need their

3       written permission?

4            A.   I was reading from lawyer's, what they had

5       devised.

6            Q.   Do you know --

7            A.   I didn't write those.

8            Q.   Do you know --

9            A.   I was reading the lawyer's commentary.

10           Q.   Okay.  Do you know whether that's true or not?

11           A.   Well, I do -- I -- from -- I've learned quite a

12      bit now, and from some of the dialogues and the

13      information we've received from attorneys, if the

14      student has purchased the textbook and if the publisher

15      has said it's okay to use it, use materials, then that

16      faculty member could use it, but it's very important

17      that the student purchases the textbook.

18           Q.   Do you know whether or not under the Fair Use

19      Doctrine you can use for limited educational purposes a

20      copied work without the publisher's permission?  Do you

21      know whether you can do that or not?

22           A.   I'm not going to -- I won't answer that.

23           Q.   You don't know?

24           A.   I don't know.

25           Q.   I understand.

MCCCD/Martinez 03594

1          Do you know -- you mentioned Maggie McConnell.

2     I just met her during lunch.  Do you know her?

3          A.   Yes.

4          Q.   She's the District -- she's one of the

5     District's lawyers, right?

6          A.   Yes, that's correct.

7          Q.   You don't know whether or not she's a copyright

8     expert, do you?

9          A.   I think she has some knowledge but she did feel

10    it was -- it was wise to bring in an expert, a legal

11    expert, which we did.

12         Q.   Are you aware that Professor Martinez

13    repeatedly contacted Maggie McConnell asking her for

14    direction, asking her to review stuff in advance, and

15    Maggie McConnell refused?

16         A.   I wasn't aware of that.

17         Q.   Okay.  Do you know whether or not Professor

18    Martinez -- do you know a guy named Lee Combs?

19         A.   Yes, I know Lee.

20         Q.   Tell the Committee who Mr. Lee Combs is?

21         A.   He's our General Counsel or attorney for the

22    District.

23         Q.   Okay.  Do you know whether or not Professor

24    Martinez repeatedly contacted the General Counsel for

25    the District, Lee Combs, and asked him to give her

MCCCD/Martinez 03595

1    guidance regarding whether or not her materials violated

2    copyright law or, in fact, fell within copyright's Fair

3    Use Doctrine?  Do you know that?

4        A.   I don't know that.

5        Q.   Okay.  Now, you said that you know -- you

6    testified that Professor Martinez met with doctor -- the

7    District's librarian?

8        A.   No.  Phoenix College librarian.

9        Q.   That's right.  Thank you for correcting me.

10            You testified Professor Martinez met with

11   Phoenix College's librarian --

12       A.   Yes.

13       Q.   -- to talk about copyright law?

14       A.   Because it was unfortunate she missed the

15   workshop.  We --

16       Q.   Do you know why she missed the workshop?

17       A.   Can I finish?

18       Q.   Of course you can.

19       A.   We felt it was important that we go through the

20   PowerPoint, and one of our librarians has some expertise

21   and has attended the workshop.  So, we had them sit down

22   and they had a one-on-one session together.

23       Q.   Do you know whether or not that librarian

24   actually told Professor Martinez that Professor Martinez

25   seemed to understand copyright law as well as the

MCCCD/Martinez 03596

1    librarian did?

2         A.    I don't know that.   I did not have that

3    conversation with...

4         Q.    Do you know whether or not the Phoenix College

5    librarian actually even went through the PowerPoint with

6    Professor Martinez?

7         A.    I was told she did go through the PowerPoint.

8         Q.    You don't know that, do you?

9         A.    I asked the librarian and she said she went

10   through the PowerPoint.

11        Q.    Did you ask Professor Martinez?

12        A.    No, I did not.

13        Q.    Okay.   I think that you testified you were

14   reading from an exhibit, I think it was Exhibit 26, that

15   more complicated mathematical equations are subject to

16   copyright.   Did you say that?

17        A.    I read what Maggie McConnell wrote.

18        Q.    Do you know whether that's true or not?

19        A.    I don't have personal knowledge, but I was

20   reading what the attorney Maggie McConnell had written

21   to Dr. Martinez.

22        Q.    So, you can't -- you can't swear -- you're

23   under oath, right?

24        A.    Correct.

25        Q.    You can't swear to the Committee you know

MCCCD/Martinez 03597

1            that's even true, can you?

2                 A.    I'm not an expert in copyright laws.

3                 Q.    Okay.  I think that you testified that

4       Professor Martinez was subverting the directive by

5       copying things directly to the laser printer, right?

6                 A.    In the Math Department.

7                 Q.    Have you seen what she actually copied?

8                 A.    Yes.

9                 Q.    What?  What was it?

10                A.    Stacks of -- well, here's just a few of them.

11      I think there was at least 14 that were printed.  At

12      least 14.  And here are -- this is what was found, nine

13      copies.

14                Q.    Did you ask Professor Martinez what she was

15      going to do with those?

16                A.    No, I did not.

17                Q.    Why not?

18                A.    I received this from the Department Chair.

19                Q.    Okay.  So, you don't know whether it was to

20      distribute to students or for some other reason or

21      whether it was even an accidental printing?  Do you

22      know?

23                A.    I was told by Dr. Martinez --

24                Q.    I'm asking you.

25                      MS. BLACH:  Sir, please let the witness answer

MCCCD/Martinez 03598

1      the question.

2              MR. MONTOYA:  Well, I'm going to -- please

3      don't direct me what to do, that's the Chair's job.

4              MS. BLACH:  Chairperson, I respectfully request

5      that Mr. Montoya allow the witness to finish her answer

6      before cutting her off and proceeding to the next

7      question.

8              CHAIRPERSON CRUDUP:  Please allow her to

9      finish.

10             MR. MONTOYA:  Yes, sir.

11             THE WITNESS:  So this was brought to me by the

12     Department Chair and they knew that at least 14, they

13     don't know where the other copies were.  This is the

14     same materials that were under question by Maggie

15     McConnell.

16             And as I met with Dr. Martinez she had

17     explained to me that she made a mistake and put in a

18     wrong number in her computer and printed this -- it

19     wasn't what she wanted to have printed, she just wanted

20     one copy to have printed.

21        Q.   BY MR. MONTOYA:  You've made mistakes in

22     printing sometimes, right?

23        A.   Well, probably, yes.

24        Q.   There's nothing nefarious about that, is there?

25     No?

MCCCD/Martinez 03599