1         A.    I probably try to be very careful when I'm

2    printing such a large job.

3         Q.    Let me ask you this:  You also said that

4    Professor Martinez gave an assignment or asked a junior

5    faculty member to print something for her?

6         A.    An adjunct faculty member.

7         Q.    Do you know what it was?

8         A.    It was some type of a handout.  But, keep in

9    mind, the President's directive, Joe Sueyoshi, was to

10   approve all of her print jobs.

11        Q.    How do you know it was a handout?  Did you ask

12   her?

13        A.    I think somebody gave me a copy of it.  Joe

14   did.

15        Q.    Now, I'm going to ask you the questions again.

16   How do you know it was a handout?  Did you ask Professor

17   Martinez?

18        A.    No.  I was working with Dr. Sueyoshi, he was

19   our contact and my contact for this.

20        Q.    Okay.  Thank you.

21              Now I got a question, it's about the Staples'

22   stuff.  You say that violated a rule.  Is that your

23   belief, that cash-handling rule?

24        A.    Well, first of all, all of the print jobs were

25   to be approved by Mr. Sueyoshi that Dr. Martinez printed

MCCCD/Martinez 03600

1       was to be approved -- this is a directive from the

2       President -- and he's supposed to have been given

3       two-day's notice.

4           Q.   Okay.

5           A.   In addition, from my understanding the person

6       that wrote the materials was also supposed to be giving

7       a permission and he did not give permission to have them

8       printed and bound, and certainly not sold to the

9       students.

10           Q.   Okay.  Let me ask a question now.  Okay, are

11      you aware that Joe Sueyoshi approved every item to be --

12      in that -- in that little booklet to be printed by the

13      university separately?

14             MS. BLACH:  Objection.

15             MR. MONTOYA:  Are you aware of that?

16             MS. BLACH:  Objection.  That's not a question.

17      That's a speech.

18           Q.   BY MR. MONTOYA:  Are you aware of that?

19           A.   Say it again because I didn't quite follow your

20      logic.

21           Q.   I'll say it again.  Are you aware that Joe

22      Sueyoshi appeared -- approved separately every item

23      collected in that handout to be printed at PC's Icon

24      copy center separately?  Are you aware of that?  Yes or

25      no?

MCCCD/Martinez 03601

1      A.   I know that the materials that were created by

2      the faculty member was -- they were approved by the Math

3      Department's Committee that approves the materials that

4      can be used in the Math Department.

5           Q.   Are you aware that Professor Martinez also told

6      her students:  Hey, you guys want to borrow this and

7      make your own copies, go for it; are you aware of that?

8           A.   No.

9           Q.   Okay.  Are you aware that the students said:

10     Hey, no, I don't want to go to Kinkos and waste my time,

11     you go copy it; are you aware of that?

12          A.   No.

13          Q.   Are you aware that Professor Martinez even lost

14     money on the deal?

15               MS. BLACH:  Objection.  These are not --

16               THE WITNESS:  No.

17               MS. BLACH:  -- questions.

18               MR. MONTOYA:  That's a question.  Do you know

19     whether or not Professor Martinez lost money on the

20     deal?

21               MS. BLACH:  These are facts not in evidence.

22               MR. MONTOYA:  I'm trying to get evidence.  I'm

23     asking her what she knows.

24               CHAIRPERSON CRUDUP:  You can answer the

25     question.

MCCCD/Martinez 03602

1          THE WITNESS:  I don't.  I don't know.

2          Q.   BY MR. MONTOYA:  Now, you said that violated

3     one of the District's rules regarding cash handling,

4     right?  Is that what you said?

5          A.   There are cash-handling rules and regulations.

6          Q.   Now, you tell the Committee what that rule is.

7     What's the name of the rule?

8          A.   It's cash-handling procedure.

9          Q.   What number is it?

10         A.   I don't know the number.

11         Q.   Tell the Committee what that rules says.

12         A.   One of the --

13         Q.   Because I have it right in front of me.

14         A.   Why don't you read it?

15         Q.   Because you're the one who's testifying, not

16    me.  When I say things, I get shouted down for allegedly

17    testifying.  So, tell the Committee what the rule says,

18    please.  You're the one who said she violated it.

19         CHAIRPERSON CRUDUP:  Let the witness answer.

20         MR. MONTOYA:  Yes.

21         THE WITNESS:  It's standard policy in the

22    Governing Boards.  I think you must be all aware of it,

23    as well, that you must go through training.  There's a

24    process that you must follow in order to handle cash and

25    there's several different items that describe that and

 1      describe that process.

 2          Q.   BY MR. MONTOYA:   Is that everything you know

 3      about that rule to tell the Committee?

 4          A.   That pretty much sums it up.   I know there's

 5      training and process and procedure you must go through

 6      before you are allowed to handle cash at Maricopa

 7      Community College District.

 8          Q.   Are you aware of the difference between selling

 9      something as opposed to seeking reimbursement for a cost

10      that you have incurred on somebody else's behalf?

11          A.   In my opinion, a transaction was made and

12      students received a product, a good, after they gave $11

13      to Dr. Martinez.

14          Q.   Thank you for that statement, but now answer my

15      question.

16          A.   What was it again?   Because, I'm following the

17      logic.

18          Q.   I'll tell you.   And I don't mean to be harsh

19      with you, but I'm looking at the clock, I'm under a lot

20      of time pressure.

21               Are you aware of the difference between going

22      to Starbucks and buying a cup of coffee and reimbursing

23      your friend who went to Starbucks for you and bought a

24      cup of coffee?   Are you aware of that difference?

25          A.   I mean, I guess.   Sure.   Why not.

MCCCD/Martinez 03604

1              MR. MONTOYA:  Okay.  I don't have any further

2      questions of this witness.  Thank you so much, Dr.

3      Kakar.

4              THE WITNESS:  Thank you.

5              MS. BLACH:  I have a couple.

6              DR. REYES:  Mr. Chairman, I have a follow-up

7      question, please.  You said that all the materials that

8      were included -- Mr. Montoya, you asked the question --

9      if all the materials in the packet had previously been

10     approved by the Department Chair, could you explain that

11     further?  If the packet had been previously

12     independently approved?

13             THE WITNESS:  Yes.  The Math Department has a

14     process where if a faculty member creates their own

15     materials, they actually review it and as a department

16     decide if those materials can be used in the classroom.

17     In this case, I think the professor, Tim Bryan, he

18     doesn't have his printed, he has it all electronic.  But

19     he has been using those materials for a number of years.

20     I mean, he has created those materials on his own.

21             And so Dr. Martinez had asked if she could use

22     his materials that particular semester; he said yes.  He

23     did not, however, agree to have her print the materials.

24     He had no idea that she was going to print the materials

25     or that she was going to collect $11 from each student.

MCCCD/Martinez 03605

1          CHAIRPERSON CRUDUP:  I have a quick question.

2          THE WITNESS:  And there is an e-mail in the

3    materials of his -- of his words to that effect.

4          CHAIRPERSON CRUDUP:  I have a quick question

5    for Mr. Montoya.

6          MR. MONTOYA:  Yes, sir.

7          CHAIRPERSON CRUDUP:  You mentioned Dr. Martinez

8    was trying to get ahold of Lee Combs and another counsel

9    with District, do you have any documentation of e-mails

10   or something?

11         MR. MONTOYA:  Yes, we do.  And I will ask

12   Professor Martinez regarding that when I present my

13   defense to these charges, because she repeatedly asked

14   and they told her no.  And when -- and when they didn't

15   tell her no, like I said to you in my hearing

16   memorandum, they gave her false information.

17         CHAIRPERSON CRUDUP:  Thank you.

18         DR. CAIRE:  I have one question.  In Exhibit 25

19   it was suggesting Cleopatria Martinez published this

20   stuff on Blackboard.  What's the difference between

21   putting this stuff on Blackboard and making Xerox

22   copies?

23         THE WITNESS:  We were trying to give her some

24   options as to how she could maybe get the materials to

25   the students, and Blackboard at the time was our

MCCCD/Martinez 03606

1    learning course management system.  It's now changed to

2    Canvas.

3              MS. BLACH:  I have just a couple of follow-up

4    questions.

5

6                        REDIRECT EXAMINATION

7

8    BY MS. BLACH:

9         Q.   Dr. Kakar, this e-mail that the Committee just

10   asked you about, what is the date on that e-mail?

11        A.   January 28th, 2010.

12        Q.   Was that before the directives were put in

13   place limiting her copy restrictions?

14        A.   Yes.

15        Q.   So, that recommendation was made before her

16   copy privileges were revoked?

17        A.   Yes.  After -- after this meeting her -- well,

18   yeah, that's the case.

19        Q.   And then one final question.  With respect to

20   the Tim Bryan materials that are the subject of the

21   cash-handling violation.  Isn't it true that Dr.

22   Martinez actually modified these materials before she

23   distributed them to students?

24        A.   I -- I can't answer that.

25              CHAIRPERSON CRUDUP:  Five minutes left.

MCCCD/Martinez 03607

1          MS. BLACH:  Finished with the witness.

2          MR. UPPAL:  I'd like to call my next witness.

3          MR. MONTOYA:  Five minutes left of their whole

4     case?  That is our view.

5          MR. UPPAL:  I'd like to call my witness now.

6     I'd like to call President Anna Solley.

7

8                    ANNA SOLLEY,

9       called as a witness herein, having been first duly

10         sworn, was examined and testified as follows:

11

12                  DIRECT EXAMINATION

13

14    BY MR. UPPAL:

15       Q.   Good afternoon, Dr. Solley.  Could you please

16    tell the Committee what position you hold with MCCCD?

17       A.   Yes.  I'm President of Phoenix College.

18       Q.   And if there is a problem or a headache or an

19    insubordinate employee who doesn't follow the law,

20    doesn't follow directives, whose desk does it ultimately

21    land on at Phoenix College?

22       A.   It is my responsibility.  I serve as the CEO of

23    the college and I'm responsible for all the operations

24    of the institution.  So, any issue that affects an

25    employee, that affects a student, that affects budget,

MCCCD/Martinez 03608

1    any challenges that we face are ultimately my

2    responsibility.

3        Q.   So, there's this phrase, and tell me if it's

4    accurate, does the buck stop with you?

5        A.   Absolutely.

6        Q.   And if there's a headache, it's your headache?

7        A.   Absolutely.

8        Q.   So, in your own words, Dr. Solley, would you

9    please tell the Committee, face them and tell them why

10   you are recommending Dr. Cleopatria Martinez for

11   termination?

12       A.   Committee Members, I am recommending that Dr.

13   Martinez be terminated for several reasons.  One

14   certainly deals with the infringement of copyright and

15   fair use violations; in addition to that, repeated

16   attempts to not follow the Governing Board policies and

17   procedures; in addition to that, repeated attempts not

18   to follow my directives, my directions; and not just my

19   directions, but the directions and advice of our staff

20   and our faculty and her Chair; and then, of course,

21   another issue has to do with the most recent situation

22   in regards to violation of the Cash-Handling Policy.

23           And then also because we are very concerned

24   about potential liability, this morning's expert

25   witness, Sean Garrison, talked in detail about some of

MCCCD/Martinez 03609

1    the potential threats, not only to our college but he

2    gave examples of previous situations where there had

3    been losses and we're very concerned about that because

4    we do have limited resources.  We're good stewards of

5    the public resources and we want to ensure that those

6    resources are deployed for the right purpose, to promote

7    and support student's success, to promote and support

8    teaching and learning, and not to put us in the

9    defensive posture of defending a very expensive

10   lawsuits.

11       Q.   So, if a lawsuit had resulted as a result of

12   Dr. Martinez's copyright violations or her attempts to

13   evade the limitations that were placed on her, as a

14   result of those copyright violations all that money and

15   all those damages that Mr. Garrison testified about,

16   where would that money come from?  Who would pay the

17   attorney's fees?  Who would pay the damages?

18       A.    Those funds would come from my college.  And we

19   are experiencing some budget challenges, not just my

20   college but in the system.  We have lost some

21   considerable funding from the State, and as a result of

22   that, that would mean that rather than hiring faculty

23   and staff or providing support for very specific

24   programs that would support student success, we would

25   have to use those resources in turn to defend our

MCCCD/Martinez 03610

1     colleagues against these lawsuits.

2         Q.   So, instead of spending the money for students,

3     you have to spend it fighting a lawsuit?

4         A.   That is correct.

5         Q.   And what about with respect to the complaints

6     that you've received from students that they couldn't

7     even get receipts from Dr. Martinez after she sold them

8     packets of materials, how does that impact your request

9     for termination?

10        A.   That is an indication of willful and

11    intentional behavior on behalf of Dr. Martinez, because

12    it demonstrates that she is not willing to follow

13    directives, she was not willing to follow instructions.

14    And we have been working with Dr. Martinez for the last

15    four years.  We've met with her, we've counselled her,

16    we've advised her.

17        And, again, the latest indication is that she's

18    not going to change her behavior and she's going to put

19    us in a very precarious situation and it's really

20    beginning to affect students.  And if anybody knows

21    anything about me, I stand for -- I'm a person of

22    integrity; I stand for excellence.  I want our students

23    to have the best because they deserve the best.

24        CHAIRPERSON CRUDUP:  Okay.  One last question.

25        MR. UPPAL:  Okay.  If the Committee would

MCCCD/Martinez 03611

```
 1      indulge me, I would like one final question.

 2              MR. MONTOYA:  What about my turn?

 3              MR. UPPAL:  I said one final question, Mr.

 4      Montoya.

 5              CHAIRPERSON CRUDUP:  One question.

 6         Q.   BY MR. UPPAL:  Do you have any final comment

 7      that you would like to make to the Committee with

 8      respect to your level of trust in Ms. Martinez [sic] and

 9      what you would like the Committee to do or not do?

10              MR. MONTOYA:  Object to him asking an

11      open-ended question when his time is already expired.

12      And he's been repeatedly warned by the Committee that

13      you are going to hold him to his time so that he would

14      expend it wisely.

15              MR. UPPAL:  Mr. Chairperson, how many minutes

16      has Mr. Montoya used making speeches and objections,

17      these same objections over and over and over.  That time

18      should come back to me.

19              MR. MONTOYA:  If he wouldn't completely --

20              CHAIRPERSON CRUDUP:  Just one minute.

21              MR. MONTOYA:  -- do the same thing over and

22      over --

23              MR. UPPAL:  One question.  One minute.

24              MR. MONTOYA:  -- I wouldn't have to do that.

25              CHAIRPERSON CRUDUP:  You may proceed.
```

1      Q.   BY MR. UPPAL:  So the question was, which the

2     Committee Chairperson has just allowed you to answer is:

3     Could you please tell the Committee in your own words

4     what level of trust you have in Dr. Martinez to follow

5     the law, follow the directives, follow orders that you

6     have received [sic], and what you would like -- or what

7     your request is of the Committee in this matter?

8         A.   I do not trust that Dr. Martinez would comply

9     with our directive; I do not trust that she will follow

10    the law; I do not trust she will abide by Governing

11    Board policies and procedures.  I respectfully request

12    that the Committee recommend to our Chancellor -- or,

13    the Governing Board, excuse me, termination as per my

14    request, my recommendation.

15           CHAIRPERSON CRUDUP:  Okay.  Thank you.

16

17                    CROSS-EXAMINATION

18

19    BY MR. MONTOYA:

20        Q.   You believe that Professor Martinez violated

21    copyright law, right?

22        A.   Yes.

23        Q.   But that's not your independent conclusion, is

24    it?  Because you're not a copyright law expert, right?

25        A.   It is not my independent conclusion but we did

```
 1    hire --
 2         Q.   Okay.  You answered the question.
 3         A.   Let me answer.
 4              MR. UPPAL:  Objection.
 5              THE WITNESS:  Can you let me answer?
 6              MR. UPPAL:  Objection.  Here we go again.
 7              MR. MONTOYA:  Can I say something?
 8              MR. UPPAL:  When Mr. Montoya does not like the
 9    answer he engages in misconduct.
10              MR. MONTOYA:  I don't want a speech to hand her
11    the answer.
12              MR. UPPAL:  No, he's not --
13              MR. MONTOYA:  Your lawyers -- your lawyers will
14    tell you that judges have the right to direct witnesses
15    to be responsive then to tell them to stop with a speech
16    that's not responsive.  She's -- she's had her
17    opportunity to give speeches, Lord knows.  All I want
18    her to do is answer my question so I can move on so I
19    can get to my case.
20              MR. UPPAL:  This is the President of Phoenix
21    College, the person on whom this entire headache lands
22    and --
23              MR. MONTOYA:  And why didn't you call her
24    earlier?
25              MR. UPPAL:  He is cutting off her question
```

MCCCD/Martinez 03614

1    [sic].  I'm not -- this is completely inappropriate.  He

2    asked a question.  Now he was getting a response which

3    he didn't like which undermines his client's position,

4    and he's trying not to -- he's trying to hide the answer

5    from you.  He can't ask a question and cut the witness

6    off.

7              CHAIRPERSON CRUDUP:  Rephrase the question.

8              MR. MONTOYA:  Okay.

9              CHAIRPERSON CRUDUP:  You may answer.

10       Q.    BY MR. MONTOYA:  Okay.  Your claim that

11   Professor Martinez has violated the copyright laws is

12   based upon opinions that you received from individuals

13   that you believe to be legal experts, correct?

14       A.    It is correct.

15       Q.    Thank you.  Budget -- you have budget problems?

16       A.    Yes.

17       Q.    And you don't want to pay lawyers, right?

18       A.    Well, my con- --

19       Q.    Is that yes --

20             MR. UPPAL:  Objection.

21       Q.    BY MR. MONTOYA:  -- or no?

22       A.    My --

23             MR. UPPAL:  Here we go again.  There is a

24   question, she's about to answer it, he doesn't like

25   what's coming in the answer and asks another question.

Miller Certified Reporting, LLC

MCCCD/Martinez 03615

1    Mr. Crudup, this is completely outrageous.

2          MR. MONTOYA:  No, it's not.

3          DR. CAIRE:  Can you give her at least a few

4    seconds before you interject again, so we can hear --

5          MR. MONTOYA:  Well, wait a minute.  Can I --

6          MR. UPPAL:  You just received an instruction.

7    You're actually arguing with an instruction?

8          MR. MONTOYA:  No.

9          MR. UPPAL:  So, can we continue and let her

10   answer?

11         MR. MONTOYA:  Well, I'm not going to answer you

12   and you can --

13         CHAIRPERSON CRUDUP:  Rephrase the question.

14   Let her answer.

15         MR. UPPAL:  Well, Dr. Crudup, on this one

16   that's fine.  We're going to defer to you.  But I don't

17   want a series of him interrupting the President of

18   Phoenix College when he doesn't like an answer and then

19   he gets a second shot at rephrasing the question and

20   deprives the witness of a chance to answer.  This is the

21   second time he's gotten this.  It's an old lawyer's

22   trick.  It shouldn't be allowed to continue.

23         DR. REYES:  Mr. Chairman, may I?  I'd just like

24   to advise everyone of the time.  We do want to honor

25   equal -- as close as possible amounts of time for both

1    the sides.  So, whatever additional time we take right

2    now, we're going to need to adjust closing statements.

3    We have very little buffer at the end of day before 5

4    o'clock adjournment.

5              MR. MONTOYA:  I'm going to be mindful and move

6    on to something else.

7              DR. REYES:  Then it will be your turn.

8         Q.   BY MR. MONTOYA:  Okay.  You claimed that

9    Professor Martinez violated a cash-handling rule?

10        A.   Yes, I do.

11        Q.   Okay.  Which one?

12        A.   It's Governing Board -- it's one of our

13   administrative regulations.

14        Q.   Which one?

15        A.   I don't know off the top of my head the exact

16   number.

17        Q.   Okay.  Do you know its content?

18        A.   Yes, I do know it's content.

19              MR. MONTOYA:  Wait.  Excuse me.  Now he just

20   handed her the answer.

21              MR. UPPAL:  We handed her the charges.

22              MR. MONTOYA:  Excuse me.  And I want you to

23   please seek advice from counsel.  You can't hand the

24   witness the answer when she's being cross-examined.

25   That is improper.

MCCCD/Martinez 03617

1           MR. UPPAL:  He's trying to get her to state the

2      rule of a Cash-Handling Policy without her taking a look

3      at it.  You can take a look at it right here.  I've

4      circled it.  It's the statement of charges.

5           MR. CALDERON:  Mr. Chairman, with your

6      permission may I retrieve the paper?

7           MS. BLACH:  Statement of Charges.

8           MR. CALDERON:  With your permission, Mr. Chair.

9      Mr. Montoya, this is what was handed.

10           MR. MONTOYA:  Yeah.  And I don't want her --

11           MR. CALDERON:  This isn't asking you anything.

12      Just so you can see it, what was handed.

13           MR. MONTOYA:  Okay.  I see it.

14           MR. CALDERON:  And there's a bracket.

15           MR. MONTOYA:  I'll hand it back to you, sir.

16           MR. CALDERON:  All right.  For the benefit of

17      the Committee, this is what was handed to the witness

18      during the testimony.  And Mr. Chairman, I would

19      recommend that you admonish all the parties not to hand

20      the witness anything while they're testifying.

21           CHAIRPERSON CRUDUP:  Okay.  Do not hand the

22      witness anything while they're testifying.

23           MR. UPPAL:  Fair enough.  My request is if he's

24      going to ask about a rule, then the witness should be

25      able to look at the rule that she's being questioned

1        about.

2                MR. MONTOYA:  My response is when you're trying

3        to fire somebody, you should at least know the rule that

4        you claim they violated off the top of your head,

5        because you owe that to someone when you're trying to

6        deprive them of their career and employment.  It's not

7        that hard to do.  Believe me.  I did it and I don't work

8        for Phoenix College.

9            Q.   BY MR. MONTOYA:  President Solley, what's the

10       rule say that you claim my client violated and that you

11       want to fire her for?

12               MR. UPPAL:  Objection.  We'll stipulate she

13       doesn't have it memorized.  He's asked a question.  Now,

14       may I hand her the rule so she can answer the question?

15               MR. MONTOYA:  I object.  This is part of my

16       cross-examination.

17               DR. REYES:  Mr. Chairman, may I?  I'm sorry but

18       I don't believe we need to have all rules memorized.  I

19       believe we teach our students and know how to use the

20       resources.

21               MR. MONTOYA:  That's right.  That's why I just

22       asked her what it said.  And I -- and she hasn't

23       answered that yet.

24               MR. UPPAL:  May I hand her the rule?

25           Q.   BY MR. MONTOYA:  I know you don't have it

MCCCD/Martinez 03619

1      memorized --

2            MR. UPPAL:  This is a request.  May I hand her

3      the rule?  She's being --

4            MR. MONTOYA:  Well, you were just ordered that

5      that not to be done.

6            MR. UPPAL:  I just asked, Mr. Montoya.

7            MR. MONTOYA:  Well, he's --

8            MR. UPPAL:  No.

9            MR. MONTOYA:  I heard him order that they are

10     not to --

11           MR. CALDERON:  Mr. Chair, may I ask a question?

12           CHAIRPERSON CRUDUP:  Yes.

13           MR. CALDERON:  Mr. Montoya, what are you trying

14     to -- what's your end?

15           MR. MONTOYA:  I just want -- I agree with you

16     that you don't need to memorize a rule.  However, you

17     should know it's substance.  And all I'm asking her is

18     what is the substance of the rule.

19           CHAIRPERSON CRUDUP:  She has already stated the

20     substance earlier when she's being questioned.  She

21     stated the basic substance of it, the relationship

22     between -- between the faculty and the students.  She

23     knows what -- what it refers to, so you can ask her

24     again what it refers to.

25           MR. UPPAL:  Dr. Crudup, I thought you just

MCCCD/Martinez 03620

1    ruled -- I thought I heard a yes from you that I could

2    hand her the rule.  You were about to pass it to me.

3          MR. MONTOYA:  I'll make this easy.  I'll

4    withdraw the question and I'm done questioning this

5    witness.  Thank you.

6          And as long as there's no redirect, it's

7    already 1:35.

8          MR. CALDERON:  He withdrew the question, so

9    let's move on.

10         DR. REYES:  Mr. Chairman, may I?

11         CHAIRPERSON CRUDUP:  Sure.

12         DR. REYES:  For procedural purposes as we move

13   ahead, if there is anything that either of you would

14   like to hand the witness, if you could please ask

15   permission first without handing.  That way we're still

16   consistent with what Mr. Chair said.

17         MR. MONTOYA:  That's my understanding of the

18   proper procedure and that's what I would follow.

19         Thank you, President Solley.

20         THE WITNESS:  You're welcome.

21         MR. UPPAL:  No redirect.

22         My request would be that if we could take a

23   two-minute break and five-minute break before Mr.

24   Montoya begins the defense.  I would appreciate it.

25   Just as a matter of courtesy.

1          CHAIRPERSON CRUDUP:  Okay.

2          MR. MONTOYA:  Sure.

3          CHAIRPERSON CRUDUP:  We're at recess.

4          (Whereupon a recess is taken at 1:34 p.m. until

5     1:40 p.m.)

6

7          MR. MONTOYA:  May I proceed?

8          CHAIRPERSON CRUDUP:  Yes.

9          MR. MONTOYA:  The witness needs to be sworn.

10

11                CLEOPATRIA MARTINEZ,

12     called as a witness herein, having been first duly

13        sworn, was examined and testified as follows:

14

15                DIRECT EXAMINATION

16

17     BY MR. MONTOYA:

18          Q.   Professor Martinez, I want to quickly go

19     through your background because I know that your life is

20     more than the allegations that are our present concern.

21     First of all, where were you born?

22          A.   I was born in Las Vegas, New Mexico.

23          Q.   When were you born?

24          A.   1948.

25          Q.   Now, Professor, I need you to speak up.  I'm

MCCCD/Martinez 03622

1        kind of hard of hearing, that's why I speak so loudly.

2        Other people might be hard of hearing, too, all the way

3        over there.  So, I need to make sure 100 percent they

4        hear you.  Okay?

5            A.    Oh.  Yes.  Of course.

6            Q.    So, please raise your voice and I'll remind

7        you.

8                  How old are you?

9            A.    I'm 65.

10           Q.    Did you go to college?

11           A.    Yes.

12           Q.    Where?

13           A.    Undergraduate at the University of Denver; and

14       graduate school, University of Colorado in Boulder.

15           Q.    Did you go to high school in Denver?

16           A.    Yes.

17           Q.    Did you graduate from high school?

18           A.    Yes.

19           Q.    Tell the Committee how high in your high school

20       class you graduated.

