# EXHIBIT 24

*12-9-2013*

BEFORE THE GOVERNING BOARD OF THE
MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

| | | |
|---|---|---|
| MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT, | ) ) | HEARING COMMITTEE |
| | ) | |
| v. | ) ) | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION |
| DR. CLEOPATRIA MARTINEZ | ) | |

Pursuant to the October 16, 2013 Scheduling Order, having reviewed all of the parties' pleadings and exhibits and conducting a hearing on November 18, 2013, the Hearing Committee (by majority vote) hereby submits the following Findings of Fact, Conclusions of Law and Recommendation.

## FINDINGS OF FACT

1.      After having taught mathematics full-time for ten years at Denver Community College, Dr. Cleopatria Martinez moved to Arizona and started teaching mathematics full-time at Scottsdale Community College on January 1, 1985.

2.      Dr. Martinez voluntarily transferred to Phoenix College ("PC") in 1995 and has been teaching mathematics there full-time ever since.

3.      Dr. Martinez elected to voluntarily transfer to PC because there were very few minority students attending Scottsdale Community College, and she wanted to use her bilingual education skills in the mathematics classroom to better educate the large number of minority students attending PC.

4.      Dr. Martinez was elected by her colleagues to serve as the Chairperson of the Mathematics Department of PC from 2002 to 2005.

5.      In early 2010, PC discovered that Dr. Cleopatria Martinez may have exposed MCCCD to potential liability for copyright infringement.

6.      Dr. Martinez testified that, during her twenty-eight years of teaching mathematics in the MCCCD system, she and her colleagues in the Mathematics Departments of both Scottsdale Community College and PC routinely borrowed mathematics problems from other mathematicians to use in their student handouts for educational purposes on a not for profit basis.

7.      Dr. Martinez testified, without rebuttal, that this borrowing of mathematics problems is a longstanding, widespread custom throughout the District and academia at large.

8.      Instead of requiring her mathematics students to purchase textbooks, Dr. Martinez prepared her own course materials which she called her "Lecture Notes" and distributed them to

MCCCD/Martinez 03993

her students.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 77:17-78:15, 106:16-108:16, 121:25-140:13, 132:16-137:25).

9.     Dr. Martinez read the Copyright Act of 1976 and believed that it authorized her to use small portions of other scholars' work under the "Fair Use" doctrine because she was using it only for classroom teaching purposes on a not for profit basis and her use of the material did not undermine the potential market for the other scholar's work.

10.     Per the "Fair Use" doctrine of the Copyright Act, the "use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107.

11.     Dr. Martinez copied problems from copyright protected textbooks and inserted them into her course materials.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 106:16-108:16).

12.     Dr. Martinez, in her Basic Arithmetic (MAT082) course, copied problems directly from a copyrighted textbook entitled "Basic Mathematics" and inserted them into her "MAT 082 Basic Arithmetic Spring 2010" course materials which she distributed to students.  MCCCD Exhibit List # 20 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

13.     Dr. Martinez also copied problems directly from the Sullivan & Sullivan "Precalculus" textbook and inserted them into her "MAT182 Trigonometry Spring 2010" course materials.  MCCCD Exhibit List # 22 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

14.     Dr. Martinez did not require her students to purchase textbooks in her Spring MAT082 Course.  MCCCD Exhibit List # 18 (email from Dr. Martinez stating "I indicated in my syllabus that, instead of a published textbook, I was using lecture notes in my MAT082 class.")

15.     Dr. Martinez did not require her students to purchase textbooks in her Spring MAT182 Course.  *See* Dr. Martinez's hearing testimony (conceding that students were not required to purchase a textbook in her Spring 2010 MAT182 course).

16.     On or around January 12, 2010, MCCCD's Vice President of Academic Services, Ronnie Elliot, sent Dr. Martinez an email notifying her that there were alleged copyright related problems with the materials she had printed for the Fall 2009 and Spring 2010 semesters.  MCCCD Exhibit List # 23 (January 12, 2010 email).  The materials in question were packets of course materials for Dr. Martinez's MAT182 and MAT187 courses and contained mathematics problems and graphs that were taken from copyrighted textbooks.  MCCCD Exhibit List # 11 (Ronnie Elliot Declaration, ¶¶8-9); MCCCD Exhibit List # 16 (MAT182 course packet); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memorandum).

17.     Dr. Martinez used three of the four packets of "lecture notes" in the Spring of 2010 in two pre-calculus classes. See District Exhibit 6, parts 1-3.

MCCCD/Martinez 03994

18.     The MCCCD administration, following Vice President Elliot's email, repeatedly explained its copyright concerns to Dr. Martinez and asked Dr. Martinez to remove any copyright protected mathematics problems from her materials. See Kakar Hearing Testimony.

19.     On January 26, 2010, Vice President Elliot sent Dr. Martinez an email outlining MCCCD's concerns regarding Dr. Martinez's potential copyright infringement.   MCCCD Exhibit List # 24 (January 26, 2010 email).

20.     On January 28, 2010, MCCCD in-house-counsel Margaret McConnell discussed copyright compliance with Dr. Martinez telephonically.  MCCCD Exhibit List # 25 (January 28, 2010 email).

21.     Dr. Martinez did not benefit from the multiple MCCCD copyright information sessions noted above.

22.     PC's own expert witness, Sean Garrison, testified that under the "Fair Use" doctrine, someone could lawfully copy from a copyrighted textbook without either using or purchasing the textbook.

23.     On February 5, 2010, Vice President of Academic Affairs Casandra Kakar, Interim Vice President of Administrative Services Paul DeRose, and Dr. Martinez met to discuss Dr. Martinez's alleged misuse of copyrighted materials.  MCCCD Exhibit List # 26 (February 12, 2010 email).

24.     Dr. Martinez has not used any of the four sets of "lecture notes" since the Spring of 2010 when PC first raised its concerns regarding the notes.

25.     On April 15, 2010, PC Librarian Ann Roselle conducted a personalized, one-on-one copyright training session with Dr. Martinez.  MCCCD Exhibit List # 28 (Copyright PowerPoint Presentation).  See also, Kakar Hearing Testimony.

26.     When Dr. Martinez met with the librarian, the librarian told Dr. Martinez that Dr. Martinez knew as much about copyright law as she did. See Martinez Hearing Testimony.

27.     Following the revocation of Dr. Martinez's copying privileges, Dr. Martinez was required to submit her copy requests to Mathematics Department Chairperson Mr. Sueyoshi so that Mr. Sueyoshi could review her materials for possible copyright violations prior to copying and distribution to students.  MCCCD Exhibit List # 8 (April 2, 2010 Directive).

28.     Dr. Martinez sought and obtained a form of written permission from the publisher of the textbook, Sullivan & Sullivan's "Precalculus," to copy materials from their book after PC accused her of violating copyright law.

29.     On or around April 19, 2010, Dr. Martinez attempted to bypass the copying restrictions by having an adjunct mathematics Professor, Johnny Santellan, make 24 sets of copies of her "Lecture Notes" for distribution to her mathematics students without obtaining prior approval from the Mathematics Department Chairperson.  MCCCD Exhibit List # 12 (Sueyoshi Decl., ¶9); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 223:11-224:21).

408881                                    -3-

MCCCD/Martinez 03995

30.   Because Dr. Martinez did not feel she was able to obtain reliable guidance regarding copyright compliance from the District, she sought advice from a private intellectual property attorney regarding the issue, Mr. Frederic Bellamy.

31.   Mr. Bellamy reviewed the first two sets of Dr. Martinez's "lecture notes" and concluded that they did not violate copyright law because they fell under the "Fair Use" doctrine.

32.   Mr. Bellamy based his conclusion that Dr. Martinez did not violate copyright law on the opinion that the portion of material that Dr. Martinez copied from the Sullivan & Sullivan Precalculus textbook was very small, that she used the copied materials exclusively for educational purposes without any profit motive, that the content of the copied material consisted of mathematics problems that are arguably not subject to copyright in the first place, and that the small portion of the textbook that Dr. Martinez copied did not adversely impact the potential market for the textbook.

33.   At the hearing, another lawyer practicing in the area of intellectual property law, Sean Garrison, testified on behalf of PC. In contrast to Mr. Bellamy, Mr. Garrison testified at the hearing that the first three sets of Dr. Martinez's lecture notes violated copyright law.

34.   In contrast to his testimony at the hearing of November 18, 2013, in his written report Mr. Garrison concluded only that the first three sets of Dr. Martinez's lecture notes subjected the District "to a serious risk of a copyright infringement claim." See District Exhibit 6, p. 0002.

35.   MCCCD invited Dr. Martinez to a copyright workshop that was held on March 1, 2010 at PC. Dr. Martinez chose not to attend the workshop. MCCCD Exhibit List # 10 (Solley Decl., ¶11).

36.   PC President Anna Solley, on December 9, 2010, concluded that Dr. Martinez's alleged misconduct posed an unacceptable legal risk of a copyright infringement claim and imposed restrictions on Dr. Martinez's photocopying privileges. MCCCD Exhibit List # 10 (Solley Decl., ¶12).

37.   MCCCD sought a legal opinion from an outside copyright expert, attorney Sean Garrison. MCCCD Exhibit List # 10 (Solley Decl., ¶ 14); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memo).

38.   According to Mr. Garrison, the third set of "lecture notes" appeared to have 13 mathematics problems copied from two other mathematics textbooks.

39.   Mr. Garrison testified that he was certain that Dr. Martinez has committed copyright infringement. See Garrison Hearing Testimony. In reaching this conclusion, Mr. Garrison reviewed thousands of pages of materials including nearly 300 pages of Dr. Martinez's lecture notes and three separate copyrighted mathematics textbooks. MCCCD Exhibit List # 6 (Sean Garrison April 19, 2013 Report); see also Garrison Hearing Testimony.

40.   In reliance upon Mr. Garrison's recommendations, PC President Anna Solley issued a December 9, 2010 directive that imposed further restrictions on Dr. Martinez's copying

MCCCD/Martinez 03996

privileges. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 10 (Solley Decl., ¶15).

41.     The December 9, 2010 Directive prohibited Dr. Martinez from utilizing any course materials of her own creation. MCCCD Exhibit List # 9 (December 9, 2010 Directive). Instead, Dr. Martinez was required to only use course materials that are "approved by the mathematics department" or that are "available in the bookstore for sale to students and that are authored by persons other than [Dr. Martinez]." MCCCD Exhibit List # 9 (December 9, 2010 Directive).

42.     The December 9, 2010 Directive further required Dr. Martinez to submit her photocopy requests to the Mathematics Department Chair for his approval. MCCCD Exhibit List # 9 (December 9, 2010 Directive).

43.     Despite MCCCD's frequent discussions with Dr. Martinez regarding the importance of complying with copyright laws and the December 9, 2010 Directive, Dr. Martinez continued to attempt to ignore the directive. See Kakar Hearing Testimony.

44.     At the beginning of the Fall 2012 semester (on or about August 21-23, 2012), Dr. Martinez informed her students that they were not required to purchase a course textbook and that she would provide them with her own course materials in lieu of a textbook. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

45.     In fall of 2012, Dr. Martinez sought to have her lecture notes photocopied off campus at a nearby Staples store. This practice is inconsistent with the December 9, 2010 Directive. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

46.     Dr. Martinez did not submit her Fall 2012 materials to Mathematics Department Chairperson Mr. Sueyoshi for approval. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

47.     Dr. Martinez made copies of her course materials at an off-campus Staples store and distributed them to students for $11 per copy. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

48.     The $11 course material fee was paid directly to Dr. Martinez by students. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

49.     PC accused Dr. Martinez of violating the District's "cash handling" rules by distributing these course materials to her students if the students reimbursed her for her out-of-pocket copying costs.

50.     PC subsequently claimed that Dr. Martinez violated the District's "cash handling" policies by seeking reimbursement for the copies.

51.     MCCCD's policies prohibit instructors from having "any financial interest in or receiv[ing] compensation from the sale of any unpublished instructional materials required or

406681                                          -5-

MCCCD/Martinez 03997

suggested for a class that the instructor teaches." MCCCD Exhibit List # 41 (Residential Faculty Policies, 3.2.4).).

52.    Dr. Martinez failed to follow the protocol set forth in the December 9, 2010 Directive in copying her Fall 2012 course materials. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

53.    Dr. Martinez distributed course materials directly to students in her Fall 2012 MAT151 class. MCCCD Exhibit List # 4-5 (Martinez Depo. pp. 232:19-233:21).

54.    The MCCCD Administration learned of Dr. Martinez's unauthorized distribution of course materials to students after one of Dr. Martinez's MAT151 students complained to Mathematics Department Chairperson Mr. Sueyoshi. The student complained that Dr. Martinez refused to provide her with a receipt for the purchased course materials. See Kakar Hearing Testimony.

55.    Upon learning that Dr. Martinez had distributed course materials to students allegedly in violation of MCCCD's cash handling policy, President Solley instructed Martinez to immediately issue refunds to her students via personal check. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

56.    On or around October 18, 2012, President Solley and Dr. Kakar met with Dr. Martinez to explain the seriousness of Dr. Martinez's alleged cash handling violation. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony. In addition, President Solley and Dr. Kakar prepared a written counseling memo dated October 18 2010 for Dr. Martinez regarding her alleged violation of cash handling rules. Dr. Martinez was provided with a copy of the October 18, 2010 counseling notice and President Solley proceeded to explain to Dr. Martinez the seriousness of the alleged cash handling violations and the requirement that Dr. Martinez issue reimbursements to her students. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

57.    Several months later, on or around January 9, 2013, Dr. Kakar learned that most (if not all) students had not yet received refunds from the Dr. Martinez. MCCCD Exhibit List # 39 (various emails regarding student refunds). As a result, Dr. Kakar instructed Dr. Martinez to provide copies of refund checks by January 18, 2013. MCCCD Exhibit List # 39 (various emails regarding student refunds).

58.    Dr. Martinez failed to produce a single refund check by the January 18, 2013 deadline. MCCCD Exhibit List # 39 (various emails regarding student refunds).

59.    Dr. Martinez did not think that she had violated any District rule in reference to the copies. Therefore, she declined to follow the December 9, 2010 order because she believed she was not required to do so under any District rule.

60.    At the November 18, 2013 hearing, Dr. Martinez did not provide any explanation for her refusal to comply with the October 18, 2012 and January 9, 2013 directives to issue refunds to her students. See Martinez Hearing Testimony.

MCCCD/Martinez 03998

61.     At the hearing Dr. Martinez testified that she had made a "mistake" and, in retrospect, should have complied with President Solley's instructions.  See Martinez Hearing Testimony.

62.     On or around August 9, 2013, MCCCD Chancellor Rufus Glasper sent Dr. Martinez a letter informing her that MCCCD was proceeding with termination proceedings. Included with this letter was a statement of charges that summarized the particular violations Dr. Martinez had been charged with (hereinafter referred to as "Statement of Charges.") MCCCD Exhibit List # 1 (Statement of Charges).

## CONCLUSIONS

63.     PC failed to carry its burden of proof relating to violation of MCCCD's cash handling rules found in MCCCD Administrative Regulations 1.17, violation of Residential Policy Manual 3.2.4 (relating to financial interests in unpublished materials), violation of U.S. Copyright Law and fair use guidelines, and violation of MCCCD Administrative Regulations 3.2.4 and 3.2.5 related to copyright regulations.

64.     Notwithstanding their education, their experience, and their good faith, Mr. Bellamy and Mr. Garrison disagreed as to whether or not Dr. Martinez violated copyright law. Therefore, it is inconclusive as to whether Dr. Martinez intentionally and/or inadvertently violated federal copyright law.

65.     It is inconclusive as to whether or not Dr. Martinez violated the "cash handling" policies of MCCCD.

66.     Dr. Martinez willfully and intentionally failed to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley.

67.     Dr. Martinez conceded that she never complied with President Solley's clear directive to issue refunds to her students. Although Dr. Martinez now regrets her decision not to comply with President Solley's directive, she has never claimed that she did not understand the instructions or that the instructions were beyond the scope of management's authority. Viewed in light of these facts, Martinez's claim that she "made a mistake" is an admission of willful insubordination.

68.     By failing to comply with President Solley's directive to issue refunds to her students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.1 which prohibits the "[w]illful and intentional violation of any…MCCCD administrative regulation that affects the employee's ability to perform his or her job."

69.     By failing to comply with President Solley's directive to issue refunds to students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.3 which prohibits the "[w]illful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment."

///

406681                                   -7-

MCCCD/Martinez 03999

## RECOMMENDATION

70.    We hereby recommend that the Governing Board deny President Solley's termination request and allow Dr. Martinez to continue her MCCCD employment.

71.    Per MCCCD Administrative Regulation 6.7 indicating that violation of any Employment Standards "constitutes grounds for disciplinary action, *up to* [emphasis added] and including termination," we hereby recommend that the Governing Board retain Dr. Martinez.

It is ordered so, at Mesa, Arizona, this 9th day of December, 2013.

Dr. Keith Crudup
Chairperson
On Behalf of the Hearing Committee,
Dr. Nora Reyes and Dr. Carlos Caire

406881                                     -8-

MCCCD/Martinez 04000

# EXHIBIT 25

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Cleopatria Martinez,                )

                                    )

                Plaintiff,          )

                                    )

        v.                          )   No. CV 15-01759-PHX-NVW

                                    )

Maricopa County Community           )

College District; et al.,           )

                                    )

                Defendants.         )

_____)


VIDEOTAPED DEPOSITION OF

CLEOPATRIA MARTINEZ, Ph.D.

VOLUME I (Pages 1 through 158)

Phoenix, Arizona

August 16, 2016

10:07 a.m.


Glennie Reporting Services, LLC

7330 North 16th Street

Suite A100

Phoenix, Arizona  85020-5275

                            Prepared by:

602.266.6535                Janet Hauck, RPR

www.glennie-reporting.com   Arizona CR No. 50522

1      A.     Yes.

2              MS. BALCH:   This is marked as Exhibit 4 --

3      Exhibit 4 to the deposition.

4              (Exhibit 4 was marked.)

5      Q.     BY MS. BALCH:   This is titled Notice of

6      Pre-Disciplinary Conference.   It is dated March 20th, 2013.

7      Do you see it at the top of the page?

8      A.     Yes.

9      Q.     And this is a notice to you that the District

10     was considering disciplinary action against you based on

11     the bulleted alleged violations at the bottom of this page

12     and continuing on to the next page; is that correct?

13     A.     Yes.

14     Q.     And as of the date of this March 20th, 2013

15     disciplinary notice you had not issued refunds to students,

16     had you?

17     A.     Correct.

18     Q.     On this Notice of Pre-Disciplinary Conference

19     the third paragraph of this reads, "The purpose of this

20     conference is to ensure that the decision to be made

21     concerning the complaints against you as described in

22     detail below is based upon complete and accurate

23     information, to inform you of the charges against you and

24     the evidence in support of those charges, and to provide

25     you with an opportunity to respond."   Do you see that?

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

48

1      A.      Yes.

2      Q.      And I want to draw your attention to two

3  specific alleged violations here.  The first one is the

4  first bullet, Violation of Administrative Regulation

5  6.7.1 -- I'm sorry, 6.7.1, "Willful and Intentional

6  Violation of any state or federal law, applicable

7  ordinance, MCCCD governing board policy, or MCCCD

8  administrative regulation that affects the employee's

9  ability to perform his or her job."

10          And the last bullet under the alleged

11  violations, it's immediately above where it says, "Brief

12  Timeline," states, "Violation of Administrative Regulation

13  6.7.3, willful and intentional failure to perform job

14  duties that have first been communicated to an employee and

15  are within the employee's scope of employment."  Do you see

16  that?

17      A.      Yes.

18      Q.      So as of March 20th, 2013, you were put on

19  notice that the District was seeking to discipline you over

20  alleged violations of Administrative Regulations 6.7.1 and

21  6.7.3; is that correct?

22      A.      State that again.

23      Q.      This Notice of Pre-Disciplinary Conference dated

24  March 20th, 2013, Exhibit 4 to your deposition, this notice

25  is notifying you that the District is seeking to take

1    disciplinary action against you based on your alleged

2    violations of Administrative Regulation 6.7.1 and 6.7.3,

3    correct?

4         **A.     I'm not clear about that.   There are other**

5    **bullets.   You named two bullets.**

6         Q.     I'm asking you whether or not you had knowledge

7    that the District intended to pursue disciplinary action

8    against you based on your alleged violations of

9    Administrative Regulations 6.7.1 and 6.7.3 based on this

10   notice?

11        **A.     Yes.**

12        Q.     All right.  I want to draw your attention back

13   to Exhibit 1, which is the complaint, and the first tab

14   we've affixed to that complaint, it's the first Statement

15   of Charges dated August 9th, 2013.

16              MS. MARTON:  I apologize, Counselor.  Is

17   Exhibit 1 the complaint or is Exhibit 2 the complaint?

18              MS. BALCH:  I apologize.  Exhibit 2 is the

19   complaint.

20              MS. MARTON:  Okay.  Just to clarify.

21              MS. BALCH:  Thank you for that clarification.

22              MS. MARTON:  Mm-hmm.

23        Q.     BY MS. BALCH:  So Exhibit 2 to your deposition,

24   the first tab, and it is dated August 9th, 2013, Statement

25   of Charges.  Do you know when you received the Statement of

1    **A.    I understand that there exists -- that they're**
2    **saying there exists a cause for dismiss -- prima facie**
3    **cause for dismissal.**
4         Q.    So is your -- are you finished?
5    **A.    Yes.**
6         Q.    So is your understanding of the Statement of
7    Charges that the District is looking to terminate you on
8    the basis of --
9    **A.    Yes.**
10        Q.    -- these charges --
11   **A.    Yes.**
12        Q.    -- correct?
13             And one of the allegations under 6.7.3 is
14   your failure to reimburse students for the materials you
15   wrongfully charged them for and failure to meet the
16   deadline to provide copies of any reimbursement checks to
17   students, correct?
18   **A.    That's what I read there.**
19        Q.    And after receiving this August 9th, 2013
20   Statement of Charges you submitted an appeal, correct?
21   **A.    (No oral response.)**
22        Q.    Let me phrase it differently.  A request for
23   hearing.
24   **A.    I don't remember when I submitted it.**
25        Q.    I'm just asking if you did submit a request for

1  hearing.  And if you want to just turn to the next page

2  you'll see a document that should refresh your memory.

3       A.    Yes.

4       Q.    So the next page here is -- the date on it is

5  August 16th, 2013, and this is a letter from Stephen

6  Montoya to James Bowers, who is the interim vice chancellor

7  for human resources at MCCCD.  At the top of the page it

8  says document 14-3.  And this is your attorney's request,

9  acting on your behalf, for a hearing, correct?

10      A.    Yes.

11      Q.    And the district granted your request for a

12  hearing, correct?

13      A.    Yes.

14      Q.    And a hearing was, in fact, held on

15  November 18th, 2013, correct?

16      A.    Yes.

17      Q.    And the hearing was conducted before a

18  three-member panel, correct?

19      A.    Yes.

20      Q.    And the panel was comprised of District faculty

21  who are your peers, correct?

22      A.    Yes.

23      Q.    And, in fact, you selected one of those Hearing

24  Committee panel members, correct?

25      A.    Yes.

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

54

1    Q.    And the District selected another, correct?

2    A.    Yes.

3    Q.    And you and the District compromised on the

4    third, correct?

5    A.    No.

6    Q.    Who selected the third?

7    A.    I'm not clear.

8    Q.    During this hearing you were represented by

9    counsel, correct?

10   A.    Yes.

11   Q.    Was that Stephen Montoya?

12   A.    Yes.

13   Q.    And you received a full-day hearing, correct?

14   A.    Yes.

15   Q.    And you submitted a hearing brief through your

16   counsel; is that correct?

17   A.    I don't know what that is.

18        MS. BALCH:  Mark this as Exhibit 5.

19        (Exhibit 5 was marked.)

20   Q.    BY MS. BALCH:  Dr. Martinez, have you seen this

21   document before that's been marked as Exhibit 5 to your

22   deposition?

23   A.    I don't remember.

24   Q.    That's fine.  Is titled Hearing Committee

25   Preliminary Scheduling Order.  Do you see that at the top

1   of the page?

2       **A.**     **Yes.**

3       Q.     And I want to draw your attention to a couple of

4   paragraphs here.  Paragraph number 7 on page 2 it states

5   that a hearing is set for November 18th.  See that?

6       **A.**     **Yes.**

7       Q.     And a Hearing Committee was, in fact, held on

8   November 18th regarding your possible dismissal, correct?

9       **A.**     **Yes.**

10      Q.     And this Preliminary Scheduling Order also sets

11  forth deadlines for you to submit a position brief; is that

12  correct?  Paragraph 3.

13      **A.**     **Yes.**

14      Q.     So you were provided the opportunity to submit a

15  position brief, including exhibits and a list of witnesses,

16  to testify at the November 18th hearing; is that correct?

17      **A.**     **Yes.**

18      Q.     And you did, in fact, submit a position brief to

19  the Hearing Committee; is that correct?

20      **A.**     **I'm assuming so.  I don't know.**

21              MS. BALCH:  Mark this as Exhibit 6.

22              (Exhibit 6 was marked.)

23      Q.     BY MS. BALCH:  You have what's been marked as

24  Exhibit 6 to your deposition.  It is titled Cleopatria

25  Martinez's Position Statement.  And in parens underneath it

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

56

1    it states, "Hearing scheduled for November 18th, 2013, at

2    9:00 a.m.," end parens.  Do you see that?

3        A.    Yes.

4        Q.    This is a copy of the position statement that

5    your attorney submitted on your behalf for the

6    November 18th, 2013 Hearing Committee?

7        A.    Ask your question again.

8        Q.    This is a copy of the position statement that

9    your attorney, Stephen Montoya, submitted on your behalf to

10   the Hearing Committee?

11       A.    It appears to be.

12       Q.    So you did, in fact, submit a position statement

13   to the Hearing Committee with regards to the November 18th,

14   2013 hearing, correct?

15       A.    My counsel, yes.

16             MS. BALCH:  Mark this as Exhibit 7.

17             (Exhibit 7 was marked.)

18       Q.    BY MS. BALCH:  Dr. Martinez, you have been

19   handed what's been marked as Exhibit 7 to your deposition.

20   This is titled Cleopatria Martinez's supplemental position

21   statement (hearing scheduled for November 18, 2013, at

22   9:00 a.m.).  Do you see that at the top of the page?

23       A.    Yes.

24       Q.    And this is, in fact, a supplemental position

25   statement that your attorney, Stephen Montoya, submitted on

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

57

1   your behalf for the November 18th, 2013 hearing, correct?

