# EXHIBIT 40



**MARICOPA COMMUNITY COLLEGES®** | Vice Chancellor
Human Resources

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T  480.731.8103 • F  480.731.8120 • www.maricopa.edu

April 14, 2014

Dr. Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ  85020

Re:  Update to Notice of Suspension without Pay

Dear Dr. Martinez:

Your Notice of Suspension without Pay, dated February 10, 2014, has been updated.  The February 10th notice advised you that your suspension without pay would begin on March 1, 2014 and end on May 15, 2015.  The dates of your suspension without pay have been revised as follows:

Your suspension without pay from your position as Mathematics faculty at Phoenix College will begin on April 15, 2014 and end on May 15, 2015.  Your teaching responsibilities and pay will resume Fall semester 2015, should you choose to return.

Although your paid administrative leave will cease after this Friday, April 11, 2014, and your unpaid suspension will begin on April 12, 2014, your benefits will continue through April 30, 2014.  Zenith Administrators will send you a Cobra Notice within fourteen days of the end of your coverage.

Sincerely,

Rufus Glasper, Ph.D., CPA
Chancellor

Cc:  Dr. Anna Solley
     LaCoya Shelton-Jackson, VCHR
     Personnel File

EXHIBIT 7
WIT: R. Glasper
DATE: 11-22-16
Angela F. Miller, RPR, CR

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert  I  Estrella Mountain  I  GateWay  I  Glendale  I  Mesa  I  Paradise Valley  I  Phoenix
Rio Salado  I  Scottsdale  I  South Mountain  I  Maricopa Skill Center  I  SouthWest Skill Center

# EXHIBIT 41

Stephen Montoya
Attorney at Law

Montoya, Jimenez & Pastor, P.A.
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012-2490
Tele: 602-256-6718; Fax: 602-256-6667
stephen@montoyalawgroup.com

March 12, 2014

**SENT VIA EMAIL ONLY**

Doyle Burke, President
Office of the Governing Board
Maricopa Community Colleges
2411 West 14th Street
Tempe, Arizona 85281
doyle.burke@domail.maricopa.edu

Alfredo Gutierrez, Member
Office of the Governing Board
Maricopa Community Colleges
2411 West 14th Street
Tempe, Arizona 85281
alfredo.gutierrez@domail.maricopa.edu

Randolph S. Elias Lumm, Member
Office of the Governing Board
Maricopa Community Colleges
2411 West 14th Street
Tempe, Arizona 85281
randolph.lumm@domail.maricopa.edu

Debra Pearson, Member
Office of the Governing Board
Maricopa Community Colleges
2411 West 14th Street
Tempe, Arizona 85281
debra.pearson@domail.maricopa.edu

Dana G. Saar, Member
Office of the Governing Board
Maricopa Community Colleges
2411 West 14th Street
Tempe, Arizona 85281
dana.saar@domail.maricopa.edu



EXHIBIT NO. 9
Martinez
8/16/16

March 12, 2014
page 2

Re:   Petition to the Governing Board by Professor Cleopatria
      Martinez

Dear Honorable Members of the Governing Board:

This letter is to alert the Governing Board of a grave injustice perpetrated against a faculty member by the Chancellor of the Maricopa County Community College District in violation of the express provisions of the District's Residential Faculty Policies ("RFP"). This injustice is of special concern to the Board because the Chancellor's unilateral actions have usurped the Board's authority to terminate and otherwise discipline its employees under the RFP.

Specifically, Cleopatria Martinez has been employed by the District as a Professor of mathematics since January 1, 1985. See attached Exhibit A, ¶ 1. In almost thirty-years of dedicated service to the District, Professor Martinez has no prior record of discipline.

On August 9, 2013, the Chancellor of the District, Dr. Rufus Glasper, served a "Statement of Charges" on Professor Martinez alleging that she violated the District's "cash handling" rules and violated United States copyright laws. See attached Exhibit B. The Chancellor recommended that Professor Martinez be dismissed from employment at the District based upon the misconduct alleged in the Statement of Charges, although Professor Martinez has been employed by the District for almost thirty-years and has no record of previous discipline. Id.

Professor Martinez exercised her right to appeal from the Chancellor's recommended dismissal pursuant to RFP 3.15.3. See Exhibit C. On November 18, 2013, a Hearing Committee conducted an evidentiary hearing and considered both testimonial and documentary evidence regarding the District's Statement of Charges against Professor Martinez. After considering all of the evidence, the Hearing Committee unanimously rendered the following conclusion:

> PC failed to carry its burden of proof relating to violation of MCCCD's cash handling rules found in MCCCD Administrative Regulations 1.17, violation of Residential Policy Manual 3.2.4 (relating to financial interests in unpublished materials), violation of U.S. Copyright Law and

March 12, 2014
page 3

fair use guidelines, and violation of MCCCD
Administrative Regulations 3.2.4 and 3.2.5 related
to copyright regulations.

See Exhibit A, ¶ 63.

Notwithstanding the Hearing Committee's unanimous conclusion
that the District had failed to satisfy its burden of proof, the Chancellor
unilaterally suspended Professor Martinez on March 7, 2014 without pay
for fourteen (14) months from March 1, 2014 to May 15, 2015, based
upon an entirely new Statement of Charges back-dated to February 10,
2014 that contains facts specifically rejected by the Hearing Committee.
See attached Exhibit D.

The Chancellor's rejection of the Hearing Committee's factual
findings and unilateral imposition of a fourteen-month, unpaid suspension
on Professor Martinez violates the District's Residential Faculty Policies
and flatly usurps the Board's ultimate authority to discipline its employees.

Specifically, RFP 3.13 provides that:

### 3.13.    Faculty    Member    Dismissal—Probationary and Appointive

A Faculty member who is recommended, by the
College President, through the Chancellor, to the
Governing Board, for dismissal shall have access
to the following due process procedures.

### 3.13.1.

A written statement of charges, formulated by the
College President, shall be forwarded to the Vice
Chancellor of Human Resources. After review of
the charges, the Vice Chancellor, in consultation
with the MCCCD Legal Office, may recommend,
to the Chancellor, that there exists prima facie
cause for the dismissal of a Faculty member. The
Chancellor shall inform the Governing Board in
writing, with a copy of the recommendation being
sent (U.S. certified or registered mail) to the
Faculty member at his/her place of residence as

March 12, 2014
page 4

recorded in the MCCCD records. The Vice Chancellor's recommendation will give notice to the Chancellor, Governing Board, and the Faculty member of the intention to formally recommend dismissal, which shall not be sooner than thirty (30) days from the date of the letter, nor later than the end of the current academic year.

### 3.13.2.

A written statement of charges shall be provided to the Chancellor, Governing Board, and the Faculty member as an attachment to the notification outlined in the preceding paragraph. The statement of charges shall state, if applicable, the statutes, policies, rules, or written objectives of the College that the Faculty member is alleged to have violated. The statement of charges shall be of such specificity that the Faculty member will be able to prepare a defense based on the statement.

### 3.13.3.

The Faculty member shall have the right to a hearing by filing a written request with the Vice-Chancellor within five (5) business days after being served with a notice of intent to dismiss. The filing of a timely request shall suspend the dismissal procedure, pending the completion of the hearing.

### 3.13.4.

Upon request, a Hearing Committee shall be constituted within five (5) business days and shall be composed of three (3) Faculty members: one (1) appointed by the Chancellor, one (1) selected by the President of the Faculty Association, and one (1) selected by the member. All three (3) shall be Appointive Faculty. The committee member selected by the Chancellor and the

March 12, 2014
page 5

President of the Faculty Association will be from colleges other than the college where the Faculty member recommended for dismissal is assigned. The committee shall be considered constituted when the hearing committee and the Faculty member have been informed by the Faculty Association President of the committee's formation.

### 3.13.5.

The Hearing Committee shall select a Chair. Unless the parties stipulate to extend the time beyond that which is set forth below, the Chair shall conduct a meeting with the attorney representing the MCCCD and the Faculty member and/or his/her attorney/representative no later than twenty (20) business days after the formation of the committee for the purpose of exchanging exhibits, witness lists, and summaries of witness testimony. The Chair may choose to deny admission of an exhibit(s) or witness testimony for failure to comply with this Section.

### 3.13.6.

Unless the parties otherwise agree, the Hearing Committee shall conduct the hearing no later than ten (10) business days after the exchange of information detailed in **Section 3.13.5.** Prior to the hearing, the Faculty member must declare, in writing, whether he/she wishes the hearing to be public or in executive session. The member may attend the hearing; present any testimony, evidence, or statements, oral or written, in his/her behalf; and be represented by legal counsel or other representative. It is expressly understood the act of testifying will not be subject to reprisal by the MCCCD.

