# EXHIBIT 46

**MCCCD GOVERNING BOARD MEETING – MARCH 25, 2014**

Speaker 1:     Sprinted the newspaper and online newsletters. The taxpayers are watching the TV reports and reading the articles. You will have to answer to them at election time. Be transparent. Take action. Don't weigh in until it's too late. Thank you very much.

Speaker 2:     Thank you very much. Next up is Steven Montoya. ... Mr. Montoya, same thing, if you've got something that you would like to have in the record.

Steven:     Yes, President. I'm here as a concerned citizen. I have been advocating, uh, the rights of educators, uh, for at least two decades in this community. And I'm here to alert the board to what I believe is a severe delusion of the board's authority, the board's exclusive authority, to terminate its employees. As the board is aware, only the board pursuant to the RFP, can terminate an employee. Uh, what is, what is happening, perhaps in some ways unbeknownst to the board the administration, after it commences termination proceedings unsuccessfully, is unilaterally transforming the termination proceedings into a suspension. And the suspension is a de facto termination because the suspension is of such a length that from a, economic perspective, it is the de facto substantive equivalent of a termination. And that is, uh, in violation of the RFP. That, that deludes this board's authority to discipline [00:02:00] and terminate its employees. And it needs to be stopped.

    Uh, so I urge the board to consider, uh, matters that are before the board and to ask your council and to ask you administration if it in fact is transforming termination proceedings into unilateral suspensions that are not subject to this board's review. That in fact, subvert, and undermines, and severely deludes this board's authority to manage its employees through the termination proceedings, uh, set forth by the RFP. Thank you.

Speaker 4:     Mr. Chair. Mr. Montoya.

Steven:     Yes.

Speaker 4:     Are you an attorney.

Steven:     I am an attorney, yes. But I am here as a citizen, not as an attorney.

Speaker 4:     What is your, um, sp-, specific law, um, sp-, specialty?

Steven:     Uh, I would say it is federal civil rights litigation.

Speaker 4:     Okay. Thank you.

Steven:     You're welcome. Any other questions.

1

MCCCD/Martinez 00730

Speaker 2:          Thank you very much.

Steven:             You're welcome.

Speaker 2:          Dr. Martinez is next. ... Same thing, Dr. Martinez. Take three minutes. And if you have something that you'd like to put in the record, bring it up here.

Dr. Martinez:       I will. Thank you. President Czar, members of the board, Dr. Glasper, members of the CEC, and distinguished guests, my name is Dr. Cleopatria Martinez. I'm a mathematics instructor at Phoenix College. I have been employed as the mathematics professor by the Maricopa Community College District for twenty-nine years. I have always loved my job as a teacher. During my three decades of hard word for the [00:04:00] district, I have never been disciplined and have never, otherwise, been in any trouble. As you are aware, the president of Phoenix College recently attempted to terminate me, but a hearing committee unanimously rejected the recommenda-, recommended termination. Although the chancellor ultimately accepted the hearing committee's recommending not to terminate me, the chancellor is now attempting to suspend me for fourteen and a half months.

                    I want to keep my job. And for that reason, I have followed orders from the administration, which have great grossly violated my academic freedom and has affected my ability to perform my job. Writing course materials for students is one of the duties of MCCD faculty and because these materials are faculty generated, Phoenix College is obligated to absorb the cost to make copies for students. In Spring 2014, my colleagues ... I selected my colleagues' unpublished materials in lieu of a published textbook. The material had been approved by the mathematics department for this purpose and it had been used for several semesters. The PC administration refused to make copies of this unpublished material and I was told to have the students make their own copies at their own expense.

                    The administration proceeded to dismiss me. I appealed the dismissal, presented my case to an appeals committee. This faculty hearing committee found that PC had failed to carry its burden of proof. They found no violation of the cash handling policy, but the chancellor still has suspended me for fourteen and a half months because [00:06:00] I would not pay for the students' course materials. No faculty is responsible for purchasing instructional materials for students. And I believe that I should not have to either. It is for this one time effort on my part to help students that I am being suspended without pay for an unacceptably long length of time. And I have not broken any policies.

                    Like most working people, I cannot economically survive on fourteen months suspension of pay. The chancellor's suspension may also cause me to lose my health insurance because I may not be able to afford to pay my contribution towards continued health coverage. Under the circumstances, the chancellor's fourteen month suspension of me is the functional equivalent of termination from the district. As you are aware, under the RFP, only this court has the

2

MCCCD/Martinez 00731

authority to terminate an employee. While I was never found guilty of violating MCCD regulations or policies, I am unfairly being punished. I am not guilty of violating any MCCD policy or regulation including cash handling. I was not afforded due process. Accordingly, I ask the board to intervene in my case to resend the ch-, chancellor's suspension. And at the very minimum, allow me to present proof of what I have stated here. Thank you very much.

Speaker 2:    Thank you. Next we have, uh, Mr. Lucas Bodine, and a number of other fine Mesa students. Mr. Morgan, you can go first.

Spencer:    I am not Lucas Bodine. My name is Spencer Morgan. I am the previous president of the associate students of Mesa Community- [00:08:00]

MCCCD/Martinez 00732

# EXHIBIT 47

8-13-14

To:      Vice Chancellor for Human Resources Lacoya Shelton-Johnson
         Chancellor Rufus Glasper
         Governing Board Member Doyle Burke
         Governing Board Member Alfredo Gutierrez
         Governing Board Member Randolph Elias Lumm
         Governing Board Member Debra Pearson
         Governing Board Member Dana F. Saar

From:    Cleopatria Martinez

Date:    August 13, 2014

Subject: Grievance

This email will serve as my formal grievance for a misapplication, misinterpretation, or violation of a specific
provision(s) of the *Residential Faculty Policies* that adversely affects me.  RFP sections 3.11 (Suspension of a
Faculty Member), 3.2.4 (financial interest from a sale) or (sale of unpublished instructional material), 3.13
(Faculty Member Dismissal), 6.1 (Grievance Procedure: 6.1.1.1 Informal Level; 6.1.2.5 Level 5 Governing
Board), have been misapplied, misinterpreted, or violated as well as MCCCD AR 1.12 (Sale of Products or
Services), AR 1.12.2 (Authorization) AR 1.12.3 (Fees), and AR 1.17 (cash handling), AR 3.2.5 (copyright
infringement).  I seek review of this matter.

## Timeline
I was hired as a mathematics instructor at MCCCD in 1985, 29 years ago.  In August 2013 Chancellor Glasper
sent me a letter of intent to dismiss me from my employment. I appealed and prevailed on December 9, 2013,
when the Termination Hearing Committee recommended I not be terminated. MCCCD changed direction and
then sent me a letter explaining I was going to be suspended without pay. I was put on suspension without
pay on March 1, 2014, but was notified on March 7. This was later changed to April 14, 2014. On May 1, 2014,
I filed for unemployment benefits with DES. I was initially denied.  I appealed and got a favorable result as
explained below.  In July 2014 I tried to file an internal grievance by establishing an appointment with my
supervisor, VPAA Kakar, to provide the oral delivery of the grievance as per the grievance procedure (RFP
6.1.1.1) but VPAA Kakar's secretary told me I could not to talk with VPAA Kakar, instead she referred me to
District Human Resources Senior Manager, Judy Castellanos. Ms. Castellanos said I could not file the grievance
until next year after my suspension ended in August 2015.

## Information and Belief
After the Termination Hearing Committee submitted their recommendation to the Chancellor, the Chancellor
failed to follow procedure outlined in RFP 3.13.8 "...forward the recommendation along with the summary of
the evidence, a copy of the findings of fact, conclusions of law, and final recommendations of the Hearing
Committee to the Governing Board." The Governing Board did NOT receive this information.  The Chancellor
instead of terminating me employed RFP 3.11 (Suspension of a Faculty Member) which action does not involve
the Governing Board nor are there any guidelines for implementation. On March 7, 2014, I was notified that I
was suspended without pay as of March 1, 2014. This was later changed to April 14, 2014. I am still on
suspension without pay or benefits. I filed for unemployment benefits and was initially denied.  I appealed the
denial and the DES Administrative Law Judge found in my favor.

## Applicable Board Policy
6.1  Grievance Procedure   6.1.1 "...the grievant shall present the grievance orally to his/her immediate
supervisor, citing the specific section of the RFP which has allegedly been misapplied, misinterpreted, or

violated.  The purpose of bringing the matter to the attention of the immediate supervisor is to resolve the matter at the lowest level..."

3.13  Faculty Member Dismissal  3.13.8

3.11  Suspension of a Faculty Member   There was no sale. **(See page 2 of the Decision of Appeal Tribunal.)**

## Argument

The Chancellor had no option but to forward the Hearing Committee's "recommendation along with the summary of the evidence, a copy of the findings of fact, conclusions of law, and final recommendations of the Hearing Committee to the Governing Board."

The Governing Board should have reviewed the termination documents but they did not receive this information.

I have spent a lot of money hiring an attorney to assist me with my termination defense.

When the Chancellor could not terminate me, he suspended me without pay for such a long time that it is tantamount to termination.

The Chancellor's grounds for suspension are not supported by facts as stated **on pages 2 and 6 of the Decision of Appeal Tribunal.**

The DES Administrative Law Judge found pursuant to their regulations that "a suspension beyond 16 or more of the employer's workdays is a suspension for an unreasonable period of time.  The suspension amounted to a constructive discharge. The Administrative Law Judge concluded the following:

> *"The claimant photocopied documents for her students and asked that the students compensate her for the copies.  The students had the opportunity to copy the documents on their own but asked the claimant to do the copying for them.  The claimant did not sell the documents or otherwise make a profit."*

> *"The claimant was suspended for insubordination.  The claimant was ordered to return money for photocopies to her students and did not do so.  The basis for insubordination is whether or not the instruction to return the money was reasonable.  The employer's own fact-finding did not find evidence to show that the claimant violated the cash-handling policy.  The claimant would also bear the burden of the cost of the photocopies.  Because the employer did not find a violation of the cash-handling policies, the order/instruction to return the money to the students was not reasonable.  The claimant was not insubordinate for refusing.*

> *Therefore, I conclude that the claimant was discharged, but not for wilful or negligent misconduct connected with the employment."*

The decision of the Administrative Law Judge is consistent with the decision of the Termination Hearing Committee.  The Committee *"recommended that the Governing Board deny Phoenix College President Anna Solley's request to terminate Dr. Martinez from her MCCCD employment."*  They further recommended that *"Chancellor Glasper place the Hearing Committee's Findings of Fact, Conclusions of Law, and Recommendation, the entire record, exhibits and hearing transcript in a secure room for the Governing Board's and his review."*

I am submitting this grievance because it is my right to grieve "an alleged misapplication, misinterpretation, or violation of a specific provision(s) of the *Residential Faculty Policies* that adversely affects" me.

Respectfully,


Cleopatria Martinez, PhD

# EXHIBIT 48

October 28, 2014

Governing Board Member, Dana F. Saar
Governing Board Member Doyle Burke
Governing Board Member Alfredo Gutierrez
Governing Board Member Randolph Elias Lumm
Governing Board Member Debra Pearson

Dear Governing Board Members,

On August 13, 2014 I emailed you a grievance. As of today I have heard nothing in response. According to the RFP, grievances at your level need to be responded to within 30 days of receipt. I request that the matter of my suspension be an Executive Session item at the next meeting of the Governing Board.

The reason I am pursuing this matter is that it is the most recent example of the conduct that I have been experiencing since 2009.

In August 2013, the Phoenix College administration attempted to terminate me for copyright violation, cash-handling violation, and insubordination. I appealed pursuant to the Residential Faculty Policies (RFP). In December 2013, the MCCCD internal Termination Hearing Committee found that MCCCD had not met its burden of proof with respect to copyright violation and cash-handling violation and recommended that I not be terminated. The Chancellor then suspended me in March 2013 without pay for over 14 months for my alleged insubordination.

In May 2014 I applied for unemployment compensation. MCCCD advised the Department of Economic Security (DES) that I should be denied unemployment compensation benefits because I had walked off the job in anticipation of termination and because I had been suspended for gross misconduct. Initially the DES denied my claim but on appeal, the DES Administrative Law Judge decided in my favor. Among other things the Administrative Law Judge wrote in his decision that
(1) I "did not sell the documents or otherwise make a profit," (2) the order to return the money to the students was not reasonable, (3) that I was discharged not suspended as contended by MCCCD, and (4) I was not discharged "for willful or negligent misconduct."

Consequently, MCCCD's claims of copyright violation, cash-handling violation, and insubordination have not been substantiated by either independent reviewing authority (i.e., MCCCD's own internal Termination Hearing Committee or the DES Administrative Law Judge).

