# Exhibit A

**Subject:**    FW: Dr. Cleopatria Martinez
**Attachments:**   Martinez Recommendation Mr Saar-Gov Board 2-10-14 .pdf; Martinez - Intent to
         Dismiss Ltr 8-9-13.pdf; Martinez - Statement of Charges - ASolley - 8-9-13.pdf; Martinez
         - Hearing Committee Findings 12-9-13.pdf

**From:** Linda Back [mailto:linda.back@domail.maricopa.edu]
**Sent:** Monday, February 10, 2014 11:09 AM
**To:** Dana Saar <dana.saar@domail.maricopa.edu>
**Cc:** Randolph Lumm <randolph.lumm@domail.maricopa.edu>; Doyle Burke <doyle.burke@domail.maricopa.edu>;
Debra Brimhall Pearson <debra.pearson@domail.maricopa.edu>; Alfredo Gutierrez
<alfredo.gutierrez@domail.maricopa.edu>; Jim Bowers <james.bowers@domail.maricopa.edu>; Anna Solley
<anna.solley@phoenixcollege.edu>; Uppal, Pavneet <puppal@laborlawyers.com>; stephen@montoyalawgroup.com;
Rufus Glasper <r.glasper@domail.maricopa.edu>
**Subject:** Dr. Cleopatria Martinez

On behalf of Chancellor Rufus Glasper, please find attached the Recommendation to adopt hearing committee's
recommendation regarding dismissal, Dr. Cleopatria Martinez.  You will also find attached three additional
documents referenced in the recommendation.

Thank you.

--

  **Linda Back**: Assistant to the Chancellor

  Maricopa Community Colleges

  2411 West 14th Street, Tempe AZ 85281
  phone | 480-731-8108 • fax | 480-731-8120
  email | linda.back@domail.maricopa.edu
  website | www.maricopa.edu



**MARICOPA COMMUNITY COLLEGES**
**OFFICE OF THE CHANCELLOR**

---

**M E M O R A N D U M**

**DATE:**      February 10, 2014

**TO:**         Dana Saar, President
               MCCCD Governing Board

**FROM:**     Rufus Glasper

**SUBJECT:**   **Recommendation to adopt hearing committee's recommendation**
               **regarding dismissal, Dr. Cleopatria Martinez**

On August 9, 2013, I notified Dr. Cleopatria Martinez, in writing that I intended to
recommend to the MCCCD Governing Board that she be dismissed from her position as
Mathematics Faculty at Phoenix College (copy attached). This recommendation was based on
a statement of charges against Dr. Martinez prepared by Dr. Anna Solley, President of
Phoenix College, and reviewed and forwarded to me by James N. Bowers, Interim Vice
Chancellor for Human Resources (copy attached).

Pursuant to Section 3.15.3 of the RFP Policy Manual, Dr. Martinez invoked her right to a
hearing on her dismissal. This hearing was held on November 18, 2013 pursuant to section
3.15.2 – 3.15.7 of the RFP Policy Manual.

I received the Hearing Committee's Summary of Evidence, Findings of Fact, Conclusions of
Law and Recommendation on December 9, 2013. I was unable to schedule a meeting with the
hearing committee because of the winter break, and the parties graciously extended the time
for my decision to permit me this opportunity. On January 23, 2014, pursuant to section
3.15.8 of the RFP Policy Manual, I met with the Hearing Committee to clarify questions I had
concerning their recommendations.

Now, as required by section 3.15.8 of the RFP Policy Manual, I am providing the Governing
Board with my recommendation regarding dismissal along with the Summary of the Evidence
and a copy of the Findings of Fact, Conclusions of Law and final recommendations of the
Hearing Committee.

Page 2

Based on all of the information referred to above and attached hereto, I accept the written recommendation of the committee that Dr. Martinez NOT be dismissed. After consulting with the committee I have determined that a lesser sanction authorized by the RFP and within my sole discretion as Chancellor is appropriate and warranted.

Attachments

cc:   MCCCD Governing Board Members
      Mr. Jim Bowers
      Dr. Anna Solley
      Mr. Pavneet Uppal
      Mr. Steve Montoya



MARICOPA
COMMUNITY
COLLEGES®

Rufus Glasper
Chancellor

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8100 • F 480.731.8120 • r.glasper@domail.maricopa.edu

August 9, 2013

Cleopatria Martinez
7030 N. 21st Street
Phoenix, AZ  85020

Re:  Intent to dismiss you from your employment

Dear Dr. Martinez:

Dr. Anna Solley, President of Phoenix College (PC) has forwarded a statement of charges to James Bowers, Interim Vice Chancellor for Human Resources. Mr. Bowers has reviewed the charges, in consultation with the MCCCD Legal Office, and recommended to me that there exists prima facie cause for your dismissal from your position as Mathematics Faculty at Phoenix College (see attached). I concur with his recommendation. The recommended effective date of your involuntary termination is September 24, 2013.

Maricopa County Community College District Administrative Regulation 6.7 states that violation of any of its Employment Standards "constitutes grounds for disciplinary action, up to and including termination of any Maricopa County Community College District (MCCCD) employee as outlined by the respective policy manuals".

