**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cleopatria Martinez,<br><br>        Plaintiff,<br><br>   v.<br><br>Maricopa County Community College District, a political subdivision of the state, and Rufus Glasper and Debra Glasper, husband and wife,<br><br>        Defendants. | No. CV-15-01759-PHX-NVW<br><br>**ORDER** |

Before the Court are competing motions for summary judgment. (Doc. 69, 71.) For the reasons below, the Court will grant Defendants' motion and deny Plaintiff's.

**I.     SUMMARY JUDGMENT STANDARD**

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

It is the moving party's burden to show there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such a showing, however, the burden shifts to the non-moving party, who must then "set forth specific facts showing that there is a genuine issue for trial" without simply resting on the pleadings. *Anderson*, 477 U.S. at 256. To carry this burden, the nonmoving party must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* at 587. "A court must view the evidence 'in the light most favorable to the [non-moving] party.'" *Tolan v. Cotton*, — U.S. —, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).

## II. FACTUAL BACKGROUND

### A. Summary of Facts and Claims

Plaintiff Cleopatria Martinez ("Martinez") is a math instructor at Phoenix College, a school within the Maricopa County Community College District ("District"). She has over 30 years of service at the District and had reached "appointive" status, giving her a right to continuous employment. (Doc. 78 at ¶ 1, 14.)

High-level administrative officials brought termination proceedings against Martinez. Following the District's termination procedure, a Hearing Committee found, in part, that Martinez had committed insubordination by refusing a direct command to refund money to students whom she had charged for course materials. Nevertheless, the Hearing Committee recommended against termination in light of her 30 years' service. Chancellor Rufus Glasper ("Glasper") accepted the Hearing Committee's finding of misconduct and did not pursue termination any further, which would have required action by the Governing Board. He then commenced proceedings for the lesser sanction of suspension, which he imposed. Those proceedings did not require Board approval.

Martinez brought this 42 U.S.C. § 1983 damage action against the District and Glasper personally[1] for violation of due process of law in depriving her of property and liberty. (Doc. 14 at ¶¶ 93-109.) She has since conceded that there was no due process violation for deprivation of liberty. (Doc. 71 at 13.) She also seeks declaratory relief. (Doc. 14 at ¶¶ 110-17.) Both sides have moved for summary judgment on facts that are materially undisputed.

Martinez's exact claim is elusive. Her cause of action is 42 U.S.C § 1983. She attempts to plead only a claim for deprivation of property (her employment) without the federal constitutional minimums of fair and adequate procedure required by due process of law in the circumstances. It may seem strange and even bizarre that the District's rich and elaborate procedures for dismissal and suspension would nevertheless fall short of federal constitutional minimums of fairness. Indeed, the claim is bizarre. Martinez has raised no colorable federal claim of deprivation of property without due process of law.

At oral argument on October 30, 2017, Martinez conceded that she pleaded no state law cause of action. Nevertheless, her briefing argues that her one-year suspension was not authorized under the District procedures for suspension, which do not require Governing Board approval. Her one-year suspension, Martinez contends, could have been done only under the District procedures for termination, which *do* require Governing Board approval. She says the one-year suspension was the "economic equivalent" of termination and therefore available only under the procedures for termination. Thus, she contends, Glasper could suspend her only by disputing the Hearing Committee's recommendation that she not be terminated and recommending that she be suspended by the Governing Board in the termination proceedings. Whatever its merit, that is a contention of the meaning of state law.

---

[1] Defendants pleaded a qualified immunity defense. (Doc. 15 at 20, ¶ 2.) Martinez never challenged the qualified immunity defense in her motion for summary judgment. Glasper did not move for summary judgment on that defense either. The Court decides in favor of Defendant Glasper on the merits and does not reach the qualified immunity defense.

Even apart from Martinez's disavowal of any state law cause of action, if she did plead a state law claim, it too would be patently incorrect. The District fully complied with the District's procedures. District policies themselves sensibly distinguish between dismissal and suspension and outline different procedures and authority for each. Martinez received the benefit of both sets of procedures, though her actual discipline was suspension only. A one-year suspension is still a suspension. Indeed, the suspension expired 13 months later, and Martinez returned to work the next Fall semester. To say she was terminated though she returned to work proves only that paper will bear any words written upon it. There is no colorable state law claim here even if Martinez did attempt to plead such a claim.