21           A.    I graduated sixth out of around 800 students.

22           Q.    You graduated in the top 1 percent of your

23       class?

24           A.    Yes.

25           Q.    Now, tell the Committee, did your family have

1    enough money to pay for your college education?

2         A.   No.  I was raised by a single parent, we lived

3    in federal housing projects and we were on Welfare, very

4    poor.  My education -- any higher education was paid for

5    by scholarships and grants.

6         Q.   What did you major in in college?

7         A.   Undergraduate mathematics, my master's was in

8    education, my Ph.D. was in bilingual mathematics

9    education.

10        Q.   Are you bilingual?

11        A.   Yes, I am.

12        Q.   Now, in your home as a child, what language did

13   they speak?

14        A.   I spoke Spanish first and I learned English

15   later in school.

16        Q.   Okay.  Now, when you were majoring in

17   mathematics in the University of Denver as an

18   undergraduate, were there a lot of women math majors?

19        A.   No.  And I think I was the only non-white math

20   person in the college, in the university.

21        Q.   What year did you graduate from the University

22   of Denver?

23        A.   1971.

24        Q.   Was it -- did you have to work part-time or

25   full-time?

MCCCD/Martinez 03624

1    A.   Yes.  I had to work part-time and I lived in --

2  I rented a room from a person in their house.

3    Q.   And when you went to graduate -- after you

4  graduated from college, what year was that?

5    A.   I graduated from -- with my bachelor's in 1971,

6  my masters in 1976, and Ph.D. the spring of 1985.

7    Q.   After you graduated from college, what did you

8  do next?  Tell the Committee.

9    A.   I went directly to teaching public schools,

10  Denver public schools for four years; and then I went to

11  the university -- and, I'm sorry, the Community College

12  of Denver, Auraria Campus, where I taught for ten years;

13  then I moved to Scottsdale Community College were I

14  taught -- Maricopa; I taught Scottsdale ten years and

15  Phoenix College 18 years.

16    Q.   How did you pay for your master's degree?

17    A.   Grants and scholarships.

18    Q.   How did you pay for your Ph.D.?

19    A.   Grants and scholarships.

20    Q.   How long did you teach at Denver Community

21  College?

22    A.   About four years, four years almost.

23    Q.   What did you teach?

24    A.   Mathematics and I also taught physical

25  education.

MCCCD/Martinez 03625

```
 1          Q.   Were there a lot of Hispanic women teaching

 2    mathematics at Denver Community College when you taught

 3    there for four years -- no, for ten years from 1974 to

 4    1984?

 5          A.   No.

 6               MR. UPPAL:  Objection.  Irrelevant.

 7               MR. MONTOYA:  Can I respond?  I'll tell you why

 8    it's relevant is because you pass judgment on somebody,

 9    you need to know their whole story, not just a fraction

10    of the story.  I'm going to be brief.  I could be very,

11    very long because I can tell you this individual has a

12    remarkable personal story, so I could go on and on.

13    Literally, in fact, other scholars have written about

14    her fascinating and compelling personal story, but I

15    won't.  I just want you to know who this lady is,

16    especially given the fact that President Solley was

17    allowed to testify that she didn't trust her and that

18    she was untrustworthy and that she has a history of

19    violating the rules, which is not true.  This demon- --

20    her whole life is a reputation of that.

21               MR. UPPAL:  I stand by my objection because her

22    background in this matter or having Hispanic teachers or

23    students that were at Denver at some point in the past

24    is totally irrelevant to this.  The best way I can

25    illustrate this is even if Dr. Martinez had rescued a
```

MCCCD/Martinez 03626

1    child from a burning building, we could all agree that

2    that's incredibly altruistic and wonderful but it

3    doesn't go to the issues that are before the Committee

4    today.

5         MR. MONTOYA:  I was talking about her

6    educational and professional background, not whether or

7    not she saved a child from a burning building in her

8    personal life.

9         DR. REYES:  Mr. Chairman, would it be possible

10   for you to just recognize that how you use your time

11   will be based on --

12        MR. MONTOYA:  Oh, I will be.

13        DR. REYES:   -- based on time constraints.

14        MR. MONTOYA:  I will.  I'm going to go real

15   quick.  You watch.

16        Q.   BY MR. MONTOYA:  So, tell me, when you taught

17   at Denver Community College, were there a lot of

18   Hispanic math professors?

19        A.   No, I was the only one.

20        Q.   When you taught at Denver Community College,

21   were there a lot of bilingual math professors?

22        A.   I was the only one, no.

23        Q.   Why did you leave Denver Community College?

24        A.   I like -- Maricopa was one of the top-rated

25   community college districts in the country and I liked

1    Phoenix and so did my family.  And I was very cold in

2    Denver and the weather was nice here.

3         Q.   So you moved to Phoenix?

4         A.   Yes.

5         Q.   And you started up at Scottsdale?

6         A.   Yes.

7         Q.   And tell the members of the community what you

8    taught at Scottsdale Community College?

9         A.   Mathematics.

10        Q.   How did you like it?

11        A.   I loved it.  I still do.

12        Q.   Isn't it true that you taught at Scottsdale

13   Community College from 1985 to 1995?

14        A.   Yes.

15        Q.   And now tell the Members of the Committee why

16   you left Scottsdale Community College.  Did you chose to

17   or were you forced to?

18        A.   I --

19        Q.   Speak up.

20        A.   I was interested in getting more diversity in

21   both the student body and in the faculty and Phoenix

22   College was extremely diverse.  It's the flagship

23   college of the Maricopa District.  I liked the --

24   everything about Phoenix College and my colleagues had

25   been urging me to move over.

MCCCD/Martinez 03628

1          Q.    When you worked at Denver Community College,

2    were you ever accused of violating the copyright laws?

3          A.    No.

4          Q.    Were you ever accused of any misconduct?

5          A.    No.

6          Q.    When you were work at Scottsdale Community

7    Colleges for a decade, were you ever accused of

8    violating the copyright laws?

9          A.    No.

10          Q.    Were you ever accused of any misconduct?

11          A.    No.

12          Q.    When you moved to Phoenix Community College in

13    1995, what did you teach?

14          A.    I taught mathematics.

15          Q.    Did any students accuse you of being

16    incompetent?

17          A.    No.

18          Q.    Now -- now, you heard someone testify in a very

19    vague and insubstantial, nonspecific way --

20                MR. UPPAL:  Objection.  Not a question.  That's

21    a speech.  Objection.

22                CHAIRPERSON CRUDUP:  Please continue.

23          Q.    BY MR. MONTOYA:   -- that students were starting

24    to complain about you.  Have you ever been the subject

25    of a student complaint?

MCCCD/Martinez 03629

1        A.   No.

2        Q.   Do you love to -- did you hear my opening

3    statement?

4        A.   Yes.

5        Q.   You taught at the District for 28 years?

6        A.   Yes.

7        Q.   You're 65 years old?

8        A.   Yes.

9        Q.   Why don't you retire?

10       A.   I really enjoy teaching and I'm not ready to

11   retire.  It's a love of mine.  It's second only to my

12   children.  I love teaching and that's why I'm not at the

13   university, I'm at the community college.  And I think I

14   do a really good job.

15       Q.   Do your students tell you you do a good job?

16       A.   Yes, they do.

17       Q.   Now, I think somebody mentioned that you were

18   the chairperson of the Math Department at Phoenix

19   College?

20       A.   Yes.

21       Q.   When?

22       A.   Around 2005 to 2008.

23       Q.   Okay.  Is that an elected position?

24       A.   Yes, it is.

25       Q.   So, your -- your faculty elected you to that

1  position?

2      A.  Yes.

3      Q.  What are the responsibilities of a Chair of a

4  Math Department at a community college here in Maricopa

5  County?

6      A.  I -- I am the voice of the department to the

7  Administration and visa versa; I bring the messages of

8  the Administration to the department; I schedule all the

9  classes both for adjunct and for residential faculty; I

10 deal with any problems that exist between students and

11 faculty and vice versa or faculty with faculty.

12     Q.  Now, when you were chairperson of the faculty,

13 did the District educate you regarding copyright law?

14     A.  No.

15     Q.  Did anyone come and tell you what you could or

16 couldn't copy under the federal copyright laws?

17     A.  No.

18     Q.  Now, you've been a -- let me see if I -- let me

19 see how my math is working out for me this afternoon.

20 You taught at the Denver Community College for ten

21 years, right?

22     A.  Yes.

23     Q.  But then you taught at the Phoenix Community

24 College since 1985?

25     A.  Yes.

MCCCD/Martinez 03631

1      Q.   So, in fact, you have been in --

2      A.   Maricopa.  Excuse me.  Maricopa County.

3      Q.   Maricopa County.

4           Isn't it true you've been an educator for

5      almost 40 years?

6      A.   More than 40 years.

7      Q.   And that would include your -- your teaching

8      experience as a high school teacher, right?

9      A.   Yes, it does.

10      Q.   Now, have you ever -- and, plus, you went to

11      college, graduate school, and you were in a doctoral

12      program, right?

13      A.   Yes.

14      Q.   Now, did you ever get any handouts from your

15      faculty members when you were in graduate school?

16      A.   Yes.

17      Q.   Were they of publications other than from the

18      person handing the handout to you?

19      A.   Sometimes.

20      Q.   Did anyone say:  Hey, that's a violation of

21      copyright law?

22      A.   No.

23      Q.   Now, you've also seen your colleagues at

24      Maricopa Community College District use handouts that

25      they did not write, correct?

MCCCD/Martinez 03632

1      A.   Yes.

2      Q.   Is that -- how common is that?

3           MR. UPPAL:  Objection.  Facts not in evidence.

4      Lacks foundation.

5           MR. MONTOYA:  Excuse me.  This is how -- this

6      is how you get facts into evidence.  As your counsel

7      will tell you, you get facts into evidence through

8      direct examination based upon a witness's personal

9      knowledge.  That is absurd, that objection.

10          MR. UPPAL:  Objection.  The question that he

11     just asked is essentially how common is that, meaning

12     how -- implying how common is it for everybody else to

13     rampantly violate copyright law.  If he wanted to go

14     through this line of questioning, he owes a lot of

15     exhibits that are not in evidence.

16          MR. MONTOYA:  I can ask her, ladies and

17     gentlemen of the Committee, based on her own personal

18     knowledge, Lord knows she's worked at the District for

19     28 years, that's a long time.

20          MR. UPPAL:  I'm not going to get into prefaces

21     like "Lord knows," because I just don't think that's

22     appropriate for me to say.  But what I am going to say

23     is that there is no evidence.  There's supposed to be

24     evidence to back up what the questioning is going to be

25     about and this is far afield, and --

MCCCD/Martinez 03633

```
 1              CHAIRPERSON CRUDUP:  So, rephrase the question.

 2    You're asking her opinion, so.

 3              MR. MONTOYA:  Well, I'm not asking her opinion.

 4    I'm asking her what she's seen.  And your lawyer will

 5    also tell you, that what all lawyers know, is evidence

 6    can be both documentary and testimonial, and they're

 7    entitled to equal weight.

 8         Q.   BY MR. MONTOYA:  Okay.  I'm not asking you to

 9    guess --

10              MR. UPPAL:  Objection.  This subject matter was

11    not disclosed as a subject of testimony and it's just

12    outrageous because, you know --

13              CHAIRPERSON CRUDUP:  Proceed.

14              MR. UPPAL:  -- if he -- if he -- if Dr. --

15              MR. MONTOYA:  You know, that's what's

16    outrageous is he --

17              MR. UPPAL:  I haven't finished yet.  I haven't

18    finish- --

19              MR. MONTOYA:  That is an example of what the

20    District is doing in this case.  The --

21              MR. UPPAL:  He's talking over me.

22              THE COURT REPORTER:  I'm sorry.  Please.

23              MR. UPPAL:  He's talking over me just like he

24    talked over the witnesses.

25              CHAIRPERSON CRUDUP:  Please continue.  Ask your
```

1   question.

2       Q.   BY MR. MONTOYA:  Now, Cleopatria, I'm not

3   asking you to guess and I'm not asking you for your

4   personal opinion, I'm asking you to tell the Committee

5   -- you're under oath -- what you've seen with your own

6   eyes over the 28 years that you've worked at the

7   District.  Do you understand that?

8       A.   Yes.

9            MR. UPPAL:  Objection.  This is not a subject

10  of testimony that was disclosed.  And the reason that

11  this is important is, if she is about to say that other

12  people do this, it had to be disclosed so we could bring

13  those other people here under oath and have them repute

14  it.

15           MR. MONTOYA:  That is not a rule -- that might

16  be a rule in federal court, but that is not the rule in

17  administrative law.  To the contrary.

18           MR. CALDERON:  Mr. Chair, Members of the

19  Committee, I recommend you let the question be answered

20  and then let the parties move on.

21           MR. MONTOYA:  That's what I intend to do if I

22  can.

23       Q.   BY MR. MONTOYA:  Okay.  Tell the Committee what

24  you've seen over the 28 years in reference to scholars

25  copying other scholar's work for educational purposes,

MCCCD/Martinez 03635

1    classroom instruction purposes, teach their students?

2         A.    Educators do this all the time.  They will get

3    -- if they find some material that will help their

4    students learn something, they'll make copies of it and

5    hand it out to students.  This is not an unusual

6    practice.

7              MR. UPPAL:  Objection.  I move to strike.  If

8    she's going to testify about this, she needs to testify

9    about who the other people are and name them.

10             MR. MONTOYA:  He can ask those questions -- he

11   can ask these questions when it's his turn.

12             MR. UPPAL:  It's undisclosed and she's not even

13   testifying to any facts.  Did you get a name here of

14   anyone else who has done this or what they've done?  No.

15             CHAIRPERSON CRUDUP:  We're waiting for --

16             DR. CAIRE:  I think you would have that right

17   when you cross-examine, to refute any kind of facts or

18   perspective.

19             MR. UPPAL:  Sir, the problem is that this line

20   of questioning has not been disclosed.  You're supposed

21   to disclose it in your brief.

22             MR. MONTOYA:  There is no disclosure rules in

23   administrative law.  That is ridiculous.

24             MR. UPPAL:  It's not ridiculous at all.  We

25   were required to --

```
1              MR. MONTOYA:  This is a legal question --

2              MR. UPPAL:  -- submit briefs that --

3              MR. MONTOYA:  -- that you should talk to you

4      legal counsel on.

5              MR. UPPAL:  -- and then there was a requirement

6      for supplemental briefs.

7              DR. REYES:  Mr. Chairman, please.  It seems

8      that, if I'm understanding correctly, the question is

9      getting diluted.

10             I'm not understanding how your question, Mr.

11     Montoya, leads to incriminating others.  The fact that

12     educators use other works -- other people's works does

13     not mean they're infringing on copyright law.

14             MR. MONTOYA:  I know.

15             DR. REYES:  So, we can't make that assumption.

16     If we could adjust that question and move on quickly.

17             MR. MONTOYA:  I was about to before I was

18     interrupted with the same interruption that was ruled

19     upon by the Chair twice.

20        Q.   BY MR. MONTOYA:  Professor Martinez, have you

21     ever heard of the Fair Use Doctrine?

22        A.   Yes, I have.

23        Q.   Tell -- tell -- and did you learn it as a

24     teacher?

25        A.   Yes.
```

Miller Certified Reporting, LLC

MCCCD/Martinez 03637

1    Q.   Did you learn it at Phoenix College?

2    A.   Well, I --

3    Q.   Or the Maricopa Community College District?

4    A.   I've known about fair use, I'd say, all my

5    career.

6    Q.   Did you believe that when you -- when you and

7    your colleagues were using the work of others, that you

8    were doing it under the Fair Use Doctrine as educators

9    engaging in classroom instruction?

10   A.   Yes.

11   Q.   When is the first time that an administrator

12   told you that your use of copies to help educate your

13   students violated federal copyright law?

14   A.   In 2012, in January, when I received the letter

15   the e-mail from Ronnie Elliot.

16   Q.   Okay.  I want to --

17        DR. REYES:  I'm sorry.  Please.  Correction, is

18   that "2012," you stated?

19        THE WITNESS:  I'm sorry.  Did I say "2012"?

20   2010.

21        MR. MONTOYA:  Can you hear her?

22        DR. REYES:  Yes.

23        MR. MONTOYA:  Are you all good hearing?

24   Q.   BY MR. MONTOYA:  But, could you raise your

25   voice, please, because I'm getting paranoid about it.

MCCCD/Martinez 03638

1        A.    Yes.

2        Q.    Okay.  So, someone came to you and told you

3    that your materials might be violative of federal

4    copyright law?

5        A.    No.  I received an e-mail from Ronnie Elliot

6    saying that there was a question.

7        Q.    And that was in January of 2010?

8        A.    '10.

9        Q.    Okay.  Now, I want you to tell the Committee

10   this really important fact that doesn't even involve

11   dispute regarding federal copyright law:  When is the

12   last time that someone from the Administration told you

13   that a specific material that you were using to instruct

14   your students, to teach your students, violated federal

15   copyright law?

16            When is the last time someone pointed out

17   something and said:  Hey, this violates federal

18   copyright law the way Mr. Sean Garrison was testifying

19   this morning?

20       A.    It was the -- it was the Sean Garrison

21   material.

22       Q.    And isn't that true that that was all used by

23   you in the spring semester of 2010 and after that you

24   never used it again?

25       A.    Yes.  That's correct.

MCCCD/Martinez 03639

1          Q.    Okay.  Now, I'm going to get specific with you.

2               MR. MONTOYA:  And this is based upon the

3     District's own exhibits.  This is Exhibit 6, page 27.

4     District's Exhibit 6, page 27.  Garrison Exhibit 27.

5     I'll show you the cover page.  It's her lecture notes

6     for MAT 182, precalculus, Dr. Cleopatria Martinez.

7          Q.    BY MR. MONTOYA:  I'm going to hand it to you

8     and I'm going to ask you some questions about it.

9          A.    Okay.

10         Q.    Thank you.

11         A.    Yes.

12         Q.    Professor Martinez, what is that document?

13         A.    These are the notes that I gathered in January

14    of 2010 to teach the trigonometry -- tigmometry class

15    MAT 182.  I pulled them from my fall materials to use in

16    lecture for my MAT 182 trigonometry class.

17         Q.    Okay.  On the front page you said you prepared

18    these for your fall course?

19         A.    I -- I originally prepared materials for fall

20    in 2009.  I pulled from those materials the lecture

21    notes that would fit in spring of 2010.

22         Q.    Okay.  So it says fall of 2009 up here, right?

23         A.    Yes.

24         Q.    Isn't it true that you used those instead in

25    the spring of 2010?

MCCCD/Martinez 03640

```
 1              A.   I used the sections from 2009 in 2010, and I

 2       used the original notes in 2009 fall.

 3              Q.   Okay.  When is the last time you used these

 4       materials?

 5              A.   In --

 6              Q.   Tell the Committee --

 7              A.   In spring of 2010.

 8              Q.   You haven't used them since?

 9              A.   No.

10              Q.   Isn't it true the reason why you haven't used

11       them since is because you were told they violated

12       federal copyright law?

13              A.   Yes.

14              Q.   Okay.  Now, did you write everything in -- in

15       those lecture notes?

16              A.   Well, I'd like to make a correction.  I was

17       told they could -- they might violate copyright law.

18                   And I wrote everything except for the problems

19       in here.

20              Q.   Okay.  Where did you get the problems from?

21              A.   I got the problems from the precalculus

22       Sullivan textbook.

23              Q.   Had you ever used that textbook in your

24       classes?

25              A.   Yes.
```

Miller Certified Reporting, LLC

MCCCD/Martinez 03641

1      Q.   Were you using that textbook in some of your

2   classes in the spring of 2010?

3      A.   No.

4      Q.   When was the last time you would have used that

5   textbook?

6      A.   In fall of 2009.

7      Q.   Okay.  Now -- now tell me what percentage of

8   the content in those materials you derived from the

9   Sullivan?

10      A.   Less than half a percent, less than a percent.

11      Q.   Less than -- less than half a percent?

12      A.   Yes.

13      Q.   Why didn't you write the publisher and ask

14   permission?

15      A.   Well, I thought it was by fair use, that it fit

16   under fair use.

17      Q.   And isn't it true that after the District

18   started to accuse you of violating the copyright laws

19   you did write the publisher's asking for permission?

20      A.   Yes, I did.

21      Q.   How many times -- do you know who Maggie

22   McConnell is?

23      A.   Yes.

24      Q.   Who is she?  Tell the Committee.

25      A.   She's in-house counsel for the Maricopa

1      District Community College District.

2            Q.   Have you ever asked or tried to ask Maggie

3      McConnell any questions regarding complying with federal

4      copyright law?

5            A.   Yes.  Ann Rosel (phonetic), the libr- -- one of

6      the librarians at Phoenix College suggested that I call

7      her, that Maggie McConnell had volunteered to help

8      faculty individually and respond to their questions

9      regarding copyright.  But when I contacted Maggie

10     McConnell, she refused to do so.  She refused to help me

11     at all.

12           Q.   Did you contact her telephonically,

13     face-to-face, e-mail, by letter, or all of the above?

14           A.   It was definitely by telephone and I also had

15     some e-mail communication with her.

16           Q.   What did she tell you when you asked her for

17     guidance?

18           A.   She said she didn't have time to deal with

19     individual issues presented by faculty members on

20     copyright.

21           Q.   Now, you also talked about you spoke to a

22     Phoenix College librarian, did anyone instruct you to

23     speak to the Phoenix College librarian?

24           A.   I wrote to Dr. Solley asking -- saying that I

25     would like to get additional assistance since I was

MCCCD/Martinez 03643

1    unable to attend the workshop.

2        Q.   Let me stop you there.  Tell the Committee why

3    you were unable.  Were you out partying with a friend or

4    were you going on vacation?  Tell the Committee why you

5    were unable to go to that, because there was a

6    suggestion you just blew it off?

7        A.   Absolutely not.  I had a previous commitment

8    that I had made weeks before that -- so, I was unable to

9    attend.

10       Q.   What kind of commitment?

11       A.   I don't recall now what it was, but I remember

12   at the time I had to chose between the two and I felt

13   that the other one was my bigger commitment.

14       Q.   Did anyone report to you what Maggie McConnell

15   said at that meeting?

16       A.   I asked to meet with Ann Rosel the librarian at

17   Phoenix College regarding copyright, and Ann Rosel did

18   go -- communicate with me much of what was discussed at

19   the -- at the workshop and said to me that I seem to

20   know more about -- as much about copyright as she did.

21   But neither of us was real clear on the specifics when

22   you relate mathematics and connect to copyright.  We

23   weren't clear there, neither of us.

24       Q.   Is it your belief that a mathematical

25   calculation, simple or complex, can be copyrighted?

MCCCD/Martinez 03644

1        A.    I believe it cannot be copyrighted.

2        Q.    Some of what you copied from the Sullivan text

3    consisted of pure mathematical equations, right?

4        A.    Yes.

5        Q.    So, of that point -- of that less than

6    .5 percent, some of that less than .5 percent was

7    actually pure math, wasn't it?

8        A.    Yes.   Equations.

9        Q.    But some of it wasn't, right?   Some of it

10   consisted of introductory statements or questions,

11   correct?

12       A.    Yes.

13       Q.    And after you were told not to copy those types

14   of materials again, what did you do?

15       A.    I didn't copy them.   I replaced all of the

16   problems with problems I made up of my own.

17       Q.    Tell the Committee when you did that.

18       A.    I began doing it in February when I got the

19   e-mail from --

20       Q.    February of what?

21       A.    February of 2010, when I got the e-mail from

22   Ronnie Elliot.   And I proceeded to complete that,

23   removing all problems and replacing with my own by April

24   of 2010.

25       Q.    Okay.   Now, I'm going to hand you the Exhibit 2

MCCCD/Martinez 03645

1    of -- I think I might have already did it.

2             MR. MONTOYA:  Pavneet, can I borrow Exhibit 2

3    to Exhibit 6?

4             MR. UPPAL:  My Exhibit 2?

5             MR. MONTOYA:  Of your exhibit.  And we don't --

6    we can just show it to her right from where you're

7    sitting so I don't waste the Committee's time finding

8    it.

9             MR. UPPAL:  Sure.

10            MR. MONTOYA:  Thank you, sir.  Is that --

11            MR. UPPAL:  Here.

12            THE WITNESS:  Here it is.  Here it is.

13            MR. MONTOYA:  Oh, okay.  Thank you, though.

14   Appreciate that.

15            MR. UPPAL:  Can you pass me a bottle of water

16   when you get back?

17            MR. MONTOYA:  I sure will.

18            MR. UPPAL:  Thanks.

19       Q.   BY MR. MONTOYA:  Exhibit 2 of District's

20   Exhibit No. 6 starts at page 102.  Now tell the

21   Committee what that is.

22       A.   Exhibit 2 is the rest of the material that I

23   had pulled from my lecture notes from 2009 to be used in

24   my trigonometry class in 2010, spring.

25       Q.   Okay.

MCCCD/Martinez 03646

1          A.    Just a continuation.

2          Q.    So, I want to make sure that the Committee gets

3    this straight.  So, when is the last time that you used

4    the exhibits of Exhibit 2 in District Exhibit No. 6?

5          A.    Spring of 2010.

6          Q.    Have you ever used them again?

7          A.    No.

8          Q.    Why?

9          A.    The Administration -- well, they said I

10   couldn't use them and I didn't want to use them because

11   of their questioning.  I don't want to go against them.

12         Q.    Okay.  So, they said they potentially violated

13   copyright law?

14         A.    Correct.

15         Q.    Now, the materials in that set of documents of

16   your lecture notes, did you write everything in there?

17         A.    They are a continuation of Exhibit 1 which I

18   wrote the same way.  I pulled materials from the notes I

19   had written to lecture from in 2009, that I could use in

20   2010, spring.  And so they are based on what I wrote and

21   then the problems that I copied from the Sullivan

22   textbook.

23         Q.    Okay.  Now, tell the Members of the

24   Committee -- you're a mathematician -- you're best

25   estimate of what percentage of the copied material is in

MCCCD/Martinez 03647

1    Exhibit 2?

2         A.   Well, in Exhibit 2 it would probably be like

3    one-tenth of 1 percent, because all the homework

4    problems have been pulled out.  The only thing left in

5    Exhibit 2 are examples.

6         Q.   And are those examples mathematical formulas

7    and mathematical equations?

8         A.   Yes.

9         Q.   And is it -- in your view, can you copyright

10   mathematical formulas and mathematical equations, simple

11   or complex or in between?

12        A.   I believe they cannot be copyrighted.

13        Q.   Isn't it true that mathematicians are always

14   borrowing each other's problems, snippets of each

15   other's problems?