2        A.    I assume so.

3             MS. BALCH:  Marking this Exhibit 8.

4             (Exhibit 8 was marked.)

5        Q.    BY MS. BALCH:  And this is titled Citation of

6   Supplemental Authority, correct?

7        A.    Yes.

8        Q.    And this is a document that your attorney,

9   Stephen Montoya, submitted to the Hearing Committee on your

10  behalf, correct?

11       A.    I don't know all the documents you gave.

12       Q.    I'm just asking whether or not you know if he

13  submitted that on your behalf.

14       A.    I don't know.

15       Q.    You don't know.  But you do know that he

16  submitted at least two briefs to the Hearing Committee on

17  your behalf, correct?

18       A.    I don't know.  I'm assuming they were.  I don't

19  know.  I don't remember.

20       Q.    Okay.  So your testimony here today is that you

21  were assuming that your attorney, Stephen Montoya,

22  submitted position statements or briefs to the Hearing

23  Committee, but you don't have any knowledge one way or the

24  other; is that correct?

25       A.    Yes.

1   correct?

2        A.    Yes.

3        Q.    Turn to the next page, page 11, paragraph 22.

4   Read this out loud.  "The Acting/Interim Vice Chancellor of

5   Human Resources did not consult with Dr. Martinez until a

6   week after Chancellor Glasper suspended her pay."  What

7   facts do you have in support of paragraph 22 of your

8   complaint?

9        A.    **That's the only time I saw the chancellor, and**

10   **that's when I was notified.**

11        Q.    When you say it is the only time that you saw

12   the chancellor, that was the first or second week of

13   March 2014, correct?

14        A.    **The vice chancellor.**

15        Q.    I'm sorry.  The vice chancellor.

16        A.    **Mm-hmm.**

17        Q.    It's the only time that you saw the vice

18   chancellor of human resources was the first or second week

19   of March 2014; is that correct?

20        A.    **Probably the second week, yes.**

21        Q.    So if I understand your allegation correctly,

22   you are claiming that you did not meet with the vice

23   chancellor of human resources until after you were already

24   suspended; is that correct?

25        A.    Yes.

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

78

1      Q.    And your suspension was without pay?

2      A.    Yes.

3      Q.    And are you claiming that it was somehow

4   improper for the vice chancellor of human resources to meet

5   with you after your suspension was in effect?

6               MS. MARTON:   Objection.

7               But you can answer.

8               THE WITNESS:   I just think you should be

9   notified that you are going to be suspended before it

10  happens, and he notified me -- I got the letter of

11  notification after I had already been suspended for several

12  days, maybe a week or two.  So that is improper, I thought.

13  I don't know.

14     Q.    BY MS. BALCH:  Do you have any knowledge as to

15  whether or not the District refused to allow you to meet

16  with the vice chancellor of human resources prior to

17  March 1st, 2014?

18     A.    I don't know.

19     Q.    Did you have anything to do with the scheduling

20  of the meeting with the vice chancellor of human resources?

21     A.    What do you mean?

22     Q.    Well, you've had a meeting with the vice

23  chancellor of human resources, correct?

24     A.    Mm-hmm.

25     Q.    And it was -- it occurred on a certain date,

1    correct?

2        A.    Mm-hmm, yes.

3        Q.    Were there multiple people that were present at

4    that meeting?

5        A.    Yes.

6        Q.    Who was present at the meeting with the vice

7    chancellor of human resources --

8        A.    I don't remember.

9        Q.    Let me ask that again because we're -- I don't

10   want to talk over each other on the record.  So let me just

11   make sure that I have that clean.

12             Who was present during your meeting with the

13   vice chancellor of human resources the first or second week

14   of March 2014?

15       A.    I don't remember everybody.

16       Q.    Well, obviously, you were present, right?

17       A.    Yes.

18       Q.    And the vice chancellor of human resources was

19   present?

20       A.    Mm-hmm, yes.

21       Q.    Do you know if your attorney was present?

22       A.    Yes.

23       Q.    So that's three people that were present.  Do

24   you know if anyone else was present?

25       A.    I don't remember.

1   writing before you were suspended, what did that mean?

2               MS. MARTON:  Objection.  It is what it says.

3               But if you can answer, go ahead.

4               THE WITNESS:  Well, I can't say it any more

5   clearly.

6       Q.   BY MS. BALCH:  If you were given the opportunity

7   to respond in writing before you were suspended, what would

8   that writing have looked like?  What would it have been?

9       A.   **What would it have been?  I would have responded**

10  **to the charges.**

11      Q.   For example, I know that your attorney on -- I

12  think it was March 12th of 2014, following your meeting

13  with the vice chancellor of human resources, he submitted a

14  brief to the board with exhibits.  Would your written

15  statement have looked something like that?

16      A.   **I don't know what it would have looked like.**

17              **(Exhibit 9 was marked.)**

18      Q.   BY MS. BALCH:  Introducing Exhibit 9 to your

19  deposition.  Do you recognize the document that is Exhibit

20  9 to your deposition --

21      A.   **Yes.**

22      Q.   -- Dr. Martinez?

23              It's dated March 12th, 2014, correct?

24      A.   **Yes.**

25      Q.   And this is a letter from your attorney at the

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

84

1   time, Stephen Montoya, to the District's governing board,

2   correct?

3         A.      Yes.

4         Q.      And the letter is just over eight pages long,

5   correct, plus exhibits?

6         A.      **Nine pages plus exhibits.**

7         Q.      And your attorney, Stephen Montoya, submitted

8   this to the governing board on your behalf, correct?

9         A.      Yes.

10        Q.      Do you know why he submitted this March 12th,

11  2014 letter to the governing board?

12        A.      **I don't remember.**

13        Q.      But it would have been with your authorization,

14  correct?

15        A.      Yes.

16        Q.      And you would have reviewed this March 12th,

17  2014 letter in its entirety, correct?

18        A.      Yes.

19        Q.      And you would have agreed with the arguments and

20  statements that Mr. Montoya made in this March 12th, 2014

21  letter, correct?

22        A.      **I don't know.  I think so.  I don't know.**

23        Q.      So you indicated that if you had been provided

24  an opportunity to respond to your Notice of Suspension in

25  writing prior to effective date of the suspension -- strike

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

85

1  that.

2        Let me know if my understanding of your

3  testimony is correct.  I believe you testified that you

4  believe you should have been able to submit a response in

5  writing to the District regarding your suspension prior to

6  the effective date of your suspension; is that correct?

7        A.    **Say that again.**

8        Q.    My understanding of your testimony is that you

9  believe you should have been allowed to submit a response

10  in writing to the District to your suspension before the

11  effective date of your suspension; is that correct?

12        A.    **Well, something.  I don't know exactly what, but**

13  **something before I got suspended rather than after or not**

14  **at all.**

15        Q.    If this March 12th, 2014 letter from Stephen

16  Montoya had been sent prior to the effective date of your

17  suspension, would it have served that purpose?

18             MS. MARTON:  Objection; speculation.

19             But you can answer.

20             THE WITNESS:  I don't know.

21        Q.    BY MS. BALCH:  Do you recall what your attorney,

22  Stephen Montoya, stated in this March 12th, 2014 letter to

23  the board?

24        A.    No.

25        Q.    I want you to look at the bottom of page 8 of

1    the March 12th, 2014 letter.  The last full paragraph

2    states -- the second paragraph there, "As the board is

3    aware, a 14-month suspension is the economic equivalent of

4    a dismissal."  Do you see that?

5        **A.    No.  Oh, there.  Okay.  Read it again.**

6        Q.    "As the board is aware, a 14-month suspension is

7    the economic equivalent of a dismissal."  Do you see where

8    that's noted?

9        **A.    Yes.**

10       Q.    So is it true that, as of March 12th, 2014, your

11   attorney, Stephen Montoya, argued to the governing board

12   that a 14-month suspension is the economic equivalent of a

13   dismissal?

14              MS. MARTON:  Objection, but go ahead and

15   answer.

16              THE WITNESS:  I don't know what it means to

17   argue before the governing board.  I don't know the meaning

18   of that.  I don't know.

19       Q.    BY MS. BALCH:  Is it true that your attorney

20   submitted a letter to the board dated March 12th, 2014,

21   where you raised the issue that a 14-month suspension is

22   the economic equivalent of a dismissal?

23       **A.    Yes, he wrote this letter.**

24       Q.    And he informed the board in this letter that a

25   14-month suspension is the economic -- economic equivalent

1   of a dismissal, correct?

2       **A.    Yes.**

3       Q.    And attached to this letter he included various

4   exhibits, correct?

5       **A.    Yes.**

6       Q.    Including the Hearing Committee's findings of

7   fact, conclusions of law, and recommendation, correct?

8       **A.    Yes.**

9       Q.    So at least as of March 12th, 2014, the

10  governing board had a copy of the Hearing Committee's

11  findings of fact, conclusions of law, and recommendation,

12  correct?

13      **A.    I don't know.**

14      Q.    Do you have any reason to believe that

15  Mr. Montoya did not send this letter to the governing board

16  on March 12th, 2014?

17      **A.    No.**

18      Q.    So you don't know one way or the other whether

19  or not he submitted this letter to the governing board?

20      **A.    Well, I don't know, but I believe he did.  I**

21  **just don't know if the governing board got it.  I don't**

22  **know what happened.**

23              **(Exhibit 10 was marked.)**

24      Q.    BY MS. BALCH:  Introducing Exhibit 10 to your

25  deposition.  This is a transcript of what was stated during

1    the District's governing board meeting on March 25th, 2014,

2    hence that you're aware this is a transcript that was

3    provided along with requests for admission that were served

4    upon you and your attorney, and you, through your

5    attorneys, admitted that this is, in fact, a truthful

6    summary of the public board meeting that occurred -- or at

7    least excerpt of the board meeting that occurred on this

8    date.  So I wanted to give you that background before I ask

9    you questions.

10              That being said, is it true that on

11   March 25th, 2014, you appeared before the governing board

12   regarding your suspension?

13        **A.    What do you mean I appeared?**

14        Q.    Did you go before the governing board on

15   March 25th, 2014?

16        **A.    What does that mean, go before?  What do you**

17   **mean?**

18        Q.    Did you attend the March 25th, 2014 governing

19   board meeting?

20        **A.    I was there for a while.**

21        Q.    What does that mean?

22        **A.    Means I was present for a while, not very long.**

23        Q.    How long is a while?

24        **A.    I don't know.**

25        Q.  .  Can you give me an estimate?

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

89

1        A.    No.

2        Q.    Was it 30 minutes?  Was it an hour?

3        A.    **Could be, like, an hour.**

4        Q.    And did you speak in front of the board?

5        A.    **What do you mean?**

6        Q.    Dr. Martinez, I'm using some pretty basic

7    terminology here:  Appear before, speak in front of.  What

8    are you having issue with?

9        A.    **Are you speaking about officially or just**

10   **showing up or what?**

11       Q.    Why did you attend the March 25th, 2014

12   governing board meeting?

13       A.    **To participate in the citizens interim.**

14       Q.    And what did you want presented in this citizens

15   interim?

16       A.    **The letter that I presented.**

17       Q.    And the letter is dated March 25th, 2014?

18       A.    **Yes.**

19       Q.    The same date as the appearance?

20       A.    **Yes.**

21       Q.    And in your March 25th, 2014 letter to the

22   governing board did you summarize the termination

23   proceedings and Dr. Glasper's suspension of you?

24       A.    **Well, I had three minutes as a citizens interim**

25   **participant.**

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

90

1      Q.     I'm asking in the letter.

2      **A.     Right, and so I attempted to say something about**

3  **myself in those three minutes.**

4      Q.     Let me clarify this here.  So on March 25th,

5  2014, you attended the governing board meeting for the

6  purpose of participating in the citizens interim, correct?

7      **A.     Yes.**

8      Q.     On that same date you submitted a letter to the

9  governing board, correct?

10     **A.     Yes.**

11            MS. MARTON:  Objection.  Did we establish

12  that, that she submitted a letter?

13            MS. BALCH:  She volunteered that information.

14            MS. MARTON:  Okay.

15     Q.     BY MS. BALCH:  Was the letter submitted before

16  the governing board hearing, during the governing board

17  hearing, or after the governing board hearing?

18     **A.     Well, it's not a letter.  It was my three**

19  **minutes content, and it was submitted during the citizens**

20  **interim, yeah.**

21            MS. BALCH:  Give me a quick break, a quick

22  photocopy break, and I will be right back, because I think

23  this will help.

24            THE VIDEOGRAPHER:  We're off the record at

25  2:11 p.m.

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

91

1          (Recess from 2:11 p.m. to 2:19 p.m.)

2          THE VIDEOGRAPHER:  Back on the record at

3   2:19 p.m.

4      Q.   BY MS. BALCH:  All right.  So before the break

5   you mentioned that you had submitted a letter to the

6   governing board on March 25th, 2014, correct?

7      **A.     It wasn't a letter.**

8      Q.   You submitted a document to the governing board

9   on March 25th, 2014, correct?

10     **A.     Yeah.  It was the content of my three-minute**

11  **presentation.**

12     Q.   Can you describe what that letter looked like --

13  or that document looked like?

14     **A.     It was -- it's a page and a fourth.**

15     Q.   It's a page and a fourth?

16     **A.     Single spaced, yes.**

17          MS. BALCH:  Okay.  I'm going to introduce an

18  exhibit to your deposition, but I'm going to flag it for

19  both of you so we'll speed up the process here a little bit.

20          (Exhibit 11 was marked.)

21     Q.   BY MS. BALCH:  This is Exhibit 11.  Exhibit 11

22  is a print-off of the District's governing board minutes

23  for March 25th, 2014.  They're available on line.  I just

24  printed them off.  If you go to the little flag that I put

25  on there, do you recognize this March 25th, 2014 document?

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

92

1     A.     Yes.

2     Q.     Is this the document that you submitted to the

3  governing board on March 25th, 2014?

4     A.     Yes.

5     Q.     Do you remember what you argued to the board in

6  this March 25th, 2014 document?

7     A.     **To hear me regarding my suspension.**

8     Q.     I want to draw your attention to the second page

9  of that document.  On the one, two, three, four, the fourth

10 paragraph up from the bottom it starts with, "Like most

11 working people..."  Do you see that paragraph?

12    A.     Yes.

13    Q.     The last sentence reads, "Under the

14 circumstances, the Chancellor's 14-month suspension of me

15 is the functional equivalent of a termination from the

16 District."  Do you see that?

17    A.     Yes.

18    Q.     And this is an argument that you made to the

19 board in this document on March 25th, 2014, correct?

20    A.     Yes.

21    Q.     And at the bottom of the document you conclude

22 by asking the board to intervene in your case to rescind

23 the chancellor's suspension and, at the very minimum, allow

24 you to present proof of what you stated there; is that

25 correct?

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

93

1   A.   Yes.

2   Q.   And you made these same arguments verbally to

3   the board on March 25th, 2014, during the citizens interim,

4   correct?

5   A.   Yes.  What did you say?  I'm not really clear.

6   What did you ask me?

7   Q.   I'm asking if you raised the same or similar

8   arguments to the board verbally that you raised in the

9   March 25th, 2014 document?

10   A.   During the citizens interim you're referring,

11   right?

12   Q.   Yes.

13   A.   The three minutes, yes.

14   Q.   Is it true that your attorney, Stephen Montoya,

15   also appeared on March 25th, 2014, during the citizens

16   interim portion of the governing board meeting?

17   A.   Is there a legal meaning to "appear"?  Or is

18   that what you're asking me?

19   Q.   I'm asking the terms generally.  I can use a

20   different word if you prefer.

21   A.   What are you referring to?

22   Q.   To your knowledge, did your attorney, Stephen

23   Montoya, attend the March 25th, 2014 governing board

24   meeting?

25   A.   He didn't attend the whole meeting.  He was

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

94

1  there for a portion.

2      Q.    What portion was he there for?

3      A.    I don't know.  He was just there for a while.

4      Q.    How long is a while?

5      A.    About an hour.

6      Q.    Was he present for the citizens interim?

7      A.    For part of it.

8      Q.    Was he present when you presented to the board

9  during the citizens interim?

10     A.    Okay.  Now, when I spoke -- there's really not a

11  presentation -- yes, he was.

12     Q.    Did you see Mr. Montoya speak to the governing

13  board during the citizens interim?

14     A.    Yes.

15     Q.    And the statements that he made to the governing

16  board are set forth in that transcript of proceedings dated

17  March 25th, 2014, correct?

18     A.    Yes.

19     Q.    Was Mr. Montoya still representing you at the

20  time he spoke to the governing board during the citizens

21  interim?

22     A.    I'm not sure I understand that question.

23     Q.    At the time you spoke -- I'll use your word --

24  to the governing board during the citizens interim, were

25  you represented by counsel?  In other words, did you have

1    an attorney?

2        A.    In my life or at that meeting?

3        Q.    Did you have an attorney retained?

4        A.    In my life or at that meeting?

5        Q.    In your life.

6        A.    Yes, in my life I did.

7        Q.    And that attorney was Stephen Montoya, correct?

8        A.    Yes, uh-huh.

9        Q.    And Mr. Montoya is the same attorney that

10   represented you in the November 18th, 2013 Hearing

11   Committee, correct?

12       A.    Yes.

13       Q.    Do you know whether or not your March 25th, 2014

14   document to the board was submitted into evidence?

15       A.    Into evidence?  What do you mean?

16       Q.    Was it -- strike that.

17             You provided that March 25th, 2014 document

18   to the governing board, right?

19             MS. MARTON:  Objection; asked and answered.

20             THE WITNESS:  To the secretary for the

21   governing board.

22       Q.    BY MS. BALCH:  That was actually my next

23   question.  How did you submit it to the governing board?

24   So you submitted it to the governing board through the

25   secretary, correct?

1      A.     That's the process.

2      Q.     How did you submit it?  Via e-mail, via fax?

3  How did you submit it to the secretary?

4      A.     I handed it to her.

5      Q.     Did you hand it to the secretary at the

6  March 25, 2014 board meeting?

7      A.     Yes.

8      Q.     I next want to turn to the May 27, 2014

9  governing board meeting.  This is one where Dr. Townsel

10  spoke to the governing board as part of the citizens

11  interim.  I haven't handed you the exhibit yet.  Do you

12  know whether you were present at the governing board

13  meeting on May 27th, 2014, when Mr. Townsel spoke to the

14  governing board --

15      A.     I don't remember.

16      Q.     -- regarding you?

17             (Exhibit 12 was marked.)

18      Q.     BY MS. BALCH:  Handing you what's been marked

19  Exhibit 12 to your deposition.  Again, this is a excerpted

20  portion of a transcript from the May 27, 2014 District

21  governing board meeting.  And in this meeting a Dr. Townsel

22  spoke to the governing board about you during the citizens

23  interim.  Do you have any facts or information about

24  Dr. Townsel's speaking to the governing board on this date?

25      A.     Do I have any what?

1  interim?

2      **A.**      **No.**

3      Q.      Prior to today, did you know that he spoke to

4  the governing board regarding you during the citizens

5  interim on May 27th, 2014?

6      **A.**      **I don't know the date.   So I don't know.**

7      Q.      Prior to today, did you know that he had spoken

8  about you to the board during a citizens interim?

9      **A.**      **Yes.**

10     Q.      Turn, please, back to Exhibit 2 to your

11  deposition.   It's the Verified Amended Complaint, and it's

12  kind of near the end of the document.   I'm going to have

13  you find the page that says document 14-8 at the top maybe

14  about ten pages from the back.   It's a letter dated

15  August 13th, 2014.   Are you there?

16     **A.**      **Yes.**

17     Q.      Do you recognize this document?

18     **A.**      **Yes.**

19     Q.      What is this?

20     **A.**      **It's from me to the governing board, and its**

21  **subject is grievance.**

22     Q.      And what is the content of this letter to the

23  governing board?

24     **A.**      **"This e-mail will serve as my formal grievance**

25  **for misapplication, misinterpretation, or violation of a**

1    **specific provision or provisions of the residential faculty**

2    **policies that adversely affects me."**

3         Q.    In this August 13th, 2014 letter to the board,

4    are you essentially grieving to the governing board that

5    your suspension was somehow improper?

6         A.    **Let's see.   What was the question again?**

7         Q.    I'll ask a new one.

8              Isn't it true that on August 13th, 2014, in

9    your letter to the governing board, you argued that the

10   chancellor could not terminate you, that he suspended you

11   without pay for such a long time that it's tantamount to

12   termination?   And I'm looking at page 2 under argument.

13        A.    **Where are you referring to in here, argument?**

14        Q.    Starts, "When..." under argument.   It's probably

15   one, two, three, four, five, six, seven lines down.

16        A.    **And what did you ask me?**

17        Q.    Isn't it true that on August 13th, 2014, which

18   is the date of this letter, you argued to the governing

19   board in your argument section that, "When the chancellor

20   could not terminate me, he suspended me without pay for

21   such a long time that it is tantamount to termination."

22        A.    **I did write that.**

23        Q.    Why did you submit this August 13th, 2014

24   letter, or as you phrased it, grievance, to the governing

25   board?

1    A.    Because there had been a misapplication,

2  misinterpretation, or violation of a specific provision or

3  provisions of the residential faculty policy that adversely

4  affected me.  So I was grieving that.

5    Q.    What did you want the governing board to do?

6    A.    To make that right.

7    Q.    And what do you mean by "make that right"?

8    A.    Reverse the termination.

9    Q.    So were you asking the governing board in this

10  August 13th, 2014 letter to reverse the termination?

11    A.    No.  I'm asking to hear my grievance.

12    Q.    Flip to the two pages immediately before this

13  August 13th letter.  It's document 14-7 attached to your

14  verified complaint.

15    A.    Mm-hmm, yes.

16    Q.    This is another letter to the governing board

17  dated October 28th, 2014, correct?

18    A.    Yes.

19    Q.    Do you recognize this document?

20    A.    Yes.

21    Q.    Did you prepare this document?

22    A.    Yes.

23    Q.    Is everything in this document truthful and

24  correct?

25    A.    Yes.

1    Q.    And in this document I'm going read the last

2   sentence of the third paragraph here.  On October 28th,

3   2014, you argued to the governing board, "The chancellor

4   then suspended me in March 2013 without pay for over 14

5   months for my alleged insubordination."  Correct?

6        A.    Mm-hmm.

7        Q.    So this argument was raised again to the board

8   on October 28th, 2014?

9        A.    What argument?

10       Q.    That you were suspended without pay for over 14

11  months.

12       A.    Yes.  I don't know if the board ever saw any of

13  this.

14       Q.    Isn't it true that on October 28th, 2014, you

15  also attended the board meeting and participated in the

16  citizens interim?

17       A.    I don't know for sure.

18                  (Exhibit 13 was marked.)

19       Q.    BY MS. BALCH:  This is Exhibit 13 to your

20  deposition.  This is -- another transcript again was

21  attached to the Request for Admission that we served on you

22  through your counsel.  And you have admitted that this is a

23  correct typed version of the board meeting that took place

24  on October 28th, 2014, and is actually (indiscernible) on

25  the District's website.  This was on October 28th, 2014.

1  And the second line at the top there says, "I'll call on

2  the first one is Cleopatria Martinez."  Do you see that?

3        A.    **What did you say about my name?**

4        Q.    That at the top of the page there the governing

5  board is calling on you as part of the citizens interim?

6        A.    **Yes.**

7        Q.    So is it safe to assume that you attended the

8  board meeting for purposes of the citizens interim on

9  October 28th, 2014?

10       A.    **Yes.**

11       Q.    And are the statements that you made to the

12 governing board during this board meeting, were they

13 truthful?

14       A.    **I think so.**

15       Q.    You have no reason to lie to the board, right?

16       A.    **Correct.**

17       Q.    And during this board meeting you requested --

18 and I'm reading at the top of the second page, the first

19 part of that first full paragraph, that you requested the

20 board to make you whole by reinstating you to your former

21 position, correct?

22       A.    **Yes.**

23       Q.    And during the citizens interim were you

24 grieving your suspension?

25       A.    **I was presenting a three-minute statement.**

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

104

1      Q.     Was the three-minute statement about your

2  suspension?

3      A.     Yes.

4      Q.     On this date did you also provide -- strike

5  that.

6               We, just a minute ago, were talking about

7  your October 28th, looks like, a letter to the board.  Is

8  that a document that you would have brought with you to the

9  board meeting and handed to the secretary for the board?

10     A.     I don't know.  I don't remember.  I don't know.

11            (Exhibit 14 was marked.)

12     Q.     BY MS. BALCH:  This is Exhibit 14 to your

13  deposition.  This is a printout of the District's governing

14  board minutes from its October 28th, 2014 board meeting.

15  And it's attached to these minutes and go to where the

16  tabbed portion is.  Do you recognize that document dated

17  October 28th, 2014?

18     A.     Yes.

19     Q.     Is this the same document that is contained at

20  Exhibit 2 to your deposition, which is the amended

21  complaint, as document 14-7?

22     A.     Yes.

23     Q.     In reviewing through these meeting minutes and

24  this attachment, does this refresh your memory as to

25  whether or not you may have provided this October 28th,

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

105

1   2014 document to the governing board at the governing board

2   meeting?

3         A.     It appears I did.

4         Q.     So you would have provided this October 28th,

5   2014 document at the October 28th governing board meeting?

6         A.     Yes.

7         Q.     Would you have provided this document in the

8   same manner as you did in the prior board meeting where you

9   provided it to the board secretary?

10        A.     Yes.

11        Q.     On October 28th during the citizens interim were

12  there any other individuals who spoke to the board

13  regarding you?

14        A.     Well, according to this document it looks like

15  Mr. Vega -- Dr. Vega did.

16        Q.     Anyone else?

17        A.     And Dr. Townsel.

18        Q.     Who is -- strike that.

19               Do you know Santos Vega?

20        A.     Yes.

21        Q.     How do you know him?

22        A.     He's in the education community.

23        Q.     Does he work for the District?

24        A.     I don't think so.  I don't know.

25        Q.     Do you know where he works?

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

106

1    A.    No.

2    Q.    Do you know how he came to attend the

3    October 28th, 2014 governing board meeting?

4    A.    He and I talked.

5    Q.    When did you talk?

6    A.    I don't know.

7    Q.    But it would have been before the October 28th,

8    2014 governing board meeting, right?

9    A.    Yes.

10   Q.    Did you ask him to attend on your behalf?

11   A.    I don't recall.

12   Q.    What was said in your discussions with Santos

13   Vega?

14   A.    Oh, I don't know.  I don't remember.

15   Q.    You don't remember one way or the other?

16   A.    I don't remember the exact content.  No, I

17   don't.