March 12, 2014
page 6

### 3.13.7.

Within five (5) business days after completion of the hearing, the Hearing Committee shall provide the Chancellor, and the Faculty member with a summary of the evidence that was presented during the hearing. In addition, the Hearing Committee shall render binding written findings of fact and conclusions of law and forward these along with its recommendation regarding dismissal to the Chancellor. The above deadline may be extended up to fifteen (15) business days after completion of the hearing, if the Hearing Committee requests briefs and/or recommended findings of fact and conclusions of law from the parties.

### 3.13.8.

After receiving the Hearing Committee's summary of evidence, findings of fact, conclusions of law, and final recommendation in regard to dismissal, the Chancellor, may meet with the Hearing Committee to clarify any questions he/she may have. The Chancellor shall have ten (10) business days in which to review the recommendation regarding dismissal. The Chancellor may adopt the Hearing Committee's recommendation regarding dismissal or make his/her own recommendation and forward the recommendation along with the summary of the evidence, a copy of the findings of fact, conclusions of law, and final recommendations of the Hearing Committee to the Governing Board.

### 3.13.9.

The Governing Board will meet with the Faculty member and/or his/her representative and a representative of the administration to hear arguments regarding the Chancellor's and the Hearing Committee's recommendation regarding

March 12, 2014
page 7

dismissal. This meeting will be an executive
session unless the Faculty member chooses to
have this meeting in public. The parties shall have
no less than one-half hour to present their
respective cases. The length of the meeting shall
not exceed one (1) hour.

**3.13.10.**

The Governing Board, at a public meeting, shall
render a final decision for retention or dismissal of
the Faculty member. A copy of the final decision
shall be sent (U.S. certified or registered mail) to
the Faculty member at his/her place of residence
as recorded in MCCCD records. It is expressly
understood that the Governing Board decision
does not diminish the Faculty member's right to
seek other legal remedies under local, state and
federal law.

As explained below, the Chancellor's unilateral suspension of
Professor Martinez violates her rights under the RFP and her right to due
process under Arizona and federal law.

First, the Chancellor's new Statement of Charges of February 10,
2014 contains allegations regarding Professor Martinez's alleged violation
of federal copyright law that were expressly considered and rejected by the
Hearing Committee. Specifically, although the Hearing Committee
specifically concluded that the District failed to meet its burden of proof
regarding its allegation that Professor Martinez violated federal copyright
laws, see Exhibit A, ¶ 63, the Chancellor's Statement of Charges
specifically faults Professor Martinez for violating federal copyright laws.
See Exhibit D, p. 2.

Similarly, the Chancellor's new Statement of Charges also contains
violations that were not set forth in the original Statement of Charges of
August 9, 2013 and that were never even considered by the Hearing
Committee. For example, the Chancellor's new Statement of Charges of
February 10, 2014 claims for the first time that Professor Martinez violated
MCCCD Administrative Regulations 1.12.2 and 1.12.3. See Exhibit D, p.
3. Neither of these regulations were even mentioned in the original
Statement of Charges.

March 12, 2014
page 8

In addition to violating the RFP, the Chancellor's new Statement of Charges violates Professor Martinez's due process rights under state and federal law. Specifically, although Professor Martinez's suspension was predicated upon a new Statement of Charges, she was never even given the opportunity to respond to the Statement of Charges in writing before she was suspended. Moreover, the Chancellor also failed to allow Professor Martinez any opportunity to present evidence refuting the new Statement of Charges before a neutral finder-of-fact. Accordingly, the Chancellor's suspension failed to provide Professor Martinez with any due process at all, although it has severely damaged her reputation and deprived her of over a year's salary. The Chancellor's violation of Professor Martinez's due process rights has exposed the District to substantial liability to Professor Martinez under state and federal law.

Furthermore, although under the RFP, the Chancellor's Recommendation regarding the Hearing Committee's Findings and Conclusions are subject to the Board's ultimate review and approval, see RFP 3.13.8-3.13.10 above, the Chancellor did not submit the suspension for the Board's consideration or approval after the Board meets with Professor Martinez under RFP 3.13.9.

The Chancellor attempted to justify his unilateral, fourteen-month, unpaid suspension of Professor Martinez by claiming that he is not required to submit "suspensions" to Board for approval. However, because the original Statement of Charges against Professor Martinez clearly involved "dismissal," not "suspension" both the Hearing Committee's Recommendation and the Chancellor's Recommendation are expressly subject to ultimate Board approval under RFP 3.13.8-3.13.10.

Moreover, the Chancellor cannot be allowed to suspend a faculty member for fourteen-months without pay without the ultimate approval of the Board. As the Board is aware, a fourteen-month suspension is the economic equivalent of dismissal. The Chancellor should not be allowed to de facto terminate the District's employees in the form of lengthy suspensions without first obtaining approval by the Governing Board. A contrary conclusion would render the protections set forth in RFP 3.13 nugatory.

Based upon the foregoing—in accordance with RFP 3.13.9—Professor Martinez hereby petitions the Governing Board to meet with her "to hear arguments regarding the Chancellor's and the Hearing

March 12, 2014
page 9

Committee's recommendation regarding dismissal," and conclude that
Professor Martinez has already been punished enough for any underlying
disciplinary infraction and close this matter without either terminating or
suspending her.

Sincerely,

Stephen Montoya

cc:    Pavneet Uppal (via email only)
       puppal@laborlawyers.com

       Lee Combs (via email only)
       lee.combs@domail.maricopa.edu

       James Bowers (via email only)
       james.bowers@domail.maricopa.edu

       Tina Emmons (via email and first class mail)
       Assistant to the Governing Board
       tina.emmons@domail.maricopa.edu

# EXHIBIT A

BEFORE THE GOVERNING BOARD OF THE
MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

|  |  |  |
|---|---|---|
| MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT, | ) ) | HEARING COMMITTEE |
| v. | ) ) ) | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION |
| DR. CLEOPATRIA MARTINEZ | ) | |

Pursuant to the October 16, 2013 Scheduling Order, having reviewed all of the parties' pleadings and exhibits and conducting a hearing on November 18, 2013, the Hearing Committee (by majority vote) hereby submits the following Findings of Fact, Conclusions of Law and Recommendation.

## FINDINGS OF FACT

1.    After having taught mathematics full-time for ten years at Denver Community College, Dr. Cleopatria Martinez moved to Arizona and started teaching mathematics full-time at Scottsdale Community College on January 1, 1985.

2.    Dr. Martinez voluntarily transferred to Phoenix College ("PC") in 1995 and has been teaching mathematics there full-time ever since.

3.    Dr. Martinez elected to voluntarily transfer to PC because there were very few minority students attending Scottsdale Community College, and she wanted to use her bilingual education skills in the mathematics classroom to better educate the large number of minority students attending PC.

4.    Dr. Martinez was elected by her colleagues to serve as the Chairperson of the Mathematics Department of PC from 2002 to 2005.

5.    In early 2010, PC discovered that Dr. Cleopatria Martinez may have exposed MCCCD to potential liability for copyright infringement.

6.    Dr. Martinez testified that, during her twenty-eight years of teaching mathematics in the MCCCD system, she and her colleagues in the Mathematics Departments of both Scottsdale Community College and PC routinely borrowed mathematics problems from other mathematicians to use in their student handouts for educational purposes on a not for profit basis.

7.    Dr. Martinez testified, without rebuttal, that this borrowing of mathematics problems is a longstanding, widespread custom throughout the District and academia at large.

8.    Instead of requiring her mathematics students to purchase textbooks, Dr. Martinez prepared her own course materials which she called her "Lecture Notes" and distributed them to

-1-

her students.   MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 77:17-78:15, 106:16-108:16, 121:25-140:13, 132:16-137:25).

9.      Dr. Martinez read the Copyright Act of 1976 and believed that it authorized her to use small portions of other scholars' work under the "Fair Use" doctrine because she was using it only for classroom teaching purposes on a not for profit basis and her use of the material did not undermine the potential market for the other scholar's work.

10.     Per the "Fair Use" doctrine of the Copyright Act, the "use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.

11.     Dr. Martinez copied problems from copyright protected textbooks and inserted them into her course materials.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 106:16-108:16).

12.     Dr. Martinez, in her Basic Arithmetic (MAT082) course, copied problems directly from a copyrighted textbook entitled "Basic Mathematics" and inserted them into her "MAT 082 Basic Arithmetic Spring 2010" course materials which she distributed to students.  MCCCD Exhibit List # 20 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

13.     Dr. Martinez also copied problems directly from the Sullivan & Sullivan "Precalculus" textbook and inserted them into her "MAT182 Trigonometry Spring 2010" course materials.  MCCCD Exhibit List # 22 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

14.     Dr. Martinez did not require her students to purchase textbooks in her Spring MAT082 Course.  MCCCD Exhibit List # 18 (email from Dr. Martinez stating "I indicated in my syllabus that, instead of a published textbook, I was using lecture notes in my MAT082 class.")