In order to right this wrong, in July 2014 I attempted to follow the grievance process which requires that I first present the grievance to the Vice President of Academic Affairs (VPAA). The VPAA secretary advised that I could only speak to Human Resources (HR) about the grievance. HR told me I could not file while I was suspended although I could file the grievance upon my return in August 2015, some 12 months away. On August 13, 2014, I submitted my grievance to the Vice Chancellor for Human Resources, the Chancellor, and the Governing Board members. No one has responded.

There are no substantiated claims against me but I remain suspended without pay. My grievance has not been addressed. The Governing Board is the final decision maker in the District. I respectfully request that the Board immediately make me whole by reinstating me to my former position with back pay to the day I was suspended, reimbursing me for attorney fees and costs, and pay me the dollar value

of any and all other benefits I lost as a result of this prejudicial, damaging "suspension." Finally, I request that the Chancellor's dictatorial authority to suspend employees without cause, without pay, and without due process for any length of time be eradicated and a policy be written to include guidelines, process, checks and balances. Paying lawyers to continue pursuing an administrative abuse of power is not what MCCCD should represent. This type of irresponsible fiduciary behavior must be eliminated.

Respectfully,

*Cleopatria Martinez*

Cleopatria Martinez, PhD
Professor of Mathematics

# EXHIBIT 49

HAND-DELIVERED 1-27-15

To:    Governing Board President Tracy N. Livingston
       Governing Board Secretary Johanna Haver
       Governing Board Member Doyle Burke
       Governing Board Member Alfredo Gutierrez
       Governing Board Member John B. Heep
       Governing Board Member Jean McGrath
       Governing Board Member Dana F. Saar

Maricopa County Community College District (MCCCD)
2411 W. 14th Street
Tempe, Arizona  85281-6941

From:  CLEOPATRIA MARTINEZ, PhD
       7030 NORTH 21ST STREET
       PHOENIX, ARIZONA  85020

                    Re:  Notice of Claim/Appeal of Grievances

Dear Board Members:

The following is my Notice of Claim against MCCCD and/or appeal of grievances to the Governing Board.

                              **OVERVIEW**

Since the Fall of 2009 and Spring of 2010, the MCCCD administration has engaged in an intense campaign of harassment, intimidation, and retaliation against me culminating in my unprecedented suspension for 15 months without pay and benefits.  The goal of the MCCCD campaign, however, was not to suspend me but to terminate my employment after nearly 30 years of faithful and excellent service as a mathematics professor first at Scottsdale Community College and then at Phoenix College.  Why MCCCD sought my termination remains as mysterious to me today as it was five years ago.  Perhaps it occurred because of my longstanding and continuous involvement in Hispanic issues at MCCCD.

When I was informed by the Chancellor that he intended to recommend to the Governing Board that I be terminated, I appealed pursuant to RFP 3.15.3 (effective July 1, 2012).  As more fully detailed below, my appeal was heard by a three member Termination Hearing Committee which recommended that I not be discharged.  Rather than to continue with the termination process at this point, the Chancellor then decided to suspend me for 15 months without any pay and benefits for essentially the same reasons that had been rejected by the Termination Hearing Committee.  In awarding me unemployment benefits, the Arizona Department of Economic Security (DES) Administrative Law Judge who heard my appeal for unemployment benefits said that a suspension for 15 months without pay and benefits is tantamount to a discharge because of its unreasonable length and terms.  More details about the DES proceeding are presented later.

The reason why the Chancellor decided to "suspend" me is obvious.  By renaming my termination a "suspension" the Chancellor has effectively denied me the right to meet in either executive session or at a public meeting with the Governing Board afforded by Residential Faculty Policies (RFP 3.13.9 Faculty Member Dismissal). I would have selected a public meeting with the Board.

RFP 3.13.9 reads as follows:
   *The Governing Board will meet with the faculty member and/or his/her representative and a representative of the administration to hear arguments regarding the Chancellor's and the Hearing Committee's recommendation regarding*

                                                          Page 1 of 6

*dismissal. This meeting will be in executive session unless the faculty member chooses to have this meeting in public. The parties shall have no less than one-half hour to present their respective cases. The length of the meeting shall not exceed one hour.*

I have tried to keep the Governing Board apprised of my situation by various methods, including filing two grievances—one in 2010 and the other in 2014. However, as far as I know, the Governing Board has never formally or informally considered either of them. This means that the Governing Board itself is in violation of its own Policy since RFP 6, Conflict Resolution, requires that issues of this nature go before the Governing Board unless the matter is resolved beforehand.

The use of the Conflict Resolution process was the only method readily available to me and affordable after spending thousands of dollars on an attorney in representing me on various matters. These included representing me during the termination hearing process and to appeal the Chancellor's decision to suspend me for 15 months without any pay and benefits rather than to discharge me outright as he originally sought to do. As discussed above, by suspending me for 15 months, the Chancellor constructively discharged me (i.e., a suspension of unreasonable length) without giving me the opportunity to meet with you to defend myself in Executive Session or a Public Board Meeting as required by RFP 3.13.9.

Since April 15, 2014, I have not been paid nor have I received any benefits whatsoever from MCCCD. Before my suspension, my annual gross pay and benefits approximated $130,000.00. Replacement health insurance alone costs me over $700 dollars monthly which I pay from my rapidly diminishing savings which also funds my other living expenses.

I remain hopeful that the Governing Board will still consider my 2014 grievance regarding my "suspension" even belatedly so.

## Termination Hearing Committee Nixed My Termination

The Termination Hearing Committee recommended that I not be terminated. Pursuant to RFP 3.13.7 the Termination Hearing Committee could only recommend one of two choices: 1) recommend termination and 2) not recommend termination. As related above, the Termination Hearing Committee recommended that I not be terminated.

Since before classes started in spring of 2010, I have been continuously accused of violating copyright laws and MCCCD Policy. At no time was I given the opportunity to defend myself against these ludicrous accusations until my termination hearing in February 2014. The Termination Hearing Committee concluded that MCCCD had failed to establish that I had violated any copyright law or MCCCD policy or that I violated MCCCD Cash Handling Policy. The committee recommended that I not be terminated. So for nearly five years I have suffered abuse based on allegations that MCCCD could not prove.

In April 2010 the PC President told me I could print nothing for my classes without the permission of my department chair. In December 2010 the PC President gave me a directive which eliminated all my academic freedom because it required that I not use any of my own creativity in teaching. To my knowledge, no other professor at PC has ever been treated so cavalierly. Indeed, to my knowledge, no professor in the history of the District has been treated so brusquely.

In August 2013 the Phoenix College President told me I was to be terminated due to alleged copyright violations, a cash-handling violation, and insubordination. I appealed. The Termination Hearing Committee found that MCCCD had not carried its burden of proof and recommended that I not be terminated. While the Chancellor did not "terminate" me, he suspended me from March 2014 until August 2015 without pay or benefits, the length and severity of which is unprecedented at the District.

### DES Administrative Law Judge Not Fooled

I applied for unemployment benefits on May 1, 2014. On appeal of the initial denial of benefits, the DES Administrative Law Judge (ALJ) reversed the denial and found in my favor. He affirmed all the findings of my termination committee except that of insubordination. He pointed out that I could not have been insubordinate for the reasons MCCCD asserted if I hadn't violated either copyright law or the cash handling policy. He dismissed MCCCD's contention at the DES Hearing that I had not been terminated but suspended. The ALJ stated, *"If the suspension is for an unreasonable period of time...the suspension terminates the employer-employee relationship and the worker is discharged on the date the worker was suspended and for the reason the worker was suspended."* Furthermore, he held that *"a suspension of 16 or more of the employer's workdays is a suspension for an unreasonable period of time."* See attached copy of ALJ Decision.

### Annotated Time Line by Semester

**Fall 2009**

Throughout the semester the Phoenix College administration began what became five years of harassment including false and intimidating accusations and severe violations of my academic freedom.

For example, I was accused of keeping 3 computers in my office. Actually IT had not gotten around to removing 2 of those computers which they eventually did. I was accused of having LimeWire on my computer. I told the PC administration I did not know what LimeWire was, and I certainly did not install it on my computer. I was told supervision of my FWS (federal work/study student workers) was unsuitable because they sometimes worked while I was in class. However, this was the practice of all other employees with their FWS. I was accused of giving my password to my FWS. I assured the PC administration only I knew my password. But the PC administration insisted I change it, so I did. The administration lied by saying that I requested a set-aside for Hispanic students from the Federal Title V Grant PC had received. The truth is I requested that PC consider the needs of Hispanic students since Title V money goes only to Hispanic Serving Institutions. I know set-asides are illegal. I was accused of placing sensitive papers in my office trash receptacle. I told the PC administration I did not know they were in my trash and had no knowledge of how they got there.

As a result of these false accusations, the PC administration took disciplinary action: I was no longer allowed to have student workers, I could not serve on committees, etc., and President Solley notified me I could be terminated.

**Spring 2010**

During the previous semester, for teaching "College Algebra & Trigonometry" I used both the assigned textbook and my lecture notes which included problems directly from the assigned textbook. All faculty use problems from the assigned textbook as this falls squarely within the scope of the fair use doctrine of copyright law. In Spring 2010 I taught a similar course (Trigonometry) using the assigned textbook and some of the lecture notes I had used during Fall 2010. My lecture notes are my lesson plans.

In January 2010 I was accused of violating copyright laws and policies during the Fall 2009 and Spring 2010. I later deduced that the accusation came from my inclusion of problems from the textbook in my lecture notes. I asked what I could do to remedy the perceived problem and the administration sternly accused me of trying to circumvent the copyright issue. **Nevertheless, by April 2010, I had replaced all math problems in my lecture notes which I had borrowed from the textbook with math problems that I had made up. In other words, by this date the risk about which the District was complaining had been completely eliminated because the alleged offending math problems had been deleted. Moreover, the Termination Hearing Committee found that I had not used any of these lecture notes since the spring of 2010 when Phoenix College first raised its concerns. See Finding #24 and related findings in the Termination Hearing Committee's Finding of Fact, Conclusions of Law, and Recommendation.**

In May 2010, I filed an internal grievance alleging Mr. Sueyoshi, chair of the math department, violated my academic freedom. (Exhibit ?) Also, Mr. Sueyoshi failed to respond to the grievance within the RFP established timeline. President Solley imposed the restriction that Mr. Sueyoshi would monitor my copy requests. I did not grieve President Solley's restriction. However, both the Vice Chancellor for Human Resources and the Chancellor responded to my grievance as though I had grieved President Solley's restriction. Mr. Sueyoshi denied copy requests and his reasons were untruthful, irrational, inconsistent, and not based on copyright law thus violating my academic freedom. It was Mr. Sueyoshi's punitive restrictions which were the subject of my grievance. Per the RFP 6 grievance process, I requested an audience with the Governing Board to defend myself. The Governing Board has never responded as required by RFP 6.1.2.5. I was told by a Board Member that the Board was never advised of my request.

**Fall 2010**

Not only was I prohibited by the Phoenix College administration from using any of my lecture notes for any purpose, but I also was banned from using in class any outline or lesson plan I prepared. I was forced to teach from memory—without the use of any notes to guide my lectures. This was a severe infringement of my academic freedom and made teaching very difficult since I had to teach each class without the use of lesson plans to guide the lecture.

For teaching Arithmetic during Spring 2010, I used my own department-approved instructional materials instead of a published textbook. In Fall 2010, I planned to again use the same instructional materials. Several weeks into the semester the PC administration prohibited me from using these instructional materials even though I had gone through the approval process and the department had sanctioned the use of the materials. In December 2010, President Solley gave me a directive which prohibited me from using anything

I wrote. This was interpreted to mean I could not even copy the product of my lectures for students, I could not produce a single math problem for a test or for use during a lecture, I was not allowed to use a list of math formulas I selected, I could not use a "+" sign in front of the infinity symbol to symbolize positive infinity, etc. My academic freedom was trampled upon and my students were not allowed the benefits of my extensive training and experience in mathematics.

I was not allowed even to provide disabled students or students who were absent from class copies of the contemporaneous notes I routinely make during class documenting the topics covered during the class. The reason given was that I authored these notes, and the PC President's directive did not allow me to author anything I use. Additionally, the administration refused to make copies of a test because I had added two adjectives for clarification to the author's directions of one of the questions, and the Math Dept. Chair said, "You cannot 'author' your own directions to test questions." I had to remove the two adjectives for the administration to approve copies for my students.

**Spring 2011**

For my Math 120 (Algebra) class, I used my colleague's (Tim Bryan's) department-approved instructional materials. With permission from Tim Bryan, I changed his use of Roman numerals for chapter numbers to Arabic numbers and I separated chapters with a quote from motivational people like Mahatma Gandhi, Martin Luther King, Associate Supreme Court Justice Sonia Sotomayor, etc. The PC administration scolded me and denied these additional changes.