Pursuant to Section 3.15.3 of the RFP Policy Manual, you may invoke your right to a hearing by filing a written request with Interim Vice Chancellor James Bowers within five (5) business days after being served with this notice of intent to dismiss you from your employment.

Sincerely,

Rufus Glasper, Ph.D., CPA
Chancellor


Cc:    MCCCD Governing Board
        Dr. Anna Solley
        Mr. Jim Bowers

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert  I  Estrella Mountain  I  GateWay  I  Glendale  I  Mesa  I  Paradise Valley  I  Phoenix
Rio Salado  I  Scottsdale  I  South Mountain  I  Maricopa Skill Center  I  SouthWest Skill Center

MARICOPA
COMMUNITY
COLLEGES® | Vice Chancellor
Human Resources

2411 W. 14th Street, Tempe, Arizona 85281-6942 • T 480.731.8103 • F 480.731.8120 • www.maricopa.edu

August 9, 2013

Dear Dr. Glasper:

The following statement of charges against Dr. Cleopatria Martinez was forwarded to me by Dr. Anna Solley, President, Phoenix College.  Pursuant to 3.15.1 of the Residential Faculty Policy (RFP), I have reviewed the charges, in consultation with the MCCCD Legal Office, and recommend to you that there exists prima facie cause for the dismissal of Dr. Cleopatria Martinez.

Sincerely,

James Bowers, J.D.
Interim Vice Chancellor for Human Resources

## Statement of Charges

- Violation of Administrative Regulation 6.7.1 - "Willful and intentional violation of any state or federal law, applicable ordinance, MCCCD Governing Board policy, or MCCCD administrative regulation that affects the employee's ability to perform his or her job", specifically:

  - Violation of MCCCD's cash handling rules as covered by MCCCD Administrative Regulations 1.17

- Violation of Residential Faculty Policy Manual 3.2.4 - "A Faculty member shall not have any financial interest in or receive compensation from the sale of any unpublished instructional materials required or suggested for a class that the Faculty member teaches."

- Violation of U.S. Copyright Law and fair use guidelines, and MCCCD Administrative Regulations 3.2.4 and 3.2.5 regarding copyright regulations:

  3.2.4 Employees are prohibited from copying materials not specifically allowed by the (1) copyright Law, (2) fair use guidelines, (3) Licenses or contractual agreements, or (4) other permission.

  3.2.5 The Governing Board disapproves of unauthorized duplication in any form. Employees who willfully disregard this Board policy and/or the aforementioned copyright guidelines do so at their own risk and assume all liability for their actions.

*Ten colleges and two skill centers dedicated to student success.*

Chandler-Gilbert I Estrella Mountain I GateWay I Glendale I Mesa I Paradise Valley I Phoenix
Rio Salado I Scottsdale I South Mountain I Maricopa Skill Center I SouthWest Skill Center

- Violation of Administrative Regulation 6.7.3 - "Willful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment", specifically, repeated failure to follow instructions regarding printing/copying of unauthorized materials, failure to use only approved course materials, unauthorized copying and sale of course materials, failure to reimburse students for the materials you wrongfully charged them for, and failure to meet the deadline to provide copies of any reimbursement checks to students.

Brief Timeline:

- January 2010 - College Vice Presidents Ronnie Elliott, Paul DeRose and Cassandra Kakar; along with Maggie McConnell; Assistant General Counsel, reviewed the requirements of AR 3.2 with you at length.
- April 2, 2010 --Anna Solley, Phoenix College President, notified you that your copying privileges at the Phoenix College IKON Copy Center were suspended.
- Spring 2010 -- An Administrative Evaluation was initiated based on Mr. Joe Sueyoshi's complaint. By agreement, the Evaluation Team did not undertake its task until the fall semester. The findings and recommendations were submitted to Dr. Solley on November 17, 2010. The overall findings included:
  - o Copyright and plagiarism: Dr. Martinez was notified in writing and in meetings of MCCCD's and Phoenix College's concerns regarding her course materials violating copyright, fair use, and plagiarism laws.
  - o Insubordination: Dr. Martinez failed to follow Dr. Solley's and MCCCD's Legal Counsel's directives - specifically, she repeatedly requested copies, copied and printed unauthorized materials.
- December 9, 2010 -- Dr. Solley administered an Initial Corrective Action to you for insubordination and failure to follow instructions regarding printing or copying of unauthorized materials.
- August 21-23, 2012 - You told your MAT 091 and MAT 151 students not to buy the approved text that you listed on the syllabus. Instead, you made copies of a colleague's materials and sold them to your students for $11 each.
- October 18, 2012 -- A Second Corrective Action for insubordination and unauthorized copying and sale of course materials was administered to you by Dr. Solley. Included in the corrective action was the following directive: "Because you imposed charges on your students without authority to do so, you have the responsibility to reimburse the students from your own funds. You are hereby directed to do so by personal check, beginning immediately and continuing until all students who paid you are reimbursed."
- January 11, 2013 -- Upon discovering that the students who bought your unauthorized course materials had yet to be reimbursed, Casandra Kakar directed you, via email, to provide her, by January 18, 2013, with front and back copies of all cashed personal reimbursement checks to your students.
- January 18, 2013 - You failed to provide Dr. Kakar with copies of any reimbursement checks and neglected to contact her regarding the money you still owe the students.
- February 21, 2013 -- A student turned in the MAT091 materials which you left in room B210. Timothy Bryan, Mathematics Faculty, has previously told you that you do not have permission to use his materials again.