### B. Martinez's Transgressions

Martinez did not require her students to purchase textbooks. Instead, she prepared her own materials, which she called lecture notes, to distribute to the students. (Doc. 73 at ¶ 7.) As part of these lecture notes, she would copy problems and diagrams from copyrighted sources. (*Id.* at ¶ 8.) She did not cite the sources when so copying. (*Id.*) Martinez believed that the education exception of the fair use doctrine protected her use of copyrighted materials. (Doc. 80 at 3, ¶ 9).

When district officials learned of this behavior, they disapproved. The District's Vice President of Academic Services emailed Martinez on January 12, 2010. He flagged the potential copyright problems with materials she had printed for the Fall 2009 and Spring 2010 semesters. He sent another email on January 26, 2010, and two days later, the District's in-house counsel talked with Martinez by phone. An in-person meeting with other administrators followed, as did a copyright training session with a librarian. (Doc. 73 at ¶ 10.)

The administration restricted Martinez's ability to use the college's copy center, requiring her to submit her requests to the department chair so he could screen the materials. (Doc. 73 at ¶ 11.) Martinez did not abide by this policy, printing materials without departmental approval. (*Id.* at ¶ 12.) This deprived the administration of its

independent confirmation that she was not continuing to use copyrighted material. Outside counsel informed the District that, in his opinion, Martinez's Fall 2010 lecture notes violated copyright law. (*Id.* at ¶ 13.) He said these violations could prove very costly—up to $150,000 each. (*Id.*) Consequently, on December 9, 2010, the administration further restricted Martinez's printing and copying privileges. She was now unable to use materials that she created and had to use only math-department-approved materials or those available for sale at the bookstore. (*Id.* at ¶ 14.)

Many months later, in August of 2012, Martinez photocopied materials at a local Staples store. (*Id.* at ¶ 15.) She used the materials as an alternative to a textbook. (*Id.*) She either "sold" the packets to the students for $11 (*id.*) or asked to be reimbursed for her expenses if the students did not copy the packets themselves (Doc. 80 at 5, ¶ 15).

On October 18, 2012, the President of Phoenix College required Martinez to reimburse, via personal check, any affected student. (Doc. 73 at ¶ 17.) The President found that Martinez had violated District policy, particularly Administrative Regulation 1.12, by transacting directly with students. (Doc. 73-2, Ex. 21.) Administrative Regulation 1.12 requires the Governing Board to approve changes to the budget and fees collected, which it had not done with respect to the money Martinez collected when she transacted directly with students. (*See id.* ("[Y]ou imposed charges on the students without authority to do so.").) In the October 18 directive, the President reaffirmed her earlier restrictions on Martinez's copying privileges. (*Id.*) Citing Administrative Regulation 6.7, she also warned Martinez that further insubordination could subject her to harsher punishment, "up to and including termination." (*Id.*)

Around January 9-11, 2013, the District learned that several students had not received their reimbursement checks. (Doc. 73 at ¶ 17; Doc. 72 at ¶ 7.) The District required Martinez to produce copies of all refund checks by January 18, 2013. (Doc. 73 at ¶ 17.) As of her dismissal hearing in November 2013, she still had not done so. (Doc. 73-4, Ex. 23 at 232:17-25.)

### C. The Dismissal Hearing

The road to that dismissal hearing began with a "Pre-Disciplinary Conference" on April 3, 2013. (Doc. 73 at ¶ 19.) The stated purpose of the conference was "to ensure that the decision to be made concerning the complaints against" Martinez would be "based on complete and accurate information." (Doc. 73-5, Ex. 26.) Phoenix College's President and Vice President of Academic Affairs conducted the meeting. Also present were two Human Resources staff members. Martinez was entitled to have a fellow employee there as a representative, but only to observe and not to participate. (*Id*.)

After the April 3, 2013 meeting, the President and Vice President decided to terminate Martinez's employment. (Doc. 73 at ¶ 20.) On August 9, 2013, the District provided Martinez with a Statement of Charges regarding termination proceedings. (*Id*.) The charges included violating copyright law and the District's cash handling policy—although pointing to Administrative Regulation 1.17 rather than Regulation 1.12. (Doc. 73-5, Ex. 27.) A copy of Regulation 1.17 was attached to the Statement of Charges. Regulation 1.17 requires that there be, among other things, specific safeguards for storing cash, independent reconciliation of receipts, and management oversight of cash handling processes and personnel. (*Id*.) The Statement of Charges also accused Martinez, because of her failure to follow the administration's commands barring unauthorized copying and requiring her to reimburse her students, of violating Administrative Regulations 6.7.1 and 6.7.3, which prohibit willful violations of the law or of District rules. (*Id*.)