16        A.   Yes, it is.

17        Q.   Have your colleagues borrowed your problems?

18        A.   Yes, they have.

19        Q.   Have they asked for your permission?

20        A.   It is understood that if I give them something

21   of mine, they can use it.  As well as if they give me

22   copies of what they've written, I can use them as well.

23   They're not published materials.

24        Q.   Okay.  Now, I'm going to direct your attention

25   and hand you Exhibit 3 to the District's Exhibit No. 6.

Miller Certified Reporting, LLC

MCCCD/Martinez 03648

1          MR. UPPAL:  And what's the Bates number on

2     that?

3          MR. MONTOYA:  The Bates number --

4          THE WITNESS:  153.

5          MR. MONTOYA:  -- starts at 153 and it ends at

6     245 -- no, 249.

7     Q.   BY MR. MONTOYA:  Tell the Committee what that

8     is.  What is that stuff?

9     A.   Exhibit 3 are notes that -- material that I

10    wrote using all the handouts I've made or that

11    colleagues have given me throughout my mathematic career

12    that pertain to basic arithmetic.

13    Q.   Okay.  Did you get any of it from Sullivan?

14    A.   No.

15    Q.   Did you get any of it from Tussy & Gustafson?

16    A.   No.  These materials came from myself that --

17    over the years and from colleagues who had shared

18    materials with me.

19    Q.   And did the colleagues share the materials with

20    the understanding you can use them to teach your

21    students?

22    A.   Yes.

23    Q.   Now, let me ask you a question, tell the

24    Committee how much money you made off of the first stack

25    of papers, what I call the -- it's Exhibit 1 to

 1          District's Exhibit No. 6.  How much did you make on

 2     that?

 3          A.   I made no money.

 4          Q.   How much money did you make to Exhibit 6, part

 5     two?

 6          A.   None.

 7          Q.   How much money did you make on Exhibit 3

 8     part -- Exhibit 6, part three?

 9          A.   No, none.

10          Q.   Now, do you use those materials for any purpose

11     other than instructing your classroom students?

12          A.   No.  I only did it for instruction of my

13     students.

14          Q.   And you thought you could under the Fair Use

15     Doctrine?

16          A.   Yes.

17          Q.   Now, let me ask you a question, we talked about

18     this guy whose going to testify this afternoon named

19     Fred Bellamy.  Isn't it true that when the District

20     wouldn't give you any legal direction, that you had to

21     actually go out and find a private lawyer who would give

22     you legal direction?

23          A.   That's exactly what happened.

24          Q.   And tell the District in your own words how you

25     came about meeting Fredric Bellamy?

1       A.   Well, I talked with colleagues of mine trying

2    to find out how I could get information on copyright

3    because I wanted to know what was the violation or how

4    could I not violate -- what could I do to not violate, I

5    wanted to, to abide by all the laws, both the Maricopa

6    District as well as Federal, State, everything.  And so

7    I -- in talking to colleagues one of my colleagues said

8    that he had found this one attorney whose entire life

9    was based on copyright law and that I should contact

10   him, so I did.  And I took my materials to him and I

11   asked him to give me his opinion as to whether I had

12   violated copyright and if I had how could I not violate

13   copyright because I wanted to be in compliance.

14       Q.   What was his name?

15       A.   Fredric Bellamy.

16       Q.   Tell the Committee how much he charged you?

17       A.   He didn't charge me anything.

18       Q.   Did he tell you why he didn't charge you

19   anything?

20       A.   No, he did not tell me.

21       Q.   He'll tell the Committee when he gets here.

22       A.   Okay.

23       Q.   What did he tell you?  Summarize that for the

24   Committee briefly because he's going to come and talk to

25   the Committee himself, face-to-face.

MCCCD/Martinez 03651

1        A.   He told me in essence that this was a tempest

2    in a teapot, there was nothing here that violated

3    copyright; that I was using my lecture note -- these

4    were lecture notes, they were written to present a

5    lecture to help students, to provide space for them to

6    write in because they can't write in their textbook; it

7    was purely for educational purposes.

8            DR. REYES:  Can I ask a question?  May I ask a

9    question?

10           MR. MONTOYA:  Of course you can.

11           DR. REYES:  Did Mr. --

12           MR. MONTOYA:  Bellamy.

13           DR. REYES:  -- Bellamy, did he review the same

14   materials that Mr. Garrison reviewed?

15           THE WITNESS:  At the time -- yes, I gave Mr.

16   Bellamy the spring 2010 materials which are Exhibits 1

17   and 2.  I don't know how much of it I gave him, but it

18   was the same material, the very exact one.  And I also

19   gave him copies of the textbook where I had copied the

20   problems.

21           MR. MONTOYA:  But the answer is no.  At

22   Exhibit 6, part one, yes; Exhibit 6, part two, yes; then

23   she gave him the book.  But Exhibit 6, part three hadn't

24   been created yet so she did not give him that.  But if

25   you read Mr. Garrison's opinion, his main problems were

MCCCD/Martinez 03652

1   with the two materials that Mr. Bellamy did review.

2           MR. UPPAL:  Objection.  Objection.  Now, Mr. --

3   Mr. Montoya has crossed the line into testifying --

4           MR. MONTOYA:  You did that Pavneet.

5           MR. UPPAL:  -- what the expert's opinion was.

6           MR. MONTOYA:  You did that Pavneet.

7           MR. UPPAL:  Because he should be

8   cross-examined --

9           MR. MONTOYA:  You too.

10          MR. UPPAL:  -- if he's going to testify what

11  the witness testified about.  He's literally testifying

12  to you --

13          MR. MONTOYA:  That's what you did.

14          MR. UPPAL:  -- what the expert witness

15  allegedly told you and what the expert witness's main

16  problem was.

17          CHAIRPERSON CRUDUP:  Move on.

18          MR. MONTOYA:  I'll move on.

19      Q.   BY MR. MONTOYA:  Okay.  Now, Exhibit 3, so you

20  didn't use any -- you didn't copy from any published

21  textbook?

22      A.   Not at all.

23      Q.   And now tell the -- tell the Members of the

24  Committee, when was the last time that you used

25  Exhibit 3?

MCCCD/Martinez 03653

1      A.    In spring of 2010.

2      Q.    Have you used it since then?

3      A.    No.

4      Q.    Why not?

5      A.    The Administration does not allow me to use

6   them.

7      Q.    So you did what the Administration said?

8      A.    Yes.

9      Q.    Now, I'm going to give you what's been --

10   that's Exhibit 4 -- or, part six [sic] to the District's

11   Exhibit 6, it's MAT 187 precalculus algebra section

12   lecture notes starting at Garrison 260.

13          Tell the Committee what that is.

14      A.    Exhibit 4 is comprised of my lecture notes,

15   notes that I was going to lecture from for fall of 2010

16   when I taught the same class that I had taught the

17   previous year in fall of 2009.  But in these materials,

18   I had removed every problem that was from the textbook I

19   would be using and I had replaced all those problems

20   with my own problems.

21      Q.    Now, tell the Committee loud and clear, because

22   I want them to get this straight, when is the first time

23   that you used the materials in District's Exhibit 6,

24   part four the first time?

25      A.    The materials in Exhibit 4, is that the one

1      you're talking about --

2          Q.   Yeah.

3          A.   -- that you just gave me?

4          Q.   Those.  When was the first time you used them?

5          A.   These materials have never been used.

6          Q.   Why?

7          A.   Because the Administration disallowed my use of

8      them.

9          Q.   Okay.  So, isn't it true that -- that all of

10     the materials that the District claims violated federal

11     copyright law were used in the spring of 2010?

12         A.   Yes.

13         Q.   And you haven't used any of those materials

14     since?

15         A.   No, I have not.

16         Q.   Because the District told you not to?

17         A.   Correct.

18         Q.   Now, Sean Garrison testified to this Committee

19     that you never use textbooks; is that true?

20         A.   Absolutely not true.

21         Q.   Tell the Committee how that's false.

22         A.   The only time I did not use a textbook was when

23     I taught the arithmetic class, the basic arithmetic 082

24     class.  That's the only time I did not use a published

25     textbook.  All the other classes were taught requiring a

MCCCD/Martinez 03655

1    published textbook and the students had purchased the

2    published textbook.

3        Q.   Are you against textbooks?

4        A.   No, no.  I like textbooks.  But I felt my

5    arithmetic class, I thought my material was superior to

6    the textbooks that were out; and I was always writing

7    these materials to supplement the textbooks, so I just

8    thought, just put them all together.  I mean, you're

9    writing it anyway and using it, so I used this in place

10   of a textbook.  And it had been approved by the Math

11   Department at Phoenix College for use by any faculty

12   member, which means they can make copies of them.

13       Q.   And that's District Exhibit 6, part four that's

14   been approved?

15       A.   Yes.

16       Q.   And what's the Bates number on that at the

17   beginning?

18       A.   153.

19       Q.   The District approved it?

20       A.   Yes, the Math --

21       Q.   You still didn't use it?

22       A.   The Math Department approved it.

23       Q.   Let me ask you this:  Did anyone in a position

24   of authority at the District, Professor Martinez, tell

25   you that unless you had written authorization from a

MCCCD/Martinez 03656

1    publisher's agent, you could not even use a snippet of

2    publisher's materials because it violated federal

3    copyright law?

4        A.   That's --

5        Q.   We've heard Dr. Kakar testify to that

6    repeatedly.

7        A.   That was the information I was given by Dr.

8    Solley, Dr. Kakar, and Maggie McConnell.

9        Q.   Did Mr. Bellamy confirm that for you?

10       A.   No.

11       Q.   Now, you also heard Dr. Kakar testify that even

12   though simple arithmetic problems weren't subject to

13   copyright, complex arithmetic equations were subject to

14   copyright.  Did Mr. Bellamy say that?

15       A.   No, and none of these problems are complex,

16   they're all simple.

17       Q.   Let's talk about that.  Tell me what level of

18   math you teach at Phoenix College to your students.

19       A.   I teach the full range from basic arithmetic

20   through calculus.

21       Q.   And do you teach mathematical theory?

22       A.   I teach theory in the context of teaching the

23   content but not separately.

24       Q.   Do you teach the philosophy of mathematics?

25       A.   I teach the philosophy and context of teaching

MCCCD/Martinez 03657

1      the subject but not separately.

2          Q.   Let me ask you this:   In your 40-plus years of

3      teaching, have you found that sometimes you have to

4      modify your teaching materials to satisfy your needs of

5      your particular class members?

6          A.   That is always happening.   We have a textbook

7      and I present the content of the textbook in a way that

8      I think my students, whoever they are, will understand

9      it.

10         Q.   Now, why do you prepare lecture notes to give

11     to your students?   Why don't you make your lazy students

12     take notes when you're lecturing?

13         A.   Well, I did that for years, I would write

14     things either on the board or on the overhead screen and

15     I noticed they were spending a lot of time copying what

16     I was writing and it took up my instructional time, when

17     that wasn't the important part.   The important part was

18     for them to listen to what I was saying and learn.   So,

19     I decided those things that I'm going to say to them

20     that they don't act, I should have it already written

21     down, it will save us time, it will give the student an

22     opportunity to think about what's being said rather than

23     copy it down and not be able to think about it.   And

24     then once they can think about what's being said, then

25     they can do examples and following the procedure I gave

MCCCD/Martinez 03658

1    them.

2         Q.   Have your students given you any feedback as to

3    the efficacy of that teaching methodology?

4         A.   The students are very grateful that they don't

5    have to copy the question or the notes that I am

6    lecturing -- my lecture material and that they can just

7    refer to it in the book and, yet, they get to practice

8    in the lecture materials, whatever it is I'm lecturing

9    about and these documents don't get lost and shuffled

10   all over the place because they can't write it in the

11   textbook.  Before this, they'd have to write separate

12   notes and the textbook and the separate notes got mixed

13   up and lost and they weren't able to keep organized.

14   And this is a method that has helped them and it has

15   been very appreciative, this type of organization, this

16   type of instructional presentation.

17        Q.   You just testified, Professor Martinez -- Dr.

18   Martinez, that your students couldn't write in your

19   textbook.  Explain to the Committee why.

20        A.   Well, the students like to resell the textbooks

21   after the class is finished and they can't resell the

22   textbook that's been written in, so they protect the

23   textbook so they can get resale value from it, and then

24   anything they want to keep they need to write down.

25        Q.   Are you a lawyer?

Miller Certified Reporting, LLC

MCCCD/Martinez 03659

1     A.   No, I'm not.

2     Q.   Now, when you were meeting -- how many

3 administrators did you meet with at Phoenix College or

4 from the District regarding the issue of copyright?

5     A.   I met with several administrators, Anna Solley,

6 Cassandra Kakar, Paul DeRose -- I met with several.

7     Q.   Now, were they uniformly polite with you when

8 you met with them?

9     A.   No, they were uniformly cold and distant with

10 me and it was scary always meeting with them.  Because

11 instead of engaging in a conversation to find out what

12 are you talking about or how can I do better here?  They

13 consistently reiterated the language of policy, of

14 regulation, and of the law.  And in -- they just read

15 those statements back to me and I didn't always

16 understand, or I wanted to get a question about how

17 mathematics fits into that, or what I could do to do a

18 better job and not violate their sensitivities, but that

19 was not allowed.  It was just:  Do you understand this,

20 that you are not to -- do you understand that you're not

21 to copy material without permission?  And I do

22 understand that, but --

23     Q.   But -- but do you remember Sean Garrison

24 testifying to this Committee under oath that under the

25 Fair Use Doctrine you can copy something without

1    permission?

2        A.   Yes.

3        Q.   Within certain limitations?

4        A.   Yes, but the information I was given is you may

5    not copy without permission.  There were -- it was a lot

6    of information of that nature because, I guess, that's

7    the way they were interpreting.  But they -- when I

8    couldn't ask a question, they wouldn't answer any

9    question I asked that was specific to mathematics.

10       Q.   Were you intimidated?

11       A.   I was extremely intimidated.

12       Q.   Now, the fact that you were intimidated, did

13   that have an impact upon your ability to -- to work with

14   them and to do your job?

15       A.   Well, I -- the fact that -- the intimidation

16   wasn't the bad thing, the bad thing was that they

17   wouldn't talk with me, they wouldn't answer my

18   questions, they wouldn't get down to specifics in terms

19   of their complaints.  For instance, they said:  We don't

20   have faith in you, we've lost faith.  Well, okay, how --

21   how can I gain faith with you or how did I lose it?  And

22   they would not discuss that.  It's your job to find out

23   how you did that.  I can't read somebody's mind.

24            It was all very vague that way:  It's your job

25   to find out how to make us believe you.

MCCCD/Martinez 03661

1       Q.   Are you -- are you rebellious?  Are you a

2    rebel?

3       A.   I want -- no.  I want to know what I can do to

4    address their concerns.  I just want to know what it is.

5    What can I do?

6       Q.   Are you afraid to lose your job?

7       A.   Yes.  I don't want to lose my job, I love my

8    job.  I love teaching.  I love my students and I really

9    enjoy my colleagues.  There's nothing I would rather do

10   than this.  And I really like Maricopa Community College

11   District.  I like you and I don't even know you because

12   I know you are all colleagues of mine and I know your

13   heart is there to help students.

14       If we wanted to do something else, we would go

15   to the university.  There's a lot of places where we

16   could go and earn more money, but we're here because we

17   like our profession, we love our profession, and we care

18   about our students.  We want to do the best by them and

19   we don't want to break any laws.  We don't want to lose

20   our jobs.

21       Q.   Now, let's move on to the second prong of the

22   Administration's case against you, the one based upon a

23   number list, substantive list rule that you violated the

24   District's money handling rules.  Let's talk about that.

25       Now, did you take some materials to Staples to

213

1      have copied for your students?

2           A.   Yes, I did.

3           Q.   Now, first, tell the Committee about the

4      content of those materials.

5           A.   These were materials that had been approved for

6      use by the Math Department faculty in teaching, like the

7      course.  And in this case, I think it was -- I think it

8      was college algebra -- it was one of the algebras.  And

9      these materials had been developed by one of the

10     colleagues, had been used for years by him, had been

11     used for years by me.  So, that semester, it's used as

12     the -- the classroom textbook.  So, I -- I asked my

13     colleague -- and I didn't need to be asking, I just did

14     that in abundance of caution.  I didn't need to ask

15     because it was already approved.

16          Q.   Asked what colleague?

17          A.   Ask Tim Bryan for permission to use his

18     material.

19          Q.   What did he say?

20          A.   He said yes.

21          Q.   Did he say you can use them but you can only

22     use them on online?

23          A.   No.  He said go ahead and use them.  He was

24     unable to give them to me, so he said, well, if you have

25     an old -- you know, a previous time I've given to you,

Miller Certified Reporting, LLC

MCCCD/Martinez 03663

1    because he had electronically, go ahead and use him.

2    And I thanked him and proceeded to let my students know

3    that we were going to be using those materials and

4    not -- and this happened on a Friday and class began on

5    a Monday.  So, when I met with the students on Monday, I

6    told them we're not using the textbook, we're using --

7    the textbook that's on the syllabus, we're using these

8    materials.

9         Q.   Okay.  And did you ever give them to one of

10   your colleagues to approve for copying item-by-item?

11        A.   I had been told if I copied them piecemeal,

12   that Icon would copy those.  And I thought -- but if I

13   took the whole stack at once, then I couldn't get them

14   copied.

15        Q.   Now, did you tell your students:  Hey, you can

16   borrow my copy and copy it yourself on your own time

17   using your own money?

18        A.   That's exactly what I said.  Either now you

19   need to make copies of this and I recommend you bind

20   them so you don't lose them and if you don't -- anywhere

21   you -- copy them anywhere, at home, at school, or at

22   college; or I can take it, if you want, because I wanted

23   them to get the booklets as soon as possible, I can go

24   and make copies on my own time, but if you want me to do

25   that, you'll need to reimburse me whatever it costs me.

Miller Certified Reporting, LLC

1        And the entire class preferred that I make the copies

2        myself and that they would reimburse me my cost.

3              Q.   Do you regret doing that?

4              A.   Now I do.  I definitely do.

5              Q.   Trying to -- no good deed goes unpunished, have

6        you ever heard that saying?

7              A.   Yes.

8              Q.   Tell the Committee how much money you made

9        making those copies for your students.

10             A.   I didn't make any money.  I --

11             Q.   Did you lose any?

12             A.   Yes.  I rounded down to $11.

13             Q.   About how much money did you lose?

14             A.   Oh, I don't know.  Maybe $25.

15             Q.   Did you try to get it back from the students?

16             A.   No.  Absolutely not, no.

17             Q.   Did you use the materials?

18             A.   Yes.

19             Q.   Now, are you aware of any rules -- maybe you'll

20       know what those rules are -- that prohibited you from

21       doing what you've described?

22             A.   I am not familiar with any rule.  And I did ask

23       to please show me the procedure, the policy for Phoenix

24       College that identified that this was wrong.  And I also

25       asked for them to show me where it describes the type of

MCCCD/Martinez 03665

1    materials that can get copied versus the ones that will

2    not be allowed to be copied and I was told there was no

3    such procedure or policy.

4         The policy as stated is quite general and it

5    refers to athletics, it refers to theatre -- exchanging

6    money at theatre, it refers to financial aid, but

7    there's no reference there to this type of situation or

8    when we get money for students involving clubs, because

9    we do club work and get money.

10        Q.   Okay.  Tell -- briefly because the Committee

11   just heard this and they understand it, I believe --

12   what is your understanding between being reimbursed for

13   something and selling something?

14        Did you -- well, let me just ask it this way:

15   Did you think you were selling the materials to the

16   students or being reimbursed for your out-of-pocket

17   costs, rounded out to the lowest dollar?

18        A.   No.  I made it very, very, very clear to the

19   students that either they -- they needed to get copies

20   of the materials, either they go off and make copies of

21   it at their own expense or -- this is their expense, or

22   I would be willing to make the copies for them but they

23   would need to reimburse me whatever it costs.  If we

24   made that arrangement they would need to reimburse me

25   because I made the copies for them instead of them

MCCCD/Martinez 03666

1    making them.  I was not selling.  I was getting

2    reimbursed.

3         Q.   The directive ordered you to give the

4    reimbursement, the money back to students?

5         A.   Yes.  And at that time I said, well, then, I'd

6    like my booklets back.  If you're going treat this that

7    I purchased them, then I'd like the booklets, and I was

8    told:  No, you are giving the booklets to the students.

9              And I said:  No, that wasn't our understanding;

10   it's their cost, it's their booklet, their material and

11   they agreed.  I didn't force them to.

12        Q.   How many of your colleagues in the Math

13   Department in Phoenix College can speak Spanish?

14             MR. UPPAL:  Objection.  Irrelevant.

15             MR. MONTOYA:  I don't think it's irrelevant at

16   all.  There are -- there are math students at Phoenix

17   College who --

18             CHAIRPERSON CRUDUP:  To save time, just

19   continue.  Just answer.

20             THE WITNESS:  In the Math Department?

21        Q.   BY MR. MONTOYA:  Yeah.

22        A.   There are four.  I think there are four.

23        Q.   Do you have students in the Math Department

24   that can't really speak English as well?

25        A.   Yes.

MCCCD/Martinez 03667

1      Q.   Do you sometimes instruct in Spanish when you
2  need to push someone along?
3      A.   Yes, yes.
4      Q.   Now, did you pay back the money that you were
5  reimbursed for?
6      A.   I don't consider it pay back.
7      Q.   Did you give it back?
8      A.   No, I did not.
9      Q.   Why not?
10     A.   I want to get clear first that this is
11  something I am supposed to do.  I was researching -- I
12  want to research where are they coming up with this,
13  because they're -- it seems like the Administration was
14  just looking for any little thing to cause me grief.
15  And I wanted to know, show me where it says this or show
16  me the process that says I can't make these copies at
17  Icon.  Why can't I make it at Icon?  They're
18  instructional materials.  The RFP says:  If you have
19  unpublished materials written by the instructor, you may
20  not cause the student to buy it.  That's the RFP.  And
21  here, that's exactly what I was doing.  I wanted to make
22  sure that I was in the clear here.
23     Q.   You reminded me of a really good point, because
24  I remember Dr. Kakar testifying twice that she
25  recommended that you make your own materials and bind

1      them and sell them to your students at the bookstore.

2           A.    That's exactly what --

3           Q.    Did she testify to you that?

4           A.    Yes, she did.

5           Q.    Did she tell you that?

6           A.    She told me that as well as --

7           Q.    Are you allowed to do that under the

8      Residential Faculty Policies?

9           A.    No, I'm not.  And they also said I could post

10     them on my Website and then the student could copy.  And

11     I thought, well:  What's the difference if you post

12     them, they copy them.

13          Q.    Plus, do you think -- do all of your students

14     have access to the Internet?

15          A.    They're --

16          Q.    Do all -- do they?

17          A.    Well, I don't know but I'm assuming that not

18     everybody does.

19          Q.    Do all of your students have access to a copy

20     machine?

21          A.    No, they do not.

22          Q.    So you were trying to help your students?

23          A.    Absolutely, I was helping.

24          Q.    Isn't that what teachers are supposed to do?

25          A.    Yes.

MCCCD/Martinez 03669

1      Q.   So, you never -- did any of your students come

2      and tell you:  Hey, I've been -- I've been told that you

3      have to give me back that money and I don't want it

4      back?

5      A.   I had several students really upset because

6      they received an e-mail from the Administration before I

7      even knew about it and the Administration came into my

8      classroom before I was there and talked to the students,

9      telling them how wrong I was to make these copies and

10     then sent them this e-mail telling -- and additionally

11     sent them an e-mail telling them I was to reimburse the

12     $11, they were to request it.  And the students were

13     very upset.  They didn't want -- they didn't understand

14     why.  They said:  I bought this.  This is my textbook.

15     And they couldn't understand, they were asking me:  What

16     could we do?  I didn't know what they could do, so I was

17     just trying to figure it out.

18     Q.   Okay.  Now, I want to ask you -- I'm trying to

19     go quickly -- do you remember when Dr. Kakar testified

20     that you asked a junior faculty member to make copies

21     for you so you could subvert the directive that you

22     couldn't make copies unless they were approved?

23     A.   Yes.

24     Q.   Do you remember her testifying to that?  I want

25     you to tell the Committee what really happened.

1        A.    Okay.  Over the weekend in April I think it

2   was, I had noticed that my students needed some graphs

3   that were not in the textbook and they are very

4   important graphs.  So, that weekend I spent the whole

5   weekend generating two pages -- two papers that had

6   these graphs and all the information I thought was

7   valuable to them.

8        Q.    Let me stop you.  When you say "generated

9   them," did you copy them from the book?  Did you copy

10  them from the Internet?  Did you copy them or did you

11  generate them independently based upon your own

12  knowledge?

13       A.    I generated them independently based upon my

14  own knowledge using the software that was available to

15  me.  And I got the two pages ready and then I couldn't

16  find -- none of the administrators were to be found that

17  morning and -- the Chair, the Vice President, the

18  President, the Dean, no administrator was to be found.

19  And I wanted to share that material with the class at,

20  like, 10 o'clock.  And I knew they were going to look

21  for copyright violations, but I knew there was no

22  copyright violation, I just generated this myself this

23  weekend.

24            So, I thought, oh -- I thought they were

25  reasonable.  I thought the real concern was copyright.

MCCCD/Martinez 03671

222

1      So, thinking innocently that way, I thought, well,

2      they're going to approve it because I know it's not

3      copyright violation and I asked -- it was getting close

4      to, like, five minutes before class.  I thought:

5      They're going to approve it and this way I'll have them

6      ready.  I asked an adjunct to make copies of those two

7      pages.

8              Now I know I should have waited.  And I never

9      did get to use them because the Chair did not approve

10     them and I didn't use them.  To this day.

11     Q.   Isn't it true that the Chair, you know, with

12     President Solley's directive that the Chair stopped

13     approving your own original work that you created based

14     on your own knowledge, your own education, your own

15     sweat and blood?

16     A.   Well, this was before Dr. Solley's directive.

17     Q.   That's a good point.  So --

18     A.   It was before the directive.  And Mr. Sueyoshi

19     just arbitrarily say "that's copyrighted."  I know it's

20     not copyrighted, I did it myself.  Because he was in his

21     mind, he wouldn't let me copy it.

22     Q.   Okay.  Now, remember a bunch of other documents

23     that Dr. Kakar said that you copied in violation of the

24     directive, then when I asked her on direct -- this was

25     kind of deceptive.  No, I take that back.  This was

MCCCD/Martinez 03672

1     deceptive.

2          Dr. Kakar was asked by the administration's

3     counsel:  Did she printout a bunch of course materials?