18   Q.    Can you provide a summary?

19   A.    Probably about -- I'm -- I don't remember the

20   summary, but it's probably about my suspension.

21   Q.    Draw your attention to Exhibit 2 again.  This is

22   the verified complaint, document 14-6.  Let me know when

23   you're there.

24   A.    I'm here.

25   Q.    Do you recognize this document?

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

107

1     A.     Yes.

2     Q.     Is this a document that you drafted?

3     A.     Yes.

4     Q.     Does it appear to be a true and correct copy of

5  the document that you drafted?

6     A.     Yes.

7     Q.     And it's dated January 27, 2015, correct?

8     A.     Yes.

9     Q.     And is this a letter that you submitted to the

10  governing board?

11     A.     Yes.

12     Q.     And the subject of this letter is your

13  suspension, correct?

14     A.     It says, "Notice of Claim Appeal of Grievances."

15     Q.     But is this letter regarding your suspension?

16     A.     It contains information about my suspension and

17  my termination.  That's several pieces in here.

18     Q.     I'm going to draw your attention to the last

19  full paragraph on the first page of this January 27, 2015

20  letter.  It starts, "The reason why..."

21          Says, "The reason why the chancellor decided

22  to suspend me is obvious.  By renaming my termination a

23  suspension the chancellor has effectively denied me the

24  right to meet either in executive session or a public

25  meeting with the governing board afforded by the

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

108

1    residential faculty policies" -- there's a citation

2    there -- "to faculty member dismissal.  I would have

3    selected a public meeting with the board."  Do you see

4    that?

5         A.    Yes.

6         Q.    So on January 27th, 2015, you argued to the

7    board that your suspension was really a termination,

8    correct?

9         A.    I don't think I'm arguing to the board.  This is

10   a --

11        Q.    What word did you use?

12        A.    This is a Notice of Claim and Appeal of

13   Grievances.

14        Q.    What word would you like to describe it?

15        A.    Notice of Claim/Appeal of Grievances.

16        Q.    So on January 27th, 2015, you appealed your

17   suspension and claimed that it was really a termination,

18   correct?

19        A.    I -- I just want to meet with the board right

20   here, and I don't know how to go about that.  I'm just a

21   faculty member trying to talk to the board.

22        Q.    And you had the ability to provide documentation

23   to the board, correct?

24        A.    I don't consider it ability to provide

25   documentation.  I don't even know if the board gets this.

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

109

1    I don't know what's going on.  I would like to meet with

2    them so I could have some communication, but I don't have

3    any communication.

4        Q.    Well, but you did have communication with the

5    board when you appeared on March 25th, 2014, and again on

6    October 28th, 2014, correct?

7        A.    Absolutely not.  That's not communication.

8    That's three minutes of one-sided presentation.  It's not

9    communication, not by a long shot.

10       Q.    And at both of these governing board meetings

11   that you attended the citizens interim for on March 25th,

12   2014, and October 28th, 2014, you were free to submit to

13   the board whatever documentation you wanted to, correct?

14       A.    I don't know.

15       Q.    Well, you did provide documentation to the

16   board, correct?

17       A.    I provided -- no.  I provided the content of my

18   three-minute presentation.  That's what I was asked to

19   provide.  That's what everybody is asked to provide.

20       Q.    Flip to the page immediately before, right

21   before the January 27, 2015 letter.  This is still

22   contained in Exhibit 2 to your deposition, the verified

23   complaint.  This is a letter dated February 21st, 2015.  Do

24   you see it at the top?

25       A.    Yes.

1    have over 40 years of training in this, but my students are

2    not able to get any information that is my own.

3        Q.    Let's go back to the October 18th, 2012

4    corrective action.  And I believe we introduced that as an

5    exhibit, Exhibit 3 to your deposition.

6        A.    Exhibit 3 of the deposition?

7            MS. MARTON:  Looks like this.

8            THE WITNESS:  Oh, okay.

9        Q.    BY MS. BALCH:  So on October 18th, 2012, you

10   were told to issue refunds to students via personal check,

11   correct?

12       A.    Yes.

13       Q.    And you were specifically advised that failure

14   to do so would result in discipline up to and including

15   termination of employment, correct?

16       A.    Yes.

17       Q.    But as of March 20th, 2014, the date of the

18   notice of pre-disciplinary conference, you still had not

19   issued refunds to students; is that correct?

20       A.    As of when?

21       Q.    As of March 20th, 2014, the date of the notice

22   of pre-disciplinary conference, you still had not issued

23   refunds to students?

24       A.    That's right.

25       Q.    As of the November 18th, 2014 hearing you still

Martinez vs MCCCD
Videotaped  Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

137

1  had not issued refunds to students; is that correct?

2  **A.    What was that date again?**

3  Q.    The November 18th, 2014 hearing.

4  **A.    Yes.**

5  Q.    And the Hearing Committee found that you did not

6  comply with the October 18th, 2012 and the January 9th,

7  2013 directives, correct?

8  **A.    The January what?**

9  Q.    9th, 2013 directives.

10  **A.    What's the January 9th, 2013 directive?**

11  Q.    Read from the Hearing Committee findings.

12  Paragraph 60 of the Hearing Committee findings states, "At

13  the November 18th hearing Dr. Martinez did not provide any

14  explanation for her refusal to comply with the

15  October 18th, 2012 and January 9, 2013 directives to issue

16  refunds to her students."

17  **A.    Is that a question?  I didn't get the question.**

18  Q.    I was asking if that was a finding found by the

19  Hearing Committee?

20  **A.    That was a finding.**

21  Q.    And the Hearing Committee found that you were

22  insubordinate, correct?

23  **A.    Where is that?**

24  Q.    Paragraph 66 states, "Dr. Martinez willfully and

25  intentionally failed to follow instructions that were

1          THE WITNESS:  Okay.  Ask your question again.

2      Q.     BY MS. BALCH:  In the section at the end of page

3  3 under Non-Compliance it states, "Because you imposed

4  charges on the students without authority to do so, you

5  have a responsibility to reimburse the students from your

6  own funds.  You are hereby directed to do so by personal

7  check beginning immediately and continuing until all

8  students who paid you are reimbursed."

9      **A.     That's not true.  I didn't impose charges.  The**

10  **administration told me that students were to pay for their**

11  **own copies.  I didn't impose that.  That's what I was told.**

12      Q.     Well, the Hearing Committee found that you were

13  in violation of this directive and found that you were

14  insubordinate.  And I want to direct your attention

15  to Exhibit 2, the amended complaint, document 14-11.  This

16  is an August 25th, 2015 letter from Chris Haines to you.

17      **A.     Yes.**

18      Q.     And that last paragraph states, "Also, I'm

19  informed that a corrective action was issued to you for

20  selling copies of materials to your students in violation

21  of MCCCD cash handling rules and that you remain in

22  violation of a related directive to reimburse the students

23  the money you collected.  I'll be working with appropriate

24  officials to address that concern.  You may avoid

25  disciplinary action by immediately reimbursing the students

1   directly or by authorizing the District to do so by

2   deducting money from your paycheck and transferring the

3   amounts due to the students."  Do you see that?

4        A.    Yes.

5        Q.    So as of August 25th, 2015, you still had not

6   issued any refunds to students; is that correct?

7        A.    Yes.

8        Q.    Sitting here today, as of today's date, have you

9   issued refunds to students?

10       A.    No.  There's no refund.  There's no refund to

11  give.  That statement is false.  For selling copies of

12  materials -- I did not sell copies of materials -- to your

13  students.  I was -- and the -- it says there's a violation

14  of MCCD cash handling rules.  That's not true either.

15  There has been no finding of a violation of cash handling.

16  So she -- she wasn't there when this was happening.

17  Somebody has informed her of these untrue facts that,

18  first, I sold copies -- that's not true -- and that I

19  violated cash handling rules.  That's not true either.

20       Q.    I understand that you take issue with and you

21  contend that you did not violate cash handling policies,

22  but you were instructed to issue refunds to students on

23  October 18th, 2012, and January 9th, 2013, correct?

24       A.    Yes.

25       Q.    And you disregarded those express directions,

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

148

 1   correct?

 2        A.      Well, their basis is false.  I didn't sell

 3   materials and I didn't violate cash handling.  And the

 4   committee -- the Hearing Committee stated that there had

 5   been no finding of cash handling violation.

 6        Q.      The Hearing Committee also found you to be

 7   insubordinate in refusing to comply with the October 18th,

 8   2012 and January 9th, 2013 directives; isn't that right?

 9        A.      I don't know.  I'd have to look at that.

10             MS. MARTON:  Objection; asked and answered.

11             Go ahead and answer.

12        Q.      BY MS. BALCH:  I'll, again, direct your

13   attention to paragraphs 66, 67, 68, and 69 of the Hearing

14   Committee's conclusions.

15        A.      What about them?

16        Q.      I'm asking you, isn't it true that the Hearing

17   Committee found you insubordinate for failing to comply

18   with Phoenix College's October 18th, 2012 and January 9th,

19   2013 directives to issue refunds to students?

20             MS. MARTON:  Objection; asked and answered.

21             Go ahead and answer again.

22             THE WITNESS:  There are statements -- the

23   statements you named that were made by the Hearing

24   Committee, those statements were made by the Hearing

25   Committee, the statement 66 to 69.

Martinez vs MCCCD
Videotaped Deposition of Cleopatria Martinez, Ph.D., Vol. I - 8/16/2016

149

1    Q.    BY MS. BALCH:  And this -- these findings by the

2    Hearing Committee were authored on December 9th, 2013,

3    correct?

4    A.    Yes.

5    Q.    It's almost three years later, right?

6    A.    Yes.

7    Q.    And to date, you still have not issued any

8    refunds to students?

9              MS. MARTON:  Objection; asked and answered.

10             THE WITNESS:  You keep asking me the same

11   thing.  Do you want me to answer again?

12   Q.    BY MS. BALCH:  Yes.  Please answer my question.

13   A.    **That's true.  I have not paid for the students'**

14   **instructional materials.**

15   Q.    Do you believe that it's okay to disregard an

16   instruction from Phoenix College administration?

17   A.    **It depends on what the instruction is.**

18   Q.    Do you believe it's optional to comply with the

19   October 18th, 2012 and January 9th, 2013 directives?

20   A.    **I think the administration should talk with me**

21   **about this, and they have not, and address the fact that to**

22   **ask -- it's improper, out of line, to ask a faculty member**

23   **to purchase learning materials for students, instructional**

24   **materials for students.**

25   Q.    You're saying that the administration should

# EXHIBIT 26



**MARICOPA COMMUNITY COLLEGES®**

**Notice of Pre-Disciplinary Conference**

To:       Cleopatria Martinez
From:     Casandra Kakar
Subject:  Notice of Pre-Disciplinary Conference
Date:     March 20, 2013

---

This is to notify you that a Pre-Disciplinary Conference has been scheduled for 3:30 p.m. on Wednesday, April 3, 2013 in Room 237 in the District Office located at 2411 W. 14th Street, Tempe, AZ 85281.

Dr. Anna Solley, President of Phoenix College, and Casandra Kakar, VP Academic Affairs, will be the Hearing Officers conducting this conference. Judy Castellanos and Sheri Klein from the District Office HR Solutions Center will also be present.

The purpose of this conference is to ensure that the decision to be made concerning the complaints against you as described in detail below is based on complete and accurate information, to inform you of the charges against you and the evidence in support of those charges, and provide you with an opportunity to respond.

You may have a fellow MCCCD employee as your representative at the conference. The representative shall be present only to observe and not to participate. Attorneys are not permitted to serve as a representative. During the conference the representative shall be permitted to observe and take notes, and be permitted a limited right to speak, to include repeating to me points you have already made, explaining to me the significance of points you have made, and occasionally conferring with you in a confidential manner. The representative has no right to bargain at the conference, no right to make your willingness to answer contingent on a guarantee of leniency, and no right to speak for you in response to questions.

**Alleged Violations:**

- Violation of Administrative Regulation 6.7.1 - "Willful and intentional violation of any state or federal law, applicable ordinance, MCCCD Governing Board policy, or MCCCD administrative regulation that affects the employee's ability to perform his or her job", specifically:

    o   Violation of MCCCD's cash handling rules as covered by MCCCD Administrative Regulations 1.17 (see attached)

- Violation of Residential Faculty Policy Manual 3.2.4 - "A Faculty member shall not have any financial interest in or receive compensation from the sale of any unpublished instructional materials required or suggested for a class that the Faculty member teaches."

- Violation of U.S. Copyright Law and fair use guidelines, and MCCCD Administrative Regulations 3.2.4 and 3.2.5 regarding copyright regulations:

    3.2.4  Employees are prohibited from copying materials not specifically allowed by the (1) copyright Law, (2) fair use guidelines, (3) Licenses or contractual agreements, or (4) other permission.

MCCCD/Martinez 01458
MCCCD/Martinez02114

3.2.5 The Governing Board disapproves of unauthorized duplication in any form. Employees who willfully disregard this Board policy and/or the aforementioned copyright guidelines do so at their own risk and assume all liability for their actions.

- Violation of Administrative Regulation 6.7.3 - "Willful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment", specifically, repeated failure to follow instructions regarding printing/copying of unauthorized materials, failure to use only approved course materials, unauthorized copying and sale of course materials, failure to reimburse students for the materials you wrongfully charged them for, and failure to meet the deadline to provide copies of any reimbursement checks to students.

Brief Timeline:

- January 2010 - College Vice Presidents Ronnie Elliott, Paul DeRose and Cassandra Kakar; along with Maggie McConnell; Assistant General Counsel, reviewed the requirements of AR 3.2 with you at length.
- April 2, 2010 –Anna Solley, Phoenix College President, notified you that your copying privileges at the Phoenix College IKON Copy Center were suspended.
- Spring 2010 – An Administrative Evaluation was initiated based on Mr. Joe Sueyoshi's complaint. By agreement, the Evaluation Team did not undertake its task until the fall semester. The findings and recommendations were submitted to Dr. Solley on November 17, 2010. The overall findings included:
  o Copyright and plagiarism: Dr. Martinez was notified in writing and in meetings of MCCCD's and Phoenix College's concerns regarding her course materials violating copyright, fair use, and plagiarism laws.
  o Insubordination: Dr. Martinez failed to follow Dr. Solley's and MCCCD's Legal Counsel's directives - specifically, she repeatedly requested copies, copied and printed unauthorized materials.
- December 9, 2010 – Dr. Solley administered an Initial Corrective Action to you for insubordination and failure to follow instructions regarding printing or copying of unauthorized materials.
- August 21-23, 2012 - You told your MAT 091 and MAT 151 students not to buy the approved text that you listed on the syllabus. Instead, you made copies of a colleague's materials and sold them to your students for $11 each.
- October 18, 2012 – A Second Corrective Action for insubordination and unauthorized copying and sale of course materials was administered to you by Dr. Solley. Included in the corrective action was the following directive: "Because you imposed charges on your students without authority to do so, you have the responsibility to reimburse the students from your own funds. You are hereby directed to do so by personal check, beginning immediately and continuing until all students who paid you are reimbursed."
- January 11, 2013 – Upon discovering that the students who bought your unauthorized course materials had yet to be reimbursed, Casandra Kakar directed you, via email, to provide her, by January 18, 2013, with front and back copies of all cashed personal reimbursement checks to your students.
- January 18, 2013 - You failed to provide Dr. Kakar with copies of any reimbursement checks and neglected to contact her regarding the money you still owe the students.
- February 21, 2013 – A student turned in the MAT091 materials which you left in room B210. Timothy Bryan, Mathematics Faculty, has previously told you that you do not have permission to use his materials again.

If proven, the allegations against you could result in disciplinary action including suspension or dismissal from employment.

At the conference, you may:

MCCCD/Martinez 01459
MCCCD/Martinez02115

a.      Appear to present an oral or written statement in your defense; or
b.      Appear with a representative if desired, and present an oral or written statement in your defense; or
c.      Elect in advance in writing to waive the pre-disciplinary conference.

If you elect to attend the conference and present evidence, you must answer all questions truthfully.  If it is later proven that your answers were not truthful, such dishonesty may result in corrective action.  You may present any testimony, witnesses, or documents which explain whether or not the alleged misconduct occurred.  You shall provide a list of witnesses to me as far in advance as possible, but not later than one hour prior to the conference.  It is your responsibility to notify witnesses that their attendance is desired.

If you provide a response at the conference it will be reviewed and considered before a final decision on discipline is made.  If you do not attend the conference and have not discussed rescheduling, a decision will be made based on the information available.

I acknowledge receipt of this Notice of Pre-Disciplinary Conference.


Employee Signature: _____        Date: _____

| home | about us | employees | search |



# Maricopa Governance

## Online Policy Manual

### 6.7 Employment Standards

The following constitutes grounds for disciplinary action, up to and including termination of any Maricopa County Community College District (MCCCD) employee as outlined by the respective policy manuals:

1. Willfully and intentional violation of any state or federal law, applicable ordinance, MCCCD Governing Board policy, or MCCCD administrative regulation that affects the employee's ability to perform his or her job.
2. Making a false statement of or failing to disclose a material fact in the course of seeking employment or re-assignment of position at MCCCD.
3. Willful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment.
4. Willful and intentional commitment of acts of fraud, theft, embezzlement, misappropriation, falsification of records or misuse of MCCCD funds, goods, property, services, technology or other resources.
5. Conviction of a felony or misdemeanor that adversely affects an employee's ability to perform job duties or has an adverse action on MCCCD if employment is continued.
6. Fighting with a fellow employee, visitor, or student, except in self-defense. Committing acts of intimidation, harassment or violence, including (but not limited to) oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm.
7. Reporting to work under the influence of alcohol and/or illegal drugs or narcotics; the use, sale, dispensing, or possession of alcohol and/or illegal drugs or narcotics on MCCCD premises, while conducting MCCCD business, or at any time which would interfere with the effective conduct of the employee's work for the MCCCD; the use of illegal drugs; or testing positive for illegal drugs. The exception would include the consumption of alcohol at a reception or similar event at which the employee's presence is clearly within the scope of employment.
8. Possessing firearms or other weapons on MCCCD property, except as may be required by the job or as otherwise permitted by law.
9. Abandonment of one's position.
10. Intentional destruction or threat of destruction of MCCCD property, with malicious intent.
11. Performing acts or executing job responsibilities in a reckless manner that pose a threat to the physical safety of the employee or another person.
12. Failure by the College President, Vice Chancellor, Chancellor or other senior level administrators to notify appropriate law enforcement authorities of any potential theft of District funds or assets.

**Statement on Rehiring**

Employees (Board approved and otherwise) who are terminated or non renewed due to a determination that the employee has violated Maricopa Employment Standards as set forth above, or who resign in lieu of such termination or non renewal by agreement or otherwise, are not eligible for rehire within the Maricopa County Community College District. Employees will be afforded notice of such a determination and an opportunity to be heard pursuant to the applicable employee policy or administrative regulation.

The Vice Chancellor for Human Resources is responsible for reviewing documented violations of employment standards, establishing procedures for the review of recommended disciplinary action to be taken, and determining whether the recommended disciplinary action is consistent with the documented violations of the employment standards. The Vice Chancellor for Human Resources shall have final authority to recommend disciplinary action under this policy and shall document the rationale for all decisions. To the extent that the recommendation for disciplinary action by the Vice Chancellor for Human Resources differs from the recommendation of the employee's College President or Vice Chancellor or other Chancellor's Executive Council Member, the Chancellor shall be consulted and shall make the final recommendation on disciplinary action. The Vice Chancellor for Human Resources shall make recommendations that involve the Chancellor.

Quarterly, a summary report shall be submitted to the Governing Board on disciplinary actions taken pursuant to this policy.

AMENDED June 28, 2011, Motion No. 9838
AMENDED February 22, 2011, Motion No. 9781, 9782
ADOPTED February 27, 2007, Motion No. 9407

Print Section (Adobe Acrobat—Requires Adobe Acrobat Reader)



OPS Web Issues?
Contact Tina Emmons or your College Help Desk

Questions or comments?
Contact Teresa Toney | Office of Public Stewardship | 2411 West 14th Street | Tempe, AZ
85281-6942 | 480.731.8880 | 480.731.8819 fax
A division of the Office of General Counsel | 2411 West 14th Street | Tempe, AZ 85281-6942 |
480.731.8877 | 480.731.8890 fax
Legal Services Disclaimer | MCCCD Disclaimer
© Maricopa County Community College District. All Rights Reserved.

~ Ten colleges specializing in university transfer, continuing education, career and job training programs ~
note disclaimer | contact us

MCCCD/Martinez 01461
MCCCD/Martinez02117

1.17 Cash Handling                                                                                    Page 1 of 1



# Maricopa Governance

## Online Policy Manual

### 1.17 Cash Handling

**Scope of Coverage of this Regulation**

This regulation covers all Maricopa County Community College District (MCCCD) employees or offices (including, but not limited to: all employees—Board-approved or part-time, cashiers offices, performing arts centers, athletic facilities, program offices, etc.) that accept payment for any MCCCD services or donations (including, but not limited to: tuition, fees, dues, event tickets, etc.). Cash is defined as coins, currency, checks, money orders, credit cards, electronic funds transfers, and all cash equivalents (including, but not limited to: tokens, gift cards, tuition waivers, parking tickets, stamps).

**General Standards**

1. To ensure strong internal controls over cash handling, to safeguard against loss and to meet our obligation to the community as stewards of public resources, the following elements of internal controls must be adhered to:
   A. Proper segregation of duties (i.e., dual controls)
   B. Specific safeguards for handling, transporting and storing cash
   C. Specific safeguards for deposits
   D. Independent reconciliation of deposit documents to receipts
   E. Management oversight and review of cash handling processes and personnel
2. Each college and the District Office are required to establish written procedures for all locations that handle cash. Such procedures shall ensure compliance with all of the required internal control elements identified in 1. Such procedures shall address all control elements identified in 1 by reflecting the space, physical configuration, staff and other particulars of each location.
3. The District's Business Services division will review such written procedures for potential areas of concern relating to the required internal control elements. Such concerns will be noted and communicated back to the applicable College/District Office for further action.
4. On or about January 1st of each year, each college and the District Office are to review the written procedures relating to cash handling. If significant changes are required, such changes are to be reviewed by the District's Business Services division as in C. above.
5. The District's Internal Audit and Management Advisory Services Department may test the written procedures for compliance in accordance with their established audit plan.
6. If inappropriate activity is suspected or determined (i.e., a pattern of cash shortages, forgery or alterations of checks, misapplication of tuition waivers, loss or damage to securities, computer fraud, etc.), the college or District Office staff should immediately notify their appropriate Vice President or Vice Chancellor, who should then notify Risk Management and Internal Audit and Management Advisory Services of any real or potential losses. The notifications stated above are critical as MCCCD has a limited discovery period in which to report such activity to our insurance carrier.
7. If it is suspected that a theft has occurred, the appropriate law enforcement authorities must be notified.
8. Annually, each employee responsible for handling cash will be required to complete an acknowledgement that they have read and agree to abide by established procedures for proper handling of cash.
9. Annually, each Vice President or senior level administrator with supervisory or management responsibility for any and all areas that handle cash and the college President and Vice Chancellors with any and all responsibility for cash shall complete an acknowledgement that they will enforce the established procedures for the proper handling of cash.
10. The Vice Chancellor for Business Services shall develop, make available and have the authority to require training as may be appropriate for any and all persons handling cash or supervising those individuals at the colleges, District Office or any district location.

TOP

ADOPTED by the Governing Board, February 27, 2007, Motion No. 9412



Print Section (Adobe Acrobat—Requires Adobe Acrobat Reader)

---

OPS Web Issues?
Contact Teresa Emmons or your College Help Desk

Questions or comments?
Contact Teresa Toney | Office of Public Stewardship | 2411 West 14th Street | Tempe, AZ 85281-6942 | 480.731.8680 | 480.731.8810 fax
A division of the Office of General Counsel | 2411 West 14th Street | Tempe, AZ 85281-6942 | 480.731.8877 | 480.731.8890 fax
Legal Services Disclaimer | MCCCD Disclaimer
© Maricopa County Community College District, All Rights Reserved.

~ Ten colleges specializing in university transfer, continuing education, career and job training programs ~
note disclaimer | contact us

3/20/2013

MCCCD/Martinez 01462
MCCCD/Martinez02118

**3.2.2.**

Other provisions may be negotiated by the Faculty member and MCCCD and added to the contract. These may include the ability to edit and control the presentation of the work, the ability to change and update materials over time, the ability to create derivative or related works, and the sharing of costs and revenues associated with the commercialization of such work.

**3.2.3**

A Faculty member shall not, in connection with any class, suggest or require that a student purchase instructional materials which the Faculty member has produced, or from the purchase of which the Faculty member or the Faculty member's designee is entitled to royalty or similar consideration, unless the materials have been:

**3.2.3.1.**

produced by a "recognized, independent publisher," defined as a commercial entity in the business of publishing books, periodicals, and similar instructional materials, and which performs editorial, printing, distribution, marketing, and other functions typically associated with commercial publishing at the publisher's expense; and

**3.2.3.2.**

previously approved for students' purchase by the Vice President of Academic Affairs at the college where the Faculty member teaches the class.

**3.2.4.**

A Faculty member shall not have any financial interest in or receive compensation from the sale of any unpublished instructional materials required or suggested for a class that the Faculty member teaches.

## 3.3. Personal Rights

The Governing Board recognizes that the personal life of a Faculty member is not an appropriate concern of the MCCCD, provided it does not affect the Faculty member's effectiveness in fulfilling professional obligation(s).

## 3.4. Visitation of Faculty Members

Brief class visits by administrative and/or staff personnel may be conducted without notice to the Faculty member in situations that need immediate attention for the normal operation of the College, for example, the safety and welfare of the Faculty and/or students. These visits will not be used for the purpose of the Faculty member evaluation.

## 3.5. Faculty Evaluation Plan (FEP) for Instructional Improvement

Inasmuch as the Faculty is committed to quality teaching and instruction and is contracted to provide professional services to students, colleagues, and the MCCCD, the Faculty do hereby agree to adhere to, support, and implement the following self-evaluation policies and procedures.