15.     Dr. Martinez did not require her students to purchase textbooks in her Spring MAT182 Course.  *See* Dr. Martinez's hearing testimony (conceding that students were not required to purchase a textbook in her Spring 2010 MAT182 course).

16.     On or around January 12, 2010, MCCCD's Vice President of Academic Services, Ronnie Elliot, sent Dr. Martinez an email notifying her that there were alleged copyright related problems with the materials she had printed for the Fall 2009 and Spring 2010 semesters.  MCCCD Exhibit List # 23 (January 12, 2010 email).  The materials in question were packets of course materials for Dr. Martinez's MAT182 and MAT187 courses and contained mathematics problems and graphs that were taken from copyrighted textbooks.  MCCCD Exhibit List # 11 (Ronnie Elliot Declaration, ¶¶8-9); MCCCD Exhibit List # 16 (MAT182 course packet); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memorandum).

17.     Dr. Martinez used three of the four packets of "lecture notes" in the Spring of 2010 in two pre-calculus classes. See District Exhibit 6, parts 1-3.

18.     The MCCCD administration, following Vice President Elliot's email, repeatedly explained its copyright concerns to Dr. Martinez and asked Dr. Martinez to remove any copyright protected mathematics problems from her materials. See Kakar Hearing Testimony.

19.     On January 26, 2010, Vice President Elliot sent Dr. Martinez an email outlining MCCCD's concerns regarding Dr. Martinez's potential copyright infringement. MCCCD Exhibit List # 24 (January 26, 2010 email).

20.     On January 28, 2010, MCCCD in-house-counsel Margaret McConnell discussed copyright compliance with Dr. Martinez telephonically. MCCCD Exhibit List # 25 (January 28, 2010 email).

21.     Dr. Martinez did not benefit from the multiple MCCCD copyright information sessions noted above.

22.     PC's own expert witness, Sean Garrison, testified that under the "Fair Use" doctrine, someone could lawfully copy from a copyrighted textbook without either using or purchasing the textbook.

23.     On February 5, 2010, Vice President of Academic Affairs Casandra Kakar, Interim Vice President of Administrative Services Paul DeRose, and Dr. Martinez met to discuss Dr. Martinez's alleged misuse of copyrighted materials. MCCCD Exhibit List # 26 (February 12, 2010 email).

24.     Dr. Martinez has not used any of the four sets of "lecture notes" since the Spring of 2010 when PC first raised its concerns regarding the notes.

25.     On April 15, 2010, PC Librarian Ann Roselle conducted a personalized one-on-one copyright training session with Dr. Martinez. MCCCD Exhibit List # 28 (Copyright PowerPoint Presentation). *See also,* Kakar Hearing Testimony.

26.     When Dr. Martinez met with the librarian, the librarian told Dr. Martinez that Dr. Martinez knew as much about copyright law as she did. See Martinez Hearing Testimony.

27.     Following the revocation of Dr. Martinez's copying privileges, Dr. Martinez was required to submit her copy requests to Mathematics Department Chairperson Mr. Sueyoshi so that Mr. Sueyoshi could review her materials for possible copyright violations prior to copying and distribution to students. MCCCD Exhibit List # 8 (April 2, 2010 Directive).

28.     Dr. Martinez sought and obtained a form of written permission from the publisher of the textbook, Sullivan & Sullivan's "Precalculus," to copy materials from their book after PC accused her of violating copyright law.

29.     On or around April 19, 2010, Dr. Martinez attempted to bypass the copying restrictions by having an adjunct mathematics Professor, Johnny Santellan, make 24 sets of copies of her "Lecture Notes" for distribution to her mathematics students without obtaining prior approval from the Mathematics Department Chairperson. MCCCD Exhibit List # 12 (Sueyoshi Decl., ¶9); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 223:11-224:21).

30.   Because Dr. Martinez did not feel she was able to obtain reliable guidance regarding copyright compliance from the District, she sought advice from a private intellectual property attorney regarding the issue, Mr. Frederic Bellamy.

31.   Mr. Bellamy reviewed the first two sets of Dr. Martinez's "lecture notes" and concluded that they did not violate copyright law because they fell under the "Fair Use" doctrine.

32.   Mr. Bellamy based his conclusion that Dr. Martinez did not violate copyright law on the opinion that the portion of material that Dr. Martinez copied from the Sullivan & Sullivan Precalculus textbook was very small, that she used the copied materials exclusively for educational purposes without any profit motive, that the content of the copied material consisted of mathematics problems that are arguably not subject to copyright in the first place, and that the small portion of the textbook that Dr. Martinez copied did not adversely impact the potential market for the textbook.

33.   At the hearing, another lawyer practicing in the area of intellectual property law, Sean Garrison, testified on behalf of PC. In contrast to Mr. Bellamy, Mr. Garrison testified at the hearing that the first three sets of Dr. Martinez's lecture notes violated copyright law.

34.   In contrast to his testimony at the hearing of November 18, 2013, in his written report Mr. Garrison concluded only that the first three sets of Dr. Martinez's lecture notes subjected the District "to a serious risk of a copyright infringement claim." See District Exhibit 6, p. 0002.

35.   MCCCD invited Dr. Martinez to a copyright workshop that was held on March 1, 2010 at PC. Dr. Martinez chose not to attend the workshop. MCCCD Exhibit List # 10 (Solley Decl., ¶11).

36.   PC President Anna Solley, on December 9, 2010, concluded that Dr. Martinez's alleged misconduct posed an unacceptable legal risk of a copyright infringement claim and imposed restrictions on Dr. Martinez's photocopying privileges. MCCCD Exhibit List # 10 (Solley Decl., ¶12).

37.   MCCCD sought a legal opinion from an outside copyright expert, attorney Sean Garrison. MCCCD Exhibit List # 10 (Solley Decl., ¶ 14); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memo).

38.   According to Mr. Garrison, the third set of "lecture notes" appeared to have 13 mathematics problems copied from two other mathematics textbooks.

39.   Mr. Garrison testified that he was certain that Dr. Martinez has committed copyright infringement. See Garrison Hearing Testimony. In reaching this conclusion, Mr. Garrison reviewed thousands of pages of materials including nearly 300 pages of Dr. Martinez's lecture notes and three separate copyrighted mathematics textbooks. MCCCD Exhibit List # 6 (Sean Garrison April 19, 2013 Report); see also Garrison Hearing Testimony.

40.   In reliance upon Mr. Garrison's recommendations, PC President Anna Solley issued a December 9, 2010 directive that imposed further restrictions on Dr. Martinez's copying

privileges.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 10 (Solley Decl., ¶15).

41.    The December 9, 2010 Directive prohibited Dr. Martinez from utilizing any course materials of her own creation.  MCCCD Exhibit List # 9 (December 9, 2010 Directive). Instead, Dr. Martinez was required to only use course materials that are "approved by the mathematics department" or that are "available in the bookstore for sale to students and that are authored by persons other than [Dr. Martinez]."  MCCCD Exhibit List # 9 (December 9, 2010 Directive).

42.    The December 9, 2010 Directive further required Dr. Martinez to submit her photocopy requests to the Mathematics Department Chair for his approval.  MCCCD Exhibit List # 9 (December 9, 2010 Directive).

43.    Despite MCCCD's frequent discussions with Dr. Martinez regarding the importance of complying with copyright laws and the December 9, 2010 Directive, Dr. Martinez continued to attempt to ignore the directive.  See Kakar Hearing Testimony.

44.    At the beginning of the Fall 2012 semester (on or about August 21-23, 2012), Dr. Martinez informed her students that they were not required to purchase a course textbook and that she would provide them with her own course materials in lieu of a textbook.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

45.    In fall of 2012, Dr. Martinez sought to have her lecture notes photocopied off campus at a nearby Staples store.  This practice is inconsistent with the December 9, 2010 Directive.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

46.    Dr. Martinez did not submit her Fall 2012 materials to Mathematics Department Chairperson Mr. Sueyoshi for approval.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

47.    Dr. Martinez made copies of her course materials at an off-campus Staples store and distributed them to students for $11 per copy.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

48.    The $11 course material fee was paid directly to Dr. Martinez by students. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

49.    PC accused Dr. Martinez of violating the District's "cash handling" rules by distributing these course materials to her students if the students reimbursed her for her out-of-pocket copying costs.

50.    PC subsequently claimed that Dr. Martinez violated the District's "cash handling" policies by seeking reimbursement for the copies.