**Fall 2011& Spring 2012**

In September 2011, in response to my request to discuss dissolution of PC President Solley's restricting directive of December 2010, President Solley presented an "Agreement" which stipulated that I had violated copyright, I was insubordinate, and that I was evasive. Additionally, it stated that I agreed to waive for all time my rights and protections regarding copyright afforded to faculty members at MCCCD, that I would not sue, grieve, or otherwise act to invalidate the agreement, finally that I waived all personal claims and causes of action of any kind in connection with the agreement or the facts alleged in complaints I had filed. I chose not to sign the Agreement.

For all my courses, I taught using a textbook but was not allowed to use any lecture notes to guide my lectures. The harassment continued with petty, mean-spirited accusations from the administration. For instance, the administration did not allow me to make copies of a test of math formulas represented with the variable "u" until I changed the variable to the letter "x". Additionally, a final exam was held up because I had prepared a graph using the MCCCD software on my computer which produced a graph which was mathematically identical to the graph in the textbook except that the background color was different. The administration required that the graphs be absolutely identical. No other faculty member has been subjected to this unrealistic and bizarre standard. As a result I was forced to show the textbook's graph (which was identical to mine except that the textbook had a black grid and the District's software produced a blue grid) on the overhead projector.

**Fall 2012**

In August I told my class I would be using my colleague's approved instructional material as their textbook. The PC administration said that if the students wanted a copy of this material, they would have to make the copies and pay for it themselves. The students asked me to make the copies, and they would reimburse me the cost of copying. I made the copies at Staples and the students reimbursed me. The PC administration ordered me to give the students the money they had reimbursed me. I responded that I would then want the copied materials returned to me. The PC administration said I was to assume the cost of copying myself. I did not return the money to the students because I felt it was an unreasonable request since it was beyond the scope of my responsibilities, it was not among my job duties, and the administration had originally stated that the students were to pay for their own copies.

**Spring 2013**

In late spring 2013, I received a call from Sherrie Klein at District HR to schedule a meeting with me. She was reluctant to give me any information but after a series of inquiries, she informed me the meeting was to "provide you with information that benefits faculty." Not understanding the stated purpose of the meeting, I asked who would be in attendance at that meeting. Again, only after I made numerous inquiries, did she divulge that there would be four high-ranking administrators and myself at this meeting. I asked if I could bring a representative. She said I could.

It soon became evident that the purpose of the meeting had been mischaracterized. It was in fact a disciplinary meeting. They accused me of continuing to violate copyright laws, of violating the cash-handling policy, and of insubordination. Although on short notice, I

was glad to finally be afforded the opportunity to defend myself against the administration's perplexing, disturbing, and oftentimes inconsistent allegations. We did not finish the meeting, so it would be continued.

A few weeks later I received notice that the meeting would reconvene during final exam week. My representative asked that we meet after finals because she was unwilling to miss classes during this very important week. I was told we could not meet after finals because it was beyond our contract time. I assured the administration that both my representative and I were willing to come in outside of our contract time. I was told to get someone else if my representative couldn't come. I reiterated that no faculty would be willing to be absent from final exams. I was told to attend this meeting or be considered insubordinate.

I met at the District with the Phoenix College President, Vice President, and two administrators from Human Resources. When I repeatedly asked for documentation of alleged continued violation of copyright laws and policies, the President refused to show me a single page of evidence of alleged continued copyright violations. She insisted I had them among the emails I had received from 2009 to the present, but I explained I did not know to which of the thousands of emails I had received she was referring. I asked for these documents in order to determine the factual basis of the accusations made against me, so I could respond precisely. For nearly three years, I had been asking for evidence supporting these allegations so I could cogently respond to them. I had not been given the opportunity in the past and it was again denied to me at this meeting. The President ended the meeting abruptly and told me I would be terminated on the first day of Fall 2013.


**Fall 2013**

In August 2013, I received a letter of termination of employment and was given administrative leave with pay until my termination. I appealed in accordance with the Residential Faculty Policies (RFP). A three-member committee of faculty heard the evidence at a Termination Hearing. In December they submitted their recommendation not to terminate my employment because Maricopa County Community College District (MCCCD) had failed to show that 1) there had been a copyright violation and that 2) there had been a violation of the cash-handling policy. The Faculty Termination Committee did find that I had not done what the administration had ordered me to do—i.e., return money to students who had reimbursed me for making instructional copies for them. I never disputed the facts about cash handling other than to assert that my actions were not insubordinate. My lawyer submitted correspondence to the Governing Board requesting a hearing on the suspension alleging it was tantamount to termination. The Governing Board did not respond.

**Spring 2014**

In a meeting on March 6, 2014, the acting Vice Chancellor for Human Resources told me the Chancellor was not terminating me but had suspended me without pay, without medical insurance, completely severed my association with MCCCD as of March 1, 2014, until August 2015 (i.e., for more than a year) due to insubordination. I was not allowed to have any hearing or to provide a defense. In April 2014, the Chancellor revised the suspension without pay date to be effective April 15, 2014 until August 2015.

**Summer/Fall 2014**

May 1, 2014, I applied for unemployment benefits. The Department of Economic Security (DES) Unemployment Insurance Administration determined I was disqualified because the MCCCD administration had given the following reasons:

*"Voluntarily Left Employment, A.R.S. 23-775.1, Leaving in Anticipation of Discharge, A.A.C. R6-3-50135.C (You left your job because you believed you were to be discharged. You did not determine prior to quitting whether your employer was actually going to discharge you. You voluntarily left work without good cause in connection with your employment."*

Furthermore, the PC administration said I was suspended for gross insubordination. (See Decision of Appeal Tribunal). On appeal, the Appeal Tribunal found in my favor. The DES Administrative Law Judge wrote:

1) I "was discharged from employment but not for willful or negligent misconduct,"

2) I "was placed on suspension for insubordination arising out of a dispute over copyright and cash handling issues. The employer's internal investigation and fact-finding did not find sufficient evidence to discharge the claimant.... Because the employer did not find a violation of the cash-handling policies, the order/instruction to return the money to the students was not reasonable. **The claimant was not insubordinate for refusing ....The claimant did not sell the documents or otherwise make a profit.**" (See Decision of Appeal Tribunal). [emphasis added]

3) My suspension was "for an unreasonable period of time." Therefore, "the suspension terminates the employer-employee relationship and the worker is discharged on the date the worker was suspended and for the reason the worker was suspended." (See Decision of Appeal Tribunal).

<div align="center">**Claims**</div>

My specific claims for relief are as follows.

MCCCD has violated my employment contract as spelled out in the RFP, other policies, rules, regulations, and practice. As detailed above, the MCCCD followed the terms of the contract only when it benefited itself while holding me to strict compliance. I was neither timely apprised of the information against me nor was I ever given the opportunity to rebut the accusations for over three years until the Termination Hearing Committee convened to hear my appeal in the fall semester of 2010.

I have submitted two grievances which were never processed to the Governing Board as required by the RFP. The more recent grievance was filed on August 14, 2014.

The District deliberately failed to process to conclusion the termination process and in so doing I was denied my contractual right to appear before the Board to defend myself against these absurd accusations in executive session or in a public meeting. Worse still, the District without any legal basis switched horses in mid-stream by converting the termination process into a summary suspension process leading to an exceedingly long "suspension" from which there was no appeal to the Board.

With respect to the 2014 suspension without pay, it was implemented **before** I was notified that I was suspended. The RFP calls for notification before an adverse employment action is taken. There are no guidelines or process outlined for the Chancellor to follow in determining what employee actions should result in suspension and the length of such suspensions nor is there a guide for determining when the employee should be suspended with or without pay.

There are other claims for relief I am investigating among which are: retaliation under Title VII, defamation, intentional infliction of emotional distress. As evidence supporting these claims becomes available I will amend this Notice of Claim/appeal of grievances.

<div align="center">**Damages and Settlement**</div>

At this point I estimate my yearly gross income and monetized benefits to approximate $130,000.00 or $10,800 per month. Additionally, there are other perks which I lost. These perks include approximately $8,000 in travel funds for faculty for two years, $20,000 lost opportunities to receive grants for projects both in the two summers and the two calendar years, $4,000 in lost tuition covered for faculty and family for two years, legal fees and costs at this point are in the neighborhood of $60,000.00. Assuming I serve the 15 months suspension, my damages amount to $254,500.00. Furthermore, I had to activate my social security benefits before they reached their maximum resulting in a loss of income. I have been subjected to intentional infliction of emotional distress since fall semester of 2009.

At this point I am willing to settle all my claims against the District for the monetary damages spelled out above. Additionally, I require that I be given a letter of apology from the District which will be posted where HR postings are normally made within the District and that it be emailed to every student, faculty, and employee of the District and that my employment records and any other records containing information about the matters dealt with herein be sanitized. Please note that the amount of back pay depends on when I am reinstated.

Sincerely,

*Cleopatria Martinez*

Cleopatria Martinez, PhD

Attachment:  Decision of Appeal Tribunal (i.e., Decision of the Administrative Law Judge (ALJ)

# EXHIBIT 50

### MCCCD GOVERNING BOARD MEETING – OCTOBER 28, 2014

Speaker 1:    as a citizen interim, we have, uh, several of them here tonight. Um, remember we got a five minute limit, um, and I'll call on the first one is Cleopatra Martinez.

Cleopatra:    President Saar, can you hear me? Um, members of the governing board, Chancellor Glasper, members of the CEC, honored guests and members of the community. Um, on August 13th, 19- 2014, I emailed you a grievance. As of today, I have heard nothing in response. According to the RFP, grievances at your level need to be responded to within thirty days of receipt. I request that the matter of my suspension be an executive session item at the next meeting of the governing board. The reason I'm pursuing this matter is that it is the most recent example of the conduct that I have been experiencing since 2009 and I'm, uh, in January, I will have been with Maricopa Colleges for thirty years.

In August of 2013, the Phoenix College administration attempted to terminate me for copyright violations, cash handling violation and insubordination. I appealed, pursuant to the residential faculty policies, that's the RFP. In December of 2013, the MCCCD Internal Termination Hearing Committee found that MCCCD had not met its burden of proof with respect to copyright violation and cash handling violation and recommended that I not be terminated. The Chancellor then suspended me in March 2013 without pay for over fourteen months for my [00:02:00] alleged insubordination.

In May 2014, I applied for unemployment compensation. MCCCD advised the Department of Economic Security, DES, that I should be denied unemployment compensation because ben- benefits because I had walked off the job in anticipation of termination and because I had been suspended for gross misconduct, both untrue. Initially, the DES denied my claim but on appeal, the DES administrative law judge decided in my favor. Among other things, the administrative law judge wrote in his decision that one, I did not sell the documents or otherwise make a profit which was an all- uh, an allegation made.

The order to return the money to students was not reasonable and three, that I was discharged not suspended as contended by MCCCD and four, I was not discharged for willful and or negligent misconduct. Consequently, MCCCD's claims of copyright violation, cash handling violation and insubordination have not been substantiated by either independent reviewing authority, that is MCCCD's own internal termination hearing committee or the DES administrative law judge. In order to right this wrong in July 2014, I attempted to follow the grievance process which requires that I first present the grievance to the Vice President of Academic Affairs, the VPAA.

The VPAA's secretary advised that I could only speak to Human Resources, HR about the grievance. HR told me I could not file while I was [00:04:00] suspended although I could file the grievance upon my return in August of 2015, some twelve months away. On August 13, 2014, I submitted my grievance to the Vice Chancellor for Human Resources, the Chancellor and the governing board members. No one has responded. There are no substantiated claims, no substantiated claims against me but I remain suspended

<div align="center">1</div>

MCCCD/Martinez 01160

without pay. My grievance has not been addressed. The governing board is the final decision maker in the district.

I respectfully request that the board immediately make me whole by reinstating me to my former position with back pay to the day I was suspended, reimbursing me for attorney fees and cost and paying me the dollar value of any and all other benefits I lost as a result of this prejudicial, damaging suspension and um, I think also the, um, policy needs to be rewritten so it would not be as dictatorial as it is, uh, with respect to um, the person making this decision. There's, uh, a fiduciary, uh- this has been fiduciarily irresponsible I think and it must be eliminated. This is not how Maricopa operates so I ask again, I request that the matter of my suspension be an executive session item at the next meeting of the governing board. Thank you very much members of the governing board. If you have any questions, I'm willing to answer.

| | |
|---|---|
| Speaker 1: | And we, uh, the documents you brought. I'll make sure that that's part of the record tonight and we'll follow up on that. |
| Cleopatra: | Okay, okay. |
| Speaker 1: | Thank you. |
| Speaker 3: | [inaudible 00:05:45] technical. No conversation, just technical. |
| Speaker 1: | Mmm hmm. (affirmative) |
| Speaker 3: | Suspension was ... you were suspended on what date? |
| Cleopatra: | Initially on March 1st, 2013 and then it was changed to April 15, 2013. [00:06:00] That's without pay. |
| Speaker 3: | Okay. March of 2013? |
| Cleopatra: | And then it was changed to April of 2013. |
| Speaker 3: | So were you paid during March to the April [crosstalk 00:06:16]? |
| Cleopatra: | When it was changed, then I was paid and my- uh, my, um, without pay began on April 15, 2013. |
| Speaker 3: | And the suspension was for one year? |
| Cleopatra: | Until August of 2015, so more than a year. |
| Speaker 3: | Without pay? |
| Cleopatra: | Without pay. And the administrative law judge said that's not suspension, that's a termination. It's too long and uh, that document is available to you. |

MCCCD/Martinez 01161

Speaker 1:      Thank you.