BEFORE THE GOVERNING BOARD OF THE
MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT

| | |
|---|---|
| MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT, | ) ) ) |
| v. | HEARING COMMITTEE |
| DR. CLEOPATRIA MARTINEZ | ) ) ) ) ) FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION |

Pursuant to the October 16, 2013 Scheduling Order, having reviewed all of the parties' pleadings and exhibits and conducting a hearing on November 18, 2013, the Hearing Committee (by majority vote) hereby submits the following Findings of Fact, Conclusions of Law and Recommendation.

## FINDINGS OF FACT

1.      After having taught mathematics full-time for ten years at Denver Community College, Dr. Cleopatria Martinez moved to Arizona and started teaching mathematics full-time at Scottsdale Community College on January 1, 1985.

2.      Dr. Martinez voluntarily transferred to Phoenix College ("PC") in 1995 and has been teaching mathematics there full-time ever since.

3.      Dr. Martinez elected to voluntarily transfer to PC because there were very few minority students attending Scottsdale Community College, and she wanted to use her bilingual education skills in the mathematics classroom to better educate the large number of minority students attending PC.

4.      Dr. Martinez was elected by her colleagues to serve as the Chairperson of the Mathematics Department of PC from 2002 to 2005.

5.      In early 2010, PC discovered that Dr. Cleopatria Martinez may have exposed MCCCD to potential liability for copyright infringement.

6.      Dr. Martinez testified that, during her twenty-eight years of teaching mathematics in the MCCCD system, she and her colleagues in the Mathematics Departments of both Scottsdale Community College and PC routinely borrowed mathematics problems from other mathematicians to use in their student handouts for educational purposes on a not for profit basis.

7.      Dr. Martinez testified, without rebuttal, that this borrowing of mathematics problems is a longstanding, widespread custom throughout the District and academia at large.

8.      Instead of requiring her mathematics students to purchase textbooks, Dr. Martinez prepared her own course materials which she called her "Lecture Notes" and distributed them to

her students. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 77:17-78:15, 106:16-108:16, 121:25-140:13, 132:16-137:25).

9.   Dr. Martinez read the Copyright Act of 1976 and believed that it authorized her to use small portions of other scholars' work under the "Fair Use" doctrine because she was using it only for classroom teaching purposes on a not for profit basis and her use of the material did not undermine the potential market for the other scholar's work.

10.   Per the "Fair Use" doctrine of the Copyright Act, the "use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107.

11.   Dr. Martinez copied problems from copyright protected textbooks and inserted them into her course materials. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 106:16-108:16).

12.   Dr. Martinez, in her Basic Arithmetic (MAT082) course, copied problems directly from a copyrighted textbook entitled "Basic Mathematics" and inserted them into her "MAT 082 Basic Arithmetic Spring 2010" course materials which she distributed to students. MCCCD Exhibit List # 20 (Full-Sized Excerpted Comparison). She did not seek or obtain permission from the copyright holder.

13.   Dr. Martinez also copied problems directly from the Sullivan & Sullivan "Precalculus" textbook and inserted them into her "MAT182 Trigonometry Spring 2010" course materials. MCCCD Exhibit List # 22 (Full-Sized Excerpted Comparison). She did not seek or obtain permission from the copyright holder.

14.   Dr. Martinez did not require her students to purchase textbooks in her Spring MAT082 Course. MCCCD Exhibit List # 18 (email from Dr. Martinez stating "I indicated in my syllabus that, instead of a published textbook, I was using lecture notes in my MAT082 class.")

15.   Dr. Martinez did not require her students to purchase textbooks in her Spring MAT182 Course. *See* Dr. Martinez's hearing testimony (conceding that students were not required to purchase a textbook in her Spring 2010 MAT182 course).

16.   On or around January 12, 2010, MCCCD's Vice President of Academic Services, Ronnie Elliot, sent Dr. Martinez an email notifying her that there were alleged copyright related problems with the materials she had printed for the Fall 2009 and Spring 2010 semesters. MCCCD Exhibit List # 23 (January 12, 2010 email). The materials in question were packets of course materials for Dr. Martinez's MAT182 and MAT187 courses and contained mathematics problems and graphs that were taken from copyrighted textbooks. MCCCD Exhibit List # 11 (Ronnie Elliot Declaration, ¶¶8-9); MCCCD Exhibit List # 16 (MAT182 course packet); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memorandum).

17.   Dr. Martinez used three of the four packets of "lecture notes" in the Spring of 2010 in two pre-calculus classes. See District Exhibit 6, parts 1-3.