Martinez exercised her right to a hearing. (Doc. 80 at 6, ¶ 19.) The day-long hearing took place on November 18, 2013. (Doc. 73 at ¶ 22.) The Hearing Committee was composed of three faculty members. (Doc. 73-5, Ex. 24 at 8.) The procedures were robust and involved a scheduling order, pre- and post-hearing briefing of arguments, a list of witnesses and exhibits, citation to supplemental authority, and more. (Doc. 73 at ¶ 22.) Martinez was represented by counsel, called witnesses, cross-examined the District's witnesses, and offered evidence. (*Id*.) Among Martinez's evidence was advice

she received from an intellectual property attorney, who provided a detailed analysis of why Martinez had not violated copyright law. (Doc. 73-5, Ex. 24 at 4, ¶¶ 30-32.)

The Hearing Committee made its findings and recommendation on December 9, 2013. (Doc. 73-5, Ex. 24 at 8.) It found: (1) the expert testimony conflicted and made it unclear whether Martinez violated copyright law; (2) for reasons the Committee did not clearly explain, whether Martinez violated the District's "cash handling" rules was also inconclusive; and (3) Martinez "intentionally" failed to comply with the "clear directive" to issue refunds and was therefore willfully insubordinate. (Doc. 73-5, Ex. 24 at 7, ¶¶ 64-67.) This willful insubordination violated two portions of District regulations. Administrative Regulation 6.7.1 prohibits the "[w]illful and intentional violation of any . . . [District] administrative regulation that affects the employee's ability to perform his or her job." Administrative Regulation 6.7.3 prohibits the "[w]illful and intentional failure to perform job duties that have first been communicated to an employee and are within the employee's scope of employment." (Doc. 73-5, Ex. 24 at 7, ¶¶ 68-69.) Ultimately, the Committee recommended against dismissing Martinez in light of her 30 years' service. (Doc. 73-5, Ex. 24 at 8; Doc. 73 at ¶ 25.) Glasper did not further pursue dismissal, which would have required approval of the Governing Board.

### D. The Suspension

Glasper informed Martinez in a February 10, 2014 letter that he would not recommend to the Governing Board that it overturn the Hearing Committee's recommendation against termination. He also provided a new Statement of Charges seeking suspension and said that he had "decided to suspend [her] employment under [his] sole authority as Chancellor pursuant to section [3.13][2] of the Residential Faculty Policies." (Doc. 73-6, Ex. 36 at 57 of 88.) The suspension was to begin on March 1, 2014, and run through May 15, 2015. Glasper said that he had confirmed with the

---

[2] The section numbering changed from 3.13 to 3.11 in the 2013-14 academic year. For simplicity, and because there were no substantive changes, the Court uses "3.13" throughout this Order. All other Residential Faculty Policy references are also to the Policies from the 2012-13 academic year.

- 7 -

General Counsel, as the Residential Faculty Policies required, that the suspension did not violate Martinez's rights. "The basis for this action is the unanimous finding of an independent hearing committee that you willfully violated the district policies set forth in the statement of charges and that I have the authority to suspend your employment without pay." Glasper also informed Martinez that she could retire voluntarily and remain on paid administrative leave until May 9, 2014. (*Id.*)

Martinez had the right to meet with the Vice Chancellor of Human Resources to discuss the Statement of Charges. She canceled the day before their scheduled meeting because of a medical issue. (Doc. 73 at ¶ 27.) The District postponed her suspension by one month to ensure that she could meet with the Vice Chancellor. (*Id.*) On March 7, 2014, the two met, with Martinez accompanied by counsel. (*Id.* at ¶ 28.) Martinez's suspension was upheld and ran from April 15, 2014, until May 15, 2015. (*Id.* at ¶ 27.)

The Governing Board was not required to approve the suspension or to review it. Martinez could ask the Board, in its discretion, to intervene, and she wrote numerous letters to the Governing Board and appeared before it several times. (Doc. 73 at ¶¶ 30-35.) She argued that her suspension was the economic equivalent of termination. Martinez contends she had no meaningful hearing because she had no right under the Residential Faculty Policies to appear formally before the Board, but she did appear. (Doc. 80 at 12-13, ¶ 23.) The Board took no action to intervene. Again, at oral argument Martinez disavowed any claim for violation of state law.