4          MR. UPPAL:  Objection.  This is not a question.

5     This is another one of --

6          MR. MONTOYA:  Yes, it is.

7          MR. UPPAL:  It's one of Mr. Montoya's --

8          MR. MONTOYA:  It is a question.  You wouldn't

9     know because you interrupted me.

10          MR. UPPAL:  It's a speech, it's not a question.

11          MR. MONTOYA:  No, there is a question mark at

12     the end.

13          MR. UPPAL:  It's an inquiry at the end.

14          MR. MONTOYA:  I can go on.

15     Q.    BY MR. MONTOYA:  Do you remember when Dr. Kakar

16     testified you printed out a bunch of course materials?

17     A.    Yes, I do.

18     Q.    When she was asked by the administration's

19     lawyer if that violated a directive, she said, yes.  But

20     when I asked her on cross-examination, isn't it true

21     that Dr. Martinez [sic] said that was a mistake.  Do you

22     remember that?

23     A.    Yes.

24     Q.    Tell the Committee about that.

25     A.    Well, I wanted a copy of, I think, it was page

MCCCD/Martinez 03673

1      16.   One copy for myself.

2          Q.   Of what?

3          A.   Some material I had written, I had written.

4     Page 16.  And I had a colleague in my office and we were

5     talking, so as we were talking, I put on the computer

6     that I put on page 16.  After a little bit, I went to go

7     get my one page, but the printer was printing and I

8     thought:  What's going on?  It's printing a bunch.

9              So, I came back to my office and I thought:

10    What's going on?  So, I cancelled the print.  I went

11    back and it was still printing.  I came back and I

12    cancelled the print.  Then I called I.T.  I said:

13    What's going on here?  I can't stop the print.  They

14    told me how to cancel, which I had already done and it

15    wasn't cancelling.

16              So, I went back to the office and I unplugged

17    the printer and then I asked the secretary:  I don't

18    know why it's printing, I wanted one page, how do we

19    stop this?  And then he proceeded to come back to my

20    office.  He tried the same cancel procedure, which

21    didn't work.  And then we -- but, eventually the whole

22    thing stopped printing.

23              And by that time, there were a lot of copies

24    but because the print -- apparently I had put the "16"

25    instead of page 16 on copies.  That's all I can think

MCCCD/Martinez 03674

1    must have happened.  I don't know to this day but that's

2    all I can guess because I just wanted one page of page

3    16.

4         Q.   Did you distribute those copies to your

5    students in violation of the directive?

6         A.   Oh, absolutely not.  Absolutely not.  And the

7    Administration Evaluation Team found that that was just

8    a mistake, so I'm surprised to find it in here as a

9    complaint.

10        Q.   Tell the Committee what the "Administrative

11   Evaluation Team" is.

12        A.   Well, I -- my Chair asked that I receive an

13   administrative evaluation due to the very points being

14   made here, except for the cash handling wasn't in there

15   at that time.  And the three members met and received --

16   interviewed people, and on that one issue they found

17   that there was an honest mistake, I wasn't trying to

18   waste -- the way they had put it, that I was wasting

19   department materials -- I was attempting to waste

20   department materials, which I wasn't.  And they found in

21   my favor on that issue.

22        Q.   Do you miss not teaching?

23        A.   Oh, I do.  I love teaching.  At the end of

24   every summer I'm ready to get back in the classroom.

25        Q.   You've been placed on administrative leave?

MCCCD/Martinez 03675

1        A.   Yes, I have.

2        Q.   Why are you fighting -- why don't you just

3   retire instead of going through this?

4        A.   Because I love teaching.  It is a joy of mine.

5   It is not a big job.  It is something I like doing.  I

6   like creating materials and creating the presentation of

7   mathematical knowledge because I know that's difficult

8   for people.  I enjoy seeing the spark in the student's

9   eyes.  I love this subject and I really enjoy Phoenix

10  College.  I enjoy my students there are who very

11  diverse.  I enjoy my colleagues who are also -- they're

12  Latinos there and I enjoy my Latino colleagues.  I enjoy

13  all my friends at Phoenix College.

14        The college is a beautiful college.  It's a

15  pleasure for me.  It is not a job.  It's a pleasure and

16  I'm not ready yet to retire.  I will retire eventually.

17  I will retire when I'm ready to retire.

18        MR. MONTOYA:  I don't have -- yes, please.

19        DR. REYES:  Question.  How long have you been

20  on administrative leave?

21        THE WITNESS:  This semester.

22        DR. REYES:  Just this semester.

23        THE WITNESS:  Right from the beginning.  I was

24  told at the end of May by Dr. Solley that I would be

25  terminated in the fall, and my lawyer at that time said:

MCCCD/Martinez 03676

1    No, they won't; no, they won't; that would be crazy.

2    But they did.  I got the letter and I've not returned

3    back to the college.

4              MR. MONTOYA:  I don't have any further

5    questions on direct.  Thank you very much.

6              MR. UPPAL:  I'd like to take a five-minute

7    break before I start my cross.  It can come out of my

8    time.

9              CHAIRPERSON CRUDUP:  Okay.

10             (Whereupon a recess is taken at 2:49 p.m. until

11   3:03 p.m.)

12

13             CHAIRPERSON CRUDUP:  We're convened.

14

15                     CROSS-EXAMINATION

16

17   BY MR. UPPAL:

18       Q.   Dr. Martinez, good afternoon.

19       A.   Good afternoon.

20       Q.   You know who I am.  I'm counsel for the

21   District, with my colleague Shannon Balch.  And to

22   expedite my questioning since it's late in the day, I'm

23   going to ask you a series of questions and then my

24   colleague is going to finish up with a few questions

25   before we pass you back to your own attorney.

```
 1              And so let me begin by asking you because Mr.

 2    Martinez -- excuse me.  Your own attorney, Dr. Martinez,

 3    Mr. Montoya asked you about the fact you are under oath.

 4    Do you remember when he went through that with you a

 5    little bit?

 6         A.   Yes.

 7         Q.   What's your understanding of being under oath?

 8         A.   I'm required to tell the truth.

 9         Q.   You're required to tell the truth, right?  I'm

10    not accusing you of anything.  I'm just saying you

11    understand that you're required to tell the entire truth

12    and essentially respond to questions completely and

13    honestly, right?

14         A.   Yes.

15         Q.   And you're familiar with Dr. Anna Solley -- or,

16    I should say President Anna Solley, correct?

17         A.   Yes.

18         Q.   She is the President of Phoenix College, right?

19         A.   Correct.

20         Q.   And she's also a Hispanic, right?

21         A.   I think so.

22         Q.   You don't know?

23         A.   I just know what I am told and I am told she

24    is.

25         Q.   Is there some doubt in your mind about that
```

MCCCD/Martinez 03678

1    issue?

2         A.   Well, somebody else told me she was not.

3         Q.   Really?

4         A.   So -- yeah.  So, I --

5         Q.   Well, normally I would not even go into this

6    line of inquiry but since your own attorney asked you so

7    much about your bilingualism and your heritage, I'm just

8    wondering whether or not you know if Dr. Solley is the

9    same national origin and whether she's active in

10   Hispanic civil rights groups.  Do you have any

11   information about that?

12        A.   She is active in civil rights groups.

13        Q.   In fact, she's won awards for being in

14   leadership positions and Hispanic civil rights groups,

15   hasn't she?

16        A.   Yes, she has.

17        Q.   And, again, there's really no doubt in your

18   mind that Dr. Solley is also Hispanic and bilingual is

19   there?

20        A.   I've answered that.

21        Q.   Is there any doubt in your mind?  I'm sorry.  I

22   didn't get -- I didn't get your answer.

23        A.   Yes.

24        Q.   You said you doubt it?

25        A.   I said that somebody told me that she was not,

MCCCD/Martinez 03679

1        so now I don't know.

2            Q.   Okay.  All right.

3            A.   I don't know.

4            Q.   Who is that someone that told you that she is

5        not?

6            A.   I don't recall but it was probably several

7        people.

8            Q.   But it was significant enough to cause doubt in

9        your mind?

10           A.   Oh, yeah.

11           Q.   Okay.  Is there any doubt in your mind about

12       the fact that Dr. Solley is in a managerial position?

13           A.   No.

14           Q.   Okay.  She's basically, as she described, the

15       CEO of -- the chief operating officer of Phoenix

16       College.  You would agree with that, right?

17           A.   Yes.

18           Q.   You know, when there's a headache with respect

19       to budgetary issues or problems, it's her problem to

20       deal with it, right?

21           A.   No.

22           Q.   You're not in a managerial position, right?

23           A.   No.

24           Q.   But you're certainly -- since you're not in a

25       managerial position but Dr. Solley is, would you agree

MCCCD/Martinez 03680

1    that Dr. Solley has to take into consideration issues

2    and facts and problems that really are not encompassed

3    within your job duties?

4         A.   Yes.

5         Q.   Okay.  So, given Dr. Solley's position as the

6    President of Phoenix College, do you think that she's

7    owed any discretion or deference by people that work in

8    her college, people that report to her?

9         A.   Yes.

10        Q.   How about yourself, do you think you owe her

11   some deference or discretion or courtesy of following

12   her directions?

13        A.   Yes.

14        Q.   Okay.  But you haven't done so, have you?

15        A.   No.

16        Q.   "No" meaning you agree with me or you disagree

17   with me?

18        A.   I agree.

19        Q.   That you have not followed her directions?

20        A.   Well...

21        Q.   If you agree with me, that's what I want the

22   Committee to know.  If you don't agree, this is your

23   chance to say otherwise.

24        A.   Well, I disagree -- I don't know whether --

25   what is true and what is not, and so I guess that's what

MCCCD/Martinez 03681

1    I'm saying.

2        Q.   I'm sorry.  I didn't mean to interrupt you.

3    So, I'm going to ask you:  Have you finished your

4    thought or your answer?

5        A.   Ask me the question again.

6        Q.   Okay.  Isn't it true that you have not followed

7    Dr. Solley's directions and instructions?

8        A.   Dr. Solley's?  I think I have to the best of my

9    ability.

10       Q.   To the best of your ability.  So, isn't it

11   true -- well, let me retract that.

12            Since you claim that you have followed Dr.

13   Solley's directions to the best of your abilities, given

14   her status as the President of the college, how many

15   cancelled checks have you come here with today?

16       A.   I don't have any.

17       Q.   All right.  And you were told -- you were

18   instructed unequivocally with respect to this

19   Cash-Handling Policy -- and bear in mind I'm not asking

20   you whether or not you agree with the instruction or

21   not, I'm just asking you, weren't you instructed in

22   writing to make refunds and produce cancelled checks?

23       A.   Yes.

24       Q.   And you haven't done so?

25       A.   Correct.

MCCCD/Martinez 03682

```
 1          Q.   Ma'am, in this hearing today, would you agree
 2     with me that the witnesses that have come before you
 3     that the Committee -- that it is reasonable for the
 4     Committee to assess their credibility?
 5          A.   To assess their credibility of the witness?
 6          Q.   Right.  Just because a witness has testified to
 7     something here today, the Committee doesn't have to take
 8     that as a fact, right?  The Committee has the ability,
 9     and I would say even the duty, to assess the credibility
10     of the witnesses?
11          A.   Yes.
12          Q.   And that includes you, doesn't it?
13          A.   Yes.
14          Q.   The Committee is not required you6delete to
15     take you at your word, the Committee is rather charged
16     with assessing your credibility?
17          A.   Is that a question?
18          Q.   Yes.  You agree with that?
19          A.   Yes.
20          Q.   Your credibility has to be assessed, does it
21     not, in the context of your direct insubordination and
22     direct refusal to comply with President Solley's
23     directives?
24          A.   I'm not agreeing with your use of
25     "insubordination" or "refusal."  I am --
```

MCCCD/Martinez 03683

1        Q.   Would you prefer "failure"?

2        A.   No.

3             MR. MONTOYA:  I would like to object.  He's

4   arguing with the witness instead of asking her about

5   facts.  What happened; what did she do; what did you

6   think?  This is an argument.

7             MR. UPPAL:  I'd ask for the same leniency that

8   --

9             CHAIRPERSON CRUDUP:  Okay.  Yes.

10            MR. UPPAL:  Thank you.

11       Q.   BY MR. UPPAL:  Since you don't like the word

12  "insubordination," let's use the word "failure."  Would

13  you agree that your credibility has to be assessed by

14  the Committee in the context of your very recent failure

15  to comply with Dr. Solley's instructions to you to

16  produce cancelled checks for the refund -- showing that

17  you made refunds to the students to whom you sold course

18  materials that you copied at Staples?

19       A.   You're saying I sold them.  I did not sell

20  these.

21       Q.   What word would you prefer?

22       A.   I got reimbursed for my cost.

23       Q.   Let's use your word.  Let's use "reimbursed."

24  Isn't it true that the Committee has to assess your

25  credibility in the light of your failure to produce

1    cancelled checks in direct violation of President

2    Solley's directive to you to produce proof in the form

3    of canceled checks that you had refunded what you like

4    to call reimbursements.  Do you agree with that?

5        A.   Well, in discussing this with my students they

6    did not want this to happen and neither myself nor they

7    knew what we could do about it.

8        Q.   Name every student that said that.  Give me the

9    names.

10       A.   I don't have a list of their names.

11       Q.   That's right.  You don't have the names.  But

12   let's --  let's indulge hypothetically that a couple of

13   students said to you that they didn't care, you would

14   have still been told, had you not, that you had to

15   produced cancelled checks?

16       A.   Well, it was a class of students so...

17       Q.   Ma'am --

18       A.   And Dr. Solley -- I think it was Dr. Kakar if I

19   remember right that said I was to return the

20   reimbursement, and I then proceeded to inquire, just be

21   a little bit more clear with me as to where is this

22   violation because I have an understanding with the

23   students; I'm not clear on what's going on, what's the

24   policy, what's the procedure here at Phoenix College?

25       Q.   You are clear, are you not?  Because if you're

MCCCD/Martinez 03685

1   not clear, we'll just go through the instruction.

2           You are clear, are you not, that irrespective

3   of what you believe, what you feel, or what you contend

4   these unidentified, unnamed students may have said,

5   isn't it crystal clear to you and everyone else that you

6   were told that you had to produce cancelled checks

7   showing you had made refunds?

8       A.   Yes.

9       Q.   And you have failed to do so?

10      A.   I have not done so.

11      Q.   And given that -- and given this failure in

12  direct contravention of what the President of your

13  college is asking you to do -- or, not asking, frankly

14  telling you to do, why -- why do you believe that you

15  can be trusted as to anything else?

16      A.   Well, this is after four-and-a-half years of a

17  lot of stress and noncommunication from Dr. Solley and

18  the Administration.

19          And I can certainly be trusted.  I've been

20  trying to work to figure out what is -- what's the issue

21  here.  And even on this particular one, even my students

22  do not want the money back, they totally agree with me

23  that we made this arrangement, I -- I would not do

24  anything I am told.  If I was told to jump out of a

25  window, I wouldn't do that.  And I would like to speak

MCCCD/Martinez 03686

1   with them and I want to cooperate with something that

2   makes sense, and even some things that don't make sense.

3   It doesn't make sense that I wasn't able to use

4   Exhibit 4 when Garrison -- nobody found anything wrong

5   with it and I used the same textbook.  That doesn't make

6   sense but I have obliged by it.  But I did make -- I did

7   not follow this particular directive and I think it's

8   the only one I have not yet followed.

9        Q.   So, if it's only one directive, even though

10   it's in writing, if it's only one, is this like a free

11   dog bite or something where you get one chance and you

12   shouldn't be held to the consequences because according

13   to you -- let's indulge your hypothetical.  This is the

14   first time that you have violated something, let's

15   assume that is the case.  Does that give you a free

16   get-out-of-jail card?

17        A.   Well, I think what that should do is allow me

18   to communicate and allow the Administration to

19   communicate back to me about this particular situation

20   and address the points that I've brought up and asked

21   for.  I asked for:  Show me the policies that I am

22   breaking here; show me where it describes this because

23   I'm not really clear about it.  And if I -- I want to

24   help my students make copies of something that they're

25   going to go spend money on, how is that done?  And if it

1    can't be done, why can't we just do it at the school?

2    The school pays for faculty copies.  It's not clear to

3    me.  The whole thing is a big muddle in terms of why

4    won't you make copies of these materials?  I want to

5    understand so that I, in the future, will know which

6    ones I can get copies of at Icon or copy center and

7    which documents I cannot.

8         Q.   Is there some sort of rule or faculty manual or

9    policy, something that you can point to or identify,

10   that gives an instructor such as yourself the right not

11   to follow the President -- a written instruction of the

12   President of the college because you don't agree with

13   it?  There's nothing like that, right?

14        A.   No.

15        Q.   You do understand that whether you agree with

16   the directive from the President or not, you have to

17   follow it?

18        A.   And, you know, after all this time I think I

19   should have and then continued to follow my -- my path

20   and try to find out, what is it that is wrong with this

21   picture here?  What could -- what is the policy that --

22   I still don't know the policy that I've broken or the

23   procedure.  I don't know how to better do this.  And

24   I've continued to ask:  Why won't you make copies of

25   this?  Where is the procedure/policy at Phoenix College?

MCCCD/Martinez 03688

1    And I have not been -- that question has not been

2    answered.

3        Q.   How does any of that excuse you from failing to

4    produce the cancelled checks?

5        A.   I think that was a mistake.

6        Q.   On your part?

7        A.   Yes.

8        Q.   I just want to make this clear.  Are you saying

9    it was a mistake on President Solley's part or a mistake

10   on your part?

11       A.   I think -- right now I think I've made a

12   mistake.

13       Q.   When did you come to this realization that you

14   made a mistake?

15       A.   I've not been clear about it.  I'm really not

16   clear right now, but I'm thinking right now -- I just

17   want to move on.  I'm going to acknowledge this is a

18   mistake and --

19       Q.   My question --

20       A.   -- we can move on.

21       Q.   I'm sorry.  I made -- now I made a mistake.  I

22   didn't mean to talk over you.  Please finish your

23   answer.

24       A.   Well, we all make mistakes and this is a

25   mistake I made.  I think.

MCCCD/Martinez 03689

1       Q.    Okay.  So you have made a mistake with respect

2  to your failure -- you're acknowledging that you made a

3  mistake with respect to your failure to follow President

4  Solley's instruction to you in writing to produce

5  cancelled checks showing that you made refunds, right?

6            Just a yes or no.  You're acknowledging that's

7  a mistake on your part?

8       A.    I think so.

9       Q.    You think.  So there's still some doubt in your

10  mind?

11      A.    Well, I don't know this for sure but I believe

12  it is a mistake.

13      Q.    So, when did you come to this realization?

14  Just in the last five minutes while I was

15  cross-examining you?

16      A.    Well, I've never been clear about it.

17      Q.    Ma'am, my question --

18      A.    I'm not clear.

19      Q.    Ma'am, my question is:  When did you come to

20  this realization that you made a mistake?

21      A.    I have not been clear.  I don't know if it

22  really is or if it's not.  But for the purposes here, I

23  will acknowledge that it's a mistake.

24      Q.    When did you come to that realize?

25      A.    Right now I'm acknowledging.

Miller Certified Reporting, LLC

MCCCD/Martinez 03690

1    Q.   Right.  So, if it took you -- how long has this

2    thing been going with the Cash-Handling Policy?

3    A.   Six months.

4    Q.   Six months.  During that time you've received a

5    lot of e-mails and written instructions about what to do

6    and how to make refunds to students, right?

7    A.   Yes.

8    Q.   So, this has been going on for six months but

9    you only come to this realization within this last split

10   second?

11   A.   Well -- and still -- still I haven't received

12   any policy or procedure from the Cashier's Office, from

13   anybody at Phoenix College, the President, Vice

14   President, the Dean, nobody has given me any feedback.

15   It's like do what we say; if we say jump, just jump and

16   forget about how high or whatever.

17   Q.   Well -- well --

18   A.   So, I'm willing to do that right now.  And I'm

19   going to find out -- I really want to find out why we

20   can't make copies of this.

21   Q.   It's taken you this long to acknowledge that

22   you made a mistake in not comply with Dr. Solley's

23   directives that you still haven't complied with, even

24   though all of this, according to you, has been going on

25   for at least six months.  Given what you just said, how

MCCCD/Martinez 03691

1      can Dr. Solley trust you to comply with any of her
2      instructions if it takes you six months on this simple
3      point?
4          A.   I follow -- I follow every instruction.   This
5      is the only one I had a question on that -- and I
6      don't -- I didn't have an easy way of finding out the
7      answers.
8          Q.   Now, did you testify in response to your
9      attorney's questioning and is it still your position
10     that the District reached out to students and somehow,
11     you know, belittled you or defamed you or said something
12     improper with respect to your violation of the
13     Cash-Handling Policy before they talked to you about it?
14         A.   That's what the students told me.   That's the
15     first news I had about it.   I didn't know about it until
16     they told me and they asked what was going on.
17         Q.   Take a look at Exhibit 35.   Do you have it in
18     front of you?
19         A.   No.
20         Q.   I'll give you a copy.
21             DR. REYES:   Would you please clarify what
22     semester it was you made the copies of this at Staples?
23             THE WITNESS:   The copies at Staples were made
24     in the fall of 2012, one year ago.
25             DR. REYES:   Thank you.

Miller Certified Reporting, LLC

MCCCD/Martinez 03692

1          Q.    BY MR. UPPAL:  So, really, this issue about you

2    making the refund and you're violating the Cash-Handling

3    Policy, this has been going on for at least a year,

4    right?  Not six months?

5          A.    I wasn't notified about it.  I didn't know

6    about it until the end of the semester.

7          Q.    I want to direct your attention to Exhibit 35.

8    And this is in the binder for the Committee at

9    Exhibit 35.  This was an e-mail from the Math Department

10   Chairman.  It says:  -- I'm not going to read the whole

11   thing -- it says:  "Dear Students, it has come to my

12              attention that Dr. Martinez, math faculty, may

13              have sold you instructional material she's not

14              authorized to have such materials printed."

15   And then it references the District's Cash-Handling

16   Policy, and, again, I'm not going to read it.  But

17   what's the date of this?

18         A.    April 4th, 2013.

19         Q.    Actually, I'd like for you to read the date of

20   the e-mail below.

21         A.    November 28th, 2012.

22         Q.    You had already been talked to about the

23   Cash-Handling Policy by November 28th, 2010 [sic], when

24   Phoenix College reached out to the students, isn't that

25   right?

MCCCD/Martinez 03693

1       A.   I don't remember.

2       Q.   Okay.  Are you still going to maintain your

3  position that the District somehow reached out to the

4  students about cash handling and tried to cast you in a

5  bad light in light of this November 28th, 2012, e-mail?

6  Is that still your position?

7       A.   Say that again.

8       Q.   Is it still your position -- now that you've

9  seen this notice in writing dated November 28, 2012, to

10 students, you have it before you, are you still going to

11 maintain your claim that the District or Phoenix College

12 reached out to students and tried to belittle you or

13 take advantage of you or cast you in a bad light before

14 talking to you?

15      A.   I don't know when they first contacted me.

16      Q.   Okay.

17      A.   So, I can't tell.

18      Q.   Could you pass back that exhibit, Dr. Martinez?

19      A.   Uh-huh.

20      Q.   Thank you.

21           So, ma'am, since you don't remember when the

22 District first contacted you about the cash-handling

23 issue, I want to show you Exhibit 3.  I'll give it to

24 you in a second.

25           MR. UPPAL:   I want to direct the Committee's

MCCCD/Martinez 03694

1    attention to Exhibit 3, as well.

2         DR. REYES:  What Tab is that under?

3         MR. UPPAL:  Tab 3.  All the exhibits we have

4    are corresponded to the Tab numbers.

5         Q.   BY MR. UPPAL:  Dr. Martinez, what is the date

6    of this Corrective Action?

7         A.   October 18th, 2012.

8         Q.   Okay.  And I don't mean to be flippant about

9    this, but you agree with me that October 18th, 2012,

10   proceeds November 18th, 2012, by more than a month,

11   right?

12        A.   Oh, okay.  Yes.

13        Q.   Now, have you paid so little attention to this

14   cash-handling issue that you've actually forgotten that

15   you received a Corrective Action in October 18th of

16   2010?

17        A.   Absolutely not.  I've been so bombarded by

18   data, by e-mails, and phone calls and all this -- that

19   kind of behavior, that it's all jumbled sometimes.  It's

20   hard to keep all this stuff straight.  So, it was not

21   intentional.  I can see now when it happened.

22        Q.   Professor, you're a math instructor, aren't

23   you?

24        A.   I sure am.

25        Q.   Aren't you used to data?  Aren't you used to

MCCCD/Martinez 03695

1    processing large volumes of data?

2        A.   Absolutely.  This is not a mathematical

3    problem.

4        Q.   Okay.  But you had forgotten that you not only

5    were talked to but you were actually put on a written

6    Corrective Action before Phoenix College reached out to

7    the students with respect to the refunds?  You forgot,

8    is that your contention?

9        A.   Okay.  When you attack me, I'm getting -- I get

10   shaken up.  Say it again.

11       Q.   Would you like to take a break, ma'am?

12       A.   No.  I would like you to say it again and I'll

13   try to listen to words and not the delivery.

14       Q.   You testified in response to your -- by the

15   way, nothing that your own attorney asked you shook you

16   up, did it?

17       A.   No.

18       Q.   Okay.  And he asked you some rather complicated

19   questions, didn't he?

20       A.   Yes.

21       Q.   And --

22       A.   I guess.  I don't know.

23       Q.   In response to one of your questions under

24   oath, you notified the Committee that -- you testified

25   to the Committee that Phoenix College had reached out to

MCCCD/Martinez 03696

1    students and cast you in some sort of bad light before

2    even discussing the cash-handling issue with you, right?

3        A.    Well, you know, I don't think this is

4    discussing.  This is just giving me a statement and we

5    never discussed this, so there's been no discussion.

6    This is the way the District has spoken to me.  This is

7    how this Administration has spoken to me, in letters

8    like this that are read to me for the first time and

9    then I'm trying to make sense out of them.  And when I

10    ask for clarification, I either get the same statements

11    restated to me in this language, but never a discussion.

12    There's been no discussion.

13        Q.    There's been no discussion about your violation

14    of a Cash-Handling Policy with you?

15        A.    No discussion.

16        Q.    Did you hear Dr. Kakar testify that not only

17    was there a discussion with you, but hat Dr. Kakar and

18    Dr. Solley, the woman who is the President of Phoenix

19    College and has better things to do, took the time to

20    meet with you in person to explain your cash-handling

21    violation?