**3.5.1.** The objectives of the evaluation program are as follows:

MCCCD/Martinez 01463
MCCCD/Martinez02119

3.2 Copyright Regulation

| home | about us | employees | search |



# Maricopa Governance

## Online Policy Manual

### 3.2 Copyright Regulation 

1. It is the intent of the Governing Board of the Maricopa County Community College District to adhere to the provisions of the U.S. Copyright Law (Title 17, United States Code Section 101 et seq.). Though there continues to be controversy regarding interpretation of the Copyright Law, this policy represents a sincere effort by the Board to operate legally within the District.
2. The Governing Board directs the Chancellor or his designee(s) to develop and distribute to employees guidelines that (1) clearly discourage violation of the Copyright Law and (2) inform employees of their rights and responsibilities under the Copyright Law.
3. Each college president or provost and the Chancellor shall name an individual(s) at each district location who will assume the responsibilities of distributing copyright guidelines, act as a resource person regarding copyright matter and provide training programs on current copyright laws.
4. Employees are prohibited from copying materials not specifically allowed by the (1) copyright law, (2) fair use guidelines, (3) licenses or contractual agreements, or (4) other permission.
5. The Governing Board disapproves of unauthorized duplication in any form. Employees who willfully disregard this Board policy and/or the aforementioned copyright guidelines do so at their own risk and assume all liability for their actions.
6. In order to assist employees and students in complying with the Copyright Law, appropriate notices shall be placed on or near all equipment capable of duplicating copyrighted materials.

What Students Should Know About Copyright

AMENDED through the Administrative Regulation approval process, August 18, 2008

ADOPTED into Governance, September 24, 1996
AMENDED Motion No. 8894
AMENDED Motion No. 8895
AMENDED Motion No. 8896

Founding Source:
Governing Board Minutes, December 12, 1989, Motion No. 7144

Print Section (Adobe Acrobat)—Requires Adobe Acrobat Reader)

OPS Web Issues?
Contact Tina Emmons or your College Help Desk

Questions or comments?
Contact Teresa Toney | Office of Public Stewardship | 2411 West 14th Street | Tempe, AZ 85281-6942 | 480.731.8880 | 480.731.8819 fax
A division of the Office of General Counsel | 2411 West 14th Street | Tempe, AZ 85281-6942 | 480.731.8877 | 480.731.8880 fax
Legal Services Disclaimer | MCCCD Disclaimer
© Maricopa County Community College District. All Rights Reserved.

~ Ten colleges specializing in university transfer, continuing education, career and job training programs ~
note disclaimer | contact us

MCCCD/Martinez 01464
MCCCD/Martinez02120

# EXHIBIT 27



**MARICOPA COMMUNITY COLLEGES®** | **Rufus Glasper**
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

August 9, 2013

Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ  85020

**Re:  Intent to dismiss you from your employment**

Dear Dr. Martinez:

Dr. Anna Solley, President of Phoenix College (PC) has forwarded a statement of charges to James Bowers, Interim Vice Chancellor for Human Resources. Mr. Bowers has reviewed the charges, in consultation with the MCCCD Legal Office, and recommended to me that there exists prima facie cause for your dismissal from your position as Mathematics Faculty at Phoenix College (see attached).  I concur with his recommendation.  The recommended effective date of your involuntary termination is September 24, 2013.

Maricopa County Community College District Administrative Regulation 6.7 states that violation of any of its Employment Standards "constitutes grounds for disciplinary action, up to and including termination of any Maricopa County Community College District (MCCCD) employee as outlined by the respective policy manuals".

Pursuant to Section 3.15.3 of the RFP Policy Manual, you may invoke your right to a hearing by filing a written request with Interim Vice Chancellor James Bowers within five (5) business days after being served with this notice of intent to dismiss you from your employment.

Sincerely,

Rufus Glasper, Ph.D., CPA
Chancellor

Cc:     MCCCD Governing Board
        Dr. Anna Solley
        Mr. Jim Bowers

EXHIBIT  3
WIT: R.C. Glasper
DATE: 11-22-16
Angela F. Miller, RPR, CR

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert | Estrella Mountain | GateWay | Glendale | Mesa | Paradise Valley | Phoenix
Rio Salado | Scottsdale | South Mountain | Maricopa Skill Center | SouthWest Skill Center



MARICOPA
COMMUNITY
COLLEGES®   |   Vice Chancellor
Human Resources

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8103 • F 480.731.8120 • www.mancopa.edu

August 9, 2013

Cleopatria Martinez
7030 N. 21ˢᵗ Street
Phoenix, AZ  85020

RE:  Employment Status

Dear Dr. Martinez:

You are being placed on paid administrative leave from August 12 through
September 24, 2013, pending the approval of your termination. During
administrative leave, you will remain an employee of Maricopa County
Community College District (MCCCD) and must continue to observe all policies
regarding employee conduct.

For the duration of paid administrative leave, you should not report to work nor
do you need to make contact with your supervisor. Upon approval of your
termination by the Maricopa County Community Colleges Governing Board, you
will be notified regarding the termination of your employment status with
MCCCD.

Sincerely,

James Bowers, J.D.
Interim Vice Chancellor for Human Resources

cc:    Dr. Anna Solley
       Employee Personnel File

Ten colleges and two skill centers dedicated to student success.

Chandler-Gilbert I Estrella Mountain I GateWay I Glendale I Mesa I Paradise Valley I Phoenix
Rio Salado I Scottsdale I South Mountain I Maricopa Skill Center I SouthWest Skill Center



**MARICOPA COMMUNITY COLLEGES** | Vice Chancellor
Human Resources

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8103 • F 480.731.8120 • www.maricopa.edu

August 9, 2013

Dear Dr. Glasper:

The following statement of charges against Dr. Cleopatria Martinez was forwarded to me by Dr. Anna Solley, President, Phoenix College.  Pursuant to 3.15.1 of the Residential Faculty Policy (RFP), I have reviewed the charges, in consultation with the MCCCD Legal Office, and recommend to you that there exists prima facie cause for the dismissal of Dr. Cleopatria Martinez.

Sincerely,

James Bowers, J.D.
Interim Vice Chancellor for Human Resources

### Statement of Charges

- Violation of Administrative Regulation 6.7.1 – "Willful and intentional violation of any state or federal law, applicable ordinance, MCCCD Governing Board policy, or MCCCD administrative regulation that affects the employee's ability to perform his or her job", specifically:

  - Violation of MCCCD's cash handling rules as covered by MCCCD Administrative Regulations 1.17

- Violation of Residential Faculty Policy Manual 3.2.4 – "A Faculty member shall not have any financial interest in or receive compensation from the sale of any unpublished instructional materials required or suggested for a class that the Faculty member teaches."

- Violation of U.S. Copyright Law and fair use guidelines, and MCCCD Administrative Regulations 3.2.4 and 3.2.5 regarding copyright regulations:

  - 3.2.4 Employees are prohibited from copying materials not specifically allowed by the (1) copyright Law, (2) fair use guidelines, (3) Licenses or contractual agreements, or (4) other permission.

  - 3.2.5 The Governing Board disapproves of unauthorized duplication in any form. Employees who willfully disregard this Board policy and/or the aforementioned copyright guidelines do so at their own risk and assume all liability for their actions.

Chandler-Gilbert | Estrella Mountain | GateWay | Glendale | Mesa | Paradise Valley | Phoenix
Rio Salado | Scottsdale | South Mountain | Maricopa Skill Center | SouthWest Skill Center

- Violation of Administrative Regulation 6.7.3 - "Willful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment", specifically, repeated failure to follow instructions regarding printing/copying of unauthorized materials, failure to use only approved course materials, unauthorized copying and sale of course materials, failure to reimburse students for the materials you wrongfully charged them for, and failure to meet the deadline to provide copies of any reimbursement checks to students.

Brief Timeline:

- January 2010 - College Vice Presidents Ronnie Elliott, Paul DeRose and Cassandra Kakar; along with Maggie McConnell, Assistant General Counsel, reviewed the requirements of AR 3.2 with you at length.
- April 2, 2010 –Anna Solley, Phoenix College President, notified you that your copying privileges at the Phoenix College IKON Copy Center were suspended.
- Spring 2010 – An Administrative Evaluation was initiated based on Mr. Joe Sueyoshi's complaint.  By agreement, the Evaluation Team did not undertake its task until the fall semester.  The findings and recommendations were submitted to Dr. Solley on November 17, 2010.  The overall findings included:
  - o  Copyright and plagiarism:  Dr. Martinez was notified in writing and in meetings of MCCCD's and Phoenix College's concerns regarding her course materials violating copyright, fair use, and plagiarism laws.
  - o  Insubordination:  Dr. Martinez failed to follow Dr. Solley's and MCCCD's Legal Counsel's directives - specifically, she repeatedly requested copies, copied and printed unauthorized materials.
- December 9, 2010 – Dr. Solley administered an initial Corrective Action to you for insubordination and failure to follow instructions regarding printing or copying of unauthorized materials.
- August 21-23, 2012 - You told your MAT 091 and MAT 151 students not to buy the approved text that you listed on the syllabus.  Instead, you made copies of a colleague's materials and sold them to your students for $11 each.
- October 18, 2012 – A Second Corrective Action for insubordination and unauthorized copying and sale of course materials was administered to you by Dr. Solley.  Included in the corrective action was the following directive:  "Because you imposed charges on your students without authority to do so, you have the responsibility to reimburse the students from your own funds.  You are hereby directed to do so by personal check, beginning immediately and continuing until all students who paid you are reimbursed."
- January 11, 2013 – Upon discovering that the students who bought your unauthorized course materials had yet to be reimbursed, Cesandra Kakar directed you, via email, to provide her, by January 18, 2013, with front and back copies of all cashed personal reimbursement checks to your students.
- January 18, 2013 - You failed to provide Dr. Kakar with copies of any reimbursement checks and neglected to contact her regarding the money you still owe the students.
- February 21, 2013 – A student turned in the MAT091 materials which you left in room B210.  Timothy Bryan, Mathematics Faculty, has previously told you that you do not have permission to use his materials again.

EXHIBIT 28

Stephen Montoya
Attorney at Law

Montoya, Jimenez & Pastor, P.A.
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012-2490
Tele: 602-256-6718; Fax: 602-256-6667
stephen@montoyalawgroup.com

August 16, 2013

**SENT VIA EMAIL (JAMES.BOWERS@DOMAIL.MARICOPA.EDU),**
**FAX (480-731-8120), AND FIRST CLASS MAIL**

James Bowers, J.D.
Interim Vice Chancellor for Human Resources
Maricopa Community Colleges
2411 West 14th Street
Tempe, Arizona 85281-6942

      Re:   <u>Cleopatria Martinez; Request for Hearing</u>

Dear Mr. Bowers:

      Pursuant to Section 3.15.3 of the Maricopa Community College RFP Manual, Dr. Cleopatria Martinez hereby invokes her right to a hearing regarding her proposed dismissal from the Maricopa County Community College District.

      We ask that the proposed termination of Dr. Martinez be rejected because it is based upon a misunderstanding of the underlying facts and applicable law, in addition to improperly ignoring Dr. Martinez's twenty-eight years of exemplary service to the District.

      I will be serving as Dr. Martinez's legal counsel in connection with the proposed dismissal.

      Thank you very much.

              Sincerely,

              Stephen Montoya

MCCCD/Martinez 04005

Blank                                                                Page 1 of 1

**April Roll**

| | |
|---|---|
| **From:** | April Roll |
| **Sent:** | Friday, August 16, 2013 1:55 PM |
| **To:** | 'james.bowers@domail.maricopa.edu' |
| **Cc:** | Steve Montoya |
| **Subject:** | Cleopatria Martinez |
| **Attachments:** | martinez--letter bowers 01.pdf |

Mr. Bowers:

Please see attached letter of today regarding Ms. Martinez.  The original will follow by first class mail.

Thank you.

April Roll
Legal Assistant to Stephen Montoya
**Montoya, Jimenez & Pastor, P.A.**
3200 North Central Avenue, Ste. 2550
Phoenix, Arizona 85012
Tele: 602-256-6718 Fax: 602-256-6667

This electronic mail transmission contains information from Montoya, Jimenez & Pastor, P.A. that may be confidential and/or privileged.  Such information is solely for the intended recipient, and use by any other party is not authorized.  If you are not the intended recipient, be advised that any disclosure, copying, distribution or use of this email, its contents or any attachments is prohibited.  Any wrongful interception of this message is punishable as a federal crime.

8/16/2013

MCCCD/Martinez 04006

P. 1

✱ ✱ ✱ Transmission Result Report(MemoryTX) ( Aug.   2013  1:38PM ) ✱ ✱ ✱

1)
2)

Date/Time: Aug. 16. 2013  1:37PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|----------|------|-------------|-------|--------|---------------|
| 4360 | Memory TX | 4807318120 | P.   2 | OK | |
| | APRIL ROLL | | | | |

--------------------------------------------------------------------------------

Reason for error
 E. 1) Hang up or line fail           E. 2) Busy
 E. 3) No answer                      E. 4) No facsimile connection

Stephen Montoya                    Montoya, Jimenez & Pastor, P.A.
Attorney at Law                    3200 North Central Avenue, Suite 2550
                                   Phoenix, Arizona 85012-2690
                                   Tele: 602-256-6718 Fax: 602-256-6667
                                   stephen@montoyalawgroup.com

**FAX TRANSMISSION**

PERSONAL & CONFIDENTIAL

To:              James Bowers, J.D.
                 Interim Vice Chancellor for Human Resources

Fax No:          (480) 731-8120

From:            Stephen Montoya

Date:            August 16, 2013

Number of pages: 2 (including cover page)

This communication is privileged and confidential under federal and state law and is intended to be reviewed only by the recipient specified above.  If you receive this communication in error, please immediately notify us at (602) 256-6718 and return it to the above address by first class mail.  Thank you for your cooperation.

MCCCD/Martinez 04007

# EXHIBIT 29

BEFORE THE GOVERNING BOARD OF THE
MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

| | | |
|---|---|---|
| MARICOPA COUNTY COMMUNITY | ) | |
| COLLEGE DISTRICT, | ) | |
| | ) | HEARING COMMITTEE |
| v. | ) | |
| | ) | PRELIMINARY SCHEDULING ORDER |
| Dr. Cleopatria Martinez. | ) | |

The Hearing Committee, on October 14, 2013 (through its Chairman Dr. Keith Crudup), convened a preliminary scheduling conference of the parties in the above referenced matter. Attendees included Dr. Anna Solley (MCCCD Representative), Pavneet Uppal, Esq. (representing MCCCD), Stephen Montoya, Esq. (representing Dr. Cleopatria Martinez) and Ernest Calderón (counsel to the Hearing Committee).

Subject to both parties' counsel securing their witness availabilities, it is ORDERED:

1.  The Martinez hearing shall be held in Executive Session. Adoption of the Findings of Fact, Conclusions of Law and Recommendation will be held in public session.

2.  Both parties briefly outlined the themes of their cases. MCCCD legal counsel objected to Mr. Montoya's statements as "argument." No substantive ruling was made based on the thematic discussions. Therefore, the Hearing Committee need not rule on MCCCD's objections.

3.  Position briefs to include attached exhibits, list of witnesses to testify (with the subject matter of their testimony also listed), foundational issues and relevance to the performance standard at issue and other matters deemed important by the parties' counsel to be presented shall be filed with the Hearing Committee on Friday, November 1, 2013. The documents are to be transmitted via email to the Hearing Committee in care of Ernest Calderón, ecalderon@rhlfirm.com and four hard copies are to be delivered to Mr. Calderón as well. Each party is to share the same information with opposing counsel.

402425                                                    -1-

MCCCD/Martinez 01184

4. Responses to the position briefs, objections to witnesses and evidence shall be exchanged and filed with the Hearing Committee on Friday, November 8, 2013  The same rules of filing with the Hearing Committee as listed above shall apply.

5. The hearing duration is tentatively set for one day. MCCCD's counsel exercised his right to reserve the possibility of the hearing going to two days. Dr. Martinez' counsel noted that the hearing might be limited to one day by rule.

6. The Hearing Committee determined that both parties will have equal time to present their cases.

7. The hearing is set for November 18th. Counsel are to notify the Hearing Committee via Ernest Calderón witness availability as soon as possible.

8. The hearing shall be held at the Maricopa County Community College District offices as a neutral site.

9. Post-hearing memoranda, briefs and Proposed Findings of Fact & Conclusions of Law shall be filed with the Hearing Committee, in the matter noted above, no later than one week after the hearing. Tentatively, November 25, 2013.

10. The Hearing Committee shall render its Findings of Fact, Conclusions of Law and Recommendation no later than December 9, 2013.

It is ordered so, at Mesa, Arizona, this 16th day of October, 2013.

Dr. Keith Crudup
Chairperson
On Behalf of the Hearing Committee

MCCCD/Martinez 01185

# EXHIBIT 31

1  Stephen Montoya (#011791)
   **Montoya, Jimenez & Pastor, P.A.**
2  3200 North Central Avenue, Suite 2550
   Phoenix, Arizona 85012
3  602-256-6718 (telephone)
   602-256-6667 (fax)
4  stephen@montoyalawgroup.com

5  Attorney for Cleopatria Martinez

6

7              **BEFORE THE GOVERNING BOARD OF THE**

8         **MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT**

9

10 Maricopa County Community College
   District,                                    **CLEOPATRIA MARTINEZ'S**
11                                               **POSITION STATEMENT**
   v.
12                                               (Hearing scheduled for November 18,
   Cleopatria Martinez                          2013 at 9:00 a.m.)
13

14

15      Pursuant to the Hearing Committee's <u>Preliminary Scheduling Order</u> of

16 October 16, 2013, Professor Cleopatria Martinez submits the following <u>Position</u>

17 <u>Statement</u>.

18      **1.     The Administration's attempt to terminate Professor Martinez is**
19             **invalid because the Administration has not complied with the**
               **time requirements set forth in the Residential Faculty Policies.**
20

21      The Residential Faculty Policies (the "RFP") set forth strict, specific rules

22 governing the time limitations for Appeals from Recommendations of Termination.

23 Those deadlines were set forth expressly in this case in District General Counsel

24 Lee Comb's email to the members of the Hearing Committee of September 11,

25
26 2013.  <u>See</u> attached Exhibit A.

27      Because <u>none</u> of those deadlines were met, the Hearing Committee cannot

28 proceed, and the District must vacate the <u>Statement of Charges</u> of August 9,

MCCCD/Martinez 03198

2013 against Professor Martinez as a matter of law in accordance with the RFP.

**2.     Professor Martinez did _not_ violate any copyright laws.**

The Administration is attempting to terminate Professor Martinez from her position as a Mathematics Professor at Phoenix College after twenty-eight years of distinguished service to the District (including four years of service as the Chair of the Mathematics Department at Phoenix College) based on its erroneous belief that Professor Martinez has violated the federal copyright laws.

First, Professor Martinez did _not_ violate the copyright laws. One of the foremost legal experts in the area of copyright law in Arizona, Mr. Fredric Bellamy, a 1986 graduate of Harvard Law School with almost three decades of experience in intellectual property law, has rendered a written opinion conclusively demonstrating that Professor Martinez did _not_ violate the federal copyright laws in any way.

Second—as evidence of her good faith—Professor Martinez repeatedly asked the Administration for guidance regarding complying with the federal copyright laws and the Administration's related directives. In response to Professor Martinez's repeated requests, the Administration either provided Professor Martinez with inaccurate guidance or with no guidance at all.

Third, the Administration has attempted to punish Professor Martinez for using mathematic materials that other mathematics professors routinely employ throughout the District. This demonstrates that the Administration's treatment of Professor Martinez has been both arbitrary and capricious. It has also been rude and disrespectful.

MCCCD/Martinez 03199

Fourth, all of the District's allegations regarding Professor Martinez's alleged copyright violations arose during the 2010 year. Professor Martinez has complied with the Administration's instructions regarding copyright issues since that time. Based on Professor Martinez's twenty-eight years of dedicated service to the District—and the inherently confusing nature of federal copyright law, which even the District's own lawyers do not understand—the Administration's proposed punishment of termination is too harsh in light of the underlying offense.

**3.   Professor Martinez did not violate the District's rules governing unauthorized compensation.**

In the Fall semester of 2012, Professor Martinez decided that she could best teach her students using course materials other than a published textbook. This is a common practice throughout academia in general and the District in particular. Professor Martinez offered to allow each student to make a copy of the materials at the student's expense. Because this promised to be an inefficient and laborious process, Professor Martinez offered to copy the materials for her students and each student could subsequently reimburse her for her out-of-pocket copying costs.

Professor Martinez took the materials and had them copied at a nearby "Staples" office supply store. Each student subsequently reimbursed Professor Martinez for his or her share of the copying costs. Professor Martinez did not make any profit from the copies. To the contrary, once again, Professor Martinez simply asked the students to reimburse her for the actual cost of copying approximately sixty copies of her course materials. She did not charge for her

MCCCD/Martinez 03200

# EXHIBIT A

MCCCD/Martinez 03201

## Steve Montoya

| | |
|---|---|
| **From:** | Lee Combs [lee.combs@domail.maricopa.edu] |
| **Sent:** | Wednesday, September 11, 2013 9:45 AM |
| **To:** | Nora Reyes; Ernest Escobedo; Keith Crudup |
| **Cc:** | Steve Montoya; Diana Davidson; Uppal, Pavneet |
| **Subject:** | Re: Termination Appeal Hearing Committee |

Members of the Hearing Committee,

Thank you very much for accepting this role. As you may know, I am the chief in-house legal counsel to the District. Since Dr. Martinez requested a hearing concerning the recommendation to terminate her employment, I have attempted to facilitate the formation of the hearing committee. However, I will not serve as the committee's attorney. Should the Hearing Committee need legal advice and assistance, an independent attorney will be retained by the district to provide it. Legal counsel for the Committee can help the committee assure compliance with legal standards for this type of decision, as well as questions of procedure and evidence. Please let Ms. Diana Davidson (480-731-8878) know and she will issue a purchase order.

As facilitator, I do have some basic information to share with you, so that you can get started with your initial set of decisions Then, I will step aside and communicate no further with you concerning this matter.

The next steps in the hearing procedure are described in the Residential Faculty Policies as follows:

"3.15.5.

The Hearing Committee shall select a Chair. Unless the parties stipulate to extend the time beyond that which is set forth below, the Chair shall conduct a meeting with the attorney representing the MCCCD and the Faculty member and/or his/her attorney/representative no later than twenty (20) business days after the formation of the committee for the purpose of exchanging exhibits, witness lists, and summaries of witness testimony. The Chair may choose to deny admission of an exhibit(s) or witness testimony for failure to comply with this Section.

3.15.6.

Unless the parties otherwise agree, the Hearing Committee shall conduct the hearing no later than ten (10) business days after the exchange of information detailed in Section 3.15.5. Prior to the hearing, the Faculty member must declare, in writing, whether he/she wishes the hearing to be public or in executive session. The member may attend the hearing; present any testimony, evidence, or statements, oral or written, in his/her behalf; and be represented by legal counsel or other representative. It is expressly understood the act of testifying will not be subject to reprisal by the MCCCD.

3.15.7.

Within five (5) business days after completion of the hearing, the Hearing Committee shall provide the Chancellor and the Faculty member with a summary of the evidence that was presented during the hearing In addition, the Hearing Committee shall render binding written findings of fact and conclusions of law and forward these along with its recommendation regarding dismissal to the Chancellor. The above deadline may be extended up to fifteen (15) business days after completion of the hearing, if the

MCCCD/Martinez 03202

Hearing Committee requests briefs and/or recommended findings of fact and conclusions of law from the parties."

Conference rooms at the district office are available for the pre-hearing meeting and the hearing itself. Please contact Diana Davidson (480-731-8877) to schedule the facility if that is your choice. The procedure does not restrict the committee as to the location of the hearing. However, the legal department retains a court reporter to transcribe the hearing, so Ms. Davidson will need to know where it will be held if you choose an alternate location.

Dr. Martinez is entitled to have legal counsel represent her in this matter, and she has retained Mr. Stephen Montoya for that purpose. The College and District administration will be represented by Mr. Pavneet Uppal.

Please confer among yourselves and select a chair as soon as possible: The committee was formed on September 3, 2013, and by my count the deadline for the information exchange meeting with the chair (see section 3.15.5 above) is Tuesday, October 1, 2013. The hearing is required to follow within 10 days of that meeting. Of course, all deadlines can be changed by agreement of the parties.

I will offer some general information about these hearings for those who are not familiar with the process and the committee's role in it. This information is intended to be descriptive of how hearings generally proceed and how common issues have been addressed. I hope you find it useful, for example, in deciding to ask the district to appoint legal counsel to advise you. It is not intended as legal advice, or direction to you in this case. The parties are free to question or challenge any of these points, and the committee is entitled to rely on the confidential advice of independent counsel retained for it by the district in responding to such objections and deciding how it will operate.

The hearing committee serves an important role in the termination process. Committee members have responsibilities similar to a jury or a judge, and this role requires a similar degree of impartiality. In the past, members have been challenged and resigned after they appeared to act on behalf of a party, or assumed the role of advocate or investigator before or during the hearing. To assure fair consideration of the matter and avoid controversy, members generally avoid contact with the parties, their counsel, or any witness while this matter is pending except as provided in the above policy. Hearing committee members strive to set any preconceptions they may have aside, maintain independence from the parties, and keep an open mind on the issues until they have heard, seen, and considered all the evidence.

Administrative hearings are informal: the formal rules of evidence and civil procedure are not strictly applied. Evidence is typically admitted unless it is clearly irrelevant (i.e. does not tend to prove or disprove any fact related to the issues to be decided), unreliable (e.g. anonymous or unattributed statements), or not disclosed in the pre-hearing meeting. To the extent that such questions do arise, the chair normally responds on the committee's behalf. Committee legal counsel advises, but the chair decides.

Generally speaking, the party presenting a witness has not been allowed to ask "yes or no" questions except on preliminary matters (i.e. "leading questions"). The party cross examining a witness for the other side _can_ ask "yes or no" questions. Exceptions have been granted only when witnesses presented by one party are demonstrably aligned with the other (i.e. "hostile" witnesses).

Committees (like courts) have expected the parties to stipulate to the authenticity (not the relevance or probative value) of any documents they intend to offer in evidence unless there is serious dispute on that point. In general, they have found it helpful to ask the parties to submit to the chair (at the information exchange) pre-hearing statements with attached exhibits. Such statements set forth the facts the party intends to prove, their relationship to specific documents and witness testimony the party intends to present, and their relevance to the performance standard at issue. This is not required by the policy, but

it can save a great deal of time at the hearing stage and avoid confusion.

The policy does allow you to request that the parties submit post hearing briefs and/or proposed findings and conclusions, and allows for extension of deadlines for that purpose. (section 315.7.)

Chairs have found that setting and maintaining a standard of dignity and respect for participants goes a long way to assuring a fair hearing and effective use of everyone's time.

At the hearing, the administration bears the burden to prove by a preponderance of the evidence (i.e. more likely than not) that the facts alleged in support of the disciplinary action recommended are true. The administration also bears the burden to persuade you that the facts support a finding that the employee violated the performance standard at issue.