51.    MCCCD's policies prohibit instructors from having "any financial interest in or receiv[ing] compensation from the sale of any unpublished instructional materials required or

suggested for a class that the instructor teaches." MCCCD Exhibit List # 41 (Residential Faculty Policies, 3.2.4).).

52.     Dr. Martinez failed to follow the protocol set forth in the December 9, 2010 Directive in copying her Fall 2012 course materials.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

53.     Dr. Martinez distributed course materials directly to students in her Fall 2012 MAT151 class.  MCCCD Exhibit List # 4-5 (Martinez Depo. pp. 232:19-233:21).

54.     The MCCCD Administration learned of Dr. Martinez's unauthorized distribution of course materials to students after one of Dr. Martinez's MAT151 students complained to Mathematics Department Chairperson Mr. Sueyoshi.  The student complained that Dr. Martinez refused to provide her with a receipt for the purchased course materials.  See Kakar Hearing Testimony.

55.     Upon learning that Dr. Martinez had distributed course materials to students allegedly in violation of MCCCD's cash handling policy, President Solley instructed Martinez to immediately issue refunds to her students via personal check.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

56.     On or around October 18, 2012, President Solley and Dr. Kakar met with Dr. Martinez to explain the seriousness of Dr. Martinez's alleged cash handling violation.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.  In addition, President Solley and Dr. Kakar prepared a written counseling memo dated October 18 2010 for Dr. Martinez regarding her alleged violation of cash handling rules.  Dr. Martinez was provided with a copy of the October 18, 2010 counseling notice and President Solley proceeded to explain to Dr. Martinez the seriousness of the alleged cash handling violations and the requirement that Dr. Martinez issue reimbursements to her students.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

57.     Several months later, on or around January 9, 2013, Dr. Kakar learned that most (if not all) students had not yet received refunds from the Dr. Martinez.  MCCCD Exhibit List # 39 (various emails regarding student refunds).  As a result, Dr. Kakar instructed Dr. Martinez to provide copies of refund checks by January 18, 2013.  MCCCD Exhibit List # 39 (various emails regarding student refunds).

58.     Dr. Martinez failed to produce a single refund check by the January 18, 2013 deadline. MCCCD Exhibit List # 39 (various emails regarding student refunds).

59.     Dr. Martinez did not think that she had violated any District rule in reference to the copies.  Therefore, she declined to follow the December 9, 2010 order because she believed she was not required to do so under any District rule.

60.     At the November 18, 2013 hearing, Dr. Martinez did not provide any explanation for her refusal to comply with the October 18, 2012 and January 9, 2013 directives to issue refunds to her students.  See Martinez Hearing Testimony.

61.     At the hearing Dr. Martinez testified that she had made a "mistake" and, in retrospect, should have complied with President Solley's instructions. See Martinez Hearing Testimony.

62.     On or around August 9, 2013, MCCCD Chancellor Rufus Glasper sent Dr. Martinez a letter informing her that MCCCD was proceeding with termination proceedings. Included with this letter was a statement of charges that summarized the particular violations Dr. Martinez had been charged with (hereinafter referred to as "Statement of Charges.") MCCCD Exhibit List # 1 (Statement of Charges).

## CONCLUSIONS

63.     PC failed to carry its burden of proof relating to violation of MCCCD's cash handling rules found in MCCCD Administrative Regulations 1.17, violation of Residential Policy Manual 3.2.4 (relating to financial interests in unpublished materials), violation of U.S. Copyright Law and fair use guidelines, and violation of MCCCD Administrative Regulations 3.2.4 and 3.2.5 related to copyright regulations.

64.     Notwithstanding their education, their experience, and their good faith, Mr. Bellamy and Mr. Garrison disagreed as to whether or not Dr. Martinez violated copyright law. Therefore, it is inconclusive as to whether Dr. Martinez intentionally and/or inadvertently violated federal copyright law.

65.     It is inconclusive as to whether or not Dr. Martinez violated the "cash handling" policies of MCCCD.

66.     Dr. Martinez willfully and intentionally failed to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley.

67.     Dr. Martinez conceded that she never complied with President Solley's clear directive to issue refunds to her students. Although Dr. Martinez now regrets her decision not to comply with President Solley's directive, she has never claimed that she did not understand the instructions or that the instructions were beyond the scope of management's authority. Viewed in light of these facts, Martinez's claim that she "made a mistake" is an admission of willful insubordination.

68.     By failing to comply with President Solley's directive to issue refunds to her students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.1 which prohibits the "[w]illful and intentional violation of any...MCCCD administrative regulation that affects the employee's ability to perform his or her job."

69.     By failing to comply with President Solley's directive to issue refunds to students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.3 which prohibits the "[w]illful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment."

///

## RECOMMENDATION

70.     We hereby recommend that the Governing Board deny President Solley's termination request and allow Dr. Martinez to continue her MCCCD employment.

71.     Per MCCCD Administrative Regulation 6.7 indicating that violation of any Employment Standards, "constitutes grounds for disciplinary action, *up to* [emphasis added] and including termination," we hereby recommend that the Governing Board retain Dr. Martinez.

It is ordered so, at Mesa, Arizona, this 9th day of December, 2013.

Dr. Keith Crudup
Chairperson
On Behalf of the Hearing Committee,
Dr. Nora Reyes and Dr. Carlos Caire

406681                                    -8-

# EXHIBIT B



MARICOPA
COMMUNITY
COLLEGES®

Rufus Glasper
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

August 9, 2013

Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ  85020

**Re:  Intent to dismiss you from your employment**

Dear Dr. Martinez:

Dr. Anna Solley, President of Phoenix College (PC) has forwarded a statement of charges to James Bowers, Interim Vice Chancellor for Human Resources. Mr. Bowers has reviewed the charges, in consultation with the MCCCD Legal Office, and recommended to me that there exists prima facie cause for your dismissal from your position as Mathematics Faculty at Phoenix College (see attached). I concur with his recommendation. The recommended effective date of your involuntary termination is September 24, 2013.

Maricopa County Community College District Administrative Regulation 6.7 states that violation of any of its Employment Standards "constitutes grounds for disciplinary action, up to and including termination of any Maricopa County Community College District (MCCCD) employee as outlined by the respective policy manuals".

Pursuant to Section 3.15.3 of the RFP Policy Manual, you may invoke your right to a hearing by filing a written request with Interim Vice Chancellor James Bowers within five (5) business days after being served with this notice of intent to dismiss you from your employment.

Sincerely,

Rufus Glasper, Ph.D., CPA
Chancellor


Cc:     MCCCD Governing Board
        Dr. Anna Solley
        Mr. Jim Bowers

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert I Estrella Mountain I GateWay I Glendale I Mesa I Paradise Valley I Phoenix
Rio Salado I Scottsdale I South Mountain I Maricopa Skill Center I SouthWest Skill Center



MARICOPA
COMMUNITY
COLLEGES®  |  Vice Chancellor
Human Resources

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8103 • F 480.731.8120 • www.maricopa.edu

August 9, 2013

Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ  85020

RE:  Employment Status

Dear Dr. Martinez:

You are being placed on paid administrative leave from August 12 through
September 24, 2013, pending the approval of your termination. During
administrative leave, you will remain an employee of Maricopa County
Community College District (MCCCD) and must continue to observe all policies
regarding employee conduct.

For the duration of paid administrative leave, you should not report to work nor
do you need to make contact with your supervisor. Upon approval of your
termination by the Maricopa County Community Colleges Governing Board, you
will be notified regarding the termination of your employment status with
MCCCD.

Sincerely,

James Bowers, J.D.
Interim Vice Chancellor for Human Resources

cc:    Dr. Anna Solley
       Employee Personnel File

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert I Estrella Mountain I GateWay I Glendale I Mesa I Paradise Valley I Phoenix
Rio Salado I Scottsdale I South Mountain I Maricopa Skill Center I SouthWest Skill Center



MARICOPA
COMMUNITY
COLLEGES² | Vice Chancellor
Human Resources

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8103 • F 480.731.8120 • www.maricopa.edu

August 9, 2013

Dear Dr. Glasper:

The following statement of charges against Dr. Cleopatria Martinez was forwarded to me by Dr. Anna Solley, President, Phoenix College.  Pursuant to 3.15.1 of the Residential Faculty Policy (RFP), I have reviewed the charges, in consultation with the MCCCD Legal Office, and recommend to you that there exists prima facie cause for the dismissal of Dr. Cleopatria Martinez.