Speaker 3:      Thank you.

Cleopatra:      You're welcome.

Speaker 1:      Next is, uh, Santos Vega. Welcome, Mr. Vega.

Santos:         Uh, President Saar, and um, Doctor Glasper and Board of Directors and fellow citizens, I came here to speak on behalf of mathematics professor, Cleopatra Martinez who taught for thirty years in Phoenix College. She lost her teaching position based on accusations that subsequent investigations and judgments found her not guilty of any one of the accusations. Evidence proved her innocent. Therefore, to continue to keep her from working is an injustice. She appealed her accusations and the district did not find her guilty.

                During [00:08:00] the time of this ordeal that she was suspended, she applied for unemployment to pay for her home and her food. She went to court and her charge was unsubstantiated yet the governing board won't hear her case. This is like an unjust termination without adequate cause. The suspension has gone for over a year, it should be ended and Professor Cleopatra Martinez should be reinstated to her former position immediately. I petition you to do what is fair, the right and just thing to do. Students need her back in the classroom. Thank you.

Speaker 1:      Thank you Mr. Vega.

Santos:         Thank you.

Speaker 1:      Next is, uh, Doctor Charles Townsend.

Charles:        Mr. President, I think the last time I was here I told you I was sick. I'm still sick but I'm concerned about an injustice to Doctor Martinez. I didn't know anything about Doctor Martinez when I first came to this board. I came to this board because I had looked at television one night and I didn't see one Black president sitting up that I still don't see one Black [00:10:00] president. Now, some of you might say, "Well, that's racism." Well, it is racism because there are no Blacks sitting up there as a president.

                You got twelve colleges out in this community college system and not one Black president and I've been working to get Blacks involved all of my life including the Chancellor. I've been in this town for thirty years and have worked to make certain that Blacks were included in administrative positions all over this county and it is a disgrace for a community college, uh, an institution of higher education to be so prejudicial that you can't find one Black president. I didn't come here tonight to talk about the president, I came here to talk about two other things.

                Here's a book that I discovered called Policies of Deceit. It talks about Maricopa Community College district and other districts in the county and across this nation. It is

the most revealing book that I have ever read about education and I have been in ej- in education all of my life. I'm eighty years old. I probably am on my death bed with congestive heart failure but I'm not going until I have had the opportunity and I may have it tonight to speak my last breath about injustice.

I was trying [00:12:00] to talk to Doc- or to Mr. Saar, President Saar a few moments ago and two of the board members got up and walked away and uh, somebody said, "Well, you got to talk to the attorney." The voters in Maricopa County didn't vote for the attorney. They voted for you hoping that you would carry your own head. I called the faculty representative, I believe his name was Keith Heffner, he may be the new one. Do you know is he the new one or the old one?

Speaker 1:      New one.

Charles:        He's a new one. I called him and told him that I wanted to talk with him about Doctor Martinez's situation. He emailed me- I had to leave- first of all, I had to leave a message on the phone and he said, "The best way to get in touch with me is through email," so anyway, I emailed him. He emailed- I emailed him and said I'd like to talk with him about Doctor Martinez's case. He emailed me back and said his attorney had told him that he couldn't discuss Doctor Martinez's case with me. I wrote him back and I said, "Well, Doctor Martinez has given me the authority to discuss it."

I never heard from him and somebody said something about the board not responding. This board ought to respond. You don't respond to anything. I have asked you to respond to me a thousand times and you won't even respond to me. It is an injustice and all of you people who are sitting around here, you may be faculty members. It can happen to you one [00:14:00] day and these people here who are from ASU, I imagine they're in education, want to see how an educational institution operates, well, this is the worst place to be.

If you want to see how a good board operates, you don't need to watch this one. Now, I don't want to be- I don't want to be too cantankerous about, uh, what I'm saying about the board. You got some good people up there, most of 'em up there are good. The last thing I want to say tonight, in district five back in the summer there were two people who indicated an interest to serve on this school board, two people. At the close of registration, two people. One Black young man and that's another thing, you don't have any Black board members up there, um, one Black man and one Hispanic applied or got their petitions signed so that they could run for a seat on this board.

The Hispanic gentleman decided that he would file a charge against this Black person because the Black person failed to indicate on his petition that the date that this position would be final. That was the extent of that petition. You had to put on there the date that this position would end so [00:16:00] what happens when you file, uh, uh, a claim against one of your, uh, adversaries? You gotta go to court so you gotta get an attorney. He went to an attorney, the attorney told him five thousand dollars. If we have to take it to the Supreme Court, it- it'll cost you another five thousand dollars.

Now, here's a young man. He doesn't have five dollars, let alone five thousand to run for a seat for this governing board because here we have a seasoned, a seasoned politician who knows all the ins and ropes of how you get elected so now what do we have in district five? We have one person and I submit to you that that person is illegitimate to serve on this school- on this, on this board, illegitimate. Now, if I were- ...

Speaker 1:     One minute, please.

Charles:       Yes, sir, one minute. If I were running and there were only two, I would think that uh, since I am a seasoned politician, I would win. This person hadn't run for anything and he's gonna sit on this board and represent me 'cause I'm in district five. I should have run for di- for the board myself. Probably if I hadn't been sick, I would have. The board needs to have some training and you need to strongly consider what your duties are to your employees including the Chancellor.

At some point in time, you might end up firing him [00:18:00] 'cause we like to fire people I read in the paper not to long ago. You fired somebody who was in charge of technology or something. Just firing people all the time. I asked somebody, "How many-how many, uh, suits have you, uh, entertained?" They had entertained so many lawsuits they can't even keep up with them. Okay, I'll be back, I'm not going anyplace.

Speaker 1:     [crosstalk 00:18:31]. Appreciate the [crosstalk 00:18:34].

Charles:       The Lord is with me.

Speaker 1:     Appreciate your comments.

Charles:       Thank you, sir.

Speaker 1:     Okay.

Charles:       And I think that these, these people ought to be advocates to get Black folks sitting up there and sitting down here.

Speaker 1:     Thank you Mr. Townsend. We have to move on to item number 6.1 and we have ...

MCCCD/Martinez 01164

# EXHIBIT 51


MARICOPA
COMMUNITY
COLLEGES®

**Maricopa County Community College District**
**Governing Board Minutes**
**October 28, 2014**

An executive session and a regular meeting of the Maricopa County Community College District Governing Board were scheduled to be held beginning at 5:30 p.m. at the District Support Services Center, 2411 West 14th Street, Tempe, Arizona, pursuant to A.R.S. Section 38-431.02, notice having been duly given.

| GOVERNING BOARD | ADMINISTRATION (REGULAR BOARD MEETING) |
|---|---|
| Dana Saar, President | Rufus Glasper |
| Randolph Lumm, Secretary | Maria Harper-Marinick |
| Doyle Burke, Member | Debra Thompson |
| Alfredo Gutierrez, Member | LaCoya Shelton-Johnson |
| Debra Pearson, Member | Steve Helfgot |
| | Lee Combs |
| | Linda Lujan |
| | Ernie Lara |
| | Steven Gonzales |
| | Irene Kovala |
| | Shouan Pan |
| | Paul Dale |
| | Anna Solley |
| | Chris Bustamante |
| | Jan Gehler |
| | Shari Olson |
| | Brianna Bendotti for Gene Giovannini |

EXHIBIT NO. *14*
*Martinez*
*2/10/16*

**EXECUTIVE SESSION**    Executive Session was called to order at 5:30 p.m.

**MOTION**    <u>Motion 10234</u>
Board Member Gutierrez made a motion to go into Executive Session. Board Member Burke seconded. Motion passed 5-0.

**CALL TO ORDER**    The regular board meeting was re-called to order at 6:31 p.m.

**SUBSTITUTIONS**    There was one substitution for a member of the CEC.

**PLEDGE OF ALLEGIANCE**    The assembly pledged allegiance to the United States of America led by Mr. Lumm.

**CLASS ACKNOWLEDGEMENTS**    President Saar welcomed Dr. Maria Hesse's HED634 *American Community College* class from ASU.

**STUDENT LIFE REPORTS**    Rico Moran, President of Glendale's Associated Student Government (ASG) presented an overview of events planned for the year, along with other members of the ASG. Students shared that the ASG represents 33,000 stakeholders and that they would be sharing their experiences with the Board that night. They reported that student government is more than just a funding source in support of campus events; members also serve on hiring committees, MEN's group, and other campus initiatives. Student Life at GCC reaches far beyond the border of the campus with trips and conference competitions. This week the college will focus on the issue of human trafficking. The group members are also proponents of District initiatives such as Breathe Easy, MEN, and sustainability—yet student representatives all feel that academics must come first. Representatives all easily maintain the 3.0 GPA required. The number of student clubs has grown from 22 clubs when they first started to over 60 clubs, six years later. They initially didn't have enough representatives for a full student governing board but now they have more than enough. They have moved from merely attending events towards hosting and facilitating them, including a three-day leadership retreat. Students thanked the Board for its time and invited members to attend events on campus regarding human trafficking.

*ASG Members:* Rico Moran, President; Anthony Lee, Vice President; Victoria Moreno, Treasurer; Jessica Mateo, Secretary; and John Garduno, Public Relations

**EMERITUS, AWARDS,**    Dr. Shari Olson, President of South Mountain Community College, thanked the Board and reported
**AND RECOGNITION**    that she and Mr. Bruce McHenry, Economics faculty member and Director of the SMCC Community

Entrepreneurship Center, were awarded $15,000 from the Coleman Foundation for their elevator pitch to further develop entrepreneurial student worker positions at SMCC at the recent National Association of Community College Entrepreneurs (NACCE) conference in Phoenix, October 12-15, 2014. She then invited faculty members Mr. Bruce McHenry and Ms. Maria Bailey-Benson to speak. Ms. Baily-Benson reported that, of the four awards presented at the NACCE conference, three were awarded to SMCC students. Mr. McHenry called himself an entrepreneurship champion and reported SMCC had received a fourth grant opportunity from NACCE that year. He also reported that Dr. Shari Olson was named NACCE's President of the Year. He noted that three of the student award winners were recipients of seed money from last year's grant.

**CITIZEN'S INTERIM**

There were three requests to address the Board.

1. Dr. Cleopatria Martinez, representing herself. Statement included in the Appendix.
2. Mr. Santos Vega, representing Dr. Cleopatria Martinez
3. Dr. Charles Townsel, representing the NAACP State Conference

Dr. Martinez' statement in its entirety is included in the Appendix.

Mr. Vega informed the Board he was there to speak on behalf of Dr. Cleopatria Martinez who taught for 30 years at Phoenix College. He said she lost her teaching position on allegations that subsequent investigations found unsubstantiated. He feels that keeping her from working is an injustice. He remarked that during her suspension, she applied for unemployment and was initially denied, but subsequent investigations upon her appeal found claims against her to be unsubstantiated. He said the Board would not hear her case. He called for her suspension to be ended and that she be reinstated to her former position. He said the students needed her back in the classroom.

Dr. Charles Townsel remarked he was concerned about an injustice to Dr. Martinez. He said he came before the Board that night because he did not see any Black presidents represented in MCCCD. He said with 12 colleges in the system it was a disgrace for the community colleges, and all institutions of higher education, to be so prejudicial that no Black presidents could be found. He returned to the topic of Dr. Martinez and said he'd attempted to communicate about the situation with the Faculty Executive Council president but was informed that the FEC attorney advised him not to speak about the case. Dr. Townsel also said this Board was the least responsive and worst model of how a good board should operate. He then remarked that there were initially two candidates running for the District 5 seat, one Black and one Hispanic, and what he considered inappropriate actions were employed to ensure the Black candidate was defeated before his campaign could begin. He concluded that the Board needed to strongly consider what its duties to its employees were and to be aware of the number of suits against the District. He advocated for Black representation on the Board, as well, as he left the podium.

**CHANCELLOR**

Chancellor Rufus Glasper said he wanted to piggy-back on the awards to SMCC and asked Dr. Olson to share with the Board about activities that led to her nomination for the NACCE President of the Year award. Dr. Olson remarked that the evidence of her students' award winning work speaks to the reason why she was honored for the award. She said she was surprised by the nomination. Her focus has always been on students attending college and experiencing business in a new way by learning together and doing business together. She said her faculty were engaged in providing a myriad of opportunities for students and the college supported them completely.