18.    The MCCCD administration, following Vice President Elliot's email, repeatedly explained its copyright concerns to Dr. Martinez and asked Dr. Martinez to remove any copyright protected mathematics problems from her materials. See Kakar Hearing Testimony.

19.    On January 26, 2010, Vice President Elliot sent Dr. Martinez an email outlining MCCCD's concerns regarding Dr. Martinez's potential copyright infringement.    MCCCD Exhibit List # 24 (January 26, 2010 email).

20.    On January 28, 2010, MCCCD in-house-counsel Margaret McConnell discussed copyright compliance with Dr. Martinez telephonically.  MCCCD Exhibit List # 25 (January 28, 2010 email).

21.    Dr. Martinez did not benefit from the multiple MCCCD copyright information sessions noted above.

22.    PC's own expert witness, Sean Garrison, testified that under the "Fair Use" doctrine, someone could lawfully copy from a copyrighted textbook without either using or purchasing the textbook.

23.    On February 5, 2010, Vice President of Academic Affairs Casandra Kakar, Interim Vice President of Administrative Services Paul DeRose, and Dr. Martinez met to discuss Dr. Martinez's alleged misuse of copyrighted materials.  MCCCD Exhibit List # 26 (February 12, 2010 email).

24.    Dr. Martinez has not used any of the four sets of "lecture notes" since the Spring of 2010 when PC first raised its concerns regarding the notes.

25.    On April 15, 2010, PC Librarian Ann Roselle conducted a personalized one-on-one copyright training session with Dr. Martinez.  MCCCD Exhibit List # 28 (Copyright PowerPoint Presentation). See also, Kakar Hearing Testimony.

26.    When Dr. Martinez met with the librarian, the librarian told Dr. Martinez that Dr. Martinez knew as much about copyright law as she did. See Martinez Hearing Testimony.

27.    Following the revocation of Dr. Martinez's copying privileges, Dr. Martinez was required to submit her copy requests to Mathematics Department Chairperson Mr. Sueyoshi so that Mr. Sueyoshi could review her materials for possible copyright violations prior to copying and distribution to students.  MCCCD Exhibit List # 8 (April 2, 2010 Directive).

28.    Dr. Martinez sought and obtained a form of written permission from the publisher of the textbook, Sullivan & Sullivan's "Precalculus," to copy materials from their book after PC accused her of violating copyright law.

29.    On or around April 19, 2010, Dr. Martinez attempted to bypass the copying restrictions by having an adjunct mathematics Professor, Johnny Santellan, make 24 sets of copies of her "Lecture Notes" for distribution to her mathematics students without obtaining prior approval from the Mathematics Department Chairperson.  MCCCD Exhibit List # 12 (Sueyoshi Decl., ¶9); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 223:11-224:21).

30.   Because Dr. Martinez did not feel she was able to obtain reliable guidance regarding copyright compliance from the District, she sought advice from a private intellectual property attorney regarding the issue, Mr. Frederic Bellamy.

31.   Mr. Bellamy reviewed the first two sets of Dr. Martinez's "lecture notes" and concluded that they did not violate copyright law because they fell under the "Fair Use" doctrine.

32.   Mr. Bellamy based his conclusion that Dr. Martinez did not violate copyright law on the opinion that the portion of material that Dr. Martinez copied from the Sullivan & Sullivan Precalculus textbook was very small, that she used the copied materials exclusively for educational purposes without any profit motive, that the content of the copied material consisted of mathematics problems that are arguably not subject to copyright in the first place, and that the small portion of the textbook that Dr. Martinez copied did not adversely impact the potential market for the textbook.

33.   At the hearing, another lawyer practicing in the area of intellectual property law, Sean Garrison, testified on behalf of PC. In contrast to Mr. Bellamy, Mr. Garrison testified at the hearing that the first three sets of Dr. Martinez's lecture notes violated copyright law.

34.   In contrast to his testimony at the hearing of November 18, 2013, in his written report Mr. Garrison concluded only that the first three sets of Dr. Martinez's lecture notes subjected the District "to a serious risk of a copyright infringement claim." See District Exhibit 6, p. 0002.

35.   MCCCD invited Dr. Martinez to a copyright workshop that was held on March 1, 2010 at PC. Dr. Martinez chose not to attend the workshop. MCCCD Exhibit List # 10 (Solley Decl., ¶11).

36.   PC President Anna Solley, on December 9, 2010, concluded that Dr. Martinez's alleged misconduct posed an unacceptable legal risk of a copyright infringement claim and imposed restrictions on Dr. Martinez's photocopying privileges. MCCCD Exhibit List # 10 (Solley Decl., ¶12).

37.   MCCCD sought a legal opinion from an outside copyright expert, attorney Sean Garrison. MCCCD Exhibit List # 10 (Solley Decl., ¶ 14); MCCCD Exhibit List # 7 (Sean Garrison October 28, 2010 Memo).

38.   According to Mr. Garrison, the third set of "lecture notes" appeared to have 13 mathematics problems copied from two other mathematics textbooks.