Martinez returned to Phoenix College in the fall of 2015, after her suspension expired. (*Id.* at ¶ 36.) Plainly, she was not terminated. She is still in defiance of the order to reimburse her students for the $11 course materials. (*Id.* at ¶ 37.)

### III. DUE PROCESS OF LAW

#### A. Federal Due Process Standards

The federal due process clause does not give a substantive right to property or liberty. It gives, in some circumstances, a federal right to some process before the state takes away property or liberty, or process afterwards. There are two steps to the due

process analysis. The first is determining whether the plaintiff has a property interest. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972). If so, the second is determining what process is due. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). The answer varies according to the circumstances of the deprivation. The inquiry considers the procedures and the interest affected, "the risk of erroneous deprivation of such interest" through the challenged procedure, the value of additional procedure, and the government's interest in the existing procedure. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333 (internal quotation marks omitted).

As an appointive—i.e., tenured-in-fact—faculty member, Martinez had a property interest in her continued employment at Phoenix College, even as against a temporary suspension. *See Roth*, 408 U.S. at 577 (citing *Connell v. Higginbotham*, 403 U.S. 207, 208 (1971)) (recognizing due process rights for teachers even without tenure when there was "a clearly implied promise of continued employment"). "Temporary suspensions, like terminations, are deprivations of employment that can implicate the protections of due process." *Ass'n for L.A. Deputy Sheriffs v. Cty. of L.A.*, 648 F.3d 986, 991 (9th Cir. 2011). The question is what process was due. Martinez had a right not to be suspended without minimally fair procedure under the due process clause.

After a thorough termination procedure, the Hearing Committee made a binding finding that Martinez refused to comply with express directions and therefore was insubordinate. That elaborate procedure richly satisfied federal constitutional standards. By equal if not stronger force, Glasper's reliance on the binding facts found under that procedure was constitutionally adequate to suspend her.

**B.     The Faculty Policies Concerning Suspension and Termination**

Two distinct sections of the Residential Faculty Policies are in play here. Policy 3.13 deals with the Chancellor's power to suspend. (*See* Doc. 72-2 at 59-60 of 117.) Under that Policy, the Chancellor must write a formal statement of charges against the

faculty member, as Glasper did. The faculty member must be notified either in person or by registered or certified mail. If the suspension is without pay, the Chancellor must first seek the advice of the General Counsel. Further, the Vice Chancellor of Human Resources must consult with the faculty member regarding the rationale for the suspension. The District did everything the Policy required. The state-law procedure was fully satisfied. Martinez does not plead any claim for violation of Policy 3.13.

The provision of the Residential Faculty Policies that deals with termination is more elaborate. (*See* Doc. 72-2 at 60-62 of 117.) Under Policy 3.15, the College President first writes a formal statement of charges and forwards it to the Vice Chancellor of Human Resources. The Vice Chancellor then consults with the District Legal Office and determines whether to inform the Chancellor that a legally sufficient case exists for dismissal. The Chancellor writes to the Governing Board, with a copy sent to the faculty member.

The Vice Chancellor's recommendation gives notice to all parties of the intent to formally recommend dismissal. It also includes as an attachment a formal statement of charges that contains, as applicable, the statutes, policies, rules, or written objectives that the faculty member is alleged to have violated. The statement of charges must be specific enough to allow the faculty member to defend herself.

Within five business days the faculty member may demand a hearing by writing to the Vice Chancellor. This suspends dismissal. The District then forms a Hearing Committee composed of three faculty members. The Chancellor selects one, the President of the Faculty Association selects another, and the accused faculty member selects the third. The Chancellor's and the Faculty Association President's selections must come from other colleges within the District. Only the accused may select a Committee member from the college where the accused teaches.

The Hearing Committee selects a chair. (The parties can stipulate to different timelines at this point.) Within twenty business days, the Chair meets with the attorneys/representatives of the parties to hold a prehearing conference and exchange

exhibits, witness lists, summaries of testimony. If a party does not comply with the prehearing rules, the Chair can exclude any offending evidence.