22        A.    This is what happened --

23        Q.    No.  My question is and then you can explain

24    what happened.

25        A.    Okay.  All right.

MCCCD/Martinez 03697

```
 1          Q.   Do you recall Dr. Kakar testifying about that?

 2          A.   Yes, I do.

 3          Q.   Is Dr. Kakar a liar on that issue?  Because we

 4     can have President Solley testify about that as well.

 5          A.   I don't want to call anybody names.

 6          Q.   Terrific.  Isn't it true that Dr. Kakar testify

 7     that you walked out of that meeting while they were

 8     trying to have a discussion with you?

 9          A.   She did testify to that.

10          Q.   And did you, in fact, walk out?

11          MR. MONTOYA:  Now he's interrupting the

12     witness.

13          Q.   BY MR. UPPAL:  Did you, in fact, walk out is

14     the question?

15          A.   I did walk out.

16          Q.   As they were trying to have a discussion with

17     you?

18          A.   No.  They were not having a discussion with me,

19     that's the whole thing.  I was in that meeting and for

20     the first time in my life, what the meeting consisted of

21     was Dr. Solley or Dr. Kakar, I can't remember which now,

22     read an agreement to me, and then at the end of that

23     reading of it asked that I sign the last page.  I

24     refused to sign it.  I said:  This is the first time

25     I've looked at it, I'm not really clear what it says.
```

MCCCD/Martinez 03698

1    I'm under a lot of stress right here because they did

2    not allow me to bring somebody else to this meeting,

3    quote, "meeting."  And I said I want to be able to think

4    about this and look at it more carefully before I sign

5    anything.

6            Then they pressured that:  What was it that was

7    bothering me, and I mentioned some of the point -- a

8    point; and they said:  We'll scratch that out and then

9    sign it.  And I said, no, I'm not clear on this yet.

10   And they kept urging me and it was even threatening.

11   I'm afraid of Dr. Solley, she can cause me a lot of

12   harm.  And they insisted that I sign and they kept

13   reading the same material over and insisting that I

14   sign.  And I wanted to discuss it and they said they're

15   not there to discus, that they were there for me to get

16   this and sign it.

17           And I said:  Well, I -- I said:  I feel

18   threatened; I'm afraid here; I haven't read this yet

19   clearly and in a calm place, and I said I need to leave.

20   And they said:  But you need to sign it, you need to

21   sign it right now.  And then I walked out.  There was

22   nothing else I thought could be gained from that.

23       Q.   Let me get this straight.  You're afraid of

24   President Solley but, yet, you're not so afraid as to

25   violate her written instructions to make refunds.  Is

MCCCD/Martinez 03699

1    that about right?

2        A.   I am afraid of Dr. Solley, I'm sorry.

3        Q.   Wow.  Given this fear, what gave you the

4    bravery to violate her instructions?

5        A.   I didn't -- I didn't want to violate.  That was

6    not my intention.  My intention was Dr. Solley, Dr.

7    Kakar, somebody, show me the policy that you are saying

8    I violated.  Because the policy that I am shown

9    addresses theatre, athletics, the Cashier's Office, and

10   doesn't address this.  I'm not clear about it.  Why have

11   I not been allowed to make a copy of this through Icon?

12   Where is the procedure or the policy that described what

13   can be copied and what cannot be copied?  Please speak

14   to me.  I want to follow policy and procedure.  I want

15   to know what needs to be done.  And there was no

16   response to that.  No discussion at all.

17       Q.   Did you give this speech before or after you

18   walked out of the meeting?

19       A.   Well, during the meeting I said:  I want time.

20   I said:  I have not seen this document before this

21   moment and you have just read it to me, I want some time

22   to read it carefully and understand what it says.  And

23   then discuss it with you; and I was told no.

24       Q.   When you walked out, did you take this

25   Corrective Action dated October 18th, 2012, with you?

MCCCD/Martinez 03700

1          A.    Whatever was given to me in my hand I did walk

2     out with.

3          Q.    And then since you wanted time to read it,

4     certainly when you walked out you must have read it?

5          A.    Well, actually, I didn't read it.

6          Q.    So, you didn't even bother to -- you didn't

7     bother to read it right away?

8          A.    Well, I was very terrified, shaken up.  So, no,

9     immediately I did not step outside and start reading.

10         Q.    When did you read it?

11         A.    I needed to calm down and I don't remember

12    exactly.

13         Q.    Days later?  A month later?

14         A.    Oh, no.  I mean, as soon as I was able to feel

15    safe and feel unshaken up by it, I read it.

16         Q.    So, I want a timeline here.  You walked out of

17    the meeting with President Solley who had taken her time

18    to meet with you and you claimed you are afraid of her,

19    and then you took the October 18, 2012, directive --

20    just looking for the time here, not a speech -- how much

21    time after you walked out of that meeting, how long did

22    it take you to actually read this Corrective Action?

23    I'm just looking for an estimate.  You know, two hours?

24    Two days?  Five days?

25         A.    Mr. Uppal, I don't recall.

MCCCD/Martinez 03701

1          Q.   Because you didn't read it, did you?

2          A.   Of course I read it.

3          Q.   Okay.  Well, let's read it now.  Let's turn to

4     this Exhibit at Bates label Martinez 02250 and I want to

5     direct your attention to the third sentence of the

6     section that says "Non-Compliance."  And read along with

7     me.

8          A.   Wait a minute.  I'm not clear.

9          Q.   Ma'am.

10         A.   Oh, the second page.

11         Q.   I'm going to point to it just so we're on the

12    same page.  So are you on --

13         A.   The second page.

14         Q.   -- 02250?

15         A.   Yes, okay.

16              MR. UPPAL:  Okay.  Just in the interest of

17    time, Mr. Montoya, if it's all right with you, I'm just

18    going to point her to where we are at.

19              MR. MONTOYA:  Sure.

20              THE WITNESS:  I know where we are.

21              MR. UPPAL:  I just want to show you a sentence,

22    ma'am.

23              If that's okay?  With your permission.  Do you

24    prefer I not?  I can sit down.

25              MR. MONTOYA:  You can point to it.  You're

MCCCD/Martinez 03702

1      okay.  You're being polite.

2           Q.   BY MR. UPPAL:  Starting right there, ma'am.

3           A.   Okay.

4           Q.   So I just want you to read silently along with

5      me.  I just want you to tell the Committee if I read it

6      correctly.

7                It sates:  "Because you imposed charges on the

8                students without authority to do so, you have a

9                responsibility to reimburse the students from

10               your own funds.  You are hereby directed to do

11               so by personal check beginning immediately and

12               continuing until all students who paid you are

13               reimbursed."

14               Do you see that?  Did I read it correctly?

15          A.   Yes.

16          Q.   Okay.  And then we've already established you

17     didn't do that.

18               Are you aware that subsequent to your not

19     following that instruction, some attempts were made to

20     see whether or not you had, in fact, contacted students

21     to give them refunds?

22          A.   Well, I didn't -- I disagree with that

23     statement.  I didn't impose charges on the students.

24          Q.   Ma'am, I think we're way past that point.

25          A.   Okay.

MCCCD/Martinez 03703

1       Q.   We'll stipulate to the fact that you don't

2    agree.  I think everyone understands that here.   You

3    don't agree with what you were instructed to do.   That's

4    not the point.

5       A.   I didn't impose charges on the students, that's

6    what I'm saying.

7       Q.   Ma'am, I understand.  We have a different point

8    of view on that.  That's not what I'm asking you.   Okay?

9       A.   Uh-huh.

10       Q.   My question now is, that after receiving that

11    instruction, are you aware that attempts were made to --

12    by Phoenix College to contact students to inquire

13    whether or not you had followed that instruction to make

14    refunds?

15       A.   You're asking if I'm aware of that?

16       Q.   Yes.

17       A.   Now I'm aware of it.

18       Q.   Does that indicate to you the level of

19    seriousness with which the college and Dr. Solley

20    treated this cash-handling violation?

21       A.   Yes.

22       Q.   Okay.

23       A.   It is very serious.

24       Q.   There's an e-mail at Exhibit 39 from a Kelly

25    Loucks.  Who is Kelly Loucks, by the way?

1      A.    He is the secretary of the Math Department.

2      Q.    Okay.  Kelly Loucks has an e-mail at Exhibit 39

3  which states out of -- and it's dated January 9, 2013.

4            It says:  "Out of 52 total contacts between

5            messages and speaking with students, only one

6            had confirmed receiving the refund.  Twenty

7            others had indicated they had not received a

8            refund from the instructor."

9            Do you have any basis to agree or disagree with

10  that?

11     A.    I've never seen that e-mail.

12     Q.    Would you like to see it?

13     A.    Sure.

14     Q.    Okay.

15           THE WITNESS:  May I speak with my lawyer?

16           MR. UPPAL:  Not -- well, I'm going to defer to

17  the Committee, but the general rule -- and I'm actually

18  going to ask Mr. Calderon what his view is on this is,

19  but the general rule is you don't get to take a break

20  and speak with your attorney in the middle of

21  questioning.

22           MR. CALDERON:  Mr. Chairman, may I ask the

23  witness a question?  May I ask the witness a question?

24           CHAIRPERSON CRUDUP:  Yes.

25           MR. CALDERON:  Dr. Martinez, are you -- I mean,

MCCCD/Martinez 03705

1    is this an emotional thing you need to talk to him or

2    are you talking to him about the case?  Don't tell me

3    specifically what it is.  Are you seeking advice from

4    him?

5            THE WITNESS:  I am feeling very badly and I

6    would like to continue and I think if I speak to my

7    lawyer I might be able to feel better about coming in

8    and returning.

9            MR. UPPAL:  I tell you what.  I'm just going to

10   go ahead despite in light of what the witness has said,

11   normally this would not be allowed, because -- I want to

12   explain why I have a hesitation to this.  My hesitation

13   to this is when a witness takes a break in the middle of

14   being questioned and speaks to her attorney, that

15   witness can tailor her testimony to the questioning

16   instead of giving the complete and truthful questions

17   [sic].  That's why I had reservation about it and I

18   still do, but I'm going to withdraw it because I don't

19   want Dr. Martinez to feel or her attorney to argue that

20   she asked for a break and then wasn't given it.

21           So, I'll just withdraw my objection and let her

22   speak with her attorney.

23           MR. CALDERON:  Mr. Chairman, if you're willing

24   to allow a break, I would allow maybe a two- or

25   three-minute break.  And Mr. Montoya is an officer of

MCCCD/Martinez 03706

1    the court, he knows he can't coach her while she's on

2    the stand.  But if perhaps the two of them can just talk

3    about the non-substantive part to the extent they can.

4    I don't see a problem with that.

5            CHAIRPERSON CRUDUP:  A brief break.  Two

6    minutes.

7            (Whereupon a recess is taken at 3:37 p.m. until

8    3:39 p.m.)

9

10           MR. MONTOYA:  She's just a little -- just a

11   little tired.  You know, it's getting -- she's under a

12   lot of stress, she's not used to be being

13   cross-examined.  Pavneet and I are used to this but

14   she's not, so she's a little under the weather and

15   little tearful.  But, go ahead.

16           THE WITNESS:  Okay.  I don't remember the

17   question.

18           MR. UPPAL:  I'm going to go ahead and withdraw

19   the last question and ask a different one.

20       Q.  BY MR. UPPAL:  So, during this course of trying

21   to get you to comply with the directive to issue refunds

22   as set forth in the Corrective Action that you received,

23   did you at some point tell students that you would give

24   them a refund but that they had to give back the

25   materials to you?

1    A.   No.

2    Q.   Okay.  I want to show you --

3    A.   I don't recall that happening.

4    Q.   Okay.  So, I want to show you an e-mail from

5    yourself to Elizabeth Pati dated January 16, 2013.  And

6    the Committee will note that these are the same, you

7    know, sequence of e-mails that are Exhibit 39 to the

8    District's submission.

9         So, Dr. Martinez, I've actually drawn an arrow

10   to try to expedite this.  Do you see that you had --

11   that you sent an e-mail from you to an Elizabeth Pati on

12   Wednesday, January 16, 2013, at 7:16 p.m.  Do you see

13   that?

14   A.   Yes.

15   Q.   Okay.  And do you see in the third paragraph

16   you wrote:  "Since you wish to have your money back, you

17             should return the hard copy"?

18   A.   Yes.

19   Q.   So you were imposing the condition that before

20   you gave a refund that you were directed to give, you

21   were requiring the hard copy to be returned?

22   A.   Yes.

23        DR. CAIRE:  Which exhibit is that?

24        MR. UPPAL:  Sir, that is -- if you go to MCCD

25   Exhibit 39, you will see a series of e-mails.  And if

Miller Certified Reporting, LLC

MCCCD/Martinez 03708

1        you tab through to the e-mail from Dr. Martinez to a

2        student named Elizabeth Pati that Dr. Martinez sent it

3        on January 16, 2013.

4                MS. BLACH:  I believe it's the third page from

5        the back of that exhibit.

6                MR. UPPAL:  That might be easier to find it.

7        Q.    BY MR. UPPAL:  By the way, this student, Ms.

8        Pati, had made clear to you that she had wanted her

9        money back, didn't she?

10       A.    Yes.

11       Q.    In fact, she wrote to you by e-mail on

12       December 6th, 2012, telling you that she wanted her

13       refund and understood it would be in check form?

14       A.    May I see that?

15       Q.    Sure.  So, Dr. Martinez, I want to direct your

16       attention to this e-mail.  I've drawn an arrow just to

17       expedite matters.  Again, the Committee will note that

18       this is another e-mail at Exhibit 39.

19               Do you see that there's an e-mail from an

20       Elizabeth Pati to you where she address you as:  "Dear

21       Dr. Martinez" that Ms. Pati sent on December 6th, 2012?

22       A.    Yes.

23       Q.    And she wrote, that is Ms. Pati:  "At the

24             beginning of this semester fall of 2012, I

25             purchased a book from you for $11.  I was given

MCCCD/Martinez 03709

1              a letter today stating that if any student

2              purchased a book that we were entitled" -- it's

3              misspelled, but it's entitled -- "to a refund."

4              Do you see that?

5        A.   Yes.

6        Q.   Wasn't it clear to you that at least this

7    student believed that she had purchased a book from you?

8        A.   Well, that's what she had been told apparently

9    by the Administration, because I certainly never ever

10   said that to her at all.  And you will note I told

11   her -- by this time, this was now in December, I -- by

12   December then, I guess, the Administration had written

13   her the other letter and I -- I just figured, okay.  And

14   I had talked with Mr. Combs because I wanted to know

15   from Mr. Combs, well, what about just getting my

16   material back?

17              MR. MONTOYA:  Can I raise a point with the

18   Committee?  We're supposed to end at 4:40.  I've only

19   had the opportunity to call one witness, my client.  We

20   basically admitted that she has never paid this money

21   back and she's repeatedly told you why.  So, he's

22   choosing to go on and on and on about something that

23   we've admitted and I should not be penalized for that.

24   I got two individuals who are waiting in the witness

25   room.  One is one of your colleagues and the another one

MCCCD/Martinez 03710

```
1        is Fred Bellamy.  And he hasn't even got to the

2        copyright issue yet.  There has to be a time limit

3        imposed upon him, otherwise these guys have come here

4        for nothing and that's really unfair.

5               He called three witnesses.  I should be able to

6        call three witnesses, too.

7               CHAIRPERSON CRUDUP:  How much more time do you

8        think you have?

9               MR. UPPAL:  I think we're close to wrapping up

10       on -- on this issue.

11              MR. MONTOYA:  It's not only this issue that I'm

12       concerned about.  I consider the copyright issue to be a

13       more important issue that's going to take more time.

14              MR. UPPAL:  Now, that's a speech and --

15              CHAIRPERSON CRUDUP:  Just continue.

16              MR. UPPAL:  Right.

17       Q.     BY MR. UPPAL:  So, let's turn then --

18              CHAIRPERSON CRUDUP:  Five more minutes, okay?

19              MR. UPPAL:  Okay.  Five more minutes for this

20       subject or entirety?

21              CHAIRPERSON CRUDUP:  To complete.

22              MR. UPPAL:  To complete this subject or this

23       witness?

24              The reason I'm asking is because Mr. Montoya

25       was the one saying cross-examination does not count
```

Miller Certified Reporting, LLC

MCCCD/Martinez 03711

1    against the allotment, it counts against the person who

2    called the witness.

3            MR. MONTOYA:  If -- if you're not wasting your

4    time.

5            DR. REYES:  May I ask a question?

6            MR. MONTOYA:  And I went through my witness

7    very rapidly because I was looking at the clock.

8            DR. REYES:  Mr. Montoya, would you give us an

9    estimate of about how much time you need for each

10   witness?

11           MR. MONTOYA:  For the two witnesses out there,

12   I can tell you probably 20 minutes apiece.  And that

13   is -- that's cutting all the fat and some meat to boot.

14           DR. REYES:  And -- okay.  And that would

15   include cross-examination?

16           MR. MONTOYA:  No, that's not -- I have no idea

17   what he's -- especially the way he is asking questions

18   here, he could take -- we could be here until 8:00.

19           DR. REYES:  Could we estimate 20 minutes for

20   your questions of each of your witnesses, 20 each?

21           And cross-examination, how much would you

22   estimate that would be for each?  For each witness?

23           MR. UPPAL:  I would estimate, ma'am, it would

24   be approximately similar.  But here's the tough part, I

25   don't know what they're going to say.  For example, if

1    they come to you and say something that's completely

2    false, it may take a while for me to extract that from

3    them.

4         MR. MONTOYA:  And I didn't know what his

5    witnesses were going to say.

6         DR. REYES:  For the sake of time, would we be

7    able to move things along and assume we'll take, say,

8    five more minutes here and then 20 minutes per witness

9    with 10 to 15 of cross-examination each?

10        MR. UPPAL:  If you can give me ten minutes,

11   we'll do our best to comply with that.  I don't think I

12   can sit with five -- or, comply with five, but we could

13   do ten.

14        DR. REYES:  And you both understand that will

15   impact the amount of time you have for closing

16   statement?

17        MR. MONTOYA:  I don't understand that, with all

18   due respect.  And I object to that with all due respect.

19   Because every time with -- and I'm not criticizing the

20   Committee, but every time he's always one more minute,

21   two more minutes, five more minutes, it's always that.

22   And my client is the one whose suffers for it and I

23   think that is chronically unfair.  Especially since I

24   think you have been crystal clear that, hey, if you

25   waste time, it's your time, you're going to lose it.

MCCCD/Martinez 03713

```
1              MR. UPPAL:  Well, if the Committee were to

2       count up the minutes that Mr. Montoya has used on

3       objections --

4              MR. MONTOYA:  And you, too.

5              MR. UPPAL:  No, I don't think there's any rough

6       equivalency on that.

7              DR. REYES:  May I suggest that we stop arguing

8       about it and move on with your next five minutes.

9              MR. UPPAL:  Thank you.  Yes, ma'am.

10         Q.   BY MR. UPPAL:  So, to expedite things a little

11      bit hopefully, do you remember receiving an e-mail from

12      Cassandra Kakar on which Dr. Solley was copied, this is

13      at Exhibit 39, January 11th, 2013, where you were

14      instructed because you imposed charges on your students

15      without authority to do so, you have the responsibility

16      to reimburse the students from your own funds:  "You are

17              hereby directed to do by personal check

18              beginning immediately and continuing until all

19              students who paid you are reimbursed."

20              Do you remember getting that instruction?

21         A.   Yes.

22         Q.   Okay.  Now, earlier -- turning to a different

23      subject -- you testified that your students love you.

24      Isn't it true that you've received some rather harsh

25      assessments on Rate My Instructor?
```

```
 1              MR. MONTOYA:  Objection.  That is irrelevant.

 2              MR. UPPAL:  Well, I will withdraw it if Mr. --

 3              MR. MONTOYA:  And moreover -- I wasn't done --

 4     if you look at Statement of Charges, it is not in there.

 5     It is not in there.  And this proceeding, I think your

 6     counsel will agree, is limited to what she has notice of

 7     in the Statement of Charges.  If it's not in there, we

 8     need to move on and conclude.

 9              MR. UPPAL:  Here's my response:  You can't

10     elicit testimony from your witness informing the

11     Committee that the students love you and then take

12     offense or claim that there's some sort of exclusion

13     when that very point is disputed.  But, I'm going to

14     move on on that.  But I direct the Committee to

15     Exhibit 43 and you will see the absolutely abysmal

16     reviews that Dr. Martinez has received from students;

17     but, I won't question about her about it.

18              DR. CAIRE:  I have a question.  Can you

19     substantiate that all the comments here are really from

20     students?

21              MR. UPPAL:  No, sir.  Good point.  And I will

22     concede the point.  It's Rate My Professor and it is

23     what it is.  So, your point is well-taken.

24              MR. MONTOYA:  And it's nothing.  It's just

25     slander and a smear job.
```

MCCCD/Martinez 03715

1          MR. UPPAL:  Was that an objection?  Was that a

2     debate or argument?

3          MR. MONTOYA:  It is an objection.  It is an

4     objection because that is wrong to be able to

5     anonymously slander someone without any attribution.

6     That is completely wrong especially when it's not in the

7     Statement of Charges.  How do we know --

8          MR. UPPAL:  Okay.

9          MR. MONTOYA:  -- that wasn't done by her

10    ex-boyfriend?

11         MR. UPPAL:  Sir, since you raised the question

12    and given the speech that Counsel has made, I'll direct

13    you to Exhibit 36, where there's no dispute that a

14    Joseph Hobson, a student, on December 11, 2012,

15    explicitly sends an e-mail to the Math Department

16    Chairman Mr. -- or, Dr. Sueyoshi, and he's so

17    disappointed with her that he says, quote:  "I would

18    like the opportunity to retake    this class with a

19    different instructor if     possible."

20         Anyway, I'm done.  My point is you can't on one

21    hand contend the students love and on the other hand

22    shirk away from the fact that many of them don't.

23         THE WITNESS:  I'd like to make a statement.

24         MR. UPPAL:  Objection.

25         MR. MONTOYA:  He brought it up.

1          MR. UPPAL:  She can make a statement on her own

2     time.

3          MR. MONTOYA:  She has the right to defend

4     herself.

5          MR. UPPAL:  There's no question pending.  If

6     she's going to make a statement, it should be on

7     redirect.

8          MR. MONTOYA:  Well, she's the one who -- okay.

9          MR. UPPAL:  All right.  So thank you.  I'm

10     going to now pass the witness to my colleague.

11          MR. MONTOYA:  I object to that.

12          MR. UPPAL:  I announced this at the beginning.

13     She's going to wrap this and use --

14          MR. MONTOYA:  Well, wait a --

15          DR. REYES:  One and a half minutes.

16          MR. UPPAL:  -- the remaining time I have

17     allotted.

18          DR. REYES:  One and a half minutes.

19          MR. MONTOYA:  Okay.  For one and a half

20     minutes.

21

22                    FURTHER CROSS-EXAMINATION

23

24     BY MS. BLACH:

25          Q.   I just have a couple of questions for you, Dr.

1    Martinez.  First of all, you testified earlier that you

2    tried to speak with Maggie McConnell and Lee Combs

3    regarding copyright issues but they refused to speak

4    with you?

5        A.   Yes.

6        Q.   Did I hear you correctly?

7        A.   Yes.

8        Q.   Well, Dr. Martinez, at Exhibit -- around 23,

9    isn't it true that you met with Maggie McConnell

10   regarding copyright issues?

11       A.   I don't recall that.

12       Q.   Did you have a discussion with her regarding

13   copyright issues?

14       A.   What type of discussion are you talking?

15   Electronic or --

16       Q.   Well, I'll have you take a look at Exhibit 25.

17   That states:  "As we discussed" -- and this is from

18   Maggie McConnell to you dated January 28, 2010, to you,

19   stated:  "As we discussed today, it is inappropriate to

20           copy anything from copyrighted source and

21           reproduce it without the written permission of

22           the copyright holder."

23           So, Maggie McConnell, in-house counsel, did, in

24   fact, speak with you regarding copyright issues?

25       A.   Yes.  Yes, she did.  That was by telephone.

MCCCD/Martinez 03718

1         Q.   And, similarly, Lee Combs and Maggie McConnell

2    discussed --

3              MR. MONTOYA:  It is time.

4         Q.   BY MS. BLACH:  -- copyright issue at --

5              MR. MONTOYA:  It's over time.  I move that this

6    stop and that I be allowed to proceed with my case.

7    They're using all of my time.  That hurts me, that hurts

8    my client.  How is that far?

9              MR. UPPAL:  This is the same individual, Mr.

10   Montoya, who insisted that cross-examination time counts

11   against the witness -- counts against the lawyer who

12   called the witness; now he is complaining.

13             MR. MONTOYA:  Well, yeah, the --

14             DR. REYES:  We are getting down to the last

15   minutes.

16             MR. MONTOYA:  She is -- the Committee said you

17   had a minute and a half and you used it.  It's long

18   over.

19             MS. BLACH:  I'll conclude with one last

20   question.

21        Q.   BY MS. BLACH:  Dr. Martinez, isn't it true that

22   earlier today you testified that the students were not

23   required to buy this textbook in your Math 182 spring

24   2010 course?

25        A.   No.

MCCCD/Martinez 03719

1          Q.   Didn't you tell that to the Hearing Committee

2     earlier today?

3          A.   That they were not -- no, I didn't say that.

4          Q.   Wasn't it your testimony that you said students

5     were required to buy it in fall of 2009, but you did not

6     require them to buy this book in spring of 2010?

7          A.   Yes.  They were not required to buy that

8     particular textbook, they had to buy a different

9     textbook.

10              MR. MONTOYA:  Okay.  She's done.

11              MS. BLACH:  Thank you.

12              CHAIRPERSON CRUDUP:  On that last question,

13     everything that you've been presenting, I'm familiar

14     with.  I've read it, they've read it.  So, we'll see

15     what they have to say.

16              MR. MONTOYA:  I'm going to just do one.  When

17     -- when --

18              MR. UPPAL:  Well, I -- is this time going to

19     come out of his testimony time with his witnesses?

20              MR. MONTOYA:  Yeah.  I have no problem with

21     that.

22

23

24

25

MCCCD/Martinez 03720

REDIRECT EXAMINATION

BY MR. MONTOYA:

Q.   Now, remember when you were trying to say something when Pavneet read something from some student?

A.   Yeah.  Right.

Q.   Go ahead and say it.

A.   The complaint that came out on December 11th was the result of I was hospitalized that fall.  I had a pulmonary embolism in both lungs and I was hospitalized. I was out.  I was not allowed to go back to work for, I think, a two-week period.  And my Chair then would call me and say:  What are you going to do about this, students are complaining?  And I told them:  I'm in the hospital, or I'm in -- or, I'm recuperating.