Committees hear and see evidence in different forms and of different kinds. What significance or weight to give it us up to the committee. Committees have considered but not required direct evidence (e.g. the observations of an eyewitness) to prove facts: they commonly draw reasonable factual inferences from other facts and circumstances. (e.g. If the sidewalk is dry when we go to sleep and covered with snow when we wake up, we can safely infer there was precipitation during the night even though you didn't directly see, hear, or feel it falling.)

When facts are disputed, committees have employed their own common sense - just as jurors do at the conclusion of a trial - to evaluate the evidence in its totality and determine what the committee believes is true. Sometimes in sorting out the facts the decision will come down to a question of credibility. Who does the committee believe? Committees have considered factors such as consistency, responsiveness, and corroboration to make this determination. Counsel for the parties may call your attention to other credibility factors as well. Legal counsel for the committee can be helpful in your deliberations. However, it has been the committees that ultimately decided these issues, after hearing all the evidence and arguments.

After the hearing, as soon as possible committees generally meet to discuss what they have heard and, if possible, form a consensus as to what they believe has been proved and what their recommendations will be. If a consensus is impossible, the majority has determined the outcome in some cases. The committee's attorney can be especially helpful here, providing legal context for the committee's deliberations, assessing independently the legal arguments of the parties, and helping to articulate the conclusions of law that the committee must provide to the Chancellor. At your direction, based on your findings and conclusions, counsel may prepare a draft report summarizing the evidence, making findings of fact and conclusions of law, and documenting your recommendation to the chancellor as the procedure requires

At this point, I will step aside. After you select a chair, please let Ms. Davidson know the identity of the chair you choose, and if you would like to have the district retain independent legal counsel to advise and assist the committee. She is available to assist with scheduling meeting and hearing dates, reserving rooms, and contracting for attorney and court reporter services. 480-731-8877 is her telephone. Her e-mail address is included in the header to this e-mail.

Again, thank you for your service.



Maricopa Community Colleges. The college of you.

**Lee Combs:** General Counsel

2411 West 14th Street, Tempe AZ 85281
phone | 480-731-8878 • fax | 480-731-8890
email | lee.combs@domail.maricopa.edu

On Wed, Sep 4, 2013 at 7:02 PM, Patty Finkenstadt <patricia.finkenstadt@phoenixcollege.edu> wrote:
Colleagues,

11/1/2013

This will certify that as of the close of business Monday, the following individuals were designated as members of the hearing committee concerning a recommendation to terminate Dr. Cleopatria Martinez:

Dr. Ernesto Escobedo
Dr. Keith Crudup
Dr. Nora Reyes

I have confirmed that they are available to serve, and therefore pursuant to the RFP, I hereby certify that the hearing committee has been duly formed

I understand that the committee's next step is to designate a chair, who will have some procedural responsibilities. Legal counsel for the committee will advise the group on next steps after a chair is designated.

Thanks to the members of the committee for their service in this important process.

Members, as soon as possible please confer among yourselves, select a chair, and let the other addressees above know your selection.

Thank you,

Patricia Finkenstadt
Faculty Association President

---

**Patricia Finkenstadt, Ph.D.**

Biosciences Faculty and Faculty Association President

1202 W Thomas Road, Phoenix, AZ  85013
phone | 602.285.7108 • fax | 602.285.7349
email | patricia.finkenstadt@phoenixcollege.edu
website | www.phoenixcollege.edu

MCCCD/Martinez 03205

EXHIBIT 32

Stephen Montoya (#011791)
**Montoya, Jimenez & Pastor, P.A.**
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
602-256-6718 (telephone)
602-256-6667 (fax)
stephen@montoyalawgroup.com

Attorney for Cleopatria Martinez

## BEFORE THE GOVERNING BOARD OF THE

## MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

| | |
|---|---|
| Maricopa County Community College District, <br><br> v. <br><br> Cleopatria Martinez | **CLEOPATRIA MARTINEZ'S SUPPLEMENTAL POSITION STATEMENT** <br><br> (Hearing scheduled for November 18, 2013 at 9:00 a.m.) |

Pursuant to the Hearing Committee's <u>Order</u> of November 8, 2013, Professor Cleopatria Martinez submits the following <u>Supplemental Position Statement</u>.

**1.    Professor Martinez did <u>not</u> violate any copyright laws.**

The Administration is attempting to terminate Professor Martinez from her position as a Mathematics Professor at Phoenix College after twenty-eight years of distinguished service to the District (including three years of service as the Chair of the Mathematics Department at Phoenix College) based on its erroneous belief that Professor Martinez has violated the federal copyright laws.

First, Professor Martinez did <u>not</u> violate the copyright laws. One of the foremost legal experts in the area of copyright law in Arizona, Mr. Fredric Bellamy, a 1986 graduate of Harvard Law School with almost three decades of

MCCCD/Martinez 03207

experience in intellectual property law, has rendered a written opinion conclusively demonstrating that Professor Martinez did <u>not</u> violate the federal copyright laws in any way. Indeed, as Mr. Bellamy demonstrates, mathematical formulas are <u>not</u> even subject to copyright protection and any use of those formulas by Professor Martinez was covered by the "fair use" doctrine in any event. <u>See</u> attached Exhibits 18 and 19. Reflecting Mr. Bellamy's conclusions, <u>no</u> author <u>or</u> publisher has ever accused Professor Martinez of violating any copyright. The Administration's claim that Professor Martinez had violated copyright is nonsense.

Second—as evidence of her good faith—Professor Martinez repeatedly asked the Administration for guidance regarding complying with the federal copyright laws and the Administration's related directives. In response to Professor Martinez's repeated requests, the Administration either provided Professor Martinez with inaccurate guidance or with no guidance at all. <u>See</u> attached Exhibits 22, 25, 35, 36, 40, 44, 47, 53, and 56. In addition, Professor Martinez has consistently sought and obtained written permission from both colleagues and publishers to use their materials. <u>See</u> attached Exhibits 22 and 31.

Third, the Administration has attempted to punish Professor Martinez for using mathematic materials that other mathematics professors routinely employ throughout the District. This demonstrates that the Administration's treatment of Professor Martinez has been both arbitrary and capricious. It has also been rude and disrespectful.

MCCCD/Martinez 03208

Fourth, all of the District's allegations regarding Professor Martinez's alleged copyright violations arose during the 2010 year.  Professor Martinez has complied with the Administration's instructions regarding copyright issues since that time. Based on Professor Martinez's twenty-eight years of dedicated service to the District—and the inherently confusing nature of federal copyright law, which even the District's own lawyers do not understand—the Administration's proposed punishment of termination is too harsh in light of the underlying offense.

**2.    Professor Martinez did not violate the District's rules governing unauthorized compensation.**

In the Fall semester of 2012, Professor Martinez decided that she could best teach her students using course materials other than a published textbook. This is a common practice throughout academia in general and the District in particular.  Professor Martinez offered to allow each student to make a copy of the materials at the student's expense.  Because this promised to be an inefficient and laborious process, Professor Martinez offered to copy the materials for her students and each student could subsequently reimburse her for her out-of-pocket copying costs.

Professor Martinez took the materials and had them copied at a nearby "Staples" office supply store.  See attached Exhibit 21.   Each student subsequently reimbursed Professor Martinez for his or her share of the copying costs.   Professor Martinez did not make any profit from the copies.   To the contrary, she actually lost money making the copies!

Once again, Professor Martinez only asked the students to reimburse her

-3-

MCCCD/Martinez 03209

for the actual cost of copying approximately sixty copies of her course materials. She did <u>not</u> charge for her time <u>or</u> travel expenses in reference to making the copies.   In fact, she even rounded out her costs to the lowest round dollar and sought reimbursement only for that amount.

The Administration subsequently accused Professor Martinez of obtaining unauthorized "compensation" from her students in violation of District rules. The Administration's allegation in this regard is false (and in fact silly) because reimbursement for out-of-pocket expenses resulting in <u>no</u> profit does <u>not</u> constitute "compensation" in violation of District rules.

Once again, when Professor Martinez asked for guidance from the Administration, the District's General Counsel Lee Combs refused to help her. <u>See</u> attached Exhibit 20.

Moreover, and in any event, the Administration's proposed sanction of termination is <u>not</u> justified by the alleged underlying misconduct because the alleged underlying misconduct is trivial at best and bogus at worst.   Indeed, the District's attempt to terminate Professor Martinez's employment based upon these facts is evidence of either personal animosity or arbitrariness, <u>not</u> of any good faith attempt to enforce the District's rules.

Respectfully submitted this 13th day of November 2013.

**MONTOYA, JIMENEZ & PASTOR, P.A.**

<u>s/ Stephen Montoya</u>
Stephen Montoya
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
Attorney for Plaintiff

-4-

MCCCD/Martinez 03210

I hereby certify that on November 13, 2013, the foregoing document was sent via email to:

Ernest Calderon
Ridenour Hienton & Lewis, PLLC
201 North Central Avenue, Suite 3300
Phoenix, Arizona 85004
ecalderon@rhlfirm.com
Counsel to the Hearing Committee

and

Pavneet Uppal
Fisher & Phillips, LLP
201 East Washington Street, Suite 1450
Phoenix, Arizona 85004
puppal@laborlawyers.com
Attorney for Maricopa County
Community College District

s/ Stephen Montoya

MCCCD/Martinez 03211

# EXHIBIT 18

MCCCD/Martinez 03212

# STEPTOE & JOHNSON LLP

### ATTORNEYS AT LAW

Fredric D. Bellamy
602.257.5204
fbellamy@steptoe.com

Collier Center
201 East Washington Street
Suite 1600
Phoenix, AZ 85004-2382
Tel 602.257.5200
Fax 602.257.5299
steptoe.com

December 16, 2010

Cleopatria Martinez, Ph.D.
7030 North 21st Street
Phoenix, AZ 85010

Re: Review of Copyright Issues Relating to Class Lecture Notes

Dear Dr. Martinez:

You requested that I review your lecture notes with respect to issues of potential copyright infringement. In connection with doing so, I also reviewed your correspondence with the publisher of the textbook that you use these notes with, and specifically considered whether they fall within the scope of your publisher's permission or as fair use under U.S. copyright law, or both. The materials you sent me include your Spring 2010 lecture notes for MAT182 Trigonometry, as well as the pages from the required textbook that contain similar math problems and that discuss the subjects on which you lectured. You also included a copy of correspondence you received from Ronnie Elliott discussing certain issues relating to copyright permission.

In reviewing these materials, I note that my practice as a lawyer has included copyright infringement actions since I began practicing law in Arizona (and in federal court in the Northern District of California). After graduating from Harvard Law School in 1986, I have spent a substantial portion of my legal practice over almost 25 years representing clients in copyright, trademark, unfair competition and other intellectual property matters. I have been recognized in a publication (based on a peer-review methodology) as a "Southwest Superlawyer" in the field of Intellectual Property Litigation, and I have frequently counseled clients on copyright and other intellectual property-related issues. I have also spoken many times at continuing legal education programs for bar and other organizations, including the Phoenix City Attorney's office, on copyright and related legal areas.

Based on the materials I reviewed, it is my conclusion that your lecture notes fall clearly within the scope of the fair use doctrine in copyright law. My conclusion is based on the following factors:

MCCCD/Martinez 03213

Ms. Cleopatria Martinez                                    STEPTOE & JOHNSON LLP
December 16, 2010
Page 2 of 2

    1.    The purpose and character of your lecture notes are not for any commercial purpose and are purely for nonprofit educational purposes. Indeed, in my view your lecture notes are the quintessential educational-purpose types of materials that fall squarely within the core of the fair use defense's ambit and reason for existence. It is in the nature of a required textbook to be used as a source material for a professor's lectures.

    2.    The nature of the copyrighted work is that of a textbook on mathematics, which implies and anticipates the type of uses reflected in your lecture notes. It is in the implicit nature of such a textbook containing mathematical problems or exercises that the enrolled students may be asked to develop, practice and demonstrate their knowledge and understanding of the textbook's lessons by performing additional exercises similar in nature to those presented in the textbook. In my review of the problems set forth in your lecture notes, it appears that they are based on similar mathematical principles with changes in the numerical or other pertinent parameters designed to assist students in the learning of the textbook's lessons as used and taught by you as the course instructor and professor.

    3.    The amount and substantiality of the portion of the copyrighted materials used in relation to the textbook as a whole is reasonable in light of the notes' supplementary nature to your lectures based on that book. The lecture notes appear to be intended to serve as a convenient means for your students to pay attention to your lectures and to retain the information, while providing them with additional exercises based on the mathematical principles you are teaching in the trigonometry course. The lecture notes do not appear to supplant the textbook, but rather to supplement it. The use of materials appears to be limited to that purpose and context.

    4.    There does not appear to be any adverse effect on the potential market for the textbook based on the lecture notes, as the students are required to purchase the textbook for the course. The absence of any such effect on the market is consistent with the fact that the publisher has granted you permission to use the materials in the precise manner in which you used them.

Therefore, all of these factors support the conclusion that your lecture notes clearly fall within the fair use doctrine under U.S. copyright law under the circumstances. I am not aware of any factor that militates in favor of a contrary conclusion, and do not see a reasonable basis in this situation for undue concern about potential copyright infringement. Please let me know if you have any questions.

    Sincerely,

    *Fredric D. Bellamy / dh*

    Fredric D. Bellamy

FDB:dh

# EXHIBIT 19

MCCCD/Martinez 03215



# RYLEY CARLOCK
& A P P L E W H I T E
*Attorneys*

## Fredric D. Bellamy
**Shareholder**

One North Central Avenue    fbellamy@rcalaw.com
Suite 1200                   P (602) 440-4835
Phoenix, AZ 85004-4417       F (602) 257-6935



Following his graduation from Harvard Law School in 1986 and Harvard University in 1983, Fredric Bellamy began practicing law, accruing 25 years of experience in civil litigation and alternative dispute resolution, focusing on complex "bet-the-company" high-stakes cases relating to many of the most difficult issues facing businesses in the West. His experience includes litigation on behalf of major financial institutions and banks, including lender liability, financial, securities fraud and racketeering matters, international mining companies, major retailers and manufacturers, and technology companies. Experience with financial institutions includes:

- Representing one of the country's largest banks in fraud litigation in Tucson involving the financing of nuclear power plants in the West, in a case that involved over $2.2 billion in alleged damages -- a case that settled on favorable terms after the first month of a jury trial.

- Representing local banks in defending against highly charged lender liability suits, resulting in favorable rulings after the filing of summary judgment motions.

- Representing a major savings and loan in financial fraud litigation involving the financing of a master-planned community in Arizona, defending against a large Japanese real estate company -- a case that settled on highly favorable terms after Fredric filed a comprehensive motion for summary judgment following dozens of depositions and extensive document discovery.

Fredric's substantial experience in all phases of complex litigation has frequently led to his representation of clients in cases involving highly technical issues, including issues relating to finance, economics and accounting, as well as a broad range of scientific and engineering issues. Recognizing Fred's breadth and depth of experience in dealing with a variety of difficult technical disputes, Fred has been named in Best Lawyers in America® (2008-2012), in Southwest Superlawyers (2007-2010), and in Chambers USA (2007-2010). Chambers USA (2007) noted that Fredric's "litigation practice has seen him involved in some very sizeable cases. He is widely perceived as a 'substantive lawyer' with a quick grasp of scientific issues and a creative approach." Fredric's experience with highly technical cases includes:

- Representing the country's largest copper mining company in toxic tort and environmental litigation in a complex, multiple-party series of cases that lasted nearly two decades, including two interlocutory appeals and defense against a class action, with a settlement achieved as the case was being prepared for trial.

- Representing a major jet plane manufacturer in environmental litigation focusing mostly on complex issues relating to corporate successorship, achieving a highly favorable settlement after filing a successful motion for summary judgment following years of discovery.

- Representing one of Arizona's largest cities in a complex case involving issues relating to the construction and maintenance of a landfill, resulting in a highly favorable settlement before trial, following the filing of several dispositive motions.

Fredric's experience includes class actions, multi-district (MDL) litigation, and other complex cases, and he has extensive experience with e-discovery and document discovery issues that are critical in complex and especially high-stakes litigation.

**OFFICES**

Phoenix, AZ

**SOLUTIONS**

Intellectual Property
Litigation
Lender Liability Defense Group
Water, Energy, Resources and
Environmental Law
Water
Environment
Natural Resources

**EDUCATION**

Harvard Law School J.D., 1986
Harvard University B.A., 1983,
*cum laude*

**ADMISSIONS**

Arizona 1986
US Supreme Court
US Court of Appeals, Ninth
Circuit

MCCCD/Martinez 03216

In 2007, Fredric received the prestigious Burton Award for Distinguished Legal Achievement at the Library of Congress, an award that recognizes 30 entries (out of 1,000 entries submitted by the nation's leading law firms each year) for excellence in legal writing in plain English. Fredric's writings have included chapters on electronic data security and data breaches in the Intellectual Property Deskbook for Business Lawyers, published by the American Bar Association, as well numerous other publications.
He is recognized by Best Lawyers, *Super Lawyers,* and Chambers USA.

 

## MEMBERSHIPS

- Former Chairman, State Bar of Arizona Intellectual Property Section
- Former Chairman, State Bar of Arizona E-Commerce, Internet & Technology Law Section
- Founding Chairman, Technology Committee, Executive Council, State Bar of Arizona Young Lawyers Division

## NEWS

- Monday, August 19, 2013 Best Lawyers Recognizes Ryley Carlock for 2014
- Wednesday, June 19, 2013 Ryley Carlock Attorneys Selected As Leaders by Chambers USA
- Thursday, July 12, 2012 Chambers USA 2012 Details Client Praise for Ryley Carlock Lawyers
- Monday, September 12, 2011 Ryley Carlock & Applewhite Achieves First-Tier Rankings in 2012 Best Lawyers in America
- Monday, June 13, 2011 RCA Lawyers Selected as Leaders By Chambers USA
- Monday, January 24, 2011 Ryley Carlock & Applewhite Adds Shareholder Fredric D. Bellamy from Steptoe & Johnson

MCCCD/Martinez 03217

# EXHIBIT 21

MCCCD/Martinez 03218



Staples
106 W. Osborn Rd
Phoenix, Az. 85013

that was easy:

Tel:   602-248-8122
Fax:   602-248-8006
cc0392@staplescopycenter.com

Fabian Garcia
Certified Print Pro
Staples Copy & Print

www.staples.com

COPY HOLD TRANSACTION

TRAN NO.: 52857   REGISTER NO.: 005
DATE: 04/05/2013

2 ITEM(S): $294.84

1575 1-100 BW LTR STD
     713893        0.100ea           157.50
  25  14MM SPIRALL - BIN
     625909        4.490ea           112.25

1636659 005 052857
0392 04/05/2013 01:48



0 5 5 2 8 5 7

Company Name: 0000
Name: 0000 0000
Phone Number: 000-000-0000
Time Due: 7:00a

MCCCD/Martinez 03219

# EXHIBIT 20

MCCCD/Martinez 03220



Judy Castellanos <judil02211@domail.maricopa.edu>

## Fwd: $11 Refund

1 message

Anna Solley <anngh24831@phoenixcollege.edu>                     Wed, Apr 3, 2013 at 3:58 PM
To: "judy.castellanos@domail.maricopa.edu" <judy.castellanos@domail.maricopa.edu>
Cc: Casandra Kakar <Casandra.Kakar@phoenixcollege.edu>

Begin forwarded message:

From: Lee Combs <lee.combs@domail.maricopa.edu>
Date: December 13, 2012 11:08:06 AM PST
To: cleopatria.martinez@phoenixcollege.edu
Subject: Re: $11 Refund
Reply-To: lee.combs@domail.maricopa.edu

Dr. Martinez,

The Code of Professional Responsibility prohibits me from giving you advice on this matter,
because you are in a legal posture adverse to my client. Nor can anything I say supersede
President Solley's direction to you.

On Thu, Dec 13, 2012 at 11:51 AM, Cleopatria Martinez <cleopatria.martinez@
phoenixcollege.edu> wrote:
    I have a question about the $11 refund: I want to know if I can request the booklet be returned to
    me in exchange for the $11 refund. Also, please send me a copy of the policy.
    Thank you,
    Cleopatria

On Tue, Dec 11, 2012 at 1:50 PM, Joe Sueyoshi <joe.sueyoshi@phoenixcollege.edu> wrote:
    I have received a complaint from one of your former students concerning the $11 refund. As
    per the corrective action and with consultation with District Legal, the student is to receive the
    $11 reimbursement. The student can provide a receipt, but returning the booklet is not a
    condition of receiving the refund. This type of conflict is one of the reasons why there are
    District cash handling policies.

    Failure to comply with students' requested refunds may be interpreted as insubordination. I
    suggest you proceed accordingly.

    joe

    —
    Joe Sueyoshi
    Phoenix College
    Math Department Chair

MCCCD/Martinez 03221



4/11/13                                    Maricopa Community College District Mail - Fwd: $11 Refund

602/285-7885

**Lee Combs:** General Counsel

2411 West 14th Street, Tempe AZ 85281
phone | 480-731-8878 · fax | 480-731-8890
email | lee.combs@domail.maricopa.edu

MCCCD/Martinez 03222

# EXHIBIT 22

MCCCD/Martinez 03223

*(2)  Permission not needed to*
*replace the textbook examples with nzv own examples*

**Subject:** RE: Substitution of my problems
**From:** Estelle.Simpson@Pearson.com
**Date:** 8/23/2010 5:13AM
**To:** cleopatria.martinez@pcmail.maricopa.edu

Cleopatria,
Yeyo   are correct ad may proceed with your request  as stated below.
Kind Regards
Estelle

-----Original Message----- From:
cleopatria.martinez
[mailto:cleopatria.martinez@pcmail.marjcopa.edu]
Sent: Sa.turday, **August 21, 2010** 1:43 AM
To: Simpson, Estelle
Subject: Substitution of my problems

Estelle,      8-20-10
On 8-17-10 I swnmarized my understanding of our phone conversation. That
is, t.J·at  ▌did not need t:'le publisner's permission to use  (l:-, ﬂy lec:-...:.re
otes which ▌may discrib-...:.re to st-...:.de rs for their  se in my precalc-...:.l s
class at PC) my own problems which are similar to the selected exa ples
in the adopted textbook by Sullivan.  ▌haven't heard back from you.
Would you kindly confirm whether ▌ need permission to do the above'?
Thank you,
Cleopatria

**From:** cleopatria.martinez@pcrnail.maricopa.edu
**Date:** B/17/2010 1:20 PM
**To:** Estelle.Costa@Pearson.corn

> A5 per our telephone conversation last week, I wish to confirm
Agreement that I could substitute in my lecture notes my own problems which
are similar to the selected examples in the adopted textbook by Sullivan,
PRECALCULUS: CONCEPTS THROUGH FUNCTIONS, A RIGHT TRIANGLE APPR, copyright:
2011 ?earso:r: Ed·c×cat:ion, Inc. Reprinted by perrdss:ion of ?earsoT: :C:d·,;eac:ion,
Inc. It is wy understanding I do not. need the publisher?s permission in
Regards to using the problems I have created for my lecture notes k:-.ich I rr.ay
Distribute to students for their use in my MAT187 Precalculus math class at
Phoenix College.
Thank you,
Cleopatria
>

EEOC140   MCCCD/Martinez 03224

## 3) _I mar use textbook examples in mv lecture notes_

Subject:     RE: Borrowing Text Examples for Lecture Notes
From:        Estelle Simpson
Date:        10/8/2010 8:05AM              FWD: j Abdo  2:04PM
To:          Cleopatria Martinez

Yes for as long as you are adopting the text and it is being purchased by the students
Best

Estelle Simpson
Permissions Specialist
Pearson Education, Inc.
501 Boylston Street, Suite 900
Boston, MA 02116
lilt  estelle.simpson@pearson.com
V   617-671-3445
    617-671-3447


From: cleopatria.martinez [mailto:cleopatria.martinez@pcmail.maricopa.edu]
Sent: Friday, October 08, 2010 11:02 AM   8:01AM
To: Simpson, Estelle
Subject: Borrowing  Text Examples for Lecture Notes

Hi Estelle,     10-8-10

I hope all is going well for you.

I am using the Sullivan. PRECALCULUS: CONCEPTS THROUGH FUNCTIONS, A RIGHT
TRIANGLE APPR, © 2011 Pearson Education, Inc. Reprinted by permission of Pearson
Education, Inc. Students are required to purchase this textbook and I use it to teach the
class.

I teach using lecture notes I make summarizing the main points needed to understand a
concept. May I every so often use examples from the text in my lecture notes?  Is it ok if I
distribute these lecture notes which may contain examples from the required textbook to
my students?.

Thanking you in advance for a speedy response.

Cleopatria

## 4) I ma-v use textbook problems in my exancs

| | |
|---|---|
| Subject: | RE: Use of textbook questions on tests |
| From: | Estelle.Simpson@Pearson.com |
| Date: | 10/19/2010 1:13PM |
| To: | Cleopatria Martinez |

Cleopatria,
As long as the books you mention, Briggs & Sullivan, have actually been adopted for your course/s AND have been purchased by the students, you are free to use the questions form the text's in any many that best suits your teaching needs.
I hope this helps.

| | |
|---|---|
| Subject: | RE: Use of textbook questions on tests |
| From: | Cleopatria Martinez |
| Date: | 10/19/2010 1:06PM |
| To: | Estelle. Siplpson@Pearson.com |

Estelle,   10-19-10
I must apologize for the clarification that I needed from you as a publisher. My immediate supervisor and the college administration have questioned this practice of using problems from the Precalculus textbook in tests.
You indicated use of text questions for tests was fine for the Briggs/Cochran text but it was not specifically stated that the same was true for Sullivan's Precalculus text. I am sorry for taking up so much of your time but it is impmtant that I make this specific inquiry.
Thank you for your reply.

| | |
|---|---|
| Subject: | RE: Use of textbook questions on tests |
| From: | Estelle. Simpson@Pearson.com |
| Date: | 10/19/2010 5:22AM |
| To: | Cleopatria Martinez |

I thought I'd already done that Cleopatria

| | |
|---|---|
| Subject: | RE: Use oftextbook questions on tests |
| From: | Cleopatria Martinez |
| Date: | 10/19/2010 1241 PM |
| To: | Estelle.Simpson@Pearson.com |

Hi Estelle,   10-19-10
Would you verify that the same is true regarding my use of questions from the Sullivan text (also adopted and purchased by students) in tests for the class?
Thanks

| | |
|---|---|
| Subject: | RE: Use oftextbook questions on tests |
| From: | Estelle.Simpson@Pearson.com |
| Date: | 10/19/2010 5::22 AM |
| To: | Cleopatria Martinez |

Cleopatria,
You are fine to use your choice of questions from the Briggs/Cochran text as long as the text has been adopted and purchased by the students,
Best  *ES. m-*

Subject:      Use of textbook questions on tests
From:         Cleopatria Martinez IO/I8/2OIO
Date:         3:17PM
To:           Estelle.Simpson@Pearson.com
Bcc           Cleopatria Martinez

Hi Estelle,   I0-18-10
I haven't heard from you regarding my use of textbook questions on my exams. I have also
adopted the Calculus textbook by Briggs/Cochmn. I am preparing a Calculus test. Please send me
your response ASAP. I want to be certain that my use of questions from the textbook on tests does
not require per1Iission, and I do not need to credit the author when I use these questions on
a test since the book is adopted and students are required to purchase it.
Thanks,
Cleopatria

Subject:      Use of textbook questions on tests
From:         Cleopatria Martinez
Date:         10/13/2010 9:53AM
To:           Estelle.Simpson@Pearson.com
Bcc           Cleopatria Martinez

Hi Estelle,   10-13-10
I hope you are having a great day.