Sincerely,

James Bowers, J.D.
Interim Vice Chancellor for Human Resources

## Statement of Charges

- Violation of Administrative Regulation 6.7.1 - "Willful and intentional violation of any state or federal law, applicable ordinance, MCCCD Governing Board policy, or MCCCD administrative regulation that affects the employee's ability to perform his or her job", specifically:

  o Violation of MCCCD's cash handling rules as covered by MCCCD Administrative Regulations 1.17

- Violation of Residential Faculty Policy Manual 3.2.4 - "A Faculty member shall not have any financial interest in or receive compensation from the sale of any unpublished instructional materials required or suggested for a class that the Faculty member teaches."

- Violation of U.S. Copyright Law and fair use guidelines, and MCCCD Administrative Regulations 3.2.4 and 3.2.5 regarding copyright regulations:

  3.2.4 Employees are prohibited from copying materials not specifically allowed by the (1) copyright Law, (2) fair use guidelines, (3) Licenses or contractual agreements, or (4) other permission.

  3.2.5 The Governing Board disapproves of unauthorized duplication in any form. Employees who willfully disregard this Board policy and/or the aforementioned copyright guidelines do so at their own risk and assume all liability for their actions.

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert I Estrella Mountain I GateWay I Glendale I Mesa I Paradise Valley I Phoenix
Rio Salado I Scottsdale I South Mountain I Maricopa Skill Center I SouthWest Skill Center

- Violation of Administrative Regulation 6.7.3 - "Willful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment", specifically, repeated failure to follow instructions regarding printing/copying of unauthorized materials, failure to use only approved course materials, unauthorized copying and sale of course materials, failure to reimburse students for the materials you wrongfully charged them for, and failure to meet the deadline to provide copies of any reimbursement checks to students.

Brief Timeline:

- January 2010 - College Vice Presidents Ronnie Elliott, Paul DeRose and Cassandra Kakar; along with Maggie McConnell; Assistant General Counsel, reviewed the requirements of AR 3.2 with you at length.
- April 2, 2010 –Anna Solley, Phoenix College President, notified you that your copying privileges at the Phoenix College IKON Copy Center were suspended.
- Spring 2010 – An Administrative Evaluation was initiated based on Mr. Joe Sueyoshi's complaint. By agreement, the Evaluation Team did not undertake its task until the fall semester. The findings and recommendations were submitted to Dr. Solley on November 17, 2010. The overall findings included:
  - ○ Copyright and plagiarism: Dr. Martinez was notified in writing and in meetings of MCCCD's and Phoenix College's concerns regarding her course materials violating copyright, fair use, and plagiarism laws.
  - ○ Insubordination: Dr. Martinez failed to follow Dr. Solley's and MCCCD's Legal Counsel's directives - specifically, she repeatedly requested copies, copied and printed unauthorized materials.
- December 9, 2010 – Dr. Solley administered an Initial Corrective Action to you for insubordination and failure to follow instructions regarding printing or copying of unauthorized materials.
- August 21-23, 2012 - You told your MAT 091 and MAT 151 students not to buy the approved text that you listed on the syllabus. Instead, you made copies of a colleague's materials and sold them to your students for $11 each.
- October 18, 2012 – A Second Corrective Action for insubordination and unauthorized copying and sale of course materials was administered to you by Dr. Solley. Included in the corrective action was the following directive: "Because you imposed charges on your students without authority to do so, you have the responsibility to reimburse the students from your own funds. You are hereby directed to do so by personal check, beginning immediately and continuing until all students who paid you are reimbursed."
- January 11, 2013 – Upon discovering that the students who bought your unauthorized course materials had yet to be reimbursed, Casandra Kakar directed you, via email, to provide her, by January 18, 2013, with front and back copies of all cashed personal reimbursement checks to your students.
- January 18, 2013 - You failed to provide Dr. Kakar with copies of any reimbursement checks and neglected to contact her regarding the money you still owe the students.
- February 21, 2013 – A student turned in the MAT091 materials which you left in room B210. Timothy Bryan, Mathematics Faculty, has previously told you that you do not have permission to use his materials again.

# EXHIBIT C

Stephen Montoya
Attorney at Law

Montoya, Jimenez & Pastor, P.A.
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012-2490
Tele: 602-256-6718; Fax: 602-256-6667
stephen@montoyalawgroup.com

August 16, 2013

SENT VIA EMAIL (JAMES.BOWERS@DOMAIL.MARICOPA.EDU),
FAX (480-731-8120), AND FIRST CLASS MAIL

James Bowers, J.D.
Interim Vice Chancellor for Human Resources
Maricopa Community Colleges
2411 West 14th Street
Tempe, Arizona 85281-6942

> Re:   Cleopatria Martinez; Request for Hearing

Dear Mr. Bowers:

Pursuant to Section 3.15.3 of the Maricopa Community College RFP Manual, Dr. Cleopatria Martinez hereby invokes her right to a hearing regarding her proposed dismissal from the Maricopa County Community College District.

We ask that the proposed termination of Dr. Martinez be rejected because it is based upon a misunderstanding of the underlying facts and applicable law, in addition to improperly ignoring Dr. Martinez's twenty-eight years of exemplary service to the District.

I will be serving as Dr. Martinez's legal counsel in connection with the proposed dismissal.

Thank you very much.

Sincerely,

Stephen Montoya

Blank                                                                    Page 1 of 1

**April Roll**

| | |
|---|---|
| **From:** | April Roll |
| **Sent:** | Friday, August 16, 2013 1:55 PM |
| **To:** | 'james.bowers@domail.maricopa.edu' |
| **Cc:** | Steve Montoya |
| **Subject:** | Cleopatria Martinez |
| **Attachments:** | martinez—letter bowers 01.pdf |

Mr. Bowers:

Please see attached letter of today regarding Ms. Martinez. The original will follow by first class mail.

Thank you.


April Roll
Legal Assistant to Stephen Montoya
Montoya, Jimenez & Pastor, P.A.
3200 North Central Avenue, Ste. 2550
Phoenix, Arizona 85012
Tele: 602-256-6718 Fax: 602-256-6667

This electronic mail transmission contains information from Montoya, Jimenez & Pastor, P.A. that may be confidential and/or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be advised that any disclosure, copying, distribution or use of this email, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a federal crime.

8/16/2013

P. 1

* * * Transmiss n Result Report(MemoryTX) ( Aug. 2013 1:38PM ) * * *
}}
2}

Date/Time: Aug. 16. 2013 1:37PM

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 4360 Memory TX<br>APRIL ROLL | 4807318120 | P. 2 | OK | |

Reason for error
  E. 1) Hang up or line fail          E. 2) Busy
  E. 3) No answer                      E. 4) No facsimile connection

---

Stephen Montoya
Attorney at Law

Montoya, Jimenez & Pastor, P.A.
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012-2310
Tele: 602-256-6718 Fax: 602-256-6667
stephen@montoyalawgroup.com

## FAX TRANSMISSION

### PERSONAL & CONFIDENTIAL

To:             James Bowers, J.D.
                Interim Vice Chancellor for Human Resources

Fax No:         (480) 731-8120

From:           Stephen Montoya

Date:           August 16, 2013

Number of pages:   2 (including cover page)

This communication is privileged and confidential under federal and state law and is intended to be reviewed only by the recipient specified above. If you receive this communication in error, please immediately notify us at (602) 256-6718 and return it to the above address by first class mail. Thank you for your cooperation.

# EXHIBIT D



MARICOPA
COMMUNITY
COLLEGES®      |      Rufus Glasper
                       Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

February 10, 2014

Dr. Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ  85020

Re: Notice of Suspension without Pay

Dear Dr. Martinez:

Based upon the attached written statement of charges, I have decided to suspend your employment under my sole authority as Chancellor pursuant to section 3.11 of the Residential Faculty Policies. The purpose of this letter to notify you that your suspension from your position as Mathematics faculty at Phoenix College will begin on March 1, 2014 and end on May 15, 2015. Your teaching responsibilities and pay will resume Fall semester, 2015 unless you choose to retire (see below).

Having sought the advice of the General Counsel as required by section 3.11.3 of the RFP, I am satisfied that your procedural rights concerning the grounds for suspension have been met. The basis for this action is the unanimous finding of an independent hearing committee that you willfully violated the district policies set forth in the statement of charges and that I have the authority to suspend your employment without pay.

Also under the terms of subsection 3.11.3, the interim Vice Chancellor for Human Resources will offer to consult with you (and the Faculty Association President, if you choose) concerning the rationale for this decision. If you accept his invitation, he will deliver this notice and attachment after the meeting. If you decline your opportunity to consult with him, he will have the decision delivered to you in accordance with the policy.

You may voluntarily retire from your position in lieu of this suspension without pay. If you elect to do so, you will remain on paid administrative leave and be paid through May 9, 2014.