Dr. Glasper said the Board should take note of the number of presidents involved in the NACCE conference. He remarked he had visited a number of cities and town across the country and one of the leading themes he has seen is small business development. Community colleges can take the lead and role of developing the economy by focusing on this. The theme is global, as well. There are more and more centers for entrepreneurism and small business development. He also hears from employers that they want to be connected with employees with soft skills (i.e., critical thinkers, solution seekers, etc.) in addition to technical skills. The colleges are creating stackable credentials in programs such as cyber security and energy, among others, which can eventually result in a Bachelor's degree. He wants to look at the curriculum and infuse the notion of soft skills—that can be the community college footprint. Employers need to know that MCCCD can apply it, deliver it, and can be relied upon to provide it. He wants MCCCD and community colleges to be a primary leader nationwide in such efforts.

| | |
|---|---|
| FACULTY | There was no report. |
| EMPLOYEE GROUP | Mr. Leo Valverde, President of the Adjunct Faculty Association, provided the following. "President Saar, Members of the Board, Chancellor Glasper, members of the CEC, and Guests, I am Leo Valverde, President of the Adjunct Faculty Association. I am pleased to announce the selection of two new Adjunct Faculty College Representatives. Dr. Wilfred McFadden at Estrella Mountain and Ahmed Daniels at South Mountain. Both men have contributed to adjunct faculty, the district, and the community at-large for years. We are in the process of recruiting College Representatives for Phoenix College, Mesa Community College, and Scottsdale Community College as current reps move on to other responsibilities. The AFA is currently working in conjunction with MCLI toward the creation of an online, districtwide orientation for all new adjunct faculty hires. This orientation would not replace any campus orientation, but is meant to be used as both a training tool and a resource for all new adjunct faculty. It is our hope to have the course fully developed and ready to go fall, 2015. In addition, the AFA has submitted a proposal for a presentation to the Academic Innovations nationwide conference to be held here in Phoenix this spring. The focus of conference is adjunct faculty." |
| | Mr. Ted Georgas, President of the Crafts Employee Group, remarked he wanted to talk about excellence. He noted that people who are excellent often don't think they are. On behalf of the Unified Crafts Association, he congratulated all the excellence in Maricopa as a whole. He then said the Crafts association would be making a donation to the Maricopa Foundation in the name of the MCCCD Governing Board. He then thanked the Board for all the work it does for Maricopa. |
| APPROVAL OF THE ORDER OF THE AGENDA | President Saar then requested a motion to approve the Order of the Agenda. |
| MOTION | **Motion 10235** <br> Board Member Burke made a motion to approve the Order of the Agenda. Board Member Lumm seconded. Motion passed 5-0. |
| APPROVAL OF CONSENT AGENDA | President Saar asked if anyone wanted to remove any items from the consent agenda. No items were removed. |
| | The following items were included in the Consent Agenda: |
| | **9.1 APPROVAL OF THE MINUTES OF THE SEPTEMBER 17, 2014 BUDGET AND FINANCE RETREAT, SEPTEMBER 23, 2014 REGULAR BOARD MEETING, SEPTEMBER 30 SPECIAL SESSION, AND OCTOBER 14, 2014 AGENDA REVIEW AND WORK SESSION** |
| | **10.1 CONSIDERATION OF EMPLOYMENTS**—approve the personnel actions as proposed. Budget approvals have been granted and are on file for the recommended personnel actions in this item. |
| | **10.2 CONSIDERATION OF SPECIALLY FUNDED EMPLOYMENTS**—approve the personnel actions as proposed. Budget approvals have been granted and are on file for the recommended personnel actions in this item. |
| | **10.3 CONSIDERATION OF SHORT TERM EMPLOYMENTS**—approve the personnel actions as proposed. Budget approvals have been granted and are on file for the recommended personnel actions in this item. |
| | **10.4 CONSIDERATION OF SEPARATIONS**—approve the personnel actions as proposed. |
| | **10.5 CORRECTION TO PREVIOUS BOARD ITEMS**—approve the personnel actions as proposed. |
| | **11.1 APPROVAL OF CURRICULUM**—approve as submitted; the curriculum proposals have been processed through all procedures established by the Maricopa County Community College District. |
| | **11.2 APPROVAL OF NATIONAL SCIENCE FOUNDATION MATHEMATICS AND SCIENCE PARTNERSHIP (PROMOTING EXCELLENCE IN ARIZONA MIDDLE SCHOOL MATHEMATICS: INCREASING STUDENT ACHIEVEMENT THROUGH SYSTEMIC INSTRUCTIONAL CHANGE)**—accept a Mathematics and Science Partnership Grant continuing award in the amount of $1,920,675 for Year 4 of a 5-year project (totaling $8,748,267) from the National Science Foundation. The NSF Promoting Excellence in Arizona Middle School Mathematics: Increasing Student Achievement through Systemic Instructional Change (DUE 1103080) project commenced on March 15, 2012 and will conclude on February 28, 2017. |
| | **11.3 APPROVAL OF INTERGOVERNMENTAL AGREEMENT BETWEEN THE WESTERN MARICOPA** |

EDUCATION CENTER (WESTMEC) AND THE MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT ON BEHALF OF ESTRELLA MOUNTAIN COMMUNITY COLLEGE AND THE SOUTHWEST SKILL CENTER FOR EMT, PRECISION MANUFACTURING, AND FIRE SCIENCE PROGRAM TRAINING—approve the Intergovernmental Agreement between West MEC and the Maricopa County Community College District for Educational Programs with Estrella Mountain Community College and the SouthWest Skill Center, which includes use of the West MEC Central Campus Facility located at 6997 N. Glen Harbor Blvd., Glendale, AZ. 85307.

11.4 APPROVAL OF SUBAWARD AGREEMENT BETWEEN CENTRAL ARIZONA COLLEGE AND GATEWAY COMMUNITY COLLEGE/MARICOPA SKILL CENTER—accept the subaward agreement from Central Arizona College to GateWay Community College/Maricopa Skill Center in the amount of $1,264,970 for Year 1 of this four-year project with effective dates of October 1, 2014 through September 30, 2015.

11.5 APPROVAL OF SUBAWARD AGREEMENT BETWEEN CENTRAL ARIZONA COLLEGE AND ESTRELLA MOUNTAIN COMMUNITY COLLEGE/SOUTHWEST SKILL CENTER—accept the subaward agreement from Central Arizona College to Estrella Mountain Community College/SouthWest Skill Center in the amount of $988,430 for Year 1 of this four-year project with effective dates of October 1, 2014 through September 30, 2015.

11.6 APPROVAL OF DIVERSE PERSPECTIVES – ARIZONA SCIENCE TECH DESK—accept a two year grant award for Diverse Perspectives – Arizona Science Tech Desk from the Corporation for Public Broadcasting totaling $350,000. This project will commence on October 1, 2014 and conclude on September 30, 2016.

12.1 APPROVAL OF LEASE AGREEMENT BETWEEN CHANDLER UNIFIED SCHOOL DISTRICT (CUSD) AND CHANDLER-GILBERT COMMUNITY COLLEGE (CGCC)—approve a Lease Agreement with CUSD. The agreement will provide for the lease of Javelina Hall, a 3,950 square foot building containing three classrooms, offices and restrooms at the CGCC Pecos campus. CUSD will pay monthly for the period of July 1, 2014 through June 30, 2019 the sum of $10,961.67 ($32 per square foot) for the lease of the building. Beginning July 1, 2015 the rate will increase based on a national index. CUSD will reimburse CGCC quarterly for office supplies, copying services, and postage. The lease includes 4 one-year extensions.

MOTION

**Motion 10236**
Board Member Burke moved for approval of the Consent Agenda. Board Member Lumm seconded. Motion passed 5-0.

13.1 APPROVAL OF 4.9 BOARD COMMITTEE STRUCTURE—approve the proposed changes to Board Policy 4.9 to include the scope of the three Board committees: Board Policy, Budget and Finance, and Charter Schools.

MOTION

**Motion 10237**
Board Member Lumm moved for approval of Item 13.1. Board Member Burke seconded. Motion passed 5-0.

13.2 APPROVAL OF AUTHORIZATION OF EXPENDITURES OF LEGAL FEES—authorize the expenditure of legal fees and expenses in the amount of $1,726,850 through December 31, 2014 to pay for legal fees and expenses incurred with the law firm of Greenberg Traurig, LLP, for consultation and representation related to data security issues that arose with the security incident of 2013.

MOTION

**Motion 10238**
Board Member Burke moved for approval of Item 13.2. Board Member Gutierrez seconded. Motion passed 5-0.

14.1 APPROVAL OF CONCEPTUAL APPROVAL FOR ADDITIONS TO THE JOHN PAUL THEATER PHOENIX COLLEGE—provide Conceptual Approval for additions and renovations to the existing John Paul Theater at Phoenix College.

MOTION

**Motion 10239**
Board Member Lumm moved for approval of Item 14.1. Board Member Pearson seconded. Motion passed 5-0.

14.2 APPROVAL OF JOB ORDER CONTRACTING PURCHASE ORDER TO REPLACE MECHANICAL

SYSTEM FAN COIL UNITS IN THE NORTH GYM PHOENIX COLLEGE—approve a Job Order Contract (JOC) purchase order in the amount of Three Hundred Seventy One Thousand, Four Hundred Ninety-Seven Dollars and Eighty-Five Cents ($371,497.85) to Jokake Construction for installation of new mechanical system fan coil units in the North Gymnasium at Phoenix College.

**MOTION**

**Motion 10240**
Board Member Pearson moved for approval of Item 14.2. Board Member Burke seconded. Motion passed 5-0.

**14.3 APPROVAL OF PARTIAL GUARANTEED MAXIMUM PRICE NUMBER ONE PHASE 1 SITE WORK FOR THE NEW INTEGRATED LEARNING BUILDING AT PARADISE VALLEY COMMUNITY COLLEGE BLACK MOUNTAIN CAMPUS**—approve the partial Guaranteed Maximum Price (GMP) Number One for the site work package with a not to exceed price of One Million Two Hundred Thousand and 00/100ths Dollars ($1,200,000.00) to Austin Commercial LP for the new Integrated Learning Building at Paradise Valley Community College, Black Mountain Campus.

**MOTION**

**Motion 10241**
Board Member Pearson moved for approval of Item 14.3. Board Member Burke seconded. Motion passed 5-0.

**MONITORING REPORTS**

**15.1 BUDGET ANALYSIS REPORT, FUND 1—GENERAL UNRESTRICTED FUND FOR THE THREE MONTHS ENDING SEPTEMBER 30, 2014**—Expenditure analysis indicates 16.8% of the budget has been expended this year as compared to 19.3% expended at this same point last year. 39.6% of the budget remained unexpended or unencumbered compared to 36.0% in the prior year. Revenue analysis indicated that 28.8% of the budget has been recognized as compared to 26.3% in the prior year. The projected fund balance will increase by ~$3.4M this fiscal year and the projected ending fund balance for June 2015 is $167.6M. The District should meet its financial stability requirements.

**15.2 2004 GENERAL OBLIGATION BONDS SERIES A (2005), SERIES B (2007), SERIES C (2009), SERIES D (2011) AND SERIES 2013 2004 CAPITAL DEVELOPMENT PLAN SUMMARY AS OF SEPTEMBER 30, 2014**—As of September 30, 2014, $823.5 million, representing approximately 87% of proceeds from the Series A, Series B, Series C, Series D, and Series 2013 issuances of the 2004 bond have been expended or encumbered and $127.8 million remains available. Bond proceeds are invested until expended.

**15.3 BUDGET ANALYSIS REPORT, FUND 1—GENERAL UNRESTRICTED FUND FOR THE TWELVE MONTHS ENDING JUNE 30, 2014 (FINAL-UNAUDITED)**—Expenditure analysis indicated 89.5% of the budget was expended this year as compared to 91.6% expended at this same point last year. 10.5% of the budget remained unexpended or unencumbered compared to 8.4% in the prior year. Revenue analysis indicated that 96.4% of the budget was recognized as compared to 97.6% in the prior year. The fund balance increased by ~$4.1M to $164.1M. The District met its financial stability requirements.

**15.4 2004 GENERAL OBLIGATION BONDS SERIES A (2005), SERIES B (2007), SERIES C (2009), SERIES D (2011) AND SERIES 2013 2004 CAPITAL DEVELOPMENT PLAN SUMMARY AS OF JUNE 30, 2014**—As of June 30, 2014, $796.0 million, representing approximately 84% of proceeds from the Series A, Series B, Series C, Series D, and Series 2013 issuances of the 2004 bond have been expended or encumbered and $155.3 million remains available. Bond proceeds are invested until expended.