39.   Mr. Garrison testified that he was certain that Dr. Martinez has committed copyright infringement. See Garrison Hearing Testimony. In reaching this conclusion, Mr. Garrison reviewed thousands of pages of materials including nearly 300 pages of Dr. Martinez's lecture notes and three separate copyrighted mathematics textbooks. MCCCD Exhibit List # 6 (Sean Garrison April 19, 2013 Report); see also Garrison Hearing Testimony.

40.   In reliance upon Mr. Garrison's recommendations, PC President Anna Solley issued a December 9, 2010 directive that imposed further restrictions on Dr. Martinez's copying

privileges. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 10 (Solley Decl., ¶15).

41.    The December 9, 2010 Directive prohibited Dr. Martinez from utilizing any course materials of her own creation. MCCCD Exhibit List # 9 (December 9, 2010 Directive). Instead, Dr. Martinez was required to only use course materials that are "approved by the mathematics department" or that are "available in the bookstore for sale to students and that are authored by persons other than [Dr. Martinez]." MCCCD Exhibit List # 9 (December 9, 2010 Directive).

42.    The December 9, 2010 Directive further required Dr. Martinez to submit her photocopy requests to the Mathematics Department Chair for his approval. MCCCD Exhibit List # 9 (December 9, 2010 Directive).

43.    Despite MCCCD's frequent discussions with Dr. Martinez regarding the importance of complying with copyright laws and the December 9, 2010 Directive, Dr. Martinez continued to attempt to ignore the directive. See Kakar Hearing Testimony.

44.    At the beginning of the Fall 2012 semester (on or about August 21-23, 2012), Dr. Martinez informed her students that they were not required to purchase a course textbook and that she would provide them with her own course materials in lieu of a textbook. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21.

45.    In fall of 2012, Dr. Martinez sought to have her lecture notes photocopied off campus at a nearby Staples store. This practice is inconsistent with the December 9, 2010 Directive. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

46.    Dr. Martinez did not submit her Fall 2012 materials to Mathematics Department Chairperson Mr. Sueyoshi for approval. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

47.    Dr. Martinez made copies of her course materials at an off-campus Staples store and distributed them to students for $11 per copy. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

48.    The $11 course material fee was paid directly to Dr. Martinez by students. MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

49.    PC accused Dr. Martinez of violating the District's "cash handling" rules by distributing these course materials to her students if the students reimbursed her for her out-of-pocket copying costs.

50.    PC subsequently claimed that Dr. Martinez violated the District's "cash handling" policies by seeking reimbursement for the copies.

51.    MCCCD's policies prohibit instructors from having "any financial interest in or receiv[ing] compensation from the sale of any unpublished instructional materials required or

suggested for a class that the instructor teaches." MCCCD Exhibit List # 41 (Residential Faculty Policies, 3.2.4).).

52. Dr. Martinez failed to follow the protocol set forth in the December 9, 2010 Directive in copying her Fall 2012 course materials. MCCCD Exhibit List # 9 (December 9, 2010 Directive); MCCCD Exhibit List # 4-5 (Martinez Depo., pp. 232:19-233:21).

53. Dr. Martinez distributed course materials directly to students in her Fall 2012 MAT151 class. MCCCD Exhibit List # 4-5 (Martinez Depo. pp. 232:19-233:21).

54. The MCCCD Administration learned of Dr. Martinez's unauthorized distribution of course materials to students after one of Dr. Martinez's MAT151 students complained to Mathematics Department Chairperson Mr. Sueyoshi. The student complained that Dr. Martinez refused to provide her with a receipt for the purchased course materials. See Kakar Hearing Testimony.

55. Upon learning that Dr. Martinez had distributed course materials to students allegedly in violation of MCCCD's cash handling policy, President Solley instructed Martinez to immediately issue refunds to her students via personal check. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

56. On or around October 18, 2012, President Solley and Dr. Kakar met with Dr. Martinez to explain the seriousness of Dr. Martinez's alleged cash handling violation. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony. In addition, President Solley and Dr. Kakar prepared a written counseling memo dated October 18 2010 for Dr. Martinez regarding her alleged violation of cash handling rules. Dr. Martinez was provided with a copy of the October 18, 2010 counseling notice and President Solley proceeded to explain to Dr. Martinez the seriousness of the alleged cash handling violations and the requirement that Dr. Martinez issue reimbursements to her students. MCCCD Exhibit List # 3 (October 18, 2012 Counseling Notice); see also Kakar Hearing Testimony.

57. Several months later, on or around January 9, 2013, Dr. Kakar learned that most (if not all) students had not yet received refunds from the Dr. Martinez. MCCCD Exhibit List # 39 (various emails regarding student refunds). As a result, Dr. Kakar instructed Dr. Martinez to provide copies of refund checks by January 18, 2013. MCCCD Exhibit List # 39 (various emails regarding student refunds).

58. Dr. Martinez failed to produce a single refund check by the January 18, 2013 deadline. MCCCD Exhibit List # 39 (various emails regarding student refunds).