Within ten business days the hearing commences. The faculty member may elect to have the hearing in public or in executive session. "The member may attend the hearing; present any testimony, evidence, or statements, oral or written, in his/her behalf; and be represented by legal counsel or other representative. It is expressly understood the act of testifying will not be subject to reprisal by the [District]." Faculty Policy 3.15.6. Within five business days the Hearing Committee must provide the Chancellor and the faculty member with a summary of evidence and binding written findings of fact and conclusions of law. It must also recommend whether to dismiss the faculty member, but the recommendation is not binding.

The Chancellor has an opportunity to meet with the Hearing Committee and clarify any questions about its findings or conclusions. He may then either adopt the Committee's recommendation regarding dismissal or make his own and forward it, along with the Committee's findings and recommendation, to the Governing Board.

Again, in the earlier proceeding concerning dismissal, the District procedures were fully complied with. Glasper adopted the Committee's finding that Martinez had violated District regulations and its recommendation against dismissal, despite the violation.

**1.     Neither Faculty Policy Requires Board Action for Suspension**

Though it is not a federal due process claim, Martinez argues that her suspension was the economic equivalent of termination. Because she was effectively terminated, she says, under Policy 3.15 Glasper could not suspend her without recommendation to and approval of the Governing Board. That part of Martinez's discussion is odd because at oral argument she conceded that she was making no claim of violation of the Faculty Policy.

In any event, Martinez misstates the text and the meaning of Policy 3.15. Martinez asserts that Policy 3.15 commands the Chancellor to (1) accept the Hearing Committee's recommendations or (2) recommend his own course to the Governing

Board, which can be "a recommendation for a lesser discipline." (Doc. 71 at 2.) But the recommendation to the Board is required only if the Chancellor seeks termination despite the Committee's recommendation not to terminate. To the extent she says the Chancellor is ever required to recommend a lesser discipline or get Board approval for it, Martinez manufactures her assertion out of whole cloth. It has no textual basis and it contradicts the language of the Faculty Policy. Policy 3.15.8 states, "The Chancellor may adopt the Hearing Committee's recommendation *regarding dismissal* or make his/her own recommendation and forward the recommendation . . . to the Governing Board." (Emphasis added.) The Policy speaks to recommendations "regarding dismissal." Here, the Committee recommended against dismissal despite its finding of Martinez's misconduct. The Chancellor could have nonetheless recommended dismissal to the Board but did not. The Policy does not even hint that the Chancellor must make a recommendation on lesser discipline within the 3.15 dismissal proceeding.

Policy 3.13 speaks directly to the Chancellor's authority to impose discipline less than dismissal, which lies entirely within his authority subject to the procedures stated therein and the Board's discretion to intervene later and overturn his action. The Board need not review the Chancellor's imposition of the discipline of suspension. Neither 3.13 nor 3.15 require Board action on discipline less than dismissal.

Under Martinez's interpretation, if a faculty member received the full procedural protections of Policy 3.15 for a possible dismissal, the Chancellor would have to go to the Governing Board to suspend her or for any lesser discipline at all. Yet if the Chancellor invoked Policy 3.13 from the start, going to the Governing Board would not be required. This result has no basis in the text, is contrary to the text, and is absurd.

In addition to the full process of Policy 3.13 for suspension, Martinez received the surplusage of process that 3.15 affords for the predicate finding of willful insubordination. The Hearing Committee found that Martinez had violated Administrative Regulation 6.7. (Doc. 73-5, Ex. 24 at 7, ¶¶ 68-69.) It further noted that violating Administrative Regulation 6.7 "constitutes grounds for disciplinary action *up to*

. . . and including termination." (*Id.* at 8, ¶ 71.) When deciding to suspend Martinez, Glasper was perfectly within his authority to incorporate the Committee's binding finding, made under the processes of 3.15, that she had violated Administrative Regulation 6.7.

Moreover, Policy 3.15.8 encourages the Chancellor to meet with Committee members after the termination hearing: "After receiving the Hearing Committee's summary of evidence, findings of fact, conclusions of law, and final recommendation in regard to dismissal, the Chancellor, may meet with the Hearing Committee to clarify any questions he/she may have." Glasper did just that and testified without contradiction that he spoke privately with the Committee members to find out more about their recommendation. (Doc. 73 at ¶ 25.) The Committee members told him that termination was too harsh but that a different disciplinary action, such as unpaid suspension, would be appropriate. (Doc. 73-6, Ex. 35 at ¶ 7.) (This is not inadmissible hearsay because the statements are the speakers' own advice/recommendations to Glasper from their own present state of mind. *See* Fed. R. Evid. 803(3).) Martinez does not controvert this evidence. It is immaterial that Glasper did not include it in the suspension letter.