And so the students were upset because the Chair did not take care of my classroom, I guess, to a -- in a way that they felt would be appropriate.  It wasn't me at all.  I wasn't even there.  And that's -- that's where the complaint generated from, my not being in class and conducting the class.  They were upset that it wasn't running well or something.  But that wasn't my job, I was in the hospital.

MR. MONTOYA:  May I call my next witness?

CHAIRPERSON CRUDUP:  Yes.

MCCCD/Martinez 03721

1          MR. MONTOYA:  I'm going to have to leave the

2     room and go fetch him.

3          (Whereupon the witness enters the hearing

4     room.)

5

6          MR. MONTOYA:  May I proceed?

7          Please swear the witness.

8

9               FREDRIC D. BELLAMY,

10     called as a witness herein, having been first duly

11        sworn, was examined and testified as follows:

12

13               DIRECT EXAMINATION

14

15     BY MR. MONTOYA:

16        Q.   Mr. Bellamy, good afternoon.

17        A.   Good afternoon.

18        Q.   And what is your profession?

19        A.   I am an attorney.

20        Q.   How long have you been admitted to the practice

21     of law, sir?

22        A.   Since 1986.

23        Q.   And where did you go to college?

24        A.   I went to college at Harvard University.

25        Q.   When did you graduate?

MCCCD/Martinez 03722

| | |
|---|---|
| 1 | A.   1983. |
| 2 | Q.   And did you graduate with any honors? |
| 3 | A.   Yes, I did.  I graduated cum laude in my field |
| 4 | of concentration. |
| 5 | Q.   And what was your field of concentration? |
| 6 | A.   Psychology and social relations. |
| 7 | Q.   And upon graduating from Harvard, what did you |
| 8 | do next educationally? |
| 9 | A.   I then attended Harvard Law School. |
| 10 | Q.   Is that a difficult school to gain acceptance |
| 11 | to? |
| 12 | A.   Yes. |
| 13 | Q.   And did you attend -- how long did you attend |
| 14 | Harvard University? |
| 15 | A.   Seven years all together.  Four years for my |
| 16 | undergrad degree and three years for law school. |
| 17 | Q.   When you were at Harvard Law School, did you |
| 18 | take any courses regarding the subject of intellectual |
| 19 | property? |
| 20 | A.   You know, I actually don't recall. |
| 21 | Q.   Okay.  And after you graduated from Harvard Law |
| 22 | School, what did you do next? |
| 23 | A.   I accepted a job as an attorney, as an |
| 24 | associate at a law firm called Brown & Bain in Phoenix, |
| 25 | Arizona. |

MCCCD/Martinez 03723

1        Q.    And what year was that?

2        A.    That was 1986.

3        Q.    And did Brown & Bain have a firm focus in

4    reference to its practice?

5        A.    Yes.  At that time, it was considered among the

6    pre-eminent litigation firms for intellectual property

7    cases.

8        Q.    And Jack -- and Brown & Bain was founded by an

9    individual that we both met, had the pleasure of meeting

10   named Jack Brown; is that correct?

11       A.    That is correct.

12       Q.    Isn't it true that Jack Brown, if you look him

13   up, was one of the pre-eminent intellectual lawyers in

14   the United States?

15       A.    Yes.  In fact, I remember the National Law

16   Journal referred to him as the Dean of the

17   High-Technology IP Bar.

18       Q.    How long did you work at Brown & Bain?

19       A.    Five years.

20       Q.    And what area of law did you concentrate in at

21   Brown & Bain?

22       A.    I principally did intellectual property and

23   litigation focusing on copyright litigation.

24       Q.    How many years have you been in practice at

25   this time?

MCCCD/Martinez 03724

```
 1          A.    Oh, let's see.  It's been over 25 years.

 2          Q.    Do you still concentrate on intellectual

 3    property and copyright matters?

 4          A.    Yes.  I mean, my practice has, you know,

 5    expanded in breadth to other forms of complex business

 6    litigation, I would call it.  But intellectual property

 7    and technology-related matters, both advising clients

 8    and litigating them, remains a focus of my practice.

 9          Q.    Isn't it true that you are the Former Chairman

10    of the State Bar of Arizona Intellectual Property

11    Section?

12          A.    Yes.  That's true.

13          Q.    Isn't it true that you are the Former Chairman

14    of the State Board of Arizona E-Commerce, Internet, and

15    Technology Law Section?

16          A.    Yes, that's true.

17          Q.    Isn't it true that you are the Founding

18    Chairman of the Technology Committee of the Executive

19    Council of the State Bar of Arizona, Young Lawyers

20    Division?

21          A.    Yes.

22          Q.    Isn't it true that you are listed in America's

23    Best Lawyers?

24          A.    Yes.

25          Q.    Isn't it true that you regularly counsel
```

MCCCD/Martinez 03725

1    clients regarding intellectual property matters?

2       A.   Yes.

3       Q.   Do you remember meeting a lady who is sitting

4    to my right whose name is Cleopatria Martinez?  She came

5    to you seeking your counsel regarding a copyright

6    matter?

7       A.   Yes, I met her.

8       Q.   Did you know her?

9       A.   Not before she came to me for some intellectual

10    property advice.

11       Q.   Do you usually counsel individuals, academics,

12    regarding intellectual property matters?

13       A.   No.

14       Q.   Why did you agree to see her?

15       A.   You know, I sympathized with her -- with her

16    issues and it struck me that although I could understand

17    the concern from a copyright infringement point of view,

18    that there was a bit of what I considered in my judgment

19    an overreaction and6delete to a very fixable problem.

20       You know, the problem in particular with the

21    Fair Use Doctrine, because it's -- to call it an

22    ambiguous, difficult, and evolving area of the law would

23    be an understatement.  It's the kind of area where in

24    some situations -- I mean, clearly, there are always

25    going to be edge cases, extreme cases where you know any

MCCCD/Martinez 03726

1    number of copyright lawyers would agree, but there are

2    many, many situations where in the Fair Use Doctrine

3    there's going to be disagreement.  It's a real source of

4    ambiguity and confusion.

5         Q.    Let me ask you this:  Tell the Committee how

6    much you charged Professor Martinez for your advice when

7    she first met you?

8         A.    I decided to take the case pro bono.

9         Q.    Do you usually do pro bono work for college

10   professors?

11        A.    No.

12        Q.    Why did you decide to take it pro bono, her

13   particular case?

14        A.    As I said, I thought it was -- you know, I

15   sympathized with her situation.  I thought there was a

16   legitimate, you know, case to be made that what she'd

17   done fell within the boundaries of fair use, recognizing

18   that it's not really possible or legitimate to have a

19   definitive opinion.  But I thought on balance that this

20   really went to the core of, you know, of what fair use

21   is really fundamentally about, which is education.  Not

22   for profit, not for commercial uses, but for in large

23   part protecting the ability of teachers and professors

24   to teach in an appropriate manner and to do some degree

25   of copying within those parameters.

MCCCD/Martinez 03727

1      Q.   And it's true that the Fair Use Doctrine is

2   codified in the Copyright Act, isn't it?

3      A.   Yes, it is.

4      Q.   And is that Section 107?

5      A.   Yes.

6      Q.   Does the first sentence of Section 107 read:

7           "The fair use of a copyrighted work for

8           purposes such as criticism, comment, news

9           reporting, teaching (including multiple copies

10          for classroom use), scholarship, or research,

11          is not an infringement of copyright"?

12     A.   Yes.  That is what it says.

13     Q.   Now, tell the Committee, under the Fair Use

14   Doctrine do you have to get the publisher's approval or

15   authorization to use it in order to fall within the Fair

16   Use Doctrine?

17     A.   No, no.  The whole point of the doctrine is

18   that you don't need permission.

19          DR. REYES:  Question, please?

20          MR. MONTOYA:  Please.

21          DR. REYES:  Sources must be cited, correct?

22          THE WITNESS:  From an academic point of view,

23   that's -- I would consider that to be a matter of

24   politeness and to avoid issues related to plagiarism,

25   but it isn't in the copyright doctrine.

MCCCD/Martinez 03728

1          MR. MONTOYA:  And that's an important point,

2     because she's not been accused of plagiarism, she's been

3     accused of copyright violation.

4          Q.   BY MR. MONTOYA:  So, let me ask you this

5     because there's been some testimony to the contrary,

6     isn't it true that the very purpose of fair use is so

7     you don't have to get the person's permission?

8          A.   Yes.

9          Q.   Isn't it true that in fair use litigation,

10    authors and publishers sue because they've withheld,

11    intentionally, permission and sometimes the Court says

12    too bad, you lose anyway, it was a fair use?

13         A.   Yes.  That's correct.  In fact, there's a

14    recent opinion, it's really a landmark opinion in a case

15    brought by -- a class action brought by writers and

16    publishers against Google, which Google literally they

17    copied, they literally copied over 20 million books, and

18    many publishers and writers had not given permission,

19    and the Court last week ruled that that was fair use.

20         Q.   Have you been on Google Books?

21         A.   Yes.

22         Q.   Have you noticed that some books are copied

23    almost in their entirety?

24         A.   Yes.  Yes.  In fact, I use Google Books for my

25    own research in the practice of law.

MCCCD/Martinez 03729

1    Q.   Now, you reviewed some materials that Professor

2    Martinez provided you before you rendered your written

3    opinion of December 16, 2010, right?

4    A.   Yes, that's correct.

5    Q.   Now, Professor Martinez will testify that the

6    materials that you reviewed are in front of you as

7    Exhibits 1 and 2.  They're her lecture notes.  Do those

8    look familiar to you?

9    A.   Yes, they do.

10   Q.   And, now, let me ask you a threshold question.

11   Mathematical formulas, mathematical calculations,

12   geometric figures, geometric calculations, are those

13   even subject to copyright?

14   A.   The actual formulas which would be considered

15   the equivalent of the laws of nature are not

16   copyrightable.

17   Q.   So, 156 squared times 942 minus 147, is that

18   copyrightable?

19   A.   No.

20   Q.   Because it's an intellectual?  It's a pure

21   idea?  It's a law of nature?

22   A.   Exactly.

23   Q.   So, does copyright have a different application

24   in reference to the field of mathematics than it would

25   have in reference to the field of religious studies or

1    poetry or history?

2        A.   Yes, absolutely.  The distinction is what

3    copyright does not do is protect ideas which would

4    include, you know, simple laws of nature.  Pythagorean

5    Theorem, you can't copyright the Pythagorean Theorem,

6    for example.

7            Now, there's a spectrum of what's protectable

8    under copyright law, as there is in all forms of

9    intellectual property law, where the expression of ideas

10   receives the maximum protection.  So if you write a

11   play, say, that's going to be entitled to maximum

12   protection.  But a mathematical equation would be at the

13   lowest end of the spectrum where it would not be

14   protectable in and of itself.

15       Q.   Now, why did you conclude that the -- well, let

16   me ask you this:  If you -- under the Fair Use Doctrine,

17   if I copy a few pages out of a book, out of a math book,

18   but I also have bought the math book, does that take it

19   away from fair use?  Do I have to buy the source in

20   order to fairly use the source or copy the source?

21       A.   No.  In the abstract.  But, again, we're

22   talking about a doctrine that is not susceptible to

23   definitive analysis.  There's no magic formula to say

24   this is fair use and this isn't.  You have to -- you

25   have to construe it in the context of a case-by-case

MCCCD/Martinez 03731

1   basis and with knowledge of what the purpose of what the

2   Copyright Act is and what the purpose of the Fair Use

3   Doctrine is.

4        Q.   Isn't it true that the purpose of the Copyright

5   Act is essentially the advancement of knowledge?

6        A.   Yes.   It's -- you know, it states that right in

7   the U.S. Constitution and the Constitution itself

8   reflects, as the Copyright Act does, that there's an

9   attempt to balance the need for freedom of

10  communication, expression, and idea to discriminate that

11  because that's the public benefit; but there's also the

12  needs to balance that for the needs of the creators to

13  basically be able to sell and make a living off of

14  creating works.

15       Q.   Isn't it true that under the Fair Use Doctrine

16  you don't even have to buy the book to fairly use the

17  book within certain limitations?

18       A.   Yes, that's true.

19       Q.   Isn't it true that's the purpose of the Fair

20  Use Doctrine?

21       A.   Yes, absolutely.

22       Q.   Now --

23            CHAIRPERSON CRUDUP:   About five more minutes.

24            MR. MONTOYA:   Okay.

25       Q.   BY MR. MONTOYA:   Why did you -- okay.   After

MCCCD/Martinez 03732

1    you reviewed the materials that Professor Martinez

2    submitted to you, isn't it true that you concluded that

3    they fell within the Fair Use Doctrine?

4         A.   Yes.  In my opinion, they do.

5         Q.   And isn't it true that you rendered that

6    opinion before you and I had even spoken about

7    Cleopatria Martinez?

8         A.   Yes, that's correct.

9         Q.   Isn't it true that you rendered that conclusion

10   before anyone even paid you a cent?

11        A.   Absolutely.

12             DR. REYES:  Could I ask a clarification

13   question?

14             MR. MONTOYA:  Of course.

15             DR. REYES:  Were the materials reviewed by

16   yourself and Mr. Garrison -- I'm not sure of if you're

17   aware of what he reviewed, were they the same materials?

18             THE WITNESS:  You know, I can't be sure at this

19   point.  I did read Mr. Garrison's opinion and I believe

20   he had more materials to look at than I did, but I can't

21   state that definitively based on my recollection.

22             MR. MONTOYA:  Mr. Bellamy didn't have 3 and 4.

23             MR. UPPAL:  Objection.  Objection.  This is not

24   proper.

25             MR. MONTOYA:  Well --

MCCCD/Martinez 03733

1            DR. REYES:  That was a clarification.

2            MR. UPPAL:  But what he's saying is not proper.

3     He's not allowed to testify and I object to him

4     testifying.

5            MR. MONTOYA:  Well --

6            MR. UPPAL:  What he's going to do?  Ask himself

7     a question and answer it?

8            MR. MONTOYA:  Okay.  Well, then I'll get that

9     testimony in when I recall her.

10           MR. UPPAL:  So, for an individual who's

11    complained there's no time, I don't know how he's going

12    to recall.

13           MR. MONTOYA:  Well --

14           MR. UPPAL:  -- and if he's going to recall

15    witnesses, I certainly am as well.

16           CHAIRPERSON CRUDUP:  Move on.

17    Q.    BY MR. MONTOYA:  Now, why did you conclude that

18    the materials that are in front of you given to you by

19    Professor Martinez fell within the Fair Use Doctrine of

20    copyrights?

21    A.    Well, there are -- there's no definitive

22    formula, as I said, to determine where the Doctrine

23    applies, but there are four predominant factors that are

24    codified within the statute and that are referred to in

25    the -- in the case law construing the Fair Use Doctrine.

```
 1        And in my analysis, the balance of those factors weighed

 2        in favor of the conclusion that it was fair use.

 3              First, there's the purpose and character of the

 4        materials that are being copied.  And here we -- we

 5        have -- you know, in my review of what appeared to be

 6        mainly trigonometry and other pre-calculation formulas,

 7        these are -- these are at the lowest end of the

 8        spectrum, they are in and of itself on an item-by-item

 9        basis not copyrightable.

10              That, doesn't mean the textbook sources, if

11        someone writes a math book, that the book itself is not

12        copyrighted, the book is because it's a compilation of

13        -- and contains original expression and descriptions of

14        how to use the formulas and so forth.

15              But when I looked at the, you know, class notes

16        that Dr. Martinez provided me, it appeared to be

17        principally, you know, snippets of math problems, math

18        formulas, math equations.  So, that itself, you know,

19        militates in favor of application of the Fair Use

20        Doctrine because it's a lower -- it's a lower level of

21        protection in the first instance.

22              In terms of the purpose for which she was using

23        it, it goes to the core of the Fair Use Doctrine which

24        is to promote its use by teachers in an academic setting

25        for the purpose of learning.
```

MCCCD/Martinez 03735

1          We also look to the amount of the materials.

2     And, you know, I believe by, you know, my impression and

3     understanding was that we are looking at a totality of

4     say less than 1 percent, maybe even less than one-half

5     of 1 percent out of the universe from which some of

6     these equations were drawn.  So, it's a relatively

7     insignificant amount in the scheme of things compared to

8     the entirety of the book.  So, that's another factor

9     that in my opinion weighed in favor of applying the Fair

10    Use Doctrine as an affirmative defense to the claim of

11    infringement.

12          Also look to the -- you know, the probable

13    impact on the commercial market for the copyright owner.

14    And based on my understanding of how these materials

15    were used, that it would not have a significant impact.

16    I'm not saying it couldn't have any impact, but it did

17    not appear to be something that would really ultimately

18    hurt the copyright owners in the marketplace.

19          So taking those factors together, it appeared

20    to be a --

21          CHAIRPERSON CRUDUP:  Out of time.

22          MR. UPPAL:  All right.

23          MR. MONTOYA:  I'd like to --

24          MR. UPPAL:  So I'd like to now begin my

25    cross-examination.

MCCCD/Martinez 03736

1          MR. MONTOYA:  Mr. Chairman, I would like to do

2     something with my time.  I would like to proceed with

3     this witness and not take any more time but, in fact,

4     just relieve my last witness of any testimonial duties.

5     So, it won't prolong anything because I really believe

6     in my opinion that this witness's testimony is more

7     important and I'd rather have him finish his testimony

8     than to have the other witness testify.  So, it won't --

9     it won't cause any more time.

10          MR. UPPAL:  I object to that.  He's been -- Mr.

11     Montoya has complained ad nauseam today about too much

12     time being taken and cutting into his cross-examination

13     time, and he was warned not once but twice by the

14     Committee to wrap it up, and so now he should bear the

15     consequences.  I'm ready to cross-examine the witnesses.

16          DR. REYES:  May I, Mr. Chairman?  Are you

17     asking for an additional 20 or your final 20 minutes

18     will be spent with this witness?

19          MR. MONTOYA:  Yeah.  My final 20, yeah, and

20     waive my other witness.  And I think that some of that

21     time will actually go to Mr. Uppal's benefit.

22          DR. REYES:  Okay.

23          MR. MONTOYA:  Because I don't have 20 minutes

24     more with him.

25          CHAIRPERSON CRUDUP:  Okay.  We'll go that way.

MCCCD/Martinez 03737

1          MR. UPPAL:  Can we -- in light of that ruling,

2     though, can we get a definitive stop time for Mr.

3     Montoya?  Because previously it was five minutes.  I

4     just want to know what it's extended to.

5          DR. REYES:  20 minutes.

6          MR. MONTOYA:  Okay.

7          MR. UPPAL:  Well, if he carries 20 more

8     minutes, then I definitely will not have an equal time

9     to cross-examine Mr. Bellamy.  I mean, we can look at

10    the clock assuming that's correct.

11         DR. REYES:  How much more time do you think you

12    need?

13         MR. MONTOYA:  Maybe 12 minutes.

14         CHAIRPERSON CRUDUP:  12 more minutes and then

15    cross.

16         Q.   BY MR. MONTOYA:  Before you were interrupted,

17    go ahead.

18         A.   Okay.  You know, just to sum up, so we look at

19    these factors, the purpose and character of the copying

20    which is done for an educational purpose for teaching;

21    we look at the impact on -- the probable impact on the

22    market and that, again, is an analysis that you can't

23    really do in a vacuum, but my understanding is that the

24    impact would not be substantial; we look at the amount

25    which is -- which is very key, I mean, if -- and hearing

MCCCD/Martinez 03738

1      the amount on a percentage basis is small, although you

2      can't define it in a mathematical -- there's no specific

3      threshold mathematically when is it too much.

4                Again, you have to construe each of the factors

5      for purposes of the Fair Use Doctrine, which is promote

6      the use of copying essentially up to a certain point for

7      the purpose of teaching because we don't want to have

8      too much constraint on essentially academic freedom for

9      teachers to be able to pull source materials for

10     educational purposes.

11        Q.    Isn't it true, Mr. Bellamy, that the language

12     of the statute in reference to any legal question is of

13     paramount importance?

14        A.    Yes.   Absolutely.

15        Q.    Isn't it true that what Professor Martinez did

16     making multiple copies for classroom use of somebody

17     else's work is expressly protected in the very first

18     sentence of Section 107, the fountainhead of fair use

19     authority?

20        A.    Yes.   I completely agree with that.

21        Q.    Did that impact -- is that one of the reasons

22     why you concluded?

23        A.    Yes.   Yes, it was precisely because she is a

24     professor, a mathematic professor, who is using

25     materials in the manner that the Fair Use Doctrine is

1    intended to protect.

2        Q.   Now, if you were a judge, would you conclude

3    that Professor Martinez's use of these materials fell

4    within the Fair Use Doctrine?

5            MR. UPPAL:  Objection.  This is not a proper

6    question because if this witness were a judge, then the

7    rules of hearsay would apply, the rules of disclosure

8    would apply, and a whole host of rules would apply that

9    there's no way that Mr. Bellamy can fairly answer this

10   question.  There's no foundation for it if he were the

11   judge.

12           CHAIRPERSON CRUDUP:  Just continue.

13       Q.   BY MR. MONTOYA:  You can answer.

14       A.   Within the confines of what I reviewed and my

15   understanding of the situation, yes, if I were to be

16   authorized to give a judicial opinion, I would conclude

17   that it's fair use.  It doesn't mean that there aren't

18   other factors that I'm not aware of that could change

19   that calculation.

20       Q.   Let me ask you this:  You mentioned at the

21   threshold of the Authors Guild versus Google opinion, do

22   you agree with it?

23       A.   Yes, I do.  I think it reflects the important

24   policy behind the Fair Use Doctrine.

25       Q.   Isn't it true that if the Authors Guild versus

1    Google case is correct, then it's an easy case in

2    reference to what Professor Martinez did to conclude

3    that, of course, it's protected by the Fair Use

4    Doctrine?

5             MR. UPPAL:  Objection.  Lack of foundation.

6             MR. MONTOYA:  I'm asking as an expert witness.

7             MR. UPPAL:  He doesn't know everything.  He's

8    already said -- he's already said he's not aware of

9    anything.

10            MR. MONTOYA:  Well, he as6delete has to

11   answer --

12            MR. UPPAL:  Wait a minute.  I want to get my

13   objection on the record.  He's already testified about

14   five times now that he's not aware of everything that

15   Dr. Martinez did.  So any opinion that he gives on this

16   subject is not based on anywhere near complete

17   information.  This is according to his testimony.  So,

18   this is an inappropriate question.

19            MR. MONTOYA:  Let me rephrase it and I'll limit

20   it.

21       Q.  BY MR. MONTOYA:  Isn't it true that if the

22   Google decision is correct, then the two booklets that

23   you reviewed for Professor Martinez clearly fall within

24   the Fair Use Doctrine?

25            MR. UPPAL:  Same objection.

MCCCD/Martinez 03741

```
 1              THE WITNESS:  Yes.  In my opinion it would be

 2      covered by the policy analysis in the Google opinion.

 3      And based on the relatively insignificant amount of

 4      copying and the educational purpose coupled with the

 5      fact that as the Court acknowledges in the Google case,

 6      Google makes billions of dollars in it's business model.

 7      But this is a classroom, this is a non-profit situation.

 8         Q.    BY MR. MONTOYA:  And isn't it true on Google

 9      Books, like sometimes 90 percent of the book is

10      reproduced?

11         A.    Yes.

12         Q.    Did Professor Martinez produce 90 percent of

13      the textbook?

14         A.    No.

15         Q.    You said it was less than .5 percent?

16         A.    Yes.

17         Q.    Is it easy for a layperson proceeding in good

18      faith to run afoul of the Fair Use Doctrine?

19         A.    Yes.  Very easy, unfortunately.

20              MR. MONTOYA:  I don't have any further

21      questions.  Thank you, sir.

22              THE WITNESS:  You're welcome.

23              MR. MONTOYA:  Less than 12-6delete minutes.  So

24      the amount of time I saved, I hope I get credit for.

25              MR. UPPAL:  I'm going to go ahead and proceed
```

MCCCD/Martinez 03742

1   with the Committee's permission.

2          CHAIRPERSON CRUDUP:  Proceed.

3

4                    CROSS-EXAMINATION

5

6   BY MR. UPPAL:

7      Q.   Mr. Bellamy, good evening.  I know it's late in

8   the day.  I know you're here on behalf of Ms. Martinez,

9   but thank you for -- for coming here today.

10     A.   You're welcome.

11     Q.   Your credentials are certainly impressive, sir,

12   and I'm not taking issue with them, but I do have a --

13     A.   Thank you.

14     Q.   -- question since Mr. Montoya made such an

15   issue with it.  Are you taking any issue with Mr.

16   Garrison's credential?  Are you claiming you're a

17   superior lawyer to him in anyway?

18     A.   No, no.  We've participated together in Bar

19   activities and so forth.  I'm certainly aware of him and

20   respect him as a fellow colleague.

21     Q.   Certainly.  That's exactly what I would expect.

22   I wouldn't expect anything different.  You respect him

23   and he respects you.  But you're a lawyer for -- you're

24   an expert witness and basically an advocate for Dr.

25   Martinez, right?

MCCCD/Martinez 03743

1    A.    No, I -- well --

2    Q.    Well, you're an expert witness?

3    A.    No -- yes, I am, but my opinions are my

4    opinions.

5    Q.    Okay.  Fair enough.

6          But you have your own clients, right?

7    A.    Yes.

8    Q.    And your clients take their advice from their

9    lawyers not from the expert witness of whoever they may

10   be having a problem with.  You agree with that, right?

11   A.    Sure.

12   Q.    So, in the case, the District has to rely on

13   the opinion and the advice of Mr. Garrison, not the

14   counter expert, right?

15   A.    Well, I can't speak to the nature of that

16   relationship, but...

17   Q.    No, doesn't that just make common sense to you

18   in light of your own practice?  Clients rely on their

19   own lawyers for own advice and not the opposition's

20   lawyers?

21         Come on, sir, you would concede that, wouldn't

22   you?

23   A.    Yes.  I can see.

24   Q.    That's what I was really looking for.  It

25   wasn't a trap or trick of any kind.

MCCCD/Martinez 03744

1   A. Sure.

2   Q. You already told us -- well, I don't want to

3 put words in your mouth.  You could concede, because I

4 think you've conceded now several times that Mr.

5 Garrison reviewed different and a much larger quantity

6 of materials than you did, right?

7   A. That is apparently the case, yes.

8   Q. It's more than apparently the case.  You agree

9 with that, don't you?