I adopted the Sullivan textbook, PRECALCULUS: CONCEPTS THROUGH FUNCTIONS, A
RIGHT TRIANGLE APPR, © 2011 Pearson Education, Inc. Reprinted by permission of
Pearson Education, Inc. Students are required to purchase this textbook

I often use questions out of the textbook \When I write up my tests. Do I need permission to do
this, and do I need to credit the a11thor when I use a question from the textbook in a test given to
the students?

Thanking you in advance for your response,
Cleopatria

*(1 ) Permission to copy selected Ho;nework Probletns*

Your Reference: Permission Request:

Div: OR: Code: 9780131874763

Req No: 38634: Cust No: 15205

Date: APR 13 10        Via Fax: 602-285-
7668

Cleopatria Martinez

Phoenix College

1202 W. Thomas Rd.

Phoenix, AZ 85013

is hereby granted permission to use the material indicated in the following acknowledgement This acknowledgement must be carried on the copyright or acknowledgements page of your book or as a footnote on the page on which the material appears:

Sullivan, PRECALCULUS: CONCEPTS THROUGH FUNCTIONS, A RIGHT TRIANGLE APPR, © 2007. Reprinted by permission of Pearson Education, Inc.

Please note: If the material is to be stapled or bound, the credit line must appear on the first page on which our material appears. If not stapled or bound, the credit line must appear on each page of our material.

This material may only be used in the following manner:

To make up to 35 copies of selected Homework problems from each section of Chapters 5, 6 and 7, pp. 371-563 for Professor Martinez and students for the course MAT187-PRECALCULUS beginning Fall2010 at Phoenix College. Permission is granted free of fee on the understanding that the above textbook has been adopted for the course and purchased by the students.

This permission is non-exclusive and applies solely to the following language(s) and territory:

Language(s):   EngHsh      Territory: Phoenix College

IMPORTANT NOTICE:

Pearson Education, Inc. reserves the right to take any appropriate action if you have used our intellectual property in violation of any of the requirements set forth in this permissions letter. Such action may include, but is not limited to, the right to demand that you cease and desist in your use of Pearson Education's material and remove it from the marketplace.

This permission does not allow the reproduction of any material copyrighted in or credited to the name of any person or entity other than the publisher named above. The publisher named above disclaims all liability in connection with your use of such material without proper consent.

*E. Costa*

*fE.steffe Costa*

*Permissions Administrator*

*Pearson Education, Inc*

*501 Boylston Street*

*Boston, MA 02116*

*Tel:   617-671-3445*

*Fax:   617-671-3447*

*Email:*

*Please visit the following website to access our Disability Request Form if you are requesting an altenwtive format for the print impaired:*

EEOC137     MCCCD/Martinez 03229

GARRISON 0378

*(11 New Edition:  Permission to copy selected Homework Problems*

Your Reference: Permission Request

Div: OR: ISBN: 9780321645081

Req No: 39028: Cust No: 15205

Date: MAY 13 10        Via Fax: 602-285-7668

Cleopatria Martinez

Phoenix College

1202 W. Thomas Rd.

Phoenix, AZ 85013

is hereby granted permission to use the material indicated in the following acknowledgement. This acknowledgement must be carried on the copyright or acknowledgements page of your book or as a footnote on the page on which the material appears:

Sullivan, PRECALCULUS: CONCEPTS THROUGH FUNCTIONS, A RIGHt TRIANGLE APPR, © 2011 Pearson Education, Inc. Reprinted by permission of Pearson Education, Inc.

Please note: If the material is to be stapled or bound, the credit line must appear on the first page on which our material appears. If not stapled or bound, the credit line must appear on each page of our material.

This material may only be used in the following manner:

To make up to 50 copies of selected Homework Problems from each section of Chapters 6, 7, 8 and 9 for Professor Martinez and students for the course MAT187- PRECALCULUS beginning Fall 2010 at Phoenix College. Permission is granted free of fee on the understanding that the above textbook has been adopted for the course and purchased by the students.

EEOC138    MCCCD/Martinez 03230

This permission *is* non-exclusive and applies solely to the following language(s) and territory:

Language(s):     English       Territory:  Phoenix College

IMPORTANT NOTICE:

Pearson Education, Inc. reserves the right to take any appropriate action if you have used our intellectual property in violation of any of the requirements set forth in this permissions letter. Such action may include, but is not limited to, the right to demand that you cease and desist in your use of Pearson Education's material and remove it from the marketplace.

This permission does not allow the reproduction of any material copyrighted in or credited to the name of any person or entity other than the publisher named above. The publisher named above disclaims all liability in connection with your use of such material without proper consent.

*E. Costa*

Please visit the following website to access our Disability Request Form if you are requesting an alternative format for the print impaired:

EEOC139    MCCCD/Martinez 03231

# EXHIBIT 25

MCCCD/Martinez 03232

Re: Conversation Today

*Combs  4-8-10*
*McConnell  4-8-10*

**Subject:** Re: Conversation Today
**From:** Lee Combs <lee.combs@domail.maricopa.edu>
**Date:** Thu, 08 Apr 2010 16:53:15 -0700
**To:** Margaret McConnell <margaret.mcconnell@domail.maricopa.edu>
**CC:** Cleopatria Martinez <cleopatria.martinez@pcmail.maricopa.edu>, Anna Solley
<anna.solley@pcmail.maricopa.edu>, Casandra Kakar <casandra.kakar@pcmail.maricopa.edu>

All,

I would add these points.

With a staff of three lawyers, we can not be in the business of certifying that course materials created
by every faculty member every semester are compliant with copyright law. Moreover, our obligation is
to encourage and support legal compliance, not to assist a client to evade the law's intent and hope our
frail argument can get the client out of trouble. That obligation is not well served when we are asked to
substitute advocacy for advice, as seems to be the case here. Maggie is essentially asked to approve the
result of an inherently risky strategy - modifying or "tweaking" a textbook problem by changing the
numbers. This "fine tuning" just makes a derivative work, use of which without permission is no less
illegal. There is always a degree of uncertainty as to what constitutes fair use, but given the size of the
penalty for each violation it is not in the legal interest of Maricopa Community Colleges or any
individual faculty member to test the limits of that uncertainty. Our advice is that the risk of incurring
penalties involved in pursuing that strategy are essentially the same as copying: they are unacceptably
high from the institution's standpoint, and the strategy must not be used.

Courts tend to reject arguments made under the so-called Fair Use Doctrine when the effect of a
practice is to undermine the market for a work. In this case, I understand that there is a consistent
pattern: students in Dr. Martinez' classes either do not purchase the required text or take it back for a
refund after learning about the course materials. The demonstrable market effect vitiates any other
argument that what she is doing is Fair Use. Dr. Martinez' self-evident intention to save students
money is honorable, but the means she has used is illegal and exposes her individually to substantial
financial penalties, as well as the risk of a plagiarism charge.

Our advice is that the course materials Dr. Martinez distributes to classes must be clearly and
demonstrably her own original work, unless she attributes authorship to another, whose permission for
such use is documented.

Margaret McConnell wrote:

> Cleopatria -
>
> This is a summary and a follow-up to our conversation today, in which you asked for time on my
> schedule to review some of your class materials.  When I advised you to speak to your librarian
> about these questions, you responded that the librarian had advised you to speak to me.
>
> It is my understanding that you wanted advice concerning whether, in your words, changing a
> number from a 3 to a 5 or a plus to a minus from someone's copyrighted math equation,
> presumably in a text book, would avoid a copyright violation. I explained to you that numbers and

1 of 2

Re: Conversation Today

4-8-10

sequences of numbers are within the definition of "literary works" under the federal copyright law. While I noted that "2 + 2 = 4" is not copyrightable, I advised that more complicated math equations are. I stated that the only way for you to ensure that you do not violate copyright is to make up the math equations completely on your own to illustrate a math theory. As I noted, that would be the only safe approach and, with your advanced degree and your year's of experience that should not be difficult.

You still indicated that you wished for me to review your materials. (You also advised that you could not attend the special presentation that I and Hazel Davis prepared on copyright law for Phoenix College last month because of other commitments.) However, as I reiterated, I'm not going to be in a position to tell you whether the changing of a number or two, or of a mathematical sign, is enough.

In fact, no MCCCD employee is going to be in a position to tell you that "tweaking" is OK, particularly when the owner of the original work isn't given credit for the "tweaked" work. The verdict under the law would almost certainly be that "tweaking" would not solve the problem, and that is the answer that you are going to get from a wide range of folks that you might consult. Changes to an exiting copyrighted work make the work a derivative under the law, and the copyright owner of the original work has rights in that changed work as well as to the original.

It appears from our conversation that you persist in thinking, however, that "tweaking" at a certain point will be OK from a copyright standpoint. That is troublesome, given that the college and, to some degree, this office have been dealing with you on this issue at a minimum for nearly two months. The more that you push to find a bright line between a copyright violation and changing someone's work to make it appear to be original, which does not exist in the law, the more it will be difficult for your department and administration to feel comfortable with giving you copying privileges.

You may avoid all of the questions and potential legal pitfalls by simply crafting all of the illustrative equations in your lecture notes yourself. I have received a copy of the letter that Dr. Solley recently sent you concerning these matters and given the potential for personal liability on them in the future, I would urge you to create your own equations. Based on the observations I make in this note, it will not be useful for us to meet and go over your materials.

Maggie


Margaret E. McConnell
Assistant General Counsel


MARICOPA COMMUNITY COLLEGES
**Office of General Counsel**
2411 West 14th Street
Tempe, AZ 85281-6942
**Tel:** 480.731.8888  **Fax:** 480.731.8890
www.maricopa.edu/legal

# EXHIBIT 31

MCCCD/Martinez 03235

Feb. 7, 2011

Dr. Cleopatria Martinez has my
Permission to use my handouts.

Elena Sung

MCCCD/Martinez 03236

Section 2.2 - Operations with fractions

①  $\dfrac{3}{5}$

②  $\dfrac{a}{1} =$  ,  $\dfrac{a}{a} =$  ,  $\dfrac{0}{4} =$  ,  $\dfrac{4}{0}$

③  3 types of fractions
{ Proper, Improper, mixed numbers

④  Reduce fractions to its lowest terms

$\dfrac{18}{24}$ ,  $\dfrac{36}{48}$ ,  $\dfrac{75}{225}$ ,  $\dfrac{120}{480}$

⑤  Build fractions

$\dfrac{2}{3} = \dfrac{}{18}$ ,  $\dfrac{2}{7} = \dfrac{}{35}$ ,  $\dfrac{4}{5} = \dfrac{}{40}$

⑥  Round decimals

⑦ (A)  $\left(\dfrac{10}{9}\right)\left(\dfrac{3}{5}\right)$     (B)  $\dfrac{7}{12} \div \dfrac{5}{6}$

MCCCD/Martinez 03237

(C) $\dfrac{\dfrac{11}{12}}{\dfrac{5}{24}}$

(D) $\left(3\dfrac{5}{6}\right) \div \left(2\dfrac{2}{3}\right)$

(E) $\dfrac{4}{22} + \dfrac{8}{22}$

(F) $\dfrac{2}{3} - \dfrac{1}{4}$

(G) $1\dfrac{2}{3} + 2\dfrac{5}{6}$

(H) $3\dfrac{1}{2} - 1\dfrac{3}{4}$

(I) $5 - 3\dfrac{1}{4}$

MCCCD/Martinez 03238

# EXHIBIT 35

MCCCD/Martinez 03239

**April Roll**

| | |
|---|---|
| **From:** | Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu] |
| **Sent:** | Friday, November 01, 2013 1:45 PM |
| **To:** | April Roll |
| **Subject:** | Fwd: Electronic Copy of Dec 9, 2010, letter |

---------- Forwarded message ----------
From: <cleopatria.martinez@pcmail.maricopa.edu>
Date: Fri, Jan 7, 2011 at 4:16 PM
Subject: Re: Electronic Copy of Dec 9, 2010, letter
To: anna.solley@pcmail.maricopa.edu
Cc: renee.perry@pcmail.maricopa.edu

January 7, 2011

Dear President Solley,

Mr. Eddie Genna said you wanted me to direct my questions and concerns to
you regarding your letter of December 9, 2010.  There are areas of clarification
I need.

Please clarify what you mean by ?course materials? when you say I must ?use
only course materials approved by the department, that are available in the
bookstore for sale to the students and that are authored by persons other
than yourself.?
Can I write my own tests?
What about my use of universal math formulas for graphs, trigonometry, and
calculus which I selected and prepared for my students to memorize but I
have not found such documents in other materials?
Can I use materials authored by my colleagues in the math department?

Specifically what are you referring to when you say ?I have also considered
our experiences under the current temporary arrangement???
I am not aware of any ?printing or copying? of ?unauthorized materials? or
failure ?to follow the law as well as Maricopa policies and procedures??
during summer and fall 2010.
I want to rectify whatever misunderstanding has occurred but I need to know
details.

I thank you for your response to these questions.

Cleopatria


>-- Original Message --
>Date: Fri, 10 Dec 2010 16:43:12 -0700
>From: Renee Perry <renee.perry@pcmail.maricopa.edu>
>To: "cleopatria.martinez" <cleopatria.martinez@pcmail.maricopa.edu>
>CC: Anna Solley <anna.solley@pcmail.maricopa.edu>
>Subject: Re: Electronic Copy of Dec 9, 2010, letter

11/1/2013

MCCCD/Martinez 03240

>
>
>Per your request.
>
>rp
>
>On 12/9/2010 11:35 AM, cleopatria.martinez wrote:
>> Good morning Dr. Solley,   12-9-10
>> Please provide me with an electronic copy of the letter that was
>> handdelivered to me today.
>> Thank you,
>> Cleopatria
>>
>
>Attachment: c.martinez.12_9_10docx-1.pdf
>
>
>Attachment: renee_perry.vcf
>

Cleopatria Martinez,PhD
Professor of Mathematics
Department of Mathematics
Phoenix College--MCCCD
1202 W. Thomas Road
Phoenix, Arizona  85013
Office:  602.285.7390
Fax:    602.285.7668

--
Cleopatria Martinez, PhD,   Department of Mathematics, Phoenix, College 80213,  (602) 285-7390

Cada cabeza es un mundo.

11/1/2013

MCCCD/Martinez 03241

# EXHIBIT 36

MCCCD/Martinez 03242

Page 1 of 2

**April Roll**

**From:**   Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu]
**Sent:**   Friday, November 01, 2013 1:45 PM
**To:**     April Roll
**Subject:** Fwd: FW: Acknowledgement of Receipt


---------- Forwarded message ----------
From: **David Munoz** <dmunoz7@cox.net>
Date: Tue, Jan 11, 2011 at 11:19 AM
Subject: FW: Acknowledgement of Receipt
To: cleopatria.martinez@pcmail.maricopa.edu
Cc: j v <julianini@hotmail.com>


-----Original Message-----
From: Copyright Office [mailto:cop-rc@locgov]
Sent: Tuesday, January 11, 2011 11:09 AM
To: dmunoz7@cox.net
Subject: Acknowledgement of Receipt

THIS IS AN AUTOMATED EMAIL - DO NOT REPLY.

Thank you for submitting your registration claim using the electronic Copyright Office (eCO) System. This
email confirms that your application and fee for the work Math is a foreign language for many people was
received on 01/12/2011. The following applies to registration claims only (not preregistrations):

The effective date of registration is established when the application, fee AND the material being registered
have been received. If you have not yet sent the material to be registered, logon to eCO and click the blue case
number associated with your claim in the Open Cases table, then do one of the following:

For digital uploads: Click the Upload Deposit button at the top of the Case Summary screen, then browse and
select the file(s) you wish to upload. Note: only certain classes of works may be registered with digital deposits
(See FAQs: http://www.copyright.gov/eco/faq.html#eCO_1.4).

For hardcopy submissions:  Click the Create Shipping Slip button at the top of the Case Summary screen, then
click the Shipping Slip link that appears in the Send By Mail table. Print out and attach the shipping slip to the
copy(ies) of your work. For multiple works, be sure to attach shipping slips to the corresponding copies.

A printable copy of the application will be available within 24 hours of its receipt. To access the application,
click the My Applications link in the left top most navigation menu of the Home screen.

You will be issued a paper certificate by mail after the registration has been completed. You may check the
status of this claim via eCO using this number [1-543779971].

[THREAD ID: 1-91KZ9L]

United States Copyright Office

11/1/2013

MCCCD/Martinez 03243

--
Cleopatria Martinez, PhD,   Department of Mathematics, Phoenix, College 80213,  (602) 285-7390

Cada cabeza es un mundo.

MCCCD/Martinez 03244

# EXHIBIT 37

MCCCD/Martinez 03245

**April Roll**

| | |
|---|---|
| **From:** | Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu] |
| **Sent:** | Friday, November 01, 2013 1:45 PM |
| **To:** | April Roll |
| **Subject:** | Fwd: Pay.Gov Payment Confirmation |

---------- Forwarded message ----------
From: <paygovadmin@mail.doc.twai.gov>
Date: Tue, Jan 11, 2011 at 11:09 AM
Subject: Pay.Gov Payment Confirmation
To: "cleopatria.martinez@pcmail.maricopa.edu" <cleopatria.martinez@pcmail.maricopa.edu>

THIS IS AN AUTOMATED MESSAGE.  PLEASE DO NOT REPLY.

Your transaction has been successfully completed.

Transaction Summary

Application Name: Copyright Fee Services
Pay.gov Tracking ID: 252A1B55
Agency Tracking ID: 1-91KXID

Name On Account: David Munoz
Transaction Type: ACH Debit
Transaction Amount: $35.00
Payment Date: Jan 12, 2011
Account Type: Personal Checking
Routing Number: 122105278
Account Number: ***********3192
Check Number: 142

Transaction Date: Jan 11, 2011 1:09:18 PM
Number of Payments Scheduled: 1
Frequency: OneTime

---

Cleopatria Martinez, PhD,   Department of Mathematics, Phoenix, College 80213,  (602) 285-7390

       Cada cabeza es un mundo.

MCCCD/Martinez 03246

# EXHIBIT 44

MCCCD/Martinez 03247

**April Roll**

| | |
|---|---|
| **From:** | Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu] |
| **Sent:** | Friday, November 01, 2013 2:05 PM |
| **To:** | April Roll |
| **Subject:** | Fwd: Meeting Request |

---------- Forwarded message ----------
From: **Anna Solley** <anna.solley@pcmail.maricopa.edu>
Date: Thu, Feb 17, 2011 at 5:35 PM
Subject: Re: Meeting Request
To: cleopatria.martinez@pcmail.maricopa.edu
Cc: Lee Combs <lee.combs@domail.maricopa.edu>, Casandra Kakar <casandra.kakar@pcmail.maricopa.edu>

Dr. Martinez, please send me a written proposal that includes your recommendations.

Sincerely,

Anna Solley, Ed.D.
President
Phoenix College

cleopatria.martinez@pcmail.maricopa.edu wrote:

> Dear Dr. Solley,    2-16-11
> I am asking to meet with you to resolve the continuing issue of my academic
> freedom and to end the impasse that I believe exists between the Phoenix
> College administration and me.  I feel that your directive does not allow
> me to do my job as a faculty member.
> I would like to propose a middle ground that all parties can live with.
> I look forward to receiving your response.
> Respectfully,
> Cleopatria
>
>
> Cleopatria Martinez,PhD
> Professor of Mathematics
> Department of Mathematics
> Phoenix College--MCCCD
> 1202 W. Thomas Road
> Phoenix, Arizona  85013
> Office:  602.285.7390
> Fax:    602.285.7668

--
Cleopatria Martinez, PhD,   Department of Mathematics, Phoenix, College 80213,  (602) 285-7390
        Cada cabeza es un mundo.

MCCCD/Martinez 03248

**April Roll**

| | |
|---|---|
| **From:** | Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu] |
| **Sent:** | Friday, November 01, 2013 2:05 PM |
| **To:** | April Roll |
| **Subject:** | Fwd: Meeting Request |


---------- Forwarded message ----------
From: **Anna Solley** <anna.solley@pcmail.maricopa.edu>
Date: Thu, Feb 17, 2011 at 5:35 PM
Subject: Re: Meeting Request
To: cleopatria.martinez@pcmail.maricopa.edu
Cc: Lee Combs <lee.combs@domail.maricopa.edu>, Casandra Kakar <casandra.kakar@pcmail.maricopa.edu>


Dr. Martinez, please send me a written proposal that includes your recommendations.

Sincerely,

Anna Solley, Ed.D.
President
Phoenix College

cleopatria.martinez@pcmail.maricopa.edu wrote:

> Dear Dr. Solley,   2-16-11
> I am asking to meet with you to resolve the continuing issue of my academic
> freedom and to end the impasse that I believe exists between the Phoenix
> College administration and me.  I feel that your directive does not allow
> me to do my job as a faculty member.
> I would like to propose a middle ground that all parties can live with.
> I look forward to receiving your response.
> Respectfully,
> Cleopatria
>
>
> Cleopatria Martinez,PhD
> Professor of Mathematics
> Department of Mathematics
> Phoenix College--MCCCD
> 1202 W. Thomas Road
> Phoenix, Arizona  85013
> Office:  602.285.7390
> Fax:    602.285.7668


--
Cleopatria Martinez, PhD,   Department of Mathematics, Phoenix, College 80213,  (602) 285-7390
        Cada cabeza es un mundo.

MCCCD/Martinez 03249

# EXHIBIT 45

MCCCD/Martinez 03250

# EXHIBIT 47

MCCCD/Martinez 03251

**April Roll**

| | |
|---|---|
| **From:** | Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu] |
| **Sent:** | Friday, November 01, 2013 2:13 PM |
| **To:** | April Roll |
| **Subject:** | Fwd: December 9, 2010 Directive |
| **Attachments:** | Bellamy--Intellectual Property Lawyer.bmp; Bellamy page 2.bmp |

---------- Forwarded message ----------
From: **cleopatria.martinez** <cleopatria.martinez@pcmail.maricopa.edu>
Date: Thu, Jan 27, 2011 at 3:29 PM
Subject: Re: December 9, 2010 Directive
To: Anna Solley <anna.solley@pcmail.maricopa.edu>
Cc: Lee Combs <lee.combs@domail.maricopa.edu>, Casandra Kakar <casandra.kakar@pcmail.maricopa.edu>, Harold Cranswick <harold.cranswick@pcmail.maricopa.edu>, Eddie Genna <eddie.genna@pcmail.maricopa.edu>, James Abdo <jabdo@napierlawfirm.com>, Michael Napier <mike@napierlawfirm.com>, Melissa Sailors <msailors@napierlawfirm.com>, Joe Sueyoshi <joe.sueyoshi@pcmail.maricopa.edu>

Dear President Solley,

Thank you for your response to my email dated 1/7/2011. I wish to fully comply with the terms of your directive. Would you verify my interpretation below?

1) I am understanding that I cannot write tests, quizzes, or handouts for students. With respect to tests and quizzes, I may only use problems from the textbook test bank or text homework problems. For my MAT120 class, I may only use Tim Bryan's tests if he gives me permission. I am limited to using test questions which are in the textbook test banks or homework.

2) I may write my syllabus. However, Mr. Sueyoshi may restrict the content of my syllabus.

3) When I use a colleague's material I may not change anything including the numbering of chapters from Roman Numerals to Arabic Numerals even if the author gives permission for such changes.

4) By the PC Math Department Policy, all math faculty (adjunct and residential faculty) may use Tim Bryan's material. However, you indicate that I "must obtain approval from Tim Bryan for the use of his materials." Tim gave his approval to me in an email written to Joe. Was it your understanding that perhaps I had not obtained his personal approval?

5) Universal math formulas/graphs are not copyrighted because they do not belong to a specific author. I select certain formulas and graphs to be memorized by my students. There is no author other than myself for these selected formulas and graphs. Consequently, I am not sure how to cite this kind of math content. Perhaps you could provide me with copyright guidance.

I do not believe you responded to the following question which I asked in my correspondence of January 7, 2011. I need to know to what events you are referring so that I can do better.

Specifically what are you referring to when you say "I have also considered our experiences under the current temporary arrangement..."? I am not aware of any "printing or copying" of "unauthorized materials" or failure "to follow the law as well as Maricopa policies and procedures..." during summer and fall 2010.
I want to rectify whatever misunderstanding has occurred but I need to know details.

Likewise, in the third paragraph of your directive dated December 9, 2010, you state "due to your repeated copyright violations..." I trust you will identify these "repeated copyright violations" as requested in my previous paragraph. I note that the District's expert legal counsel did not conclude with a finding of copyright violation but with a recommendation "to avoid the risk of copyright infringement" and even affirmed: "We cannot state definitively whether this particular work was created independently, nor is there sufficient evidence in the work itself for us to form an opinion that it was copied from other sources without permission."

Mr. Fredric Bellamy, an intellectual property Harvard lawyer with nearly 25 years experience, concluded that my "lecture notes clearly fall within the scope of the fair use doctrine in copy

Thanking you in advance for your timely response.

Respectfully,

Cleopatria Martinez, PhD

Attachment: Letter from Mr. Fredric D Bellamy

--
Cleopatria Martinez, PhD
Professor of Mathematics, Phoenix College, 1202 W. Thomas Rd,
Phoenix , Arizona 85013        (602)-285-7390

--
Cleopatria Martinez, PhD,  Department of Mathematics, Phoenix, College 80213, (602) 285-7390
        Cada cabeza es un mundo.

STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

Fredric D. Bellamy
602.257.5204
fbellamy@steptoe.com

Collier Center
201 East Washington Street
Suite 1600
Phoenix, AZ 85004-2382
Tel 602.257.5200
Fax 602.257.5299
steptoe.com

December 16, 2010

Cleopatria Martinez, Ph.D.
7030 North 21st Street
Phoenix, AZ 85010

Re: Review of Copyright Issues Relating to Class Lecture Notes

Dear Dr. Martinez:

You requested that I review your lecture notes with respect to issues of potential copyright infringement. In connection with doing so, I also reviewed your correspondence with the publisher of the textbook that you use these notes with, and specifically considered whether they fall within the scope of your publisher's permission or as fair use under U.S. copyright law, or both. The materials you sent me include your Spring 2010 lecture notes for MAT182 Trigonometry, as well as the pages from the required textbook that contain similar math problems and that discuss the subjects on which you lectured. You also included a copy of correspondence you received from Ronnie Elliott discussing certain issues relating to copyright permission.

In reviewing these materials, I note that my practice as a lawyer has included copyright infringement actions since I began practicing law in Arizona (and in federal court in the Northern District of California). After graduating from Harvard Law School in 1986, I have spent a substantial portion of my legal practice over almost 25 years representing clients in copyright, trademark, unfair competition and other intellectual property matters. I have been recognized in a publication (based on a peer-review methodology) as a "Southwest Superlawyer" in the field of Intellectual Property Litigation, and I have frequently counseled clients on copyright and other intellectual property-related issues. I have also spoken many times at continuing legal education programs for bar and other organizations, including the Phoenix City Attorney's office, on copyright and related legal areas.

Based on the materials I reviewed, it is my conclusion that your lecture notes fall clearly within the scope of the fair use doctrine in copyright law. My conclusion is based on the following factors:

MCCCD/Martinez 03253

Ms. Cleopatria Martinez                                    STEPTOE & JOHNSON LLP
December 16, 2010
Page 2 of 2

    1.     The purpose and character of your lecture notes are not for any commercial purpose and are purely for nonprofit educational purposes. Indeed, in my view your lecture notes are the quintessential educational-purpose types of materials that fall squarely within the core of the fair use defense's ambit and reason for existence. It is in the nature of a required textbook to be used as a source material for a professor's lectures.

    2.     The nature of the copyrighted work is that of a textbook on mathematics, which implies and anticipates the type of uses reflected in your lecture notes. It is in the implicit nature of such a textbook containing mathematical problems or exercises that the enrolled students may be asked to develop, practice and demonstrate their knowledge and understanding of the textbook's lessons by performing additional exercises similar in nature to those presented in the textbook. In my review of the problems set forth in your lecture notes, it appears that they are based on similar mathematical principles with changes in the numerical or other pertinent parameters designed to assist students in the learning of the textbook's lessons as used and taught by you as the course instructor and professor.

    3.     The amount and substantiality of the portion of the copyrighted materials used in relation to the textbook as a whole is reasonable in light of the notes' supplementary nature to your lectures based on that book. The lecture notes appear to be intended to serve as a convenient means for your students to pay attention to your lectures and to retain the information, while providing them with additional exercises based on the mathematical principles you are teaching in the trigonometry course. The lecture notes do not appear to supplant the textbook, but rather to supplement it. The use of materials appears to be limited to that purpose and context.

    4.     There does not appear to be any adverse effect on the potential market for the textbook based on the lecture notes, as the students are required to purchase the textbook for the course. The absence of any such effect on the market is consistent with the fact that the publisher has granted you permission to use the materials in the precise manner in which you used them.

Therefore, all of these factors support the conclusion that your lecture notes clearly fall within the fair use doctrine under U.S. copyright law under the circumstances. I am not aware of any factor that militates in favor of a contrary conclusion, and do not see a reasonable basis in this situation for undue concern about potential copyright infringement. Please let me know if you have any questions.

       Sincerely,

       Fredric D. Bellamy

FDB:dh

Doc. #609312 v.1

MCCCD/Martinez 03254

# EXHIBIT 53

MCCCD/Martinez 03255

## April Roll

**From:**    Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu]
**Sent:**    Friday, November 01, 2013 2:20 PM
**To:**      April Roll
**Subject:** Fwd: Textbook Required?

---------- Forwarded message ----------
From: **cleopatria.martinez** <cleopatria.martinez@pcmail.maricopa.edu>
Date: Mon, Apr 11, 2011 at 8:06 AM
Subject: Re: Textbook Required?
To: Wilbert Nelson <Wilbert.Nelson@phoenixcollege.edu>
Cc: "joe.sueyoshi@pcmail.maricopa.edu" <joe.sueyoshi@pcmail.maricopa.edu>,
"casandra.kakar@pcmail.maricopa.edu" <casandra.kakar@pcmail.maricopa.edu>

Wilbert,  4-11-11
This is a policy question.  What is the policy regarding textbook adoption by faculty?  Do we have the option of
recommending, requiring, highly recommending a textbook?  I will of course always use material that will give the
student(s) the foundation they need to succeed in the completion of their educational goals.  I simply wish to know
the policy regarding the textbook so I can respond to an email from Kelly Loucks regarding this topic..
I hope this clears it up for you but if you have additional questions, please feel free to ask me.
Respectfully,
Cleopatria


Wilbert Nelson wrote:

Cleopatria,



Good afternoon, I am not in a position to respond to your question since I am not sure what the context of
it is.  I would think that one would be using a textbook for a math course since in my mind this provides a
resource for the student and a reference point for the instructor.  I would strongly suggest that you discuss
your concerns regarding this issue with your Department Chair and examine what the consequences are if
no textbook is used for the instruction of your course.  The central question would be whatever material
that is used will it give the student(s) the foundation they need to succeed in the completion of their
educational goals.



Wilbert


---

**From:** cleopatria.martinez [mailto:cleopatria.martinez@pcmail.maricopa.edu]
**Sent:** Friday, April 08, 2011 1:10 PM
**To:** Wilbert Nelson
**Subject:** Re: Textbook Required?

MCCCD/Martinez 03256

Good Afternoon Wilbert, 4-8-11
Just a friendly reminder to please respond to my question: Can faculty recommend or highly
recommend a textbook and not require it? May I hear from you by Monday, April 11?
Thank you,
Cleopatria

cleopatria.martinez wrote:

Good Morning Wilbert,   4-6-11
Are faculty required to require a textbook in their classes or can the faculty
member recommend or highly recommend a textbook without requiring it?
Please advise.
Thank you,
Cleopatria

--

Cleopatria Martinez, PhD

Professor of Mathematics, Phoenix College, 1202 W. Thomas Rd,

Phoenix , Arizona   85013        W602-285-7390


--

Cleopatria Martinez, PhD

Professor of Mathematics, Phoenix College, 1202 W. Thomas Rd,

Phoenix , Arizona   85013        W602-285-7390


--
Cleopatria Martinez, PhD
Professor of Mathematics, Phoenix College, 1202 W. Thomas Rd,
Phoenix , Arizona   85013        W602-285-7390


--
Cleopatria Martinez, PhD,  Department of Mathematics, Phoenix, College 80213,  (602) 285-7390

        Cada cabeza es un mundo.

11/1/2013

MCCCD/Martinez 03257

# EXHIBIT 54

MCCCD/Martinez 03258

**April Roll**

| | |
|---|---|
| **From:** | Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu] |
| **Sent:** | Friday, November 01, 2013 2:20 PM |
| **To:** | April Roll |
| **Subject:** | Fwd: Request permission to copy my lecture notes |


---------- Forwarded message ----------
From: <cleopatria.martinez@pcmail.maricopa.edu>
Date: Tue, Sep 20, 2011 at 2:28 PM
Subject: RE: Request permission to copy my lecture notes
To: "Lee, Karen" <karen.lee@cengage.com>


Dear Karen,    9-20-11
Thank you so much for helping me with this issue.  I believe all possible
questions the administration may have are now addressed.
Have a great rest of the day,
Cleopatria

>-- Original Message --
>From: "Lee, Karen" <karen.lee@cengage.com>
>To: "cleopatria.martinez@pcmail.maricopa.edu"
>      <cleopatria.martinez@pcmail.maricopa.edu>
>Date: Tue, 20 Sep 2011 17:03:50 -0400
>Subject: RE: Request permission to copy my lecture notes
>
>
>Dear Cleopatria,
>
>Attached is a revised permission letter.
>
>I changed the course title from Calculus to College Algebra. And removed
>1 from the total pages. The total pages section is a mandatory field and
>that was why "1" entered. Whenever, we are unsure of the exact page count
>and page ranges of the material a "1" is entered into that field.
>
>I hope this clarifies things.
>
>Regards,
>
>Karen Lee
>Granting Manager, Rights Administration & Content Reuse
>Cengage Learning * 20 Davis Drive * Belmont, CA 94002
>(o) 650.413.7438 | (e) karen.lee@cengage.com | www.cengage.com/permissions
>
>
>-----Original Message-----
>From: cleopatria.martinez@pcmail.maricopa.edu [mailto:cleopatria.martinez@pcmail.maricopa.edu]
>
>Sent: Monday, September 19, 2011 8:20 PM
>To: Lee, Karen

MCCCD/Martinez 03259

>Subject: RE: Request permission to copy my lecture notes
>
>Dear Karen,
>Thank you for your prompt reply.  However, there are a few adjustments I
>request.  1)  The course is College Algebra.
>2)  Total pages is listed as "1".  I am not clear to what the "1" refers.
> The examples from the textbook which I use are found throughout the book--not
>necessarily on "1" page. The Phoenix College administration may want me
to
>clarify this reference to "1" and at this time I am not understanding the
>meaning of the "1".
>Again, thank you for taking time to respond quickly.  I know your time is
>valuable.
>Cleopatria
>
>>-- Original Message --
>>From: "Lee, Karen" <karen.lee@cengage.com>
>>To: "cleopatria.martinez@pcmail.maricopa.edu"
>>     <cleopatria.martinez@pcmail.maricopa.edu>
>>CC: "Park, Jane" <Jane.Park@cengage.com>
>>Date: Mon, 19 Sep 2011 20:24:36 -0400
>>Subject: RE: Request permission to copy my lecture notes
>>
>>
>>Dear Cleopatria,
>>
>>Attached is a permission letter granting you permission to us the material
>>as stated below. For future requests, you can submit them at www.cengage.com/permissions.
>>
>>Regards,
>>
>>Karen Lee
>>Granting Manager, Rights Administration & Content Reuse
>>Cengage Learning * 20 Davis Drive * Belmont, CA 94002
>>(o) 650.413.7438 | (e) karen.lee@cengage.com | www.cengage.com/permissions
>>
>>
>>-----Original Message-----
>>From: cleopatria.martinez@pcmail.maricopa.edu [mailto:cleopatria.martinez@pcmail.maricopa.edu]
>>
>>Sent: Monday, September 19, 2011 4:59 PM
>>To: Lee, Karen
>>Cc: Park, Jane
>>Subject: Request permission to copy my lecture notes
>>
>>Good afternoon Karen,   9-19-11
>>I have adopted and use your textbook (College Algebra with Applications
>for
>>Business and the Life Sciences by Larson & Hodgkins, 2009), and students
>>are required to purchase it for class.
>>
>>Instead of writing on the board, I write on paper which is projected onto
>>a screen for students to see and take notes.  Every now and then I use
examples

>>from the adopted textbook in my lectures to demonstrate a concept. Some
>of
>>my students have asked that I make copies for them of these lecture pages.
>>
>>In order to make these copies for the students, the Phoenix College administration
>>has asked me to provide them with correspondence from you indicating that
>>it is all right with you that I make copies of my lecture notes for students.
>> The administration also wishes to be assured that you are aware that some
>>examples from the adopted textbook are used in my lectures, and that you
>>find this to be an acceptable practice.
>>
>>Please respond as soon as possible so that I may get copies of my lecture
>>pages to give to my students.
>>
>>Thank you for your time and effort in this matter,
>>Cleopatria
>>
>>PS  You may remember me since in December 2010 I asked you if I needed your
>>permission to use a table of integration formulas which I had written for
>>my calculus class.  Our department had adopted a different textbook, but
>>the integration formulas were also found in your textbook; so my administration
>>was concerned that I did not have your permission to use the table I had
>>developed since these same formulas were found in a similar table in your
>>textbook.
>>
>>Cleopatria Martinez,PhD
>>Professor of Mathematics
>>Department of Mathematics
>>Phoenix College--MCCCD
>>1202 W. Thomas Road
>>Phoenix, Arizona  85013
>>Office:  602.285.7390
>>Fax:    602.285.7668
>>
>>Cleopatria Martinez,PhD
>>Professor of Mathematics
>>Department of Mathematics
>>Phoenix College--MCCCD
>>1202 W. Thomas Road
>>Phoenix, Arizona  85013
>>Office:  602.285.7390
>>Fax:    602.285.7668
>>
>>
>>
>>
>>Attachment: 262761-20110919.pdf
>>
>
>Cleopatria Martinez,PhD
>Professor of Mathematics
>Department of Mathematics
>Phoenix College--MCCCD

11/1/2013

MCCCD/Martinez 03261

>1202 W. Thomas Road
>Phoenix, Arizona  85013
>Office:  602.285.7390
>Fax:    602.285.7668
>
>
>
>
>Attachment: 262761-20110920.pdf
>

Cleopatria Martinez,PhD
Professor of Mathematics
Department of Mathematics
Phoenix College--MCCCD
1202 W. Thomas Road
Phoenix, Arizona  85013
Office:  602.285.7390
Fax:    602.285.7668


--
Cleopatria Martinez, PhD,   Department of Mathematics, Phoenix, College 80213,  (602) 285-7390

    Cada cabeza es un mundo.

11/1/2013

MCCCD/Martinez 03262

# EXHIBIT 56

MCCCD/Martinez 03263

## April Roll

| | |
|---|---|
| **From:** | Cleopatria Martinez [cleopatria.martinez@phoenixcollege.edu] |
| **Sent:** | Friday, November 01, 2013 2:25 PM |
| **To:** | April Roll |
| **Subject:** | Fwd: Copy Request: Trig Identities |

---------- Forwarded message ----------
From: **Casandra Kakar** <Casandra.Kakar@phoenixcollege.edu>
Date: Wed, Oct 12, 2011 at 8:39 AM
Subject: RE: Copy Request: Trig Identities
To: "cleopatria.martinez@pcmail.maricopa.edu" <cleopatria.martinez@pcmail.maricopa.edu>
Cc: "Joe Sueyoshi (joe.sueyoshi@pcmail.maricopa.edu)" <joe.sueyoshi@pcmail.maricopa.edu>, Anna Solley
<anna.solley@pcmail.maricopa.edu>, "Lee Combs (lee.combs@domail.maricopa.edu)"
<lee.combs@domail.maricopa.edu>


Dr. Martinez,
The use of materials you have created and the printing of the materials is in violation of the 12/9/10 directive
from the president.
Casandra

-----Original Message-----
From: cleopatriamartinez@pcmail.maricopa.edu [mailto:cleopatria.martinez@pcmail.maricopa.edu]
Sent: Tuesday, October 11, 2011 4:37 PM
To: casandra.kakar@pcmail.maricopa.edu
Subject: Re: Copy Request: Trig Identities

Hi Casandra, 10-11-11
Joe has asked that I acknowledge the Sullivan and Sullivan MAT187 textbook as the source of the
trigonometric identities document before he can approve it for copying. I also wish to use an amended version
of this document as a test. I do not feel comfortable acknowledging the textbook as the source as I am the
source of the document; therefore, such an acknowledgement would be a falsehood. The attached document of
trigonometric identities is important for the instruction, learning, and success of my students.  Please advise.
Cleopatria


>-- Original Message --
>Date: Tue, 11 Oct 2011 15:46:51 -0700
>From: Joe Sueyoshi <joe.sueyoshi@pcmail.maricopa.edu>
>To: cleopatria.martinez@pcmail.maricopa.edu
>CC: Casandra Kakar <casandra.kakar@pcmail.maricopa.edu>,
> Kelly Loucks <kelly.loucks@pcmail.maricopa.edu>
>Subject: Re: Copy Request:  Trig Identities
>
>
>Please acknowledge the Sullivan & Sullivan MAT187 textbook in your
>"notes" before I can approve it.
>
>If you are claiming this document as your own, then by the Directive, I

11/1/2013

MCCCD/Martinez 03264

\>cannot approve it.
\>
\>joe
\>
\>On 10/8/2011 8:56 AM, cleopatria.martinez@pcmail.maricopa.edu wrote:
\>> Joe,    10-15-11
\>> Please make 30 copies of the attached trig identities on
\>> lavender-colored papaer.
\>> Thanks,
\>> Cleopatria
\>>
\>> Cleopatria Martinez,PhD
\>> Professor of Mathematics
\>> Department of Mathematics
\>> Phoenix College--MCCCD
\>> 1202 W. Thomas Road
\>> Phoenix, Arizona  85013
\>> Office:  602285.7390
\>> Fax:    602.285.7668
\>>
\>>
\>>
\>

Cleopatria Martinez,PhD
Professor of Mathematics
Department of Mathematics
Phoenix College--MCCCD
1202 W. Thomas Road
Phoenix, Arizona  85013
Office:  602.285.7390
Fax:    602.285.7668


--
Cleopatria Martinez, PhD,   Department of Mathematics, Phoenix, College 80213,  (602) 285-7390

    Cada cabeza es un mundo.

11/1/2013

MCCCD/Martinez 03265

# EXHIBIT 33

1   Stephen Montoya (#011791)
    **Montoya, Jimenez & Pastor, P.A.**
2   3200 North Central Avenue, Suite 2550
    Phoenix, Arizona 85012
3   602-256-6718 (telephone)
    602-256-6667 (fax)
4   stephen@montoyalawgroup.com

5   Attorney for Cleopatria Martinez

6

7                   **BEFORE THE GOVERNING BOARD OF THE**

8           **MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT**

9

10  Maricopa County Community College
    District,
11                                          **CLEOPATRIA MARTINEZ'S**
                                            **CITATION OF SUPPLEMENTAL**
12  v.                                      **AUTHORITY**

13  Cleopatria Martinez

14

15          Professor Martinez directs the Hearing Committee's attention to the case of

16  The Authors Guild v. Google, Inc., 05 Civ. 8136 (DC), decided by the United

17  States District Court for the Southern District of New York only yesterday,
18
19  November 14, 2013.

20          In The Authors Guild case, the Honorable Denny Chin, a judge of the

21  United States Court of Appeals for the Second Circuit, sitting by designation as a

22  District Court Judge, dismissed a copyright infringement action asserted by both
23
24  authors and an association of authors ("the Author's Guild") against Google based

25  upon Google's digital scanning of over twenty (20) million copyrighted books

26  made available on the internet to the public at large for searches and preview on
27
    "Google Books."
28
            In dismissing the action, the District Court concluded that Google's copying

MCCCD/Martinez 03417

1   and dissemination of the copyrighted materials was primarily for educational
2   purposes and consequently fell within the "fair use doctrine" of copyright law and
3
4   did <u>not</u> infringe upon the various plaintiffs' copyrights.

5       A copy of the District Court's opinion is attached hereto as Exhibit A.

6       The opinion conclusively demonstrates that Professor Martinez's limited,
7   classroom use of the mathematical formulas, calculations and problems that the
8   Administration claims violates federal copyright law squarely falls within the "fair
9   use doctrine" and did <u>not</u> violate federal copyright law.
10

11      Respectfully submitted this 15th day of November 2013.

12      **MONTOYA, JIMENEZ & PASTOR, P.A.**

13      <u>s/ Stephen Montoya</u>
14      Stephen Montoya
    3200 North Central Avenue, Suite 2550
15      Phoenix, Arizona 85012
16      Attorney for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

MCCCD/Martinez 03418

1  I hereby certify that on November 15, 2013, the foregoing document was sent via
   email to:
2

3  Ernest Calderon
   Ridenour Hienton & Lewis, PLLC
4  ecalderon@rhlfirm.com
   Counsel to the Hearing Committee
5

6  Pavneet Uppal
   Fisher & Phillips, LLP
7  puppal@laborlawyers.com
   Attorney for Maricopa County
8  Community College District

9
   Keith J. Crudup
10 Keidz02681@mesacc.edu
   Committee Chair
11

12 Nora Amavisca Reyes, Ed.D
   Nora.reyes@mesacc.edu
13 Hearing Committee

14
   Carlos Caire
15 Carlos.caire@southmountaincc.edu
   Hearing Committee
16

17

18 s/ Stephen Montoya

19

20

21

22

23

24

25

26

27

28

                        MCCCD/Martinez 03419

# EXHIBIT A

MCCCD/Martinez 03420

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

THE AUTHORS GUILD, INC., and      :
BETTY MILES, JOSEPH GOULDEN,
and JIM BOUTON, on behalf of      :
themselves and all others
similarly situated,               :

               Plaintiffs,      :

       - against -              :

GOOGLE INC.,                      :

          Defendant.    :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/14/13

OPINION

05 Civ. 8136 (DC)

**APPEARANCES:**   (See last page)

**CHIN, Circuit Judge**

      Since 2004, when it announced agreements with several major research libraries to digitally copy books in their collections, defendant Google Inc. ("Google") has scanned more than twenty million books.  It has delivered digital copies to participating libraries, created an electronic database of books, and made text available for online searching through the use of "snippets."  Many of the books scanned by Google, however, were under copyright, and Google did not obtain permission from the copyright holders for these usages of their copyrighted works.  As a consequence, in 2005, plaintiffs brought this class action charging Google with copyright infringement.

Before the Court are the parties' cross-motions for summary judgment with respect to Google's defense of fair use under § 107 of the Copyright Act, 17 U.S.C. § 107.  For the reasons set forth below, Google's motion for summary judgment is granted and plaintiffs' motion for partial summary judgment is denied.  Accordingly, judgment will be entered in favor of Google dismissing the case.

**BACKGROUND**

**A.   The Facts**

For purposes of this motion, the facts are not in dispute.  (See 9/23/13 Tr. 10-11, 15, 25-28 (Doc. No. 1086)).[1] They are summarized as follows:

**1.   The Parties**

Plaintiff Jim Bouton, the former pitcher for the New York Yankees, is the legal or beneficial owner of the U.S. copyright in the book Ball Four.  Plaintiff Betty Miles is the legal or beneficial owner of the U.S. copyright in the book The Trouble with Thirteen.  Plaintiff Joseph Goulden is the legal or beneficial owner of the U.S. copyright in the book The

_____

[1]      When pressed at oral argument to identify any factual issues that would preclude the award of summary judgment, plaintiffs' counsel was unable to do so.  (Id. at 25-26).

-2-

MCCCD/Martinez 03422

<u>Superlawyers:   The Small and Powerful World of the Great</u>

<u>Washington Law Firms</u>.   (Google Resp. ¶¶ 1-3).[2]  All three books

have been scanned by Google and are available for search on

Google's website, without plaintiffs' permission.   (Google Resp.

¶ 4).  Plaintiff The Authors Guild, Inc., is the nation's largest

organization of published authors and it advocates for and

supports the copyright and contractual interests of published

writers.   (Google Resp. ¶¶ 7-8).

Google owns and operates the largest Internet search

engine in the world.   (Google Resp. ¶ 9).  Each day, millions of

people use Google's search engine free of charge; commercial and

other entities pay to display ads on Google's websites and on

other websites that contain Google ads.   (Google Resp. ¶ 10).

Google is a for-profit entity, and for the year ended December

31, 2011, it reported over $36.5 billion in advertising revenues.

(Google Resp. ¶ 11).

---

[2]    "Google Resp." refers to Google's Responses and
Objections to plaintiffs' Statement of Undisputed Facts in
Support of Their Motion for Partial Summary Judgment (Doc. No.
1077).  "Pl. Resp." refers to plaintiffs' Response to Google's
Local Rule 56.1 Statement (Doc. No. 1071).  I have relied on the
parties' responses to the statements of undisputed facts only to
the extent that factual statements were not controverted.

-3-

MCCCD/Martinez 03423

2.   **The Google Books Project**

In 2004, Google announced two digital books programs.
The first, initially called "Google Print" and later renamed the
"Partner Program," involved the "hosting" and display of material
provided by book publishers or other rights holders.  (Google
Resp. ¶¶ 13, 14).  The second became known as the "Library
Project," and over time it involved the digital scanning of books
in the collections of the New York Public Library, the Library of
Congress, and a number of university libraries.  (Clancy Decl. ¶
5 (Doc. No. 1035); Google Resp. ¶¶ 25, 26, 27; Pl. Resp. ¶ 14).

The Partner Program and the Library Project together
comprise the Google Books program ("Google Books").  (Google
Resp. ¶ 15).  All types of books are encompassed, including
novels, biographies, children's books, reference works,
textbooks, instruction manuals, treatises, dictionaries,
cookbooks, poetry books, and memoirs.  (Pl. Resp. ¶ 6; Jaskiewicz
Decl. ¶ 4 (Doc. No. 1041)).  Some 93% of the books are
non-fiction while approximately 7% are fiction.[3]  Both in-print

---

[3]     These estimates are based on studies of the contents of
the libraries involved.  (Def. Mem. at 7 (Doc. No. 1032) (citing
Brian Lavoie and Lorcan Dempsey, Beyond 1923:  Characteristics of
Potentially In-Copyright Print Books in Library Collections, 15-
D-Lib 11/12 (2009), available at http://www.dlib.org/dlib/
november09/lavoie/11lavoie.html (last visited November 12,

MCCCD/Martinez 03424

and out-of-print books are included, although the great majority
are out-of-print.  (Jaskiewicz Decl. ¶ 4).

     In the Partner Program, works are displayed with
permission of the rights holders.  (Google Resp. ¶ 16).   The
Partner Program is aimed at helping publishers sell books and
helping books become discovered.  (Google Resp. ¶ 18).
Initially, Google shared revenues from ads with publishers or
other rights holders in certain circumstances.   In 2011, however,
Google stopped displaying ads in connection with all books.
(Google Resp. ¶¶ 17, 21; Dougall Decl. ¶¶ 5-8 (Doc. No. 1076)).
Partners provide Google with a printed copy of their books for
scanning, or a digital copy if one already exists.  (Google Resp.
¶ 19).  Partners decide how much of their books -- from a few
sample pages to the entire book -- are browsable.  (Google Resp.
¶ 20).  As of early 2012, the Partner Program included
approximately 2.5 million books, with the consent of some 45,000
rights holders.  (Google Resp. ¶ 24).

     As for the Library Project, Google has scanned more
than twenty million books, in their entirety, using newly-
developed scanning technology.  (Google Resp. ¶¶ 28, 29).

---

2013)).  The numbers are not disputed.  (See 9/23/2013 Tr. at
26).