Sincerely,

Rufus Glasper, Ph.D., CPA
Chancellor

Lee Combs
General Legal Counsel

cc: Dr. Anna Solley
    Mr. Jim Bowers

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert | Estrella Mountain | GateWay | Glendale | Mesa | Paradise Valley | Phoenix
Rio Salado | Scottsdale | South Mountain | Maricopa Skill Center | SouthWest Skill Center



MARICOPA COMMUNITY COLLEGES®  |  Rufus Glasper
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

February 10, 2014

Dr. Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ 85020

Re: Statement of Charges

Based upon the findings of the hearing committee which are attached to this statement, and the record of their proceedings, I have determined as follows:

In teaching your Phoenix College mathematics students, you did not use a textbook. Instead, you prepared your own course materials you called your "lecture notes," copied them on Phoenix College equipment and at College expense, and distributed them to your students without charge. In preparing your notes, you copied problems from copyright protected textbooks and inserted them into your lecture notes without attribution to, or permission of, the copyright holders.

In early 2010, Phoenix College discovered that you may have exposed MCCCD to liability for copyright infringement, notified you of the concerns, and provided training and legal counsel. To protect the College from the risk of liability, in April 2010 President Solley restricted your copying privileges, allowing only those copy projects approved by your department chair. You attempted to bypass these restrictions. The chair filed a complaint that was referred to an administrative evaluation team for investigation. The team, including your own appointee, unanimously concluded that your lecture notes violated copyright and that you had failed to follow President Solley's direction.

President Solley considered this history, and on December 10, 2010 imposed a stricter restriction in accordance with the RFP. She directed you to use only course materials approved by the department, that were available in the bookstore for sale to the students, and that were authored by persons other than yourself. She also required that you provide proper attribution of authorship of the materials by others and show evidence that you had purchased the materials or otherwise received permission to use them from the author. She restricted your authority to copy to materials approved by your department chair after two days' notice and written proof that you had permission of the author to copy the materials.

In concluding her directive, Dr. Solley stated, "This direction is intended to communicate job duties to you within the meaning of Governing Board employment standard A4.3. In accordance with that section of the All Employment Policy Manual, willful and intentional violation of these instructions will be considered grounds for disciplinary action, up to and including dismissal."

Despite MCCCD's frequent discussions with you regarding the importance of complying with copyright laws and the December 9, 2010 directive, you continued to attempt to ignore the directive. At the beginning of the Fall 2012 Semester, you informed your students that they were not required to purchase a course textbook and that you would provide them with your own course materials in lieu of a textbook. In violation of President Solley's December, 2010 directive, you made copies at a local Staples store of course materials that had not been approved by your department chair, and distributed them to your students for $11 per copy, payable directly to you. This distribution violated Dr. Solley's directive.

Page 2

You decided unilaterally that no district policy required you to comply with the job duties communicated to you in writing by Dr. Solley, so you violated them. However, her directive was issued under section 3.7.4 of the RFP. This section authorizes a president to take "any appropriate action" after receiving the results of the administrative review. In considering the appropriate action, Dr. Solley relied on the advice of expert counsel to assess the risk of liability represented by your behavior, on your documented history of evasion of her prior efforts to protect MCCCD, and the unanimous report of the administrative evaluation team. You did not file a timely appeal or grievance seeking review of this directive.

An additional concern arose after a student brought the copying to PC's attention, complaining that you did not provide receipts for the material charges. MCCCD Administrative Regulation 1.12. states as follows:

"1.12.2 Authorization

Prior to participating in the sale of products or services, Revenue and Expenditure categories must be included in a program's budget, and approved by the Governing Board during the annual budget adoption process, or as legally changed during a fiscal year.

1.12.3 Fees

Fees exchanged for products or services produced through an educational, training, or service activity shall be pre-approved by the Governing Board."

Phoenix College determined that your course materials charge was not included in the adopted budget or pre-approved by the Governing Board. Dr. Solley therefore issued a corrective action that directed you to issue refunds to the students for the unauthorized charge. You refused, and offered no explanation or justification of your decision to the hearing committee. The hearing committee found your failure to comply with the corrective action was in violation of Administrative Regulation 6.7.1 and Administrative Regulation 6.7.3.

Therefore, for purposes of RFP Section 3.13, this letter will serve as a statement of charges that you are in violation of Administrative Regulation 6.7.1 and Administrative Regulation 6.7.3. In accordance with these regulations, disciplinary action up to and including termination is warranted. I accept the hearing committee's recommendation that you should not be dismissed from employment. However, I believe suspension without pay for a substantial time is the appropriate sanction.

Sincerely,

Rufus Glasper, Ph.D. CPA
Chancellor

BEFORE THE GOVERNING BOARD OF THE
MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

| | | |
|---|---|---|
| MARICOPA COUNTY COMMUNITY<br>COLLEGE DISTRICT, | ) | |
| | ) | HEARING COMMITTEE |
| v. | ) | FINDINGS OF FACT, CONCLUSIONS |
| | ) | OF LAW, AND RECOMMENDATION |
| DR. CLEOPATRIA MARTINEZ | ) | |

Pursuant to the October 16, 2013 Scheduling Order, having reviewed all of the parties' pleadings and exhibits and conducting a hearing on November 18, 2013, the Hearing Committee (by majority vote) hereby submits the following Findings of Fact, Conclusions of Law and Recommendation.

## FINDINGS OF FACT

1.      After having taught mathematics full-time for ten years at Denver Community College, Dr. Cleopatria Martinez moved to Arizona and started teaching mathematics full-time at Scottsdale Community College on January 1, 1985.

2.      Dr. Martinez voluntarily transferred to Phoenix College ("PC") in 1995 and has been teaching mathematics there full-time ever since.

3.      Dr. Martinez elected to voluntarily transfer to PC because there were very few minority students attending Scottsdale Community College, and she wanted to use her bilingual education skills in the mathematics classroom to better educate the large number of minority students attending PC.

4.      Dr. Martinez was elected by her colleagues to serve as the Chairperson of the Mathematics Department of PC from 2002 to 2005.

5.      In early 2010, PC discovered that Dr. Cleopatria Martinez may have exposed MCCCD to potential liability for copyright infringement.

6.      Dr. Martinez testified that, during her twenty-eight years of teaching mathematics in the MCCCD system, she and her colleagues in the Mathematics Departments of both Scottsdale Community College and PC routinely borrowed mathematics problems from other mathematicians to use in their student handouts for educational purposes on a not for profit basis.

7.      Dr. Martinez testified, without rebuttal, that this borrowing of mathematics problems is a longstanding, widespread custom throughout the District and academia at large.

8.      Instead of requiring her mathematics students to purchase textbooks, Dr. Martinez prepared her own course materials which she called her "Lecture Notes" and distributed them to

her students. . MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 77:17-78:15, 106:16-108:16, 121:25-140:13, 132:16-137:25).

9.    Dr. Martinez read the Copyright Act of 1976 and believed that it authorized her to use small portions of other scholars' work under the "Fair Use" doctrine because she was using it only for classroom teaching purposes on a not for profit basis and her use of the material did not undermine the potential market for the other scholar's work.

10.    Per the "Fair Use" doctrine of the Copyright Act, the "use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107.

11.    Dr. Martinez copied problems from copyright protected textbooks and inserted them into her course materials.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 106:16-108:16).

12.    Dr. Martinez, in her Basic Arithmetic (MAT082) course, copied problems directly from a copyrighted textbook entitled "Basic Mathematics" and inserted them into her "MAT 082 Basic Arithmetic Spring 2010" course materials which she distributed to students.  MCCCD Exhibit List # 20 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

13.    Dr. Martinez also copied problems directly from the Sullivan & Sullivan "Precalculus" textbook and inserted them into her "MAT182 Trigonometry Spring 2010" course materials.  MCCCD Exhibit List # 22 (Full-Sized Excerpted Comparison).  She did not seek or obtain permission from the copyright holder.

14.    Dr. Martinez did not require her students to purchase textbooks in her Spring MAT082 Course.  MCCCD Exhibit List # 18 (email from Dr. Martinez stating "I indicated in my syllabus that, instead of a published textbook, I was using lecture notes in my MAT082 class.")

15.    Dr. Martinez did not require her students to purchase textbooks in her Spring MAT182 Course.  *See* Dr. Martinez's hearing testimony (conceding that students were not required to purchase a textbook in her Spring 2010 MAT182 course).