**BOARD MEMBERS**

Mr. Burke reported he was pleased to have attended Rio's Welcome Lunch for Dr. Rita Cheng, new president of Northern Arizona University. He attended the Student Success Conference and was pleased with the offerings. He attended the dedication of the new Performing Arts Center at Mesa Community College.

Mr. Gutierrez reported he had attended the ACCT Conference in Chicago. He found the seminars helpful and focused on the ones concerning developmental education. He also reported a coming tsunami of change should be expected as aging executive leaders in community colleges retire.

Mr. Lumm reported he attended similar meetings and events as Mr. Burke. He congratulated MCC on its new facility and his expectation it would greatly contribute to Mesa's arts. He also congratulated Dr. Maria Harper-Marinick on an excellent Student Success Conference.

Mr. Saar reported He attended the ACCT as well and learned about what was happening throughout the country. He focused on workforce development sessions and will keep pushing

that agenda at MCCCD. He also congratulated MCC on its new PAC—with 460 seats!

Mrs. Pearson reported she also attended ACCT and found it be an emotional experience as she handed the reins of the Asian, Pacific Islander, Native American Trustee Association (APINATA) over to a new chair. She said she focused on sessions dealing with poverty in education. The conference served as a mirror to help her see where MCCCD fits in the scheme of things and she felt renewed appreciation for all the work being done in Maricopa. She thanked SMCC for stepping up to the challenge of focusing on entrepreneurism—community colleges could do this better than anyone! She noted entrepreneurship can be applied in more than business classes—art, tutoring, technology, civic engagement—all areas can encourage someone in how to set up a business. She then concluded her remarks with a request the Board secure outside, independent counsel, to review findings in a recent lawsuit the Board was not previously made aware of. She said the Board needed an unbiased review to ensure all actions were proper.

| | |
|---|---|
| **VICE CHANCELLOR** | Dr. Maria Harper-Marinick, Executive Vice Chancellor and Provost, welcomed the MCCCD Women's Leadership Group Mentor Program participants. She said the group was created in support of professional development for the women of MCCCD. This was the 15th year of the program with 34 mentees representing all the colleges and District. Since its inception, the program has had 369 graduates. She thanked everyone for participating and asked the mentees to stand and be acknowledged by the Board. |
| **COLLEGE** | There were no reports. |
| **AADGB** | There was no report. |
| **ASBA** | There was no report. |
| **ACCT** | Mr. Saar reported the conference was well worth attending and he looked forward to the National Legislative Summit in February, 2015. |
| **GOVERNMENT RELATIONS** | Ms. Dawn Wallace, Director of State and Local Government Relations, provided the following, "Good evening, Mr. President, Members of the Governing Board, Chancellor, Members of CEC, and all in the audience. Thank you for allowing me to present on a variety of government relations topics tonight. First, I'll speak on the elections next week. All U.S. House seats are up for election. Six of the nine congressional districts have predictable outcomes, however CD-1 (Tobin/Kirkpatrick), CD-2 (Barber/McSally) and CD-9 (Sinema/Rogers) are classified as potential swing districts and are somewhat close to call. These three races have generated a tremendous amount of out of state money. All Statewide offices are up for grabs and Maricopa continues to watch all races; the Governor (Ducey, DuVal), State School Superintendent (Garcia/Douglas), and Attorney General (Brvonich/Rotellini)are the offices with whom Maricopa interacts. Most of the Legislative districts in Maricopa County are predictable; however, there are some swing districts that could have ramifications to the makeup of the House and Senate. This is particularly true for the State Senate. For example, if LD18 (Chandler-Ahwatukee) or LD28 (Central Phx/PV), which are currently Republican incumbents, shift to the Democratic candidates, and LD(6) goes to the Independent candidate (who will likely align with the Democrats), the Senate could be 15-15. The County seats include county assessor, judges, the election of our board, and the $935 million bond approval for Maricopa Integrated Health System. There are three ballot propositions for voters to consider. The first two are referendums: 1) Prop 122 allows the state to opt out of federal laws deemed unconstitutional by the voters or the state legislature and if this happens, the state would be prohibited from devoting any resources toward enforcing the law (Crandell); 2) Prop 303 would allow investigational drugs, biological products or devices to be made available to eligible terminally ill patients. (Lovas, Allen, etc., and some Dems); and 3) Prop 304 increases legislative salaries from $24,000 to $35,000.<br><br>Earlier this month, the Financial Advisory Committee met to discuss the economic outlook for the State. We know that FY 2014 has come in below projections. That does not mean there was negative growth, rather when you build a budget, you assume revenue levels that are then used to budget expenditures. If the revenues don't come in, the expenditures remain the same you end up with a deficit. In some years, ending balances have helped the deficit, like in 2015, but ending balances are only one-time solutions. The area that was most significantly below projections is corporate income taxes. Possibilities for the decrease could be tax credits (like R&D), or prior year liabilities that were carried from one year to another, and tax cuts. JLBC estimates that over the three year budget period there was a $226m loss in revenues due to tax cuts. We know FY 2015 revenues continue to be below |

forecast—which only makes the outlook grimmer. The fiscal impact of the K-12 litigation continues to be a black cloud over the budget outlook. One positive piece of news, the economists did not indicate that we were in recession mode; compared to the rest of the country, our recovery out of the 2009 recession is slower.

Here is a quick visual on the state budget. The FY2015 has been updated to show a $189m deficit, leading to a $667m deficit in 2016. With the K-12 reset, the numbers increase to $520m and $1b, respectively. These are dire numbers, however, the FY 2015 deficit will not be that difficult to solve with one-time solutions. FY 2016 will be more difficult. There are several solutions: Rainy Day fund has $460million; Debt Financing might be an option but there is not much left to mortgage; perhaps some lottery proceeds. Revenue enhancements are the most creative solution and I have heard a variety of solutions including the sweep of the Permanent School Fund, which is the corpus of the state trust lands. This can include increased fees (which are used generally to help supplant general funded agencies). Budget reductions are much more likely in FY2016 than in FY2015. As I mentioned before, we are vulnerable. In the past, there have been rollovers in K-12, Universities, DES, and AHCCCS. $900m still remains in K-12, $200m at Universities, but DES and AHCCCS are available. Finally, a tax increase is possible but unlikely and will depend on the makeup of the Executive and Legislative leadership.

State Budget Request

- Due on September 1 but extended to October 1.
- Historically, a letter (with calculations) submitted to Governor by Community College System. Operating, STEM/Workforce and Equalization Aid formulas provided to JLBC.
- Legislature no longer holds budget hearings for community college budgets.
- Adjustments to operating and equalization aid formula seen as "technical."

Our total request to the Legislature, assuming we keep our baseline funding, is $10.1 million. We will be submitting another letter the middle of next month that provides potential STEM and workforce related projects that would be funded if funding is fully realized."

**NEXT BOARD MEETINGS**        President Saar announced the following future meetings.

- November 13, 2014, 1:00 p.m., Board Orientation: Open Meeting Law, Rio Conference Center
- November 18, 2014, 1:00 p.m., Agenda Review, Rio Conference Center
- November 18, 2014, 2:30 p.m., Annual Outcomes Monitoring Retreat, Rio Conference Center
- November 25, 2014, 4:30 p.m., Agenda Review, Rio Conference Center
- November 25, 2014, 6:30 p.m., Regular Board Meeting, Rio Conference Center
- December 4, 2014, 1:00 p.m., Board Orientation: Maricopa Governance, Rio Conference Center
- December 9, 2014, 6:30 p.m., Regular Board Meeting, Rio Conference Center

**ADJOURNMENT**        President Saar adjourned the regular board meeting at 8:01 p.m.

_____
Randolph Elias Lumm
Governing Board Secretary

# Appendix

**Citizen's Interim Report to the Board (Martinez)**

**Government Relations Report**

October 28, 2014

Governing Board Member, Dana F. Saar
Governing Board Member Doyle Burke
Governing Board Member Alfredo Gutierrez
Governing Board Member Randolph Elias Lumm
Governing Board Member Debra Pearson

Dear Governing Board Members,

On August 13, 2014 I emailed you a grievance.  As of today I have heard nothing in response.  According to the RFP, grievances at your level need to be responded to within 30 days of receipt.  I request that the matter of my suspension be an Executive Session item at the next meeting of the Governing Board.

The reason I am pursuing this matter is that it is the most recent example of the conduct that I have been experiencing since 2009.

 In August 2013, the Phoenix College administration attempted to terminate me for copyright violation, cash-handling violation, and insubordination.  I appealed pursuant to the Residential Faculty Policies (RFP).  In December 2013, the MCCCD internal Termination Hearing Committee found that MCCCD had not met its burden of proof with respect to copyright violation and cash-handling violation and recommended that I not be terminated.  The Chancellor then suspended me in March 2013 without pay for over 14 months for my alleged insubordination.

In May 2014 I applied for unemployment compensation.  MCCCD advised the Department of Economic Security (DES) that I should be denied unemployment compensation benefits because I had walked off the job in anticipation of termination and because I had been suspended for gross misconduct.  Initially the DES denied my claim but on appeal, the DES Administrative Law Judge decided in my favor.  Among other things the Administrative Law Judge wrote in his decision that
(1) I "did not sell the documents or otherwise make a profit," (2) the order to return the money to the students was not reasonable, (3) that I was discharged not suspended as contended by MCCCD, and (4) I was not discharged "for willful or negligent misconduct."

Consequently, MCCCD's claims of copyright violation, cash-handling violation, and insubordination have **not** been substantiated by either independent reviewing authority (i.e., MCCCD's own internal Termination Hearing Committee or the DES Administrative Law Judge).

In order to right this wrong, in July 2014 I attempted to follow the grievance process which requires that I first present the grievance to the Vice President of Academic Affairs (VPAA).  The VPAA secretary advised that I could only speak to Human Resources (HR) about the grievance.  HR told me I could not file while I was suspended although I could file the grievance upon my return in August 2015, some 12 months away.  On August 13, 2014, I submitted my grievance to the Vice Chancellor for Human Resources, the Chancellor, and the Governing Board members.  No one has responded.

There are no substantiated claims against me but I remain suspended without pay.  My grievance has not been addressed.  The Governing Board is the final decision maker in the District.  I respectfully request that the Board immediately make me whole by reinstating me to my former position with back pay to the day I was suspended, reimbursing me for attorney fees and costs, and pay me the dollar value

of any and all other benefits I lost as a result of this prejudicial, damaging "suspension." Finally, I request that the Chancellor's dictatorial authority to suspend employees without cause, without pay, and without due process for any length of time be eradicated and a policy be written to include guidelines, process, checks and balances.  Paying lawyers to continue pursuing an administrative abuse of power is not what MCCCD should represent.  This type of irresponsible fiduciary behavior must be eliminated.

Respectfully,

Cleopatria Martinez, PhD
Professor of Mathematics

November 4, 2014


Governing Board Member, Dana F. Saar
Governing Board Member Doyle Burke
Governing Board Member Alfredo Gutierrez
Governing Board Member Randolph Elias Lumm
Governing Board Member Debra Pearson


Dear Governing Board Members,

Re:  Erratum in my letter dated October 28, 2014, to the Governing Board and during Citizens' Interim

In discussing the dates of events in response to Governing Board Member Debra Pearson's question, I incorrectly referred to a date in 2013 which should have actually been 2014.  The same error was made in the letter dated October 28, 2014. The correct answer to Governing Board Member Debra Pearson's question concerning the date I was suspended is:

"I was suspended with pay on August 12, 2013.  I was suspended without pay on **March 1, 2014**.  Later Chancellor Glasper changed the date to **April 15, 2014** and my pay will resume in August 2015."

Sincerely,



Dr. Cleopatria Martinez

11/4/2014



**Maricopa Community College
Governing Board Meeting
Government Relations Update
October 28, 2014**

---



OFFICE OF GOVERNMENT RELATIONS

### Nov. 4 Elections

- ☐ Federal – all U.S. House seats
- ☐ Statewide Offices
- ☐ County (non-partisan)
  - County Assessor
  - Superior Court Judges
  - Community College Governing Board
  - Special Health Care District $935 million Bond Approval

---



### Nov. 4 Elections

- ☐ State Ballot Propositions
  - Proposition 122 – Rejection of Unconstitutional Federal Actions
  - Proposition 303 – "Right to Try"
  - Proposition 304 – Legislative Salaries

---



### State Budget Outlook

- ☐ FY 2014 revenues came in below projections – main driver was Corporate Income Tax (13.1% decrease).
  - Tax Credits (R&D).
  - Prior Year liabilities.
  - Tax Cuts (since 2011) - $226m loss from FY 2016-2018.
- ☐ FY2015 1st Quarter revenues ($65m) below forecast.
- ☐ K-12 Litigation - "Cave Creek USD v. Ducey"

---

OFFICE OF GOVERNMENT RELATIONS

### State General Fund
### Estimated Ending Balances

| After: | FY2015 | FY 2016 |
|---|---|---|
| • May Special Session | $130m | $(237m) |
| • October Update | (189m) | (667m) |
| • October + K-12 Reset* | (520m) | (1,002m) |

☐ Does not include the Rainy Day Fund of $460 million.
☐ Does not reflect K-12 litigation retroactive payments of $1.3 billion.