59. Dr. Martinez did not think that she had violated any District rule in reference to the copies. Therefore, she declined to follow the December 9, 2010 order because she believed she was not required to do so under any District rule.

60. At the November 18, 2013 hearing, Dr. Martinez did not provide any explanation for her refusal to comply with the October 18, 2012 and January 9, 2013 directives to issue refunds to her students. See Martinez Hearing Testimony.

61.     At the hearing Dr. Martinez testified that she had made a "mistake" and, in retrospect, should have complied with President Solley's instructions.  See Martinez Hearing Testimony.

62.     On or around August 9, 2013, MCCCD Chancellor Rufus Glasper sent Dr. Martinez a letter informing her that MCCCD was proceeding with termination proceedings. Included with this letter was a statement of charges that summarized the particular violations Dr. Martinez had been charged with (hereinafter referred to as "Statement of Charges.") MCCCD Exhibit List # 1 (Statement of Charges).

## CONCLUSIONS

63.     PC failed to carry its burden of proof relating to violation of MCCCD's cash handling rules found in MCCCD Administrative Regulations 1.17, violation of Residential Policy Manual 3.2.4 (relating to financial interests in unpublished materials), violation of U.S. Copyright Law and fair use guidelines, and violation of MCCCD Administrative Regulations 3.2.4 and 3.2.5 related to copyright regulations.

64.     Notwithstanding their education, their experience, and their good faith, Mr. Bellamy and Mr. Garrison disagreed as to whether or not Dr. Martinez violated copyright law. Therefore, it is inconclusive as to whether Dr. Martinez intentionally and/or inadvertently violated federal copyright law.

65.     It is inconclusive as to whether or not Dr. Martinez violated the "cash handling" policies of MCCCD.

66.     Dr. Martinez willfully and intentionally failed to follow instructions that were communicated to her when she failed to issue refunds to students as directed by President Solley.

67.     Dr. Martinez conceded that she never complied with President Solley's clear directive to issue refunds to her students. Although Dr. Martinez now regrets her decision not to comply with President Solley's directive, she has never claimed that she did not understand the instructions or that the instructions were beyond the scope of management's authority.  Viewed in light of these facts, Martinez's claim that she "made a mistake" is an admission of willful insubordination.

68.     By failing to comply with President Solley's directive to issue refunds to her students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.1 which prohibits the "[w]illful and intentional violation of any...MCCCD administrative regulation that affects the employee's ability to perform his or her job."

69.     By failing to comply with President Solley's directive to issue refunds to students, Dr. Martinez violated MCCCD Administrative Regulation 6.7.3 which prohibits the "[w]illful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment."

///

## RECOMMENDATION

70.   We hereby recommend that the Governing Board deny President Solley's termination request and allow Dr. Martinez to continue her MCCCD employment.

71.   Per MCCCD Administrative Regulation 6.7 indicating that violation of any Employment Standards "constitutes grounds for disciplinary action, *up to* [emphasis added] and including termination," we hereby recommend that the Governing Board retain Dr. Martinez.

It is ordered so, at Mesa, Arizona, this 9th day of December, 2013.

Dr. Keith Crudup
Chairperson
On Behalf of the Hearing Committee,
Dr. Nora Reyes and Dr. Carlos Caire

# Exhibit B

9316 E. Raintree Drive
Suite 130
Scottsdale, Arizona 85260

**C. BRADY WILSON, PH.D.**
PSYCHOLOGIST • CONSULTANT

Phone (480) 778-0202
FAX (480) 778-0204
drwilson@cbradywilsonphd.com

October 16, 2016

Ms. Shayna Balch
Fisher Phillips
201 E. Washington Street
Suite 1450
Phoenix, AZ 85004

<u>**Delivered Electronically**</u>

Re: Cleopatria Martinez v. Maricopa County Community College District

Dear Ms. Balch,

Late in July, you engaged me as an expert witness in the matter of Cleopatria Martinez v. Maricopa County Community College District (hereafter referred to as the District). Cleopatria Martinez had made a claim in her lawsuit of "damages for pain, suffering, humiliation, embarrassment, mental anguish, anxiety, and emotional distress in an amount to be proven at trial." Pursuant to her claim, you engaged me to assess her claims of mental anguish, anxiety and emotional distress.

The specific issue to be addressed was the subject's psychological status as it related to her claim of emotional distress. In this case Cleopatria Martinez refused to submit to an independent psychological examination. Therefore my assessment is limited to forensic review of existing records.

In cases where an individual is alleging emotional distress, an evaluation is indicated due to the possibility of any pre-existing conditions, pre-existing vulnerability, status at the time of employment, sequella of the alleged acts, current status, any relationship between historical factors and current status, and long term prognosis.

**Procedure:** The standard of care for a forensic examination requires an integration of information from a variety of sources and through a variety of assessment techniques in what forensic psychologists refer to as a multi-source, multi-method evaluation. The components of forensic evaluations typically include record review, objective psychological testing, face-to-face clinical interview of the examinee, and review of collateral sources as available to obtain additional information and to check for consistency with the information that has been provided in the interviews and the background records.