### 2. Glasper Did Not Include a New Charge in the Suspension Letter

Martinez incorrectly asserts that Glasper's February 10 letter brought up a new "charge" under Administrative Regulation 1.12, which requires the Governing Board to approve changes to the budget and fees charged. Glasper's letter said, in the context of going over the facts of the case, "Phoenix College determined that your course materials charge was not included in the adopted budget or pre-approved by the Governing Board." (Doc. 73-6, Ex. 36.) Glasper was explaining why the District came to believe that Martinez had violated the cash handling policy and how the President had described it in the October 18, 2012 corrective action notice. He was not laying out a new charge against her, nor did he use it as a new basis for suspending her, which he made clear was the Hearing Committee's finding that Martinez violated Administrative Regulation 6.7. (*See id.* ("[T]his letter will serve as a statement of charges that you are in violation of

Administrative Regulation 6.7.1 and Administrative Regulation 6.7.3.").) For that reason, it is less than honest for Martinez to say she had not previously encountered Administrative Regulation 1.12. (*See* Doc. 73-2, Ex. 21 at 245 of 266 (October 18, 2012 corrective action notice to Martinez) ("This transaction is a violation of . . . [the District's] cash handling rules as detailed in Administrative Regulation 1.12.").)

In addition, Martinez *was* charged in the termination proceedings with violating Administrative Regulation 1.17, which was another basis for finding that she had improperly transacted with students. Regulation 1.17 requires management oversight of cash handling processes and personnel; Regulation 1.12 requires Governing Board oversight of the budget and of fees charged. Martinez points to no meaningful distinction between the two as applied to her transactions with her students.

### 3. Martinez Received Ample Process

Because Martinez admittedly raises no state law claims, this action turns solely on whether she received minimally adequate due process. As a matter of federal law, the procedures of Policies 3.13 and 3.15 provided Martinez with abundant due process for termination or suspension.

Martinez undoubtedly has a property interest as against suspension of her employment sufficient to require some process before she is deprived of it. But that interest against suspension was not the legal or economic equivalent of dismissal. The rich processes Martinez received, including notice and opportunity to be heard, clearly met federal due process requirements. The facts of her insubordination are undisputed. Martinez says she regrets her action, not that she denies it. The District has an interest in maintaining its existing process. Martinez does not identify any additional procedure she could be due under federal procedural law.

The District also has a strong interest in sanctioning insubordinate employees, particularly when it sees a pattern after warnings. Martinez's insubordination continues to this day. It is does not matter how many similar punishments have been necessary in the past or whether this is the first time it has been necessary.

Perhaps Martinez also demands an opportunity to argue to the decision-maker that a lesser sanction than suspension would be appropriate for her undisputed insubordination. She had that opportunity and availed herself of it before the Board.

### 4. Glasper Was Impartial for Due Process Purposes

Though it was not pleaded or otherwise properly before the Court, Martinez also contends in her Motion for Summary Judgment that Glasper unconstitutionally occupied both a partisan and a judicial role in her case. Failure to plead this claim bars it. *See Wasco Prods. Inc. v. Southwall Tech, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory. . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings."). Beyond recounting Glasper's actions, Martinez's Reply Brief can point only to a blanket assertion in the Complaint that she had a "right to due process free of bias." (Doc. 88 at 7-8.) That bare conclusion unsupported by any allegation that would make it plausible falls short of federal pleading requirements. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It was not enough to "put Defendants on notice" (Doc. 88 at 8) of her bias theory.

In any event, the bias theory holds no water. It appears Martinez contends that because Glasper (indirectly) initiated the discipline that the Hearing Committee reviewed and found factually correct, Glasper was intrinsically biased in any further action concerning that discipline. That would have disqualified Glasper from recommending further action in the dismissal proceeding too. Martinez argues, "A situation in which an official occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process." (Doc. 71 at 13.) Yet, for the reasons discussed above, there is nothing inconsistent about how Glasper behaved. District policy, embodied in Policies 3.15 and 3.13, allowed Glasper both (1) to accept the Hearing Committee's recommendation not to fire Martinez and (2) to suspend her based on the same Committee findings. He accepted the Committee's recommendation

on termination and also accepted its finding of misconduct, on which Martinez had received abundantly sufficient process.