10   A. As far as I can recall, yes.

11   Q. Okay.  And so you certainly are in absolutely

12 no position -- not because of your qualifications,

13 because I'm not challenging those, but because you

14 didn't review the same materials or the same quantity of

15 materials that Mr. Garrison reviewed, you're in no

16 position to render an opinion on materials that you

17 never reviewed, right?

18   A. I did review the analysis that Mr. Garrison put

19 forward and --

20   Q. That wasn't my question.

21   MR. MONTOYA:  He's interrupted the witness.

22   Q. BY MR. UPPAL:  Here's my question:  If you

23 didn't review a particular set of lecture notes, then

24 you have no basis to render an expert opinion on that,

25 would you?

MCCCD/Martinez 03745

1          A.    That's correct.

2          Q.    Okay.  And you, in fact, did not review the

3    lecture notes for a class that Dr. Martinez taught which

4    is MAT 082?

5          A.    I believe that's the case, yes.

6          Q.    Okay.  And are -- that's probably enough on

7    that.

8                Let's turn to your two-page letter of

9    December 16, 2010.  The Committee saw it because it's in

10   the materials and we had it on screen and PowerPoint,

11   too.  It said the materials -- this is what you wrote

12   and I can show it to you, but I think you're going to

13   remember.  Let me know if you want to see it.

14         A.    Okay.

15         Q.    You said:  "The materials you sent me include

16               your spring 2010 lecture notes for MAT 182

17               trigonometry, as well as pages from the

18               required textbook that contain similar math

19               problems and that discuss the subjects on which

20               you lectured."

21               When you use that phrase -- do you remember

22   saying that, by the way?

23         A.    Yes.

24         Q.    Now, you use the phrase -- these are your words

25   again, I'm not trying to trick you or anything -- "the

MCCCD/Martinez 03746

1    required textbooks," what is your understanding or what

2    did you mean when you used that phrase?

3        A.   If I recall correctly, and it may not have been

4    the best choice of words, but I understood that that was

5    a textbook that was being used in that class.

6        Q.   So, the --

7        A.   I understand from reading Mr. Garrison's

8    opinion and some of the other materials, that my

9    understanding may not have been correct.

10        Q.   Right.  And, in fact, you weren't here but Dr.

11   Martinez testified that from MAT 182 she required

12   students to buy a particular textbook, the one that's at

13   issue from Sullivan & Sullivan in 2009, but not in 2010.

14        A.   Okay.

15        Q.   So, in fact, your report contains a

16   misstatement then, doesn't it?

17        A.   Well, I couldn't call it a report.  It wasn't

18   intended to be an expert report.

19        Q.   I absolutely agree.  You -- you are so right.

20   It's not an expert report.  Your two-page letter

21   contains a misstatement.  Doesn't it?

22        A.   It contains a misunderstanding.

23             MR. UPPAL:  Okay.  Mr. Montoya, could I?

24             MR. MONTOYA:  Yeah.

25             MR. UPPAL:  Thank you.

MCCCD/Martinez 03747

```
1                  MR. MONTOYA:  Sure.

2                  MR. UPPAL:  Appreciate it.

3                  MR. MONTOYA:  No problem.

4          Q.   BY MR. UPPAL:  I don't know if you can read

5      that, I wanted to go ahead and show you --

6                  MR. UPPAL:  And, actually, Steve, can I impose

7      on you, I think we've got it memorized, to maybe

8      erase...

9                  MR. MONTOYA:  You want me to move?

10                 MR. UPPAL:  No.  If you wouldn't mind erasing.

11                 MR. MONTOYA:  If they -- I don't want to erase

12     their work without their permission.

13                 MR. UPPAL:  Well, I think -- is that all right?

14                 MR. MONTOYA:  Is that all right?

15                 MR. UPPAL:  Because I think that's been

16     superceded at this point.

17                 CHAIRPERSON CRUDUP:  It's okay.

18                 MR. MONTOYA:  Okay.

19                 MR. UPPAL:  Thank you, Steve.  I appreciate it.

20                 MR. MONTOYA:  Sure.

21         Q.   BY MR. UPPAL:  So, this is the two pages that

22     you submitted, right?

23         A.   Yes.

24         Q.   And even you say, I think I got this

25     mislabeled, I got it labeled as a report, but I think
```

MCCCD/Martinez 03748

1      you just said yourself it really is not a report, right?

2         A.   No, I was asked to do -- I mean, I asked her,

3      you know, Dr. Martinez's attorneys at the time who had

4      contacted me, to coordinate what they were looking for,

5      did they want a full-blown analysis and report or -- and

6      they said just an informal letter with your opinion,

7      which is what I provided.

8         Q.   So, what you provided is -- is not really what

9      you would provide for a client that wants an expert

10     opinion?

11        A.   It wouldn't be -- if a client wanted a formal

12     expert opinion, no.

13        Q.   Okay.  And, therefore, what you wrote in these

14     two pages, wouldn't you agree with me it's not nearly as

15     exhaustive or reliable as when you prepare a formal

16     report in the nature that Mr. Garrison produced?

17        A.   Well, it's certainly not as detailed.

18        Q.   Okay.  Did you try to understand -- I'm sorry.

19     What was that word again that you used?  I asked you if

20     your report contained a misstatement whether a textbook

21     was required and you preferred to a different term.  I

22     want to use your term.  You said it wasn't a

23     misstatement, it was a misunderstanding?

24        A.   Yes.

25        Q.   Okay.  Is there any other misunderstandings in

MCCCD/Martinez 03749

1       your report -- excuse me, your letter?

2           A.   Not that I'm aware of.

3           Q.   Okay.  Did you try and compare the lecture

4       notes that Dr. Martinez gave you with copyrighted

5       textbooks to try to determine for yourself how much of

6       the copyrighted materials she took was incorporated into

7       her lecture notes?

8           A.   If you're asking me if I dived down to that

9       level of analysis, no, I didn't.

10          Q.   In fact, you didn't even make an attempt, did

11      you?

12          A.   Meaning what?  I did review the textbook.

13          Q.   Well, let's back up for a second.  You agree

14      with me that the textbooks that we have in front of us

15      are copyrighted, right?  There's really no doubt about

16      that.

17          A.   Yes.  Of course.

18          Q.   Okay.  And so you also understand from your own

19      clients, Dr. Martinez that when she came to you, that

20      the District had expressed concerns -- whether you agree

21      with them or not -- is it your understanding that the

22      District had expressed concerns that the materials she

23      was using in her lecture notes might constitute

24      copyright infringement?

25          A.   Yes, that's my understanding.

MCCCD/Martinez 03750

```
 1              Q.    Okay.  So, then, certainly, you must have taken
 2        the lecture notes which are appended to Exhibit 6 of Mr.
 3        Garrison's report -- the ones that you did review,
 4        because I know that you didn't review all of them.  The
 5        ones that you did review, certainly, you must have taken
 6        those lecture notes which, you know, are 50 to 60 pages,
 7        and tried to undertake analysis for example with the
 8        Sullivan & Sullivan book, and see how much -- what
 9        percentage, how much, what substantiality of the lecture
10        notes are taken from copyrighted books, but you didn't,
11        did you?
12              A.    I don't understand the question.
13              Q.    Well, let's look at this chart in Mr.
14        Garrison's report which you've read.
15              A.    Uh-huh.
16              Q.    Since you've read the report you know what he
17        did, which is he created these charts.  And here's just
18        one example of it -- by the way, this is from MAT 082,
19        this is the one you never even tried to analyze, right?
20              A.    I'll take your word for it.
21              Q.    Well, no, I want your word for it.  I think
22        you've already said this.  I just want to be clear --
23              A.    Okay.  Okay.
24              Q.    You agree?
25              A.    I'm just not -- I haven't memorized the Bates
```

1    numbers for different documents, that's my point.

2        Q.    But you never saw the lecture notes for MAT

3    082, basic arithmetic 082, because I will tell you Dr.

4    Martinez already testified she didn't give them to you.

5        A.    Okay.

6        Q.    All right.  So, since you read Mr. Garrison's

7    report you see that he created three columns.

8        A.    Uh-huh.

9        Q.    And he created these charts which basically

10   have a comparison, which he testified was not

11   exhaustive, in which he cited in the first column on the

12   left two pages from Dr. Martinez's lecture notes, and in

13   the middle he showed where it had been copied, and then

14   on the third column to the right he showed the location

15   from and the copyrighted book from which the materials

16   were lifted.  You're familiar with that, right?

17       A.    Yes.

18       Q.    Did you try to do that?

19       A.    No.

20       Q.    Right.  So, you don't really know how much --

21   well, actually, let me withdraw that question.

22             Which textbooks did you review?

23       A.    Sitting here today I can't recall.

24       Q.    Because you reviewed none of them.  Isn't that

25   right?

MCCCD/Martinez 03752

1            Sir, you're here claiming you're an expert and

2    I certainly agree that you have the qualifications for

3    an expert, but given that you're testifying as an

4    expert, certainly you must have taken a review of these

5    textbooks but you don't remember.

6        A.    I don't have the documents in front of me.  I

7    do recall looking at the original source material that

8    was identified to me --

9        Q.    Which one?

10       A.    -- and comparing it.

11            I can't tell you sitting here now.

12       Q.    Well, sir, how am I supposed to cross-examine

13   you?  Mr. Montoya is claiming time is that, you know,

14   time is of the essence and is very limited to time and

15   we have to be over with today, and you're claiming that

16   in your opinion it was fair use, but you're unable to

17   tell the Committee which books you looked at?

18       A.    Unfortunately, this was a number of years ago

19   and it was at -- I was at a different firm and I do not

20   have my file with me.

21       Q.    Well, Mr. --

22            CHAIRPERSON CRUDUP:  Five more minutes.

23       Q.    BY MR. UPPAL:  Well, Mr. Garrison does remember

24   and Mr. Garrison actually created these very detailed

25   charts for the Committee which he said was not

Miller Certified Reporting, LLC

1    exhaustive, which he finds one instance after another of

2    verbatim or almost verbatim copying.  You don't take

3    issue with his conclusion that the copies were verbatim,

4    right?

5        A.   No.

6        Q.   In fact, you're not in a position to do that

7    because you didn't try and undertake that analysis?

8        A.   In my opinion, that level of analysis based on

9    my understanding of the amount of material and the

10   nature and purpose of fair use is unnecessary.  It's

11   over kill.

12       Q.   What, if your nature -- what if your

13   understanding of the nature of the amount that Dr.

14   Martinez misappropriated is incorrect?  You have nothing

15   to stand on then, right?

16       A.   Look, there are always going to be edge cases.

17   If someone -- you know, you know, fair use doesn't mean

18   an academic can take wholesale a textbook.

19       Q.   I'll withdraw the question in light of my

20   limited time.

21            MR. MONTOYA:  You can't interrupt the witness.

22            MR. UPPAL:  It was non-responsive.

23            MR. MONTOYA:  Well, that's for the Committee to

24   judge.

25            CHAIRPERSON CRUDUP:  Allow.  You can finish.

1          THE WITNESS:  I also, you know -- assuming

2    everything that Mr. Garrison says is correct, I do not

3    reach the same opinion.  But his ultimate opinion is not

4    an infringement opinion, it simply states that there is

5    a heightened risk because of copying.  Well, that's

6    inherent to any fair-use situation because there's

7    always copying involved.

8          Q.   BY MR. UPPAL:  How can you possibly render an

9    opinion on fair use let alone what Mr. Garrison said

10   when you don't even remember the source materials that

11   you reviewed?

12         A.   I'm sitting here relying on my recollection of

13   the analysis I did at the time.

14         Q.   And isn't it true that you didn't even try to

15   review the entire copyrighted textbooks that are at

16   issue, at most what you reviewed was selective pages

17   that were given by Dr. Martinez; isn't that right?

18         A.   Yes, that's correct.

19         Q.   Okay.  So, you've got an individual who comes

20   to you, who wants an opinion basically stating that she

21   didn't commit copyright infringement, and she gives you

22   self-selected sections or pages of a textbook to compare

23   against her lecture notes.  You don't find that

24   problematic?

25         A.   No, not particularly.

1     Q.   You would agree with me, do you not -- I mean,

2     let me back up for a second.

3          You understand that Dr. Martinez is here today

4     in a due process hearing that is to address whether or

5     not her employment will continue with the District,

6     right?

7     A.   I have some understanding of that, yes.

8     Q.   Okay.  And you can see that she has an interest

9     in continuing her employment, right?

10    A.   I would assume so, yes.

11    Q.   And you don't think there's any issue with the

12    fact that you only reviewed selected pages that she

13    selected?

14    A.   I have no reason to doubt that she -- she's in

15    the best position to tell me what the source materials

16    are and to make that comparison, and that was what I was

17    asked to do.

18    Q.   Okay.  And since you don't remember what you

19    reviewed, you don't remember the textbooks, and you

20    conceded you only reviewed selections that she selected

21    and gave you, how do you know that she didn't give you

22    pages from some other textbook, some textbook that's

23    completely inapplicable or out of print?  You don't, do

24    you?

25    A.   No.

MCCCD/Martinez 03756

1        Q.   I want to touch on the Google Books' issue.

2   Can you tell us -- actually, let me ask you to kind of

3   speed this up.  There's a term of art in your field,

4   copyright law, called "transformative," right?

5        A.   That's correct.

6        Q.   Okay.  And if a work is transformative, then

7   essentially that's one of the factors.  If you take a

8   copyrighted material and you transform it into something

9   that has independent indicia of creativity, then it's

10  transformative and generally not considered a violation,

11  right?

12       A.   Yes.

13       Q.   So, you've referred to this case, a case that

14  Mr. Montoya has repeatedly asked you about and cited to,

15  and I just want to read you a section.  It says -- from

16  the case:  "Similarly, Google Books is also

17            transformative in the sense that it transforms

18            book text data into data for purposes of

19            substantive research."

20            Given that you haven't even reviewed everything

21  that Dr. Martinez did or the sources, you don't have any

22  basis to testify whether or not her work was

23  transformative, do you?

24       A.   I have my understanding of how the notes were

25  used.

MCCCD/Martinez 03757

1    Q.   Based on her self-selected pages that she gave

2    you?

3    A.   Yes.

4    Q.   And based on -- based on materials and books

5    that you don't even remember here today?

6    A.   That's correct.

7    Q.   Now, you said earlier that equations -- or,

8    what was it?  Natural law?  I don't remember.  I don't

9    want to use.  I'm not remembering.

10       You said equations and you gave some sort of

11   example of what you called equations, such as the

12   Pythagorean Theorem?

13   A.   Yes.

14   Q.   And Pythagorean Theorem, if I remember

15   correctly from geometry, isn't that the finding of

16   hypotenuse of a right angle:  A squared plus B squared

17   equals C squared and C squared plus --

18   A.   Yes.

19   Q.   You don't really think that MCCCD is claiming

20   that that's the manner in which she violated copyright,

21   do you?

22       Is that your understanding?  Because it's very

23   important if that's your understanding.

24       CHAIRPERSON CRUDUP:  That's time.

25       MR. UPPAL:  I would ask for him to answer that

MCCCD/Martinez 03758

1    last question.

2            MR. MONTOYA:  Can I also do my redirect?

3            CHAIRPERSON CRUDUP:  Yes, you can.

4            MR. MONTOYA:  Thank you.

5            THE WITNESS:  Here's the way I would put it in

6    my understanding of the situation:  As I said, the Fair

7    Use Doctrine is not capable of definitive analysis.  We

8    have -- even the factors that are laid out, the statute

9    itself specifies that other factors can come into play.

10   You have to look at it in light of the purpose.

11           Let's take the two extremes on -- on one

12   extreme, let's say a math professor selects problems,

13   copies them literally from a variety of textbooks and

14   assembles in her own fashion into some kind of lecture.

15   In that situation, that would be a degree -- that would

16   be transformative and that would be fair use.

17           On the other extreme we have a math professor

18   who takes a textbook and literally just copies -- copies

19   it substantially, maybe entirely, and provides that to

20   the students.  That's not fair use.

21           The analysis is where in that spectrum does

22   this situation fall.  Mr. Garrison's opinion is, well,

23   it falls in a spectrum that increases risks; but that in

24   and of itself doesn't tell us, would that be ruled fair

25   use by a judge fully informed of the facts.

MCCCD/Martinez 03759

```
 1              I'm talking about the two extremes.  I am
 2      relying on the information that I was provided and in my
 3      opinion it falls within the parameters of fair use
 4      because it seems similar in my understanding to the
 5      first hypothetical that I gave you and not the second.
 6              MR. UPPAL:  I didn't interrupt to the witness,
 7      but I want to point out that what he said is completely
 8      non-responsive to the question.  I understand that you
 9      ruled that I'm out of time.  Thank you.
10
11                      REDIRECT EXAMINATION
12
13      BY MR. MONTOYA:
14         Q.   Okay.  I have a follow up.  You say you use
15      Google Books?
16         A.   Yes.
17         Q.   Have you ever heard of Toni Morrison, the Nobel
18      Laureate, wrote this book called "Beloved"?
19         A.   Yes.
20         Q.   I'm showing you -- see Google Books up there?
21         A.   Uh-huh.
22         Q.   Okay.  It's a literary work and consequently
23      unique unlike a mathematical principle, correct?
24         A.   Yes.
25         Q.   Do you see how Google Books that the Judge
```

1      ruled was a fair use goes on page after page of verbatim

2      copying?

3          A.   Yes.

4          Q.   Now, it's your understanding that the Google

5      opinion said that that was fair use?

6          A.   Yes.

7          Q.   And remember when Mr. Uppal was saying:  Oh, in

8      your letter you made a mistake which you called a

9      misunderstanding, that you thought that Professor

10     Martinez required her students to purchase the

11     underlying textbook that she copied from?

12         A.   I think what I meant by required is that is the

13     assigned book, it doesn't mean necessarily the students

14     would purchase it.

15         Q.   But isn't it true that under the Fair Use

16     Doctrine, you don't have to buy the book?

17         A.   (No audible response.)

18         Q.   Is that a yes?

19         A.   Yes.

20         Q.   So, whether or not the book was assigned or not

21     assigned, required or not required, is irrelevant for

22     fair use purposes, correct?

23         A.   I -- I wouldn't say --

24              MR. UPPAL:  I would like that question --

25     that's a very important question.  I want that question

1    reread because I want to make sure I heard it.  I just

2    want the question reread by the court reporter.

3              MR. MONTOYA:  Well, that's something that you

4    have to ask the Chair and the Chair has to rule on.

5              CHAIRPERSON CRUDUP:  Sure.

6              MR. UPPAL:  Thank you, Mr. Chair.

7              (Whereupon the prior Question was read.)

8

9              THE WITNESS:  I wouldn't say -- I wouldn't

10   chose the word "irrelevant."

11       Q.    BY MR. MONTOYA:  Is it dispositive?

12       A.    It is not dispositive.

13       Q.    So, something can fall under the Fair Use

14   Doctrine even though you don't require your students to

15   buy it?

16       A.    That's correct.

17       Q.    In fact, one of the purposes of the Fair Use

18   Doctrine is so you don't have to buy it, right?  You can

19   just make multiple copies of it to pass out in class

20   like the statute itself says; is that correct?

21       A.    Yes.

22       Q.    And that's what Professor Martinez did, right?

23       A.    That's my understanding, yes.

24       Q.    Now, you weren't paid $10,000 to write --

25              MR. UPPAL:  Objection.  Objection.  We've been

```
 1          over this.  I mean --
 2                  MR. MONTOYA:  Well, he's the one --
 3                  MR. UPPAL:  No.  Actually, I did not receive
 4          equal time and now we're going over exact time.
 5                  MR. MONTOYA:  I had extra time.  I had extra
 6          time.
 7                  DR. REYES:  It will cut into the closing
 8          statement time.  So, as you wish.
 9                  MR. MONTOYA:  Then I will thank Mr. Bellamy for
10          his insight and his honesty and release him.
11                  THE WITNESS:  Okay.
12                  MR. MONTOYA:  Thank you, sir.
13                  THE WITNESS:  Thank you.
14                  MR. UPPAL:  Nice to meet you.
15                  CHAIRPERSON CRUDUP:  Five minutes each for
16          closing statement.
17                  MR. MONTOYA:  Bye, Fred.  Thank you, sir.
18                  MR. UPPAL:  I have very bad allergies.  Can you
19          indulge me for 30 seconds?
20                  MR. MONTOYA:  And can I -- I'm going to go
21          release my other witnesses.  In fact, I'm going -- I'm
22          still on the -- I'm going to actually invite him to come
23          in.  Is that okay?  Because he's no longer a witness.
24                  CHAIRPERSON CRUDUP:  That's fine.
25                  MR. MONTOYA:  Thank you.
```

MCCCD/Martinez 03763

```
 1                    (Whereupon a recess is taken at 4:47 p.m. until
 2        4:49 p.m.)
 3
 4                    MR. UPPAL:  Mr. Chairperson, five minutes each
 5        for closing, is that the rule?
 6                    CHAIRPERSON CRUDUP:  Five.  Five-minutes.
 7                    MR. MONTOYA:  How about ten?  Since it's her
 8        career at stake.
 9                    DR. REYES:  If you all want to stay later.
10                    CHAIRPERSON CRUDUP:  If you want ten -- we have
11        to stay later.  Do you want ten?
12                    MR. MONTOYA:  We want 10.
13                    CHAIRPERSON CRUDUP:  Ten okay with you?
14                    MR. UPPAL:  I will stick to ten.
15                    CHAIRPERSON CRUDUP:  Okay.
16                    MR. UPPAL:  But I do believe -- actually, I'm
17        going to ask Mr. Calderon.  Traditionally, I think my
18        side gets to open and close.
19                    MR. CALDERON:  You have ten minutes.  I would
20        recommend, but it's up to you if you want to reserve a
21        couple of minutes --
22                    MR. UPPAL:  That's exactly what I want to do.
23                    MR. CALDERON:  -- for final rebuttal, that's
24        fine.
25                    He'll use eight up front; Mr. Montoya will use
```

MCCCD/Martinez 03764

1    his ten; and he'll be limited to two.

2         MR. UPPAL:  Bear with me.  I'm just going to

3    start a stopwatch here.

4         So, Members of the Committee, what I'm going to

5    do is I'm going to reserve, as is customary a portion of

6    my time, if I use seven, I'll use the balance of the

7    three at the end or whatever might be the case.

8         All right.  Members of the Committee, thank

9    you.  It's been a long day and you've been very patient

10   with both of us.  And I'll just say to you that this is

11   important to both sides.  There's really no dispute as

12   to that, we're not contending this matter isn't

13   important to Dr. Martinez.

14        But what I would say to you is what you have to

15   realize is that this is a situation that has gone on for

16   a very, very long time and it has reached a point -- a

17   breaking point, basically the straw that broke the

18   camel's back, it is not a matter of one thing, it is the

19   cumulation of everything that has resulted in a

20   situation where the President of Phoenix College, who at

21   the end of the day has to bear the responsibility and

22   the risk for continuing to employ an individual such as

23   Dr. Martinez.

24        We're at the point where President Solley is

25   saying to you that she simply has lost trust in this

MCCCD/Martinez 03765

1     witness's ability to comply with her directives, to

2     comply with the law, to comply with the District's

3     policies.  And she is concerned that the continued

4     employment of Dr. Martinez and the views that Dr.

5     Martinez holds is going to result in a situation where

6     we're going to have massive problems, either with

7     respect to a violation of copyright, a copyright

8     infringement lawsuit, which I will say to you is not

9     just a theoretical or hypothetical concern, but the

10    District has been sued for this in the past, and you

11    heard about that; or, it's going to reach a situation

12    where students are going to have big complaints and have

13    legitimate, very big problems with actions that Dr.

14    Martinez takes such as simply violating the

15    cash-handling rule.

16         So, I want to begin sort of in reverse order

17    and talk about the cash-handling rule first, because it

18    surely is the straw that broke the camel's back, in

19    addition to everything that Dr. Martinez did in respect

20    to copyright violations, that has led us to a situation

21    here today where the President of the college who --

22    let's face it, we all have better things to do with our

23    time, has spent the entire day in front of you, and

24    during her testimony requested or practically begged the

25    Committee to support her recommendation to give or

MCCCD/Martinez 03766

1    return a recommendation of termination with respect to

2    Dr. Martinez.  And that request is not made lightly.

3           Let's review for a minute what happened.  Dr.

4    Martinez is already on restriction for copyright

5    violations, she's already been disciplined with respect

6    to her attempts to circumvent those copyright

7    restrictions, and then it culminates in a situation

8    because she does not want to comply with Phoenix

9    College's directive that she submit her materials for

10   pre-review in order to make sure they are not copyright

11   violations in whatever she's using, she doesn't want to

12   do that, so she goes to Staples and makes copies.

13   That's bad enough.  But then she takes those copies and

14   sells them to her students.

15           We haven't claimed that she made a profit from

16   that but that's not the issue.  When you're an

17   instructor, common sense should tell you that you don't

18   get to sell lottery tickets, you don't get to sell

19   Tupperware, you don't get to sell Girl Scout cookies,

20   and you don't get to sell course materials to your

21   students.  Because if you even offer them for sale, the

22   students are going to think that they have to buy them,

23   either to curry favor to the instructor or to avoid a

24   detriment.

25           So, when this issue is brought to Dr.

MCCCD/Martinez 03767

1    Martinez's attention, once again Dr. Solley takes time

2    out of her schedule, she's got bigger fish to fry and

3    more important things to do, a larger admission to

4    service, but she takes time out of her schedule to meet

5    with Dr. Kakar to explain the enormity of this violation

6    and it's significance.  What does Dr. Martinez do?  She

7    walked out.  And she claims she walked out because she's

8    afraid of Dr. Solley, but apparently not so afraid to

9    comply with her directive.

10          Let's face the facts.  She did not want to

11   comply with a directive, a written directive of the

12   President of Phoenix College and she simply thought that

13   she could avoid it.  Only today when she's had to face

14   the results of cross-examination does she belatedly

15   admit to you that she has made a mistake.  But it's too

16   late, the bond of trust has been broken.

17          And if you allow her to continue to be employed

18   with the District, she will simply engage in this kind

19   of behavior over and over.  She already has and she will

20   feel that she has gotten away with it; and it is

21   impermissible.

22          But, let's continue.  They try to counsel her,

23   it doesn't work, she walks out.  They tell her to

24   contact the students and give refunds, she doesn't

25   contact the students.  So then because this is such a

MCCCD/Martinez 03768

1     serious violation, Kelly Loucks, a secretary in the Math

2     Department is charged with -- look at the amount of time

3     that's being wasted here -- to go out to students and

4     see if she's contacted them to offer a refund.  It's

5     clear as day, she hasn't done so.