MCCCD/Martinez 03425

Pursuant to their agreement with Google, participating libraries can download a digital copy of each book scanned from their collections. (Google Resp. ¶ 30). Google has provided digital copies of millions of these books to the libraries, in accordance with these agreements. (Google Resp. ¶ 85). Some libraries agreed to allow Google to scan only public domain works, while others allowed Google to scan in-copyright works as well. (Google Resp. ¶ 36).

Google creates more than one copy of each book it scans from the library collections, and it maintains digital copies of each book on its servers and back-up tapes. (Google Resp. ¶¶ 40, 41). Participating libraries have downloaded digital copies of in-copyright books scanned from their collections. (Google Resp. ¶¶ 53, 54). They may not obtain a digital copy created from another library's book. (Jaskiewicz Decl. ¶¶ 6, 8). The libraries agree to abide by the copyright laws with respect to the copies they make. (Clancy Decl. ¶ 5).

Google did not seek or obtain permission from the copyright holders to digitally copy or display verbatim expressions from in-copyright books. (Google Resp. ¶¶ 53, 54). Google has not compensated copyright holders for its copying of or displaying of verbatim expression from in-copyright books or

-6-

MCCCD/Martinez 03426

its making available to libraries for downloading of digital copies of in-copyright books scanned from their collections. (Google Resp. ¶ 55).

    3.   **Google Books**

       In scanning books for its Library Project, including in-copyright books, Google uses optical character recognition technology to generate machine-readable text, compiling a digital copy of each book.  (Google Resp. ¶ 62; Pl. Resp. ¶ 18; Jaskiewicz Decl. ¶ 3).  Google analyzes each scan and creates an overall index of all scanned books.  The index links each word or phrase appearing in each book with all of the locations in all of the books in which that word or phrase is found.  The index allows a search for a particular word or phrase to return a result that includes the most relevant books in which the word or phrase is found.  (Clancy Decl. ¶ 6; Pl. Resp. ¶¶ 22-26). Because the full texts of books are digitized, a user can search the full text of all the books in the Google Books corpus. (Clancy Decl. ¶ 7; Google Resp. ¶ 42).

       Users of Google's search engine may conduct searches, using queries of their own design.  (Pl. Resp. ¶ 10).  In response to inquiries, Google returns a list of books in which the search term appears.  (Clancy Decl. ¶ 8).  A user can click

-7-

MCCCD/Martinez 03427

on a particular result to be directed to an "About the Book"
page, which will provide the user with information about the book
in question.  The page includes links to sellers of the books
and/or libraries that list the book as part of their collections.
No advertisements have ever appeared on any About the Book page
that is part of the Library Project.  (Clancy Decl. ¶ 9).

For books in "snippet view" (in contrast to "full view"
books), Google divides each page into eighths -- each of which is
a "snippet," a verbatim excerpt.  (Google Resp. ¶¶ 43, 44).  Each
search generates three snippets, but by performing multiple
searches using different search terms, a single user may view far
more than three snippets, as different searches can return
different snippets.  (Google Resp. ¶ 45).  For example, by making
a series of consecutive, slightly different searches of the book
Ball Four, a single user can view many different snippets from
the book.  (Google Resp. ¶¶ 46, 47).

Google takes security measures to prevent users from
viewing a complete copy of a snippet-view book.  For example, a
user cannot cause the system to return different sets of snippets
for the same search query; the position of each snippet is fixed
within the page and does not "slide" around the search term; only
the first responsive snippet available on any given page will be

-8-

MCCCD/Martinez 03428

returned in response to a query; one of the snippets on each page is "black-listed," meaning it will not be shown; and at least one out of ten entire pages in each book is black-listed. (Google Resp. ¶¶ 48-50; Pl. Resp. ¶¶ 35, 37-40). An "attacker" who tries to obtain an entire book by using a physical copy of the book to string together words appearing in successive passages would be able to obtain at best a patchwork of snippets that would be missing at least one snippet from every page and 10% of all pages. (Pl. Resp. ¶ 41). In addition, works with text organized in short "chunks," such as dictionaries, cookbooks, and books of haiku, are excluded from snippet view. (Pl. Resp. ¶ 42).

### 4. The Benefits of the Library Project and Google Books

The benefits of the Library Project are many. First, Google Books provides a new and efficient way for readers and researchers to find books. (See, e.g., Clancy Decl. Ex. G). It makes tens of millions of books searchable by words and phrases. It provides a searchable index linking each word in any book to all books in which that word appears. (Clancy Decl. ¶ 7). Google Books has become an essential research tool, as it helps librarians identify and find research sources, it makes the process of interlibrary lending more efficient, and it

-9-

MCCCD/Martinez 03429

facilitates finding and checking citations.   (Br. of _Amici Curiae_

American Library Ass'n _et al._ at 4-7 (Doc. No. 1048)).   Indeed,

Google Books has become such an important tool for researchers

and librarians that it has been integrated into the educational

system -- it is taught as part of the information literacy

curriculum to students at all levels.   (_Id._ at 7).

Second, in addition to being an important reference

tool, Google Books greatly promotes a type of research referred

to as "data mining" or "text mining."   (Br. of Digital Humanities

and Law Scholars as _Amici Curiae_ at 1 (Doc. No. 1052)).   Google

Books permits humanities scholars to analyze massive amounts of

data -- the literary record created by a collection of tens of

millions of books.   Researchers can examine word frequencies,

syntactic patterns, and thematic markers to consider how literary

style has changed over time.   (_Id._ at 8-9; Clancy Decl. ¶ 15).

Using Google Books, for example, researchers can track the

frequency of references to the United States as a single entity

("the United States is") versus references to the United States

in the plural ("the United States are") and how that usage has

changed over time.   (_Id._ at 7).   The ability to determine how

often different words or phrases appear in books at different

times "can provide insights about fields as diverse as

-10-

MCCCD/Martinez 03430

lexicography, the evolution of grammar, collective memory, the adoption of technology, the pursuit of fame, censorship, and historical epidemiology." Jean-Baptiste Michel et al., Quantitative Analysis of Culture Using Millions of Digitized Books, 331 Science 176, 176 (2011) (Clancy Decl. Ex. H).

Third, Google Books expands access to books. In particular, traditionally underserved populations will benefit as they gain knowledge of and access to far more books. Google Books provides print-disabled individuals with the potential to search for books and read them in a format that is compatible with text enlargement software, text-to-speech screen access software, and Braille devices. Digitization facilitates the conversion of books to audio and tactile formats, increasing access for individuals with disabilities. (Letter from Marc Maurer, President of the National Federation for the Blind, to J. Michael McMahon, Office of the Clerk (Jan. 19, 2010) (Doc. No. 858)). Google Books facilitates the identification and access of materials for remote and underfunded libraries that need to make efficient decisions as to which resources to procure for their own collections or through interlibrary loans. (Br. of Amici Curiae American Library Ass'n at 5-6).

MCCCD/Martinez 03431

Fourth, Google Books helps to preserve books and give them new life.  Older books, many of which are out-of-print books that are falling apart buried in library stacks, are being scanned and saved.  See Authors Guild v. Google Inc., 770 F. Supp. 2d 666, 670 (S.D.N.Y. 2011).  These books will now be available, at least for search, and potential readers will be alerted to their existence.

Finally, by helping readers and researchers identify books, Google Books benefits authors and publishers.  When a user clicks on a search result and is directed to an "About the Book" page, the page will offer links to sellers of the book and/or libraries listing the book as part of their collections.  (Clancy Decl. ¶ 9).  The About the Book page for Ball Four, for example, provides links to Amazon.com, Barnes&Noble.com, Books-A-Million, and IndieBound.  (See Def. Mem. at 9).  A user could simply click on any of these links to be directed to a website where she could purchase the book.  Hence, Google Books will generate new audiences and create new sources of income.

As amici observe:  "Thanks to . . . [Google Books], librarians can identify and efficiently sift through possible research sources, amateur historians have access to a wealth of previously obscure material, and everyday readers and researchers

-12-

MCCCD/Martinez 03432

can find books that were once buried in research library archives."  (Br. of Amici Curiae American Library Ass'n at 3).

**B.    Procedural History**

Plaintiffs commenced this action on September 20, 2005, alleging, inter alia, that Google committed copyright infringement by scanning copyrighted books and making them available for search without permission of the copyright holders. From the outset, Google's principal defense was fair use under § 107 of the Copyright Act, 17 U.S.C. § 107.

After extensive negotiations, the parties entered into a proposed settlement resolving plaintiffs' claims on a class-wide basis.  On March 22, 2011, I issued an opinion rejecting the proposed settlement on the grounds that it was not fair, adequate, and reasonable.  Authors Guild v. Google Inc., 770 F. Supp. 2d 666 (S.D.N.Y. 2011).

Thereafter, the parties engaged in further settlement discussions, but they were unable to reach agreement.  The parties proposed and I accepted a schedule that called for the filing of plaintiffs' class certification motion, the completion of discovery, and then the filing of summary judgment motions. (See 9/16/11 Order (Doc. No. 982)).  Plaintiffs filed a fourth amended class action complaint (the "Complaint") on October 14,

-13-

MCCCD/Martinez 03433

2011. (Doc. No. 985). While the dates in the schedule were subsequently extended, the sequence of events was retained, with the class certification motion to precede the summary judgment motions, and adding dates for Google's filing of a motion to dismiss the Authors Guild's claims. (See, e.g., 1/17/12 Order (Doc. No. 996); 3/28/12 Order (Doc. No. 1007)).

Plaintiffs filed their class certification motion and Google filed its motion to dismiss the Authors Guild's claims. On May 31, 2012, I issued an opinion denying Google's motion to dismiss and granting the individual plaintiffs' motion for class certification. Authors Guild v. Google Inc., 282 F.R.D. 384 (S.D.N.Y. 2012).

On June 9, 2012, I issued an order re-setting the briefing schedule for the summary judgment motions. (6/19/12 Order (Doc. No. 1028)). The parties thereafter filed the instant cross-motions for summary judgment. Before the motions were fully submitted, however, the Second Circuit issued an order on September 17, 2012, staying these proceedings pending an interlocutory appeal by Google from my decision granting class certification. (9/17/12 Order (Doc. No. 1063)).

On July 1, 2013, without deciding the merits of the appeal, the Second Circuit vacated my class certification

-14-

MCCCD/Martinez 03434

decision, concluding that "resolution of Google's fair use
defense in the first instance will necessarily inform and perhaps
moot our analysis of many class certification issues." Authors
Guild, Inc. v. Google Inc., 721 F.3d 132, 134 (2d Cir. 2013).
The Second Circuit remanded the case "for consideration of the
fair use issues." Id. at 135.

On remand, the parties completed the briefing of the
summary judgment motions.  I heard oral argument on September 23,
2013.  I now rule on the motions.

## DISCUSSION

For purposes of these motions, I assume that plaintiffs
have established a prima facie case of copyright infringement
against Google under 17 U.S.C. § 106.  See Feist Publ'ns, Inc. v.
Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  Google has
digitally reproduced millions of copyrighted books, including the
individual plaintiffs' books, maintaining copies for itself on
its servers and backup tapes.  See 17 U.S.C. § 106(1)
(prohibiting unauthorized reproduction).  Google has made digital
copies available for its Library Project partners to download.
See 17 U.S.C. § 106(3) (prohibiting unauthorized distribution).
Google has displayed snippets from the books to the public.  See
17 U.S.C. § 106(5) (prohibiting unauthorized display).  Google

-15-

MCCCD/Martinez 03435

has done all of this, with respect to in-copyright books in the
Library Project, without license or permission from the copyright
owners.  The sole issue now before the Court is whether Google's
use of the copyrighted works is "fair use" under the copyright
laws.  For the reasons set forth below, I conclude that it is.

## A.   Applicable Law

Fair use is a defense to a claim of copyright
infringement.  The doctrine permits the fair use of copyrighted
works "to fulfill copyright's very purpose, '[t]o promote the
Progress of Science and useful Arts.'"  Campbell v. Acuff-Rose
Music, Inc., 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art.
I, § 8, cl. 8)); accord Cariou v. Prince, 714 F.3d 694, 705 (2d
Cir. 2013).  Copyright law seeks to achieve that purpose by
providing sufficient protection to authors and inventors to
stimulate creative activity, while at the same time permitting
others to utilize protected works to advance the progress of the
arts and sciences.  See Eldred v. Ashcroft, 537 U.S. 186, 212
(2003); Blanch v. Koons, 467 F.3d 244, 250 (2d Cir. 2006); Hon.
Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev.
1105, 1107-08 (1990).  As the Supreme Court has held, "[f]rom the
infancy of copyright protection, some opportunity for fair use of
copyrighted materials has been thought necessary to fulfill

MCCCD/Martinez 03436

copyright's very purpose." Campbell, 510 U.S. at 575; see also

Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539,

560 (1985) (recognizing "the latitude for scholarship and comment

traditionally afforded by fair use").

The fair use doctrine is codified in § 107 of the

Copyright Act, which provides in relevant part as follows:

> [T]he fair use of a copyrighted work, . . .
> for purposes such as criticism, comment, news
> reporting, teaching (including multiple
> copies for classroom use), scholarship, or
> research, is not an infringement of
> copyright.  In determining whether the use
> made of a work in any particular case is a
> fair use the factors to be considered shall
> include --
>
> > (1)  the purpose and character of
> > the use, including whether such use
> > is of a commercial nature or is for
> > nonprofit educational purposes;
> >
> > (2)  the nature of the copyrighted
> > work;
> >
> > (3)  the amount and substantiality
> > of the portion used in relation to
> > the copyrighted work as a whole;
> > and
> >
> > (4)  the effect of the use upon the
> > potential market for or value of
> > the copyrighted work.

17 U.S.C. § 107.

The determination of fair use is "an open-ended and

context-sensitive inquiry," Blanch v. Koons, 467 F.3d at 251, and

-17-

MCCCD/Martinez 03437

thus the fair use doctrine calls for "case-by-case analysis,"
Campbell, 510 U.S. at 577; see also Harper & Row, 471 U.S. at
553.   The four factors enumerated in the statute are
non-exclusive and provide only "general guidance"; they are to be
explored and weighed together, "in light of the purposes of
copyright."   Campbell, 510 U.S. at 578-79; Harper & Row, 471 U.S.
at 560-61.   As fair use is an affirmative defense to a claim of
copyright infringement, the proponent carries the burden of proof
as to all issues in dispute.   Am. Geophysical Union v. Texaco
Inc., 60 F.3d 913, 918 (2d Cir. 1994); see also Campbell, 510
U.S. at 590.

        A key consideration is whether, as part of the inquiry
into the first factor, the use of the copyrighted work is
"transformative," that is, whether the new work merely
"supersedes" or "supplants" the original creation, or whether it:

              instead adds something new, with a further
              purpose or different character, altering the
              first with new expression, meaning, or
              message; it asks, in other words, whether and
              to what extent the new work is
              "transformative."

Campbell, 510 U.S. at 579 (quoting Leval, Toward a Fair Use
Standard, 103 Harv. L. Rev. at 1111); accord Bill Graham Archives
v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006)

-18-

MCCCD/Martinez 03438

("Most important to the court's analysis of the first factor is 'transformative' nature of the work."); <u>Am. Geophysical Union</u>, 60 F.3d at 923.  Although transformative use is not "absolutely necessary" to a finding of fair use, "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works."  <u>Campbell</u>, 510 U.S. at 579.

**B.   Application**

      I discuss each of the four factors separately, and I then weigh them together.

    1.   **Purpose and Character of Use**

      The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).

      Google's use of the copyrighted works is highly transformative.  Google Books digitizes books and transforms expressive text into a comprehensive word index that helps readers, scholars, researchers, and others find books.  Google Books has become an important tool for libraries and librarians and cite-checkers as it helps to identify and find books.  The use of book text to facilitate search through the display of snippets is transformative.  <u>See Perfect 10, Inc. v. Amazon.com, Inc.</u>, 508 F.3d 1146, 1168 (9th Cir. 2007) (holding that use of

-19-

MCCCD/Martinez 03439

works -- "thumbnail images," including copyrighted

photographs -- to facilitate search was "transformative");  <u>Kelly</u>

<u>v. Arriba Soft Corp.</u>, 336 F.3d 811 (9th Cir. 2003) (same); <u>see</u>

<u>also</u> <u>Bill Graham Archives</u>, 448 F.3d at 609-11 (holding that

display of images of posters in 480-page cultural history of the

Grateful Dead was transformative, explaining that "[w]hile the

small size [of the images of the posters] is sufficient to permit

readers to recognize the historial significance of the posters,

it is inadequate to offer more than a glimpse of their expressive

value").  The display of snippets of text for search is similar

to the display of thumbnail images of photographs for search or

small images of concert posters for reference to past events, as

the snippets help users locate books and determine whether they

may be of interest.  Google Books thus uses words for a different

purpose -- it uses snippets of text to act as pointers directing

users to a broad selection of books.

          Similarly, Google Books is also transformative in the

sense that it has transformed book text into data for purposes of

substantive research, including data mining and text mining in

new areas, thereby opening up new fields of research.  Words in

books are being used in a way they have not been used before.

Google Books has created something new in the use of book

-20-

MCCCD/Martinez 03440

text -- the frequency of words and trends in their usage provide substantive information.

Google Books does not supersede or supplant books because it is not a tool to be used to read books.  Instead, it "adds value to the original" and allows for "the creation of new information, new aesthetics, new insights and understandings." Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. at 1111. Hence, the use is transformative.

It is true, of course, as plaintiffs argue, that Google is a for-profit entity and Google Books is largely a commercial enterprise.  The fact that a use is commercial "tends to weigh against a finding of fair use."  Harper & Row, 471 U.S. at 562; accord Campbell, 510 U.S. at 585.  On the other hand, fair use has been found even where a defendant benefitted commercially from the unlicensed use of copyrighted works.  See, e.g., Blanch, 467 F.3d at 253; Bill Graham Archives, 448 F.3d at 612.  See also Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 142 (2d Cir. 1998) (observing that Second Circuit does "not give much weight to the fact that the secondary use was for commercial gain").  Here, Google does not sell the scans it has made of books for Google Books; it does not sell the snippets that it displays; and it does not run ads on the About the Book

-21-

MCCCD/Martinez 03441

pages that contain snippets. It does not engage in the direct commercialization of copyrighted works. See 17 U.S.C. § 107(1). Google does, of course, benefit commercially in the sense that users are drawn to the Google websites by the ability to search Google Books. While this is a consideration to be acknowledged in weighing all the factors, even assuming Google's principal motivation is profit, the fact is that Google Books serves several important educational purposes.

Accordingly, I conclude that the first factor strongly favors a finding of fair use.

### 2. **Nature of Copyrighted Works**

The second factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2).[4] Here, the works are books -- all types of published books, fiction and non-fiction, in-print and out-of-print. While works of fiction are entitled to greater copyright protection, Stewart v. Abend, 495 U.S. 207, 237 (1990), here the vast majority of the books in Google Books are non-fiction. Further, the books at issue are published and

_____

[4]     The parties agree that the second factor plays little role in the ultimate fair use determination. (Pl. Mem. at 36 n.18 (Doc. No. 1050); Def. Mem. at 25). See On Davis v. Gap, Inc., 246 F.3d 152, 175 (2d Cir. 2001) ("The second statutory factor, the nature of the copyrighted work, is rarely found to be determinative.") (internal citation omitted).

-22-

MCCCD/Martinez 03442

available to the public.  These considerations favor a finding of fair use.  See Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1078 (2d Cir. 1992) ("Whether or not a work is published is critical to its nature under factor two because the scope of fair use is narrower with respect to unpublished works.") (quoting New Era Publ'ns Intern., ApS v. Carol Publ'g Grp., 904 F.2d 152, 157 (2d Cir. 1990) (internal quotation marks ommitted)).

    3.  **Amount and Substantiality of Portion Used**

        The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).  Google scans the full text of books -- the entire books -- and it copies verbatim expression.  On the other hand, courts have held that copying the entirety of a work may still be fair use.  See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 449-50 (1984); Bill Graham Archives, 448 F.3d at 613 ("copying the entirety of a work is sometimes necessary to make a fair use of the image").  Here, as one of the keys to Google Books is its offering of full-text search of books, full-work reproduction is critical to the functioning of Google Books.  Significantly, Google limits the amount of text it displays in response to a search.

-23-

MCCCD/Martinez 03443

On balance, I conclude that the third factor weighs slightly against a finding of fair use.

### 4.   Effect of Use Upon Potential Market or Value

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  Here, plaintiffs argue that Google Books will negatively impact the market for books and that Google's scans will serve as a "market replacement" for books.  (Pl. Mem. at 41).  It also argues that users could put in multiple searches, varying slightly the search terms, to access an entire book. (9/23/13 Tr. at 6).

Neither suggestion makes sense.  Google does not sell its scans, and the scans do not replace the books.  While partner libraries have the ability to download a scan of a book from their collections, they owned the books already -- they provided the original book to Google to scan.  Nor is it likely that someone would take the time and energy to input countless searches to try and get enough snippets to comprise an entire book.  Not only is that not possible as certain pages and snippets are blacklisted, the individual would have to have a copy of the book in his possession already to be able to piece the different snippets together in coherent fashion.

-24-

MCCCD/Martinez 03444

To the contrary, a reasonable factfinder could only find that Google Books enhances the sales of books to the benefit of copyright holders.  An important factor in the success of an individual title is whether it is discovered -- whether potential readers learn of its existence.  (Harris Decl. ¶ 7 (Doc. No. 1039)).  Google Books provides a way for authors' works to become noticed, much like traditional in-store book displays.  (Id. at ¶¶ 14-15).  Indeed, both librarians and their patrons use Google Books to identify books to purchase.  (Br. of Amici Curiae American Library Ass'n at 8).  Many authors have noted that online browsing in general and Google Books in particular helps readers find their work, thus increasing their audiences.  Further, Google provides convenient links to booksellers to make it easy for a reader to order a book.  In this day and age of on-line shopping, there can be no doubt but that Google Books improves books sales.

Hence, I conclude that the fourth factor weighs strongly in favor of a finding of fair use.

5.  **Overall Assessment**

Finally, the various non-exclusive statutory factors are to be weighed together, along with any other relevant considerations, in light of the purposes of the copyright laws.

-25-

MCCCD/Martinez 03445

In my view, Google Books provides significant public benefits. It advances the progress of the arts and sciences, while maintaining respectful consideration for the rights of authors and other creative individuals, and without adversely impacting the rights of copyright holders. It has become an invaluable research tool that permits students, teachers, librarians, and others to more efficiently identify and locate books. It has given scholars the ability, for the first time, to conduct full-text searches of tens of millions of books. It preserves books, in particular out-of-print and old books that have been forgotten in the bowels of libraries, and it gives them new life. It facilitates access to books for print-disabled and remote or underserved populations. It generates new audiences and creates new sources of income for authors and publishers. Indeed, all society benefits.

Similarly, Google is entitled to summary judgment with respect to plaintiffs' claims based on the copies of scanned books made available to libraries. Even assuming plaintiffs have demonstrated a prima facie case of copyright infringement, Google's actions constitute fair use here as well. Google provides the libraries with the technological means to make digital copies of books that they already own. The purpose of

-26-

MCCCD/Martinez 03446

the library copies is to advance the libraries' lawful uses of
the digitized books consistent with the copyright law.  The
libraries then use these digital copies in transformative ways.
They create their own full-text searchable indices of books,
maintain copies for purposes of preservation, and make copies
available to       print-disabled individuals, expanding access
for them in unprecedented ways.  Google's actions in providing
the libraries with the ability to engage in activities that
advance the arts and sciences constitute fair use.

        To the extent plaintiffs are asserting a theory of
secondary liability against Google, the theory fails because the
libraries' actions are protected by the fair use doctrine.
Indeed, in the HathiTrust case, Judge Baer held that the
libraries' conduct was fair use.  See Authors Guild, Inc. v.
HathiTrust, 902 F. Supp. 2d 445, 460-61, 464 (S.D.N.Y. 2012) ("I
cannot imagine a definition of fair use that would not encompass
the transformative uses made by Defendants' [Mass Digitization
Project] and would require that I terminate this invaluable
contribution to the progress of science and cultivation of the
arts that at the same time effectuates the ideals espoused by the
[Americans with Disabilities Act].").  The fair use analysis set

-27-

MCCCD/Martinez 03447

forth above with respect to Google Books applies here as well to the libraries' use of their scans, and if there is no liability for copyright infringement on the libraries' part, there can be no liability on Google's part.

<u>CONCLUSION</u>

For the reasons set forth above, plaintiffs' motion for partial summary judgment is denied and Google's motion for summary judgment is granted.  Judgment will be entered in favor of Google dismissing the Complaint.  Google shall submit a proposed judgment, on notice, within five business days hereof.

SO ORDERED.

Dated:     November 14, 2013
           New York, New York

DENNY CHIN
United States Circuit Judge
Sitting By Designation

### **APPEARANCES**

For Plaintiffs:

       BONI & ZACK LLC
           By:   Michael J. Boni, Esq,
               Joshua D. Snyder, Esq.
               John E. Sindoni, Esq.
               15 St. Asaphs Road
               Bala Cynwyd, PA  19004


       FRANKFURT KURNIT KLEIN & SELZ P.C.
           By:   Edward H. Rosenthal, Esq.
               Jeremy S. Goldman, Esq.
               488 Madison Avenue
               New York, NY  10022


       MILBERG LLP
           By:   Sanford P. Dumain, Esq.
               1 Pennsylvania Plaza
               New York, NY  10119


For Defendant Google, Inc.


       DURIE TANGRI LLP
           By:   Daralyn J. Durie, Esq.
               Joseph C. Gratz, Esq.
               David McGowan, Esq.
               Genevieve P. Rosloff, Esq.
               217 Leidesdorff Street
               San Francisco, CA  94111

MCCCD/Martinez 03449

For Amicus Curiae Digital
  Humanities and Law Scholars:


                SAMUELSON LAW, TECHNOLOGY & PUBLIC POLICY CLINIC
                     By:   Jennifer M. Urban, Esq.
                           Babak Siavoshy, Esq.
                           Jason Schultz, Esq.
                           University of California, Berkeley,
                             School of Law
                           396 Simon Hall
                           Berkeley, CA  94720
                                - and -
                           Matthew Sag, Esq.
                           Loyola University of Chicago School of Law
                           25 East Pearson Street
                           Chicago, IL  60611


For Amicus Curiae American Library
  Association, Association of
  College and Research Libraries,
  Association of Research Libraries,
  and Electronic Frontier Foundation:


                JONATHAN BAND PLLC
                     By:   Jonathan Band, Esq.
                           21 Dupont Circle, NW
                           Washington, DC  20036


                            -30-

MCCCD/Martinez 03450