16.    On or around January 12, 2010, MCCCD's Vice President of Academic Services, Ronnie Elliot, sent Dr. Martinez an email notifying her that there were alleged copyright related problems with the materials she had printed for the Fall 2009 and Spring 2010 semesters. MCCCD Exhibit List # 23 (January 12, 2010 email).  The materials in question were packets of course materials for Dr. Martinez's MAT182 and MAT187 courses and contained mathematics problems and graphs that were taken from copyrighted textbooks.  MCCCD Exhibit List # 11 (Ronnie Elliot Declaration, ¶¶8-9); MCCCD Exhibit List # 16 (MAT182 course packet); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memorandum).

17.    Dr. Martinez used three of the four packets of "lecture notes" in the Spring of 2010 in two pre-calculus classes. See District Exhibit 6, parts 1-3.

18.     The MCCCD administration, following Vice President Elliot's email, repeatedly explained its copyright concerns to Dr. Martinez and asked Dr. Martinez to remove any copyright protected mathematics problems from her materials. See Kakar Hearing Testimony.

19.     On January 26, 2010, Vice President Elliot sent Dr. Martinez an email outlining MCCCD's concerns regarding Dr. Martinez's potential copyright infringement. MCCCD Exhibit List #24 (January 26, 2010 email).

20.     On January 28, 2010, MCCCD in-house-counsel Margaret McConnell discussed copyright compliance with Dr. Martinez telephonically. MCCCD Exhibit List # 25 (January 28, 2010 email).

21.     Dr. Martinez did not benefit from the multiple MCCCD copyright information sessions noted above.

22.     PC's own expert witness, Sean Garrison, testified that under the "Fair Use" doctrine, someone could lawfully copy from a copyrighted textbook without either using or purchasing the textbook.

23.     On February 5, 2010, Vice President of Academic Affairs Casandra Kakar, Interim Vice President of Administrative Services Paul DeRose, and Dr. Martinez met to discuss Dr. Martinez's alleged misuse of copyrighted materials. MCCCD Exhibit List # 26 (February 12, 2010 email).

24.     Dr. Martinez has not used any of the four sets of "lecture notes" since the Spring of 2010 when PC first raised its concerns regarding the notes.

25.     On April 15, 2010, PC Librarian Ann Roselle conducted a personalized one-on-one copyright training session with Dr. Martinez. MCCCD Exhibit List # 28 (Copyright PowerPoint Presentation). See also, Kakar Hearing Testimony.

26.     When Dr. Martinez met with the librarian, the librarian told Dr. Martinez that Dr. Martinez knew as much about copyright law as she did. See Martinez Hearing Testimony.

27.     Following the revocation of Dr. Martinez's copying privileges, Dr. Martinez was required to submit her copy requests to Mathematics Department Chairperson Mr. Sueyoshi so that Mr. Sueyoshi could review her materials for possible copyright violations prior to copying and distribution to students. MCCCD Exhibit List # 8 (April 2, 2010 Directive).

28.     Dr. Martinez sought and obtained a form of written permission from the publisher of the textbook, Sullivan & Sullivan's "Precalculus," to copy materials from their book after PC accused her of violating copyright law.

29.     On or around April 19, 2010, Dr. Martinez attempted to bypass the copying restrictions by having an adjunct mathematics Professor, Johnny Santellan, make 24 sets of copies of her "Lecture Notes" for distribution to her mathematics students without obtaining prior approval from the Mathematics Department Chairperson. MCCCD Exhibit List # 12 (Sueyoshi Decl., ¶9); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 223:11-224:21).

30.   Because Dr. Martinez did not feel she was able to obtain reliable guidance regarding copyright compliance from the District, she sought advice from a private intellectual property attorney regarding the issue, Mr. Frederic Bellamy.

31.   Mr. Bellamy reviewed the first two sets of Dr. Martinez's "lecture notes" and concluded that they did not violate copyright law because they fell under the "Fair Use" doctrine.

32.   Mr. Bellamy based his conclusion that Dr. Martinez did not violate copyright law on the opinion that the portion of material that Dr. Martinez copied from the Sullivan & Sullivan Precalculus textbook was very small, that she used the copied materials exclusively for educational purposes without any profit motive, that the content of the copied material consisted of mathematics problems that are arguably not subject to copyright in the first place, and that the small portion of the textbook that Dr. Martinez copied did not adversely impact the potential market for the textbook.

33.   At the hearing, another lawyer practicing in the area of intellectual property law, Sean Garrison, testified on behalf of PC. In contrast to Mr. Bellamy, Mr. Garrison testified at the hearing that the first three sets of Dr. Martinez's lecture notes violated copyright law.

34.   In contrast to his testimony at the hearing of November 18, 2013, in his written report Mr. Garrison concluded only that the first three sets of Dr. Martinez's lecture notes subjected the District "to a serious risk of a copyright infringement claim." See District Exhibit 6, p. 0002.

35.   MCCCD invited Dr. Martinez to a copyright workshop that was held on March 1, 2010 at PC. Dr. Martinez chose not to attend the workshop. MCCCD Exhibit List # 10 (Solley Decl., ¶11).

36.   PC President Anna Solley, on December 9, 2010, concluded that Dr. Martinez's alleged misconduct posed an unacceptable legal risk of a copyright infringement claim and imposed restrictions on Dr. Martinez's photocopying privileges. MCCCD Exhibit List # 10 (Solley Decl., ¶12).

37.   MCCCD sought a legal opinion from an outside copyright expert, attorney Sean Garrison. MCCCD Exhibit List # 10 (Solley Decl., ¶ 14); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memo).

38.   According to Mr. Garrison, the third set of "lecture notes" appeared to have 13 mathematics problems copied from two other mathematics textbooks.

39.   Mr. Garrison testified that he was certain that Dr. Martinez has committed copyright infringement. See Garrison Hearing Testimony. In reaching this conclusion, Mr. Garrison reviewed thousands of pages of materials including nearly 300 pages of Dr. Martinez's lecture notes and three separate copyrighted mathematics textbooks. MCCCD Exhibit List # 6 (Sean Garrison April 19, 2013 Report); see also Garrison Hearing Testimony.

40.   In reliance upon Mr. Garrison's recommendations, PC President Anna Solley issued a December 9, 2010 directive that imposed further restrictions on Dr. Martinez's copying

privileges.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 10 (Solley Decl., ¶15).

41.     The December 9, 2010 Directive prohibited Dr. Martinez from utilizing any course materials of her own creation.  MCCCD Exhibit List # 9 (December 9, 2010 Directive). Instead, Dr. Martinez was required to only use course materials that are "approved by the mathematics department" or that are "available in the bookstore for sale to students and that are authored by persons other than [Dr. Martinez]."  MCCCD Exhibit List # 9 (December 9, 2010 Directive).

42.     The December 9, 2010 Directive further required Dr. Martinez to submit her photocopy requests to the Mathematics Department Chair for his approval.  MCCCD Exhibit List # 9 (December 9, 2010 Directive).

43.     Despite MCCCD's frequent discussions with Dr. Martinez regarding the importance of complying with copyright laws and the December 9, 2010 Directive, Dr. Martinez continued to attempt to ignore the directive.  See Kakar Hearing Testimony.

44.     At the beginning of the Fall 2012 semester (on or about August 21-23, 2012), Dr. Martinez informed her students that they were not required to purchase a course textbook and that she would provide them with her own course materials in lieu of a textbook.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

45.     In fall of 2012, Dr. Martinez sought to have her lecture notes photocopied off campus at a nearby Staples store.  This practice is inconsistent with the December 9, 2010 Directive.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

46.     Dr. Martinez did not submit her Fall 2012 materials to Mathematics Department Chairperson Mr. Sueyoshi for approval.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

47.     Dr. Martinez made copies of her course materials at an off-campus Staples store and distributed them to students for $11 per copy.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

48.     The $11 course material fee was paid directly to Dr. Martinez by students.  MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

49.     PC accused Dr. Martinez of violating the District's "cash handling" rules by distributing these course materials to her students if the students reimbursed her for her out-of-pocket copying costs.

50.     PC subsequently claimed that Dr. Martinez violated the District's "cash handling" policies by seeking reimbursement for the copies.

51.     MCCCD's policies prohibit instructors from having "any financial interest in or receiv[ing] compensation from the sale of any unpublished instructional materials required or

suggested for a class that the instructor teaches." MCCCD Exhibit List # 41 (Residential Faculty Policies, 3.2.4).).

52.   Dr. Martinez failed to follow the protocol set forth in the December 9, 2010 Directive in copying her Fall 2012 course materials.  MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

53.   Dr. Martinez distributed course materials directly to students in her Fall 2012 MAT151 class.  MCCCD Exhibit List # 4-5 (Martinez Depo. pp. 232:19-233:21).

54.   The MCCCD Administration learned of Dr. Martinez's unauthorized distribution of course materials to students after one of Dr. Martinez's MAT151 students complained to Mathematics Department Chairperson Mr. Sueyoshi.  The student complained that Dr. Martinez refused to provide her with a receipt for the purchased course materials.  See Kakar Hearing Testimony.