*K-12 Reset is $236 per student totaling $336 million.

---

OFFICE OF GOVERNMENT RELATIONS

### K-12 Lawsuit
### Impact on State Budget

- ☐ Reset of Per Pupil Funding (prospective) - $336 million annually.
- ☐ Retroactive payments – potentially $1.3 billion.
- ☐ October hearing to consider retroactive payments.
- ☐ Settlement may reduce part of the FY 2016 budget deficit but certainly not all.

1

11/4/2014

---

 **OFFICE OF GOVERNMENT RELATIONS**

## Potential Solutions

- ☐ Rainy Day Fund – one-time, not permanent.
- ☐ Debt Financing – one-time, not permanent.
- ☐ Revenue enhancements.
- ☐ Permanent Budget Reductions.
- ☐ Rollovers.
- ☐ Tax Increase – temporary or permanent – if agreed, on the general election ballot 2016 – would only partially solve FY 2016 (collections would not begin until January 2017).

---

**OFFICE OF GOVERNMENT RELATIONS**

### FY 2015-2016 State Budget Request
### Maricopa

|  | 2015 Appropriation | 2016 Formula | Incremental Change |
|---|---|---|---|
| M&O*: | $7,409,500 | $6,680,100 | $(729,400) |
| STEM/Workforce: | 1,400,000 | 12,207,100 | 10,807,100 |
| Equalization: | N/A | N/A | N/A |
| Net Increase: | $8,809,500 | $18,887,200 | $10,077,700 |

Note: Decrease is due to net decrease of 2,777 FTSE.

---

**OFFICE OF GOVERNMENT RELATIONS**

### MCCCD Governing Board
### Candidate Forums
### September 2014

At Large: Rio Salado Community College
September 26, 2014 – Rio Conference Center
http://www.youtube.com/watch?v=SZQV5AGLE4&list=PLWDmci-IIy2vDCAMiE78E977rGtS0IInII0

District 3: Paradise Valley Community College
September 3, 2014 – East KSC-10008
http://www.youtube.com/watch?v=LiztMG008&list=PLWDmci-IIy2vDCAMiE78E977rGtS0IInII0&index=f

District 4: Glendale Community College
September 17, 2014 – Student Union
http://www.youtube.com/watch?v=7cPchbip3ntL&list=PLWDmci-IIy2vDCAMiE78E977rGtS0IInII0&index=3

District 5: South Mountain Community College
September 17, 2014 – Library Community Room
http://www.youtube.com/watch?v=m7sDdt16om0&list=PLWDmci-IIy2vDCAMiE78E977rGtS0IInlzIL&index=2



---

**OFFICE OF GOVERNMENT RELATIONS**

### Congresswoman Kyrsten Sinema
### Mesa Community College – Veterans Students
### September 5, 2014



---

**OFFICE OF GOVERNMENT RELATIONS**

### State of the Americas
### with Vicente Fox
### September 23, 2014

GCC Staff, Faculty and Students
Teresa Leyba Ruiz, V.P. Student Affairs
Dr. David Miller, Faculty

Rico Moran, President, Associated Student Government
Anthony (Buddie) Lee, Vice-President, Associated Student Government
Isis Velazquez – President, M.E.Ch.A.
Jesus Saldana – Secretary, M.E.Ch.A.



---

**OFFICE OF GOVERNMENT RELATIONS**



### Chandler-Gilbert
### Coyote Center
### Grand Opening
### September 24, 2014

Pictured above (starting from left):
Governing Board member Alfredo Gutierrez, Mayor Gail Barney, Chancellor Rufus Glasper, President Linda Lujan, Governing Board member President Dana Saar, Mayor Jay Tibshraeny, Mayor John Lewis, Supervisor Denny Barney, Governing Board Member Doyle Burke.

Attendees:
Mayor Jay Tibshraeny, Chandler
Mayor John Lewis, Gilbert
Mayor Gail Barney, Queen Creek
Supervisor Denny Barney
Chandler City Council Members
Senator Steve Yarborough
Representative J.D. Mesnard
Representative Tom Forese
Offices of Senator Jeff Flake, Senator John McCain and Congressman Matt Salmon

---

2

11/4/2014

**OFFICE OF GOVERNMENT RELATIONS**

Senator John McCain
Marshall Trimble Tribute
Scottsdale Community College
October 9, 2014



**OFFICE OF GOVERNMENT RELATIONS**

OSPB/JLBC Tour
GateWay CC - District
September 25, 2014



**OFFICE OF GOVERNMENT RELATIONS**

Paradise Valley Community College
1st Annual Veterans Summit
October 3, 2014



**OFFICE OF GOVERNMENT RELATIONS**

Arizona
Chamber of
Business &
Industry
Manufacturing
Summit

October 3, 2014



**OFFICE OF GOVERNMENT RELATIONS**



Hoop of Learning
AZ Capitol Tour
Representative Jamescita Peshlakai
October 8, 2014

**OFFICE OF GOVERNMENT RELATIONS**

Legislative Staff Tour
Virtual Incident Command Center
October 9, 2014



3

11/4/2014

OFFICE OF GOVERNMENT RELATIONS

Welcome Lunch for
Dr. Rita Cheng, NAU President
Rio Salado Community College
October 15, 2014

19

OFFICE OF GOVERNMENT RELATIONS

East Valley Veterans Center
Veterans Healthcare, Benefits and
Resources Clinic
October 17, 2014

Rep. Kyrsten Sinema, Tempe Mayor Mark Mitchell, and
Tempe Councilmembers Robin Arredondo-Savage and Corey Woods.

20

OFFICE OF GOVERNMENT RELATIONS

Arizona Get Into Energy Expo
Arizona Science Center
October 24, 2014

Pictured (left to right): Bob Bement, Sr. Vice President of Site Operations, APS Palo Verde Nuclear Generating Station, Rep. Jeff Dial, President Ernie Lara, Estrella Mountain College, Daniel Froetscher, Sr. Vice President of Transmission, Distribution & Customers at APS

21

OFFICE OF GOVERNMENT RELATIONS

Mesa Community College
Performing Arts Center
Opening
October 24, 2014

22









# EXHIBIT 52

### MCCCD GOVERNING BOARD MEETING – MAY 27, 2014

Speaker 1:     At the top and it's obvious that the board must review the chancellor limitations, and intervene to restore proper governance at the district. (coughing) We're asking that you open an independent investigation immediately to save the district from further lawsuits and financial damages. Uh, protect the public trust and the future of the district, and future of education (coughing) for our communities.

You are in charge. You're ultimately responsible. We will not hesitate to take any necessary actions to stop harassment discrimination, retaliation, mismanagement, misuse of funds, (coughing) illegal activities, (coughing) and any other actions by the district, uh, administration that jeopardizes the future of affordable education in Maracopa County. And as, um, this group of Latino leaders in our community we urge the governing board to, to get involved. To take action on this, and not dismiss it. Thank you. (coughing)

Speaker 2:     Thank you.

Speaker 1:     And I'm going submit these for the, um, the record.

Speaker 2:     Just set them by the table here. Thank you. Uh, next is Dr. Townzel.

Speaker 3:     (clears throat) (pause) (coughing) Mr. President, um, I have in my hand here a document that I ... Have not read thoroughly. But there is a section here that talks about suspension of a faculty member. Uh, this document ... Is entitled, uh, FY2013-14 Residential Faculty Policy Manual.

3.11 Suspension of Faculty Member. Upon a written statement of charges formulated by the chancellor. Charging a faculty member [00:02:00] of the MCCCD the chancellor or his/her designee may immediately suspend the faculty member, and give notice of suspension. At the option of the faculty member the MCCCD faculty association president will be notified of this action.

It goes on to say, the notice of suspension shall be in writing, and served upon the faculty member. Personally, or by you as registered or certified mail addressed to the faculty member at his or her place of resident as recorded in the MCCCD records. Any faculty member who has been suspended present to this section will normally, would normally be paid his, her regular salary during the period of suspension.

A suspension without pay will occur only upon advice of general council. If payment is to be withheld, the vice chancellor of Human Resources will first consult with and advise the member, and at the option of the faculty member the faculty association president regarding the rationale for that action.

I read that before I wanted to get into a specific ... Regarding this suspension. I also wanted to say that some board member mentioned something about the expenditures that I mentioned when I was here before. Uh, had been determined as something, but

1

MCCCD/Martinez 00947

it, uh, eh, eh, eh, and as I said before you can't read every, you can't believe everything you read in the press. But here it says [00:04:00], most of the expenditures are undetermined. And this statement was given to the press I suppose by a lady by the name of, by a person by the name of Kim G-R-A-N-I-O.

Now, if that's incorrect. This is information going out to the public. And most public people believe what they read in the paper. So if this is inaccurate then it is encumbered upon this board, or somebody here to correct it. (cough) I have a prepared statement here. And I sent this statement to all of the board members via email.

Speaker 2:      Mr. Townzel would you like those statements entered into the public ...

Speaker 3:      Yes sir. I would like ... Everything I say here to be included in the public record. In the minutes of the board. Uh, this thing says Mr. President, members of the board, Chancellor Glassburg, ladies and gentlemen. My name is Charles Townzel. Representing tonight, the political action committee of the state conference of the NAACP, and myself. M-Y-S-E-L-F. My last visit with you a month ago, I expressed my concern that there were no African American college presidents in the system.

I'm still, I still maintain this concern and would suggest to you tonight that the next president hired in the district be African American. I know your response, or some responses. "We must hire the best qualified." I know. [00:06:00] I've done that myself. I've hired the best qualified. Black, blue, pink, white, or brown.

They were hired, uh, we must hire the best, I know. But you should know that some of the presidents you have are not necessarily competent or qualified. They were hired because they were white or Hispanic. I'm asking you to do the same for African Americans. I'm confident the person will be competent and qualified.

Back in the 60s and 70s, I went out on recruiting African American educators for school districts, colleges, and universities who sought to integrate their faculties and staffs. If there are no outstanding African Americans in the district who could be promoted just as the chancellor was, you should send out some recruiters.

My second concern is Dr. [inaudible 00:07:07]. And I read your document about how you should handle situations of this nature. I sent an email to board members and the chancellor asking the board to look into this matter. I ask the chancellor to reconsider his decision. I spoke with Mr. Lamm and Mr. Bert. The chancellor did not respond to my email. A sign of disrespect and incompetence. The education code stipulates that only the board can hire and fire employees.

Even thought Dr. Martinez has not been fired, not yet. She's [inaudible 00:07:53] to having been fired. The board has a founduciary responsibility [00:08:00] to protect the interest of its employees. No one should be placed in the position that Dr. M, Martinez finds herself. Every employee at Phoenix College should be supporting Dr. Martinez. One of them will be next.

2

MCCCD/Martinez 00948

In fact, the whole district should be up in arms about the miscarriage of justice. Is the environment in the district so toxic that people are afraid to speak up and speak out? Where has the board been in this saga? Dr. Martinez, on March 25th, asked the board and I quote, "Accordingly I asked the board to intervene in my case to rescind the chancellors suspension, and at the very minimum allow me to present proof of what I have stated here."

I think at that same meeting [inaudible 00:09:06], in that letter that Dr. Mar, Martinez read to the board. I think she had indicated that they, somebody wanted to fire her initially. (coughing) And that committee that she went before, exonerated her. And then somebody came along that were going to punish her anyway, and puts her on suspension.

Now, I'm asking the board to look at that suspension policy and see if you violated that by not paying her while she's on suspension. I've only seen her once in my life, and that when, that's when she addressed this board on March 25th. But one thing I do know, what happened to her is an outrage. Has this board responded to her request? If not [00:10:00], that's an outrage.

And as I indicated to you on March 25th, I have a heart condition. And let me say tonight that I'm going to be ashamed to die knowing that Dr. Martinez's suspension has not been rectified by the chancellor and this board. And so should you. Thank you.

Speaker 2:    Thank you. (clears throat) That's the, eh, uh, last of those, eh, in the public, uh, form. Uh, uh, announcing substitutions tonight in the, uh, the EC. We have, uh, Dr. Daniel Core for Jane Geller. Bill Crawford for Linda Luhan. Clay Goodman for Ernie Laura. And Tony Asty for Steven Gonzales. (coughing) Now moving on to the agenda. Do we have a motion to approve the agenda as presented?