2

Confirmatory and discomfirmatory sources of information would include all relevant records such as those from educational and psychological institutions and providers, medical health care, employment records, deposition transcripts and law enforcement contacts.

In anticipation of the examination, I reviewed the following:

1.  Complaint filed by Cleopatria Martinez v. Maricopa County Community College District, including exhibits
2.  Memo from Steven Montoya to Fredric Bellamy
3.  Medical Records from Arizona Allergy Associates
4.  Medical Records from John C. Lincoln
5.  Medical Records from Dr. Marvin Pedick
6.  Medical Records from Dr. Robert Saide
7.  Medical Records from Dr. Jay Lewis
8.  Transcript of Administrative Hearing Committee of the Maricopa Community College District (re: Cleopatria Martinez)
9.  Deposition Transcript dated August 16, 2016, including exhibits
10. Deposition Transcript dated October 11, 2016

An independent psychological examination was scheduled for September 6, 2016. The examination was cancelled by the plaintiff at the last minute. Plaintiff waived her claims that she was depressed, suicidal or required medical treatment or medication for her alleged emotional distress that she attributes to the District.

**Qualifications of Examiner:**
I have added a copy of my curriculum vitae and testimonial history as attachments to this report, which sets forth my qualifications to perform this examination and render these opinions.

**Limitations:**
There are limitations to this report. It is limited to the extent that it is based upon my expertise in this field, my experience in treating and evaluating individuals who have made legal complaints against their employers, and a review of the records summarized above. In reviewing the records summarized above, I have come to a number of observations and opinions having completed a thorough forensic record review.

**Observations:**
In conducting a psychological examination, the examiner seeks to identify a coherent pattern of data that supports a psychological opinion. What I sought in conducting my record review was to identify such a pattern. A pattern did emerge as found in record review, and in my opinion, an analysis of these records and the recorded behavior does

WILSON 00002

3

not support Cleopatria Martinez's claim of emotional distress resulting from her employment with the District.

As evidenced in record review, Cleopatria Martinez is not a consistent or accurate historian. This leads to questions about her reliability. This observation is based upon the fact that on numerous occasions, Cleopatria Martinez contradicts herself as evidenced in record review.

In the John C. Lincoln records of May 8, 2014, she apparently denies any history of anxiety or depression. However, record review (See Dr. Jay Lewis) clearly indicates that there was a long standing history of depression and anxiety. In Dr. Saide's notes, she denies at one point any history of depression or anxiety, and at another point, asserts feelings of depression and anxiety.

In the administrative hearing on November 8, 2013, Cleopatria Martinez admits to making a mistake in not following President Solley's instructions. However, later in deposition, she changes her testimony, and asserts that she disagrees with the findings that she had made such a mistake. The observations noted above are not exhaustive of the discrepancies to Cleopatria Martinez' reports, but they are representative of her reports in these settings and are significant and relevant to her Complaint.

There is a pattern where Cleopatria Martinez misrepresents the opinions of others. When she was seen at John C. Lincoln for the transient global amnesia, her physicians were not able to identify any cause for the episode. However, when she presents the episode to Dr. Lewis on June 2, 2014, she erroneously reports to him that her physicians believed the episode to be caused by stress. She misrepresents the opinions of the physicians who treated her for the transient global amnesia in such a way that it supports her claim of emotional distress at the hands of the District.

Because my evaluation is conducted in the legal setting, malingering is a relevant issue. That an evaluation is conducted in the legal setting is not the only criteria to be assessed for malingering. Discrepancies in the plaintiff's presentation in medical records and her deposition are compared to the claims she is asserting in this case in order to assess malingering.

Though she has limited her claim of emotional distress, (please note above that plaintiff waived her claims that she was depressed, suicidal or required medical treatment or medication for her alleged emotional distress that she attributes to the District) in deposition she asserts that her physical problems (pulmonary embolism, transient global amnesia) were the result of the stress imposed upon her by the District. This assertion

is not credible.  It is without medical documentation or opinion, and misattributes the nexus between her physical status and her claim of emotional distress.

Cleopatria Martinez claims that any emotional distress she suffered is solely attributable to the District. This assertion is not credible.  Cleopatria Martinez has a well documented history of depression and anxiety.  At a minimum, this history constitutes a preexisting condition and vulnerability.  Any emotional distress that may exist at the present or at the time of Cleopatria Martinez's claim of emotional distress cannot be wholly attributable to any actions of the District.

In Cleopatria Martinez's report at deposition and in her medical record, I am able as an expert to identify a pattern of exaggeration and the mismanagement of information in attempts to present herself as considerably more disturbed than is the case.  These distortions are limited to critical symptoms, especially of her depression and suicidal episodes presented as solely attributable to the action of the District.  In other cases, Cleopatria Martinez is extreme in her fabrication or attribution of symptoms to the point that the presentation is fantastic or preposterous.