There is no evidence or even specific allegation of actual bias by Glasper. Similarly, Glasper had no occasion to present evidence of lack of bias. That is not surprising because no such claim was pleaded or subject to discovery. Martinez may not ambush Glasper now on that claim raised first in summary judgment briefing.

In the absence of actual evidence of bias, Martinez appears to argue that a personnel supervisor is disqualified from making a supervisory and disciplinary decision whenever he was involved earlier in the personnel matter. It is irrational to say that Glasper's acceptance of the Committee's prior finding of misconduct shows Glasper was biased in imposing lesser sanctions for that very misconduct, which was consistent with the Hearing Committee's recommendation against dismissal.

The cases that Martinez cites are inapposite. *Walker v. City of Berkeley*, 952 F.2d 182 (9th Cir. 1991), involved a city attorney who was litigating against the employee in federal court and who was the decision-maker in the employee's administrative post-termination hearing. *Id.* at 184. Here, the District's counsel did not decide to suspend Martinez. Glasper did. Counsel was not involved with the Hearing Committee until after its proceedings had ended. Nor is this case like *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57 (1972), in which the fines that came in from the mayor's traffic court amounted to almost half of the village's revenue. *Id.* at 58. The Supreme Court explained that this situation diminished the mayor's impartiality and might tempt "the average man as a judge to forget the burden of proof." *Id.* at 59-60 (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)). Martinez's challenge of bias is belated, factually groundless, and legally erroneous.

### C. Declaratory Relief

Martinez seeks declaratory relief that would invalidate the copying restrictions the District has placed on her. The Declaratory Judgment Act provides that the federal courts "may declare the rights and other legal relations of any interested party seeking such

declaration." 28 U.S.C. § 2201(a). "Declaratory relief is available at the discretion of the district court." *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir. 1982).

Granting declaratory relief in this case would be unwise because it would require wading into a matter, whether Martinez violated copyright law, not before the Court. Martinez has no right to push the boundaries of copyright infringement in her employer's business. The District instructed her not to, as caution allows it to do. It does not matter that the Hearing Committee found that the District "failed to carry its burden of proof regarding Martinez's . . . alleged violations of U.S. Copyright Law and fair use guidelines." (Doc. 79 at 4-5.) The Committee so found because the two copyright experts disagreed, and it was "inconclusive" whether Martinez "intentionally and/or inadvertently violated federal copyright law." (Doc. 72-3 at 109 of 125, ¶ 64.)

The Court need not decide whether Martinez actually violated copyright law. What matters is the District had a good-faith basis for adopting a prophylactic order. Martinez was insubordinate in refusing that order to desist or to obtain prior approval of content before copying course materials. The school decided to act cautiously and to institute protocols to avoid potential legal battles. Martinez ignored those protocols when they were implemented. Indeed, at her hearing, Martinez expressed regret for not complying, and she "never claimed that she did not understand the instructions or that the instructions were beyond the scope of [the District's] authority." (Doc. 73-5, Ex. 24 at 7, ¶ 67.) Martinez has no right to force the District into a copyright lawsuit. The District is not required to win that lawsuit.

It would be an abuse of discretion to adjudicate any copyright matter, and in any event this Court exercises its discretion not to do so. There is not even a case or controversy to support such a declaration.[3]

---

[3] Martinez's prior litigation appears to have sought adjudication on the declaratory judgment issue and was dismissed with prejudice. *See Martinez v. Maricopa Cty. Comm. Coll. Dist., et al.*, No. 2:12-cv-00702-DGC. *Res judicata* would normally apply, but Defendants did not make anything other than a cursory, blanket claim of *res judicata* in

Martinez was fully and richly accorded fair, adequate, impartial procedure in the District's decision to suspend her for her undisputed insubordination and refusal to follow directions. Martinez does not present even a colorable argument of violation of due process of law.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 69) is granted.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 71) is denied.

IT IS FURTHER ORDERED that the clerk enter judgment in favor of Defendants Maricopa County Community College District and Rufus and Debra Glasper against Plaintiff Cleopatria Martinez and that Plaintiff take nothing.

The clerk shall terminate this case.

Dated this 31st day of October, 2017.

_____
Neil V. Wake
Senior United States District Judge

---

their Answer without pointing to a prior case (Doc. 15 at 21, ¶ 4), and they did not develop an argument until their Reply on summary judgment (Doc. 87 at 7-9). The Court thus does not decide the merits of this defense.