6          What happens next?  She's told:  Give refunds.

7     She doesn't do it.  So a student says:  You're supposed

8     to give me a refund.  She still doesn't do so and tries

9     to make it contingent on return of materials.  That is

10    ridiculous.  She's already been told you have to make a

11    refund and she tries to make it contingent on the return

12    of the materials.

13         But the coup de gras, is when these

14    instructions are repeatedly violated, she's issued a

15    specific instruction in writing that now you have got to

16    show cancelled checks.  Because, frankly, at this point

17    it doesn't matter whether you agree with the instruction

18    or not, because management and the President of the

19    college, a woman who has dedicated her life to

20    education, who herself is Hispanic, who herself has won

21    many awards has decided this is unacceptable behavior.

22    Now, you've got to come forward with cancelled checks.

23    And where are they?  She doesn't produce a single one.

24         She violates the directive.  And if she can

25    violate that directive of a president that she told you

MCCCD/Martinez 03769

1    she was afraid of, then you really need to assess her

2    credibility and where it relies.  There is no

3    credibility.  It's unfortunate that we have to say

4    things, but that's where we're at.

5           Now, with respect to the copyright issues, what

6    I would say to you is this:  That the other side has

7    really strived to try and create the impression by this

8    expert Mr. Bellamy, who is a nice fellow, I've got

9    nothing wrong with him and I told you I don't challenge

10   his credentials, but he testified that what she did was

11   somehow fair use.  Ladies and gentlemen, that has

12   absolutely no indicia of credibility.  Not because Mr.

13   Bellamy is a bad guy or I don't think that he knows what

14   he's doing, because he didn't even review the same

15   materials that Mr. Garrison reviewed.  He doesn't even

16   remember what he reviewed.

17          And the only things that he reviewed to try and

18   see how much or what Dr. Martinez copied comes from the

19   self-selected pages that Dr. Martinez gave him.  He

20   admitted, he doesn't know what she gave him, it could

21   have been something completely out of print.  It

22   certainly wasn't this, we know that.  Because these

23   books he doesn't remember reviewing.

24          So, ladies and gentlemen, he doesn't have the

25   ability to tell you in any reliable manner that what Dr.

MCCCD/Martinez 03770

1    Martinez did is fair use or anything of the kind.  And

2    he also has no basis to testify that what she did

3    constitutes fair use, because fair use doesn't require

4    you to buy the textbook.  That's not the issue.  The

5    issue is how much material did you infringe and he

6    doesn't know.

7              I'm going to reserve whatever few seconds I

8    have until the end.

9              DR. REYES:  That will be the two minutes at the

10   end.

11             MR. UPPAL:  Thank you.

12             MR. MONTOYA:  Your lawyer will tell you that

13   the District has the burden of proof.  My client is

14   presumed innocent.  They have to show that she's guilty.

15   They haven't shown she's guilty of anything.

16             Let's start with the back end first because the

17   back end is easy.  Remember when I asked all of their

18   witnesses that had anything relevant to say regarding

19   the matter --  Dr. Kakar, President Solley -- you're

20   saying she violated the District money-handling rules,

21   what do those rules say?  Well, first of all, what is

22   the number of the rule?  I don't know.  What does the

23   rule say?  I don't know.

24             The President of Phoenix College, with all due

25   respect, is not a dictator.  She can't go around telling

MCCCD/Martinez 03771

1    people to give their money to students without citing a

2    rule, without having authority behind her.  She's not --

3    we don't live in a totalitarian state.  Remember, the

4    nature of your job.  You're members of a Faculty Senate.

5    Universities, colleges started as guilds of scholars

6    that would charge their students for their services and

7    the guilds and6delete could also expel scholars who did

8    not adhere to the guilds' standards.

9          The Faculty Senate is higher than the

10   President, that's why it's your recommendation that goes

11   to first the Chancellor and then goes to the Governing

12   Board.  The President is not a dictator.  She can't tell

13   Cleopatria Martinez to give money away without a rule.

14          And -- and let's look at the evidence, there is

15   no rule.  No one testified about a rule.  Professor

16   Martinez testified it was reimbursement and it made

17   sense.  They keep on saying that she had to -- these

18   students had to buy these materials.  That's not true.

19   The only evidence is is that they could have copied

20   themselves, which they chose not to do, or have her copy

21   them and reimburse them.  So what?  Big deal.  She

22   didn't obey.  She didn't have to obey.  This is not a

23   dictatorship.  This is based upon rules.  That's why we

24   have the RFPs.  That's why we have the Faculty Senate to

25   preserve faculty freedom.

MCCCD/Martinez 03772

1          So, they haven't proven -- so, not only have

2     they not proven, the selling the improper money-handling

3     case with the preponderance of the evidence, in fact,

4     there's no evidence to support it at all.

5          Let's talk about the copyright case.  First of

6     all, the evidence is completely uncontradicted that the

7     alleged copyright violations transpired almost four

8     years ago; spring of 2010.  And it never happened again.

9     But, yet, they say she can't be trusted, she hasn't

10    learned her lesson.

11         She testified over and over again:  I've never

12    used these materials again.  Remember that?  Never used

13    these materials again.  Why?  Because they told me not

14    to.

15         That is old news.  She's been punished for it.

16    She was given a letter of reprimand for it.  She can't

17    be punished again for it.  Why fire her for a problem

18    that transpired almost four years ago that she never

19    even repeated.

20         One thing my friend Mr. Uppal completely

21    ignored is the rest of the story.  He focuses upon

22    alleged mistakes of the spring of 2010, but what about

23    the 28 years?  What about those?  Those have to be taken

24    into consideration.  You all know the concept of tenure

25    is based upon longevity of service, longevity of

MCCCD/Martinez 03773

1    dedicated and excellence service to the college.  She's

2    tenured.  That's why we're here.  The university's rules

3    respect longevity of service but, yet, there's never

4    been any type of recognition of that.

5         And you heard:  Oh, she's done this, she's done

6    that.  They're beating up on this poor lady, which is

7    pure bullydom by the bunch of bureaucrats that President

8    Solley has rubber stamped.  That happens all the time.

9         Boy, are you right, Pavneet, President Solley

10   is super busy, she does have a lot on her plate, and

11   sometimes that results in the President rubber stamping

12   what an underlying administrator, bureaucrat does, and

13   that's why you are here to reverse it.

14        The foundation of any legal doctrine is the

15   dang written law.  Notice how no one has ever talked to

16   you about that.  Their expert didn't even cite to you

17   the statutes.  Pavneet didn't cite to you the statutes.

18   They don't want you to read the statute.  The statutes

19   reads:  "The fair use of copyrighted work for

20            purpose such as criticism, comment, news

21            reporting, teaching (including multiple copies

22            for classroom use), scholarship, or research

23            is not an infringement of copyright."

24            That's what the dang statute itself says.

25            We've gone over and over again the Google case.

MCCCD/Martinez 03774

1         If Google can do it for money, copy a whole dang book or

2    90 percent of a book, why can't she do it for no money

3    and not a whole book but a fraction of it, the vast

4    majority of which is mathematical principles in any

5    event?  Why doesn't that fall into fair use?

6         Bellamy is exactly right.  Now, did he have the

7    huge expert report that Mr. Garrison did?  No, but he

8    wasn't paid $10,000 to produce one because she couldn't

9    afford it.  He did it out of the kindness of his heart.

10   He was more objective than anyone.

11        It absolutely was fair use.  Look at the

12   language of the statute.

13        And another thing that is irrational, I

14   challenge you to address this issue that this

15   demonstrates the irrationality of what we're here for,

16   and that is this:  Why haven't they said, well, you

17   know, if you don't want to terminate her, here's another

18   sanction.  You know, whenever you watch TV, whenever you

19   discipline your kids, whenever anything -- whenever any

20   question of discipline is -- is involved, you always

21   look at the level of discipline to make sure that it's

22   proportionate to the underlying offense.

23        There's been no talk of that.  She must be

24   fired.  Why hasn't she already been punished enough?  My

25   God, she's been excoriated, she's been humiliated, she's

MCCCD/Martinez 03775

1    been put on administrative leave.  After 28 years of

2    dedicated service to the College, why isn't that enough?

3    The level of punishment betrays what's going on here.

4    This is unfair.

5         And, moreover, whenever you consider

6    punishment, you also have to consider another concept,

7    because, guess what, we're humans, and that's the

8    concept of mercy.  Why doesn't this individual deserve

9    mercy?  Everyone deserves mercy.  Everyone absolutely

10   deserves mercy, especially when they have been a

11   merciful person.  There's been no demonstration that

12   this individual is mean spirited or malicious.  She

13   didn't steal -- even though they said she stole, there's

14   no evidence that she stole.  There's no evidence that

15   she lied.  There's no evidence that she cheated, even

16   though they tried to say that she cheated.  Oh, you

17   know, she got an assistant faculty member to print

18   something.  Oh, she printed up, you know, 14 [sic]

19   copies of classroom materials.  There's been no evidence

20   of any malice on her part.

21        The punishment is disproportionate even without

22   the concept of mercy.  When you apply the concept of

23   mercy, there's absolutely no question that she shouldn't

24   be terminated.

25        And, moreover, they haven't proven their case.

MCCCD/Martinez 03776

1    They haven't proven that she's violated any rule

2    regarding handling money and they haven't proved that

3    she's violated the copyright law.  Exhibit No. 1 is the

4    Copyright Act itself, Section 107.  Exhibit No. 2 is the

5    Google case.  How can Google make money on printing

6    90 percent of Toni Morrison's original literary master

7    piece "Beloved," and her use of the limited problems

8    that she used, less than .5 percent -- that testimony

9    has been uncontradicted by the way.  Evidence .5 percent

10   or less.  That's what the evidence shows.  When I asked

11   Mr. Garrison:  How much did she use?  I don't know, that

12   wasn't important to me.  Even though he was paid $10,000

13   to review the facts, he didn't review that fact.

14          There isn't a case here.  This is a trumped-up

15   case and they're trying to destroy someone who doesn't

16   deserve to be destroyed.  I would be afraid, too.  I

17   think that you saw -- you sensed the fear in her when

18   she testified.  Did you not?  Can you deny that she was

19   shaking, that she was fearful, that she was berated.

20          CHAIRPERSON CRUDUP:  Okay.  Thank you.

21          MR. MONTOYA:  Thank you.

22          MR. UPPAL:  Ladies and gentlemen of the

23   Committee, the concept of tenure will not survive if an

24   individual such as Dr. Martinez is allowed to violate

25   written instructions from a college president and engage

MCCCD/Martinez 03777

1    in this kind of behavior.

2            Dr. Solley is not a dictator.  There's a rule

3    that you can't sell material.  There's a real good

4    reason for it, and Mr. Montoya keeps stating that the

5    rule was never cited to you.  It's in the Statement of

6    Charges, remember the one he objected to when I tried to

7    show it to the witness that was being questioned?

8            It says, Faculty Policy Manual 3.2.4:

9            "An instructor shall not have any financial

10           interest in or receive compensation from the

11           sale of any unpublished instructional materials

12           required or suggested for a class that the

13           instructor teaches."

14           With respect to why there isn't a sanction less

15    than termination, and you heard Mr. Montoya make an

16    appeal to mercy, review the record.  Look at how many

17    times Dr. Solley and the Administration tried to counsel

18    this individual.  Look at the copyright issues, she

19    wasn't immediately fired on it, maybe she should have

20    been, but they tried to work with her.  She repeatedly

21    circumvented it.  I can't take you through the examples,

22    but I know that you know them.  Look at the issues of

23    the Cash-Handling Policy, look at how many times she

24    violated it.  And then she -- as she sat here today,

25    refused and failed to produce the cancelled checks and

MCCCD/Martinez 03778

1    the refunds that she was directed to send.  That didn't

2    happen.  The very first time, they tried to talk to her,

3    she walked out.

4         Mercy and sanctions short of termination have

5    been utterly exhausted.  There is no other option at

6    this point.  And I know that, you know, you're going to

7    review the fact that she is tenured and she's worked

8    here a long time, but she's had every opportunity.

9         Again I leave you with this:  The concept of

10   tenure will not survive and MCCCD will not survive as an

11   institution if individuals such as this are allowed to

12   engage in this level of conduct and retain their

13   employment.

14        CHAIRPERSON CRUDUP:  Thank you.

15        MR. CALDERON:  Mr. Chairman, before you

16   adjourn, may I ask a question and then offer up some

17   deadlines?

18        CHAIRPERSON CRUDUP:  Yes, you may.

19        MR. CALDERON:  Thank you, Mr. Chairman.

20        Question to both counsel, is it the argument

21   today that the Committee can only rule, it's an all or

22   nothing?  There's recommendation for termination and

23   there's a recommendation for no termination?  There can

24   be no recommendation for less than termination?

25        MR. UPPAL:  That's my understanding -- let's,

Miller Certified Reporting, LLC

MCCCD/Martinez 03779

1    since I represent the District and since you were

2    turning to me.

3            MR. CALDERON:  Sure.

4            MR. UPPAL:  Our position is that you have to

5    respond to the charges, and the charges are a

6    recommendation -- are requesting a recommendation of

7    termination.  Anything short of that is not going to

8    address either the charges or the purposes that we've

9    been here for today.

10           MR. CALDERON:  Mr. Montoya?

11           MR. MONTOYA:  This Committee has the

12   jurisdiction to recommend a lesser sanction, that is

13   certainly within your jurisdiction.  The Governing

14   Board -- first of all, it's only a recommendation, and

15   ask Mr. Calderon or anyone who sat in on the Governing

16   Board's open meetings, they can do whatever they want.

17   They don't have to terminate, they can suspend, they can

18   reinstate.  I know, I got an employee reinstated.

19           The Governing Board absolutely can do that.

20   You can absolutely do that, too.  You have the -- you

21   have the power to make that recommendation.  That is

22   your absolute right.

23           MR. CALDERON:  Question for Mr. Uppal, the

24   August 9th letter signed by Chancellor Glasper, second

25   paragraph says that Regulation 6.7 says the violation of

MCCCD/Martinez 03780

1   any of its employment standards, quote, "constitute

2             ground for disciplinary action, up to and

3             including termination of any Maricopa Community

4             College District employee," blah, blah, blah.

5             MR. UPPAL:  Right.

6             MR. CALDERON:  It says "up to and including."

7             MR. UPPAL:  The reason that is -- and we can

8   have Chancellor Glasper address this if there's any

9   doubt in the Committee's mind.  The reason that that

10  verbiage is used, is that's the verbiage that's

11  basically used in employment manuals as well as faculty

12  policies, but what you are being charged with is to make

13  your recommendation to the Board with respect to -- you

14  can look at the letter for yourself, Dr. Glasper is

15  supporting termination.  There is no doubt about this.

16            MR. CALDERON:  Thank you.

17            Mr. Chairman, with your permission, this is to

18  remind the parties -- and we're still on the record --

19  that the Proposed Findings of Fact and Conclusions of

20  Law are due on November 25th, and that this Hearing

21  Committee will render its decision no later than

22  December 9th.  Any questions?

23            I see --

24            MR. UPPAL:  So, the Committee would like our

25  Proposed Findings of Fact and Conclusions of Law to

1     assist it in arriving at a decision?

2               MR. CALDERON:  Yes.

3               MR. UPPAL:  Okay.  Okay.

4               MR. MONTOYA:  I have a request.  I'm leaving

5     out of town, out of state on business on the 22nd.  Can

6     we agree we find the findings via e-mail on the 27th?

7     Would you object to that, Pavneet?

8               MR. UPPAL:  When does Thanksgiving fall?

9               MR. MONTOYA:  I don't know.  It guess it falls

10    on the 28th.

11              MR. UPPAL:  Steve, I don't -- I tend to

12    stipulate but that one doesn't seem real workable to me.

13              MR. MONTOYA:  Do you have another date that you

14    would stipulate to?

15              MR. UPPAL:  It's been a long day and I don't

16    have -- I'm having trouble pulling up my schedule.  I

17    don't think -- it's not that I'm not willing to

18    stipulate.  It's just that is Thanksgiving.  It's not

19    going to accomplish to --

20              MR. CALDERON:  That's it, too.  We don't want

21    to put Taylor in a position to having to work on

22    Thanksgiving day.

23         Why don't we do this, for the remainder of

24    today, the November 25th deadline will stand; however,

25    if both counsel get together and they want to stipulate

MCCCD/Martinez 03782

1    to something, let us know and I'll ask the Chairman or

2    the Committee to accommodate them if we can.  I just

3    don't want to put the Committee in a situation where

4    they only have a week or less than that.

5         MR. MONTOYA:  Neither do I.  And we would also

6    stipulate the Committee have a corresponding extension

7    to do it's work, of course.

8         MR. UPPAL:  Well, but the Committee -- doesn't

9    the Committee's request have to be made in line with a

10   scheduled Board meeting, like in advance of the Board

11   meeting?

12        MR. MONTOYA:  I don't think there's going to be

13   a Board meeting for awhile.

14        MR. CALDERON:  We know nothing about a Board

15   meeting.  Nobody has given us any time tables for that.

16        MR. MONTOYA:  There has to be a quorum, too.

17        MR. UPPAL:  Maybe the -- I don't know.  What I

18   was thinking was that the reason the decision has to be

19   rendered by a date certain is because it has to be so

20   many days in advance.

21        MR. CALDERON:  We came up with that date.  We

22   pulled it out of thin air because based on the schedule

23   we're trying to give this time.

24        MR. UPPAL:  I would ask this of the Committee

25   -- this isn't my request.  I'm trying to accommodate

Miller Certified Reporting, LLC

MCCCD/Martinez 03783

1    opposing counsel.  How many days in advance of

2    December 9th would you realistically need the Proposed

3    Findings of Fact and Conclusions of Law in order for you

4    to really be able to read them and digest them and

5    assist you in your decision?

6         MR. CALDERON:  I would suggest ten days.  I

7    would suggest ten days in advance.  And the reason I

8    suggest that is that is once you give us direction, what

9    we will do is we will take a look at both Findings of

10   Fact and Conclusions of Law and try to distil out the

11   salient parts that are consistent with your direction

12   and give you a draft, a third version, which would be

13   yours to tear apart.  And so I -- you know, I don't want

14   to rush you on this.  That's why I would suggest that.

15        CHAIRPERSON CRUDUP:  Ten days.

16        MR. UPPAL:  Mr. Calderon, here's what I was

17   concerned with, and maybe we should just leave this for

18   another time and stick with November 25th.  I'm looking

19   at the rules, looks like it has a deadline:  "Within

20   five working days after completion of the hearing, the

21   Committee shall provide the Chancellor," et cetera, et

22   cetera.

23        CHAIRPERSON CRUDUP:  Unless stipulated to

24   something else.

25        MR. CALDERON:  We stipulated.  All the parties

MCCCD/Martinez 03784

1    stipulated to the timetable.

2              MR. MONTOYA:  See, my understanding is that

3    because it's Dr. Martinez's job that's at stake, she has

4    the right to relax those deadlines which she's already

5    done at least on one occasion already.

6              MR. CALDERON:  Mr. Chairman, the party that

7    would be prejudiced by not adhering to the five-day rule

8    is Dr. Martinez and she, through counsel, has agreed to

9    stipulate to that.  So -- so, there's no harm, no foul.

10             MR. UPPAL:  Hold on one second, Mr. Calderon.

11   I'm not disputing what you're saying.  I'm just going to

12   request that you read the rules because the rules --

13             MR. CALDERON:  We've read the rule.

14             MR. UPPAL:  Well, here's the problem:  The rule

15   in front of it says "unless the parties otherwise

16   agree"; the rule after it does not have that statement.

17             Just want to show it to you.

18             MR. CALDERON:  Well, then, if that's the case,

19   we would ask the parties to get us the Proposed

20   Conclusions of Law and Findings of Fact by tomorrow

21   morning at 8 o'clock in the morning.

22             MR. MONTOYA:  Well, that's also true, but can I

23   say something, Mr. Calderon?

24             MR. CALDERON:  Yes, please.

25             MR. MONTOYA:  On the record, when a party says

MCCCD/Martinez 03785

1      "I waive that objection" on the record, I think that Mr.

2      Calderon will verify and Mr. Uppal will verify that they

3      cannot take that back.  That that is binding.

4              MR. UPPAL:  I agree with that.  But I -- my

5      question to the Committee still holds.  You have

6      Thanksgiving in the middle of it, so by when do you need

7      those Proposed Findings of Fact and Conclusions of Law

8      in order to assist you to reasonably reaching your

9      conclusion?

10             I'm not opposing an extension, but if it really

11     is ten days, then we don't really have -- and then

12     Thanksgiving is coming up, we don't have much to work

13     with.  That's the only thing we're saying.

14             CHAIRPERSON CRUDUP:  That's what you're

15     describing, would6delete how many days would you guys

16     apparently need?  Five days?

17             MR. UPPAL:  We'll get it to you by the 25th.

18     We're ready to comply with the 25th, the other side is

19     asking for the extension.  I'm not opposing the

20     extension request, I just want -- this requires a

21     significant amount of work.  It's important to you, too.

22             So my question to you is, I'm willing to

23     stipulate and give the other side an extension giving

24     his on-the-record waiver of any objection to timeliness.

25     Now it falls on you, how much time in advance do you

MCCCD/Martinez 03786

1     want it?

2          MR. CALDERON:  Mr. Chairman, before you answer

3     that -- and we're on the record -- Rule 3.15.7 states as

4     the five-day working rule:  "The above deadline may be

5               extended up to 15 working days after completion

6               of the hearing if the Hearing Committee

7               requests briefs and/or recommended Findings of

8               Fact and Conclusions of Law from the parties."

9          And that's precisely what the Committee is

10    asking; along with it, there's a stipulation.  So, it is

11    what it is.  Thank you, Mr. Chair.

12         MR. UPPAL:  So, once again, falls on you.  If

13    you want to render you decision by December 9th -- this

14    is the only thing I'm asking you.  If you want to render

15    you decision by December 9th, which is my understanding,

16    by when do you want our briefs?

17         MR. CALDERON:  Mr. Chairman, I recommend it

18    remains November 25th unless the parties together can

19    stipulate to some other date, because that factors in

20    your final exams, your preparation for final, because

21    you have another life other than this --

22         CHAIRPERSON CRUDUP:  Right.

23         MR. CALDERON:  -- that's why we come up with

24    the timetable.

25         If you come up with another date, I'm certainly

MCCCD/Martinez 03787

1   going to recommend it to the Hearing Committee.

2           DR. REYES:  Does that work for you?

3           MR. MONTOYA:  Well, I would like to do it -- I

4   would just like a couple more days because I fly out of

5   state to do depositions.  I have to be at the airport at

6   5:00 a.m. on the 21st, so.  And I can work -- I can work

7   when I'm gone, but it's more difficult and I don't think

8   anyone is going to be prejudiced if we do it on the 27th

9   instead.  It's not going to ruin anybody's Thanksgiving

10  because that's the day before Thanksgiving.  And the

11  rule itself says when you -- when you require Findings

12  of Fact and Conclusions of Law, that you can push

13  everything off 15 days.  So, I don't think there's any

14  obstacle in the Committee extending the time a mere two

15  days.

16          MR. CALDERON:  Mr. Uppal, will the 27th be okay

17  with you?

18          MR. UPPAL:  Fortunately, we're not working that

19  day.  But here's what I think just as an accommodation

20  to the other side is we'll try to submit our brief

21  early.  So, the -- so -- and I think Mr. Montoya would

22  agree, so he doesn't have to tailor his brief to us, we

23  won't serve it until he serves his.  You can expect ours

24  on the 25th and I would be okay with Mr. Montoya

25  submitting his on the 27th.

MCCCD/Martinez 03788

1          Would that be okay, Steve?

2          MR. MONTOYA:  That would be okay.  Let me also

3     say this, that customarily the party bearing the burden

4     of proof does file their brief first.

5          MR. UPPAL:  This is argument.

6          MR. CALDERON:  I understand.  What the Hearing

7     Committee determined was they wanted simultaneous

8     submissions rather than saying one set of findings is

9     wrong and back and forth, the Committee wants to do that

10    heavy lifting of discerning that.

11          So, with that, Mr. Chairman, since we're on the

12    record, the Phoenix College will have up to the 27th to

13    -- to submit it's Findings of Fact and Conclusions of

14    Law to the Committee through our office and it is -- it

15    is recommended that you not serve it on the opposing

16    counsel; we need to double-check it with my office that

17    we don't inadvertently share it ahead of time; and Mr.

18    Montoya you have up until the 27th to submit yours.  On

19    the night of the 27th, we'll make sure everybody has

20    everything.  And then that will give us time, once you

21    give us direction, to try to prepare for you something

22    that you can then deliberate about and tear it apart.

23          We have no part of authorship for the first

24    draft.  The final draft will be precisely the way you

25    want it to be.

MCCCD/Martinez 03789

1          MR. BELL:  Are we going to extend their

2    deadline two days?

3          MR. CALDERON:  I'd leave it alone right now and

4    the Committee can go ahead and do it if they run into a

5    jam.

6          Is that fair, Counsel?

7          MR. UPPAL:  I -- I think I just heard you say

8    the date for Committee remains December 9th?

9          MR. CALDERON:  Unless they get into a jam, then

10   I'll contact you and say we're in a jam and we'd ask for

11   two additional days.

12         MR. MONTOYA:  And they have the right to take

13   15 more days if they want.

14         MR. CALDERON:  We don't want to hold anybody,

15   Phoenix College or Dr. Martinez, hanging particularly

16   with the holidays coming up.  We want to make sure that

17   the Committee gives you a just and speedy decision.

18         MR. UPPAL:  Thank you.

19         MR. CALDERON:  Thank you.

20         CHAIRPERSON CRUDUP:  Is there something formal

21   I should say?

22         Thank you all for coming.

23         MR. BELL:  We are adjourned.

24         CHAIRPERSON CRUDUP:  We're adjourned.  Thanks.

25         (Whereupon the proceeding concludes at 5:25

1    p.m.)

2

3                          * * * * *

4

5                 C E R T I F I C A T E

6

7          I, Angela Furniss Miller, Certified Reporter,

8    do hereby certify that the foregoing pages numbered 1

9    through 340, inclusive, constitute a full and accurate

10   printed record of my stenographic notes taken at said

11   time and place, all done to the best of my skill and

12   ability.

13          DATED, at Phoenix, this 27th day of November,

14   2013.

15

16

17          _____
            Angela Furniss Miller, RPR
18          Certified Reporter (AZ50127)

19

20

21

22

23

24

25

MCCCD/Martinez 03791