55.   Upon learning that Dr. Martinez had distributed course materials to students allegedly in violation of MCCCD's cash handling policy, President Solley instructed Martinez to immediately issue refunds to her students via personal check.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

56.   On or around October 18, 2012, President Solley and Dr. Kakar met with Dr. Martinez to explain the seriousness of Dr. Martinez's alleged cash handling violation.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.  In addition, President Solley and Dr. Kakar prepared a written counseling memo dated October 18 2010 for Dr. Martinez regarding her alleged violation of cash handling rules.  Dr. Martinez was provided with a copy of the October 18, 2010 counseling notice and President Solley proceeded to explain to Dr. Martinez the seriousness of the alleged cash handling violations and the requirement that Dr. Martinez issue reimbursements to her students.  MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

57.   Several months later, on or around January 9, 2013, Dr. Kakar learned that most (if not all) students had not yet received refunds from the Dr. Martinez.  MCCCD Exhibit List # 39 (various emails regarding student refunds).  As a result, Dr. Kakar instructed Dr. Martinez to provide copies of refund checks by January 18, 2013.  MCCCD Exhibit List # 39 (various emails regarding student refunds).

58.   Dr. Martinez failed to produce a single refund check by the January 18, 2013 deadline. MCCCD Exhibit List # 39 (various emails regarding student refunds).

59.   Dr. Martinez did not think that she had violated any District rule in reference to the copies.  Therefore, she declined to follow the December 9, 2010 order because she believed she was not required to do so under any District rule.

60.   At the November 18, 2013 hearing, Dr. Martinez did not provide any explanation for her refusal to comply with the October 18, 2012 and January 9, 2013 directives to issue refunds to her students.  See Martinez Hearing Testimony.

61.   At the hearing Dr. Martinez testified that she had made a "mistake" and, in retrospect, should have complied with President Solley's instructions.  See Martinez Hearing Testimony.

62.   On or around August 9, 2013, MCCCD Chancellor Rufus Glasper sent Dr. Martinez a letter informing her that MCCCD was proceeding with termination proceedings. Included with this letter was a statement of charges that summarized the particular violations Dr. Martinez had been charged with (hereinafter referred to as "Statement of Charges.") MCCCD Exhibit List #1 (Statement of Charges).

## CONCLUSIONS

63.   PC failed to carry its burden of proof relating to violation of MCCCD's cash handling rules found in MCCCD Administrative Regulations 1.17, violation of Residential Policy Manual 3.2.4 (relating to financial interests in unpublished materials), violation of U.S. Copyright Law and fair use guidelines, and violation of MCCCD Administrative Regulations 3.2.4 and 3.2.5 related to copyright regulations.

64.   Notwithstanding their education, their experience, and their good faith, Mr. Bellamy and Mr. Garrison disagreed as to whether or not Dr. Martinez violated copyright law. Therefore, it is inconclusive as to whether Dr. Martinez intentionally and/or inadvertently violated federal copyright law.

65.   It is inconclusive as to whether or not Dr. Martinez violated the "cash handling" policies of MCCCD.

66.   Dr. Martinez willfully and intentionally failed to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley.

67.   Dr. Martinez conceded that she never complied with President Solley's clear directive to issue refunds to her students.  Although Dr. Martinez now regrets her decision not to comply with President Solley's directive, she has never claimed that she did not understand the instructions or that the instructions were beyond the scope of management's authority.  Viewed in light of these facts, Martinez's claim that she "made a mistake" is an admission of willful insubordination.

68.   By failing to comply with President Solley's directive to issue refunds to her students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.1 which prohibits the "[w]illful and intentional violation of any…MCCCD administrative regulation that affects the employee's ability to perform his or her job."

69.   By failing to comply with President Solley's directive to issue refunds to students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.3 which prohibits the "[w]illful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment."

///

## RECOMMENDATION

70.  We hereby recommend that the Governing Board deny President Solley's termination request and allow Dr. Martinez to continue her MCCCD employment.

71.  Per MCCCD Administrative Regulation 6.7 indicating that violation of any Employment Standards "constitutes grounds for disciplinary action, *up ta* [emphasis added] and including termination," we hereby recommend that the Governing Board retain Dr. Martinez.

It is ordered so, at Mesa, Arizona, this 9th day of December, 2013.

Dr. Keith Crudup
Chairperson
On Behalf of the Hearing Committee,
Dr. Nora Reyes and Dr. Carlos Caire

406681                                     -8-

### 3.10.2.1.

Not later than March 1st for all members in Probationary status.  By October 1st of the fourth and fifth academic years, the Probationary Faculty member should be advised in writing, by the Department/Division Chair or appropriate Vice President, or Vice President's designee of any deficiencies which may, if uncorrected, result in non-renewal of contract, and the Probationary member shall have the remainder of the academic year to address said deficiencies.

### 3.10.2.2.

Fifth-year Probationary members will be notified in writing of any deficiencies arising after October 1st.  The probationary period may be extended one additional semester for the affected Probationary member per Section 1.2.  Failure of the Probationary member to correct said deficiencies in the additional semester will result in their non-renewal at the end of that semester.

### 3.10.3.

Within fourteen (14) days of the receipt of the Chancellor's note of intent to recommend nonrenewal, the member shall, upon request to the Chancellor, be orally advised of the reasons that contributed to the decision to recommend nonrenewal of employment.  Such advisement shall be given by the appropriate College President within fourteen (14) days of receipt of the Faculty member's written request.

### 3.10.4.

Within fourteen (14) days of the College President's advisement of the reasons for nonrenewal, the Chancellor shall honor the Faculty member's written request to the Chancellor to confirm, in writing, the reasons given in advisement of nonrenewal.  Such written confirmation shall be delivered to the member's place of residence via certified mail, registered mail, or personal service within fourteen (14) days of the Chancellor's receipt of the request.

### 3.10.5.

The process referenced here above shall be completed prior to any nonrenewal recommendation to the Governing Board, for action prior to April 30th.

## 3.11.  Suspension of a Faculty Member

### 3.11.1.

Upon a written statement of charges formulated by the Chancellor, charging a Faculty member of the MCCCD, the Chancellor, or his/her designee, may immediately suspend the Faculty member and give notice of suspension.  At the option of the Faculty member, the MCCCD Faculty Association President will be notified of this action.

### 3.11.2.

The notice of suspension shall be in writing and be served upon the Faculty member, personally or by U.S. (registered or certified) mail, addressed to the Faculty member at his/her place of residence as recorded in the MCCCD records.

**3.11.3.**

Any Faculty member who has been suspended pursuant to this Section will normally be paid his/her regular salary during the period of suspension. A suspension without pay will occur only upon advice of General Counsel. If payment is to be withheld, the Vice Chancellor of Human Resources will first consult with and advise the member and, at the option of the Faculty member, the Faculty Association President regarding the rationale for that action.

**3.12. Administrative Leaves of Absence**

**3.12.1. Criminal Complaint**

**3.12.1.1.**

If a Faculty member is charged by criminal complaint, information, or indictment with any criminal offense, which would be cause for dismissal, the Chancellor or designee may immediately place the member on compulsory leave of absence for a period of time extending for not more than ten (10) days after the date of entry of judgment in the proceedings.

**3.12.1.2.**

Pay during this period will be based on the same consideration as in Section 3.13.3.

**3.12.2. Complaints—Other Than Criminal**

**3.12.2.1.**

The Vice Chancellor of Human Resources may, if it is appropriate, place a Faculty member on paid administrative leave of absence. At the option of the Faculty member, the MCCCD Faculty Association President will be advised.

**3.12.2.2.**

Pay during this period will be based on the same consideration as in Section 3.11.3.

**3.13. Faculty Member Dismissal—Probationary and Appointive**

A Faculty member who is recommended, by the College President, through the Chancellor, to the Governing Board, for dismissal shall have access to the following due-process procedures.

**3.13.1.**

A written statement of charges, formulated by the College President, shall be forwarded to the Vice Chancellor of Human Resources. After review of the charges, the Vice Chancellor, in consultation with the MCCCD Legal Office, may recommend, to the Chancellor, that there exists prima facie cause for the dismissal of a Faculty member. The Chancellor shall inform the Governing Board in writing, with a copy of the recommendation being sent (U.S. certified or registered mail) to the Faculty member at his/her place of residence as recorded in the MCCCD records. The Vice Chancellor's recommendation will give notice to the Chancellor, Governing Board, and the Faculty member of the intention to formally recommend dismissal, which shall not be sooner than thirty (30) days from the date of the letter, nor later than the end of the current academic year.