Speaker 4:    [inaudible 00:10:59]

3

MCCCD/Martinez 00949

# EXHIBIT 53



Christina M. Haines
Acting President

VIA HAND DELIVERY

August 25, 2015

Dr. Cleopatria Martinez
Mathematics Faculty Member
Phoenix College

Dear Dr. Martinez,

On December 9, 2010, after receiving the recommendations of an Administrative Review team, the College president issued a memorandum directing you to use only course materials approved by the department, that are available in the bookstore for sale to the students and that are authored by persons other than yourself. A copy of that memorandum is attached, and its terms are incorporated in this memorandum. The attached directive has never been cancelled by a Phoenix College president, and it remains in force and effect until cancelled in writing. This memo is intended to prevent any misunderstanding on your part that I intend to enforce the directive.

Also, I am informed that a corrective action was issued to you, for selling copies of materials to your students in violation of the MCCCD cash handling rules, and that you remain in violation of a related directive to reimburse the students the money you collected. I will be working with the appropriate officials to address that concern. You may avoid disciplinary action by immediately reimbursing the students directly, or by authorizing the district to do so by deducting money from your paycheck and transferring the amounts due to the students. In the event reimbursement is not completed (or authorization is not forthcoming) immediately, I will take such action as necessary.

Regards,

Ms. Chris Haines
Interim President

Attachments: 2

cc:     Dr. Casandra Kakar
        Mr. Paul DeRose
        Mr. Wilbert Nelson
        Mr. Joe Sueyoshi
        Mr. Lee Combs
        Ms. LaCoya Shelton-Johnson

MAIN CAMPUS
1202 West Thomas Road
Phoenix, AZ 85013
(602) 285-7761

PC DOWNTOWN
CAMPUS
640 North 1st Avenue
Phoenix, AZ 85003

GO FAR, CLOSE TO HOME
phoenixcollege.edu

A Maricopa Community College



DR. ANNA SOLLEY
OFFICE OF THE PRESIDENT

VIA HANDDELIVERY

December 9, 2010

Dr. Cleopatria Martinez
Mathematics Faculty Member
Phoenix College

Dear Dr. Martinez,

During the spring semester of 2010, I initiated an administrative evaluation based on Mr. Joe Sueyoshi's complaint, pursuant to section 3.7 of the Residential Faculty Policies Manual. By agreement, the Evaluation Team did not undertake its task until this fall semester.

I have reviewed the report of the Evaluation Team that was sent to me on November 17, 2010. The Evaluation Team which was advised by expert counsel, found that your work violated copyright. In addition, the Evaluation Team found that you were insubordinate and failed to follow District Legal Counsel's and my instructions and continued to request and persist in printing or copying unauthorized materials. The Evaluation Team agreed "that the administration should take appropriate disciplinary action following district policies in regards to this matter."

I have also considered our experiences under the current temporary arrangement in which Mr. Sueyoshi reviews materials you submit and may approve copying if they appear to be free of copyright and attribution problems. Given the Evaluation Team's findings and my lack of confidence in your willingness to follow the law as well as Maricopa policies and procedures due to your repeated copyright violations, I no longer consider the arrangement to be sufficient to protect the institution's legal and financial interests.

Pursuant to section 3.7.4 of the RFP, I now direct you to use only course materials approved by the department, that are available in the bookstore for sale to the students and that are authored by persons other than yourself. With department chair and Vice President for Academic Affairs approval, you may customize these materials for your students using traditional course packs or new online programs such as McGraw-Hill's "Create" (http://create.mcgraw-hill.com/createonline/index.html#) or McMillan's "Dynamic Books" (http://dynamicbooks.vitalbook.com/). All materials you use must be clearly attributed to authors other than yourself, and you must produce evidence of purchase or the author's permission to use them (e.g., a copy of the letter giving you a courtesy copy of the instructor's edition). If you wish to make copies of or from these materials, you must first produce written permission from the author and/or publisher to Mr. Sueyoshi. In addition, requests for the copying of these materials or your syllabi and quizzes/tests must be submitted in a timely manner (minimum of two work days notice) to Mr. Sueyoshi for approval.

SO FAR, CLOSE TO HOME
phoenixcollege.edu

Dr. Cleopatria Martinez
December 9, 2010
Page 2

This direction is intended to communicate job duties to you within the meaning of Governing Board employment standard A4.3. In accordance with that section of the All Employee Policy Manual, willful and intentional violation of these instructions will be considered grounds for disciplinary action, up to and including termination of your employment.

Sincerely,

Anna Solley, Ed.D.
President

cc: Mr. Lee Combs
Ms. Casandra Kakar
Mr. Joe Sueyoshi

EXHIBIT 54

Edmundo P. Robaina (018125)
Thomas T. Griffin (No. 022475)
ROBAINA & KRESIN PLLC
5343 North 16th Street, Suite 200
Phoenix, Arizona 85016
Telephone: (602) 682-6450
Facsimile:  (602) 682-6455
epr@robainalaw.com
ttg@robainalaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Cleopatria Martinez, | No. CV 15-01759 NVW |
| Plaintiff, | |
| vs. | **PLAINTIFF'S ANSWERS TO DEFENDANTS' FIRST REQUESTS FOR ADMISSION TO PLAINTIFF** |
| Maricopa County Community College District, a political subdivision of the State, and Rufus Glasper and Debra Glasper, husband and wife, | |
| Defendants. | |

Pursuant to Arizona Rule of Civil Procedure 34, Plaintiff Cleopatria Martinez hereby submits her Responses to Defendants Requests for Admissions, as follows:

**PREFATORY STATEMENT**

Plaintiff and her attorneys have not completed investigation of the facts relating to this case and have not completed discovery in this action.  All of the responses contained herein are based solely upon information presently available to and specifically known by Plaintiff and her attorneys at this time.

The following responses to Defendants' Requests for Admission to Plaintiff are given without prejudice to Plaintiff's right to produce witnesses and evidence, the significance of which are only subsequently discovered or discerned.  Plaintiff therefore reserves the right to modify any or all responses made herein as additional facts are obtained, analyses are made, legal research is completed and contentions are developed.

1  Thus, the responses contained herein are made in a good faith effort to supply such

2  factual information as is presently known, but should in no way be interpreted to

3  prejudice Plaintiff's rights in relation to future discovery, research, or analysis.

4      Plaintiff will supplement or amend these responses, as required by Arizona Rules

5  of Civil Procedure, to reflect witnesses, facts or evidence ascertained following service

6  of these responses.  In addition, because some of the information used to respond to

7  these requests may have been ascertained by Plaintiff's counsel, Plaintiff may not have

8  personal knowledge of the information upon which those responses are based.

9      Further, the inadvertent disclosure of privileged information or release of

10  privileged documents shall not constitute a waiver of any applicable privilege.  Plaintiff

11  further refers Defendants to Plaintiff's initial disclosure statement and documents

12  produced therein.

13                          **REQUESTS FOR ADMISSION**

14  **REQUEST FOR ADMISSION NO. 1:**  Admit that you were represented by attorney

15  Stephen Montoya at the November 18, 2013 Hearing Committee.

16  **RESPONSE:**

17      Admit __**x**__      Deny _____

18

19  **REQUEST FOR ADMISSION NO. 2:**   Admit that attorney Stephen Montoya

20  appeared before the MCCCD Governing Board on March 25, 2014 and spoke on your

21  behalf.

22  **RESPONSE:**

23      Admit _____      Deny __**x**__

24      **Plaintiff objects to this Request because the meanings of "appeared" and**

25  **"spoke on your behalf" are vague and subject to more than one meaning. Mr.**

26  **Montoya did not "appear" at the March 25, 2014 MCCCD Governing Board**

27  **meeting as an attorney would appear before a deciding body in an administrative**

28  **matter.  Nor did he state that he was there to represent Dr. Martinez.  In fact, he**

1  never mentioned Dr. Martinez during his brief presentation.   Instead, Mr.

2  Montoya spoke in generalities as a "concerned citizen" during the maximum 5

3  minute "Citizen's Interim."   See Exhibit A to Defendant's First Request for

4  Admission.

5

6  **REQUEST FOR ADMISSION NO. 3:**  Admit that you appeared before the MCCCD

7  Governing Board on March 25, 2014.

8  **RESPONSE:**

9        Admit __**x**__        Deny _____

10        **Plaintiff objects to this Request because the meaning of "appeared" is vague**

11  **and subject to more than one meaning.  Dr. Martinez did not represent herself at**

12  **the March 25, 2014 MCCCD Governing Board meeting as an employee before a**

13  **body deciding an administrative matter.   Instead, she only spoke during the**

14  **maximum 5 minute "Citizen's Interim."   See Exhibit A to Defendant's First**

15  **Request for Admission.**

16

17  **REQUEST FOR ADMISSION NO. 4:**   Admit that a true and correct excerpted

18  transcript of what you and Mr. Montoya said to the MCCCD Governing Board on

19  March 25, 2014 is attached hereto as **Exhibit A.**

20  **RESPONSE:**

21        Admit __**x**__        Deny _____

22        **Plaintiff cannot vouch for the accuracy of the transcript; Plaintiff has no**

23  **particular reason to doubt at this time that it is generally correct.**

24

25  **REQUEST FOR ADMISSION NO. 5:**  Admit that Dr. Charles Townzel appeared

26  before the MCCCD Governing Board on May 27, 2014 and spoke on your behalf.

27  **RESPONSE:**

28        Admit _____        Deny __**x**__

3

1       Plaintiff objects to this Request because the meanings of "appeared" and
2   "spoke on your behalf" are vague and subject to more than one meaning.   Dr.
3   Charles Townsel of the NAACP, who was not a lawyer and did not represent Dr.
4   Martinez, spoke at the May 27, 2014 Governing Board meeting during the
5   maximum 5 minute "Citizens' Interim" regarding, among other things, his
6   concern regarding Dr. Martinez's situation.   See Exhibit B to Defendant's First
7   Request for Admission.

8

9   **REQUEST FOR ADMISSION NO. 6:**   Admit that a true and correct excerpted
10  transcript of what Dr. Townzel said to the MCCCD Governing Board on May 27, 2014
11  is attached hereto as **Exhibit B.**
12  **RESPONSE:**
13      Admit __x____      Deny _____
14      Plaintiff cannot vouch for the accuracy of the transcript, but Plaintiff has no
15  particular reason to doubt at this time that it is generally correct.

16

17  **REQUEST FOR ADMISSION NO. 7:**  Admit that you appeared before the MCCCD
18  Governing Board on October 28, 2014.
19  **RESPONSE:**
20      Admit __x____      Deny _____
21      Plaintiff objects because the meaning of "appeared" is vague and subject to
22  more than one meaning.   Dr. Martinez did not represent herself at the March 25,
23  2014 MCCCD Governing Board meeting as an employee before a body deciding an
24  administrative matter.   Instead, she only spoke during the maximum 5 minute
25  "Citizen's Interim".   See Exhibit C to Defendant's First Request for Admission.

26

27  **REQUEST FOR ADMISSION NO. 8:**   Admit that Dr. Charles Townzel appeared
28  before the MCCCD Governing Board on October 28, 2014 and spoke on your behalf.

1  **RESPONSE:**

2      Admit _____   Deny ___x___

3      **Plaintiff objects to this Request because the meanings of "appeared" and**

4  **"spoke on your behalf" are vague.  Dr. Charles Townsel of the NAACP, who was**

5  **not a lawyer and did not represent Dr. Martinez, spoke at the October 28, 2014**

6  **Governing Board meeting during the maximum 5 minute "Citizens' Interim"**

7  **regarding, among other things, his concern regarding Dr. Martinez's situation. See**

8  **Exhibit C to Defendant's First Request for Admission.**

9

10  **REQUEST FOR ADMISSION NO. 9:**   Admit that a true and correct excerpted

11  transcript of what you and Dr. Townzel said to the MCCCD Governing Board on

12  October 28, 2014 is attached hereto as **Exhibit C.**

13  **RESPONSE:**

14      Admit ___x___   Deny _____

15      **Plaintiff cannot vouch for the accuracy of the transcript but Plaintiff has no**

16  **particular reason to doubt at this time that it is generally correct.**

17

18      Dated this 26th day of May 2016.

19                              ROBAINA & KRESIN PLLC

20                              By

21                                  Edmundo Robaina
                                    Thomas Griffin
22
                                    Attorneys for Plaintiff
23

24

25

26

27

28

                                    5

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of May 2016, the forgoing document was sent by U. S. Mail to:

Pavneet Singh Uppal
Shayna H. Balch
FISHER & PHILLIPS LLP
201 East Washington Street, Suite 1450
Phoenix, Arizona 85004-2330
puppal@laborlawyers.com
sbalch@laborlawyers.com

Attorneys for Defendants

By *Gaynell Carpenter*