An example of Cleopatria Martinez's exaggeration of symptoms is her assertion (as noted above) that all of her distress is a result of the actions of the District.  This is not conceivable for the following reasons.  First, Cleopatria Martinez has a well documented history of depression.  This emotional history cannot be eliminated as one of the multiple competitive causal stresses in her life.  Among these stresses is a history of divorce, problems with her children, previous episodes of depression, unknown characterological issues, and a complex medical history of unknown origin.

Examples of potentially extreme fabrications are the attribution of all medical problems (pulmonary embolism, transient global amnesia) to the actions of the District. This attribution is made, as noted above, in the absence of any probative medical evidence. In her deposition, Cleopatria Martinez admitted that she had no medical evidence or other evidence that her pulmonary embolism or episode of transient global amnesia was caused by the District.  This is an example of Cleopatria Martinez exaggerating her claim of emotional distress and the global misattribution of all "bad things" in her life being the result of the action of the District.

The observations noted above are not exhaustive of the issues found in record review, but they are representative of her behavior in these settings and are significant and relevant to her Complaint.  This leads to the fact that there is significant evidence of malingering. My careful examination of records came in the medico-legal context, and there are marked discrepancies in Cleopatria Martinez's assertions and self-report.

WILSON 00004

In her deposition, when asked about the issue of her claim of emotional distress as found in her lawsuit, she deflects the questions and assigns the answer to her attorney or her physician or psychologist. Though her claim of emotional distress has been limited by her withdrawal of a claim that she was depressed, suicidal or required medical treatment or medication for her alleged emotional distress that she attributes to the District, it appears in her deposition that she is still making a claim of emotional distress and is trying to assert that any emotional distress that she experienced is wholly attributable to the actions of the District. As noted above, this is not credible.

There is a distinct pattern of responding to questions in deposition where Cleopatria presents with apparent command of facts when making assertions or answering questions which might support her lawsuit. On the other hand, there is a remarkable and consistent failure to address or answer questions where an answer might negatively reflect upon her character or the basis of her lawsuit.

**Opinion:**
The result of my record review is that there is a clear pattern where Cleopatria Martinez is "mismanaging information" in such a way as to support her claim. She will deny any history of depression or anxiety at times, but at other times, when asserting the issue of emotional distress, she will assert that she has suffered from both depression and anxiety. When asked about factual questions which support her lawsuit, she appears to have good command of the facts that support her claim. However, when asked questions that could lead to answers, which could either impeach her previous testimony, or perhaps reflect negatively upon her, she presents as having little command of the facts.

When her treating psychologist (Dr. Lewis) makes an appropriate observation of her subjective feeling of depression, she challenges Dr. Lewis and makes the assertion that she was helpless as a matter of fact. When Dr. Lewis inquires about her depression, she reacts in a defensive manner as if he is questioning the fact of her depression. In Dr. Lewis' notes and other medical records, her behavior as recorded in those records make it appear that Cleopatria Martinez is asserting the fact of her depression and helplessness. Instead of answering Dr. Lewis' questions to permit him to reach his own conclusion, she was insistent that she was depressed. Thus it appears that in her interaction with Dr. Lewis, she was not seeking his diagnosis or treatment, but rather was seeking his confirmation of her claims.

I took particular note that in deposition, Cleopatria Martinez demonstrates confusion, ignorance, or deflects responsibility (to her attorney or her physicians for example) when the question is directed to her and is one that any reasonable person can answer. I

WILSON 00005

6

concluded that this behavior was either the result of some brain trauma or dysfunction, or was a "feigned ineptitude," which functioned to shield her from providing answers to questions that might negatively reflect upon her. The medical record appears to make it clear that there is no brain injury or dysfunction. Further, Cleopatria Martinez has been engaged in work without limitations or restrictions since the fall of 2015. I concluded that there is no brain dysfunction as found in record review, and concluded that there is a pattern of "feigning ineptitude" in such a way that it shields her from answering difficult questions.

Cleopatria Martinez has a PhD and has taught Mathematics in colleges for years. It is not likely that she is confused by clear and articulate questions that are directed to her in deposition. It is not likely that questions are spoken in such as way as to be too long to be comprehensible. It is not likely that she has forgotten the names of all of her previous medical and mental health providers. It is not likely that she has forgotten the reasons why she has sought medical or psychological assistance in the past. The narrative that is generated here is simply not viable.

**Summary:**
Cleopatria Martinez does not present in her medical record as a reliable and accurate historian. She frequently contradicts herself in different venues of examination. She appears to "feign ineptitude" when required to answer a question where there is a possibility that an answer might negatively reflect upon her or her lawsuit. All data supports a pervasive pattern where Cleopatria Martinez is "mismanaging information" in such a way as to support her narrative of being harmed while in the employment of the District. There is significant evidence of malingering; a pattern of exaggeration and the mismanagement of information in attempts to present herself as considerably more disturbed than is the case. This pattern of dissimulation, contradiction, disinclination to candor, lack of reliability and misrepresentation support my opinion that, based upon forensic record review, Cleopatria Martinez is mismanaging information that relates to her lawsuit.

Respectfully submitted,

C. Brady Wilson, Ph.D.

C. Brady Wilson, Ph.D.
Arizona Psychologist 1213

WILSON 00006